# EXHIBIT "A"

EFiled: Sep 1 2005 10:20A___EDT
Transaction ID 6611290

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| E. I. du PONT de NEMOURS AND COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C. A. No. |
| LUMBERMENS MUTUAL CASUALTY COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

## NOTICE OF MOTION

TO:      John M. McGregor, Esquire
Assistant General Counsel
Kemper Insurance Companies
One Kemper Drive
Long Grove, IL 60049

**PLEASE TAKE NOTICE** that the attached Motion for Temporary Restraining

Order will be presented to the Court at the earliest convenience of the Court and counsel.

*Of Counsel*:

John M. Sylvester
Christopher C. French
KIRKPATRICK & LOCKHART
  NICHOLSON GRAHAM LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222
Telephone: (412) 355-6500

POTTER ANDERSON & CORROON LLP

By:   /s/ John E. James
     John E. James (No. 996)
     Richard L. Horwitz (No. 2246)
     Hercules Plaza – Sixth Floor
     1313 North Market Street
     Wilmington, DE 19801
     Telephone: (302) 984-6000

*Attorneys for Plaintiff*

Dated: August 31, 2005
697111/20120-345

**EFiled: Sep 1 2005 10:20AM EDT**
**Transaction ID 6611290**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| E. I. du PONT de NEMOURS AND COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. |
| | ) | |
| LUMBERMENS MUTUAL CASUALTY COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiff E. I. du Pont de Nemours and Company ("DuPont") hereby applies pursuant to Chancery Rule 65 for the entry of an Order temporarily restraining Defendant Lumbermens Mutual Casualty Company ("Lumbermens") and its affiliates from drawing down or presenting any demands for payment under any collateral or security provided by DuPont, including any letters of credit and/or surety bonds.

In support of this motion, DuPont states that the issuance of a temporary restraining order is necessary to avoid irreparable harm to DuPont; that there is no potential injury to Lumbermens or others which would militate against the granting of a temporary restraining order; and that DuPont has a likelihood of success on the merits sufficient to justify the issuance of a temporary restraining order.

The grounds in support of DuPont's Motion for Temporary Restraining Order are set forth more fully in DuPont's Verified Complaint, its Opening Brief in support of this motion, and any other evidence that has been or may be made part of the record in this action.

*Of Counsel*:                                           POTTER ANDERSON & CORROON LLP

John M. Sylvester
Christopher C. French
KIRKPATRICK & LOCKHART            By:   /s/ John E. James
   NICHOLSON GRAHAM LLP                John E. James (No. 996)
Henry W. Oliver Building                     Richard L. Horwitz (No. 2246)
535 Smithfield Street                        Hercules Plaza – Sixth Floor
Pittsburgh, PA 15222                         1313 North Market Street
Telephone: (412) 355-6500                   Wilmington, DE 19801
                                             Telephone: (302) 984-6000

                                         *Attorneys for Plaintiff*

Dated:  August 31, 2005
697112/20120-345

2

**EFiled: Sep 1 2005 10:20AM EDT**
**Transaction ID 6611290**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| E. I. du PONT de NEMOURS AND COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. |
| LUMBERMENS MUTUAL CASUALTY COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

## ORDER

Plaintiff E. I. du Pont de Nemours and Company ("DuPont") having moved this

Court for a temporary restraining order, the Court having considered that motion, and good cause

having been shown therefore,

**IT IS HEREBY ORDERED** this ____ day of _____, 2005:

That Lumbermens Mutual Casualty Company and its affiliates are temporarily restrained from

drawing down or presenting any demands for payment under any collateral or security provided

by DuPont, including any letters of credit and/or surety bonds.

_____
Chancellor

697115/20120-345

EFiled: Sep 1 2005 10:20A...
Transaction ID 6611290

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

E. I. du PONT de NEMOURS AND COMPANY,       )
                                            )
          Plaintiff,                        )
                                            )
     v.                                     )    C. A. No.
                                            )
LUMBERMENS MUTUAL CASUALTY                  )
COMPANY,                                    )
                                            )
          Defendant.                        )

## BRIEF IN SUPPORT OF PLAINTIFF'S
## MOTION FOR A TEMPORARY RESTRAINING ORDER

*Of Counsel*:

John M. Sylvester
Christopher C. French
KIRKPATRICK & LOCKHART
   NICHOLSON GRAHAM LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222
Telephone: (412) 355-6500

John E. James (No. 996)
Richard L. Horwitz (No. 2246)
POTTER ANDERSON & CORROON LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19801
Telephone: (302) 984-6000

*Attorneys for Plaintiff*

Dated: August 31, 2005
697211/20120-345

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ............................................................................................................. 1

II.  FACTUAL BACKGROUND ............................................................................................ 4

  A.  Kemper is Teetering on the Verge of Insolvency and Financial Collapse ........................ 4

  B.  Kemper Sold Insurance Products to DuPont that Specifically were Designed to
      Allow DuPont to be Largely Self-Insured for Most of its Losses ..................................... 6

  C.  DuPont Provided Millions of Dollars in Collateral to Kemper to Secure DuPont's
      Obligations to Pay its Own Losses Under the Insurance Program ..................................... 8

  D.  The "Dividend" Plan was Supposed to Ensure that DuPont was Required to Pay
      Only the Actual Losses and Related Claims-Handling Fees and Expenses Under
      the Program ....................................................................................................................... 8

  E.  Kemper's Attempts to Collect the Non-Existent Debt Reveals its Spurious Nature ......... 10

III.  ARGUMENT .................................................................................................................. 11

  A.  The Standard for Obtaining Injunctive Relief ................................................................. 11

  B.  DuPont would Suffer Irreparable Injury if Kemper were Permitted to Liquidate
      Collateral Provided by DuPont ........................................................................................ 12

  C.  DuPont has at Least a "Colorable Claim" on the Merits .................................................. 13

  D.  The Balance of Equities Tips Sharply in DuPont's Favor Given that the Letter of
      Credit and Surety Bond will Remain in Place During this Litigation ............................... 15

IV.  CONCLUSION ................................................................................................................ 17

## TABLE OF AUTHORITIES

**Page**

Eisenberg v. Eisenstein,
58 Pa. D. & C.2d 511 (Pa. Ct. Com. Pl. 1972) ................................................................14

Fechter v. HMW Indus., Inc.,
879 F.2d 1111 (3d Cir. 1989) .........................................................................................13

Insituform Techs., Inc. v. Insitu, Inc.,
1999 WL 240347 (Del. Ch.) ...........................................................................................12

Kansas City S. v. Grupo TMM, S.A.,
2003 WL 22659332 (Del. Ch.) ........................................................................................12

Lauria v. Kaye,
14 Pa. D. & C.3d 604 (Pa. Ct. Com. Pl. 1979), *aff'd,*
423 A.2d 1323 (Pa. Super. Ct. 1979)...............................................................................16

Mesa Partners v. Phillips Petroleum Co.,
488 A.2d 107 (Del. Ch. 1984) .........................................................................................13

Newman v. Warren,
684 A.2d 1239 (Del. Ch. 1996) .......................................................................................12

T. Rowe Price Recovery Fund, L.P. v. Rubin,
770 A.2d 536 (Del. Ch. 2000) .........................................................................................13

Tilmon v. Adkisson,
162 S.W.2d 903 (Ark. 1942) ...........................................................................................16

Zonghetti v. Jeromack,
541 N.Y.S.2d 235 (N.Y. App. Div. 1989) ........................................................................15

**State Statutes**

215 Ill. Comp. Stat. Ann. 5/205.1(a), (b) (West 2005) ....................................................17

Ch. Ct. R. 65(b)..............................................................................................................

## I.  <u>INTRODUCTION</u>

Plaintiff E. I. du Pont de Nemours and Company ("DuPont") needs immediate injunctive relief to enjoin Lumbermens Mutual Casualty Company, which is one of several insurance companies and related affiliates that does business under the umbrella name of Kemper Insurance Companies (collectively referred to hereinafter as "Kemper"), from attempting to collect a disputed debt totaling approximately $5.7 million until the validity of Kemper's claim can be determined. In particular, DuPont requests that Kemper be enjoined from drawing down or presenting any claims for payment under a letter of credit and surety bond that DuPont provided to secure its valid obligations under an insurance program with Kemper.[1] Simply stated, Kemper is on the verge of insolvency and is desperate for cash. As a result, Kemper is attempting to alter and manipulate the insurance program it sold to DuPont. DuPont is not in breach of its obligations to Kemper and consequently, Kemper should not be permitted to collect under collateral provided by DuPont simply because Kemper is having financial difficulties.

Kemper has managed an insurance program for DuPont for nearly thirty (30) years. Under the pre-2000 insurance program, DuPont annually paid Kemper monies for "incurred losses" (i.e., reserves for projected losses), claims handling fees, miscellaneous expenses and an insurance premium for a limited risk transfer. Under the program, DuPont was largely self-insured.

---

[1] Copies of the letter of credit and surety bond are attached to DuPont's Verified Complaint as Exhibit 2.

In 2000, the insurance program changed to a pay-as-you-go program under which DuPont still is largely self-insured. Under the 2000-03 insurance program,[2] DuPont paid Kemper an upfront amount of approximately $1 million for the insurance premium for the limited risk transfer provided by Kemper, claims handling fees, profit, surcharges and taxes. DuPont also pays, on average, tens of thousands of dollars weekly into an escrow account to fund its own losses (from which Kemper pays claims against DuPont). DuPont also provided to Kemper a letter of credit in the amount of $9,604,354 and a surety bond in the amount of $5,995,646 as security to ensure those weekly payments. Kemper does not contend that DuPont has failed to make its weekly payments.

Rather, Kemper has stated that it believes it has the right and ability to draw on the letter of credit provided by DuPont at any time it decides it needs money from DuPont, whether or not DuPont agrees it owes any money to Kemper. To that end, due to its financial problems, Kemper is attempting to manufacture a DuPont debt related to the 2002-03 policy year by refusing to credit DuPont approximately $4.5 million in "dividends" that Kemper iself has determined should be credited to DuPont for the 2002-03 year (By DuPont's calculation, when DuPont is credited with the $4.5 million in accordance with the applicable accounting formula, Kemper actually owes DuPont approximately $120,000.).

By refusing to credit DuPont the "dividend" that Kemper admittedly owes DuPont, Kemper unilaterally is attempting to change the insurance program it sold to DuPont in order to create a "debt" to support Kemper's need for cash and draw down on DuPont's letter of credit. This so-called "dividend" is not a share of the profits of Kemper. Rather, it is nothing more than a line item in an accounting formula by which DuPont receives credit in the premium

---

[2]     DuPont changed insurers in 2003 once Kemper's financial problems were discovered.

calculation for the fact that it largely is self-insured and pays its own losses. Consequently, until Kemper's current financial crisis arose, this "dividend" consistently had been credited to DuPont throughout the parties' thirty-year (30) relationship.

