EFiled: Sep 1 2005 10:20A
Transaction ID 6611290

# EXHIBIT

# B

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 22659332
**(Cite as: Not Reported in A.2d)**

Page 1

**C**
Not Reported in A.2d, 2003 WL 22659332
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
KANSAS CITY SOUTHERN and Kara Sub, Inc.,
Plaintiffs,
v.
GRUPO TMM, S.A., TMM Holdings, S.A. de C.V.
and TMM Multimodal, S.A. de C.V., Defendants.
**No. Civ.A. 20518-NC.**

Submitted Oct. 29, 2003.
Decided Nov. 4, 2003.

Bruce E. Jameson , Paul M. Lukoff , and Paul A.
Fioravanti , of Prickett, Jones & Elliott, P.A. ,
Wilmington, Delaware; Allan Van Fleet , Kevin
O'Gorman , Lauren Harrison , and Samina Quddos ,
of Vinson & Elkins L.L.P., Houston, Texas, for
Plaintiffs, of counsel.

R. Judson Scaggs, Jr. and Brian J. McTear , of
Morris, Nichols, Arsht & Tunnell , Wilmington,
Delaware; Michael H. Diamond and Felton T.
Newell , of Milbank, Tweed, Hadley & McCloy LLP,
Los Angeles, California, for Defendants, of counsel.

### MEMORANDUM OPINION

CHANDLER, J.
*1 Grupo TMM, S.A. ("TMM") FN1 signed an
agreement to sell approximately $400 million worth
of its interests in certain rail transportation assets to
Kansas City Southern ("KCS") FN2 on April 20,
2003 (the "Acquisition Agreement" or "Agreement").
TMM purported to terminate the Acquisition
Agreement on August 22, 2003. This dispute arises
out of KCS' attempt to contest TMM's purported
termination and specifically enforce the Acquisition
Agreement. KCS seeks to enjoin TMM from taking
any action contrary to the terms of the Acquisition
Agreement pending the outcome of an arbitration
proceeding that will resolve the merits of the dispute.
For the reasons set forth below, I grant KCS's request
for a preliminary injunction.

> FN1. The two other defendants are the
> subsidiaries of TMM which hold the assets

at issue.

> FN2. The other plaintiff is a subsidiary of
> KCS created to effectuate the transaction.

### I. BACKGROUND

KCS is a Delaware corporation in the business of rail
transportation. TMM is a Mexican corporation also in
the business of rail transportation. In 1995, TMM
sold KCS 49% of Mexrail, Inc., a Delaware
corporation that wholly owns the Texas-Mexican
Railway Company ("Tex-Mex"). Tex-Mex's rail lines
run from the Mexican border to KCS's rail lines in
east Texas. In 1995, TMM and KCS also formed a
joint venture company to bid on concessions offered
by the Mexican Government. The company formed
by the joint venture is known today as Grupo
Transportacion Ferroviaria Mexicana, S.A. de C.V.
("GTFM"). The joint venture successfully bid for the
concession to operate a railway known currently as
TFM, S.A. de C.V. ("TFM"). TFM's rail lines run
throughout northeast Mexico and connect with Tex-
Mex's rail lines at the border. Today, TFM also owns
Mexrail, Inc. and Tex-Mex. TMM indirectly owns
approximately 38.5% of the equity and 51% of the
voting shares of GTFM. KCS indirectly owns
approximately 37% of the equity and 49% of the
voting shares of GTFM. The remaining equity of
GTFM is owned by TFM. TFM, in turn, is 80%
owned by GTFM. The remaining 20% is owned by
the Mexican Government. FN3

> FN3. Although the Mexican Government
> owns 20% of the equity of TFM, it has
> limited voting rights.

On April 20, 2003, the parties signed an agreement in
which TMM agreed to sell its stake in GTFM to KCS
for $200 million in cash and approximately $200
million of KCS stock. TMM Chairman and
controlling shareholder, Jose Serrano Segovia
("Serrano"), FN4 also negotiated a consulting
agreement with KCS worth approximately $25
million. Through the consulting agreement, Serrano
would become Vice Chairman of KCS and personally
receive 2.1 million shares of KCS stock. KCS alleges
that the consulting agreement was inducement for
Serrano to personally support the Acquisition
Agreement.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 22659332
(Cite as: Not Reported in A.2d)

FN4. Serrano controls over 99% of the voting shares of TMM. *See* Deposition of Javier Segovia Serrano ("Segovia Dep.") 61-62; Affidavit of Larry M. Lawrence ("Lawrence Aff.") ¶ 14.

In two resolutions approved at TMM Board of Directors meetings held on April 2, 2003 and July 28, 2003, TMM's Board recommended that TMM's shareholders approve the agreement. Serrano voted in favor of both resolutions. Serrano, however, voted against the transaction at a shareholders meeting on August 18, 2003. FN5 The next day, TMM sent a letter to the Mexican Government which effectively shut down the Mexican Foreign Investment Commission's review of the acquisition. On August 22, 2003, TMM sent a letter to KCS purporting to terminate the Acquisition Agreement because the shareholders did not approve the transaction. Seven days later, on August 29th, KCS initiated the arbitration process set forth in the Acquisition Agreement and filed a motion for a preliminary injunction in this Court to preserve the status quo pending arbitration.

FN5. It is unclear exactly why Serrano voted against the transaction. It appears, however, that Serrano was displeased with KCS's efforts to intervene in on-going negotiations between TMM and the Mexican Government regarding obligations to purchase the Mexican Government's outstanding shares of TMF and certain tax refunds owed to TMM by the Mexican Government. Affidavit of Jose Serrano Segovia ¶¶ 11-14. TMM also alleges that some non-controlling stockholders expressed their displeasure with the transaction. *Id.* at ¶ 18.

## II. ANALYSIS

\*2 The standard on a motion for preliminary injunction is well-settled. In order to prevail, KCS must establish: (1) a reasonable likelihood of success on the merits; (2) that irreparable harm will be suffered by KCS if the injunction is denied; and (3) that the harm that KCS will suffer if the injunction is not granted outweighs the harm that TMM will suffer if the injunction is granted . FN6

FN6. *In re Aquila Inc. S'holders Litig.*, 2002 WL 27815, at \*5 (Del. Ch. Jan. 3, 2002) ; *S.I. Mgmt. L.P. v. Wininger*, 707 A.2d 37, 40 (Del.1998).

### A. Reasonable Probability of Success on the Merits

The parties have committed the resolution of disputes arising from or in connection with the Acquisition Agreement to arbitration. FN7 The arbitration proceeding is in its preliminary stages. KCS seeks an injunction in aid of this arbitration. In such a situation, " 'likelihood of success' must be examined at two levels: (1) the moving party's entitlement to arbitration; and (2) the merits of its arbitration claims." FN8 It is undisputed that KCS is entitled to arbitration. And "where the right to arbitrate is clear, the analysis of the merits of the underlying claims may be more limited." FN9 Nevertheless, but KCS must still "establish a reasonable probability that its arbitration position is sound." FN10

FN7. Acquisition Agreement § 12.11(a). The Acquisition Agreement also contemplated the instant proceeding because Section 12.11(a) states that the arbitration procedure "shall not preclude equitable or other judicial relief to enforce the provisions hereof or to preserve the status quo pending resolution of Disputes hereunder"-precisely the relief KCS seeks before this Court. Section 12.11(b) provides that the agreement is governed by Delaware Law.

FN8. *Price Org., Inc. v. Universal Computer Services, Inc.*, 1992 WL 356026, at \*8, (Del. Ch. Dec. 2, 1992) (citing *Eastman Kodak v. Cenus Corp.*, 1991 WL 225936, at \*5 (Del. Ch. Dec. 3, 1991)).

FN9. *Id.*

FN10. *Id.* The parties agree that *Price Org., Inc.*, 1992 WL 356026, and *Eastman Kodak*, 1991 WL 225936, hold that where there is a clear right to arbitration the inquiry into the underlying merits of the arbitrable claims is more limited than a situation where the merits of a dispute are non-arbitrable. The parties disagree, however, as to how much the Court should limit its inquiry. Ultimately, I need not resolve this dispute because KCS has met the typical "reasonable likelihood of success on the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 22659332
(Cite as: Not Reported in A.2d)

Page 3

merits" standard.

KCS's primary claim is that TMM did not have the right to terminate the Acquisition Agreement because TMM shareholder approval is not a "condition" that must be fulfilled before TMM's performance under the Agreement becomes due. FN11 To determine whether TMM shareholder approval is a condition this Court will construe the Acquisition Agreement "to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted." FN12 To ascertain the parties shared expectations the Court will first look to the Agreement itself. FN13 If the Agreement is ambiguous, the Court will examine the extrinsic evidence submitted by the parties. FN14

> FN11. The Restatement defines a condition as "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Restatement (Second) of Contracts § 224.

> FN12. U.S. West, Inc. v. Time Warner, Inc., 1996 WL 307445, at *9 (Del. Ch. June 6, 1996) (citation omitted).

> FN13. True North Communications, Inc. v. Publicis, S.A., 711 A.2d 34, 38 (Del. Ch.1997) (Chandler, C.), aff'd, 705 A.2d 244 (Del.1997) (TABLE).

> FN14. Id.

The first provision in the Acquisition Agreement of consequence is Section 9.1(a)(iv), which provides that the "Agreement may be terminated prior to the Closing ... by TMM if any condition to the obligations of Sellers hereunder becomes incapable of fulfillment through no fault of Sellers." Section 9.1(a)(iv) does not define or list the "conditions to the obligations of Sellers," but this language is found elsewhere in the Agreement-most notably, Section 8 .3. Section 8.3 is, in fact, entitled "Conditions to the Obligations of Sellers" and states that "[t]he obligation of Sellers to consummate the Acquisition shall be subject to satisfaction of" a list of ten conditions. One of the enumerated conditions is that TMM shall have received the consents of certain noteholders to the transaction, provided that TMM used commercially reasonable efforts to obtain such consents. FN15 Another listed condition is that relevant governmental authorities shall have consented to the transaction. FN16 What is not listed as a condition, however, is that TMM shall have received shareholder approval of the transaction.

> FN15. Acquisition Agreement § 8.3(i).

> FN16. Id. at § 8.3(h).

*3 KCS argues that the exclusion of TMM shareholder approval from Section 8.3 evidences the parties' intent that TMM shareholder approval is not a condition to the Acquisition Agreement. To this end, KCS invokes the maxim inclusio unius est exclusio alterius, i .e., "the inclusion of one [condition in Section 8.3] is the exclusion of another [condition]." FN17 This Court has invoked this principle of interpretation to construe wills, FN18 statutes, FN19 and partnership agreements. FN20 Other courts have invoked the doctrine to find that provisions in an agreement are covenants, rather than conditions. FN21 In this context, the failure to include TMM shareholder approval within Section 8.3 "speaks volumes" FN22 and it is reasonable to conclude that the absence of TMM shareholder approval in Section 8.3 suggests that such approval is not a condition to the Agreement.

