## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| E. I. du PONT de NEMOURS and COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 05-699 (KAJ) |
| LUMBERMENS MUTUAL CASUALTY COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

### BRIEF IN SUPPORT OF
### PLAINTIFF E. I. du PONT DE NEMOURS AND COMPANY'S
### MOTION TO EXTEND TEMPORARY RESTRAINING ORDER
### AND FOR PRELIMINARY INJUNCTION

*Of Counsel*:

John M. Sylvester
Christopher C. French
Scott A. Bowan
KIRKPATRICK & LOCKHART
   NICHOLSON GRAHAM LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222
Telephone: (412) 355-6500

John E. James (No. 996)
Richard L. Horwitz (No. 2246)
POTTER ANDERSON & CORROON LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19801
Telephone: (302) 984-6000

*Attorneys for Plaintiff E. I. du Pont de Nemours and Company*

Dated: October 11, 2005
702899/20120-345

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................................1

II. FACTUAL BACKGROUND..................................................................................5

    A.  Kemper is Teetering on the Verge of Insolvency and Financial
        Collapse .......................................................................................................5

    B.  Kemper Sold Insurance Products to DuPont that Specifically were
        Designed to Allow DuPont to be Largely Self-Insured for Most of its
        Losses .........................................................................................................8

    C.  DuPont Provided Millions of Dollars in Collateral to Kemper to
        Secure DuPont's Obligations to Pay its Own Losses Under the
        Insurance Program.....................................................................................10

    D.  The "Dividend" Plan was Supposed to Ensure that DuPont was
        Required to Pay Only the Actual Losses and Related Claims-Handling
        Fees and Expenses Under the Program .....................................................10

    E.  Kemper's Attempts to Collect the Non-Existent Debt Reveals its
        Spurious Nature ........................................................................................12

III. SUMMARY OF ARGUMENT..............................................................................13

IV. ARGUMENT.........................................................................................................14

    A.  There is "Good Cause" to Extend the TRO Because the Underlying
        Facts and Circumstances at Issue in This Case Have Not Changed..........14

    B.  DuPont Satisfies the Standard for Obtaining Injunctive Relief................15

        1.  DuPont Would Suffer Irreparable Injury if Kemper Were
            Permitted to Liquidate Collateral Provided by DuPont.................15

        2.  DuPont is Likely to Succeed on the Merits ...................................17

        3.  Kemper Will Not Suffer Any Irreparable Harm if a
            Preliminary Injunction is Issued ...................................................18

        4.  The Public Interest Weighs in Favor of Issuing a Preliminary
            Injunction.....................................................................................19

V.  CONCLUSION......................................................................................................20

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*,
42 F.3d 1421 (3d Cir. 1994) ............................................................................19

*Fechter v. HMW Indus., Inc.*,
879 F.2d 1111 (3d Cir. 1989) ..........................................................................16

*J.C. Penney Co., Inc. v. Giant Eagle, Inc.*,
813 F.Supp. 360 (W.D. Pa. 1992)....................................................................20

*Kan. City S. v. Grupo TMM, S.A.*,
C.A. No. 20518-NC, 2003 WL 22659332 (Del. Ch. Nov. 4, 2003) .................16

*Kos Pharm., Inc. v. Andrx Corp.*,
369 F.3d 700 (3d Cir. 2004) ............................................................................19

*Novartis Consumer Health, Inc. v.
Johnson & Johnson-Merck Consumer Pharm. Co.*,
290 F.3d 578 (3d Cir. 2002) ............................................................................15

*Solarex Corp. v. Advanced Photovoltaic Sys., Inc.*,
C.A. No. 93-229-JJF, 1995 WL 314742 (D. Del. Jan. 6, 1995) ......................15

*T. Rowe Price Recovery Fund, L.P. v. Rubin*,
770 A.2d 536 (Del. Ch. 2000) .........................................................................16

*U.S. ex rel. Rahman v. Oncology Assocs.*,
198 F.3d 489 (4th Cir. 1999) ...........................................................................16

*Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*,
No. 00 Civ. 8051(JSM), 2000 WL 1610790 (S.D.N.Y. Oct. 27, 2000) ...........16

**Rules and Statutes**

Fed.R.Civ.P. 65(b) .......................................................................................3, 14

215 Ill. Comp. Stat. Ann. 5/205.1(a) ...............................................................19

**Other Authorities**

11A C. Wright, A. Miller & M. Kane,
*Federal Practice and Procedure* § 2953 (2d ed. West 2005)............................14

