# EXHIBIT

# A

09/07/2005 13:33 FAX 302 856 5778     Register Chancery Sussex     ☒002

EFiled: Sep 7 2005 2:30P...
Transaction ID 6646903

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| E. I. du PONT de NEMOURS AND COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 1601-N |
| LUMBERMENS MUTUAL CASUALTY COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

### ORDER

Plaintiff E. I. du Pont de Nemours and Company ("DuPont") having moved this Court for a temporary restraining order, the Court having considered that motion, and good cause having been shown therefore,

IT IS HEREBY ORDERED this _2nd_ day of _September_, 2005:

That Lumbermens Mutual Casualty Company and its affiliates are temporarily restrained from drawing down or presenting any demands for payment under any collateral or security provided by DuPont, including any letters of credit and/or surety bonds.

*William B. Chandler III*
Chancellor
9/2/05 at 11:00 A.M.

69:115/20120-345

# EXHIBIT

# B

Westlaw.

Not Reported in F.Supp.                                                              Page 1
Not Reported in F.Supp., 1995 WL 314742 (D.Del.), 34 U.S.P.Q.2d 1234
**(Cite as: 1995 WL 314742 (D.Del.))**

**Motions, Pleadings and Filings**

United States District Court,
D. Delaware.
SOLAREX CORPORATION, Plaintiff,
v.
ADVANCED PHOTOVOLTAIC SYSTEMS, INC.,
Defendant.
**Civ. A. No. 93-229-JJF.**

Jan. 6, 1995.

Steven J. Balick of Ashby & Geddes, Wilmington,
Kenneth E. Payne, Thomas W. Winland, J. Michael
Jakes, James P. Longfellow, and Raymond C. Jones
of Finnegan Henderson Farabow Garrett & Dunner,
Washington, DC, Thomas L. Tolpin, of Amoco
Corp., Naperville, IL, for plaintiff.

William J. Marsden, Jr., and Philip A. Rovner of
Potter Anderson & Corroon, Wilmington, Carl G.
Love, Lawrence Harbin, and Kendrew H. Colton of
Cushman Darby & Cushman, Washington, DC, for
defendant.

MEMORANDUM OPINION

FARNAN, District Judge.

I. INTRODUCTION

**\*1** Plaintiff Solarex Corporation ("Plaintiff" or
"Solarex") commenced this patent infringement
action against Defendant Advanced Photovoltaic
Systems, Inc. ("Defendant" or "APS") on May 5,
1993. Solarex claims that APS infringed Solarex's
United States Patent No. 4,064,521 ("the '521
patent"), United States Patent No. 4,217,148 ("the
'148 patent") and United States Patent 4,317,844
("the '844 patent") (D.I. 1). In addition to its Answer,
APS filed a Counterclaim alleging that Solarex's
three patents are invalid and unenforceable (D.I. 12).

On May 5, 1994, Solarex filed a Motion for
Temporary Restraining Order and for Preliminary
Injunction (D.I. 78). The Court granted Solarex's
Motion for Temporary Restraining Order and further
ordered that its decision would remain in effect
pending the Court's decision on Solarex's Motion for
a Preliminary Injunction (D.I. 82). For the reasons set

forth in this Memorandum Opinion, the Court will
grant Solarex's Motion for Preliminary Injunction.

II. BACKGROUND

Solarex seeks to enjoin APS from making, using or
selling amorphous silicon solar panels or from using
any manufacturing process which allegedly infringes
upon the '521 and '844 patents. [FN1] See Solarex
Memorandum In Support of Temporary Restraining
Order and Preliminary Injunction at 2 ("Solarex
Memorandum"). These patents relate to
semiconductor devices which have a body of
amorphous silicon fabricated by glow discharge in
silane. The semiconductor devices are photovoltaic
devices, commonly referred to as solar cells. See
Solarex Memorandum at 6.

A. The '521 Patent

The '521 patent was issued to Dr. David Carlson on
December 20, 1977. The patent is directed to a
semiconductor device having a semiconductor
junction and a body of amorphous silicon fabricated
by glow discharge in silane. [FN2] In the context of
the '521 patent, a semiconductor device is one that
contains a semiconductor junction. The junction may
be in the body of the semiconductor or at the surface
of the semiconductor. Solarex Corp v. ARCO Solar
Systems, Inc., 805 F. Supp. 252, 268 (D. Del. 1992)
("Solarex I"). Solarex alleges literal infringement of
Claim 11 and Claim 15 of the '521 patent.

Claim 11 of the '521 patent provides:
   A semiconductor device comprising: a body of
   amorphous silicon fabricated by a glow discharge
   in silane with a semiconductor in said body.
See Appendix to Solarex Memorandum in Support
of Motion for Temporary Restraining Order and
Preliminary Injunction at A65 ("Solarex Appendix").

This Court, in Solarex I, interpreted Claim 11 to
include the following four elements:
   (1) a semiconductor device, (2) comprising a body
   of amorphous silicon which is predominately
   silicon but may include other elements, (3) the
   amorphous silicon is fabricated by a glow
   discharge in silane, and (4) the device contains
   either a PN or PIN semiconductor junction within
   the body of amorphous silicon.
805 F. Supp. at 269.

**\*2** Claim 15 provides:

> The semiconductor device of Claim 11 wherein said body comprises a first doped layer of one conductivity type spaced from a second doped layer of an opposite conductivity type with an "intrinsic" layer between and in contact with the first and second doped layers, such that there is a capability of a space charge region being provided in the "intrinsic" layer.

See Solarex Appendix at A65.

Claim 15 is identical to Claim 11 except that Claim 15 is limited to a PIN semiconductor junction. Claim 11 offered both PN and PIN semiconductor junctions. The PIN semiconductor device contains two doped layers, the "P" and "N" layers, and an undoped, "intrinsic" layer.

### B. The '844 Patent

The '844 patent was issued to Dr. Carlson on March 2, 1982. Solarex alleges that APS literally infringed Claim 1 and Claim 6 of the '844 patent. Claim 1 of the '844 patent delineates a method of creating the amorphous silicon semiconductor device incorporating a rectifying junction. *Solarex I*, 805 F. Supp. at 271. This Court, in *Solarex I*, interpreted Claim 1 to include the following processing steps:

> (1) placing an electrically conductive substrate in a glow discharge apparatus;
> (2) reducing the pressure in the apparatus from about 10(-3) to about 10(-6) Torr;
> (3) heating the substrate from a temperature of 150 degrees to about 350 degrees Celsius;
> (4) initiating a glow discharge in an atmosphere including silane to form a body of amorphous silicon on the electrically conductive substrate;
> (5) continuing the glow discharge while altering the relative proportion of silane and the dopants (e.g. phosphorous or boron) to form a body of amorphous silicon with layers of differing conductivity; and
> (6) attaching an electrical contact to the body of amorphous silicon opposite the electrically conductive substrate.

*Id.* at 272.

Claim 6 is dependant on Claim 1. Claim 6 more specifically distinguishes the steps of the fabrication process as outlined in Claim 1. *Id.* at 273.

### III. DISCUSSION
#### A. *Legal Standard -- Preliminary Injunction*

Injunctive relief in patent cases is authorized by 35 U.S.C. § 283. The grant or denial of a preliminary injunction is within the discretion of the trial court. The court must consider the following four factors: 1) whether the movant is reasonably likely to succeed on the merits at trial; 2) whether the movant will suffer irreparable harm if preliminary relief is not granted; 3) whether the balance of hardships favors granting preliminary relief; and 4) whether the preliminary relief sought is in the public interest. *New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 882 (Fed. Cir. 1992); *see also Eli Lilly and Co. v. Premo Pharmaceutical Labs., Inc.*, 630 F.2d 120, 136 (3d Cir.), *cert. denied*, 449 U.S. 1014 (1980).

