**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| E.I. du PONT de NEMOURS and COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 05-699 (KAJ) |
| LUMBERMENS MUTUAL CASUALTY COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

**LUMBERMENS MUTUAL CASUALTY COMPANY'S
ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT,
AND COUNTERCLAIMS AGAINST PLAINTIFF
E.I. DUPONT DE NEMOURS AND COMPANY**

Defendant, Lumbermens Mutual Casualty Company ("Lumbermens"), by and through its

attorneys, and for its answer and affirmative defenses to Plaintiff E.I. Du Pont de Nemours and

Company's ("DuPont") Complaint, states as follows:

## INTRODUCTION

**COMPLAINT ¶ 1:**

In this action, DuPont is seeking injunctive, declaratory, and monetary relief to prevent Lumbermens, which is one of the insurance companies and related affiliates that does business under the umbrella name of Kemper Insurance Companies (collectively referred to hereinafter as "Kemper"), from collecting amounts from DuPont that Kemper claims to be due, but which are not due, under a comprehensive insurance program for the 2002-03 policy year.

**ANSWER:**

Lumbermens admits that DuPont is seeking injunctive, declaratory and monetary relief but denies that any such relief is warranted. Lumbermens denies the remaining allegations of Paragraph 1.

**COMPLAINT ¶ 2:**

Under the Kemper insurance program, DuPont is largely self-insured. Consequently, at the beginning of each annual policy period, DuPont has paid Kemper an insurance premium for the limited risk transfer achieved in the insurance program, as well as for Kemper's claims

handling services, overhead, profit, surcharges, assessments, and taxes. For the 2002-03 policy year, DuPont paid Kemper approximately $1 million for these charges. DuPont also has paid, on average, tens of thousands of dollars weekly into an escrow account to fund Kemper's payment of DuPont's losses, consistent with the insurance program. DuPont also has provided a letter of credit and a surety bond to ensure those weekly payments.

**ANSWER:**

Lumbermens denies that DuPont is self-insured. Lumbermens admits that DuPont has made certain payments to Lumbermens, has established an escrow account and has provided a letter of credit and a surety bond securing all obligations owed Lumbermens, but denies the remaining allegations of Paragraph 2.

**COMPLAINT ¶ 3:**

In essence, each year DuPont's account is audited to determine whether the initial projection regarding DuPont's payroll, which is part of the premium calculation, was accurate. If the account balancing reveals the projection was high, then the administrative costs and the limited risk transfer premium paid by DuPont based upon the excessive payroll projection is refunded or credited to DuPont in the form of a "dividend." If the account balancing reveals the projection was low, then DuPont pays to Kemper an additional amount.

**ANSWER:**

Lumbermens admits that each annual policy is audited after the coverage period to determine actual payrolls used to adjust the premium for that policy year, and denies the remaining allegations of Paragraph 3.

**COMPLAINT ¶ 4:**

Because DuPont effectively is self-insured for most claims, the so-called "dividend" is nothing more than an accounting calculation that determines whether DuPont has paid Kemper the appropriate premium and related administrative costs and taxes based upon the projected payroll. Thus, the so-called "dividend" is not a share of the profits of Kemper, as would be the normal understanding of the term "dividend."

**ANSWER:**

Lumbermens denies the allegations of Paragraph 4.

**COMPLAINT ¶ 5:**

Contrary to the purpose and intent of the insurance program, and solely because Kemper is on the brink of insolvency, Kemper has refused to count DuPont's "dividend" side of the equation during the account balancing and claims that DuPont owes it a premium in excess of $5 million even though DuPont essentially is self-insured. Kemper has acknowledged that DuPont's "dividend" under the applicable accounting formula is in excess of $4.5 million.

Indeed, a correct account balancing under the applicable formula reveals that instead of DuPont owing Kemper millions of dollars, Kemper owes DuPont $119,111.00.

## ANSWER:

Lumbermens denies the allegations of Paragraph 5.

## COMPLAINT ¶ 6:

Thus, Kemper effectively is attempting to collect from DuPont the premium amount that would be due if DuPont were not self-insured for most of the insurance program and had not already paid millions of dollars to pay for the claims asserted against DuPont. Kemper has threatened to draw down on a letter of credit and a surety bond posted by DuPont in order to collect this fictional debt that it has created for DuPont.

## ANSWER:

Lumbermens denies the allegations of Paragraph 6.

## COMPLAINT ¶ 7:

Consequently, through this lawsuit, DuPont asks this Court to declare DuPont's rights and obligations under the Insurance Program and to enjoin any collection efforts by Kemper until those rights have been determined. DuPont also requests monetary relief to the extent that DuPont has already paid amounts to Kemper that exceed DuPont's obligations under the Insurance Program, and further requests the release of excess collateral that DuPont has provided. Simply put, DuPont should not be required to pay millions of dollars to Kemper in exchange for nothing simply because Kemper is on the brink of insolvency.

## ANSWER:

Lumbermens admits that DuPont asks this Court to declare DuPont's rights and obligations under the Insurance Programs and to enjoin any collections efforts by Lumbermens until those rights have been determined. Lumbermens admits that Dupont requests monetary relief and other relief. Lumbermens denies that DuPont is entitled to any such relief, and denies the remaining allegations of Paragraph 7.

## PARTIES

## COMPLAINT ¶ 8:

DuPont is a corporation organized under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware.

## ANSWER:

Lumbermens admits the allegations of Paragraph 8.

**COMPLAINT ¶ 9:**

Lumbermens is an insurance company organized under the laws of the State of Illinois with its principal place of business at One Kemper Drive, Long Grove, Illinois.  Lumbermens is one of the Kemper Insurance Companies and is licensed by the Insurance Commissioner of the State of Delaware to sell insurance in Delaware to Delaware policyholders like DuPont.

**ANSWER:**

Lumbermens admits the allegations of Paragraph 9.

## KEMPER'S INSURANCE PRODUCTS

**COMPLAINT ¶ 10:**

Kemper sold various insurance products to DuPont from October 1, 1971 until March 1, 2003, including workers' compensation, automobile liability and general liability insurance policies, as well as various premium agreements, claim handling agreements (through related entities), indemnity agreements, and warranty agreements.

**ANSWER:**

Lumbermens admits that it sold various insurance products to DuPont from October 1, 1971 and admits that DuPont cancelled its insurance program on or about March 1, 2003. Lumbermens denies the remaining allegations of Paragraph 10.

**COMPLAINT ¶ 11:**

Kemper sold its insurance products to DuPont through a comprehensive insurance program ("Insurance Program") designed and warranted to meet DuPont's needs:  to satisfy all insurance regulatory requirements, to transfer certain specifically identified risks of loss, and to retain the financial responsibility for most risks of loss while concurrently retaining the benefits of positive loss performance under its specific Insurance Program.

**ANSWER:**

Lumbermens refers to the Insurance Program attached to the Complaint as Exhibit 1 and denies any allegations of Paragraph 11 inconsistent therewith.  Further answering, Lumbermens admits that it sold its insurance products to DuPont through a comprehensive insurance program and that such insurance was designed to meet certain of DuPont's needs, including to satisfy the legal requirements under financial responsibility laws requiring compulsory workers compensation insurance.  Lumbermens denies the remaining allegations of Paragraph 11.

**COMPLAINT ¶ 12:**

For the last several decades, DuPont's commitment to safety, combined with its financial resources, has allowed DuPont to adopt a risk management strategy in which DuPont retains substantial financial responsibility for its own risks of loss.