Similarly, on July 27, 2005, Kemper demanded an additional $902,475 in alleged interest on the alleged debt. Not only is the interest calculation based upon a non-existent debt, but DuPont never agreed to pay interest on amounts due under the insurance program, and the contract between DuPont and Kemper does not state that DuPont is obligated to pay such interest. Thus, the over $5 million Kemper claims DuPont should pay is simply not owed by DuPont.

Kemper should not be allowed to grab and spend millions of dollars of DuPont's money before this controversy is resolved. If Kemper were permitted to collect the amounts that it claims DuPont owes, then Kemper would reap a huge windfall, and DuPont will suffer – irreparably – an equally huge financial loss. If Kemper is not enjoined by this Court from undertaking efforts to collect this spurious debt, then DuPont will suffer irreparable harm because Kemper will be unable to repay the money at the conclusion of this litigation, given its imminent insolvency. Further, because DuPont will maintain the collateral it already has provided to Kemper during the pendency of this action, an injunction would serve to maintain the *status quo* until the rights and obligations of the parties are determined. Consequently, a temporary restraining order is appropriate and essential to preserve the *status quo* pending resolution of this dispute.

## II.    FACTUAL BACKGROUND[3]

### A.    Kemper is Teetering on the Verge of Insolvency and Financial Collapse

By late 2002, Kemper was experiencing significant financial difficulty resulting in serious erosion of its statutory surplus (assets in excess of liabilities) and downgrading of its credit worthiness. Significantly, on December 24, 2002, A.M. Best Company ("A.M. Best") lowered the financial strength rating of Kemper from A- (Excellent) to B+ (Very Good).[4] When downgrading Kemper's creditworthiness, A.M. Best cited Kemper's recently announced business decision to repurchase $125 million of Berkshire Hathaway's minority equity investment in a Kemper subsidiary company as a basis for the downgrading because the loss of capital damaged Kemper's overall capitalization and liquidity.

Between December 20-24, 2002, Moody's Investors Service and Standard & Poor's also downgraded Kemper's financial strength and other financial ratings. Because most commercial policyholders and insurance brokers will not do business with an insurance company that has less than an A- rating, the downgrade effectively prevented Kemper from writing new policies or retaining existing policyholders.

These developments occurred during the final stages of negotiations for the 2003 policy period and less than two months after DuPont signed the insurance proposal for the 2002 policy year. Kemper must have been fully aware of the continuing drain on its statutory surplus

_____

[3]    The facts set forth in this section are attested to in DuPont's Verified Complaint, submitted herewith.

[4]    Since December 2002, Kemper's fnancial strength rating has quickly descended such that it is no longer even rated. *See* A.M. Best's current report for Kemper, which is attached as Exhibit 3 to the Verified Complaint.

and the impending downgrading of its credit rating while it was negotiating with DuPont for the renewal of the insurance program in December of 2002 for the 2003 policy year.

Throughout this period, however, Kemper continued to represent to DuPont and other policyholders that it was a stable and solvent company. For example, in an advertisement that Kemper placed in *Business Insurance* on December 16, 2002, mere *days* before A.M. Best downgraded Kemper, Kemper stated that "as with anything at Kemper, you'll always have the integrity of our reputation for financial stability and strength." (A copy of the *Business Insurance* ad is attached to the Verified Complaint as Exhibit 4.)

As a result of its financial problems, Kemper has entered into "run off" mode whereby it is attempting to achieve an orderly winding down of its business operations without entering rehabilitation or liquidation proceedings. Kemper has taken extraordinary steps to temporarily avoid insolvency, including reportedly reducing its workforce from 7,000 to 370 employees (a reduction of nearly 95%) and selling its headquarters in Long Grove, Illinois. Even with these drastic measures, Kemper's statutory surplus continues to decline rapidly. Kemper has reported that its surplus is expected to decline by approximately $12 million per month, excluding the impact of claims and reinsurance commutations and loss development.

On June 10, 2004, the Illinois Department of Insurance reportedly approved Kemper's second proposed run-off plan, the first such plan having been rejected by the state regulators. Kemper's run-off plan remains secret, as neither Kemper nor the Illinois Department of Insurance has disclosed its terms. However, in a press release announcing the approval of the plan, Kemper disclosed that it has "little premium revenue (about $90 million estimated for 2004 and virtually none thereafter)" and that all investment income being generated is "offset by expenses." Most tellingly, Kemper stated that achieving the plan's objective of positive surplus

and liquidity through 2006 "will be very challenging." (A copy of Kemper's press release is attached to the Verified Complaint as Exhibit 5).

**B.    Kemper Sold Insurance Products to DuPont that Specifically were Designed to Allow DuPont to be Largely Self-Insured for Most of its Losses**

Kemper sold various insurance products to DuPont from October 1, 1971 until March 1, 2003, including workers' compensation, automobile liability and general liability insurance policies, as well as various premium agreements, claim handling agreements (through related entities), indemnity agreements, and warranty agreements. Kemper sold its insurance products to DuPont through a comprehensive insurance program ("Insurance Program") designed and warranted to meet DuPont's needs: to satisfy all insurance regulatory requirements, to transfer certain specifically identified risks of loss, and to retain the financial responsibility for most risks of loss (e.g., workers' compensation claims) while concurrently retaining the benefits of positive loss performance under its specific Insurance Program.

Under the Insurance Program, DuPont would receive an insurance proposal every year from Kemper, through which Kemper explained the Insurance Program. DuPont and Kemper would sign those insurance proposals annually. The final and accepted insurance proposal for the 2002-03 policy year at issue in this case is attached to DuPont's Verified Complaint as Exhibit 1.

Prior to 2000, the Insurance Program was an "incurred loss" program, which meant that DuPont paid Kemper monies for "incurred losses" (i.e., reserves for projected losses), claims handling fees, miscellaneous expenses and an insurance premium for a limited risk transfer. When the losses were actually incurred, Kemper paid them from the monies DuPont had paid to Kemper.

6

Each year an accounting subsequently was done to determine whether DuPont had underpaid or overpaid Kemper. If DuPont had underpaid, then DuPont paid the additional amount necessary to cover the losses (and related fees and expenses). If DuPont had overpaid Kemper, then Kemper paid DuPont a refund in the form of a "dividend" or provided DuPont with a credit.

Beginning with the 2000 policy year, the Insurance Program changed to a "pay-as-you-go" program. Under this program, DuPont did not pre-pay claims through advance premiums that were based upon projected losses. Instead, DuPont paid Kemper a deposit premium and provided Kemper collateral in three forms to ensure that DuPont would reimburse Kemper amounts necessary to cover the claims Kemper was paying on DuPont's behalf: (1) fixed payments (which included charges for Kemper's overhead and profit, taxes, front fees, various surcharges and assessments, and the full risk transfer purchased by DuPont for specified risks) (referred to hereinafter as "Fixed Payments"); (2) reimbursement for paid losses; and (3) security in the form of a letter of credit and surety bond (in equal amounts). Despite the change from an "incurred loss" to a "pay-as-you-go" program in 2002, the "dividend" piece of the premium calculation formula did not change.

Under the pay-as-you-go program, because DuPont initially funded and constantly replenishes an escrow account weekly, Kemper actually pays covered claims with DuPont's money. Kemper has not claimed that DuPont ever failed to pay promptly any of the weekly billing amounts necessary to replenish the escrow account for losses paid under the Insurance Program.

C.      **DuPont Provided Millions of Dollars in Collateral to Kemper to Secure DuPont's Obligations to Pay its Own Losses Under the Insurance Program**

The Insurance Program for 2002-03 also contained a method for determining the

security required by the Insurance Program and provided for an annual security reconciliation:

> Security will be used to secure the estimated ultimate losses less the amount of losses paid to date. The actual amount of estimated ultimate losses will be established at inception and will be adjusted annually.

Insurance Program, p. 11 (Exhibit 1 to Verified Complaint).

DuPont has provided a Safeco bond in the amount of $5,995,646 and a letter of

credit with J.P. Morgan (now BankOne) for $9,604,354 as security. Previously, DuPont had

provided security in the amount of $19,208,708, which had been divided equally between a

surety bond and a letter of credit – $9,604,354 through a letter of credit and $9,604,354 through a

surety bond. In discussions and negotiations with DuPont in 2004 and 2005, Kemper recognized

it was holding excess collateral. Nevertheless, Kemper refused to reduce the surety bond

amounts and letter of credit amounts equally, instead reducing only the surety bond, which is

contrary to the Insurance Program. Kemper has failed to perform a proper security review, and

DuPont believes that the Insurance Program remains significantly overcollateralized.

D.      **The "Dividend" Plan was Supposed to Ensure that DuPont was Required to Pay Only the Actual Losses and Related Claims-Handling Fees and Expenses Under the Program**

The "dividend" portion of the Insurance Program has been manipulated by

Kemper to justify Kemper's assertion that DuPont has an unsatisfied debt to Kemper. The

Insurance Program is subject to a Cash/Security Reconciliation which is conducted annually.

According to Kemper's most recent calculation for the 2002-03 policy year, DuPont is entitled to

a credit of $4,532,579. When the credit is included in the calculation as intended, Kemper

actually owes DuPont a refund of $119,111.00. Kemper, however, refuses to credit any

"dividend" to DuPont and instead, improperly is attempting to collect from DuPont that same amount in the form of a premium.

The "dividends" at issue are not dividends in the traditional sense, in which the profits of a company are distributed among its owners. Rather, the "dividends" are simply a line item in the accounting calculation through which DuPont is credited with being largely self-insured. In essence, each year DuPont's account is audited to determine whether the initial projection regarding DuPont's payroll, which is part of the premium calculation, was accurate. If the account balancing reveals the projection was high, then the administrative costs and the limited risk transfer premium paid by DuPont based upon the excessive payroll projection is refunded or credited to DuPont. If the account balancing reveals the projection was low, then DuPont pays to Kemper an additional amount. Thus, because DuPont effectively is self-insured for most claims, the so-called "dividend" is nothing more than DuPont's side of the accounting calculation that determines whether DuPont has paid Kemper the appropriate premium and related administrative costs and taxes based upon the projected payroll.

Contrary to the purpose and intent of the insurance program, and solely because Kemper is on the brink of insolvency, Kemper has refused to count DuPont's "dividend" side of the equation during the account balancing and claims that DuPont owes it a premium in excess of $5 million even though DuPont essentially is self-insured. Kemper has acknowledged that DuPont's "dividend" under the applicable accounting formula is in excess of $4.5 million. Indeed, a correct account balancing under the applicable formula reveals that instead of DuPont owing Kemper millions of dollars, Kemper owes DuPont $119,111.00.