> FN17. Black's Law Dictionary 906 (4th ed.1968). See also 3 Corbin on ContractsACTS § 552 at 206 (1960) ("If one subject is specifically named, or if several subjects of a larger class are specifically enumerated, and there are no general words to show that other subjects of that class are included, it may reasonably be inferred that the subjects not specifically named were intended to be excluded").

> FN18. In re Estate of Barrett, 1996 Del. Ch. LEXIS 34 (Del. Ch. Mar. 8, 1996) (Chandler, C.).

> FN19. Makin v. Mack, 336 A.2d 230 (Del. Ch.1975).

> FN20. Active Asset Recovery, Inc. v. Real Estate Asset Recovery Services, Inc., 1999 WL 743479 (Del. Ch. Sept. 10, 1999).

> FN21. Tuff 'N' Rumble Management v. Livin' Large Records, 1995 U . S. Dist. LEXIS 6955 (S.D.N.Y. May 22, 1995).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 22659332
(Cite as: Not Reported in A.2d)

FN22. *Active Asset Recovery, Inc.*, 1999 WL
743479, at *11 (citing 3 Corbin on Contracts
§ 552 at 206 (1960)) (finding intent to
exclude "media overhead" costs as
chargeable to a partnership because other
items such as "duplicating" and "telephone"
charges were identified as chargeable to the
partnership).

This conclusion is buttressed by the fact that TMM
*noteholder* approval is found in Section 8.3 and that
*KCS* shareholder approval is included in the
enumerated list under Section 8.2 of the Agreement,
entitled "Conditions to the Obligations of KCS." The
parties, aided by able legal teams, knew how to make
the non-occurrence of an event trigger the right to
terminate the Agreement. The parties did so in the
case of KCS shareholder approval and TMM
noteholder approval by including them in Article 8 of
the Agreement, conveniently entitled
"CONDITIONS." It is unlikely that the parties
intended to make TMM shareholder approval a
condition, but decided not to include TMM
shareholder approval under Article 8, especially since
the very first section of the Agreement provides that
"[u]pon the terms and *subject to satisfaction or
waiver of the conditions set forth in Article 8,* at the
Closing, KARA Sub shall purchase ... from MM
[wholly owned subsidiary of TMM] ... all GTFM
shares ... for the consideration described in Section
1.2." FN23 This provision, in my opinion,
independently suggests that the parties intended
Article 8 to contain the only conditions to the
Agreement that would permit a termination.

FN23. (emphasis added). As noted, Article 8
of the Acquisition Agreement is entitled
"CONDITIONS," and includes mutual
conditions, § 8.1, conditions to KCS'
obligations, § 8.2, and conditions to TMM's
obligations, § 8.3.

TMM argues that provisions of the Acquisition
Agreement found outside Article 8 establish that
TMM shareholder approval is a condition. First,
TMM points to Article 5, the "REPRESENTATIONS
AND WARRANTIES OF SELLERS." In particular,
Section 5.4(a) provides that "[t]he execution and
delivery of this Agreement and the Ancillary
Agreements ... have been duly and validly authorized
... and no other corporate action on the part of TMM
... is necessary ... other than approvals from the
shareholders of TMM and MM." TMM asserts that
because Section 5.4(a) states that shareholder

approval is "necessary" it must be a condition. The
more reasonable interpretation, however, is that this
provision does not create a condition.

TMM's representation that it had all necessary
corporate approvals to close the transaction, other
than shareholder approval, does not *ipso facto* make
TMM shareholder approval a condition. There is a
distinction between the warranties and
representations of TMM and an act or event that,
unless excused, must occur before TMM's duty to
perform arises, *i.e.,* a condition. FN24 Therefore, I
must assess whether the parties intended for Section
5.4 to constitute a condition. Initially, I note that this
provision is not within Article 8-favoring a
conclusion that it is not a condition. Additionally,
there is no language in Section 5 4 purporting to
create a condition. The words "on condition that" or
"provided that" or even the two-letter word "if,"
phrases typically used by parties to create conditions,
FN25 are not present. Moreover, to the extent that the
Court considers extrinsic evidence, Section 5.4 is
wholly consistent with what KCS's representatives
were told by TMM's chief negotiator (and Serrano's
nephew): that a stockholder vote was necessary but a
mere formality because of Serrano's over 99% control
of the voting shares. FN26

FN24. *See Summit Investors II, L.P. v.
Sechrist Indus., Inc.,* 2002 WL 31260989, at
*7 (Del. Ch. Sept. 20, 2002) (noting
distinction between conditions and
covenants); *Weiss v. Northwest
Broadcasting, Inc.,* 140 F.Supp.2d 336, 343-
44 (D.Del.2001) (same; applying Delaware
law).

FN25. Restatement (Second) of Contracts §
226 cmt. a (1981).

FN26. Lawrence Aff. ¶ 14; Segovia Dep. at
61-62.

*4 TMM also points to Section 12.13, governing the
"Termination Fee ." This provision provides, in part,
as follows:

In the event of ... a termination pursuant to Section
... 9.1(a)(iv) as a result of the failure of the
stockholders of ... TMM to approve the Acquisition
if at or prior to the meeting of such stockholders to
approve the Acquisition ... the Board of Directors
of TMM ... shall have failed to recommend or shall
have withdrawn and not reinstated its
recommendation of, the Acquisition, then [TMM

Page 5

shall remit to KCS] the sum of \$18 million.
TMM argues that this provision, by implication,
allowed for termination if TMM's shareholders did
not approve the transaction. FN27 Section 12.13,
however, is simply not relevant because the Board
has not withdrawn its recommendation. Also, Section
12.13 does not define what is a condition or what
permits termination. Section 12.13 only refers to
Section 9.1(a)(iv), which allows termination if "a
condition to the obligations of Seller hereunder
becomes incapable of fulfillment through no fault of
Sellers." As noted, Section 8.3, conveniently entitled
"Conditions to the Obligations of Sellers," does not
mention TMM shareholder approval. FN28

> FN27. I say "by implication" because by its
> terms, this provision does not purport to
> establish when termination is allowed and
> only sets forth that a termination fee is
> payable if TMM's shareholders do not
> approve the transaction *and* the Board did
> not recommend the transaction.

> FN28. To the extent that there is some doubt
> as to whether Section 12.13, or Section 5.4,
> creates a condition, this Court resolves those
> doubts so as to reduce KCS's risk of
> forfeiture from the non-occurrence of an
> event that is within TMM's control. *See*
> Restatement (Second) of Contracts §
> 227(1).

TMM also argues that even if it did not validly
terminate the Agreement, the remedy of specific
performance is, as a matter of law, unavailable to
KCS. TMM's argument is that this Court is unable to
require TMM to close on the transaction in light of
Serrano's vote against the deal. I need not reflect on
the validity of this argument, however, because the
relief sought here is much more limited. Ultimately,
the arbitration proceeding will determine what
ultimate remedy, if any, KCS is entitled to receive. In
the instant proceeding, however, KCS only seeks to
require TMM to abide by provisions of the
Agreement which require that TMM carry on the
business GTFM and its subsidiaries "in the ordinary
course consistent with past practices." FN29 TMM
was required to abide by these provisions before
Serrano's no vote, and can be required to do the same
until the arbitration proceedings have reached their
termination. FN30 In fact, the form of order entered
in this proceeding was contemplated by the parties in
the Acquisition Agreement. Section 12.10 provides
that KCS is "entitled ... to enforce specifically the

terms and provisions of" the Agreement. In addition,
Section 12.11 provides that the initiation of
arbitration does "not preclude equitable or other
judicial relief to enforce the provisions [of the
Agreement] or to preserve the status quo pending"
the outcome of arbitration. KCS does not seek, and
this Court does not grant, an order requiring TMM to
close on the deal regardless of Serrano's vote to reject
the transaction.

> FN29. Acquisition Agreement § 7.1.

> FN30. Requiring TMM to carry on the
> business of GFTM in the ordinary course
> does not infringe on the TMM shareholder
> franchise since TMM has a single
> shareholder, Serrano, who serves as
> Chairman of the Board and controls over
> 99% of the shareholder vote. In *Northern
> Assur. Co. v. Ruchlin Clothes Shop, Inc.*,
> 125 A. 184, 188-90 (Del.1924), Chancellor
> Wolcott stated:
> A corporation being a purely metaphysical
> creature, having no mind with which to
> think, no will with which to determine and
> no mind with which to speak, must depend
> upon faculties of natural persons to
> determine for it its policies and direct the
> agencies through which they are to be
> effectuated. The individuals within its
> organization who perform for it these
> functions are generally its directors.
> The argument that Serrano, as Chairman of
> TMM, could sign the Acquisition
> Agreement, promising to recommend the
> transaction to shareholders, *i.e.*, himself, and
> use his best efforts to get shareholders
> (again, himself) to approve the transaction,
> but yet could vote against the transaction
> without implicating TMM's covenants under
> the Acquisition Agreement is an exercise in
> sophistry.

In my opinion, KCS has demonstrated to a reasonable
probability that its arbitration position, namely, that
TMM did not validly terminate the Acquisition
Agreement, is sound. FN31

> FN31. Independently, KCS argued that
> TMM breached its covenant to use all
> commercially reasonable efforts to obtain
> shareholder approval. I do not evaluate this

claim because KCS only needs to demonstrate the soundness of one claim in order to obtain a preliminary injunction. *In re Pure Res. S'Holders Litig.*, 808 A.2d 421, 432 (Del. Ch.2002).

### B. Irreparable Harm

**\*5** The parties agreed "that irreparable damage would occur in the event that any of the provisions of [the] Agreement were not performed in accordance with their specific terms or were otherwise breached." FN32 KCS argues that this stipulation by the parties is sufficient to establish the irreparable harm element of the preliminary injunction standard. Several decisions of this Court support KCS's position. FN33 TMM argues that in the cases cited by KCS the relevant contractual provisions were "accompanied by the actual presence of demonstrable harm of a sort that would have been deemed irreparable even in the absence of the contractual provision." FN34 TMM then argues that because prior courts have relied on the contractual stipulation and since the underlying facts independently support such a stipulation, this Court is required to do likewise. I reject this proposition.

FN32. Acquisition Agreement § 12.10.

FN33. *True North Communications, Inc.*, 711 A.2d at 44 (Chandler, C.) ; *Vitalink Pharmacy Services, Inc. v. Grancare, Inc.*, 1997 WL 458494, at \*9 (Del. Ch. Aug. 7, 1997) ; *SLC Beverages, Inc. v. Burnup & Sims, Inc.*, 1987 WL 16035, at \*2 (Del. Ch. Aug. 20, 1987).

FN34. Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of ChanceryCERY § 10-2(b) at 10-36 (2001).