13 *Moore's Federal Practice* (Civil) § 6520 ...................................................18

## I.    <u>INTRODUCTION</u>

On September 1, 2005, Plaintiff E. I du Pont de Nemours and Company ("DuPont") filed a Verified Complaint and moved for immediate injunctive relief in the Court of Chancery for the State of Delaware to enjoin Defendant Lumbermens Mutual Casualty Company ("Lumbermens"), which is one of several insurance companies and related affiliates that does business under the umbrella name of Kemper Insurance Companies (collectively referred to hereinafter as "Kemper"), from attempting to collect a disputed debt totaling approximately $5.7 million until the validity of Kemper's claim can be determined.  In particular, DuPont requested that Kemper be enjoined from drawing down or presenting any claims for payment under a letter of credit and surety bond that DuPont had provided to secure its valid obligations under an insurance program with Kemper.[1]  Simply stated, Kemper is on the verge of insolvency and is desperate for cash.  As a result, Kemper is attempting to alter and manipulate the insurance program it sold to DuPont.  DuPont is not in breach of its obligations to Kemper and consequently, DuPont requested that Kemper not be permitted to collect under collateral provided by DuPont simply because Kemper is having financial difficulties.

On September 2, 2005, after reviewing the papers and hearing DuPont's arguments, Chancellor Chandler of the Court of Chancery granted DuPont's Motion for Temporary Restraining Order ("TRO").  (A copy of the TRO is attached as Exhibit A to the Motion accompanying this Brief.)

---

[1]    Copies of the letter of credit and surety bond are attached to DuPont's Verified Complaint as Exhibit 2.

Kemper was given advance notice of DuPont's request for a TRO from the Court of Chancery for the State of Delaware in two different ways. One, a copy of DuPont's papers were faxed to John M. McGregor, Assistant General Counsel for Kemper. In addition, counsel for DuPont called Mr. McGregor on the day that DuPont's papers were filed. During that call, Mr. McGregor acknowledged that he had received the papers. During the call, DuPont's counsel also advised Mr. McGregor that a hearing would be scheduled with the Court of Chancery as soon as the Court's schedule permitted. Mr. McGregor informed DuPont's counsel during that call that Kemper would not be participating in the hearing. After the Court of Chancery's office advised DuPont's counsel that a telephonic hearing regarding the motion would be scheduled on Friday, September 2, 2005, DuPont's counsel again telephoned Mr. McGregor to apprise him.

The Court of Chancery subsequently proceeded to hold the telephonic hearing on DuPont's Motion for the TRO. Consistent with Mr. McGregor's statements to DuPont's counsel, Kemper chose not to participate in the hearing. Because Kemper had been given advance notice of the hearing and chose not to participate in the hearing, Chancellor Chandler decided to make the TRO effective unless and until Kemper moved to amend or vacate it.

To date, Kemper has not taken any actions to amend or vacate the TRO. Instead, on September 23, 2005, Kemper removed the case to this Court. Kemper also requested that DuPont agree to grant it an additional thirty (30) days in which to respond to the Verified Complaint, to which DuPont agreed.

As a result of the removal, DuPont now moves this Court, pursuant to Fed.R.Civ.P. 65(b), for an extension of the TRO and the issuance of a preliminary injunction.   As discussed more fully below, DuPont satisfies the "good cause" requirement of Rule 65(b) for the extension of a temporary restraining order.  Further, DuPont satisfies the requirements for the entry of a preliminary injunction, and the TRO should be converted into a preliminary injunction based upon the papers, or, alternatively, a date should be set for a hearing on DuPont's request for the entry of a preliminary injunction and the TRO should remain in effect until a decision is reached on DuPont's motion for a preliminary injunction.

Kemper has managed an insurance program for DuPont for nearly thirty (30) years.  Under the pre-2000 insurance program, DuPont annually paid Kemper monies for "incurred losses" (i.e., reserves for projected losses), claims handling fees, miscellaneous expenses and an insurance premium for a limited risk transfer.  Under the program, DuPont was largely self-insured.