#### B. *Likelihood of Success on the Merits*

Solarex has the burden of showing that it has a reasonable likelihood of success on the merits at trial. *Hybritech, Inc. v. Abbott Lab.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988). Solarex is entitled to a preliminary injunction only if it clearly shows that its patent is valid, enforceable and infringed. *Nutrition 21 v. Thorne Research, Inc.*, 930 F.2d 867, 870 (Fed. Cir. 1991) (quoting *Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1233 (Fed. Cir. 1985)).

##### 1. Validity

###### a. Burden of Proof

**\*3** APS claims that Solarex will not succeed on the merits at trial because the Solarex patents are invalid for obviousness pursuant to 35 U.S.C. § 103. Solarex has the burden to show that there is a reasonable likelihood that APS will fail to meet its burden at trial of proving by clear and convincing evidence that the Solarex patent claims are invalid. *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 28 U.S.P.Q.2d 1362, 1367 (D. Del. 1993). Thus, this determination is made in light of the presumptions and burdens applicable at a trial on the merits. *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 388 (Fed. Cir. 1987).

In evaluating likelihood of success on the merits, the Court will also consider its prior adjudication of validity regarding the '521 patent and the '844 patent. In *Solarex I*, this Court found the '521, '844 and '148 Solarex patents to be valid and enforceable. 805 F. Supp. at 288. The court "may give considerable weight to a prior adjudication of validity in determining the likelihood of success on the merits on the issue of validity in the preliminary injunction proceeding before it." *Hybritech*, 849 F.2d at 1452. The grant of a preliminary injunction is strongly

Not Reported in F.Supp.                                                                    Page 3
Not Reported in F.Supp., 1995 WL 314742 (D.Del.), 34 U.S.P.Q.2d 1234
**(Cite as: 1995 WL 314742 (D.Del.))**

supported where the patent's validity has been previously upheld following a fully litigated trial addressing the same issues of fact and law. *H.H. Robertson, Co.,* 820 F.2d at 388.

### b. Obviousness

Section 103 sets forth the standard for obviousness:

[a] patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. 35 U.S.C. § 103.

When evaluating a patent for obviousness, the court must first determine the scope and content of the prior art. Next, the court must ascertain the differences between the prior art and the claims at issue. Finally, the court must determine the level of ordinary skill in the prior art. *Graham v. John Deere Co.,* 383 U.S. 1, 17 (1966).

APS argues that the findings and conclusions of the court in *Solarex I* were based on an incomplete representation of prior art at the time the '521 and '844 patents were issued. APS contends that had the Court evaluated the Solarex patents with reference to this prior art, the patents would have been found invalid due to obviousness.

Specifically, APS contends that United States Patent No. 3,673,471 issued to Klein ("the Klein patent") and United States Patent No. 3,757,733 issued to Reinberg ("the Reinberg patent") are prior art which establish a basis to hold the '521 patent invalid. Additionally, APS argues that references in United States Patent No. 4,799,092 to Klaassen and United States Patent No. 3,750,268 to Wang, in combination with the Klein and Reinberg patents, provide prior art to demonstrate the invalidity of the Solarex patents. APS contends that disclosure of "such prior art references in *Solarex I* would have provided the Court with a more complete record upon which to base its findings of validity." APS Answering Brief at 5.

### (1) *Scope and Content of Prior Art*
The Klein Patent

**\*4** United States Patent No. 3,673,471 issued to Klein on June 27, 1972. APS contends that the Klein patent teaches a body of amorphous silicon which can be doped to form a semiconductor junction in the body of the amorphous silicon. *See* APS Ex. C, Klein

patent, Col. 5, line 75, Col. 6, line 3; APS Ex. F, Kampas Decl. at 7-8, ¶ ¶ 25-30. APS also states that the Klein patent teaches amorphous silicon fabrication by chemical vapor deposition in silane. *See* APS Ex. C, Klein patent, Col. 9, lines 34-37 and 45-47; APS Ex. F, Kampas Decl. at 7, ¶ 26. APS contends that the Klein patent discloses that the doped amorphous silicon assists in forming a PN semiconductor junction. *See* APS Ex. C, Klein patent, Col. 8, lines 35-38; Col. 9, lines 21-58; APS Ex. F, Kampas Decl. at 8- 9, ¶ 31.

The Reinberg, Klaassen, and Wang Patents

APS contends that the Klein patent alone is sufficient to make the '521 patent invalid for obviousness. APS Answering Brief at 6. However, APS also argues that the court can combine the teachings of the Reinberg and Klein patents to reach the result of amorphous silicon fabricated in silane. Additionally, APS includes references from other patents to support its argument of invalidity based on obviousness.

APS presents comments from the Klaassen patent as evidence that the Klein patent was seen as teaching doping of amorphous silicon. APS also contends that the Reinberg patent "teaches using 'semiconductor' materials." APS Brief at 6. APS argues that the Reinberg patent teaches the concept of fabrication of amorphous silicon fabricated by glow discharge. APS Brief at 7. APS contends that these prior art teachings "provide the motivational teaching to combine Klein with Reinberg to find Claim 11 obvious under 35 U.S.C. § 103." APS Brief at 8.

The Court will not evaluate obviousness based on the combined teachings of patents discussed by APS. In *Northern Telecom, Inc. v. Datapoint Corp.,* the Federal Circuit held that prior art used to show obviousness must contain all components of the patented device. 908 F.2d 931, 934 (Fed. Cir. 1990). The court held that "[i]t is insufficient that the prior art disclosed the components of the patented device, either separately or used in other combinations; there must be some teaching, suggestion, or incentive to make the combination made by the inventor." *Id.; see also Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1143 (Fed. Cir. 1985).

Applying the Federal Circuit's holding in this case, the Court concludes that APS may not argue that a combination of the Klein, Reinberg, Klaassen, and Wang patents establish prior art which invalidates the '521 patent for obviousness. APS must show that the

Not Reported in F.Supp.                                                                                    Page 4
Not Reported in F.Supp., 1995 WL 314742 (D.Del.), 34 U.S.P.Q.2d 1234
**(Cite as: 1995 WL 314742 (D.Del.))**

prior art was contained in one reference. *See Northern Telecom,* 908 F.2d at 934. Therefore, the Court will evaluate only the Klein patent in the analysis of obviousness.

#### (2) *Differences Between Prior Art and Present Claims*

**\*5** Solarex stresses three ways that Claim 11 of the '521 patent is different from the Klein patent. Solarex argues that these differences demonstrate that the Klein patent is not prior art. First, Solarex argues that the '521 patent teaches a body of amorphous silicon as opposed to a body of polycrystalline silicon, as taught in the Klein patent. Solarex Appendix, Lucovsky Decl. at A102, ¶ 59. Second, Solarex contends that the '521 patent teaches glow discharge rather than the thermal decomposition method used in the Klein patent. Solarex Appendix, Lucovsky Decl. at A102, ¶ 58. Finally, Solarex argues that the '521 patent teaches a semiconductor junction which differs from the Klein patent's two juxtaposed silicon regions. Solarex Appendix, Lucovsky Decl. at A102, ¶ 57.

Solarex also contends that Claim 15 of the '521 patent is not invalid for obviousness due to the Klein patent. Solarex notes that the Klein patent does not disclose a PIN junction as found in Claim 15. Solarex Appendix, Lucovsky Decl. at A106, ¶ 72.