**ANSWER:**

Lumbermens is without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 12, and therefore denies those allegations.

**COMPLAINT ¶ 13:**

DuPont's commitment to safety extends to certain contractors that work on projects for DuPont. As a result, DuPont has found that it can insure certain liabilities of its contractors more cost effectively than those contractors could obtain such insurance in the open market. Because DuPont did not wish to expose itself to unlimited risk relating to its contractors' losses that were covered under the Insurance Program, DuPont annually paid Kemper an additional charge to cap its financial responsibility for the contractors' workers' compensation losses (including defense expenses) at $1 million per occurrence.

**ANSWER:**

Lumbermens is without information or knowledge sufficient to form a belief as to the truth of the allegations of the first two sentences of Paragraph 13 and therefore denies them. Lumbermens admits that the workers compensation Insurance Program sold to DuPont provided for a deductible of $ 1 million per occurrence payable to Lumbermens, and denies the remaining allegations of Paragraph 13.

**COMPLAINT ¶ 14:**

Thus, under the Insurance Program devised by Kemper, the known mutual intent of the parties was for DuPont to retain most of the financial responsibility for risks of loss, but to obtain a real transfer of underwriting risk for some potential losses, such as the contractors' workers' compensation losses in excess of $1 million per occurrence.

**ANSWER:**

Lumbermens refers to the Insurance Program attached to the Complaint as Exhibit 1 and denies all allegations of Paragraph 14 inconsistent therewith. Further answering, Lumbermens denies the allegations of Paragraph 14.

**COMPLAINT ¶ 15:**

DuPont's Insurance Program with Kemper was renewed annually through the issuance and acceptance of proposals, insurance policies, and other documents and agreements that constituted the Insurance Program.

**ANSWER:**

Lumbermens admits the allegations of Paragraph 15.

## INSURANCE PROPOSALS

**COMPLAINT ¶ 16:**

Every year, DuPont would receive an insurance proposal ("Insurance Proposal") from Kemper, through which Kemper explained the Insurance Program. When the terms of the Insurance Proposal were finalized, Kemper would send an Insurance Proposal noted "final and accepted." DuPont and Kemper would sign those Insurance Proposals annually, sometimes long after the policy period began. The final and accepted Insurance Proposal issued by Kemper for 2002-03 is attached as Exhibit 1.

**ANSWER:**

Lumbermens refers to the Insurance Program attached as Exhibit 1 to the Complaint and denies all allegations of Paragraph 16 inconsistent therewith. Lumbermens admits that DuPont would annually receive an Insurance Proposal which set forth the terms of the Insurance Program. Lumbermens admits the second sentence of Paragraph 16, and admits that the final and accepted Insurance Proposal issued by Kemper for 2002-03 is attached to the Complaint as Exhibit 1. Lumbermens denies the remaining allegations of Paragraph 16.

**COMPLAINT ¶ 17:**

Although the Insurance Program evolved over the years, and changed materially in 2000, it essentially consisted of three components: (1) Workers' Compensation Large Risk Contributory Dividend Plan ("LRDP") and warranty agreement; (2) fronting insurance and indemnity agreement; and (3) a large deductible workers' compensation program for certain operations.

**ANSWER:**

Lumbermens refers to the Insurance Program attached to the Complaint as Exhibit 1 and denies all allegations of paragraph 17 inconsistent therewith. Further answering, Lumbermens admits that various components of the Insurance Program changed over time through endorsements and annual insurance proposals, and consisted of, among other things, a workers' compensation large risk contributory dividend plan and a large deductible workers' compensation program for certain operations. Lumbermens denies the remaining allegations of Paragraph 17.

**COMPLAINT ¶ 18:**

The fronting and large deductible aspects of the Insurance Program are generally not at issue in this lawsuit, as there is no current, substantial, and known disagreement between Kemper and DuPont relating to the fronting and large deductible aspects of the Insurance Program.

**ANSWER:**

Lumbermens refers to the Insurance Program attached to the Complaint as Exhibit 1 and denies all allegations of paragraph 18 inconsistent therewith. Further answering, Lumbermens admits that it is not aware of any dispute, with one exception, regarding deductible losses that are part of the deductible provisions of the insurance policies, and denies the remaining allegations of Paragraph 18.

**COMPLAINT ¶ 19:**

The pre-2000 policy years of the Insurance Program also are not at issue in this lawsuit, as there is no current, substantial, and known disagreement between Kemper and DuPont relating to the pre-2000 policy years.

**ANSWER:**

Lumbermens admits the allegations of Paragraph 19.

**COMPLAINT ¶ 20:**

Prior to 2000, the Insurance Program required DuPont to pay Kemper a deposit premium and collateral in three forms: (1) fixed payments (which included charges for Kemper's overhead and profit, taxes, front fees, various surcharges and assessments, and the full risk transfer purchased by DuPont for specified risks) (referred to hereinafter as the "Fixed Payments"); (2) incurred losses (which included amounts paid by Kemper as well as the outstanding reserves Kemper placed on specific, identifiable open claims); and (3) security in the form of deposits to a bank account earning interest for DuPont which was converted in 1999 to a letter of credit and surety bond (in equal amounts). If DuPont overpaid in any given year, a refund was issued or credited to DuPont in the form of a "dividend." (Copies of the letter of credit and surety bond are attached as Exhibit 2).

**ANSWER:**

Lumbermens refers to the express terms of the pre-2000 Insurance Programs and denies all allegations of paragraph 20 inconsistent therewith. Further answering, Lumbermens admits that prior to 2000, DuPont paid, at the onset of the policy year, certain deposit premiums, pre-paid to Lumbermens its estimated obligations to reimburse Lumbermens for deductible losses, and provided certain collateral to Lumbermens. Lumbermens denies the remaining allegations of Paragraph 20.

**COMPLAINT ¶ 21:**

Beginning with the 2000 policy year, the Insurance Program changed to a "pay-as-you-go" program that required DuPont to pay Kemper a deposit premium and collateral in three forms: (1) Fixed Payments; (2) reimbursement for paid losses; and (3) security in the form of a letter of credit and surety bond (in equal amounts). The major change in the Insurance Program in 2000 was that DuPont would only be required to replenish an escrow account held by a third party administrator affiliate of Kemper, NATLSCO (now known as Broadspire), for losses as

they were actually paid, rather than paying in advance for "incurred loss" with annual refunds or credits for overpayments.

**ANSWER:**

Lumbermens refers to the Insurance Program attached to the Complaint as Exhibit 1 and denies all allegations of paragraph 21 inconsistent therewith.    Further answering, Lumbermens admits DuPont funded an escrow account in a specified amount that would be reviewed periodically for adequacy.   Lumbermens admits that in 2001, the Insurance Program no longer provided for pre-payment to Lumbermens of future deductible losses.   Lumbermens admits that DuPont paid a deposit premium and provided collateral in the form of surety bonds and letters of credit. Lumbermens denies the remaining allegations of Paragraph 21.

**COMPLAINT ¶ 22:**

In 2002, for example, (1) DuPont paid Kemper $1,043,343 in Fixed Payments over the course of the year, consisting of $760,601 in required plan cash, $97,742 in surcharges and assessments, and $185,000 in front fees; (2) DuPont paid and continues to pay varying weekly amounts, as requested by Kemper and as contemplated in the Insurance Proposal, to replenish an escrow account used to pay all losses as they arise under the Insurance Program; and (3) DuPont maintained security in the amount of $19,208,708, which was divided 50/50 between a letter of credit and a surety bond.