9

E.    **Kemper's Attempts to Collect the Non-Existent Debt Reveals its Spurious Nature**

On September 14, 2004, Kemper sent an invoice to DuPont claiming that DuPont owed Kemper $12,459,116. DuPont registered numerous objections to the calculations through its insurance broker, Marsh USA, Inc. ("Marsh"). Kemper ultimately issued a revised calculation on May 12, 2005, which reduced the amount Kemper claimed that DuPont owed Kemper to $6,292,733 ("Revised Calculation").

The Revised Calculation still was incorrect. In both the original calculation and the Revised Calculation, Kemper has failed to properly credit DuPont with the "dividend" line item credit due DuPont as determined in accordance with the Insurance Program. In the Revised Calculation, Kemper calculated and acknowledged that DuPont should be credited with a "dividend" of $4,532,579, yet Kemper improperly refuses to credit DuPont with that amount.

Consequently, on June 23, 2005, Marsh sent detailed calculations to Kemper's representative showing that DuPont was still being overbilled. Marsh followed up by e-mail on August 4, 2005, in an effort to resolve the outstanding billing issues relating to the Revised Calculation. Kemper has not responded to Marsh's identification of those additional billing inaccuracies.

On July 27, 2005, Kemper also attempted to bill DuPont for interest in the amount of $902,475.71 ("Interest Billing"), which purportedly is based on the amounts claimed to be owed by DuPont to Kemper even though Kemper acknowledges the interest charges are based on amounts (1) which Kemper concedes were not due because they were based upon Kemper's original admittedly erroneous calculation; (2) which previously have been paid by DuPont after Kemper made corrections to its billings; and (3) which were untraceable to any prior billings.

For example, in its Interest Billing, Kemper charges interest of $328,158.72 on a line item of $2,563,740 that allegedly was invoiced on September 14, 2004, which was the date of the original $12,459,116 billing that Kemper has admitted was incorrect. But when Kemper removed that line item on its Revised Calculation of May 12, 2005, because that amount was not owed, Kemper removed interest charges of only $62,811.63. Thus, in this example, Kemper is charging interest of $265,347.09 ($328,158.72 minus $62,811.63) on a "debt" that Kemper admits was never owed.

Kemper knows or should know that its claim for interest is patently false and is made in bad faith. Indeed, the Insurance Program sold to DuPont does not even include any provision allowing Kemper to charge DuPont interest on amounts claimed to be due.

## III.   ARGUMENT

### A.   The Standard for Obtaining Injunctive Relief

This Court looks at three factors when deciding whether a temporary restraining order is appropriate: (1) "the imminence and significance of plaintiff[']s claim of irreparable injury;" (2) "the probable merits of plaintiff[']s claim;" and (3) "the risks to defendant in the event a restraining order were issued and it ultimately were determined that the restraining order was improvidently issued." *Newman v. Warren*, 684 A.2d 1239, 1244 (Del. Ch. 1996). These factors are weighted differently depending on the circumstances of the case:

> In circumstances where the TRO application is presented in a clearly emergent context in which the applicant has had little opportunity to develop evidence in support of its position on the merits and the court therefore has an extremely unreliable record from which to assess the merits, a "colorable claim" on the merits is sufficient if the applicant makes a sufficiently strong showing on the other two factors. Where, however, the applicant has had the opportunity to develop evidence and present a record from which the court may "responsibly make a more informed judgment concerning the merits," this court "has stated the elements of the

> equitable test is something akin to the traditional preliminary
> injunction formulation."

*Insituform Techs., Inc. v. Insitu, Inc.*, 1999 WL 240347, at *7 (Del. Ch.) (internal citation

omitted) (Ex. A). The necessary showing is made by demonstrating to the Court "from

specific facts shown by affidavit or by the verified complaint that immediate and irreparable

injury, loss or damage will result to the applicant before the adverse party or that party's attorney

can be heard in opposition." Ch. Ct. R. 65(b); *see also Mesa Partners v. Phillips Petroleum Co.*,

488 A.2d 107, 112 (Del. Ch. 1984) (preliminary injunction is intended to maintain *status quo*

pending final hearing on the merits). As demonstrated below, each of the requisite elements is

satisfied here.

**B.      DuPont would Suffer Irreparable Injury if Kemper were Permitted to
         Liquidate Collateral Provided by DuPont**

      If Kemper were permitted to collect the alleged debt by drawing down or

presenting a claim for payment on the security, then DuPont would suffer immediate and

irreparable harm. In order to prove irreparable harm "'[i]t is not necessary that the injury be

beyond the possibility of repair by money compensation' but only that it 'be of such a nature that

no fair and reasonable redress may be had in a court of law and that to refuse the injunction

would be a denial of justice.' " *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 557

(Del. Ch. 2000). One such situation exists when the defendant may become insolvent or its

assets may be dissipated. *See, e.g., Kansas City S. v. Grupo TMM, S.A.*, 2003 WL 22659332, at

*5 (Del. Ch.) (defendant's precarious financial situation demonstrates that plaintiff will suffer

irreparable harm if injunction does not issue as defendant may be unable to satisfy money

judgment) (Ex. B); *Fechter v. HMW Indus., Inc.*, 879 F.2d 1111, 1121 (3d Cir. 1989) (former

employee granted preliminary injunction to preserve *status quo* and to prevent further dissipation

of surplus benefits of pension plan by employer in precarious financial situation).

Here, Kemper is almost certain to be financially insolvent before DuPont could obtain and satisfy a money judgment against it. Kemper itself has admitted that under its current run off plan it will be "challenging" for Kemper to continue to satisfy its obligations to policyholders for an extended length of time. Moreover, Kemper's statutory surplus may disappear even more quickly – in less than eight months at the current rate – rendering Kemper insolvent and virtually assuring that it will be impossible for DuPont to recover any monies seized by Kemper now.

Although Kemper has not yet drawn down on the letter of credit or made a claim for payment under the surety bond, Kemper has indicated that it may do so "at any time." Whether Kemper would notify DuPont before attempting to do so is unknown. It is possible that Kemper could take $5.7 million or more before DuPont even becomes aware of the attempt. The only means of protecting DuPont from such immediate, irreparable harm is to restrain Kemper from drawing on the security during the pendency of this litigation. Thus, the first prong of the test is satisfied in this case.

### C.    DuPont has at Least a "Colorable Claim" on the Merits

It is irrefutable that DuPont has at least a "colorable claim" on the merits in this case (which is the appropriate standard to apply in this case because of the urgent circumstance presented and the fact that there has not been an opportunity to conduct discovery or to develop the record). Consequently, injunctive relief is appropriate.

Kemper's attempt to collect over $5 million from DuPont ignores the fact that DuPont has funded its own liabilities and owes Kemper nothing. Indeed, when DuPont is properly credited with the $4.5 million "dividend," Kemper actually owes DuPont approximately

$120,000. Kemper should not be allowed to bill and collect from DuPont a fictional debt simply because Kemper is on the brink of insolvency. [5]

Further, with respect to the interest charges, there should be no question that DuPont will succeed on the merits. Kemper's interest billing of $902,475.71 is clearly wrong. Kemper is attempting to charge interest on amounts (1) which Kemper conceded were not due; (2) which had already been paid by DuPont after Kemper made corrections to its billings; and (3) which were untraceable to any prior billings.

Moreover, aside from the fact that DuPont does not owe Kemper the money in dispute, Kemper has no right under the Insurance Program to claim interest on alleged late payments.

Under similar circumstances, courts have enjoined parties claiming debts from taking action to collect on those debts. *See, e.g., Eisenberg v. Eisenstein*, 58 Pa. D. & C.2d 511, 516 (Pa. Ct. Com. Pl. 1972) ("[E]quity has jurisdiction to issue a preliminary injunction restraining the use of funds where it appears that without an injunction, funds will be depleted before the parties can conclusively establish their rights."); *Zonghetti v. Jeromack*, 541 N.Y.S.2d 235 (N.Y. App. Div. 1989) (upholding an injunction enjoining defendants from disposing of any of defendants' assets until litigation could be resolved where uncontrolled sale and disposition of the assets would threaten to render ineffectual any judgment plaintiffs might obtain); *Lauria v. Kaye*, 14 Pa. D. & C.3d 604 (Pa. Ct. Com. Pl. 1979), *aff'd*, 423 A.2d 1323 (Pa. Super. Ct. 1979) (maintaining the *status quo* by enjoining bank from releasing bank account fund until ownership

---

[5]     Further, as set forth in the Verified Complaint, if the Insurance Program were to be construed as proposed by Kemper (*i.e.*, that Kemper has discretion whether to credit DuPont even though DuPont is largely self-insured), then Kemper effectively has defrauded DuPont. In either case, Kemper is not entitled to the money it is seeking from DuPont.

of account between plaintiff and judgment proof defendant could be determined by the court); *Tilmon v. Adkisson*, 162 S.W.2d 903 (Ark. 1942) (upholding temporary restraining order issued to prevent third party from turning over a check to defendant where defendant owed plaintiff a sum of money and defendant was insolvent such that plaintiff would not be able to collect debt if defendant were allowed to obtain and cash the check).

In short, DuPont easily satisfies the second prong of the test – it has at least a "colorable claim" with respect to its claim that Kemper is not entitled to collect a non-existent debt from DuPont. Consequently, the *status quo* should be maintained, and Kemper should be enjoined from liquidating collateral provided by DuPont until the parties' dispute is resolved.

### D.    The Balance of Equities Tips Sharply in DuPont's Favor Given that the Letter of Credit and Surety Bond will Remain in Place During this Litigation

Only DuPont will be harmed if a TRO is not entered. Kemper cannot credibly argue that the entry of a temporary restraining order threatens to cause it irreparable harm. In the unlikely event that Kemper were to prevail on the merits and establish its right to the alleged payment, then DuPont – unlike Kemper – is not judgment proof. Moreover, the letter of credit and the surety bond will remain in place during this litigation, available for draw in the event that Kemper establishes its right to the amounts demanded from DuPont. DuPont is not by this motion seeking an order from the Court revoking the letter of credit and the surety bond during this litigation, but merely an order preventing Kemper from pursuing collection efforts against DuPont until the issues in dispute can be resolved.