In *Vitalink Pharmacy Services,* Vice Chancellor (now Justice) Jacobs held that such a contractual stipulation "alone suffice[d] to establish the element of irreparable harm" FN35-a holding reaffirmed in *True North Communications.* FN36 Although a contractual stipulation as to the irreparable nature of the harm that would result from a breach cannot limit this Court's discretion to decline to order injunctive relief, such a stipulation does allow the Court to make a finding of irreparable harm provided the agreement containing the stipulation is otherwise enforceable. FN37 If the facts plainly do not warrant

a finding of irreparable harm, this Court is not required to ignore those facts, especially since the "parties cannot confer subject matter jurisdiction upon a court ." FN38 But where there is no concern that the parties are attempting to improperly confer equitable jurisdiction upon this Court, a defendant cannot successfully argue that there is no irreparable harm. FN39

FN35. 1997 WL 458494, at \*9.

FN36. 711 A.2d at 44.

FN37. *Signal Cap. Corp. v. Signal One, LLC,* Del. Ch., C.A. No. 18011, bench ruling at 88-89, Jacobs, V.C. (May 15, 2000).

FN38. *Butler v. Grant,* 714 A.2d 747, 749-50 (Del.1998).

FN39. *Signal Cap. Corp.,* C.A. No. 18011, bench ruling at 88-89.

### C. Balance of the Equities

Under this prong, KCS must demonstrate that the harm to it if relief is denied outweighs the harm to TMM if the injunction is granted. FN40 I am convinced that if I deny KCS the preliminary injunction to preserve the status quo pending arbitration, KCS would suffer a harm greater than any harm TMM could suffer if I were to grant the injunction. Because there is a reasonable probability that TMM did not validly terminate the Agreement with KCS, TMM cannot invoke general equity principles to save it from an injunction enforcing the Agreement. Under the terms of the Agreement, TMM contracted away its right to undertake actions outside the ordinary course of business, including its right to solicit other offers for GTFM. FN41 Accordingly, TMM cannot now assert that it will be harmed due to the Court's enforcement of the rights and obligations for which it specifically bargained, and which were reduced to writing in the terms of the Acquisition Agreement. FN42

FN40. *True North Communications,* 711 A.2d at 45.

FN41. Section 7.1 of the Agreement provides that TMM "shall use commercially reasonable efforts to cause GTFM and each

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 22659332
(Cite as: Not Reported in A.2d)

of its subsidiaries to (i) carry on its business in the ordinary course consistent with past practices ..." Section 7.1(a) through (q) specifies what GTFM cannot do, so as to preserve GTFM for acquisition by KCS. Section 7.10 contains standard no-shop provisions.

FN42. *True North Communications,* 711 A.2d at 45.

The harm TMM alleges that it will suffer if required to abide by the Agreement until the arbitration process reaches an outcome is that TMM will become insolvent. In the present circumstances, I find this alleged harm insufficient to tip the equities in TMM's favor. First, this consideration works in favor of KCS. TMM's precarious financial situation demonstrates that KCS will suffer irreparable harm if the injunction does not issue, as TMM may be unable to satisfy a money judgment. FN43 Second, TMM has not identified any specific actions it intends to take that would avert insolvency, but are inconsistent with the Acquisition Agreement. As it stands now, there are only vague and unsubstantiated allegations of harm-allegations insufficient to overcome the clear right to specific performance contained in the Agreement. FN44 Lastly, TMM's claim of financial ruin if it is forced to abide by the Agreement is undermined by the terms of the Agreement itself. TMM negotiated to have the Agreement terminate on December 31, 2004, in order to give it ample time to obtain the consents of its noteholders. FN45 The fact that TMM anticipated it might have to abide by the terms of the Agreement, including the provisions limiting TMM's freedom of action, until the end of 2004, means that its present assertion that it will be harmed if required to abide by those provisions until resolution of the arbitration process (which will be prompt) rings hollow.

FN43. *Bayard v. Martin,* 101 A.2d 329 (Del.1953), *cert. denied,* 347 U.S. 944 (1954).

FN44. TMM is free to petition this Court for relief from abiding by specific provisions in the Agreement if there are specific actions it wishes to undertake to avoid insolvency that contravene that Agreement.

FN45. Deposition of Larry A. Lawrence at 32-33.

## III. CONCLUSION

**\*6** For the reasons stated above, KCS's motion for a preliminary injunction to prevent TMM from taking any action contrary to the terms of the Acquisition Agreement pending the outcome of the arbitration proceeding that will resolve the merits of the dispute is GRANTED. I have entered an Order consistent with this decision.

Del.Ch.,2003.
Kansas City Southern v. Grupo TMM, S.A.
Not Reported in A.2d, 2003 WL 22659332

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EFiled: Sep 1 2005 10:20AM EDT
Transaction ID 6611290

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

E. I. du PONT de NEMOURS AND COMPANY,       )
                                             )
                    Plaintiff,               )
                                             )
        v.                                   )  C. A. No.
                                             )
LUMBERMENS MUTUAL CASUALTY                   )
COMPANY,                                     )
                                             )
                    Defendant.               )

**NOTICE OF MOTION**

TO:    Register In Chancery
       Court of Chancery
       New Castle County Courthouse
       500 North King Street
       Wilmington, DE  19801

        **PLEASE TAKE NOTICE** that the attached Motion for Admission *Pro Hac Vice*

of Christopher C. French , Esquire, will be presented to the Court at the convenience of the Court

and counsel.

                        POTTER ANDERSON & CORROON LLP

                        By ____ /s/ John E. James _____
                           John E. James (#996)
                           Richard L. Horwitz (#2246)
                           Hercules Plaza, 6th floor
                           1313 North Market Street
                           P. O. Box 951
                           Wilmington, Delaware  19899
                           (302) 984-6000

Dated:  : August 31, 2005          Attorneys for E. I. du Pont de Nemours and
697235                             Company

EFiled: Sep 1 2005 10:20A
Transaction ID 6611290

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

E. I. du PONT de NEMOURS AND COMPANY,   )
                                           )
        Plaintiff,                      )
                                           )
      v.                                )  C. A. No.
                                           )
LUMBERMENS MUTUAL CASUALTY        )
COMPANY,                              )
                                           )
        Defendant.                    )

## **MOTION FOR ADMISSION _PRO HAC VICE_ OF CHRISTOPHER C. FRENCH**

John E. James ("Movant"), a member of the Delaware bar, pursuant to Court of

Chancery Rule 170(b), hereby moves the admission _pro hac vice_ of Christopher C. French ,

Esquire (the "Applicant"), of the law firm of Kirkpatrick & Lockhart Nicholson Graham, LLP.,

535 Smithfield Street, Pittsburgh, PA 15222, to represent the plaintiff E. I. du Pont de Nemours

and Company, in this action. Movant certifies that Movant finds the Applicant to be a reputable

and competent attorney, and Movant is in a position to recommend the Applicant's admission.

The Applicant is admitted, practicing and in good standing in the Commonwealth of

Pennsylvania.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

John M. Sylvester
Christopher C. French
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
(412) 355-6500

Dated: August 31, 2005
697235

By    /s/ John E. James
    John E. James (#996)
    Richard L. Horwitz (#2246)
    Hercules Plaza, 6th floor
    1313 North Market Street
    P. O. Box 951
    Wilmington, Delaware 19899
    (302) 984-6000

    Attorneys for E. I. du Pont de
    Nemours and Company

EFiled: Sep 1 2005 10:20A
Transaction ID 6611290

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

E. I. du PONT de NEMOURS AND COMPANY,    )
                                         )
         Plaintiff,                      )
                                         )
    v.                                   )    C. A. No.
                                         )
LUMBERMENS MUTUAL CASUALTY               )
COMPANY,                                 )
                                         )
         Defendant.                      )

## ORDER

The foregoing application for admission of Christopher C. French , to practice in

this action *pro hac vice* is hereby granted.

**IT IS SO ORDERED** this_____ day of _____, 2005.


_____
                    Chancellor Chandler

EFiled: Sep 1 2005 10:20A
Transaction ID 6611290

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| E. I. du PONT de NEMOURS AND COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C. A. No. |
| ) | |
| LUMBERMENS MUTUAL CASUALTY ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

### CERTIFICATION

I, Christopher C. French , hereby certify:

1.    That I am a member in good standing of the Bar of the Commonwealth of Pennsylvania.

2.    That I shall be bound by the Delaware Lawyers' Rules of Professional Conduct and that I have reviewed the Statement of Principles of Lawyer Conduct.

3.    That I and all attorneys of my firm who directly or indirectly provide services to the party or cause at issue shall be bound by all Rules of the Court of Chancery.

4.    That I consent to the appointment of the Register in Chancery of New Castle County as agent upon whom service of process may be made for all actions, including disciplinary actions, that may arise out of the practice of law under Court of Chancery Rule 170 and any activities related thereto.

5.    That I have appeared in an action in the courts of record of Delaware in the preceding twelve (12) months: *E.I. du Pont de Nemours and Company v. Allstate Insurance Company,* Del. Super. Ct., C.A. No. 99C-12-253-JTV.

6.    That payment for the *pro hac vice* admission assessment in the amount of THREE HUNDRED DOLLARS ($300) is attached to be deposited in the Supreme Court registration fund for the purpose of the governance of the Bar of its Court and may be distributed pursuant to Supreme Court Rule 69.

7.    That I have not been disbarred or suspended, and that I am not the object of any pending disciplinary proceedings in any jurisdiction where I have been admitted generally, pro hac vice, or in any other way.

8.    That I am admitted for the practice of law in the following states or other jurisdictions: Commonwealth of Pennsylvania.

Christopher C. French

2

EFiled: Sep 1 2005 10:20A...ES T
Transaction ID 6611290

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

E. I. du PONT de NEMOURS AND                )
COMPANY,                                     )
                          Plaintiff,         )
                                             )
              v.                             )          Civil Action No.
                                             )
LUMBERMENS MUTUAL CASUALTY                   )
COMPANY,                                     )
                          Defendant.         )
                                             )

## NOTICE OF MOTION

To:   Lumbermens Mutual Casualty Company      Lumbermens Mutual Casualty Company
      c/o Insurance Commissioner              c/o The Office of the Secretary of State
      State of Delaware                       Townsend Building
      841 Silver Lake Boulevard               401 Federal Street – Suite 4.
      Dover, DE  19901                        Dover, DE  19901

            **PLEASE TAKE NOTICE** that Plaintiff will present its Motion for Appointment

of Special Process Server to the Court at the earliest convenience of the Court.


*Of Counsel*:                                 POTTER ANDERSON & CORROON LLP

John M. Sylvester
Christopher C. French                         By_____/s/ John E. James_____
KIRKPATRICK & LOCKHART                             John E. James (#996)
NICHOLSON GRAHAM LLP                               Richard L. Horwitz (#2246)
Henry W. Oliver Building                           Hercules Plaza, 6th Floor
535 Smithfield Street                              1313 North Market Street
Pittsburgh, PA  15222                              Wilmington, DE  19801
(412) 355-6500                                     (302) 984-6000

Dated:  August 31, 2005                       *Attorneys for Plaintiff*
696795/20120-345

EFiled: Sep 1 2005 10:20A... EDT
Transaction ID 6611290

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

|  |  |
|---|---|
| E. I. du PONT de NEMOURS AND COMPANY,<br><br>    Plaintiff,<br><br>   v.<br><br>LUMBERMENS MUTUAL CASUALTY COMPANY,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No.<br>)<br>)<br>)<br>)<br>) |

## MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER

  Plaintiff, E. I. du Pont de Nemours and Company, by its undersigned attorneys, hereby moves pursuant to Court of Chancery Rule 4(c) for the entry of an Order appointing a special process server.