In 2000, the insurance program changed to a pay-as-you-go program under which DuPont still is largely self-insured.  Under the 2000-03 insurance program,[2] DuPont paid Kemper an upfront amount of approximately $1 million in insurance premium for the limited risk transfer provided by Kemper, claims handling fees, profit, surcharges and taxes.  DuPont also pays, on average, tens of thousands of dollars weekly into an escrow account to fund its own losses (from which Kemper pays claims against DuPont).  DuPont also provided to Kemper a letter of credit in the amount of $9,604,354 and a surety bond in the amount of $5,995,646 as security to ensure those weekly

---

[2]     DuPont changed insurers in 2003 after Kemper's financial problems were discovered.

payments.  Kemper does not contend that DuPont has failed to make its weekly payments.

Rather, Kemper has stated that it believes it has the right and ability to draw on the letter of credit provided by DuPont at any time it decides it needs money from DuPont, whether or not DuPont agrees it owes any money to Kemper.  To that end, due to its financial problems, Kemper is attempting to manufacture a DuPont debt related to the 2002-03 policy year by refusing to credit DuPont approximately $4.5 million in "dividends" that Kemper itself has determined should be credited to DuPont for the 2002-03 year.  (By DuPont's calculation, when DuPont is credited with the $4.5 million in accordance with the applicable accounting formula, Kemper actually owes DuPont approximately $120,000.)

By refusing to credit DuPont the "dividend" that Kemper admittedly owes DuPont, Kemper unilaterally is attempting to change the insurance program it sold to DuPont in order to create a "debt" to support Kemper's need for cash and draw down on DuPont's letter of credit.  This so-called "dividend" is not a share of the profits of Kemper.  Rather, it is nothing more than a line item in an accounting formula by which DuPont receives credit in the premium calculation for the fact that it largely is self-insured and pays its own losses.  Consequently, until Kemper's current financial crisis arose, this "dividend" consistently had been credited to DuPont throughout the parties' thirty-year (30) relationship.

Similarly, on July 27, 2005, Kemper demanded an additional $902,475 in alleged interest on the alleged debt.  Not only is the interest calculation based upon a non-existent debt, but DuPont never agreed to pay interest on amounts due under the

insurance program, and the contract between DuPont and Kemper does not state that DuPont is obligated to pay such interest. Thus, the over $5 million Kemper claims DuPont should pay is simply not owed by DuPont.

Kemper should not be allowed to grab and spend millions of dollars of DuPont's money before this controversy is resolved. If Kemper were permitted to collect the amounts that it claims DuPont owes, then Kemper would reap a huge windfall, and DuPont will suffer – irreparably – an equally huge financial loss. If the TRO is not extended and a preliminary injunction is not entered preventing Kemper from undertaking efforts to collect this spurious debt, then DuPont will suffer irreparable harm because Kemper will be unable to repay the money at the conclusion of this litigation, given its imminent insolvency. Further, during the course of this action, DuPont will maintain the collateral it already has provided to Kemper; thus, an extension of the TRO and the entry of a preliminary injunction would serve to maintain the *status quo* until the rights and obligations of the parties are determined.

## II.    FACTUAL BACKGROUND[3]

### A.    Kemper is Teetering on the Verge of Insolvency and Financial Collapse

By late 2002, Kemper was experiencing significant financial difficulty resulting in serious erosion of its statutory surplus (assets in excess of liabilities) and downgrading of its credit worthiness. Significantly, on December 24, 2002, A.M. Best Company ("A.M. Best") lowered the financial strength rating of Kemper from A-

---

[3]    The facts in this section are attested to in DuPont's Verified Complaint.

(Excellent) to B+ (Very Good).[4]  When downgrading Kemper's creditworthiness, A.M. Best cited Kemper's recently announced business decision to repurchase $125 million of Berkshire Hathaway's minority equity investment in a Kemper subsidiary company as a basis for the downgrading because the loss of capital damaged Kemper's overall capitalization and liquidity.

Between December 20-24, 2002, Moody's Investors Service and Standard & Poor's also downgraded Kemper's financial strength and other financial ratings. Because most commercial policyholders and insurance brokers will not do business with an insurance company that has less than an A- rating, the downgrade effectively prevented Kemper from writing new policies or retaining existing policyholders.

These developments occurred during the final stages of negotiations for the 2003 policy period and less than two months after DuPont signed the insurance proposal for the 2002 policy year.  Kemper must have been fully aware of the continuing drain on its statutory surplus and the impending downgrading of its credit rating while it was negotiating with DuPont for the renewal of the insurance program in December of 2002 for the 2003 policy year.