APS argues, however, that there are no real differences between the Klein patent and Claim 11 of the '521 patent. APS contends that the '521 patent teaches doped amorphous silicon fabricated by glow discharge. First, APS argues that amorphous silicon is indeed used in the Klein patent. APS Ex. F, Kampas Decl. at 11, ¶ 42. Dr. Kampas supports this assertion by pointing out that the Klein patent discloses a dopant concentration of 10(19/cm3). He contends that the '521 patent states that dopant concentration must be 10(18/cm3) or greater for amorphous silicon. APS Ex. F, Kampas Decl. at 11, ¶ 42.

APS also attempts to dispel any alleged differences by arguing "glow discharge," often referred to as "plasma enhanced chemical vapor deposition," is the same process as thermal decomposition. APS Ex. F, Kampas Decl. at 11, ¶ 41. Finally, APS contends that the Klein patent teaches a semiconductor junction, similar to that contained in Claim 11 of the '521 patent.

APS contends that Claim 15 of the '521 patent is invalid because it contains the same elements found

in Claim 11. Claim 15 contains, in addition to the four elements in Claim 11, a PIN junction. APS claims that the PIN junction was known in the industry at the time of issuance and that this element would have been obvious to one skilled in the art. APS Answering Brief at 11-12; APS Ex. F, Kampas Decl. at 14, ¶ 52.

#### (3) *Obviousness to One of Ordinary Skill in the Art*

APS argues that upon issuance of the Klein patent, it would have been obvious to those skilled in the art "that a body of amorphous silicon can be doped so that a semiconductor junction is formed therein." APS Answering Brief at 8; *see* APS Ex. F, Kampas Decl. at 12, ¶ ¶ 25-30. APS also contends that the PIN junction was known in the industry in July 1974, therefore, making this claim obvious to a person skilled in the art. APS Answering Brief at 11-12; APS Ex. F, Kampas Decl. at 14, ¶ 52.

**\*6** Solarex disputes these claims and argues that a person skilled in the art would have recognized differences in the '521 patent and the Klein patent. First, Solarex contends that recognition that the Klein patent taught the deposited material was polycrystalline silicon, not amorphous silicon, would be made by a person skilled in the art. Solarex Reply Brief at 5; Solarex Appendix, Lucovsky Decl. at A91-93, ¶ ¶ 25-27; Solarex Reply Brief Appendix, Third Lucovsky Decl. at C4, ¶ 12. Solarex also argues that one skilled in the art would know that the glow discharge process is different than the thermal decomposition process because the material produced "would have different chemical, structural and electronic properties." Solarex Reply Brief at 6; Solarex Appendix, Lucovsky Decl. at A104, ¶ 65; Solarex Reply Brief Appendix, Third Lucovsky Decl. at C10, ¶ 30.

#### c. *The Court's Findings*

After considering all arguments, the Court finds that Solarex has met the burden of clearly showing a likelihood of success on the merits at trial. The Court finds that APS has not rebutted the presumption of validity due the '521 patent as a result of this Court's decision in *Solarex I.* Additionally, APS has not presented any arguments challenging the validity of the '844 patent.

Further, the Court finds that Solarex has shown a likelihood of success on the merits at trial regarding the validity of the '521 patent. The Court credits the evidence presented by Solarex's expert witness Dr. Lucovsky. Dr. Lucovsky, in several affidavits, states that amorphous silicon differs from polycrystalline

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                              Page 5
Not Reported in F.Supp., 1995 WL 314742 (D.Del.), 34 U.S.P.Q.2d 1234
**(Cite as: 1995 WL 314742 (D.Del.))**

silicon. He also discusses how glow discharge, an element of the '521 patent, differs from thermal decomposition.

 Lastly, the Court finds that Solarex has demonstrated that APS cannot prove the invalidity of the '521 patent at trial by clear and convincing evidence. As discussed previously, the Court finds it inappropriate to combine the teachings of the patents asserted by APS to invalidate the '521 patent and, on the record presented, the Court concludes that the teachings of the Klein patent alone, or when considered in the context of APS's supporting testimony, do not affect the conclusion that Solarex will prevail at trial on the invalidity claims asserted by APS.

 2. Infringement

 Solarex claims that APS infringed its '521 patent and '844 patent. To prove this claim at trial, Solarex must show that someone "without authority ma [de], use[d] or s[old] any patented invention within the United States during the term of the patent ...." 35 U.S.C. § 271. To successfully demonstrate literal infringement, Solarex must prove that every element of the patent claim is found in APS's product. *See Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1054 (Fed. Cir.), *cert. denied*, 488 U.S. 825 (1988).

 In *Solarex I*, this Court made findings interpreting the elements of Claim 11 and Claim 15 of the '521 patent. *See Solarex I*, 805 F. Supp at 269-70. The Court also made findings interpreting the elements of Claim 1 and Claim 6 of the '844 patent. *Id. at 271-73.* The Court finds that the interpretations made in *Solarex I* are applicable to this case.

 **\*7** On the record before it, the Court finds that Solarex has demonstrated a likelihood of success on the merits at trial on its infringement claims. APS has manufactured eight models of solar cells or panels and is capable of producing two other models in its new California plant. *See* Solarex Appendix A293-96 (APS's Response to Solarex Interrogatories, 1, 4); Kampas Decl. at A284; A140.

 The record provides substantial expert testimony evidence which analyzes APS's own promotional information regarding its products. Additionally, the said expert testimony is based on independently run tests on APS's photovoltaic modules. Based on this record, the Court finds that Solarex has met its burden regarding likelihood of success on the merits at trial of infringement of the '521 patent. Additionally, the Court notes that APS has failed to

address or refute any of Solarex's claims of infringement.

 The record establishes that APS modules are PIN solar cell semiconductor devices incorporating a rectifying semiconductor junction. *See* Solarex Appendix, Second Lucovsky Decl. at A120, ¶ 24. The three layers in the PIN device are fabricated by a glow discharge process in an atmosphere including silane. The layers contain other elements but primarily are comprised of amorphous silicon. *See* Solarex Appendix, Second Lucovsky Decl. at A120, ¶ 23. Thus, the Court finds that all elements of Claim 11 of the '521 patent are present in the APS modules. [FN3]

 The Court also concludes that Solarex has shown a likelihood of success on its patent infringement claim for its '844 patent by presenting expert testimony analysis of APS's information regarding its products and independently run tests on APS's photovoltaic modules. APS's manufacturing process for making the photovoltaic modules includes each of the following elements of Claim 1 of the '844 patent:
   placing an electrically conductive substrate in a glow discharge apparatus, reducing the pressure in the apparatus from about 10(-3) to about 10(-6) Torr, heating the substrate from a temperature of about 150 degrees to about 450 degrees C, initiating a glow discharge in an atmosphere including silane to form a body of amorphous silicon on the electrically conductive substrate, continuing the glow discharge while altering the relative proportion of silane and the dopants to form a body of amorphous silicon with layers of differing conductivity, and attaching an electrical contact substrate.
 Solarex Appendix, Second Lucovsky Decl. at A127, ¶ 44 . The record also presents sufficient evidence of infringement of Claim 6 of the '844 patent. The particular steps for manufacturing the layers of the PIN device of Claim 6 are included in the APS manufacturing process. Solarex Appendix, Second Lucovsky Decl. at A127, ¶ 46.