**ANSWER:**

Lumbermens admits that DuPont made certain deposit premium and other payments with regard to all insurance programs, including the workers' compensation insurance program, but denies that DuPont made weekly payments to replenish an escrow account as losses became due under the workers compensation insurance program.    Lumbermens denies the remaining allegations of Paragraph 22.

**COMPLAINT ¶ 23:**

Because DuPont initially funded and constantly replenishes the escrow account, the third party administrator pays covered claims with DuPont's money.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 23.

**COMPLAINT ¶ 24:**

Kemper has never claimed that DuPont ever failed to pay promptly any of the weekly billing amounts necessary to replenish the escrow account for losses paid under the Insurance Program.

**ANSWER:**

Lumbermens denies that DuPont has replenished an escrow account on a weekly basis with regard to the workers' compensation Insurance Program; rather, DuPont reimbursed Lumbermens for deductible losses paid by Lumbermens. Lumbermens denies the remaining allegations of Paragraph 24.

## THE "DIVIDEND" PLAN

**COMPLAINT ¶ 25:**

The dispute in this case arises due to Kemper's pending insolvency and because the "dividend formula" did not change in the Insurance Program in 2000 even though the program changed from an "incurred loss" program to a "pay-as-you-go" program.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 25.

**COMPLAINT ¶ 26:**

The LRDP portion of the Insurance Program, as explained in the Insurance Proposals, included a "Dividend Formula" stating that "Dividend equals Audited Subject premium minus (Basic Premium plus Converted Limited Losses) x Tax Multiplier + (N.Y. Loss Expense)."

**ANSWER:**

Lumbermens refers to the Insurance Program attached as Exhibit 1 to the Complaint, and denies any allegation of Paragraph 26 inconsistent therewith. Further answering, Lumbermens denies the allegations of Paragraph 26.

**COMPLAINT ¶ 27:**

Generally speaking, the term "Audited Subject Premium" is the amount of premium that DuPont would have owed if the Insurance Program had been a traditional insurance program, i.e., one in which the insurance company bears the risk of loss and the policyholder is not required to pay its own losses through an escrow account or to reimburse the insurance company for losses.

**ANSWER:**

Lumbermens refers to the Insurance Program attached as Exhibit 1 to the Complaint, and denies any allegation of Paragraph 27 inconsistent therewith. Further answering, Lumbermens denies the allegations of Paragraph 27.

**COMPLAINT ¶ 28:**

Audited Subject premium takes into account: (1) a company's audited payroll; (2) premium rates established by workers' compensation rating agencies for various job

classifications; (3) an experience modification factor reflecting the policyholder's own particular prior loss experience as compared with its peers, and (4) premium and deductible discounts.

**ANSWER:**

Lumbermens admits the allegations of Paragraph 28.

**COMPLAINT ¶ 29:**

The term "Basic Premium" is undefined but reflects the Fixed Payments that DuPont paid at the beginning of each policy period, which were based upon DuPont's projected payroll and were subject to a payroll audit at the close of the policy period.

**ANSWER:**

Lumbermens refers to the Insurance Program attached as Exhibit 1 to the Complaint, and denies any allegation of Paragraph 29 inconsistent therewith. Further answering, Lumbermens denies the allegations of Paragraph 29.

**COMPLAINT ¶ 30:**

The term "Converted Limited Losses" is undefined but reflects the losses under the Insurance Program for which DuPont bears ultimate financial responsibility.

**ANSWER:**

Lumbermens refers to the Insurance Program attached as Exhibit 1 to the Complaint, and denies any allegation of Paragraph 30 inconsistent therewith. Further answering, Lumbermens denies the allegations of Paragraph 30.

**COMPLAINT ¶ 31:**

The Insurance Program was subject to an annual Cash/Security Reconciliation, sometimes referred to as a dividend adjustment or dividend determination.

**ANSWER:**

Lumbermens refers to the Insurance Program attached as Exhibit 1 to the Complaint, and denies any allegation of Paragraph 31 inconsistent therewith. Further answering, Lumbermens admits that various aspects of the Insurance Program were subject to an annual review, which may result in an adjustment of premium and other payment obligations or collateral requirements. Lumbermens denies the remaining allegations of Paragraph 31.

**COMPLAINT ¶ 32:**

In short, under that Cash/Security Reconciliation, the cash required from DuPont was adjusted to reflect DuPont's actual payroll as opposed to the projected payroll used for the initial Fixed Payment. Because DuPont makes weekly payments to cover its losses, the Cash/Security

Reconciliation typically results in a relatively small credit or deficit in the account which is based upon how accurate the original payroll projection was.

**ANSWER:**

Lumbermens refers to the Insurance Program attached as Exhibit 1 to the Complaint, and denies any allegation of Paragraph 32 inconsistent therewith.  Further answering, Lumbermens admits that a reconciliation may result in the adjustment of payment based on the audited actual payroll versus the projected payroll used for initial deposit premiums.  Lumbermens denies the remaining allegations of Paragraph 32.

**COMPLAINT ¶ 33:**

Also under the Cash/Security Reconciliation, the security was to be adjusted to secure ultimate expected loss amounts using agreed upon loss development factors.

**ANSWER:**

Lumbermens refers to the Insurance Program attached as Exhibit 1 to the Complaint, and denies any allegation of Paragraph 33 inconsistent therewith.  Further answering, Lumbermens denies the allegations of Paragraph 33.

## "DIVIDENDS" IN NAME ONLY

**COMPLAINT ¶ 34:**

In 2000, when the Insurance Program converted to a "pay-as-you-go" program, DuPont's obligations to Kemper became even more closely tied to DuPont's loss performance, as DuPont was billed weekly for losses paid by Kemper.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 34.

**COMPLAINT ¶ 35:**

Even though Kemper continued to use the term "dividend plan" and LRDP to describe one aspect of DuPont's insurance program, Dupont was not obligated to pay incurred losses and receive a return of "dividend" based upon loss performance, but instead was required to pay amounts into an escrow account weekly as Kemper paid the losses.  Consequently, the "dividend" portion of the program actually became only a line item in an accounting formula by which the up front premium DuPont paid to Kemper at the beginning of each policy year, which was based upon projected payroll figures, is later reconciled with the actual payroll figures for the time period.

**ANSWER:**

Lumbermens refers to the Insurance Program attached as Exhibit 1 to the Complaint, and denies any allegation of Paragraph 35 inconsistent therewith. Further answering, Lumbermens admits that the "dividend plan" and LRDP remained viable components of the Insurance Program in 2000 and continued to be in effect through the duration of the Insurance Program. Lumbermens denies the remaining allegations of Paragraph 35.

**COMPLAINT ¶ 36:**

Thus, the "dividends" to be determined by Kemper are not dividends in the traditional sense, in which the profits of a company are distributed among its owners. Rather, the "dividends" are an accounting calculation whereby it is recognized that DuPont is largely self-insured and DuPont receives full credit for its loss payments. Thus, the "dividend" is not tied to Kemper's overall financial performance. Rather, the "dividend" is based upon DuPont's Insurance Program alone.

**ANSWER:**

Lumbermens refers to the Insurance Program attached as Exhibit 1 to the Complaint, and denies any allegation of Paragraph 36 inconsistent therewith. Further answering, Lumbermens admits that the dividend calculations specified under the Insurance Program are not measured solely upon Lumbermens' overall financial performance. Kemper's ability to declare and pay a dividend is dependent upon certain criteria, including: Lumbermens' financial condition, the statutory pronouncements set forth in the Illinois Insurance Code, and the pronouncements of the Director of the State of Illinois Division of Insurance. Lumbermens denies the remaining allegations of Paragraph 36.