Further, in the highly likely event that Kemper becomes insolvent, under Illinois law (which likely would govern Kemper's run-off and impending insolvency), the collateral that DuPont used to secure its obligations under the insurance program including the payment of the deductibles applicable to the policies will still be there as security to ensure that claims brought

15

under those policies are paid. *See, e.g.,* 215 Ill. Comp. Stat. Ann. 5/205.1(a), (b) (West 2005) (policyholder collateral does not become an asset of the estate and is to be used "to secure the policyholder's obligation to fund or reimburse claims payment within the agreed deductible amount"). Indeed, the intent of the plain language of this statute (and of the parties) to maintain sufficient funds to pay claims would be subverted if Kemper were allowed to obtain control over DuPont's collateral prior to insolvency, thus potentially depriving claimants of access to the collateral that is intended to secure payment to them. Therefore, the equities weigh in favor of DuPont, and this Court should enjoin Kemper from attempting to collect its manufactured debt, including attempts to liquidate collateral provided by DuPont.

IV.    **CONCLUSION**

For all of the reasons discussed above, DuPont respectfully requests that the Court enter an order restraining Kemper from drawing down or presenting any demands for payment under any collateral provided by DuPont, including any letters of credit and/or surety bonds.

*Of Counsel*:

John M. Sylvester
Christopher C. French
KIRKPATRICK & LOCKHART
    NICHOLSON GRAHAM LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222
Telephone: (412) 355-6500

POTTER ANDERSON & CORROON LLP

By:_____ /s/ John E. James_____
    John E. James (No. 996)
    Richard L. Horwitz (No. 2246)
    Hercules Plaza – Sixth Floor
    1313 North Market Street
    Wilmington, DE 19801
    Telephone: (302) 984-6000

*Attorneys for Plaintiff*

Dated: August 31, 2005
697211/20120-345

17

EFiled: Sep 1 2005 10:20AM EDT
Transaction ID 6611290

# EXHIBIT

# A

**Westlaw.**

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 240347
**(Cite as: Not Reported in A.2d)**

Page 1

**C**

Not Reported in A.2d, 1999 WL 240347
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
INSITUFORM TECHNOLOGIES, INC., Plaintiff,
v.
INSITU, INC., Defendant,
andMidsouth PARTNERS, Nominal Defendant.
**No. CIV. A. 17013.**

April 19, 1999.

Thomas R. Hunt, Jr. , Esquire, S. Mark Hurd ,
Esquire, of Morris, Nichols, Arsht & Tunnell ,
Wilmington, Delaware; of Counsel: Thomas J.
Goodwin , Esquire, of Krugman & Kailes, Saddle
Brook, New Jersey, Attorneys for Plaintiff.
Donald J. Wolfe, Jr. , Esquire, Matthew E. Fischer ,
Esquire, of Potter Anderson & Corroon ,
Wilmington, Delaware; of Counsel: John S. Stump ,
Esquire. C. Torrence Armstrong , Esquire, of
McGuire, Woods, Battle & Boothe, McLean,
Virginia, Attorneys for Defendants.

MEMORANDUM OPINION

STRINE, Vice Chancellor.
*1 Defendant Insitu, Inc. ("Insitu"), with a 42.5%
interest, and plaintiff Insituform Technologies, Inc.
("ITI"), with a 42.5% direct interest and a 15%
interest held by its wholly-owned subsidiary
Insituform Southwest, Inc. ("Southwest"), together
comprise two of the partners of nominal defendant
Midsouth Partners ("Midsouth" or the "Partnership").
ITI has caused Southwest, the other partner,
conditionally to withdraw and terminate the
Midsouth Partnership agreement effective upon the
occurrence of a condition which may never come to
exist. In the wake of this action taken by its wholly-
owned subsidiary, ITI has claimed the right to deny
Midsouth the ability to use the "Insituform® "
process upon which Midsouth's business depends and
has begun to compete directly with Midsouth.

Insitu now seeks a temporary restraining order to
prohibit ITI from denying Midsouth the right to
exploit the "Insituform® " Technology and from
otherwise interfering with Midsouth's business until

such time as this court or an arbitrator determines
whether: 1) Southwest had the right to terminate
Midsouth conditionally; and, if so; 2) what effect, if
any, such termination had on the right of the
remaining partners of Midsouth to continue the
business and to continue as a licensee of the
Insituform® Technology.

In this opinion, I find that: Insitu has demonstrated a
reasonable probability of success on its claim that ITI
has breached its contractual and fiduciary obligations
to Insitu during the time since Southwest gave notice
of its conditional withdrawal and termination and
while ITI still remains a partner; that Insitu and
Midsouth face imminent, irreparable injury; and that
the absence of an injunction will injure Insitu and
Midsouth far more than the grant of an injunction
will harm ITI. As a result, I grant Insitu's motion but
will issue an order in substantially different form than
Insitu seeks.

I.

*A. Midsouth*

Midsouth is a Tennessee general partnership formed
in 1985 to obtain and hold a license to use the
"Insituform® Process" (hereinafter referred to as the
"Insituform® Technology" or the "Technology").
The Insituform® process is used to create "pipes
within pipes." It involves injecting a fiber tube or
liner "impregnated" with thermosetting resin mixture
into an existing pipe and hardening it by heat,
forming a new rigid pipe within an existing pipe.
Compl. ¶ 2. Midsouth had an exclusive right to
utilize the Insituform® process in Tennessee and in
portions of Kentucky and Mississippi (the
"Territory").

Midsouth has three partners. Insitu, a Delaware
corporation, owns 42.5%. Insitu is the successor-in-
interest of Insituform East, Incorporated ("East").
Compl. ¶ 4.

ITI, a Delaware corporation, also owns 42.5% of
Midsouth. ITI acquired its interest in Midsouth from
E-Midsouth, Inc., ITI's former wholly-owned
subsidiary, which ITI acquired in 1995. ITI is a
successor-in-interest to its former wholly-owned

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 240347
(Cite as: Not Reported in A.2d)

subsidiary, Insituform North American Corp. ("INAC").

\*2 Southwest owns the remaining 15% of Midsouth. Southwest acquired its interest in Midsouth from Insituform Mid-south Investments ("Insituform Mid-south"), another former wholly-owned subsidiary of ITI.

## B. *The Midsouth License and Partnership Agreements*

On December 2, 1985, INAC (ITI's predecessor) and Midsouth executed a sub-license agreement (the "License Agreement"). The License Agreement gave Midsouth the exclusive right to use the Insituform® Technology in the Territory. L.A. § I(A), Schedule A. In exchange, ITI was to receive a royalty of 8% of the gross contract price of all contracts performed by Midsouth using the Insituform® Technology. L.A. § I(H), IX. Section XIV(B) of the License Agreement provides that the License Agreement may be terminated by ITI FN1 in certain circumstances. Section XIV(B) states:

> FN1. The License Agreement itself refers to INAC, ITI's predecessor-in-interest. For the sake of relative brevity, I sometimes refer only to ITI.

*By INAC.* In the event [Midsouth] (i) becomes insolvent or a petition in bankruptcy is filed by or against [Midsouth] and not removed within 90 days thereafter, or a receiver is appointed for [Midsouth]; (ii) fails to pay the minimum Royalties in accordance with Paragraph IX hereof or other Royalties hereunder, or fails to provide computations of Royalties, within fifteen (15) days of when due and such failure shall continue for a period of fifteen (15) days after written notice from INAC to [Midsouth]; (iii) fails to pay when due for other invoiced goods and services, or any other amounts due INAC for any reason and such failure shall continue for a period of fifteen (15) days after written notice from INAC to [Midsouth]; (iv) fails to perform any other material term or condition of this Agreement and fails to correct the same within fifteen (15) days after written notice from INAC to [Midsouth], or if not reasonably capable of correction within such period, fails to commence such correction within such period and thereafter diligently proceeds to make such correction; (v) in the event any Partner withdraws from or seeks dissolution of [Midsouth]; or (vi) in the

event [Midsouth]'s net worth falls below $500,000 then in any such event, INAC may declare this Agreement terminated immediately upon written notice to [Midsouth]. Such termination shall not limit or affect any other right or remedy of INAC, including the right to damages resulting from [Midsouth]'s breach.L.A. § XIV(B). The License Agreement is governed by Tennessee law.

L.A. § XXI.

The same day the Midsouth Partnership was created via a partnership agreement (the "December 2, 1985 Partnership Agreement"). INAC was not a signatory to that Agreement. Rather, the only signatories were East (Insitu's predecessor), Insituform Mid-south (Southwest's predecessor), and Insituform Southeast, Inc. (the ultimate predecessor of ITI's 42.5% interest).

A mere twenty-one days later, the predecessors-in-interest of the Midsouth partners executed yet another formal partnership agreement (the "Partnership Agreement"). That Agreement "superceded" the December 2, 1985 Partnership Agreement. P.A. § 18. Section 15 of the December 23, 1985 Partnership Agreement addresses the issues of "termination" and "dissolution" of Midsouth. It states in pertinent part:

### *Termination: Dissolution.*

\*3 a. This Partnership may be terminated *at any time* by any partner upon notice in writing delivered to the other partners personally, or by certified mail, return receipt requested, to take effect not earlier than 120 calendar days after the date the notice is sent.

b. Upon the occurrence of any event of default as defined above, or on the violation of any of the provisions of this agreement by any partner, any partner not so violating the agreement, or its legal representatives, may, at its or their option, terminate and dissolve the Partnership immediately by giving a written notice of this intention to the other partner. The Partnership shall be terminated and dissolved at the dates specified in the notice. The notice may be given and served either by personal delivery to the partners to whom it is addressed, or by certified mail, return receipt requested, to the partner's last known regular place of business.

c. (1) In the event of the dissolution of the Partnership, upon the events described in paragraphs a and b above (hereinafter referred to as "events of termination"), the management

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 240347
**(Cite as: Not Reported in A.2d)**

committee, as reconstituted pursuant to the provisions of Section 13 above, shall have the right to wind up the Partnership business and to dispose of or liquidate the Partnership's assets.

(2) [omitted]

(3) [omitted]

(4) Upon any such dissolution, however, the non-defaulting partner or partners desiring to continue the partnership business shall have the right to do so in the firm name, upon the payment in cash to the withdrawing or defaulting partner of the respective value of its partnership accounts, such payment, net of costs and expenses of enforcing a defaulting partner's obligations and damages incurred by reason of default, to be made within 30 days after the date of dissolution. For this purpose, the value of a withdrawing or defaulting partner's partnership account shall be determined by the accountant then servicing the partnership as of the date of dissolution, in accordance with book values. No value shall be placed upon trade name, goodwill, customer lists or similar intangible assets.

(5) [omitted]...

P.A. § 15 (emphasis in original). Like the License Agreement, the Partnership Agreement is governed by Tennessee law. P.A. § 17. But unlike the License Agreement, INAC was not a signatory to the Partnership Agreement.