  Appointment of a special process server is requested because Plaintiff has filed a Verified Complaint seeking a temporary restraining order and other injunctive relief. Accordingly, it needs to ensure the expedited and proper service of the Summons, Complaint, and any other documents or papers requiring service on Defendant in this proceeding.

*Of Counsel*:

John M. Sylvester
Christopher C. French
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222
(412) 355-6500

Dated: August 31, 2005
697227/20120-345

POTTER ANDERSON & CORROON LLP

By: _____ /s/ John E. James _____
 John E. James (#996)
 Richard L. Horwitz (#2246)
 Hercules Plaza, 6th Floor
 1313 North Market Street
 Wilmington, DE 19801
 (302) 984-6000

*Attorneys for Plaintiff*

EFiled: Sep 1 2005 10:20A
Transaction ID 6611290

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

E. I. du PONT de NEMOURS AND  )
COMPANY,                      )
           Plaintiff,  )
                   )
          v.  )     Civil Action No.
                   )
LUMBERMENS MUTUAL CASUALTY    )
COMPANY,                      )
           Defendant.  )

## ORDER APPOINTING A SPECIAL PROCESS SERVER

Upon the motion of Plaintiff for appointment of a special process server and for

good cause shown,

**IT IS HEREBY ORDERED** this _____ day of _____, 2005, that

pursuant to Court of Chancery Rule 4(c), Parcels, Inc. is hereby appointed special process server

to serve the Summons, Complaint, and any other papers requiring service on Defendant as

follows:

        Lumbermens Mutual Casualty Company
        c/o Insurance Commissioner
        State of Delaware
        841 Silver Lake Boulevard
        Dover, DE  19901

        Lumbermens Mutual Casualty Company
        c/o The Office of the Secretary of State
        Townsend Building
        401 Federal Street - Suite 4
        Dover, DE  19901

                        _____
                            Master In Chancery

697228/20120-345

*9/2/05 FSS simm to Spec. proc. server (1 copy)*

EFiled: Sep 1 2005 10:25AM EDT
Transaction ID 6611290

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

*1601-N*

E. I. du PONT de NEMOURS AND          )
COMPANY,                               )
          Plaintiff,                   )
                                       )
     v.                                )          Civil Action No.
                                       )
LUMBERMENS MUTUAL CASUALTY             )
COMPANY,                               )
          Defendant.                   )
_____)

## NOTICE OF MOTION

To:  Lumbermens Mutual Casualty Company      Lumbermens Mutual Casualty Company
     c/o Insurance Commissioner               c/o The Office of the Secretary of State
     State of Delaware                        Townsend Building
     841 Silver Lake Boulevard                401 Federal Street – Suite 4.
     Dover, DE  19901                         Dover, DE  19901

**PLEASE TAKE NOTICE** that Plaintiff will present its Motion for Appointment

of Special Process Server to the Court at the earliest convenience of the Court.

*Of Counsel*:                    POTTER ANDERSON & CORROON LLP

John M. Sylvester
Christopher C. French          By_____/s/ John E. James_____
KIRKPATRICK & LOCKHART              John E. James (#996)
NICHOLSON GRAHAM LLP                Richard L. Horwitz (#2246)
Henry W. Oliver Building            Hercules Plaza, 6th Floor
535 Smithfield Street               1313 North Market Street
Pittsburgh, PA  15222               Wilmington, DE  19801
(412) 355-6500                      (302) 984-6000

Dated:  August 31, 2005          *Attorneys for Plaintiff*
696795/20120-345

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

E. I. du PONT de NEMOURS AND )
COMPANY, )
          Plaintiff, )
          )
     v. )     Civil Action No.
          )
LUMBERMENS MUTUAL CASUALTY )
COMPANY, )
          Defendant. )

## MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER

Plaintiff, E. I. du Pont de Nemours and Company, by its undersigned attorneys, hereby moves pursuant to Court of Chancery Rule 4(c) for the entry of an Order appointing a special process server.

Appointment of a special process server is requested because Plaintiff has filed a Verified Complaint seeking a temporary restraining order and other injunctive relief. Accordingly, it needs to ensure the expedited and proper service of the Summons, Complaint, and any other documents or papers requiring service on Defendant in this proceeding.

*Of Counsel*:

John M. Sylvester
Christopher C. French
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222
(412) 355-6500

Dated: August 31, 2005
697227/20120-345

POTTER ANDERSON & CORROON LLP

By: _____ /s/ John E. James _____
    John E. James (#996)
    Richard L. Horwitz (#2246)
    Hercules Plaza, 6th Floor
    1313 North Market Street
    Wilmington, DE 19801
    (302) 984-6000

*Attorneys for Plaintiff*

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| E. I. du PONT de NEMOURS AND COMPANY,          Plaintiff, <br><br> v. <br><br> LUMBERMENS MUTUAL CASUALTY COMPANY,          Defendant. | ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. |

## ORDER APPOINTING A SPECIAL PROCESS SERVER

Upon the motion of Plaintiff for appointment of a special process server and for good cause shown,

**IT IS HEREBY ORDERED** this ___/___ day of _____Sept._____, 2005, that pursuant to Court of Chancery Rule 4(c), Parcels, Inc. is hereby appointed special process server to serve the Summons, Complaint, and any other papers requiring service on Defendant as follows:

> Lumbermens Mutual Casualty Company
> c/o Insurance Commissioner
> State of Delaware
> 841 Silver Lake Boulevard
> Dover, DE 19901

> Lumbermens Mutual Casualty Company
> c/o The Office of the Secretary of State
> Townsend Building
> 401 Federal Street - Suite 4
> Dover, DE 19901

_____
Master In Chancery

697228/20120-345



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

E.I. duPONT de NEMOURS AND
COMPANY
      Plaintiff(s)
          V
LUMBERMENS MUTUAL
CASUALTY COMPANY
      Defendant(s)

CA #: 1601-N

SUMMONS

THE STATE OF DELAWARE
TO:   SPECIAL PROCESS SERVER

### YOU ARE COMMANDED:

To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon John E. James, Esq., Plaintiff's attorney whose address is 1313 North Market St., 6th Floor, Wilmington, DE 19801 an answer to the complaint.

To serve upon defendants a copy hereof and of the complaint.

### TO THE ABOVE NAMED DEFENDANTS:

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney name above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated September 2, 2005

_____
Register in Chancery

Case # <u>1601-N</u>

E.I. duPONT de NEMOURS AND
COMPANY
Plaintiff(s)
V
LUMBERMENS MUTUAL
CASUALTY COMPANY
Defendant(s)

## SUMMONS

Please effectuate service upon:

Lumbermens Mutual Casualty Company

BY SPECIAL PROCESS SERVER

Plaintiff's Attorney:  <u>John E. James, Esq.</u>

EFiled: Sep 1 2005 10:20AM EDT
Transaction ID 6611290

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| E. I. du PONT de NEMOURS AND COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. |
| | ) | |
| LUMBERMENS MUTUAL CASUALTY COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## VERIFIED COMPLAINT

E. I. du Pont de Nemours and Company ("DuPont"), by its undersigned counsel, as its Verified Complaint against Lumbermens Mutual Casualty Company ("Lumbermens"), alleges the following:

### Introduction

1.      In this action, DuPont is seeking injunctive, declaratory, and monetary relief to prevent Lumbermens, which is one of the insurance companies and related affiliates that does business under the umbrella name of Kemper Insurance Companies (collectively referred to hereinafter as "Kemper"), from collecting amounts from DuPont that Kemper claims to be due, but which are not due, under a comprehensive insurance program for the 2002-03 policy year.

2.      Under the Kemper insurance program, DuPont is largely self-insured. Consequently, at the beginning of each annual policy period, DuPont has paid Kemper an insurance premium for the limited risk transfer achieved in the insurance program, as well as for Kemper's claims handling services, overhead, profit, surcharges, assessments, and taxes. For the 2002-03 policy year, DuPont paid Kemper approximately $1 million for these charges. DuPont

also has paid, on average, tens of thousands of dollars weekly into an escrow account to fund Kemper's payment of DuPont's losses, consistent with the insurance program. DuPont also has provided a letter of credit and a surety bond to ensure those weekly payments.

3.    In essence, each year DuPont's account is audited to determine whether the initial projection regarding DuPont's payroll, which is part of the premium calculation, was accurate. If the account balancing reveals the projection was high, then the administrative costs and the limited risk transfer premium paid by DuPont based upon the excessive payroll projection is refunded or credited to DuPont in the form of a "dividend." If the account balancing reveals the projection was low, then DuPont pays to Kemper an additional amount.

4.    Because DuPont effectively is self-insured for most claims, the so-called "dividend" is nothing more than an accounting calculation that determines whether DuPont has paid Kemper the appropriate premium and related administrative costs and taxes based upon the projected payroll. Thus, the so-called "dividend" is not a share of the profits of Kemper, as would be the normal understanding of the term "dividend."

5.    Contrary to the purpose and intent of the insurance program, and solely because Kemper is on the brink of insolvency, Kemper has refused to count DuPont's "dividend" side of the equation during the account balancing and claims that DuPont owes it a premium in excess of $5 million even though DuPont essentially is self-insured. Kemper has acknowledged that DuPont's "dividend" under the applicable accounting formula is in excess of $4.5 million. Indeed, a correct account balancing under the applicable formula reveals that instead of DuPont owing Kemper millions of dollars, Kemper owes DuPont $119,111.00.

6.    Thus, Kemper effectively is attempting to collect from DuPont the premium amount that would be due if DuPont were not self-insured for most of the insurance program and

2

had not already paid millions of dollars to pay for the claims asserted against DuPont. Kemper has threatened to draw down on a letter of credit and a surety bond posted by DuPont in order to collect this fictional debt that it has created for DuPont.

7.    Consequently, through this lawsuit, DuPont asks this Court to declare DuPont's rights and obligations under the Insurance Program and to enjoin any collection efforts by Kemper until those rights have been determined. DuPont also requests monetary relief to the extent that DuPont has already paid amounts to Kemper that exceed DuPont's obligations under the Insurance Program, and further requests the release of excess collateral that DuPont has provided. Simply put, DuPont should not be required to pay millions of dollars to Kemper in exchange for nothing simply because Kemper is on the brink of insolvency.

### Parties

8.    DuPont is a corporation organized under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware.

9.    Lumbermens is an insurance company organized under the laws of the State of Illinois with its principal place of business at One Kemper Drive, Long Grove, Illinois. Lumbermens is one of the Kemper Insurance Companies and is licensed by the Insurance Commissioner of the State of Delaware to sell insurance in Delaware to Delaware policyholders like DuPont.