Throughout this period, however, Kemper continued to represent to DuPont and other policyholders that it was a stable and solvent company.  For example, in an advertisement that Kemper placed in *Business Insurance* on December 16, 2002, mere *days* before A.M. Best downgraded Kemper, Kemper stated that, "as with anything at Kemper, you'll always have the integrity of our reputation for financial stability and

---

[4]     Since December 2002, Kemper's financial strength rating has quickly descended such that it is no longer even rated.  *See* A.M. Best's current report for Kemper, which is attached as Exhibit 3 to the Verified Complaint.

strength." (A copy of the *Business Insurance* ad is attached to the Verified Complaint as Exhibit 4).

As a result of its financial problems, Kemper has entered into "run off" mode whereby it is attempting to achieve an orderly winding down of its business operations without entering rehabilitation or liquidation proceedings. Kemper has taken extraordinary steps to temporarily avoid insolvency, including reportedly reducing its workforce from 7,000 to 370 employees (a reduction of nearly 95%) and selling its headquarters in Long Grove, Illinois. Even with these drastic measures, Kemper's statutory surplus continues to decline rapidly. Kemper has reported that its surplus is expected to decline by approximately $12 million per month, excluding the impact of claims and reinsurance commutations and loss development.

On June 10, 2004, the Illinois Department of Insurance reportedly approved Kemper's second proposed run-off plan, the first such plan having been rejected by the state regulators. Kemper's run-off plan remains secret, as neither Kemper nor the Illinois Department of Insurance has disclosed its terms. However, in a press release announcing the approval of the plan, Kemper disclosed that it has "little premium revenue (about $90 million estimated for 2004 and virtually none thereafter)" and that all investment income being generated is "offset by expenses." Most tellingly, Kemper stated that achieving the plan's objective of positive surplus and liquidity through 2006 "will be very challenging." (A copy of Kemper's press release is attached to the Verified Complaint as Exhibit 5).

**B. Kemper Sold Insurance Products to DuPont that Specifically were Designed to Allow DuPont to be Largely Self-Insured for Most of its Losses**

Kemper sold various insurance products to DuPont from October 1, 1971 until March 1, 2003, including workers' compensation, automobile liability and general liability insurance policies, as well as various premium agreements, claim handling agreements (through related entities), indemnity agreements, and warranty agreements. Kemper sold its insurance products to DuPont through a comprehensive insurance program ("Insurance Program") designed and warranted to meet DuPont's needs: to satisfy all insurance regulatory requirements, to transfer certain specifically identified risks of loss, and to retain the financial responsibility for most risks of loss (e.g., workers' compensation claims) while concurrently retaining the benefits of positive loss performance under its specific Insurance Program.

Under the Insurance Program, DuPont would receive an insurance proposal every year from Kemper, through which Kemper explained the Insurance Program. DuPont and Kemper would sign those insurance proposals annually. The final and accepted insurance proposal for the 2002-03 policy year at issue in this case is attached to DuPont's Verified Complaint as Exhibit 1.

Prior to 2000, the Insurance Program was an "incurred loss" program, which meant that DuPont paid Kemper monies for "incurred losses" (i.e., reserves for projected losses), claims handling fees, miscellaneous expenses and an insurance premium for a limited risk transfer. When the losses were actually incurred, Kemper paid them from the monies DuPont had paid to Kemper.

Each year an accounting subsequently was done to determine whether DuPont had underpaid or overpaid Kemper. If DuPont had underpaid, then DuPont paid

the additional amount necessary to cover the losses (and related fees and expenses).  If DuPont had overpaid Kemper, then Kemper paid DuPont a refund in the form of a "dividend" or provided DuPont with a credit.

Beginning with the 2000 policy year, the Insurance Program changed to a "pay-as-you-go" program.  Under this program, DuPont did not pre-pay claims through advance premiums that were based upon projected losses.  Instead, DuPont paid Kemper a deposit premium and provided Kemper collateral in three forms to ensure that DuPont would reimburse Kemper amounts necessary to cover the claims Kemper was paying on DuPont's behalf: (1) fixed payments (which included charges for Kemper's overhead and profit, taxes, front fees, various surcharges and assessments, and the full risk transfer purchased by DuPont for specified risks) (referred to hereinafter as "Fixed Payments"); (2) reimbursement for paid losses; and (3) security in the form of a letter of credit and surety bond (in equal amounts).  Despite the change from an "incurred loss" to a "pay-as-you-go" program in 2002, the "dividend" piece of the premium calculation formula did not change.