 C. *Irreparable Harm*

 Solarex contends that it will suffer irreparable harm if commercial production begins at APS's new plant. Solarex argues that allowing APS to begin production at the California plant would cause "dramatic and indelible changes in the dynamics of the United States [photovoltaic solar cell] market." Solarex Memorandum at 23.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 6

Not Reported in F.Supp., 1995 WL 314742 (D.Del.), 34 U.S.P.Q.2d 1234
**(Cite as: 1995 WL 314742 (D.Del.))**

**\*8** A presumption of irreparable harm is appropriate in this case. *Smith Int'l, Inc. v. Hughes Tool Co., 718 F.2d 1573, 1581 (Fed. Cir.), cert. denied, 464 U.S. 996 (1983).* In *Smith,* the Federal Circuit held that irreparable harm can be presumed where a strong showing of validity and infringement has been made. *Id.* In such a case, "[t]he infringer should not be allowed to continue his infringement in the face of such a holding." *Id.*

In this case, the Court has determined that Solarex has demonstrated a likelihood of success of the merits at trial on the issues of validity and infringement. The Court has also found that Solarex provides compelling arguments regarding the negative effect of continued infringement on future operations and profitability. Solarex cites loss of existing market share, price erosion and lost market penetration and expansion opportunities as examples of the irreparable injury that would result if preliminary injunctive relief is denied. The Court finds that future infringement may lead to "market effects never fully compensable in money" to Solarex. *See Atlas Powder, 773 F.2d at 1233.* Therefore, the Court finds that Solarex has established that it will suffer irreparable harm absent a grant of injunctive relief.

D. *Balance of Hardships*

The Court must next consider the hardships each party will face as a result of the Court granting injunctive relief. The Court "must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted." *Hybritech,* 849 F.2d at 1457.

In this case, APS has not started production of the allegedly infringing products at its new California plant. The hardship that APS faces is delay of production. This hardship is not as extreme as the hardship that may be encountered by Solarex. For instance, absent the grant of an injunction Solarex will not be able to enforce its apparently valid patent. Also, Solarex will face the loss of market share, loss of market penetration opportunities, loss of revenue and loss of goodwill. With these considerations in mind, the Court finds that the balance of hardships leans in favor of granting the preliminary injunction.

E. *Public Interest*

The Court must also determine whether preliminary injunctive relief will serve the public interest. *New*

*England Braiding Co., 970 F.2d at 882.* The Court finds that granting the preliminary injunction in this case will serve the public interest.

The public has an interest in upholding and preserving patent rights. *See Smith Int'l, 718 F.2d at 1581.* In *Smith,* the Federal Circuit noted that "[t]he very nature of the patent right is the right to exclude others." *Id.* This right is undermined when infringement is permitted during the pendency of the patent infringement action. *Id.*

The public interest is also benefitted when disruption of the market is prevented or minimized. *See Critikon, 28 U.S.P.Q.2d at 1370-71.* Consumers will not prematurely rely on the availability of APS's photovoltaic products if the preliminary injunction is properly granted. Pending the outcome of the trial, consumers may no longer be able to purchase APS products. The Court is persuaded that avoidance of this type of market disruption is desirable and furthers the public interest.

IV. CONCLUSION

**\*9** Upon evaluation of the relevant four factors, the Court concludes that Solarex is entitled to preliminary injunctive relief. Solarex has clearly shown a likelihood of success on the merits at trial regarding the validity of its ' 521 and '844 patents and infringement of these patents by APS. Additionally, Solarex has shown that it will suffer irreparable harm if the request for a preliminary injunction is denied. The Court finds that the balance of hardships favors Solarex and the public interest favors granting the preliminary injunction. Therefore, the Court will grant Solarex's Motion for a Preliminary Injunction.

An appropriate Order will be entered.

> FN1. Solarex does not seek preliminary injunctive relief for the '148 patent, but intends to assert this patent at trial.

> FN2. For a more complete background of the Solarex patent technology, see *Solarex Corp. v. ARCO Solar, Inc., 805 F. Supp. 252, 260-67 (D. Del. 1992).*

> FN3. Claim 11 contains the following four elements:
> (1) a semiconductor device, (2) comprising a body of amorphous silicon which is predominately silicon but may include other elements, (3) the amorphous silicon is fabricated by a glow discharge in silane, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 7
Not Reported in F.Supp., 1995 WL 314742 (D.Del.), 34 U.S.P.Q.2d 1234
**(Cite as: 1995 WL 314742 (D.Del.))**

> (4) the device contains either a PN or PIN
> semiconductor junction within the body of
> amorphous silicon.
> 805 F. Supp. at 269.

Not Reported in F.Supp., 1995 WL 314742 (D.Del.),
34 U.S.P.Q.2d 1234

**Motions, Pleadings and Filings (Back to top)**

- 1:93CV00229_____(Docket)
(May. 14, 1993)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT

C

Westlaw.

Not Reported in A.2d                                                                                          Page 1
Not Reported in A.2d, 2003 WL 22659332 (Del.Ch.)
**(Cite as: 2003 WL 22659332 (Del.Ch.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
KANSAS CITY SOUTHERN and Kara Sub, Inc.,
Plaintiffs,
v.
GRUPO TMM, S.A., TMM Holdings, S.A. de C.V.
and TMM Multimodal, S.A. de C.V.,
Defendants.
**No. Civ.A. 20518-NC.**

Submitted Oct. 29, 2003.
Decided Nov. 4, 2003.
 Bruce E. Jameson, Paul M. Lukoff, and Paul A.
Fioravanti, of Prickett, Jones & Elliott, P.A.,
Wilmington, Delaware; Allan Van Fleet, Kevin
O'Gorman, Lauren Harrison, and Samina Quddos, of
Vinson & Elkins L.L.P., Houston, Texas, for
Plaintiffs, of counsel.

 R. Judson Scaggs, Jr. and Brian J. McTear, of
Morris, Nichols, Arsht & Tunnell, Wilmington,
Delaware; Michael H. Diamond and Felton T.
Newell, of Milbank, Tweed, Hadley & McCloy LLP,
Los Angeles, California, for Defendants, of counsel.

*MEMORANDUM OPINION*

CHANDLER, J.

 *1 Grupo TMM, S.A. ("TMM")  [FN1] signed an
agreement to sell approximately $400 million worth
of its interests in certain rail transportation assets to
Kansas City Southern ("KCS")  [FN2] on April 20,
2003 (the "Acquisition Agreement" or "Agreement").
TMM purported to terminate the Acquisition
Agreement on August 22, 2003. This dispute arises
out of KCS' attempt to contest TMM's purported
termination and specifically enforce the Acquisition
Agreement. KCS seeks to enjoin TMM from taking
any action contrary to the terms of the Acquisition
Agreement pending the outcome of an arbitration
proceeding that will resolve the merits of the dispute.
For the reasons set forth below, I grant KCS's request
for a preliminary injunction.

> FN1. The two other defendants are the
> subsidiaries of TMM which hold the assets
> at issue.

> FN2. The other plaintiff is a subsidiary of
> KCS created to effectuate the transaction.

## I. BACKGROUND

 KCS is a Delaware corporation in the business of rail
transportation. TMM is a Mexican corporation also in
the business of rail transportation. In 1995, TMM
sold KCS 49% of Mexrail, Inc., a Delaware
corporation that wholly owns the Texas-Mexican
Railway Company ("Tex-Mex"). Tex-Mex's rail lines
run from the Mexican border to KCS's rail lines in
east Texas. In 1995, TMM and KCS also formed a
joint venture company to bid on concessions offered
by the Mexican Government. The company formed
by the joint venture is known today as Grupo
Transportacion Ferroviaria Mexicana, S.A. de C.V.
("GTFM"). The joint venture successfully bid for the
concession to operate a railway known currently as
TFM, S.A. de C.V. ("TFM"). TFM's rail lines run
throughout northeast Mexico and connect with Tex-
Mex's rail lines at the border. Today, TFM also owns
Mexrail, Inc. and Tex-Mex. TMM indirectly owns
approximately 38.5% of the equity and 51% of the
voting shares of GTFM. KCS indirectly owns
approximately 37% of the equity and 49% of the
voting shares of GTFM. The remaining equity of
GTFM is owned by TFM. TFM, in turn, is 80%
owned by GTFM. The remaining 20% is owned by
the Mexican Government. [FN3]

> FN3. Although the Mexican Government
> owns 20% of the equity of TFM, it has
> limited voting rights.