**COMPLAINT ¶ 37:**

According to its most recent determination, Kemper currently owes DuPont a "Disallowed Dividend Due Insured" of $4,532,579. Kemper, however, has declined to credit that "dividend" to DuPont due to Kemper's financial problems.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 37.

## COLLATERAL PROVIDED BY DUPONT

**COMPLAINT ¶ 38:**

In order to secure DuPont's obligations to pay its own losses under the Insurance Program, Kemper required certain collateral in the form of a letter of credit and a surety bond.

**ANSWER:**

Lumbermens refers to the Insurance Program attached as Exhibit 1 to the Complaint, and denies any allegation of Paragraph 38 inconsistent therewith. Further answering, Lumbermens admits that to secure DuPont's obligations under the Insurance Program, Lumbermens required certain collateral in the forms of letters of credit and surety bonds. Lumbermens denies the remaining allegations of Paragraph 38.

**COMPLAINT ¶ 39:**

The Insurance Proposal contained a method for determining the security required by the Insurance Program and provided for an annual security reconciliation:

Security will be used to secure the estimated ultimate losses less the amount of losses paid to date. The actual amount of estimated ultimate losses will be established at inception and will be adjusted annually.

**ANSWER:**

Lumbermens refers to the Insurance Program attached as Exhibit 1 to the Complaint, and denies any allegation of Paragraph 39 inconsistent therewith. Lumbermens admits the quoted reference to the Insurance Program is correct.

**COMPLAINT ¶ 40:**

As of April 30, 2005, DuPont had provided a Safeco bond in the amount of $5,995,646 and a letter of credit with J.P. Morgan for $9,604,354 as security.

**ANSWER:**

Lumbermens admits the allegations of Paragraph 40.

**COMPLAINT ¶ 41:**

Previously, DuPont had provided security in the amount of $19,208,708, which had been divided equally between a surety bond and a letter of credit – $9,604,354 through a letter of credit and $9,604,354 through a surety bond.

**ANSWER:**

Lumbermens admits the allegations of Paragraph 41.

**COMPLAINT ¶ 42:**

In discussions and negotiations with DuPont in 2004 and 2005, Kemper recognized it was holding excess collateral.

**ANSWER:**

Lumbermens admits the allegations of Paragraph 42, and further answering, Lumbermens released excess collateral in the amount of $3,609,000 in 2005.

**COMPLAINT ¶ 43:**

Kemper refused to reduce the surety bond amounts and letter of credit amounts equally, instead reducing only the surety bond, which is contrary to the Insurance Program.

**ANSWER:**

Lumbermens admits that it reduced the DuPont surety bond, and denies the remaining allegations of Paragraph 43.

**COMPLAINT ¶ 44:**

Kemper has failed to perform a proper security review and, upon information and belief, the Insurance Program remains significantly overcollateralized.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 44.

## KEMPER'S ATTEMPTS TO COLLECT DEBTS NOT OWING

**COMPLAINT ¶ 45:**

On September 14, 2004, Kemper sent an invoice to DuPont claiming that DuPont owed Kemper $12,459,116.

**ANSWER:**

Lumbermens admits that on September 17, 2004, it sent an invoice to DuPont claiming that DuPont owed Lumbermens $12,459,116. Lumbermens denies the remaining allegations of Paragraph 45.

**COMPLAINT ¶ 46:**

DuPont registered numerous objections to the calculations through its insurance broker, Marsh USA, Inc. ("Marsh").

**ANSWER:**

Lumbermens admits the allegations of Paragraph 46.

**COMPLAINT ¶ 47:**

Kemper ultimately issued a revised calculation on May 12, 2005, claiming that DuPont owed Kemper $6,292,733 ("Revised Calculation").

**ANSWER:**

Lumbermens admits the allegations of Paragraph 47.

**COMPLAINT ¶ 48:**

The Revised Calculation still was incorrect.  On June 23, 2005, Marsh sent detailed calculations to Kemper's representative showing that amounts were still being overbilled.

**ANSWER:**

Lumbermens denies the allegations of the first sentence of Paragraph 48.  Lumbermens admits that Marsh corresponded with Lumbermens on June 23, 2005 regarding the Revised Calculations, and denies the remaining allegations of Paragraph 48.

**COMPLAINT ¶ 49:**

Marsh followed up by e-mail on August 4, 2005, in an effort to resolve the outstanding billing issues relating to the Revised Calculation.

**ANSWER:**

Lumbermens admits the allegations of Paragraph 49.

**COMPLAINT ¶ 50:**

Kemper has not responded to Marsh's identification of those additional billing inaccuracies.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 50.

**COMPLAINT ¶ 51:**

The Revised Calculation does not properly reflect all payments made by DuPont.  Furthermore, in both the original calculation and the revised calculation, Kemper has failed to properly credit DuPont with the "dividend" as determined in accordance with the Insurance Program.  Kemper has simply ignored, because of its financial distress, the credit DuPont receives under the formula as a result of DuPont paying its own losses under the program.

**ANSWER:**

Lumbermens admits that it has not credited DuPont with a dividend because no dividend was declared, or is due and owing, under the terms of the Insurance Program. Lumbermens denies the remaining allegations of Paragraph 51.

**COMPLAINT ¶ 52:**

Specifically, in the Revised Calculation, Kemper calculated a "Disallowed Dividend Due Insured" of $4,532,579 and thus, Kemper improperly is attempting to charge DuPont a premium in excess of $4.5 million that is not owed.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 52.

**COMPLAINT ¶ 53:**

In short, Kemper is attempting to charge DuPont the full Audited Subject Premium, which is what Kemper would have charged if DuPont had <u>not</u> been paying its own losses.

**ANSWER:**

Lumbermens admits that DuPont owes the full Audited Subject Premium, less deposit premiums paid to date. Lumbermens denies the remaining allegations of Paragraph 53.

**COMPLAINT ¶ 54:**

Stated differently, Kemper is attempting to collect the full Audited Subject Premium as if DuPont maintained no financial responsibility to pay its own losses. Yet, at the same time, Kemper is still requiring DuPont to pay weekly tens of thousands of dollars of its own losses. Kemper has determined that DuPont is entitled to a "dividend" credit of $4,532,579, yet Kemper improperly has declined to credit DuPont with that amount in accordance with the dividend formula. Kemper may not undermine the entire structure and purpose of the Insurance Program by charging DuPont for an insurance product that DuPont never requested and Kemper never provided.

**ANSWER:**

Lumbermens admits that DuPont owes Lumbermens, and Lumbermens seeks to collect from DuPont, the full Audited Subject Premium less deposit premiums paid to date. Lumbermens admits that the Audited Subject Premium is, as a result of the deductible provisions of the Insurance Program, significantly lower than the premium would have been had the Insurance Program incorporated a smaller deductible level, or a deductible of zero. Lumbermens admits that it has required DuPont to pay Lumbermens for deductible losses. Lumbermens denies the remaining allegations of Paragraph 54.

**COMPLAINT ¶ 55:**

On July 27, 2005, Kemper also attempted to charge interest of $902,475.71 ("Interest Billing"), purportedly on the amounts claimed to be owed by DuPont even though Kemper acknowledges the charges include interest on amounts which (1) Kemper conceded were not due; (2) already had been paid by DuPont after Kemper made corrections to its billings; and (3) were untraceable to any prior billings.