### C. *ITI Changes Strategy*

ITI owns and has world-wide rights to the Insituform® Technology. Compl. ¶ 2. Before the early 1990's, ITI's strategy had been to exploit the value of the Insituform® Technology by executing sub-license agreements with other entities who obtained the right to exploit the Technology in particular regions.

In the early 1990's, ITI changed strategic direction and determined that it would be more profitable to exploit the Technology itself as a vertically integrated business. Hartman Aff. Ex. 3A. To accomplish this result, ITI needed to acquire its independent licensees. Therefore, ITI has acquired majority control of all but three of the Insituform® licensees since 1991.

### D. *ITI Obtains A Majority Interest In Midsouth*

*4 In 1995, ITI acquired E-Midsouth as a small part of a much larger transaction by which ITI acquired E-

Midsouth's ultimate parent, Insituform Mid-America, Inc. As a result of ITI's acquisition of Mid-America and its assets, ITI thereby obtained E-Midsouth's 42.5% interest in Midsouth. Since ITI already owned 15% of Midsouth at that time through Southwest, it putatively obtained majority control of Midsouth.

ITI's predecessor-in-interest, E-Midsouth, however, had neglected to obtain the consent of its other Midsouth partner, Insitu, before being acquired by ITI. P.A. § 12. Insitu invoked the Midsouth Partnership Agreement's arbitration clause to contest ITI's right to control Midsouth.

Insitu's action did not endear it to ITI. During the period leading up to the arbitration, ITI threatened to terminate the Midsouth Partnership and to terminate Midsouth's license to exploit the Insituform® Technology if Insitu managed, through the arbitration or other means, "to achieve management control" of Midsouth. Hartman Aff. Ex. 3B.

The arbitrator ruled against ITI's predecessor-in-interest, E-Midsouth, finding that the Partnership Agreement required Insitu's consent before ITI could acquire E-Midsouth. Therefore, the arbitrator declared that ITI's predecessor-in-interest, E-Midsouth, was a defaulting party under the Partnership Agreement and ordered that Insitu could add an additional representative to Midsouth's management committee. Hartman Aff. Ex. 2. The arbitrator also found that Southwest's predecessor-in-interest was not in default of the Partnership Agreement. *Id.*

The arbitrator's order had the functional effect of ensuring Insitu's continued control of Midsouth. For whatever reason, ITI did not act on its prior threats and Midsouth continued to operate until this calendar year under the management control of Insitu.

### E. *Midsouth's Performance Lags*

During the period since that arbitration, Midsouth's financial performance has been rather poor. During calendar years 1997 and 1998, for example, Midsouth apparently suffered total losses of $1,644,000. Compl. ¶ 9. This contrasts with prior periods of sustained profitability.

It is fair to say that ITI and Insitu disagree about the cause of the decline in Midsouth's earnings. The record makes clear, however, that ITI believes that much of the problem was caused by poor managerial

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 240347
**(Cite as: Not Reported in A.2d)**

Page 4

decisions by Insitu. *See. e.g.,* Hartman Aff. Exs. 5, 16A, 16D.

### F. *ITI Offers To Buy Out Insitu*

On February 16, 1999, ITI renewed its efforts to gain control of Midsouth. That day, ITI offered to buy Insitu's parent corporation, Insituform East, for $2.50 a share. Hartman Aff. Ex. 4. According to the letter making the offer, the price represented a 150% premium over the current market price of East's stock. ITI said it was "prepared and desirous of entering into immediate discussions with [East] to proceed with negotiation and investigations leading to the execution of a definitive all-cash-merger agreement on an expeditious basis." *Id.*

*5 On March 2, 1999, ITI reiterated its offer and expressed concern at East's failure to respond. In addition, ITI stated its dissatisfaction with the performance of Midsouth under Insitu's leadership and indicated that it saw "no realistic prospect of improvement" for Midsouth under Insitu's leadership. Hartman Aff. Ex. 5. If East turned down the acquisition offer or otherwise did not respond by March 10, 1999, ITI indicated that it would "proceed on a course designed to protect [ITI's] shareholder's [sic] value by whatever means it deem [ed] appropriate." *Id.*

All of these communications were publicly disclosed by ITI via press releases and Securities and Exchange Commission filings.

### G. *ITI Attempts To Terminate Midsouth And The License Agreement*

On March 10, 1999, ITI concluded that Insitu had not responded in a substantive manner and withdrew its acquisition offer.

The next day ITI's wholly-owned subsidiary Southwest notified Insitu that:
> In accordance with Section 15(a) of the Partnership Agreement, [Southwest] hereby terminates the Partnership Agreement effective, *the later of* (x) the 120 days after the date hereof, or (y) the date on which the Chancery Court of Delaware has issued a declaration confirming that [ITI] is within its rights to terminate the Sub-License Agreement dated December 2, 1985 with the Partnership.

Hartman Aff. Ex. 7 (emphasis added). Southwest's termination letter was signed by Robert E. Kelley,

who serves as ITI's General Counsel. ITI had Southwest send the withdrawal letter because Southwest, unlike ITI, was not in default of the Partnership Agreement. ITI itself did not send a withdrawal letter.

On the same day, ITI sent Midsouth a letter purporting to terminate "immediately" the License Agreement on the ground that Southwest was "terminating the Partnership." Compl. Ex. C. In particular, the letter demanded that Midsouth cease any use of the Insituform® Technology. *Id.* Then, ITI filed a complaint in this court seeking a declaratory judgment that it "is within its rights to terminate the License Agreement upon termination of Midsouth, or in the event of any partner seeking to dissolve Midsouth, in each case in accordance with the terms of the License Agreement." Compl. ¶ 19.

By another letter that day to Midsouth, ITI enclosed a copy of the complaint in this action and advised Midsouth that during the pendency of this action and:
> [E]ffective immediately, [ITI] intends to enter the Territory [defined in the License Agreement], either in its own name or through other means during the pendency of the Proceedings, to bid upon and undertake projects for Insituform Process work. Until resolution of the Proceedings, [ITI] intends to deposit 42.5% of the net profits arising from work undertaken by or on behalf of [ITI] in the Territory into an interest-bearing account ....

Hurd Aff. Ex. 2.

### H. *ITI Publicizes Its Actions And Undertakes To Compete With Midsouth*

*6 Insitu replied to ITI on March 17, 1999. In that communication, Insitu took the position that ITI had not properly terminated the License Agreement or the Partnership and that its actions in purporting to do so constituted breaches of those Agreements and of ITI's fiduciary obligations to its Midsouth partners.

That same day, ITI reiterated to Midsouth that ITI intended to bid on projects "within Midsouth's former licensed territory." Hartman Aff. Ex. 11A. In the letter, ITI claimed that its purported termination of the License Agreement had ended Midsouth's right to bid on new projects using the Insituform® Technology. *Id.* ITI indicated its willingness to "consider" issuing Midsouth a "limited, temporary and non-exclusive license" so as to permit Midsouth to finish certain pending projects. *Id.* Thereafter, ITI issued a press release containing the text of its letter

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 240347
(Cite as: Not Reported in A.2d)

Page 5

to Midsouth.

In the wake of these communications, Insitu again stated its position that the License Agreement remained in full force and effect and that ITI was in breach of its contractual and fiduciary obligations to its Midsouth partners. Hurd Aff. Ex. 4. "Since [in its view] the License ha[d] not been terminated," Insitu said "there is no need for a temporary license" and that Midsouth would continue to bid projects using the Insituform® Technology. *Id.* Insitu called upon ITI to refrain from competing with Midsouth in its Territory and indicated that it would seek to enforce its rights under the Agreements. *Id.* On April 1, 1999, Insitu invoked the arbitration clause of the Partnership Agreement by filing a claim with the American Arbitration Association and giving notice to ITI and Southwest. Hurd Aff. Ex. 6.

Insitu's warnings and demand for arbitration were unavailing. During March and early April, ITI:
• bid on projects in direct competition with Midsouth, Slusher Aff. ¶¶ 2-3, Erikson Aff. ¶¶ 1-6, and told Midsouth that ITI had "pulled" Midsouth's license and would be bidding projects directly, Matill Aff. ¶ 2;
• informed Midsouth's creditors that ITI would not permit "any further future use of its credit on behalf of Midsouth," Hartman Aff. Ex. 10A;
• refused Midsouth's request to bid certain projects on which, pursuant to the Partnership Agreement, Midsouth could not bid without ITI's consent, Hartman Aff. Ex. 13; and
• denied Midsouth technical assistance pursuant to the License Agreement, Mattil Aff. ¶ 5.
On April 8, 1999, for example, ITI outbid Midsouth to win a project for the City of Cookeville, Tennessee. Slusher Aff. ¶ 2. Absent the ITI bid, it is likely that Midsouth, the second lowest bidder, would have been awarded the contract. *Id.* ¶ 3.

## II. *Legal Analysis*

In examining an application for a temporary restraining order three factors are critical: "the imminence and significance of plaintiffs['] claim of irreparable injury; the probable merits of plaintiffs['] claim; and the risks to defendant in the event a restraining order were issued and it ultimately were determined that the restraining order was improvidently issued." *Newman v. Warren,* Del. Ch., 684 A.2d 1239, 1244 (1996).

*7 In circumstances where the TRO application is

presented in a clearly emergent context in which the applicant has had little opportunity to develop evidence in support of its position on the merits and the court therefore has an extremely unreliable record from which to assess the merits, a "colorable claim" on the merits is sufficient if the applicant makes a sufficiently strong showing on the other two factors. *See, e.g., Cottle v. Carr,* Del. Ch., C. A. No. 9612, 1988 WL 10415, at *3, Allen, C. (Feb. 9, 1988). Where, however, the applicant has had the opportunity to develop evidence and present a record from which the court may "responsibly make a more informed judgment concerning the merits," this court "has stated the elements of the equitable test is something akin to the traditional preliminary injunction formulation." *Newman,* 684 A.2d at 1244.

In this case, the more traditional preliminary injunction standard requiring a "reasonable probability of success on the merits," *Hecco Ventures v. Sea-Land Corp.,* Del. Ch., C.A. No. 8486, 1986 WL 5840, at *3, Jacobs, V.C., (May 19, 1986), is the more appropriate. Insitu has been aware of ITI's position on the merits since March 11; has known of ITI's view that Midsouth was prohibited from using the Technology on new projects at latest as of March 17, 1999, Hartman Aff. Ex. 11A; has already answered the complaint; was involved in the negotiation of the contracts at issue and controls evidence bearing on their meaning; and has presented affidavits and documentary evidence in support of its motion. Although I do not believe that Insitu unreasonably delayed seeking relief from this court so as to disqualify it from obtaining relief, FN2 I do believe that its decision to delay application brings with it the cost of being required to make a strong showing on the merits if it is to prevail on this motion. *Cf. Cottle,* 1988 WL 10415, at *6 n. 5 (indicating that the relative ease of obtaining a TRO compared to a preliminary injunction may tempt applicants to delay their application and that the doctrine of laches is properly invoked to address such tactical delay).