### Kemper's Insurance Products

10.    Kemper sold various insurance products to DuPont from October 1, 1971 until March 1, 2003, including workers' compensation, automobile liability and general liability insurance policies, as well as various premium agreements, claim handling agreements (through related entities), indemnity agreements, and warranty agreements.

3

11.     Kemper sold its insurance products to DuPont through a comprehensive insurance program ("Insurance Program") designed and warranted to meet DuPont's needs: to satisfy all insurance regulatory requirements, to transfer certain specifically identified risks of loss, and to retain the financial responsibility for most risks of loss while concurrently retaining the benefits of positive loss performance under its specific Insurance Program.

12.     For the last several decades, DuPont's commitment to safety, combined with its financial resources, has allowed DuPont to adopt a risk management strategy in which DuPont retains substantial financial responsibility for its own risks of loss.

13.     DuPont's commitment to safety extends to certain contractors that work on projects for DuPont. As a result, DuPont has found that it can insure certain liabilities of its contractors more cost effectively than those contractors could obtain such insurance in the open market. Because DuPont did not wish to expose itself to unlimited risk relating to its contractors' losses that were covered under the Insurance Program, DuPont annually paid Kemper an additional charge to cap its financial responsibility for the contractors' workers' compensation losses (including defense expenses) at $1 million per occurrence.

14.     Thus, under the Insurance Program devised by Kemper, the known mutual intent of the parties was for DuPont to retain most of the financial responsibility for risks of loss, but to obtain a real transfer of underwriting risk for some potential losses, such as the contractors' workers' compensation losses in excess of $1 million per occurrence.

15.     DuPont's Insurance Program with Kemper was renewed annually through the issuance and acceptance of proposals, insurance policies, and other documents and agreements that constituted the Insurance Program.

4

**Insurance Proposals**

16.    Every year, DuPont would receive an insurance proposal ("Insurance Proposal") from Kemper, through which Kemper explained the Insurance Program. When the terms of the Insurance Proposal were finalized, Kemper would send an Insurance Proposal noted "final and accepted." DuPont and Kemper would sign those Insurance Proposals annually, sometimes long after the policy period began. The final and accepted Insurance Proposal issued by Kemper for 2002-03 is attached as Exhibit 1.

17.    Although the Insurance Program evolved over the years, and changed materially in 2000, it essentially consisted of three components: (1) Workers' Compensation Large Risk Contributory Dividend Plan ("LRDP") and warranty agreement; (2) fronting insurance and indemnity agreement; and (3) a large deductible workers' compensation program for certain operations.

18.    The fronting and large deductible aspects of the Insurance Program are generally not at issue in this lawsuit, as there is no current, substantial, and known disagreement between Kemper and DuPont relating to the fronting and large deductible aspects of the Insurance Program.

19.    The pre-2000 policy years of the Insurance Program also are not at issue in this lawsuit, as there is no current, substantial, and known disagreement between Kemper and DuPont relating to the pre-2000 policy years.

20.    Prior to 2000, the Insurance Program required DuPont to pay Kemper a deposit premium and collateral in three forms: (1) fixed payments (which included charges for Kemper's overhead and profit, taxes, front fees, various surcharges and assessments, and the full risk transfer purchased by DuPont for specified risks) (referred to hereinafter as the "Fixed

5

Payments"); (2) incurred losses (which included amounts paid by Kemper as well as the outstanding reserves Kemper placed on specific, identifiable open claims); and (3) security in the form of deposits to a bank account earning interest for DuPont which was converted in 1999 to a letter of credit and surety bond (in equal amounts). If DuPont overpaid in any given year, a refund was issued or credited to DuPont in the form of a "dividend." (Copies of the letter of credit and surety bond are attached as Exhibit 2).

21.    Beginning with the 2000 policy year, the Insurance Program changed to a "pay-as-you-go" program that required DuPont to pay Kemper a deposit premium and collateral in three forms: (1) Fixed Payments; (2) reimbursement for paid losses; and (3) security in the form of a letter of credit and surety bond (in equal amounts). The major change in the Insurance Program in 2000 was that DuPont would only be required to replenish an escrow account held by a third party administrator affiliate of Kemper, NATLSCO (now known as Broadspire), for losses as they were actually paid, rather than paying in advance for "incurred loss" with annual refunds or credits for overpayments.

22.    In 2002, for example, (1) DuPont paid Kemper $1,043,343 in Fixed Payments over the course of the year, consisting of $760,601 in required plan cash, $97,742 in surcharges and assessments, and $185,000 in front fees; (2) DuPont paid and continues to pay varying weekly amounts, as requested by Kemper and as contemplated in the Insurance Proposal, to replenish an escrow account used to pay all losses as they arise under the Insurance Program; and (3) DuPont maintained security in the amount of $19,208,708, which was divided 50/50 between a letter of credit and a surety bond.

23.    Because DuPont initially funded and constantly replenishes the escrow account, the third party administrator pays covered claims with DuPont's money.

6

24.    Kemper has never claimed that DuPont ever failed to pay promptly any of the weekly billing amounts necessary to replenish the escrow account for losses paid under the Insurance Program.

### The "Dividend" Plan

25.    The dispute in this case arises due to Kemper's pending insolvency and because the "dividend formula" did not change in the Insurance Program in 2000 even though the program changed from an "incurred loss" program to a "pay-as-you-go" program.

26.    The LRDP portion of the Insurance Program, as explained in the Insurance Proposals, included a "Dividend Formula" stating that "Dividend equals Audited Subject premium minus (Basic Premium plus Converted Limited Losses) x Tax Multiplier + (N.Y. Loss Expense)."

27.    Generally speaking, the term "Audited Subject Premium" is the amount of premium that DuPont would have owed if the Insurance Program had been a traditional insurance program, i.e., one in which the insurance company bears the risk of loss and the policyholder is not required to pay its own losses through an escrow account or to reimburse the insurance company for losses.

28.    Audited Subject premium takes into account: (1) a company's audited payroll; (2) premium rates established by workers' compensation rating agencies for various job classifications; (3) an experience modification factor reflecting the policyholder's own particular prior loss experience as compared with its peers, and (4) premium and deductible discounts.

29.    The term "Basic Premium" is undefined but reflects the Fixed Payments that DuPont paid at the beginning of each policy period, which were based upon DuPont's projected payroll and were subject to a payroll audit at the close of the policy period.

7

30.    The term "Converted Limited Losses" is undefined but reflects the losses under the Insurance Program for which DuPont bears ultimate financial responsibility.

31.    The Insurance Program was subject to an annual Cash/Security Reconciliation, sometimes referred to as a dividend adjustment or dividend determination.

32.    In short, under that Cash/Security Reconciliation, the cash required from DuPont was adjusted to reflect DuPont's actual payroll as opposed to the projected payroll used for the initial Fixed Payment.  Because DuPont makes weekly payments to cover its losses, the Cash/Security Reconciliation typically results in a relatively small credit or deficit in the account which is based upon how accurate the original payroll projection was.

33.    Also under the Cash/Security Reconciliation, the security was to be adjusted to secure ultimate expected loss amounts using agreed upon loss development factors.

### "Dividends" In Name Only

34.    In 2000, when the Insurance Program converted to a "pay-as-you-go" program, DuPont's obligations to Kemper became even more closely tied to DuPont's loss performance, as DuPont was billed weekly for losses paid by Kemper.

35.    Even though Kemper continued to use the term "dividend plan" and LRDP to describe one aspect of DuPont's insurance program, DuPont was not obligated to pay incurred losses and receive a return of "dividend" based upon loss performance, but instead was required to pay amounts into an escrow account weekly as Kemper paid the losses.  Consequently, the "dividend" portion of the program actually became only a line item in an accounting formula by which the up front premium DuPont paid to Kemper at the beginning of each policy year, which was based upon projected payroll figures, is later reconciled with the actual payroll figures for the time period.

8

36.    Thus, the "dividends" to be determined by Kemper are not dividends in the traditional sense, in which the profits of a company are distributed among its owners. Rather, the "dividends" are an accounting calculation whereby it is recognized that DuPont is largely self-insured and DuPont receives full credit for its loss payments. Thus, the "dividend" is not tied to Kemper's overall financial performance. Rather, the "dividend" is based upon DuPont's Insurance Program alone.

37.    According to its most recent determination, Kemper currently owes DuPont a "Disallowed Dividend Due Insured" of $4,532,579. Kemper, however, has declined to credit that "dividend" to DuPont due to Kemper's financial problems.

### Collateral Provided By DuPont

38.    In order to secure DuPont's obligations to pay its own losses under the Insurance Program, Kemper required certain collateral in the form of a letter of credit and a surety bond.

39.    The Insurance Proposal contained a method for determining the security required by the Insurance Program and provided for an annual security reconciliation:

> Security will be used to secure the estimated ultimate losses less the amount of losses paid to date. The actual amount of estimated ultimate losses will be established at inception and will be adjusted annually.

40.    As of April 30, 2005, DuPont had provided a Safeco bond in the amount of $5,995,646 and a letter of credit with J.P. Morgan for $9,604,354 as security.

41.    Previously, DuPont had provided security in the amount of $19,208,708, which had been divided equally between a surety bond and a letter of credit – $9,604,354 through a letter of credit and $9,604,354 through a surety bond.

42.    In discussions and negotiations with DuPont in 2004 and 2005, Kemper recognized it was holding excess collateral.

9

43.    Kemper refused to reduce the surety bond amounts and letter of credit amounts equally, instead reducing only the surety bond, which is contrary to the Insurance Program.

44.    Kemper has failed to perform a proper security review and, upon information and belief, the Insurance Program remains significantly overcollateralized.

### Kemper's Attempts To Collect Debts Not Owing

45.    On September 14, 2004, Kemper sent an invoice to DuPont claiming that DuPont owed Kemper $12,459,116.

46.    DuPont registered numerous objections to the calculations through its insurance broker, Marsh USA, Inc. ("Marsh").

47.    Kemper ultimately issued a revised calculation on May 12, 2005, claiming that DuPont owed Kemper $6,292,733 ("Revised Calculation").

48.    The Revised Calculation still was incorrect.  On June 23, 2005, Marsh sent detailed calculations to Kemper's representative showing that amounts were still being overbilled.

49.    Marsh followed up by e-mail on August 4, 2005, in an effort to resolve the outstanding billing issues relating to the Revised Calculation.

50.    Kemper has not responded to Marsh's identification of those additional billing inaccuracies.

51.    The Revised Calculation does not properly reflect all payments made by DuPont.  Furthermore, in both the original calculation and the revised calculation, Kemper has failed to properly credit DuPont with the "dividend" as determined in accordance with the Insurance Program.  Kemper has simply ignored, because of its financial distress, the credit DuPont receives under the formula as a result of DuPont paying its own losses under the program.

10

52.    Specifically, in the Revised Calculation, Kemper calculated a "Disallowed Dividend Due Insured" of $4,532,579 and thus, Kemper improperly is attempting to charge DuPont a premium in excess of $4.5 million that is not owed.

53.    In short, Kemper is attempting to charge DuPont the full Audited Subject Premium, which is what Kemper would have charged if DuPont had <u>not</u> been paying its own losses.