Under the pay-as-you-go program, because DuPont initially funded and constantly replenishes an escrow account weekly, Kemper actually pays covered claims with DuPont's money.  Kemper has not claimed that DuPont ever failed to pay promptly any of the weekly billing amounts necessary to replenish the escrow account for losses paid under the Insurance Program.

C.   **DuPont Provided Millions of Dollars in Collateral to Kemper to Secure DuPont's Obligations to Pay its Own Losses Under the Insurance Program**

The Insurance Program for 2002-03 also contained a method for determining the security required by the Insurance Program and provided for an annual security reconciliation:

> Security will be used to secure the estimated ultimate losses less the amount of losses paid to date. The actual amount of estimated ultimate losses will be established at inception and will be adjusted annually.

Insurance Program, p. 11 (Exhibit 1 to Verified Complaint).

DuPont has provided a Safeco bond in the amount of $5,995,646 and a letter of credit with J.P. Morgan (now BankOne) for $9,604,354 as security. Previously, DuPont had provided security in the amount of $19,208,708, which had been divided equally between a surety bond and a letter of credit – $9,604,354 through a letter of credit and $9,604,354 through a surety bond. In discussions and negotiations with DuPont in 2004 and 2005, Kemper recognized it was holding excess collateral. Nevertheless, Kemper refused to reduce the surety bond amounts and letter of credit amounts equally, instead reducing only the surety bond, which is contrary to the Insurance Program. Kemper has failed to perform a proper security review, and DuPont believes that the Insurance Program remains significantly overcollateralized.

D.   **The "Dividend" Plan was Supposed to Ensure that DuPont was Required to Pay Only the Actual Losses and Related Claims-Handling Fees and Expenses Under the Program**

The "dividend" portion of the Insurance Program has been manipulated by Kemper to justify Kemper's assertion that DuPont has an unsatisfied debt to Kemper. The Insurance Program is subject to a Cash/Security Reconciliation which is conducted

annually. According to Kemper's most recent calculation for the 2002-03 policy year, DuPont is entitled to a credit of $4,532,579. When the credit is included in the calculation as intended, Kemper actually owes DuPont a refund of $119,111.00. Kemper, however, refuses to credit any "dividend" to DuPont and instead, improperly is attempting to collect from DuPont that same amount in the form of a premium.

The "dividends" at issue are not dividends in the traditional sense, in which the profits of a company are distributed among its owners. Rather, the "dividends" are simply a line item in the accounting calculation through which DuPont is credited with being largely self-insured. In essence, each year DuPont's account is audited to determine whether the initial projection regarding DuPont's payroll, which is part of the premium calculation, was accurate. If the account balancing reveals the projection was high, then the administrative costs and the limited risk transfer premium paid by DuPont based upon the excessive payroll projection is refunded or credited to DuPont. If the account balancing reveals the projection was low, then DuPont pays to Kemper an additional amount. Thus, because DuPont effectively is self-insured for most claims, the so-called "dividend" is nothing more than DuPont's side of the accounting calculation that determines whether DuPont has paid Kemper the appropriate premium and related administrative costs and taxes based upon the projected payroll.

Contrary to the purpose and intent of the insurance program, and solely because Kemper is on the brink of insolvency, Kemper has refused to count DuPont's "dividend" side of the equation during the account balancing and claims that DuPont owes it a premium in excess of $5 million even though DuPont essentially is self-insured. Kemper has acknowledged that DuPont's "dividend" under the applicable accounting

formula is in excess of $4.5 million. Indeed, a correct account balancing under the applicable formula reveals that instead of DuPont owing Kemper millions of dollars, Kemper owes DuPont $119,111.00.

### E. Kemper's Attempts to Collect the Non-Existent Debt Reveals its Spurious Nature

On September 14, 2004, Kemper sent an invoice to DuPont claiming that DuPont owed Kemper $12,459,116. DuPont registered numerous objections to the calculations through its insurance broker, Marsh USA, Inc. ("Marsh"). Kemper ultimately issued a revised calculation on May 12, 2005, which reduced the amount Kemper claimed that DuPont owed Kemper to $6,292,733 ("Revised Calculation").

The Revised Calculation still was incorrect. In both the original calculation and the Revised Calculation, Kemper has failed to properly credit DuPont with the "dividend" line item credit due DuPont as determined in accordance with the Insurance Program. In the Revised Calculation, Kemper calculated and acknowledged that DuPont should be credited with a "dividend" of $4,532,579, yet Kemper improperly refuses to credit DuPont with that amount.