 On April 20, 2003, the parties signed an agreement
in which TMM agreed to sell its stake in GTFM to
KCS for $200 million in cash and approximately
$200 million of KCS stock. TMM Chairman and
controlling shareholder, Jose Serrano Segovia
("Serrano"),  [FN4] also negotiated a consulting
agreement with KCS worth approximately $25
million. Through the consulting agreement, Serrano
would become Vice Chairman of KCS and personally
receive 2.1 million shares of KCS stock. KCS alleges
that the consulting agreement was inducement for
Serrano to personally support the Acquisition
Agreement.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 2
Not Reported in A.2d, 2003 WL 22659332 (Del.Ch.)
**(Cite as: 2003 WL 22659332 (Del.Ch.))**

FN4. Serrano controls over 99% of the voting shares of TMM. *See* Deposition of Javier Segovia Serrano ("Segovia Dep.") 61-62; Affidavit of Larry M. Lawrence ("Lawrence Aff.") ¶ 14.

 In two resolutions approved at TMM Board of Directors meetings held on April 2, 2003 and July 28, 2003, TMM's Board recommended that TMM's shareholders approve the agreement. Serrano voted in favor of both resolutions. Serrano, however, voted against the transaction at a shareholders meeting on August 18, 2003. FN5 The next day, TMM sent a letter to the Mexican Government which effectively shut down the Mexican Foreign Investment Commission's review of the acquisition. On August 22, 2003, TMM sent a letter to KCS purporting to terminate the Acquisition Agreement because the shareholders did not approve the transaction. Seven days later, on August 29th, KCS initiated the arbitration process set forth in the Acquisition Agreement and filed a motion for a preliminary injunction in this Court to preserve the status quo pending arbitration.

FN5. It is unclear exactly why Serrano voted against the transaction. It appears, however, that Serrano was displeased with KCS's efforts to intervene in on-going negotiations between TMM and the Mexican Government regarding obligations to purchase the Mexican Government's outstanding shares of TMF and certain tax refunds owed to TMM by the Mexican Government. Affidavit of Jose Serrano Segovia ¶ ¶ 11-14. TMM also alleges that some non-controlling stockholders expressed their displeasure with the transaction. *Id.* at ¶ 18.

## II. ANALYSIS

 **\*2** The standard on a motion for preliminary injunction is well-settled. In order to prevail, KCS must establish: (1) a reasonable likelihood of success on the merits; (2) that irreparable harm will be suffered by KCS if the injunction is denied; and (3) that the harm that KCS will suffer if the injunction is not granted outweighs the harm that TMM will suffer if the injunction is granted . FN6

FN6. *In re Aquila Inc. S'holders Litig.,* 2002 WL 27815, at *5 (Del. Ch. Jan. 3, 2002); *S.I. Mgmt. L.P. v. Wininger,* 707 A.2d 37, 40 (Del.1998).

*A. Reasonable Probability of Success on the Merits*

 The parties have committed the resolution of disputes arising from or in connection with the Acquisition Agreement to arbitration. FN7 The arbitration proceeding is in its preliminary stages. KCS seeks an injunction in aid of this arbitration. In such a situation, " 'likelihood of success' must be examined at two levels: (1) the moving party's entitlement to arbitration; and (2) the merits of its arbitration claims." FN8 It is undisputed that KCS is entitled to arbitration. And "where the right to arbitrate is clear, the analysis of the merits of the underlying claims may be more limited." FN9 Nevertheless, but KCS must still "establish a reasonable probability that its arbitration position is sound." FN10

FN7. Acquisition Agreement § 12.11(a). The Acquisition Agreement also contemplated the instant proceeding because Section 12.11(a) states that the arbitration procedure "shall not preclude equitable or other judicial relief to enforce the provisions hereof or to preserve the status quo pending resolution of Disputes hereunder"-precisely the relief KCS seeks before this Court. Section 12.11(b) provides that the agreement is governed by Delaware Law.

FN8. *Price Org., Inc. v. Universal Computer Services, Inc.,* 1992 WL 356026, at *8, (Del. Ch. Dec. 2, 1992) (citing *Eastman Kodak v. Cetus Corp.,* 1991 WL 225936, at *5 (Del. Ch. Dec. 3, 1991)).

FN9. *Id.*

FN10. *Id.* The parties agree that *Price Org., Inc.,* 1992 WL 356026, and *Eastman Kodak,* 1991 WL 225936, hold that where there is a clear right to arbitration the inquiry into the underlying merits of the arbitrable claims is more limited than a situation where the merits of a dispute are non-arbitrable. The parties disagree, however, as to how much the Court should limit its inquiry. Ultimately, I need not resolve this dispute because KCS has met the typical "reasonable likelihood of success on the merits" standard.

 KCS's primary claim is that TMM did not have the right to terminate the Acquisition Agreement because

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 22659332 (Del.Ch.)
(Cite as: 2003 WL 22659332 (Del.Ch.))

TMM shareholder approval is not a "condition" that must be fulfilled before TMM's performance under the Agreement becomes due. [FN11] To determine whether TMM shareholder approval is a condition this Court will construe the Acquisition Agreement "to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted." [FN12] To ascertain the parties shared expectations the Court will first look to the Agreement itself. [FN13] If the Agreement is ambiguous, the Court will examine the extrinsic evidence submitted by the parties. [FN14]

FN11. The Restatement defines a condition as "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Restatement (Second) of Contracts § 224.

FN12. *U.S. West, Inc. v. Time Warner, Inc., 1996 WL 307445, at *9 (Del. Ch. June 6, 1996)* (citation omitted).

FN13. *True North Communications, Inc. v. Publicis, S.A., 711 A.2d 34, 38 (Del. Ch.1997)* (Chandler, C.), aff'd, 705 A.2d 244 (Del.1997) (TABLE).

FN14. *Id.*

The first provision in the Acquisition Agreement of consequence is Section 9.1(a)(iv), which provides that the "Agreement may be terminated prior to the Closing ... by TMM if any condition to the obligations of Sellers hereunder becomes incapable of fulfillment through no fault of Sellers." Section 9.1(a)(iv) does not define or list the "conditions to the obligations of Sellers," but this language is found elsewhere in the Agreement-most notably, Section 8.3. Section 8.3 is, in fact, entitled "Conditions to the Obligations of Sellers" and states that "[t]he obligation of Sellers to consummate the Acquisition shall be subject to satisfaction of" a list of ten conditions. One of the enumerated conditions is that TMM shall have received the consents of certain noteholders to the transaction, provided that TMM used commercially reasonable efforts to obtain such consents. [FN15] Another listed condition is that relevant governmental authorities shall have consented to the transaction. [FN16] What is not listed as a condition, however, is that TMM shall have received shareholder approval of the transaction.

FN15. Acquisition Agreement § 8.3(i).

FN16. *Id.* at § 8.3(h).