**ANSWER:**

Lumbermens admits that it billed DuPont in the amount of $902,475.71 as a result of DuPont late payment, and denies the remaining allegations of Paragraph 55.

**COMPLAINT ¶ 56:**

For example, in its Interest Billing, Kemper charges interest of $328,158.72 on a line item of $2,563,740 that was allegedly invoiced on September 14, 2004, which was the date of the original $12,459,116 billing that Kemper has admitted was incorrect. But when it removed that line item on its Revised Calculation of May 12, 2005, because that amount was not owed, Kemper removed interest charges of only $62,811.63. Thus, in this example, Kemper is charging interest of $265,347.09 ($328,158.72 minus $62,811.63) on a "debt" that Kemper admits was never owed.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 56.

**COMPLAINT ¶ 57:**

Kemper knows or should know that its claim for interest is patently false and is made in bad faith. Indeed, the Insurance Program sold to DuPont does not include any provision allowing Kemper to charge DuPont interest on amounts claimed to be due.

**ANSWER:**

Lumbermens denies the allegations of the first sentence of Paragraph 57. Lumbermens refers to the Insurance Program attached as Exhibit 1 to the Complaint with respect to the second sentence of Paragraph 57, and denies any allegation inconsistent therewith.

**KEMPER'S DECISION NOT TO PAY OR CREDIT "DIVIDENDS"**

**COMPLAINT ¶ 58:**

Kemper's effort to collect the Audited Subject Premium from DuPont without offsetting the "dividend" is based upon a general Kemper corporate policy of not paying any dividends that Kemper recently adopted as a result of its financial problems, rather than a fair reading of the Insurance Program in light of the purpose and intent of the parties.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 58.

**COMPLAINT ¶ 59:**

Kemper's corporate policy is not in accordance with DuPont's Insurance Program. Indeed, this change in Kemper's corporate policy should not have any impact on policyholders such as DuPont that are essentially self-insured because they do not receive any true "dividends" anyway. DuPont already has paid Kemper for whatever risk transfer was bargained for, along with overhead and profit, in its initial payment of premium at the beginning of the policy period and has paid for any adjustment in that initial amount based upon the payroll audit at the conclusion of the policy period where DuPont has been able to confirm those calculations with Kemper. Thus, in DuPont's case, the "dividend" is nothing more than a component in an accounting formula.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 59.

**COMPLAINT ¶ 60:**

DuPont recognizes its obligation to continue to reimburse Kemper for understated incurred losses and obtain credit for overstated incurred losses (for the Insurance Program prior to 2000) and to replenish the escrow account for paid losses (for the Insurance Program from 2000-03) so long as Kemper continues to pay those losses. It was never the intent of the parties to the Insurance Program, however, that DuPont would be required to pay the entire Audited Subject Premium (which does not account for the fact that DuPont essentially is self-insured) in addition to the amounts DuPont is paying weekly to cover its losses, as if Kemper were providing traditional insurance in which Kemper was required to pay the full amount of insured losses and did not receive reimbursement of loss payments from DuPont.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 60.

**COMPLAINT ¶ 61:**

The course of dealing and course of performance under the Insurance Program fully supports DuPont's position as to the proper interpretation of the Insurance Program.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 61.

## KEMPER'S FINANCIAL CONDITION

**COMPLAINT ¶ 62:**

Through December 2002, Kemper was representing to DuPont, to insurance brokers, and to the public at large that its financial strength was excellent.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 62.

**COMPLAINT ¶ 63:**

In contrast to those public representations, Kemper was experiencing significant financial difficulty by late 2002, resulting in serious erosion of its statutory surplus (assets in excess of liabilities) and the downgrading of its credit worthiness.

**ANSWER:**

Lumbermens admits that its financial strength rating, as reported by A.M. Best Company, was downgraded on May 2, 2002, from an A to an A-, and on December 24, 2002, from an A- to a B+. Lumbermens admits that its credit rating was downgraded in December 2002, and denies the remaining allegations of Paragraph 63.

**COMPLAINT ¶ 64:**

On December 24, 2002, A.M. Best Company ("A.M. Best") lowered the financial strength rating of Kemper from A- (Excellent) to B+ (Very Good). Because most commercial policyholders and insurance brokers will not do business with an insurance company that has less than an A- rating from A.M. Best, the downgrade effectively prevented Kemper from writing new policies or retaining existing policyholders.

**ANSWER:**

Lumbermens refers to the A.M. Best report attached as Exhibit 3 to the Complaint and denies any allegation inconsistent thereto. Lumbermens admits the allegations of the first sentence of Paragraph 64, and denies the remaining allegations of Paragraph 64.

**COMPLAINT ¶ 65:**

When downgrading Kemper, A.M. Best cited Kemper's recently announced business decision to repurchase $125 million of Berkshire Hathaway's minority equity investment in a Kemper subsidiary company because Kemper's decision caused problems with Kemper's overall capitalization and liquidity.

**ANSWER:**

Lumbermens refers to the A.M. Best report attached as Exhibit 3 to the Complaint and denies any allegation inconsistent thereto. Lumbermens admits that A.M. Best cited

Lumbermens' decision to repurchase $125 of Berkshire Hathaway's minority equity investment in a Lumbermens subsidiary as a basis for its downgrade of Lumbermens, and denies all remaining allegations of Paragraph 65.

**COMPLAINT ¶ 66:**

With regard to that Berkshire Hathaway transaction, upon information and belief, Kemper had created a stock company in 2002 named Kemper Commercial Insurance Company, into which Berkshire Hathaway invested $125 million, representing approximately 15% of the capital of the new company.

**ANSWER:**

Lumbermens admits that it formed a stock company, Kemper Commercial Insurance Company in 2002, and that Berkshire Hathaway, for $125 million, acquired an equity position of 15% in Kemper Commercial Insurance Company.  Lumbermens denies the remaining allegations of Paragraph 66.

**COMPLAINT ¶ 67:**

Upon information and belief, Kemper's transfer of $125 million to Berkshire Hathaway was intended to favor that equity investor over Kemper's policyholder creditors, toward whom Kemper owed a special duty of loyalty as a result of its mutual company form.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 67.

**COMPLAINT ¶ 68:**

Upon information and belief, Kemper's transfer of $125 million to Berkshire Hathaway was intended to hinder, delay or defraud the policyholder creditors of Kemper, such as DuPont.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 68.

**COMPLAINT ¶ 69:**

Between December 20-24, 2002, Moody's Investor Services, Standard & Poor's, and A.M. Best all downgraded Kemper's financial strength and other financial ratings.

**ANSWER:**

Lumbermens admits the allegations of Paragraph 69.

**COMPLAINT ¶ 70:**

Shortly thereafter, Kemper announced that it would no longer sell insurance. Indeed, Kemper announced that it had reached a definitive agreement to sell the renewal rights to its bundled large risk national accounts, like DuPont's account, to Argonaut Insurance Company.

**ANSWER:**

Lumbermens admits that in March 2003, it announced it would no longer issue new insurance policies. Lumbermens admits that, at approximately that time, Lumbermens announced that it had reached a definitive agreement to sell to Arognaut Insurance Company the renewal rights to bundled large risk national accounts, which included the DuPont account. Lumbermens denies the remaining allegations of Paragraph 70.