> FN2. In so concluding, I have considered and rejected ITI's argument that Insitu so unreasonably delayed its application as to disqualify it from eligibility for any injunctive relief at all. Insitu moved for a TRO within one month of the March 11 termination letters it received from ITI and Southwest. During that period, a great deal of back and forth ensued between the parties to clarify their respective positions. Upon definitively learning that ITI intended to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 240347
(Cite as: Not Reported in A.2d)

Page 6

deny Midsouth the right to use the Technology and that ITI was actively competing with Midsouth, Insitu moved diligently to bring this motion before me. In so finding, I note that ITI's complaint in this court and its communications to Insitu regarding the effect of Southwest's withdrawal from the Partnership may have contributed to some confusion on Insitu's part. The complaint, for example, can be read as implying that ITI did not intend to actually terminate the License Agreement until this court declared that it had the right to do so. The reason for this is that Southwest's termination of the Partnership was made "effective immediately upon the later of 120 calendar days from the date of such notice or upon issuance of a ruling from this Court declaring that, upon termination of Midsouth, [ITI] has the right to terminate the License Agreement as a consequence of [the] termination of Midsouth or, alternatively, of the attempt by a partner to dissolve Midsouth." Compl. ¶ 15. Although other communications from ITI to Insitu make clear that ITI was treating the License Agreement as having been terminated as of March 11, I think Insitu was justified in being somewhat confused by ITI's approach.

With that in mind, I turn to the merits.

### A. The Merits of The Parties' Claims

In examining the merits, I believe it is analytically important to acknowledge that ITI's duties and rights at any time depend in large measure on whether it is a partner in Midsouth. That is, the long-term right of ITI to terminate the License Agreement and withdraw from the Partnership Agreement may be different from its right to exploit the Insituform® Technology in the Territory during such time as ITI remains a partner in Midsouth.

Hence, I examine first whether Insitu has a reasonable probability of success on its contention that ITI was not free to terminate the License Agreement by causing Southwest to withdraw conditionally from Midsouth. Then I examine whether Insitu has a reasonable probability of success on its claim that ITI cannot exploit the Insituform® Technology in the Territory while it remains a partner.

### 1. ITI's Right to Terminate The License Agreement And To Cause Southwest To Withdraw

*8 Both the License Agreement and the Partnership Agreement are governed by Tennessee law. Like Delaware law, Tennessee law requires that a court "interpret and enforce contracts as they are written...." Petty v. Sloan, Tenn.Supr., 277 S.W.2d 355, 359 (1955). The Tennessee Code provides that a written contract is "prima facie evidence that the contract contains the true intention of the parties, and shall be enforced as written." Tenn.Code Ann. § 47-50-112.

ITI takes the position that the License Agreement is absolutely clear that if "any Partner" of Midsouth-- including ITI and its wholly-owned subsidiary Southwest-- " seeks dissolution of [Midsouth]," then ITI has the right to declare the License Agreement "terminated immediately." L.A. § XIV(B). Since Southwest is a "Partner" and sought, albeit conditionally on terms favorable to itself, "dissolution" of Midsouth on March 11, then ITI, it contends, was within its rights to terminate immediately the License Agreement.

After a careful consideration of the limited record before me, I believe that such a straightforward interpretation of the License Agreement most likely would, upon final examination of a full record bearing on the intentions of the drafters of the two Agreements, be found to be the correct one. FN3

> FN3. In addressing the merits, I have treated the conditional termination of the Partnership by Southwest as if it was caused by ITI and no differently than if it was done by ITI itself. Southwest is a wholly-owned subsidiary of ITI and it is apparent from the documentary evidence submitted to me that it was executing a strategy determined by ITI when it sought conditionally to withdraw and terminate the Partnership.

There are several reasons for this conclusion. The most important is that the language of the License Agreement is, on its face, unambiguous. Read plainly, § XIV(B) clearly gives ITI the right to terminate the License Agreement when "any Partner ... seeks dissolution of [Midsouth]." Insitu would have me read § XIV(B) as if it is written "when any Partner not owned or controlled by ITI ... seeks

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

dissolution of [Midsouth]." Such a reading is not consistent with the terms of the contract. *Luan Real Estate Invs., Inc v. Boiler Supply Co., Inc.*, Tenn. Ct.App., 1998 WL 221112, at *4 (1998) (to determine parties' intent the court must look to the "material contained in the four corners of the document itself" and give the words and phrases their ordinary and usual meaning).

Furthermore, reading § XIV(B) as permitting ITI to withdraw from the License Agreement at its election by causing its corporate affiliate which is a partner in Midsouth to withdraw does not create a gross imbalance in the relationship between ITI and Midsouth. Under § XIV(A), Midsouth had the right to rescind the license agreement at any time, provided that such termination would not be effective for two calendar quarters.

Insitu urges me to eschew a plain reading of the License Agreement on the grounds that the License Agreement must be read in concert with the later executed Partnership Agreement. In particular, Insitu argues that four provisions of the Partnership Agreement must color any reading of § XIV(B) of the License Agreement.

The first such provision is § 18 of the Partnership Agreement which provides that:

*Entire Agreement.* Except to the extent specifically provided herein, this Agreement shall completely and fully supercede all other prior agreements, both written and oral, by and between, [Insitu's predecessor East], [Southwest's predecessor Insituform Midsouth Investments] and [ITI's predecessor INAC] relating to the Partnership or the business and affairs of the Partnership. The parties to this Agreement shall hereafter have no rights under such prior agreements but shall look solely to this agreement for definitions and termination of all their respective rights, liabilities and responsibilities relating to the Partnership and the affairs and business of the Partnership.

*9 P.A. § 18. Insitu contends that this provision of the Partnership Agreement somehow modifies the License Agreement. I do not understand how that can be so. To the extent that Insitu contends that § 18 should be read as "superceding" the License Agreement, then that Agreement was superceded over a decade ago. Yet, the parties to the License Agreement have been operating under it during that entire period as if it was in full force and effect and, indeed, Insitu insists that the License Agreement is still operative. Section 18 is more easily read as a typical integration clause that extinguishes any rights

the Midsouth partners claimed under the previous December 2, 1985 agreement governing the Partnership. Furthermore, had the Partnership Agreement been intended to revoke or modify the License Agreement entered into twenty-one days prior (on the same day the December 2, 1985 Partnership Agreement was executed), one would expect that the Partnership Agreement would explicitly state that it had that effect and that INAC, the party with which Midsouth signed the License Agreement, would have executed the Partnership Agreement (or at least the part thereof modifying or superceding the License Agreement).

Insitu also argues that § § 1 , 12 , and 15(c)(4) of the Partnership Agreement modify ITI's right to terminate the License Agreement. Section 1 of the Partnership Agreement sets forth the purpose of the Partnership:

[Midsouth] shall be established to obtain and hold a license for the use of the Insituform Process in the [Territory] to perform underground pipe rehabilitation services for the public for profit.

P.A. § 1. Section 12 of the Partnership Agreement bars any of the partners from doing "any act detrimental to the best interests of the Partnership, or which would make it impossible to carry on the ordinary business of the Partnership, without the written consent of all partners." P.A. § 12. Since Midsouth was formed for the exclusive purpose of operating as an Insituform® licensee in the Territory, Insitu claims that § 12 is best read as prohibiting a Midsouth partner from doing any act whatsoever "which would make it impossible" for Midsouth to carry on its business as an Insituform® licensee in the Territory.

Insitu also argues that the single-purpose nature of Midsouth must guide interpretation of § 15(c)(4) of the Partnership Agreement. That subsection gives, in the event a partner has sought dissolution, any "partners desiring to continue the partnership business" the "right to do so in the firm name" by paying the exiting partners the value of their partnership interests in accordance with the provisions of the subsection. P.A. § 15(c)(4).

Taken together, Insitu contends that § § 1 , 12 , and 15(c)(4) preclude ITI from exercising its otherwise plain right under the License Agreement to terminate that contract if "any Partner" of Midsouth seeks dissolution. The Insitu argument has a certain first-blush appeal because termination of the License Agreement does literally "make it impossible" for Midsouth to carry on its business-- which requires it

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 240347
(Cite as: Not Reported in A.2d)

Page 8

to hold an Insituform® license. The termination of the License Agreement also makes it impossible as a practical matter for the non-withdrawing Midsouth partners to carry on the business of "Midsouth Insituform" in the firm name. Thus, Insitu claims that ITI has breached § § 12 and 15(c)(4) of the Partnership Agreement by terminating the License Agreement.

*10 Upon closer inspection, this argument begins to lose much of its appeal. The Partnership Agreement gives any of the partners, not just ITI and Southwest, the right to withdraw "*at any time* " after 120 days without cause. P.A. § 15(a) (emphasis in original). Insitu in essence asks that this right be read as not applying to ITI to the extent that by so withdrawing (or causing one of its affiliates to withdraw), that withdrawal triggers the termination clause of the License Agreement. That is, Insitu asks that the withdrawal provision of the Partnership Agreement be read as allowing any partner other than ITI to walk away "*at any time* " after 120 days without restriction, but as imposing a continued obligation on ITI to continue to license the Technology to the Partnership if it, or a partner affiliated with it, walks away.

It seems improbable that ITI's predecessor INAC would have put itself in such a vulnerable position. If such were the intention of the drafters, I would think they would have stated so explicitly. I believe that is especially so since the Partnership Agreement was not signed by INAC. It is difficult for me to conceive that the Partnership Agreement was intended, *sub silentio*, to diminish in a substantial manner the termination rights of INAC under the separate License Agreement.