54.    Stated differently, Kemper is attempting to collect the full Audited Subject Premium as if DuPont maintained no financial responsibility to pay its own losses.  Yet, at the same time, Kemper is still requiring DuPont to pay weekly tens of thousands of dollars of its own losses.  Kemper has determined that DuPont is entitled to a "dividend" credit of $4,532,579, yet Kemper improperly has declined to credit DuPont with that amount in accordance with the dividend formula.  Kemper may not undermine the entire structure and purpose of the Insurance Program by charging DuPont for an insurance product that DuPont never requested and Kemper never provided.

55.    On July 27, 2005, Kemper also attempted to charge interest of $902,475.71 ("Interest Billing"), purportedly on the amounts claimed to be owed by DuPont even though Kemper acknowledges the charges include interest on amounts which (1) Kemper conceded were not due; (2) already had been paid by DuPont after Kemper made corrections to its billings; and (3) were untraceable to any prior billings.

56.    For example, in its Interest Billing, Kemper charges interest of $328,158.72 on a line item of $2,563,740 that was allegedly invoiced on September 14, 2004, which was the date of the original $12,459,116 billing that Kemper has admitted was incorrect.  But when it removed that line item on its Revised Calculation of May 12, 2005, because that amount was not

11

owed, Kemper removed interest charges of only $62,811.63. Thus, in this example, Kemper is charging interest of $265,347.09 ($328,158.72 minus $62,811.63) on a "debt" that Kemper admits was never owed.

57.    Kemper knows or should know that its claim for interest is patently false and is made in bad faith. Indeed, the Insurance Program sold to DuPont does not include any provision allowing Kemper to charge DuPont interest on amounts claimed to be due.

### Kemper's Decision Not To Pay or Credit "Dividends"

58.    Kemper's effort to collect the Audited Subject Premium from DuPont without offsetting the "dividend" is based upon a general Kemper corporate policy of not paying any dividends that Kemper recently adopted as a result of its financial problems, rather than a fair reading of the Insurance Program in light of the purpose and intent of the parties.

59.    Kemper's corporate policy is not in accordance with DuPont's Insurance Program. Indeed, this change in Kemper's corporate policy should not have any impact on policyholders such as DuPont that are essentially self-insured because they do not receive any true "dividends" anyway. DuPont already has paid Kemper for whatever risk transfer was bargained for, along with overhead and profit, in its initial payment of premium at the beginning of the policy period and has paid for any adjustment in that initial amount based upon the payroll audit at the conclusion of the policy period where DuPont has been able to confirm those calculations with Kemper. Thus, in DuPont's case, the "dividend" is nothing more than a component in an accounting formula.

60.    DuPont recognizes its obligation to continue to reimburse Kemper for understated incurred losses and obtain credit for overstated incurred losses (for the Insurance Program prior to 2000) and to replenish the escrow account for paid losses (for the Insurance

Program from 2000-03) so long as Kemper continues to pay those losses. It was never the intent of the parties to the Insurance Program, however, that DuPont would be required to pay the entire Audited Subject Premium (which does not account for the fact that DuPont essentially is self-insured) in addition to the amounts DuPont is paying weekly to cover its losses, as if Kemper were providing traditional insurance in which Kemper was required to pay the full amount of insured losses and did not receive reimbursement of loss payments from DuPont.

61.    The course of dealing and course of performance under the Insurance Program fully supports DuPont's position as to the proper interpretation of the Insurance Program.

### Kemper's Financial Condition

62.    Through December 2002, Kemper was representing to DuPont, to insurance brokers, and to the public at large that its financial strength was excellent.

63.    In contrast to those public representations, Kemper was experiencing significant financial difficulty by late 2002, resulting in serious erosion of its statutory surplus (assets in excess of liabilities) and the downgrading of its credit worthiness.

64.    On December 24, 2002, A.M. Best Company ("A.M. Best") lowered the financial strength rating of Kemper from A- (Excellent) to B+ (Very Good). Because most commercial policyholders and insurance brokers will not do business with an insurance company that has less than an A- rating from A.M. Best, the downgrade effectively prevented Kemper from writing new policies or retaining existing policyholders.

65.    When downgrading Kemper, A.M. Best cited Kemper's recently announced business decision to repurchase $125 million of Berkshire Hathaway's minority equity investment in a Kemper subsidiary company because Kemper's decision caused problems with Kemper's overall capitalization and liquidity.

66.     With regard to that Berkshire Hathaway transaction, upon information and belief, Kemper had created a stock company in 2002 named Kemper Commercial Insurance Company, into which Berkshire Hathaway invested $125 million, representing approximately 15% of the capital of the new company.

67.     Upon information and belief, Kemper's transfer of $125 million to Berkshire Hathaway was intended to favor that equity investor over Kemper's policyholder creditors, toward whom Kemper owed a special duty of loyalty as a result of its mutual company form.

68.     Upon information and belief, Kemper's transfer of $125 million to Berkshire Hathaway was intended to hinder, delay or defraud the policyholder creditors of Kemper, such as DuPont.

69.     Between December 20-24, 2002, Moody's Investor Services, Standard & Poor's, and A.M. Best all downgraded Kemper's financial strength and other financial ratings.

70.     Shortly thereafter, Kemper announced that it would no longer sell insurance. Indeed, Kemper announced that it had reached a definitive agreement to sell the renewal rights to its bundled large risk national accounts, like DuPont's account, to Argonaut Insurance Company.

71.     In a conference call on January 4, 2003, Dennis Kane, the President of Kemper Casualty, noted that the changes in financial rating were not unexpected but their magnitude was a surprise. Mr. Kane blamed Kemper's difficulties on being trapped in a mutual company shell, thereby preventing Kemper from tapping the capital markets in the same manner as some competitors.

14

72.   Indeed, Kemper's financial rating has gone from an A- in July 2002, to a D in April 2005, to a NR (unrated) today. (A copy of A.M. Best's current report for Kemper is attached as Exhibit 3).

73.   DuPont cancelled its Insurance Program with Kemper as of March 1, 2003.

74.   Upon information and belief, Kemper was fully aware of the continuing drain on its statutory surplus and the impending downgrading of its credit rating while it was negotiating with DuPont for the renewal of the Insurance Program in December of 2002 for the 2003 policy year.

75.   Upon information and belief, Kemper was fully aware of the continuing drain on its statutory surplus and the impending downgrading of its credit rating when it was finalizing the details of the 2002 Insurance Program, given that the Insurance Proposal for 2002 was not signed by DuPont until October 31, 2002, and was not signed by Kemper until November 22, 2002.

76.   Nevertheless, Kemper continued to represent to DuPont and other policyholders that it was a stable and solvent company. For example, in an advertisement that Kemper placed in *Business Insurance* on December 16, 2002, mere days before A.M. Best downgraded Kemper, Kemper stated: "And as with anything at Kemper, you'll always have the integrity of our reputation for financial stability and strength." (A copy of Kemper's *Business Insurance* ad is attached as Exhibit 4).

77.   As a result of its financial problems, Kemper has entered into "run off" mode whereby it is attempting to achieve an orderly winding down of its business operations without entering rehabilitation or liquidation proceedings. Kemper has taken extraordinary steps

15

to temporarily avoid insolvency, including reportedly reducing its workforce from 7,000 to 370 employees (a reduction of nearly 95%) and selling its headquarters in Long Grove, Illinois.

78.     Even with these drastic measures, Kemper's statutory surplus continues to decline rapidly. Kemper's year-end 2003 surplus was $212.4 million. In February of 2005, Kemper submitted its unaudited annual financial statements, which indicated a surplus of approximately $182 million.

79.     However, on August 15, 2005, Kemper reported that its surplus for the first six months of 2005 is actually only $114.5 million.

80.     Kemper has not yet released its audited annual statements. Kemper reports, however, that its surplus is expected to decline by approximately $12 million per month, excluding the impact of claims and reinsurance commutations and loss development.

81.     On June 10, 2004, the Illinois Department of Insurance reportedly approved Kemper's second proposed run-off plan, the first such plan having been rejected by the state regulators.

82.     Kemper's run-off plan remains secret, as neither Kemper nor the Illinois Department of Insurance has disclosed its terms. However, in a press release announcing the approval of the plan, Kemper disclosed that it has "little premium revenue (about $90 million estimated for 2004 and virtually none thereafter)" and that all investment income being generated is "offset by expenses." Most tellingly, Kemper admitted that achieving the plan's objective of positive surplus and liquidity through 2006 "will be very challenging." (A copy of Kemper's press release is attached as Exhibit 5).

**Count I**
**PRELIMINARY AND PERMANENT INJUNCTION**

83.    DuPont repeats and realleges the averments contained in the above paragraphs, as if the same were fully set forth herein.

84.    Kemper has threatened to draw down or present a claim against the security provided DuPont, even though no debt is owed.

85.    As a result of Kemper's precarious financial condition, if Kemper draws down the collateral, Kemper likely will not be able to return those amounts if this Court determines that they were not due from DuPont, leaving DuPont irreparably harmed and without an adequate remedy at law.

86.    Accordingly, DuPont would suffer irreparable harm if Kemper continues its efforts to collect a disputed debt and improperly draws down the collateral provided by DuPont.

87.    The balance of equities favor providing DuPont with injunctive relief.

88.    Kemper would not be harmed by the maintenance of the existing security, such that if this Court determined that any debt were actually due, the security would remain available to satisfy any such debt.

WHEREFORE, DuPont respectfully requests that a temporary restraining order, preliminary, and permanent injunctive relief be ordered against Kemper, and any further relief this Court deems equitable, just and proper, as follows:

a.    Enjoining Kemper from drawing down or presenting any demands for payment under any collateral or security provided by DuPont, including any letters of credit and/or surety bonds before this action is resolved.

17

b.      Requiring Kemper to perform a security review within ninety (90) days and to release any security that is undisputed to be in excess of estimated ultimate losses less the amount of losses paid by DuPont to date.

**Count II**
**DECLARATORY JUDGMENT**

89.     DuPont repeats and realleges the averments contained in the above paragraphs, as if the same were fully set forth herein.

90.     DuPont has legal rights and obligations under its Insurance Program with Kemper, as set forth above.

91.     An actual and justiciable controversy exists between DuPont and Kemper, whose interests are real and adverse regarding the interpretation, application, and meaning of the Insurance Program and DuPont's rights and obligations thereunder.

92.     Under the circumstances, it is necessary and appropriate for the Court to declare DuPont's rights and obligations under the Insurance Program.

93.     Declaratory relief from this Court will resolve all substantial outstanding issues between DuPont and Kemper relating to DuPont's premium, reimbursement, and collateral obligations under the Insurance Program for the 2002-03 policy year.