Consequently, on June 23, 2005, Marsh sent detailed calculations to Kemper's representative showing that DuPont was still being overbilled. Marsh followed up by e-mail on August 4, 2005, in an effort to resolve the outstanding billing issues relating to the Revised Calculation. Kemper has not responded to Marsh's identification of those additional billing inaccuracies.

On July 27, 2005, Kemper also attempted to bill DuPont for interest in the amount of $902,475.71 ("Interest Billing"), which purportedly is based on the amounts claimed to be owed by DuPont to Kemper even though Kemper acknowledges the

interest charges are based on amounts (1) which Kemper concedes were not due because they were based upon Kemper's original admittedly erroneous calculation; (2) which previously have been paid by DuPont after Kemper made corrections to its billings; and (3) which were untraceable to any prior billings.

For example, in its Interest Billing, Kemper charges interest of $328,158.72 on a line item of $2,563,740 that allegedly was invoiced on September 14, 2004, which was the date of the original $12,459,116 billing that Kemper has admitted was incorrect. But when Kemper removed that line item on its Revised Calculation of May 12, 2005, because that amount was not owed, Kemper removed interest charges of only $62,811.63. Thus, in this example, Kemper is charging interest of $265,347.09 ($328,158.72 minus $62,811.63) on a "debt" that Kemper admits was never owed.

Kemper knows or should know that its claim for interest is patently false and is made in bad faith. Indeed, the Insurance Program sold to DuPont does not even include any provision allowing Kemper to charge DuPont interest on amounts claimed to be due.

### III.    SUMMARY OF ARGUMENT

1.    "Good cause" exists to extend the TRO because the facts and circumstances that justified Chancellor Chandler entering the TRO have not changed.

2.    DuPont has met the standard for obtaining injunctive relief because (1) it would suffer irreparable harm if Kemper were permitted to liquidate DuPont's collateral, (2) no harm will come to Kemper if an injunction is issued because the collateral will remain in place, (3) DuPont will likely succeed on the merits in this case because it does not owe Kemper any money, and (4) the public's interest weighs in

DuPont's favor because there is a strong public interest in ensuring fair dealing between businesses.

### IV.    ARGUMENT

#### A.    There is "Good Cause" to Extend the TRO Because the Underlying Facts and Circumstances at Issue in This Case Have Not Changed

*Federal Rule of Civil Procedure 65(b)* provides that a temporary restraining order can be extended "for good cause shown."  According to Wright and Miller, "for purposes of extending a Rule 65(b) order, a showing that the grounds for originally granting the temporary restraining order continue to exist should be sufficient." 11A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure § 2953 (2d ed. West 2005).*

The relevant facts have not changed since Chancellor Chandler entered the TRO.  Kemper still claims it is entitled to the disputed debt and still remains in a precarious financial position, teetering on the brink of insolvency.  If the TRO against Kemper were lifted, Kemper could draw upon DuPont's collateral and DuPont likely would be unable to recover that money should it ultimately prevail in this litigation because, by that time, Kemper probably will be insolvent.  The reasons supporting Chancellor Chandler's entry of the TRO -- which was unopposed by Kemper even though it had notice of the hearing -- remain as valid today as they were on September 2, 2005, when the TRO was entered.  Indeed, Kemper has not taken any steps to vacate or modify the TRO.  There is, therefore, good cause supporting an extension of the TRO.

**B.    DuPont Satisfies the Standard for Obtaining Injunctive Relief**

Kemper should be enjoined from drawing upon DuPont's collateral until this action is ultimately resolved.  If the TRO is not extended indefinitely by this Court, as the Court of Chancery intended, then this Court should extend the TRO until such time as it can enter a preliminary injunction in DuPont's favor.

There are four factors the Court should consider in determining whether to grant a preliminary injunction:  (1) the extent to which the moving party will suffer irreparable harm without injunctive relief; (2) the likelihood that the moving party will succeed on the merits; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest.  *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 586 (3d Cir. 2002)* (affirming grant of preliminary injunction); *Solarex Corp. v. Advanced Photovoltaic Sys., Inc., Civ. A. No. 93-229-JJF, 1995 WL 314742, at *2 (D. Del. Jan. 6, 1995)* (entering preliminary injunction after having issued temporary restraining order on the same issue) (Exhibit B hereto).  As demonstrated below, each of these requisite elements is satisfied here.