**\*3** KCS argues that the exclusion of TMM shareholder approval from Section 8.3 evidences the parties' intent that TMM shareholder approval is not a condition to the Acquisition Agreement. To this end, KCS invokes the maxim *inclusio unius est exclusio alterius, i .e.,* "the inclusion of one [condition in Section 8.3] is the exclusion of another [condition]." [FN17] This Court has invoked this principle of interpretation to construe wills, [FN18] statutes, [FN19] and partnership agreements. [FN20] Other courts have invoked the doctrine to find that provisions in an agreement are covenants, rather than conditions. [FN21] In this context, the failure to include TMM shareholder approval within Section 8.3 "speaks volumes" [FN22] and it is reasonable to conclude that the absence of TMM shareholder approval in Section 8.3 suggests that such approval is not a condition to the Agreement.

FN17. BLACK'S LAW DICTIONARY 906 (4th ed.1968). *See also* 3 CORBIN ON CONTRACTS § 552 at 206 (1960) ("If one subject is specifically named, or if several subjects of a larger class are specifically enumerated, and there are no general words to show that other subjects of that class are included, it may reasonably be inferred that the subjects not specifically named were intended to be excluded").

FN18. *In re Estate of Barrett,* 1996 Del. Ch. LEXIS 34 (Del. Ch. Mar. 8, 1996) (Chandler, C.).

FN19. *Makin v. Mack, 336 A.2d 230 (Del. Ch.1975).*

FN20. *Active Asset Recovery, Inc. v. Real Estate Asset Recovery Services, Inc., 1999 WL 743479 (Del. Ch. Sept. 10, 1999).*

FN21. *Tuff 'N' Rumble Management v. Livin' Large Records,* 1995 U . S. Dist. LEXIS 6955 (S.D.N.Y. May 22, 1995).

FN22. *Active Asset Recovery, Inc., 1999 WL 743479, at *11* (citing 3 CORBIN ON CONTRACTS § 552 at 206 (1960)) (finding intent to exclude "media overhead" costs as chargeable to a partnership because other items such as "duplicating" and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 4
Not Reported in A.2d, 2003 WL 22659332 (Del.Ch.)
**(Cite as: 2003 WL 22659332 (Del.Ch.))**

"telephone" charges were identified as chargeable to the partnership).

This conclusion is buttressed by the fact that TMM *noteholder* approval is found in Section 8.3 and that *KCS* shareholder approval is included in the enumerated list under Section 8.2 of the Agreement, entitled "Conditions to the Obligations of KCS." The parties, aided by able legal teams, knew how to make the non-occurrence of an event trigger the right to terminate the Agreement. The parties did so in the case of KCS shareholder approval and TMM noteholder approval by including them in Article 8 of the Agreement, conveniently entitled "CONDITIONS." It is unlikely that the parties intended to make TMM shareholder approval a condition, but decided not to include TMM shareholder approval under Article 8, especially since the very first section of the Agreement provides that "[u]pon the terms and *subject to satisfaction or waiver of the conditions set forth in Article 8,* at the Closing, KARA Sub shall purchase ... from MM [wholly owned subsidiary of TMM] ... all GTFM shares ... for the consideration described in Section 1.2." [FN23] This provision, in my opinion, independently suggests that the parties intended Article 8 to contain the only conditions to the Agreement that would permit a termination.

> FN23. (emphasis added). As noted, Article 8 of the Acquisition Agreement is entitled "CONDITIONS" and includes mutual conditions, § 8.1, conditions to KCS' obligations, § 8.2, and conditions to TMM's obligations, § 8.3.

TMM argues that provisions of the Acquisition Agreement found outside Article 8 establish that TMM shareholder approval is a condition. First, TMM points to Article 5, the "REPRESENTATIONS AND WARRANTIES OF SELLERS." In particular, Section 5.4(a) provides that "[t]he execution and delivery of this Agreement and the Ancillary Agreements ... have been duly and validly authorized ... and no other corporate action on the part of TMM ... is necessary ... other than approvals from the shareholders of TMM and MM." TMM asserts that because Section 5.4(a) states that shareholder approval is "necessary" it must be a condition. The more reasonable interpretation, however, is that this provision does not create a condition.

TMM's representation that it had all necessary corporate approvals to close the transaction, other than shareholder approval, does not *ipso facto* make

TMM shareholder approval a condition. There is a distinction between the warranties and representations of TMM and an act or event that, unless excused, must occur before TMM's duty to perform arises, *i.e.,* a condition. [FN24] Therefore, I must assess whether the parties intended for Section 5.4 to constitute a condition. Initially, I note that this provision is not within Article 8- favoring a conclusion that it is not a condition. Additionally, there is no language in Section 5.4 purporting to create a condition. The words "on condition that" or "provided that" or even the two-letter word "if," phrases typically used by parties to create conditions, [FN25] are not present. Moreover, to the extent that the Court considers extrinsic evidence, Section 5.4 is wholly consistent with what KCS's representatives were told by TMM's chief negotiator (and Serrano's nephew): that a stockholder vote was necessary but a mere formality because of Serrano's over 99% control of the voting shares. [FN26]

> FN24. *See* <u>*Summit Investors II, L.P. v. Sechrist Indus., Inc.,* 2002 WL 31260989, at *7 (Del. Ch. Sept. 20, 2002)</u> (noting distinction between conditions and covenants); <u>*Weiss v. Northwest Broadcasting, Inc.,* 140 F.Supp.2d 336, 343-44 (D.Del.2001)</u> (same; applying Delaware law).

> FN25. <u>Restatement (Second) of Contracts § 226</u> cmt. a (1981).

> FN26. Lawrence Aff. ¶ 14; Segovia Dep. at 61-62.

**\*4** TMM also points to Section 12.13, governing the "Termination Fee ." This provision provides, in part, as follows:

> In the event of ... a termination pursuant to Section ... 9.1(a)(iv) as a result of the failure of the stockholders of ... TMM to approve the Acquisition if at or prior to the meeting of such stockholders to approve the Acquisition ... the Board of Directors of TMM ... shall have failed to recommend or shall have withdrawn and not reinstated its recommendation of, the Acquisition, then [TMM shall remit to KCS] the sum of $18 million.

TMM argues that this provision, by implication, allowed for termination if TMM's shareholders did not approve the transaction. [FN27] Section 12.13, however, is simply not relevant because the Board has not withdrawn its recommendation. Also, Section 12.13 does not define what is a condition or what permits termination. Section 12.13 only refers to

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 22659332 (Del.Ch.)
(Cite as: 2003 WL 22659332 (Del.Ch.))

Section 9.1(a)(iv), which allows termination if "a condition to the obligations of Seller hereunder becomes incapable of fulfillment through no fault of Sellers." As noted, Section 8.3, conveniently entitled "Conditions to the Obligations of Sellers," does not mention TMM shareholder approval. [FN28]

> FN27. I say "by implication" because by its terms, this provision does not purport to establish when termination is allowed and only sets forth that a termination fee is payable if TMM's shareholders do not approve the transaction *and* the Board did not recommend the transaction.

> FN28. To the extent that there is some doubt as to whether Section 12.13, or Section 5.4, creates a condition, this Court resolves those doubts so as to reduce KCS's risk of forfeiture from the non-occurrence of an event that is within TMM's control. *See* Restatement (Second) of Contracts § 227(1).