**COMPLAINT ¶ 71:**

In a conference call on January 4, 2003, Dennis Kane, the President of Kemper Casualty, noted that the changes in financial rating were not unexpected but their magnitude was a surprise. Mr. Kane blamed Kemper's difficulties on being trapped in a mutual company shell, thereby preventing Kemper from tapping the capital markets in the same manner as some competitors.

**ANSWER:**

Lumbermens is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 71, and therefore denies them.

**COMPLAINT ¶ 72:**

Indeed, Kemper's financial rating has gone from an A- in July 2002, to a D in April 2005, to a NR (unrated) today. (A copy of A.M. Best's current report for Kemper is attached as Exhibit 3).

**ANSWER:**

Lumbermens admits a copy of an A.M. Best report for Lumbermens is attached as Exhibit 3 to the Complaint, and denies all allegations of Paragraph 72 inconsistent therewith.

**COMPLAINT ¶ 73:**

DuPont cancelled its Insurance Program with Kemper as of March 1, 2003.

**ANSWER:**

Lumbermens admits the allegations of Paragraph 73.

**COMPLAINT ¶ 74:**

Upon information and belief, Kemper was fully aware of the continuing drain on its statutory surplus and the impending downgrading of its credit rating while it was negotiating with DuPont for the renewal of the Insurance Program in December of 2002 for the 2003 policy year.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 74.

**COMPLAINT ¶ 75:**

Upon information and belief, Kemper was fully aware of the continuing drain on its statutory surplus and the impending downgrading of its credit rating when it was finalizing the details of the 2002 Insurance Program, given that the Insurance Proposal for 2002 was not signed by DuPont until October 31, 2002, and was not signed by Kemper until November 22, 2002.

**ANSWER:**

Lumbermens admits that it signed the 2002 Insurance Program on October 22, 2002 and further admits that DuPont signed the 2002 Insurance Program on October 31, 2002. Lumbermens denies the remaining allegations of Paragraph 75.

**COMPLAINT ¶ 76:**

Nevertheless, Kemper continued to represent to DuPont and other policyholders that it was a stable and solvent company. For example, in an advertisement that Kemper placed in *Business Insurance* on December 16, 2002, mere days before A.M. Best downgraded Kemper, Kemper stated: "And as with anything at Kemper, you'll always have the integrity of our reputation for financial stability and strength." (A copy of Kemper's *Business Insurance* ad is attached as Exhibit 4).

**ANSWER:**

Lumbermens denies the allegations of the first sentence of Paragraph 76. Lumbermens admits that Exhibit 4 is a true and correct copy of an advertisement appearing in Business Insurance, dated December 16, 2002, and denies all allegations of Paragraph 76 inconsistent therewith. Lumbermens denies that it placed this advertisement on December 16, 2002 and denies the remaining allegations of Paragraph 76.

**COMPLAINT ¶ 77:**

As a result of its financial problems, Kemper has entered into "run off" mode whereby it is attempting to achieve an orderly winding down of its business operations without entering rehabilitation or liquidation proceedings. Kemper has taken extraordinary steps to temporarily avoid insolvency, including reportedly reducing its workforce from 7,000 to 370 employees (a reduction of nearly 95%) and selling its headquarters in Long Grove, Illinois.

**ANSWER:**

Lumbermens admits that it is presently in "run-off," admits that its present workforce is approximately 300 employees, and admits that its Long Grove, Illinois offices have been sold, though Lumbermens remains at the facility under a lease. Lumbermens denies the remaining allegations of Paragraph 77.

**COMPLAINT ¶ 78:**

Even with these drastic measures, Kemper's statutory surplus continues to decline rapidly. Kemper's year-end 2003 surplus was $212.4 million. In February of 2005, Kemper submitted its unaudited annual financial statements, which indicated a surplus of approximately $182 million.

**ANSWER:**

Lumbermens denies the allegations of the first sentence of Paragraph 78. Lumbermens admits the allegations of the second and third sentences of Paragraph 78.

**COMPLAINT ¶ 79:**

However, on August 15, 2005, Kemper reported that its surplus for the first six months of 2005 is actually only $114.5 million.

**ANSWER:**

Lumbermens admits that its statutory surplus for the first six months of 2005 was $114,526,696.

**COMPLAINT ¶ 80:**

Kemper has not yet released its audited annual statements. Kemper reports, however, that its surplus is expected to decline by approximately $12 million per month, excluding the impact of claims and reinsurance commutations and loss development.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 80.

**COMPLAINT ¶ 81:**

On June 10, 2004, the Illinois Department of Insurance reportedly approved Kemper's second proposed run-off plan, the first such plan having been rejected by the state regulators.

**ANSWER:**

Lumbermens admits that a Risk Based Capital Plan submitted to the Illinois Division of Insurance, Department of Financial and Professional Regulation in 2002 was rejected. Lumbermens admits that a Run-Off Plan was approved by the Illinois Division of Insurance,

Department of Financial and Professional Regulation on or about June 10, 2004, and denies the remaining allegations of Paragraph 81.

## COMPLAINT ¶ 82:

Kemper's run-off plan remains secret, as neither Kemper nor the Illinois Department of Insurance has disclosed its terms.  However, in a press release announcing the approval of the plan, Kemper disclosed that it has "little premium revenue (about $90 million estimated for 2004 and virtually none thereafter)" and that all investment income being generated is "offset by expenses."  Most tellingly, Kemper admitted that achieving the plan's objective of positive surplus and liquidity through 2006 "will be very challenging."  (A copy of Kemper's press release is attached as Exhibit 5).

## ANSWER:

Lumbermens admits that Exhibit 5 is a true and correct copy of a June 10, 2004 press release, and denies all allegations of Paragraph 82 inconsistent therewith.  Lumbermens admits that its Run-Off Plan is confidential pursuant to the Illinois Insurance Code, and denies all remaining allegations of Paragraph 81.

**Count I**

**PRELIMINARY AND PERMANENT INJUNCTION**

## COMPLAINT ¶ 83:

DuPont repeats and realleges the averments contained in the above paragraphs, as if the same were fully set forth herein.

## ANSWER:

Lumbermens restates and realleges its answers to Paragraph 1 through 82, as if fully stated herein.

## COMPLAINT ¶ 84:

Kemper has threatened to draw down or present a claim against the security provided DuPont, even though no debt is owed.

## ANSWER:

Lumbermens denies the allegations of Paragraph 84.

## COMPLAINT ¶ 85:

As a result of Kemper's precarious financial condition, if Kemper draws down the collateral, Kemper likely will not be able to return those amounts if this Court determines that they were not due from DuPont, leaving DuPont irreparably harmed and without an adequate remedy at law.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 85.

**COMPLAINT ¶ 86:**

Accordingly, DuPont would suffer irreparable harm if Kemper continues its efforts to collect a disputed debt and improperly draws down the collateral provided by DuPont.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 86.

**COMPLAINT ¶ 87:**

The balance of equities favor providing DuPont with injunctive relief.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 87.

**COMPLAINT ¶ 88:**

Kemper would not be harmed by the maintenance of the existing security, such that if this Court determined that any debt were actually due, the security would remain available to satisfy any such debt.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 88.

**Count II**

**DECLARATORY JUDGMENT**

**COMPLAINT ¶ 89:**

DuPont repeats and realleges the averments contained in the above paragraphs, as if the same were fully set forth herein.

**ANSWER:**

Lumbermens restates and reallages its answers to Paragraph 1 through 88, as if fully stated herein.