Similarly, I find it extremely doubtful that § 12 was intended to apply to a partner which simply exercises its right to withdraw in accordance with § 15 of the Partnership Agreement. Such a reading of § 12 would create a litigable issue any time a partner with particular expertise or capabilities walked away since such a walk away could be construed as "detrimental to the best interests of the Partnership." FN4

> FN4. Insitu also suggests that ITI's termination of the License Agreement constitutes a breach of its fiduciary duties to its Midsouth partners. Although Tennessee law recognizes that partners owe each other fiduciary duties, *Am. Center-Nashville Ltd. v. Smith*, Tenn. Ct.App., 1992 WL 361352,

at *7 (1992) ("Partners owe a fiduciary duty to each other in all matters relating to the partnership."), I find it unlikely that Insitu will prevail in arbitration on this particular fiduciary duty claim in the event that it fails on its contractual claim. The Partnership Agreement clearly gave ITI and Southwest the right to withdraw after 120 days' notice. To the extent that such a withdrawal is violative of Insitu's rights, it seems likely that the arbitrator will have to examine whether the particular nature and timing of Southwest's conditional withdrawal this year constituted a breach of the Agreement's implied covenant of good faith and fair dealing. *L.I.C. Corp. v. Baskin-Robbins Ice Cream Co.*, Tenn. Ct.App., 1993 WL 2796, at *2 (1993) (implied covenant of good faith and fair dealing is to be read into all contracts). If the withdrawal did not violate an express term of the contract and the implied covenant did not prohibit the withdrawal, there seems little room left for analysis of the withdrawal under fiduciary principles. *See Am. Center-Nashville Ltd.*, 1992 WL 361352, at *7 (where a sophisticated limited partner knowingly entered into contracts with general partners and the general partners subsequently took action to the detriment of the limited partner in accordance with those contracts, the limited partner could not state a claim for breach of fiduciary duty). In so finding, I expressly limit myself to commenting on ITI's simple right to terminate, not its conduct during the period before which Southwest's conditional withdrawal and termination of the Partnership becomes effective, which I discuss *infra*.

Finally, it is unlikely that § 15(c)(4) was intended to have the substantive significance Insitu attaches to it. Rather than creating an affirmative right of any partner of Midsouth to continue to operate the business as an Insituform® licensee regardless of ITI's desires, § 15(c)(4) is better read as a standard form clause of a general partnership agreement that enables a surviving partner to continue the business without filing for a new business license, obtaining a new tax identification number, staking a new claim to the firm's name, and doing all the other ministerial work required to begin a new venture. 59A Am.Jur.2d *Partnership* § 892 (1987) ("Dissolution of a partnership does not cause the liquidation of the firm if there is an agreement among the partners

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 240347
(Cite as: Not Reported in A.2d)

stating that it does not do so..."); 4/15/99 Wolfe Ltr. Ex. B; *see also* L.A. § XIV(C) (upon termination of License Agreement, Midsouth has sixty days to drop the "Insituform" part of its name). Absent the inclusion of § 15(c)(4) in the Partnership Agreement, the remaining partners would have to start the business from scratch. Had § 15(c)(4) been intended to modify INAC's termination rights under the License Agreement, I believe that the drafters would have so stated and that INAC would have executed the Partnership Agreement.

\*11 Thus, I conclude that Insitu has not shown a reasonable probability of success on the merits of its claim that ITI did not have the right to terminate the License Agreement. In so finding, I am not insensitive to the fact that this reading of the License Agreement-- that ITI is essentially free to terminate the License Agreement once it "seeks dissolution" of Midsouth upon concluding it can thereafter make more money by exploiting the Technology in the Territory itself-- can be seen as tolerating harsh results.

Yet, the License Agreement and the Partnership Agreement appear to authorize just such a scenario. Those Agreements also gave the other Midsouth partners the right to walk away from those Agreements in two calendar quarters and 120 days, respectively, at any time if they wished to abandon the enterprise and thereafter start a new business in the pipe repair field using a different technology.

The Agreements were drafted by sophisticated parties with the capacity to negotiate contracts to protect their rights. According to one of the officers of Insitu's parent, East, who was involved in negotiating the Agreements, § XIV(B) of the License Agreement is a "kick-out clause, basically meaning that ... if [ITI] withdraws, there's no license anymore." Hurd Aff. Ex. 7. Based on the record before me, it appears likely that the Midsouth partners chose to deal with ITI on that basis and to take the risk that ITI would someday walk away and exploit the Technology on its own. FN5 *Petty*, 277 S.W.2d at 359 (The court must "interpret and enforce contracts as they are written, not withstanding they may contain terms which may be thought harsh and unjust.").

> FN5. In so concluding, I have considered Insitu's argument that ITI's "default" in coming into E-Midsouth's 42.5% interest in Midsouth as part of a much larger transaction disables it from withdrawing or

causing Southwest to withdraw. Although ITI's default position gave Insitu the right to control Midsouth and certain other options, *see* P.A. § 13(b), I do not think that position rendered ITI perpetual partners of Midsouth. Nor does the lawyer for East who helped draft the Partnership Agreement. Hurd Aff. Ex. 7 at 71-74.

Thus, Insitu has not made a sufficient showing on the merits regarding this aspect of its claim to justify this court's use of its injunctive powers over ITI in the time period before the arbitration can be held. Nor has Insitu convinced me that the question of whether ITI had the right to terminate the License Agreement is likely arbitrable. Insitu claims that under the arbitration clause of the Partnership Agreement the License Agreement termination dispute raises a "question arising out of or relating to [the] Partnership Agreement or the breach thereof." P.A. § 14(a). There is a fundamental problem with this argument. The License Agreement does not contain an arbitration clause. INAC signed the License Agreement. It did not sign the Partnership Agreement. FN6 For purposes of disputes arising under the License Agreement, ITI stands in the shoes of INAC, its predecessor. Given these circumstances, I see little likelihood that upon a final determination of arbitrability I will conclude that INAC *sub silentio* agreed that disputes arising under the License Agreement would be resolved pursuant to the dispute resolution clause of an Agreement, the Partnership Agreement, it did not execute. FN7

> FN6. Or the earlier December 2, 1985 Partnership Agreement executed the same day as the License Agreement.

> FN7. ITI has moved for summary judgment on the claims asserted in its complaint. At this time, I am not convinced that the record is adequate to rule on that motion, nor am I persuaded that the arbitrator's ruling on Insitu's claim has no bearing on ITI's right to terminate. In the latter respect, I refer to the possibility that the arbitrator might find that ITI acted wrongfully in causing Southwest conditionally to terminate the Partnership. ITI has not convinced me that in those circumstances the finding of the arbitrator that ITI wrongfully caused the occurrence of the condition in § XIV(B)(v) triggering its right to terminate the License Agreement would not bear importantly on the resolution

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 240347
(Cite as: Not Reported in A.2d)

of its claim in this court. As such, I deny ITI's motion.

### 2. ITI's Right To Exploit The Insituform® Technology In The Territory While It Is Still a Partner in Midsouth

**\*12** Although I find that Insitu has not made a sufficient showing on the merits regarding ITI's right in the long-term to terminate the License Agreement and to withdraw from Midsouth, I believe there is more merit to Insitu's contention that the Partnership Agreement's provisions place limits on ITI's activities during the period after Southwest gave notice that it conditionally intended to withdraw and terminate the Partnership and before its withdrawal and termination become effective.

In this case, Southwest does not seek to terminate Midsouth until the *later* of 120 days from March 11, 1999 or the date of a favorable ruling on ITI's complaint by this court-- the latter condition being one which may never occur. Southwest's withdrawal can only be read as not yet effective, as expressly conditional, and as equivocal. That is because by its own (rather awkward) terms Southwest's act of withdrawal and the subsequent termination will not occur at all if this action is resolved in Insitu's favor. *See* ITI Br. at 1-2 (confirming that Southwest's withdrawal is conditional on a prior ruling by this court in favor of ITI). Thus, Southwest has reserved to itself the right to continue as a partner if I rule for Insitu. For its part, ITI has taken no formal action under the Partnership Agreement to withdraw.

The Partnership Agreement expressly precludes a partner in ITI or Southwest's position from terminating the Partnership on less than 120 days notice. P.A. § 15(a). The only circumstance in which an earlier termination can occur is if a non-defaulting partner seeks immediate termination upon default or breach of the Partnership Agreement by another partner. P.A. § 15(b). The differences between § 15(a) and § 15(b) of the Partnership Agreement suggest to me that the partners bargained that their fiduciary and contractual obligations to one another could not be terminated without cause immediately. FN8 Rather, such relations would persist for at least 120 days after notice. I do not believe that this timing restriction can be read as toothless in the context of the relations at stake. It is clear from both the Partnership Agreement and the License Agreement that timing issues of this sort which could affect the competitive positions of the contracting parties were critical. In the License Agreement, for example,

INAC bargained for the right to be able to terminate that Agreement immediately if a triggering condition in § XIV(B) existed. Yet, INAC bargained to obtain two calendar quarters before Midsouth could terminate the License Agreement and cease meeting its contractual obligations thereunder. L.A. § XIV(A). As between themselves, the Midsouth partners appear to have bargained for a 120 day notice period before which a partner could not, except in cases where the other partners were in breach or default, terminate the business. FN9

> FN8. An unequivocal withdrawal by a partner in a partnership without an agreement prohibiting immediate dissolution might well free that withdrawing partner to compete with the partnership for new business so long as the withdrawing partner does not usurp for itself opportunities properly belonging to the partnership. 68 C.J.S. *Partnership* § 322(b) (1998). In this case, however, Southwest and ITI have hedged their bets and have not unequivocally withdrawn, but rather have reserved their rights to continue as partners. Coupled with the express terms of the Partnership Agreement prohibiting termination except upon 120 days prior notice, 68 C.J.S. Partnership, § § 304(c) , 305 (1998) (provisions in the partnership agreement take precedence over the statute and may specify when dissolution shall become effective upon a partner's withdrawal), Southwest's and ITI's conduct seems unlikely to be found sufficient to have freed them to compete with Midsouth yet.

> FN9. Perhaps due to the necessary haste of briefing and the lack of clarity of the Partnership Agreement, the parties have not shed much light on the usage of the terms "termination" and "dissolution" in § 15 of the Partnership Agreement. These terms appear to be used rather erratically, adding to the difficulty of discerning the drafters' intentions. However, under partnership law "dissolution" typically does not end the partnership. 68 C.J.S. *Partnership* § 302 (1998). Rather, the termination of a partnership is a three-step process: dissolution, winding up, and then termination. *Id.* Here, Southwest seeks to withdraw and begin this process only if it wins this litigation.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 240347
(Cite as: Not Reported in A.2d)

Given that it appears that this notice period was intended to have substantive effect, I find it quite troubling that Southwest and ITI have conditioned their withdrawal on a ruling by this court in their favor and have reserved the right to continue as partners in Midsouth. In these circumstances, it is difficult for me to conceive of how ITI and Southwest can disclaim their fiduciary and contractual responsibilities as partners in Midsouth.