WHEREFORE, pursuant to 10 *Del C.* § 6501, et seq., DuPont respectfully requests that the Court enter judgment in its favor and against Kemper ordering and decreeing that: (1) DuPont has no current obligation to pay any amounts to Kemper; (2) dividends shall be determined as provided in the Insurance Program and shall be included as an offset or recoupment in all calculations and adjustments of premium charged to DuPont; (3) Kemper is not entitled to charge or collect from DuPont the "Disallowed Dividend Due Insured" of $4,532,579 identified in the

18

Revised Calculation; (4) Kemper owes DuPont $119,111.00; and (5) DuPont is entitled to such other and further monetary and declaratory relief which the Court deems just and proper.

### Count III
### UNJUST ENRICHMENT

94.     DuPont repeats and realleges the averments contained in the above paragraphs, as if the same were fully set forth herein.

95.     Kemper is claiming a benefit or asset from DuPont to which it is not entitled, i.e., the "Disallowed Dividend Due Insured" of $4,532,579 identified in the Revised Calculation and interest in the amount of $902,475.71.

96.     Kemper also is claiming a benefit or asset from DuPont to which it is not entitled, i.e., security in excess of the estimated ultimate losses minus losses paid to date.

97.     It would be unjust, inequitable, and unconscionable for Kemper (1) to collect an unearned premium, which actually constitutes the "Disallowed Dividend Due Insured" of $4,532,579 identified in the Revised Calculation, and interest in the amount of $902,475.71; or (2) to retain possession of the security in excess of the estimated ultimate losses minus losses paid to date or to retain premium amounts that are in excess of DuPont's obligation to Kemper.

WHEREFORE, DuPont respectfully requests that the Court order restitution to DuPont of all amounts it would be inequitable for Kemper to retain.

### Count IV
### EQUITABLE FRAUD

98.     DuPont repeats and realleges the averments contained in the above paragraphs, as if the same were fully set forth herein.

99.     Kemper made false statements to DuPont and the public, which include but are not limited to the following:

a.      Representations relating to Kemper's financial condition, including: (i) a representation in *Business Insurance* on December 16, 2002, stating that "And as with anything at Kemper, you'll always have the integrity of our reputation for financial stability and strength" and (ii) a representation in correspondence addressed to Eugene Slesicki at DuPont dated September 11, 2000, touting Kemper's "tremendous growth and success in the past year";

b.      Concealments relating to Kemper's financial condition, including its failure to disclose its true financial condition to DuPont in December, 2002, when DuPont was negotiating a renewal of its coverage;

c.      Statements and assurances that DuPont's Insurance Program would continue to work as in past years;

d.      Statements, explanations and assurances relating to how the Insurance Program would work, particularly that Kemper understood that the Insurance Program from January 1, 2000 through March 1, 2003 was to operate in the following manner: DuPont would pay the basic premium and fees (which amounts were paid initially, subject to payroll audit), reimburse the escrow account weekly for paid losses, provide adequate collateral to ensure DuPont's reimbursement of the paid amounts pursuant to the formula in the Insurance Proposal, and would not pay amounts to Kemper based upon "audited subject premium" or "incurred losses" in those years;

e.      Kemper represented that it had always paid or credited dividends on the LRDP's in the past, thereby inducing reliance upon the issuance of the dividends, without providing adequate warning of the facts or circumstances in which Kemper would refuse to declare such dividends;

20

f.    Kemper failed to disclose that its declaration of dividends was tied to Kemper's overall financial performance, instead representing to DuPont that the issuance of dividends was tied to the performance of DuPont's particular Insurance Program.

100.    Kemper's statements were intended to induce and did induce reliance on the part of DuPont.    Among other things, Kemper's representations induced DuPont to act in purchasing the insurance as offered, and to refrain from acting by changing or clarifying the Insurance Program terms or by moving the Insurance Program to another insurance company.

101.    DuPont justifiably relied on Kemper's statement to DuPont and/or its representatives about the operation of the Insurance Program and about Kemper's financial condition.

102.    DuPont has been damaged by its reliance on Kemper's representations.

WHEREFORE, DuPont respectfully requests judgment against Kemper for all monies due DuPont under the Insurance Program, a release of all excess collateral, other compensatory and consequential damages, interest, attorney's fees, costs, and any further relief this Court deems equitable, just and proper.

## Count V
## EQUITABLE ESTOPPEL

103.    DuPont repeats and realleges the averments contained in the above paragraphs, as if the same were fully set forth herein.

104.    DuPont lacked knowledge about Kemper's financial condition and the manner in which Kemper would treat the Insurance Program if its financial condition were to deteriorate.

105.    Kemper knew that its financial condition was deteriorating and knew about DuPont's insurance needs and intent in purchasing the Insurance Program.

106.    Kemper's conduct and representations led DuPont to believe that DuPont would be required only: to pay the basic premium and fees (which amounts were paid initially, subject to payroll audit), to reimburse the escrow account weekly for paid losses, and to provide adequate collateral (pursuant to the formula in the Insurance Proposal) to ensure DuPont's reimbursement of the paid amounts.

107.    The conduct and representations of Kemper were intended to induce reliance on the part of DuPont. Among other things, Kemper's representations induced DuPont to act in purchasing the insurance as offered, and to refrain from acting by changing or clarifying the Insurance Program terms or by moving the Insurance Program to another insurance company.

108.    DuPont suffered a prejudicial change in position as a consequence of the conduct and representations of Kemper.

WHEREFORE, DuPont respectfully requests that Kemper be estopped from collecting a disallowed "dividend" due DuPont and otherwise acting contrary to the purpose and intent of the Insurance Program, and that judgment be entered against Kemper for all monies due DuPont under the Insurance Program, a release of all excess collateral, other compensatory and consequential damages, interest, attorney's fees, costs, and any further relief this Court deems equitable, just and proper.

## Count VI
## BREACH OF CONTRACT

109.    DuPont repeats and realleges the averments contained in the above paragraphs, as if the same were fully set forth herein.

110.    Kemper agreed in the Insurance Proposal and/or Insurance Program to credit certain "dividends" to DuPont.

22

111.    Kemper breached its contract(s) with DuPont by disallowing a "dividend" credit of $4,532,579.

112.    Kemper breached its contract(s) with DuPont by failing to pay DuPont $119,111.00 which currently is due and owed.

113.    In addition, Kemper breached its contract(s) with DuPont by claiming a benefit or asset from DuPont to which it is not entitled, i.e., security in excess of the estimated ultimate losses minus losses paid to date.

WHEREFORE, DuPont respectfully requests judgment against Kemper for breach of contract and requests that it be awarded compensatory and consequential damages in the amount of $119,111.00, interest, attorney's fees, costs, and any further relief this Court deems equitable, just and proper.

### Count VII
### REFORMATION

114.    DuPont repeats and realleges the averments contained in the above paragraphs, as if the same were fully set forth herein.

115.    The parties mutually intended that the Insurance Program beginning with the 2000 policy year would be a "pay-as-you-go" Insurance Program in which DuPont would be required to provide: (1) Fixed Payments at the beginning of the policy period, as adjusted at a subsequent payroll audit; (2) replenishment of an escrow account on a weekly basis to pay losses; and (3) security in the form of a letter of credit and surety bond (in equal amounts).

116.    By providing these payments and security, DuPont paid for Kemper's overhead, profit, surcharges, assessments, taxes, and for all real transfer of underwriting risk, while DuPont paid its own losses under the Insurance Program through the escrow account and provided

23

security to ensure Kemper that DuPont would continue to meet its weekly obligations to replenish the escrow account to pay losses.

117.    It was never the intent of the parties that Kemper would be required to pay losses under the Insurance Program as constituted after 2000, other than those risks of losses specifically identified (such as the contractors' losses in excess of $1 million per occurrence), without repayment by DuPont. Likewise, it was never the intent of the parties that DuPont would be required to pay the full audit premium without credit for the "dividend" – the portion of the audited subject premium amount that was not actually needed to pay losses under the Insurance Program because losses already had been paid. To pay such premium would constitute payment of a premium for insurance coverage that is not provided under the Insurance Program.

118.    To the extent that the Insurance Proposals, dividend endorsements, or other program agreements would purport to require DuPont to pay the full audited subject premium without credit for the "dividend" properly determined in accordance with the formula provided in the Insurance Program, those Insurance Proposals, dividend endorsements, or other program agreements must be reformed to accurately reflect the intent of the parties in entering into the Insurance Program, as well as to achieve the reasonable expectations of the policyholder, DuPont.

WHEREFORE, DuPont respectfully requests that the Insurance Proposals, dividend endorsements, and other program agreements be reformed to accurately reflect the intent of the parties in entering into the Insurance Program, as well as to achieve the reasonable expectations of the policyholder, DuPont, and that judgment be entered against Kemper for all return premium due under the Insurance Program including but not limited to the $119,111.00 which currently is due and owed DuPont, a release of all excess collateral, other compensatory and consequential

24

damages, interest, attorney's fees, costs, and any further relief this Court deems equitable, just and proper.

*Of Counsel*:                                          POTTER ANDERSON & CORROON LLP

John M. Sylvester
Christopher C. French
KIRKPATRICK & LOCKHART          By:___ /s/ John E. James_____
   NICHOLSON GRAHAM LLP              John E. James (No. 996)
Henry W. Oliver Building                   Richard L. Horwitz (No. 2246)
535 Smithfield Street                         Hercules Plaza – Sixth Floor
Pittsburgh, PA  15222                       1313 North Market Street
Telephone:  (412) 355-6500              Wilmington, DE  19801
                                     Telephone:  (302) 984-6000

                                  *Attorneys for Plaintiff*

Dated:  August 31, 2005
696542/20120-345

25

EFiled: Sep 1 2005 10:20A
Transaction ID 6611290

# EXHIBIT

# 1

# INSURANCE PROPOSAL

### FINAL & ACCEPTED

PREPARED FOR:              E.I. DUPONT DE NEMOURS & CO., INC.

SUBMITTED BY:              LUMBERMENS MUTUAL CASUALTY COMPANY

QUOTATION FOR PERIOD:      JANUARY 1, 2002 TO JANUARY 1, 2003

PRODUCER:                  MARSH USA, INC.

OFFICE LOCATION:           NEW YORK, NEW YORK

## DESCRIPTION OF PROGRAM

This joint proposal by Lumbermens Mutual Casualty Company (LMC) and National Loss Control Service Corporation (NATLSCO) is specifically designed for E.I. DUPONT DE NEMOURS & CO., INC.

This program utilizes a one year Workers' Compensation Large Risk Contributory Dividend Plan (LRDP) Effective 1/1/02 TO 1/1/03 for E.I. DUPONT DE NEMOURS & CO., INC. The General Liability, Automobile Liability plus various Property coverages are provided based on a 100% Fronting and Indemnity Agreement. Workers' Compensation in selected states is also subject to a large deductible program.