**1.    DuPont Would Suffer Irreparable Injury if Kemper Were Permitted to Liquidate Collateral Provided by DuPont**

If Kemper were permitted to collect the alleged debt by drawing down or presenting a claim for payment on the security, then DuPont would suffer immediate and irreparable harm.  In order to prove irreparable harm "'[i]t is not necessary that the injury be beyond the possibility of repair by money compensation' but only that it 'be of such a nature that no fair and reasonable redress may be had in a court of law and that to refuse

the injunction would be a denial of justice.' " *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 557 (Del. Ch. 2000). One such situation exists when the defendant may become insolvent or its assets may be dissipated. *See, e.g., Fechter v. HMW Indus., Inc.*, 879 F.2d 1111, 1121 (3d Cir. 1989) (former employee granted preliminary injunction to preserve *status quo* and to prevent further dissipation of surplus benefits of pension plan by employer in precarious financial situation); *Kan. City S. v. Grupo TMM, S.A.*, C.A. No. 20518-NC, *2003 WL 22659332, *5 (Del. Ch. Nov. 4, 2003)* (defendant's precarious financial situation demonstrates that plaintiff will suffer irreparable harm if injunction does not issue as defendant may be unable to satisfy money judgment) (Exhibit C hereto). *Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*, No. 00 Civ. 8051(JSM), 2000 WL 1610790, at *1 (S.D.N.Y. Oct. 27, 2000) ("[C]ourts have held that where the particular funds sought to be frozen are also the funds at issue in the suit, a preliminary injunction is proper.") (Exhibit D hereto); *U.S. ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 496 (4th Cir. 1999) ("[W]here a plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested.").

Here, Kemper is almost certain to be financially insolvent before DuPont could obtain and satisfy a money judgment against it. Kemper itself has admitted that under its current run-off plan it will be "challenging" for Kemper to continue to satisfy its obligations to policyholders for an extended length of time. Moreover, Kemper's statutory surplus may disappear even more quickly -- in less than seven months at the

-16-

current rate -- rendering Kemper insolvent and virtually assuring that it will be impossible for DuPont to recover any monies seized by Kemper now.

Although Kemper has not yet drawn down on the letter of credit or made a claim for payment under the surety bond, Kemper has indicated that it could do so "at any time." Whether Kemper would notify DuPont before attempting to do so is unknown. It is possible that, in the absence of continued injunctive relief, Kemper could take $5.7 million or more before DuPont even becomes aware of the attempt. The only means of protecting DuPont from such immediate, irreparable harm is to enjoin Kemper from drawing on the security during the pendency of this litigation. Thus, the first prong of the test is satisfied in this case.

### 2.    DuPont is Likely to Succeed on the Merits

DuPont is likely to succeed on the merits of its claim that Kemper is not entitled to the disputed debt. Kemper's attempt to collect over $5 million from DuPont ignores the fact that DuPont has funded its own liabilities and owes Kemper nothing. Indeed, when DuPont is properly credited with the $4.5 million "dividend," Kemper actually owes DuPont approximately $120,000. Kemper should not be allowed to bill and collect from DuPont a fictional debt simply because Kemper is on the brink of insolvency.[5]

Further, with respect to the interest charges, there should be no question that DuPont will succeed on the merits. Kemper's interest billing of $902,475.71 is clearly wrong. Kemper is attempting to charge interest on amounts (1) which Kemper

---

[5]    Further, as set forth in the Verified Complaint, if the Insurance Program were to be construed as proposed by Kemper (i.e., that Kemper has discretion whether to credit DuPont with being largely self-insured), then Kemper effectively has defrauded DuPont. In either case, Kemper is not entitled to the money it is seeking from DuPont.

conceded were not due; (2) which had already been paid by DuPont after Kemper made corrections to its billings; and (3) which were untraceable to any prior billings. Aside from the fact that DuPont does not owe Kemper the money in dispute, Kemper has no right under the Insurance Program to claim interest on alleged late payments.