TMM also argues that even if it did not validly terminate the Agreement, the remedy of specific performance is, as a matter of law, unavailable to KCS. TMM's argument is that this Court is unable to require TMM to close on the transaction in light of Serrano's vote against the deal. I need not reflect on the validity of this argument, however, because the relief sought here is much more limited. Ultimately, the arbitration proceeding will determine what ultimate remedy, if any, KCS is entitled to receive. In the instant proceeding, however, KCS only seeks to require TMM to abide by provisions of the Agreement which require that TMM carry on the business GTFM and its subsidiaries "in the ordinary course consistent with past practices." [FN29] TMM was required to abide by these provisions before Serrano's no vote, and can be required to do the same until the arbitration proceedings have reached their termination. [FN30] In fact, the form of order entered in this proceeding was contemplated by the parties in the Acquisition Agreement. Section 12.10 provides that KCS is "entitled ... to enforce specifically the terms and provisions of" the Agreement. In addition, Section 12.11 provides that the initiation of arbitration does "not preclude equitable or other judicial relief to enforce the provisions [of the Agreement] or to preserve the status quo pending" the outcome of arbitration. KCS does not seek, and this Court does not grant, an order requiring TMM to close on the deal regardless of Serrano's vote to reject the transaction.

> FN29. Acquisition Agreement § 7.1.

> FN30. Requiring TMM to carry on the business of GFTM in the ordinary course does not infringe on the TMM shareholder franchise since TMM has a single shareholder, Serrano, who serves as Chairman of the Board and controls over 99% of the shareholder vote. In *Northern Assur. Co. v. Rachlin Clothes Shop, Inc.,* 125 A. 184, 188-90 (Del.1924), Chancellor Wolcott stated:
> A corporation being a purely metaphysical creature, having no mind with which to think, no will with which to determine and no mind with which to speak, must depend upon faculties of natural persons to determine for it its policies and direct the agencies through which they are to be effectuated. The individuals within its organization who perform for it these functions are generally its directors.
> The argument that Serrano, as Chairman of TMM, could sign the Acquisition Agreement, promising to recommend the transaction to shareholders, *i.e.,* himself, and use his best efforts to get shareholders (again, himself) to approve the transaction, but yet could vote against the transaction without implicating TMM's covenants under the Acquisition Agreement is an exercise in sophistry.

* * *

In my opinion, KCS has demonstrated to a reasonable probability that its arbitration position, namely, that TMM did not validly terminate the Acquisition Agreement, is sound. [FN31]

> FN31. Independently, KCS argued that TMM breached its covenant to use all commercially reasonable efforts to obtain shareholder approval. I do not evaluate this claim because KCS only needs to demonstrate the soundness of one claim in order to obtain a preliminary injunction. *In re Pure Res. S'Holders Litig.,* 808 A.2d 421, 432 (Del. Ch.2002).

*B. Irreparable Harm*

**5** The parties agreed "that irreparable damage would occur in the event that any of the provisions of [the] Agreement were not performed in accordance

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 22659332 (Del.Ch.)
(Cite as: 2003 WL 22659332 (Del.Ch.))

with their specific terms or were otherwise breached." [FN32] KCS argues that this stipulation by the parties is sufficient to establish the irreparable harm element of the preliminary injunction standard. Several decisions of this Court support KCS's position. [FN33] TMM argues that in the cases cited by KCS the relevant contractual provisions were "accompanied by the actual presence of demonstrable harm of a sort that would have been deemed irreparable even in the absence of the contractual provision." [FN34] TMM then argues that because prior courts have relied on the contractual stipulation and since the underlying facts independently support such a stipulation, this Court is required to do likewise. I reject this proposition.

FN32. Acquisition Agreement § 12.10.

FN33. *True North Communications, Inc.,* 711 A.2d at 44 (Chandler, C.); *Vitalink Pharmacy Services, Inc. v. Grancare, Inc.,* 1997 WL 458494, at *9 (Del. Ch. Aug. 7, 1997); *SLC Beverages, Inc. v. Burnup & Sims, Inc.,* 1987 WL 16035, at *2 (Del. Ch. Aug. 20, 1987).

FN34. Donald J. Wolfe, Jr. & Michael A. Pittenger, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 10-2(b) at 10-36 (2001).

In *Vitalink Pharmacy Services,* Vice Chancellor (now Justice) Jacobs held that such a contractual stipulation "alone suffice[d] to establish the element of irreparable harm" [FN35]-a holding reaffirmed in *True North Communications.* [FN36] Although a contractual stipulation as to the irreparable nature of the harm that would result from a breach cannot limit this Court's discretion to decline to order injunctive relief, such a stipulation does allow the Court to make a finding of irreparable harm provided the agreement containing the stipulation is otherwise enforceable. [FN37] If the facts plainly do not warrant a finding of irreparable harm, this Court is not required to ignore those facts, especially since the "parties cannot confer subject matter jurisdiction upon a court ." [FN38] But where there is no concern that the parties are attempting to improperly confer equitable jurisdiction upon this Court, a defendant cannot successfully argue that there is no irreparable harm. [FN39]

FN35. 1997 WL 458494, at *9.

FN36. 711 A.2d at 44.

FN37. *Signal Cap. Corp. v. Signal One, LLC,* Del. Ch., C.A. No. 18011, bench ruling at 88-89, Jacobs, V.C. (May 15, 2000).

FN38. *Butler v. Grant,* 714 A.2d 747, 749-50 (Del.1998).

FN39. *Signal Cap. Corp.,* C.A. No. 18011, bench ruling at 88-89.

*C. Balance of the Equities*

Under this prong, KCS must demonstrate that the harm to it if relief is denied outweighs the harm to TMM if the injunction is granted. [FN40] I am convinced that if I deny KCS the preliminary injunction to preserve the status quo pending arbitration, KCS would suffer a harm greater than any harm TMM could suffer if I were to grant the injunction. Because there is a reasonable probability that TMM did not validly terminate the Agreement with KCS, TMM cannot invoke general equity principles to save it from an injunction enforcing the Agreement. Under the terms of the Agreement, TMM contracted away its right to undertake actions outside the ordinary course of business, including its right to solicit other offers for GTFM. [FN41] Accordingly, TMM cannot now assert that it will be harmed due to the Court's enforcement of the rights and obligations for which it specifically bargained, and which were reduced to writing in the terms of the Acquisition Agreement. [FN42]

FN40. *True North Communications,* 711 A.2d at 45.

FN41. Section 7.1 of the Agreement provides that TMM "shall use commercially reasonable efforts to cause GTFM and each of its subsidiaries to (i) carry on its business in the ordinary course consistent with past practices ..." Section 7.1(a) through (q) specifies what GTFM cannot do, so as to preserve GTFM for acquisition by KCS. Section 7.10 contains standard no-shop provisions.

FN42. *True North Communications,* 711 A.2d at 45.

The harm TMM alleges that it will suffer if required to abide by the Agreement until the arbitration

Not Reported in A.2d                                                                        Page 7
Not Reported in A.2d, 2003 WL 22659332 (Del.Ch.)
**(Cite as: 2003 WL 22659332 (Del.Ch.))**

process reaches an outcome is that TMM will become insolvent. In the present circumstances, I find this alleged harm insufficient to tip the equities in TMM's favor. First, this consideration works in favor of KCS. TMM's precarious financial situation demonstrates that KCS will suffer irreparable harm if the injunction does not issue, as TMM may be unable to satisfy a money judgment. [FN43] Second, TMM has not identified any specific actions it intends to take that would avert insolvency, but are inconsistent with the Acquisition Agreement. As it stands now, there are only vague and unsubstantiated allegations of harm-allegations insufficient to overcome the clear right to specific performance contained in the Agreement. [FN44] Lastly, TMM's claim of financial ruin if it is forced to abide by the Agreement is undermined by the terms of the Agreement itself. TMM negotiated to have the Agreement terminate on December 31, 2004, in order to give it ample time to obtain the consents of its noteholders. [FN45] The fact that TMM anticipated it might have to abide by the terms of the Agreement, including the provisions limiting TMM's freedom of action, until the end of 2004, means that its present assertion that it will be harmed if required to abide by those provisions until resolution of the arbitration process (which will be prompt) rings hollow.