**COMPLAINT ¶ 90:**

DuPont has legal rights and obligations under its Insurance Program with Kemper, as set forth above.

**ANSWER:**

Lumbermens admits the allegations of Paragraph 90.

**COMPLAINT ¶ 91:**

An actual and justiciable controversy exists between DuPont and Kemper, whose interests are real and adverse regarding the interpretation, application, and meaning of the Insurance Program and DuPont's rights and obligations thereunder.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 91.

**COMPLAINT ¶ 92:**

Under the circumstances, it is necessary and appropriate for the Court to declare DuPont's rights and obligations under the Insurance Program.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 92.

**COMPLAINT ¶ 93:**

Declaratory relief from this Court will resolve all substantial outstanding issues between DuPont and Kemper relating to DuPont's premium, reimbursement, and collateral obligations under the Insurance Program for the 2002-03 policy year.

**ANSWER:**

Lumbermens denies the allegations of Paragraph 93.

**Count III**

**UNJUST ENRICHMENT**

**COMPLAINT ¶ 94:**

DuPont repeats and realleges the averments contained in the above paragraphs, as if the same were fully set forth herein.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**COMPLAINT ¶ 95:**

Kemper is claiming a benefit or asset from DuPont to which it is not entitled, i.e., the "Disallowed Dividend Due Insured" of $4,532,579 identified in the Revised Calculation and interest in the amount of $902,475.71.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**COMPLAINT ¶ 96:**

Kemper also is claiming a benefit or asset from DuPont to which it is not entitled, i.e., security in excess of the estimated ultimate losses minus losses paid to date.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**COMPLAINT ¶ 97:**

It would be unjust, inequitable, and unconscionable for Kemper (1) to collect an unearned premium, which actually constitutes the "Disallowed Dividend Due Insured" of $4,532,579 identified in the Revised Calculation, and interest in the amount of $902,475.71; or (2) to retain possession of the security in excess of the estimated ultimate losses minus losses paid to date or to retain premium amounts that are in excess of DuPont's obligation to Kemper.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**Count IV**

**EQUITABLE FRAUD**

**COMPLAINT ¶ 98:**

DuPont repeats and realleges the averments contained in the above paragraphs, as if the same were fully set forth herein.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**COMPLAINT ¶ 99:**

Kemper made false statements to DuPont and the public, which include but are not limited to the following:

(a)     Representations relating to Kemper's financial condition, including: (i) a representation in *Business Insurance* on December 16, 2002, stating that "And as with anything at Kemper, you'll always have the integrity of our reputation for financial stability and strength" and (ii) a representation in correspondence addressed to Eugene Slesicki at DuPont dated September 11, 2000, touting Kemper's "tremendous growth and success in the past year";

(b)     Concealments relating to Kemper's financial condition, including its failure to disclose its true financial condition to DuPont in December, 2002, when DuPont was negotiating a renewal of its coverage;

(c)     Statements and assurances that DuPont's Insurance Program would continue to work as in past years;

(d)     Statements, explanations and assurances relating to how the Insurance Program would work, particularly that Kemper understood that the Insurance Program from January 1, 2000 through March 1, 2003 was to operate in the following manner: DuPont would pay the basic premium and fees (which amounts were paid initially, subject to payroll audit), reimburse the escrow account weekly for paid losses, provide adequate collateral to ensure DuPont's reimbursement of the paid amounts pursuant to the formula in the Insurance Proposal, and would <u>not</u> pay amounts to Kemper based upon "audited subject premium" or "incurred losses" in those years;

(e)     Kemper represented that it had always paid or credited dividends on the LRDP's in the past, thereby inducing reliance upon the issuance of the dividends, without providing adequate warning of the facts or circumstances in which Kemper would refuse to declare such dividends;

(f)     Kemper failed to disclose that its declaration of dividends was tied to Kemper's overall financial performance, instead representing to DuPont that the issuance of dividends was tied to the performance of DuPont's particular Insurance Program.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**COMPLAINT ¶ 100:**

Kemper's statements were intended to induce and did induce reliance on the part of DuPont. Among other things, Kemper's representations induced DuPont to act in purchasing the insurance as offered, and to refrain from acting by changing or clarifying the Insurance Program terms or by moving the Insurance Program to another insurance company.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**COMPLAINT ¶ 101:**

DuPont justifiably relied on Kemper's statement to DuPont and/or its representatives about the operation of the Insurance Program and about Kemper's financial condition.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**COMPLAINT ¶ 102:**

DuPont has been damaged by its reliance on Kemper's representations.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**Count V**

**EQUITABLE ESTOPPEL**

**COMPLAINT ¶ 103:**

DuPont repeats and realleges the averments contained in the above paragraphs, as if the same were fully set forth herein.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**COMPLAINT ¶ 104:**

DuPont lacked knowledge about Kemper's financial condition and the manner in which Kemper would treat the Insurance Program if its financial condition were to deteriorate.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**COMPLAINT ¶ 105:**

Kemper knew that its financial condition was deteriorating and knew about DuPont's insurance needs and intent in purchasing the Insurance Program.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**COMPLAINT ¶ 106:**

Kemper's conduct and representations led DuPont to believe that DuPont would be required only:  to pay the basic premium and fees (which amounts were paid initially, subject to payroll audit), to reimburse the escrow account weekly for paid losses, and to provide adequate collateral (pursuant to the formula in the Insurance Proposal) to ensure DuPont's reimbursement of the paid amounts.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**COMPLAINT ¶ 107:**

The conduct and representations of Kemper were intended to induce reliance on the part of DuPont.  Among other things, Kemper's representations induced DuPont to act in purchasing the insurance as offered, and to refrain from acting by changing or clarifying the Insurance Program terms or by moving the Insurance Program to another insurance company.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**COMPLAINT ¶ 108:**

DuPont suffered a prejudicial change in position as a consequence of the conduct and representations of Kemper.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**Count VI**

**BREACH OF CONTRACT**

**COMPLAINT ¶ 109:**

DuPont repeats and realleges the averments contained in the above paragraphs, as if the same were fully set forth herein.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**COMPLAINT ¶ 110:**

Kemper agreed in the Insurance Proposal and/or Insurance Program to credit certain "dividends" to DuPont.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**COMPLAINT ¶ 111:**

Kemper breached its contract(s) with DuPont by disallowing a "dividend" credit of $4,532,579.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**COMPLAINT ¶ 112:**

Kemper breached its contract(s) with DuPont by failing to pay DuPont $119,111.00 which currently is due and owed.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**COMPLAINT ¶ 113:**

In addition, Kemper breached its contract(s) with DuPont by claiming a benefit or asset from DuPont to which it is not entitled, i.e., security in excess of the estimated ultimate losses minus losses paid to date.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**Count VII**

**REFORMATION**

**COMPLAINT ¶ 114:**

DuPont repeats and realleges the averments contained in the above paragraphs, as if the same were fully set forth herein.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**COMPLAINT ¶ 115:**

The parties mutually intended that the Insurance Program beginning with the 2000 policy year would be a "pay-as-you-go" Insurance Program in which DuPont would be required to provide:  (1) Fixed Payments at the beginning of the policy period, as adjusted at a subsequent payroll audit; (2) replenishment of an escrow account on a weekly basis to pay losses; and (3) security in the form of a letter of credit and surety bond (in equal amounts).