**\*13** Thus, I believe it is likely that the arbitrator will find that ITI remains a fiduciary of its fellow partners and bound by § 12 of the Partnership Agreement. Tenn.Code Ann. § 61-1-120 (partners owe fiduciary duties to each other). While I cannot find on this record that ITI's fiduciary duties and § 12 prevent it from terminating the License Agreement during such period, there is a difference between ITI's contractual rights as a licensor and its duties as partner of Insitu. ITI's right to terminate the License Agreement and its right to exploit the Insituform® Technology in the Territory for its exclusive benefit during such time as it remains a partner in Midsouth are distinct, not identical.

As long as ITI is a partner in Midsouth, its obligations to its fellow partners are meaningful and substantial. For example, ITI has a duty under the Partnership Agreement to assist the Partnership in "fully complet[ing] and perform[ing]" all contracts and obligations "outstanding and unperformed ... for the advantage and profit of ... the Partnership." P.A. § 15(d)(2). Although this provision cannot be read as requiring ITI to continue the License Agreement on an exclusive basis, it does create an obligation on ITI's part to ensure that Midsouth can complete its contracts. Yet, it appears that ITI has haggled with the Partnership even over its right to complete existing work. Hartman Aff. Ex. 11A (ITI will "consider" granting the Partnership a "limited, temporary and non-exclusive license" to permit Midsouth to finish existing contracts). ITI's grudging and stand-offish approach to the completion of existing Partnership contracts seems likely to be found to be inconsistent with § 12 of the Partnership Agreement and with its fiduciary duties.

Similarly, ITI's quick-strike invasion of Midsouth's Territory, in the wake of East's refusal to accept ITI's acquisition proposal, is likely to be found inconsistent with § 12 of the Partnership Agreement and with ITI's fiduciary duties. It is true that the Partnership Agreement does not contain a provision prohibiting a partner who withdraws from competing

with the Partnership after withdrawal. Yet, it is difficult to read § 12 of the Partnership as permitting a withdrawing partner to compete unfairly with the Partnership during the period before which the Partner's right to terminate becomes effective. It is even more difficult to read § 12 as tolerating such behavior by partners who have not unequivocally given notice of their intention to withdraw and terminate the Partnership, but who claim to have reserved the right to continue as partners.

It would have been one thing had ITI simply terminated Midsouth's ability to compete for new projects using the Insituform® Technology during the period before Southwest's purported withdrawal becomes-- if it ever will--effective. It was quite another for ITI to disable the Partnership from competing for new business during that period, while simultaneously, under a new name, seeking new business for itself within the Partnership's Territory and from the Partnership's customers. Had ITI simply done the former, each of the partners to Midsouth would have been on a level playing field and would have been able to use the period to decide how best to redeploy the investments they had sunk into the Partnership.

**\*14** By executing the latter strategy-- the timing and execution of which it solely controlled-- ITI may well be found by the arbitrator to have wrongfully advantaged itself at the expense of its partners in breach of the bargained-for-notice period in § 15(a), § 12, and its fiduciary duties. It is true that in the long-term Insitu can still seek to continue the Partnership as a pipe repair business using different technology. But in the short-term, Insitu finds itself in the disadvantageous and precarious position of scrambling to do so, while ITI immediately exploits a Territory it well knows through its involvement in the Partnership and by using the Insituform® )) Technology it owns. That ITI has coupled its competition with Midsouth with communications about its actions and intentions to Midsouth creditors, customers, and the financial markets has no doubt made Insitu's position even more difficult. Coming during a time when ITI is contractually prohibited from doing any act "detrimental" to the Partnership and when it owes fiduciary duties of good faith and loyalty to Insitu, ITI's conduct is highly suspect. Thus, I find that Insitu has a reasonable probability of success of convincing the arbitrator that ITI's strategy of exploiting the Insituform® Technology for itself in the Territory before it has withdrawn as a partner is in breach of its fiduciary and contractual obligations. FN10

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 240347
(Cite as: Not Reported in A.2d)

Page 12

FN10. For precision's sake, it is important to note that I have commented on the Partnership Agreement only insofar as it relevant to ITI's claim for injunctive relief. Whether or not ITI has breached the Partnership Agreement or any fiduciary obligations it owes to its partners in Midsouth under Tennessee law will ultimately be determined *de novo* by the arbitrator based on a more well-developed record.

## B. *Is Midsouth Threatened With Imminent, Irreparable Harm?*

I find that Insitu has sustained its burden to demonstrate that Midsouth and it face imminent, irreparable harm as a result of ITI's actions.

By a multitude of measures, ITI has made it virtually impossible for Midsouth to operate in accordance with the purposes set forth in the Partnership Agreement. Any customer from whom Midsouth now seeks business does so with full knowledge that ITI takes the position that Midsouth has no right to use the Technology. Potential Midsouth customers, who have operations and interests of their own to which they must attend, will undoubtedly be reluctant to deal with a vendor at war with one of its owners. Existing Midsouth customers will no doubt need reassurance. The prospect of Midsouth obtaining additional credit during this period is quite bleak.

Although ITI contends that a future award of monetary damages can make Midsouth whole and that its decision to escrow 42.5% of the proceeds from any contracts won by ITI in the Territory until this action and the arbitration are concluded obviates any risk of irreparable harm, I do not believe that to be the case. The actions of ITI are likely to shake the confidence of Midsouth's customers, creditors, and employees in a manner that will not be fully captured by any future win-loss analysis of Midsouth's and ITI's respective records in securing new contracts during the period from March 11, 1999 until a court or an arbitrator determines whether ITI had the right to terminate the License Agreement.

**\*15** Midsouth is now operating under a dark cloud formed and seeded by ITI. Many of its customers, creditors, and employees may flee before the rain. In that eventuality, it will be very difficult to fashion monetary relief sufficient to restore Midsouth to the position it was in before ITI purported to terminate the License Agreement and the Partnership. *Roso-Lino Beverage Distrib., Inc. v. Coca Cola Bottling Co. of N.Y., Inc.,* 749 F.2d 124, 125-127 (2d Cir.1984) (termination of plaintiffs' beverage distributorship after 11 years threatened irreparable harm which would not be fully remedied by monetary relief); *Janmort Leasing, Inc. v. Econo-Car Int'l, Inc.,* 475 F.Supp. 1282, 1294 (E.D.N.Y.1979) ("loss or destruction of a going business constitutes irreparable harm"); *Dickinson Medical Group v. Foote,* Del. Ch., C.A. No. 834, 1984 WL 8208, at \*3, Brown, C. (May 10, 1984) (when former employee took customer list and could have caused her former employer to lose business, the former employer was threatened by immediate irreparable harm).

Likewise, it will be difficult to assess how much harm was done to Insitu by ITI's invasion of the Territory while still a partner of Midsouth. The competitive advantage ITI received over Insitu by getting such a timing jump will be real, but not easily reduced to quantification. It will not be difficult to count up the contracts ITI wins. But it will be difficult, if not impossible, to assess and quantify the long-term marketing and customer relations advantages ITI secured for itself, arguably improperly and at Insitu's expense.

## C. *In Whose Direction Does The Balance of Hardships Tilt?*

The balance of hardships favors Insitu.

If ITI is enjoined from exploiting the Insituform® Technology in the Territory until such time as this case and the related arbitration are concluded, ITI will simply have to live with a restriction on competing with its own partners until the Partnership ends. I do not think that this burden is substantial in comparison to the irreparable injury Insitu and Midsouth will suffer in the absence of an injunction, especially since it is ITI's aggressive strategy that brought about the exigencies Insitu and Midsouth now confront and since Southwest conditioned its withdrawal upon a prior favorable ruling by this court on ITI's claim. Moreover, ITI can, if it chooses, mitigate any harm by assisting, rather than impeding, Midsouth in obtaining new business in the Territory during the period during which an injunction is in place.

That being said, I am not insensitive to ITI's position and the reality of the poisoned relationships among

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 240347
**(Cite as: Not Reported in A.2d)**

the Midsouth partners. I am also cognizant of the fact that ITI will likely be found to have the right to terminate the License Agreement and to withdraw from Midsouth in the long-run.

As a result, the nature of the TRO that will be granted will reflect that reality. In accordance with my prior reasoning, the TRO will, at Insitu's election, either provide: i) that ITI shall not exploit the Insituform® Technology in the Territory until the TRO expires and shall escrow 42.5% of the proceeds of any contract ITI has won or wins in the Territory as a result of bids it submitted or submits before the entry of the TRO; or ii) that ITI shall not deny Midsouth the right to exploit the Insituform® Technology on a non-exclusive basis in bidding on new business in the Territory until the TRO expires and that ITI shall escrow 42.5% of the proceeds of any contract ITI has won or wins in the Territory as a result of bids it submitted or submits before the entry and during the pendency of the TRO. FN11. In addition, ITI must also consent if Insitu chooses the latter form of order. In either case, the TRO shall provide that ITI shall provide technical support to Midsouth in accordance with the License Agreement. If the latter form of TRO is elected by Insitu and consented to by ITI, that technical assistance shall extend to new projects for which Midsouth seeks technical assistance in bidding or performing.

> FN11. The nature of this order will thus deal with ITI's concern that I might enjoin ITI from working on a major municipal project it has just won in direct competition with Midsouth and which will not go to Midsouth if ITI is disqualified. ITI Br. at 31-32. In lieu of enjoining ITI from completing the project, ITI will simply have to escrow 42.5% of the project proceeds for the benefit of Insitu in the event that Insitu prevails in arbitration or convinces this court that the License Agreement was not validly terminated by ITI.

**\*16** I recognize that neither order creates an economically efficient course by which to proceed. My hope is that ITI and Insitu, which I am sure are operated by profit-maximizing businesspersons interested in doing what is rational in business terms, will work together to protect their mutual interests during the period an order is in place.

The disputes among the partners obviously need final resolution, sooner rather than later. Therefore, to limit any harm to ITI, I will also condition my order on Insitu's willingness to seek expedited treatment of its arbitration claim. For my part, I will commit to adjudicating ITI's claim on a very prompt schedule. Before setting a schedule, however, I want to consider with the parties how best to proceed in view of the fact that ITI's claim may or may not be arbitrable and, if not, whether it is advisable to permit the arbitration to go forward to completion first. Finally, I would note that I have held Insitu to the same standard it would have to meet to obtain a preliminary injunction. As such, I request that ITI advise Insitu and the court as to whether it will consent to the entry of a preliminary injunction along the lines I have described or whether the court needs to set a schedule for a hearing on a preliminary injunction.

### III.

For the foregoing reasons, Insitu's motion for a temporary restraining order is granted and ITI's motion for summary judgment is denied. Insitu shall, upon notice to ITI, submit an order in conformity with this opinion. The parties shall also set up an office conference to determine a schedule for the procession of this litigation.

Del.Ch.,1999.
Instituform Technologies, Inc. v. Insitu, Inc.
Not Reported in A.2d, 1999 WL 240347

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.