I.    Subject to Large Risk Contributory Dividend Plan & Warranty Agreement

### CORPORATE AND JOINT VENTURES

LINES OF INSURANCE                          LIMITS OF LIABILITY

DUPONT
Workers' Compensation                       Statutory
Non-self-insured (Including
Sporting Goods Properties, Inc.,
Sentinel Transportion Company,LLC
DuPont Flooring Systems (MSA
Industries) Dupont Protective Apparel
Marketing Compnay,
Protein Technologies, Qualicon Inc
Optimum Quality Grains,
Pioneer Hi-Bred International Inc.
DuPont Powder Coatings USA Inc.
and designated Joint Ventures:
DuPont Teijin Films, Inc., and
DuPont Dow Elastomers.
Dupont – Sabanci International

Employers' Liability           $1,000,000    Each Accident - Bodily
(Non-self-insured)                           Injury by Accident
                               $1,000,000    Each Employee - Bodily
                                             Injury by Disease
                               $1,000,000    Policy Limit - Bodily
                                             Injury by Disease

### CONTRACTORS

Workers' Compensation                        Statutory

Employers' Liability           $ 500,000     Each Accident - Bodily
                                             Injury by Accident
                               $ 500,000     Each Employee - Bodily
                                             Injury by Disease
                               $ 500,000     Policy Limit - Bodily
                                             Injury by Disease

Designated contractors on file $1,000,000    Each Accident - Bodily
with the company will be subject to:         Injury by Accident
                               $1,000,000    Each Employee - Bodily
                                             Injury by Disease
                               $1,000,000    Policy Limit - Bodily
                                             Injury by Disease

-2-

IA. Operations Subject to the Workers' Compensation Deductible Program

| | | | |
|---|---|---|---|
| 1. | E.I. DUPONT DE NEMOURS & CO., INC. (Corporate) | Deductible Limit:<br>Aggregate Limit: | $1,000,000<br>10,000,000 |
| 2. | Sentinel Transportation Company,LLC | Deductible Limit:<br>Aggregate Limit: | $1,000,000<br>5,000,000 |
| 3. | Zachry Construction Company | Deductible Limit:<br>Aggregate Limit: | $1,000,000<br>5,000,000 |
| 4. | Washington Group | Deductible Limit:<br>Aggregate Limit: | $1,000,000<br>5,000,000 |
| 5. | Kellogg Brown & Root (Contractor) | Deductible Limit:<br>Aggregate Limit: | $1,000,000<br>5,000,000 |
| 6. | Fluor Daniel (Contractor) | Deductible Limit:<br>Aggregate Limit: | $1,000,000<br>5,000,000 |
| 7. | Chattanooga General Services, Inc. (Contractor) | Deductible Limit:<br>Aggregate Limit: | $1,000,000<br>5,000,000 |
| 8. | BE&K Construction (Contractor) | Deductible Limit:<br>Aggregate Limit: | $1,000,000<br>5,000,000 |
| 9. | Mundy Industrial (Contractor) | Deductible Limit:<br>Aggregate Limit: | $1,000,000<br>5,000,000 |
| 10. | Kenco  (Contractor) | Deductible Limit:<br>Aggregate Limit: | $1,000,000<br>5,000,000 |
| 11. | Standard Warehouse (Contractor) | Deductible Limit:<br>Aggregate Limit: | $1,000,000<br>5,000,000 |
| 12. | M. Davies  (Contractor) | Deductible Limit:<br>Aggregate Limit: | $1,000,000<br>5,000,000 |

II.    Subject to 100% Fronting and Indemnity Agreement

## CORPORATE/JOINT VENTURES

| LINES OF INSURANCE | LIMITS OF LIABILITY | |
|---|---|---|
| General Liability | $5,000,000. | Each Occurrence Limit including Allocated Claim Expense |
| | $5,000,000. | Aggregate including Allocated Claim Expense applicable to all coverages combined. |
| Automobile Liability | $1,000,000. | Each Accident or Loss |
| Railroad Protective Liability | $2,000,000<br>$6,000,000 | Per Occurrence<br>Aggregate |
| Excess Workers' Compensation | Vary by state, between $1,000,000. & $5,000,000.,with the exception of Colorado and New Mexico, which are subject to Statutory requirements. | |
| | Retained Limit - As per expiring. | |
| Commercial Property | Various limits per schedule on file with Kemper. | |
| Inland Marine | $5,000,000 per vehicle /$5,000,000. per occ./$100,000 any one occurrence. subject to $250 deductible for Fine Arts at DUPONT Country Club. | |

## CONTRACTORS

| | | |
|---|---|---|
| General Liability | $1,000,000 | Each Occurrence including Allocated Claim Expense |
| | $1,000,000 | Products- Completed Operations Aggregate Limit including Allocated Claim Expense |
| | $1,000,000 | General Aggregate Limit including Allocated Claim Expense |
| Automobile Liability<br>(Designated contractors on file with the Company only as respects vehicles assigned to DUPONT contracts) | $1,000,000 | Each Accident or Loss |

-4-

## POLICY FORM

| | |
|---|---|
| Workers' Compensation<br>and<br>Employers' Liability | Standard Bureau Forms |
| Excess Workers' Compensation | Standard Kemper Forms |
| General Liability | (CG0001) Commercial General Liability Coverage |
| Automobile | (CA00 01) Business Auto Coverage Form |
| Railroad Protective | (CA545) Railroad Protective Liability Policy |

## EXCEPTIONS TO SPECIFICATIONS

Policy forms to be renewed as expiring or amended as agreed.

### Cancellation Provisions (All Policies)

Ninety (90) days advance notice will be given by LMC except in the case of non-payment of the premium, in which case, ten (10) days notice shall be given.

### Nonrenewal Provisions (All Policies)

Advance notice will be limited to that required in the home office state of the insured.

### Cancellation By Dupont

It is agreed Dupont may cancel the program providing Thirty (30 ) days advance notice to LMC.

-5-

CORPORATE DUPONT, JOINT VENTURES AND CONTRACTORS
ESTIMATED ANNUAL PREMIUMS FOR 2002

| Line | Subject* | Other | Total |
|------|---------|-------|-------|
| Disc. WC (Corporate) | $ 1,347,819 | $     0 | $1,842,717 |
| Disc. WC (Sentinel ) | 159,328 | | |
| Disc. WC; Dupont Teijin Films, Inc. (JV) | 3,505 | 0 | |
| Disc. WC; DUPONT DOW ELASTOMERS (JV) | 112,054 | 0 | |
| Disc. WC, Dupont – Sabanci  (JV) | 220,011 | 0 | |
| Disc. WC; Contractors | 3,759,271 | 0 | 3,759,271 |
| GL/AL (Front) (DUPONT) | 0 | 180,000 | 180,000 |
| Railroad Protective (Front) | 0 | Incl. | -- |
| GL (Front) (Contractors) | 0 | 5,000 | 5,000 |
| Property (Front) | 0 | Incl. | -- |
| Excess WC (Front) (DUPONT) | 0 | Incl. | -- |
| TOTAL | $5,601,988 | $185,000 | $5,786,988 |

ESTIMATED ASSESSMENTS

| | |
|---|---|
| Workers' Compensation | $  97,742 |
| Total Estimated Premium including Assessments: | $5,884,730 |

*Net of Premium Disc. and WC Deductible credits.

<u>WC PAYROLLS/FRONT FEES</u>

<u>Workers' Compensation and Employer's Liability</u>

Discounted WC premium will be developed using Bureau and Kemper rates and final experience modifications. Estimated payroll used for this quotation:

| | | | |
|---|---|---|---|
| I. | DUPONT Corporate | | $518,887,134 |
| II. | Joint Venture WC Coverages: | | |
| | A) | DUPONT Sabanci | 12,564,000 |
| | A) | DUPONT Teijin Films, Inc. | 537,935 |
| | B | DUPONT DOW ELASTOMERS | 18,111,114 |
| | TOTAL | | $ 31,213,049 |
| III. | Contractor Workers' Compensation: | | |
| | A) | CPPC Construction & Maintenance Contractors | |
| | B) | Design Contractors | |
| | C) | Warehouse Contractors | |
| | D) | Service Contractors | |
| | E) | Processing Contractors | |
| | F) | Playhouse - Stagehands | |
| | TOTAL | | $208,971,590 |
| | TOTAL ALL OPERATIONS: | | $759,071,773 |

<u>Automobile Liability/General Liability/RR Protective - DUPONT (Front)</u>

Flat Charge $180,000 due in quarterly installments of $45,000.

<u>Excess WC - DUPONT (Front)</u>

$ Included

<u>General Liability/Automobile Liability (Contractors) (Front)</u>

Flat Charge - $5,000 due in quarterly installments of $1,250.

<u>Property Policy (Front)</u>

$ Included

-7-

## PLAN PROVISIONS

| | |
|---|---|
| Type of Plan | Large Risk Contributory Dividend Plan |
| Company | Lumbermens Mutual Casualty Company |
| Lines Subject to Plan | Workers' Compensation & Employers' Liability |
| Term | One Year (1/1/02-1/1/03) |
| Subject Premium | Audited discounted WC premium plus N.Y. State Assessment |
| Maximum Premium (Unlimited) | Audited Discounted WC premium (Also refer to Special Note #5, "Warranty and Indemnity Agreement".) |
| Minimum Premium | Basic Premium x Tax Multiplier + (N.Y. Loss Expense) |
| Basic Premium | Basic premium is adjusted at each dividend determination and is the sum of A,B,C and D below: |

Basic Expenses       A.   .4123 per $1,000 audited WC payroll. (Est. charge $312,965) Estimated Payroll used is $759,071,773). This excludes monopolistic state payroll.

WC Assigned Risk Charge       B.   To be determined by applying the by state Assigned Risk Burden percentages (net of tax offset) shown in the attached schedule to the by state audited subject WC premium. (Est. at $40,334) Subject WC premium is net of deductible credits and premium discounts. (Est. Prem. = $5,601,988).

Special Assessments       C.   MD. - .031 per $100 of MD payroll. (est. $906) TX. - .01740 of Disc. Prem. (est. $128,928) )

Loss Limt Charge       D.   1.125 per $1,000 of contractors payroll,est.@ $208,971,590 (est. $235,093)

Loss Conversion Factor       1.00 (See NATLSCO Quote)

-8-

<u>PLAN PROVISIONS</u>
(continued)

| | |
|---|---|
| Tax Multiplier | 1.059 (est.) The actual tax multiplier will be a weighted average of the by-line/by state retro plan tax multipliers or company factors for non-retro states effective on the inception date of each annual period with the use of audited premiums. |
| *Loss Limitation | None including allocated claim expense, except Contractors WC, (excluding all accidents related to any chemical explosion or leak) which will be subject to $1,000,000. each accident including Allocated Claim Expense. |
| Special Assessments | Currently special assessments for MD and TX are not collected in the tax multiplier or outside of the subject premium. The charge for their assessments is included in the basic. (Est. $129,834) |
| *Dividend Formula | Dividend equals Audited Subject premium minus (Basic Premium plus Converted Limited Losses) x Tax Multiplier |
| Dividend Determination | Based on losses valued approximately six months after each anniversary and annually thereafter until all claims are settled or mutually agreed upon as to value. |

* Workers' Compensation incurred losses and claim expense in excess of the applicable Aggregate Deductible Limit (see Page 3. Operations subject to the WC Deductible Program) shall be included in the dividend calculations subject to the WC per accident loss limitation.