In short, DuPont easily satisfies this second prong of the test. It is likely to succeed on its claim that Kemper is not entitled to collect a non-existent debt from DuPont. Consequently, the *status quo* should be maintained, and Kemper should be enjoined from liquidating collateral provided by DuPont until the parties' dispute is resolved.[6]

### 3. Kemper Will Not Suffer Any Irreparable Harm if a Preliminary Injunction is Issued

Only DuPont will be harmed if an injunction is not entered. Kemper cannot credibly argue that the entry of a preliminary injunction threatens to cause it irreparable harm. First, DuPont continues to make payments under the pay-as-you-go plan, so money is present to pay the claims as they are incurred. Indeed, if those funds are somehow insufficient, which has not been alleged by Kemper, and in the unlikely event that Kemper were to prevail on the merits and establish its right to the alleged payment, then DuPont -- unlike Kemper -- is not judgment proof. Moreover, the letter of credit and the surety bond will remain in place during this litigation, available for draw in the event that Kemper establishes its right to the amounts demanded from DuPont. DuPont is not by this motion seeking an order from the Court revoking the letter of credit

---

[6]    *See* 13 *Moore's Federal Practice (Civil)* § 65.20 ("The purpose of the preliminary injunction is to preserve the status quo between the parties pending a final determination of the merits of the action.").

and the surety bond during this litigation, but merely an order preventing Kemper from pursuing collection efforts against DuPont until the issues in dispute can be resolved.

Further, in the highly likely event that Kemper becomes insolvent, the collateral that DuPont used to secure its obligations under the insurance program including the payment of the deductibles applicable to the policies will still be there as security to ensure that claims brought under those policies are paid. *See, e.g., 215 Ill. Comp. Stat. Ann. 5/205.1(a)*, (b) (West 2005) (policyholder collateral does not become an asset of the estate and is to be used "to secure the policyholder's obligation to fund or reimburse claims payment within the agreed deductible amount"). Indeed, the intent of the plain language of this statute (and of the parties) to maintain sufficient funds to pay claims would be subverted if Kemper were allowed to obtain control over DuPont's collateral prior to insolvency, thus potentially depriving claimants of access to the collateral that is intended to secure payment to them. Therefore, the equities weigh in favor of DuPont, and this Court should continue to enjoin Kemper from attempting to collect its manufactured debt, including attempts to liquidate collateral provided by DuPont.

### 4.    The Public Interest Weighs in Favor of Issuing a Preliminary Injunction

The Third Circuit has recognized that, "[a]s a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 730 (3d Cir. 2004)* (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)). Such is the

case here, where DuPont has established irreparable injury and likely success on the merits.

Further, there is a special public interest factor that supports DuPont's request for relief. That is, "[t]here is a strong public interest in fair dealing between businesses and the solemnity of contracts." *J.C. Penney Co., Inc. v. Giant Eagle, Inc.*, 813 F. Supp. 360, 371 (W.D. Pa. 1992) (citation omitted), aff'd, 995 F.2d 217 (3d Cir. 1993) (table). To ensure fair dealing in this instance, the Court should enter a preliminary injunction that preserves the *status quo*, rather than permit Kemper to unilaterally take money from DuPont before this case is resolved. Thus, this final factor also weighs in DuPont's favor.

### V.    CONCLUSION

For all of the reasons discussed above, DuPont respectfully requests that the Court enter an order extending the TRO entered by the Court of Chancery on September 2, 2005, and preliminarily enjoining Kemper from drawing down or presenting any demands for payment under any collateral provided by DuPont, including any letters of credit and/or surety bonds.

*Of Counsel*:                                          POTTER ANDERSON & CORROON LLP

John M. Sylvester
Christopher C. French                      By:__/s/ John E. James_____
Scott A. Bowan                                      John E. James (No. 996)
KIRKPATRICK & LOCKHART            Richard L. Horwitz (No. 2246)
  NICHOLSON GRAHAM LLP              Hercules Plaza – Sixth Floor
Henry W. Oliver Building                    1313 North Market Street
535 Smithfield Street                            Wilmington, DE  19801
Pittsburgh, PA  15222                          Telephone:  (302) 984-6000
Telephone:  (412) 355-6500

                                                             *Attorneys for Plaintiff*
                                                             *E. I. du Pont de Nemours and Company*

Dated:  October 11, 2005
702899/20120-345

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that a true and correct copy of the foregoing BRIEF IN SUPPORT OF PLAINTIFF E. I. DU PONT DE NEMOURS AND COMPANY'S MOTION TO EXTEND TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION was served by hand and has been electronically filed with the Clerk of Court using CM/ECF, this 11th day of October 2005, upon the following counsel of record who has been notified that such document has been filed and is available for reviewing and downloading from CM/ECF:

David B. Stratton
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE  19899-1709


___/s/ John E. James_____
John E. James (No. 996)