> FN43. *Bayard v. Martin,* 101 A.2d 329 (Del.1953), *cert. denied,* 347 U.S. 944 (1954).

> FN44. TMM is free to petition this Court for relief from abiding by specific provisions in the Agreement if there are specific actions it wishes to undertake to avoid insolvency that contravene that Agreement.

> FN45. Deposition of Larry A. Lawrence at 32-33.

### III. CONCLUSION

**\*6** For the reasons stated above, KCS's motion for a preliminary injunction to prevent TMM from taking any action contrary to the terms of the Acquisition Agreement pending the outcome of the arbitration proceeding that will resolve the merits of the dispute is GRANTED. I have entered an Order consistent with this decision.

Not Reported in A.2d, 2003 WL 22659332 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT

## D

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2000 WL 1610790 (S.D.N.Y.)
**(Cite as: 2000 WL 1610790 (S.D.N.Y.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
WISHNATZKI & NATHEL, INC, Plaintiff,
v.
H.P. ISLAND-WIDE, INC. and Mario L. Tiberi,
Defendants.
**No. 00 Civ. 8051(JSM).**

Oct. 27, 2000.

Sherylee F. Bauer, Silverman, Collura & Chernis, P.C.,
New York, NY, for plaintiff.

Mario L. Tiberi, H.P. Islandwide, Inc., Staten Island, NY,
for defendants.

OPINION and ORDER

MARTIN, J.

**\*1** Presently before the court is the application of
Wishnatzki & Nathel, Inc. ("Plaintiff") for a temporary
restraining order and preliminary injunction ("TRO") to
prevent H.P. Island-Wide, Inc. and its principal, Mario L.
Tiberi, (collectively "Defendants") from dissipating funds
that are allegedly owed to Plaintiffs pursuant to a Perishable
Agriculture Commodities Act ("PACA") trust. The TRO is
granted pending argument on Plaintiff's application for a
preliminary injunction, as Plaintiffs have properly
demonstrated an imminent danger of dissipation. However,
in light of the Supreme Court's recent decision in *Grupo
Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,
527 U.S. 308, 119 S.Ct. 1961 (1999)*, the ability of a district
court to grant equitable relief of this type merits comment.
[FN1]

> FN1. The question arises in part because of the
> statute's jurisdictional provision:
> The several district courts of the United States are
> vested with jurisdiction specifically to entertain (i)
> actions by trust beneficiaries to enforce payment
> from the trust, and (ii) actions by the Secretary to
> prevent and restrain dissipation of the trust.

7 U.S.C. § 499e(c)(4). While at first blush,
Plaintiffs might seem barred from applying for an
injunction by the terms of the statute, courts have
read this provision and the PACA legislative
history as retaining a plaintiff's full arsenal of
rights at common law. *See, e.g., Tanimura & Antle,
Inc. v. Packed Fresh Produce, Inc., 222 F.3d 132,
138-39 (3d Cir.2000); JSG Trading Corp. v.
Tray-Wrap, Inc., 917 F.2d 75 (2d Cir.1990); Frio
Ice, S.A. v. Sunfruit, Inc., 918 F.2d 154, 157-58
(11th Cir.1990)*. The inquiry into what those rights
are dovetails with the analysis required under
*Grupo Mexicano.*

In *Grupo Mexicano,* the Court held that district courts do
not have the power to issue preliminary injunctions freezing
a defendant's assets in order to secure a money judgment,
because unsecured creditors had no such remedy at common
law. *See Grupa Mexicano, 527 U.S. at 329-33, 119 S.Ct. at
1973-75.* In reaching its decision, the Court made a
distinction between general, unsecured creditors and those
possessing a lien or equitable interest in the property at
issue. *See id. at 324-26, 119 S.Ct. at 1971-72.* To this end,
the Court distinguished its prior decisions in *Deckert v.
Independence Shares Corporation, 311 U.S. 282, 61 S.Ct.
229 (1940),* and *United States v. First National City Bank,
379 U.S. 378, 85 S.Ct. 528 (1965).* In *Deckert,* a
preliminary injunction was appropriate because the ultimate
relief sought was equitable in nature, *see Deckert, 311 U.S.
at 288-89, 61 S.Ct. at 233-34* (rescission of fraudulently
induced contract and recovery of consideration paid), while
in *First National,* the United States was seeking to enforce
an equitable tax lien on the defendant's assets, *see First
National, 379 U.S. at 379-80, 85 S.Ct. at 529.* Similarly, in
*De Beers Consolidated Mines, Ltd. v. United States, 325
U.S. 212, 65 S.Ct. 1130 (1945),* the Court held that "[a]
preliminary injunction is always appropriate to grant
intermediate relief of the same character as that which may
be granted finally." *Id. at 220, 65 S.Ct. at 1134.*

In keeping with the principles outlined in *Deckert, De
Beers,* and *First National,* courts have held that where the
particular funds sought to be frozen are also the funds at
issue in the suit, a preliminary injunction is proper. *See, e.g.,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2000 WL 1610790 (S.D.N.Y.)
**(Cite as: 2000 WL 1610790 (S.D.N.Y.))**

*Republic of Philippines v. Marcos,* 806 F.2d 344, 356 (2d
Cir.1986); *State of New York v. Panex Indus., Inc.,* 860
F.Supp. 977, 980-81 (W.D.N.Y.1994).* Indeed, courts since
*Grupo Mexicano* have found that where plaintiffs seek both
equitable and legal relief in relation to specific funds, a
court retains it equitable power to freeze assets. *See, e.g.,*
*United States ex rel. Rahman v. Oncology Assocs.,* 198 F.3d
489, 494-98 (4th Cir.1999)* ("When the plaintiff creditor
asserts a cognizable claim to specific assets of the defendant
or seeks a remedy involving those assets, a court may in the
interim invoke equity to preserve the status quo pending
judgment...."); *National Union Fire Ins. Co. v. Kozeny,* No.
Civ.A 00-B-383, 2000 WL 1468607, at *8 (D.Colo. Sept.
25, 2000) (noting "strong nexus between the assets enjoined
and Plaintiffs' claim for money damages"); *Fairview Mach.
& Tool Co. v. Oakbrook Int'l, Inc.,* 77 F.Supp.2d 199,
202-04 (D.Mass.1999).*

**\*2** At issue here are the proceeds contained in a PACA trust.
Under PACA, a statutory trust is created on sale proceeds of
perishable agricultural products in order to protect the
security interests of sellers. This has the effect of elevating
unsecured general creditors to the status of trust
beneficiaries who have rights superior to secured creditors
in the trust funds. *See JSG Trading Corp. v. Tray-Wrap,
Inc.,* 917 F.2d 75, 77-78 (2d Cir.1990); *In re N. Merberg &
Sons, Inc.,* 166 B.R. 567, 570-71 (S.D.N.Y.1994).* Thus,
while Plaintiff seeks to freeze Defendants' assets pending
payment for goods sold, Plaintiff asserts an equitable
interest in those funds as beneficiaries of the statutory trust.
Plaintiff's application for injunctive relief therefore falls
outside the purview of *Grupo Mexicano,* not only because
of Plaintiff's equitable interest in the trust proceeds, but
because courts have traditionally had the power to enjoin
defendants from dissipating funds that are the subject of the
underlying suit.

SO ORDERED.

Not Reported in F.Supp.2d, 2000 WL 1610790 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:00cv08051 (Docket) (Oct. 23, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.