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**COMPLAINT ¶ 116:**

By providing these payments and security, DuPont paid for Kemper's overhead, profit, surcharges, assessments, taxes, and for all real transfer of underwriting risk, while DuPont paid its own losses under the Insurance Program through the escrow account and provided security to ensure Kemper that DuPont would continue to meet its weekly obligations to replenish the escrow account to pay losses.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**COMPLAINT ¶ 117:**

It was never the intent of the parties that Kemper would be required to pay losses under the Insurance Program as constituted after 2000, other than those risks of losses specifically identified (such as the contractors' losses in excess of $1 million per occurrence), without repayment by DuPont. Likewise, it was never the intent of the parties that DuPont would be required to pay the full audit premium without credit for the "dividend" - the portion of the audited subject premium amount that was not actually needed to pay losses under the Insurance Program because losses already had been paid. To pay such premium would constitute payment of a premium for insurance coverage that is not provided under the Insurance Program.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

**COMPLAINT ¶ 118:**

To the extent that the Insurance Proposals, dividend endorsements, or other program agreements would purport to require DuPont to pay the full audited subject premium without credit for the "dividend" properly determined in accordance with the formula provided in the Insurance Program, those Insurance Proposals, dividend endorsements, or other program agreements must be reformed to accurately reflect the intent of the parties in entering into the Insurance Program, as well as to achieve the reasonable expectations of the policyholder, DuPont.

**ANSWER:**

This Count is subject to Lumbermens' motion to dismiss and therefore no response is required.

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

DuPont fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Under the Insurance Program at issue in this litigation, the payment of dividends are plainly set forth as purely discretionary in nature, and are neither promised or guaranteed. The Insurance Program, attached to the Complaint as Exhibit 1, plainly states at page 12, that:

> Recognizing that dividends cannot be promised or guaranteed and noting that dividends are declared at the sole discretion of the Company's Board of Directors, this quotation constitutes no more than an agreement to recommend the proposed formula, after the expiration of the term to which the dividend declarations shall be applicable to the Board of Directors for consideration and action.
>
> Accordingly, at any given dividend determination, the Board of Directors may or may not adopt the proposed formula and may subject such formula to change as their authority allows. All dividends are recallable.
>
> Any dividend which is payable hereunder may be held by the Company as collateral against any amount owed the Company under this proposal or any other proposal accepted by E.I. DUPONT DEMOURS & CO., INC. The Company in its sole discretion may offset any such dividend against the amount owed the Company by E.I. DUPONT DEMOURS & CO., INC.

The issuance of a dividend to DuPont was purely discretionary, and therefore DuPont fails to state a claim upon which relief can be granted.

## THIRD AFFIRMATIVE DEFENSE

The payment by Lumbermens to DuPont of a dividend under the Insurance Program is prohibited by 215 ILCS 5/54 of the Illinois Insurance Code. DuPont's requested relief is therefore prohibited by the Illinois Insurance Code.

## FOURTH AFFIRMATIVE DEFENSE

DuPont's claims are barred by one or more of the doctrines of waiver, estoppel, ratification, and acquiescence.

### FIFTH AFFIRMATIVE DEFENSE

Any amount sought to be recovered in this action should be set off by the amount owing from DuPont to Lumbermens.

### SIXTH AFFIRMATIVE DEFENSE

The Complaint is barred in whole or in part by DuPont's unclean hands.

### SEVENTH AFFIRMATIVE DEFENSE

Lumbermens' public statements and representations contained no misrepresentations or omissions of material fact.

### EIGHTH AFFIRMATIVE DEFENSE

DuPont's claims should be dismissed because their allegations are not pled with particularity as required by Federal Rule of Civil Procedure 9(b).

### NINTH AFFIRMATIVE DEFENSE

DuPont's claims are barred, in whole or part, because DuPont did not rely on any alleged misstatements and omissions.

### TENTH AFFIRMATIVE DEFENSE

Lumbermens will rely on all defenses available to it at time of trial and reserves the right to amend this Answer and Defenses to include any additional defenses after the completion of discovery

### COUNTERCLAIMS

### COUNT I – BREACH OF CONTRACT

1.     In October 2002, DuPont signed the final and accepted insurance contract for Lumbermens to provide workers' compensation coverage to DuPont for a policy year from January 1, 2002 to January 1, 2003 ("Insurance Program").

2.      In computing the applicable premium payments owed Lumbermens by DuPont, Lumbermens, at the beginning of the policy term, calculated an estimated subject premium, using bureau-determined rates multiplied by DuPont's estimated payroll. This estimated subject premium was the estimated total premium for which DuPont would be responsible for and totaled $5,601,988.

3.      During the policy term, DuPont paid to Lumbermens a deposit premium in the sum of $1,043,343, which deposit applied both to the workers compensation and to the other coverages provided by Lumbermens. Lumbermens deferred charging DuPont for the difference between the estimated subject premium and the deposit premium until the expiration of the policy period at which time an audit of DuPont's actual payroll would be performed.

4.      At the expiration of the policy period, Lumbermens performed an audit of the subject premium to determine whether DuPont's actual payroll obligations were in accord with the estimated payroll projections that formed the basis of the estimated subject premium.

5.      Based on the audit, DuPont owed Lumbermens the difference between the audited subject premium and the deposit premium DuPont paid Lumbermens during the policy term.

6.      DuPont is obligated under the Insurance Program to make full payment to Lumbermens of the audited subject premium, less any deposit premium previously paid.

7.      Pursuant to the Insurance Program and in accord with applicable law, Lumbermens did not declare any dividend for the 2002/2003 policy year, which dividend, had it been so declared, may have otherwise reduced DuPont's premium obligations to Lumbermens.

8.      A sum of $4,647,059.29 remains due and owing from DuPont to Lumbermens in connection with the Insurance Program.

9.      Lumbermens has performed all of its obligations under the Insurance Program.

10.     Lumbermens has made repeated demands that DuPont make full payment on its obligations under the Insurance Program.

11.     DuPont has refused to make full payment on its obligations under the Insurance Program.

12.     DuPont has breached the agreement by failing to pay the amounts due Lumbermens under the terms of the Insurance Program.

13.     As a direct and proximate result of DuPont's failure and refusal to pay Lumbermens pursuant to the terms of the Insurance Program, Lumbermens has suffered actual damages in the amount in the amount of $4,647,059.29

WHEREFORE, Lumbermens, respectfully prays that this honorable Court enter judgment in its favor, and against DuPont, in the amount of $4,647,059.29 and such other relief as the Court deems just and equitable.

Respectfully submitted,

OF COUNSEL:

Michael M. Eidelman
Randall M. Lending
Jeffery M. Heftman
Vedder, Price, Kaufman & Kammholz, P.C.
222 North LaSalle Street Suite 2600
Chicago, IL  60601-1003


Dated:  January 9, 2006

/s/ M. Duncan Grant
David B. Stratton (DE No. 960)
M. Duncan Grant (DE No. 2994)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE   19899-1709
(302) 777-6500

Attorneys for Defendant
Lumbermens Mutual Casualty Company

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2006, I electronically filed the foregoing Lumbermens Mutual Casualty Company's Answer and Affirmative Defenses to Complaint using CM/ECF which will send notification of such filing to the following:

John E. James, Esq.
Richard L. Horwitz, Esq.
Potter, Anderson & Corroon
Hercules Plaza
1313 N. Market Street
Wilmington, DE 19801

and upon the following counsel by first class mail, postage prepaid:

Christopher C. French, Esq.
Kirkpatrick & Lockhart Nicholson Graham, LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222-2312

/s/ M. Duncan Grant
M. Duncan Grant (DE No. 2994)