IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| E.I. du PONT de NEMOURS AND COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | C.A. No. 05-699 (KAJ) |
| LUMBERMENS MUTUAL CASUALTY COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

**PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS COUNTS III, IV, V, VI, AND VII
OF PLAINTIFF'S COMPLAINT**

OF COUNSEL:

John M. Sylvester
Christopher C. French
Scott A. Bowan
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222
Telephone: (412) 355-6500

Dated: February 13, 2006
719621/20120-345

John E. James (No. 996)
Richard L. Horwitz (No. 2246)
POTTER ANDERSON & CORROON LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19801
Telephone: (302) 984-6000

*Attorneys for Plaintiff,
E.I. du Pont de Nemours and Company*

## TABLE OF CONTENTS

I.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING .........1

II.   SUMMARY OF ARGUMENT ..............................................................................5

III.  STATEMENT OF FACTS ...................................................................................6

      A.    Kemper Sold Insurance Products to DuPont that Were  Specifically
            Designed to Allow DuPont to be Largely Self-Insured for Most of
            its Losses ..................................................................................................6

      B.    DuPont Provided Millions of Dollars in Collateral to Kemper to
            Secure DuPont's Obligations to Pay its Own Losses Under the
            Insurance Program ....................................................................................8

      C.    The "Dividend" Plan was Supposed to Ensure that DuPont was
            Required to Pay Only the Actual Losses and Related Claims-
            Handling Fees and Expenses Under the Insurance Program ......................8

      D.    Kemper is Teetering on the Verge of Insolvency and Financial
            Collapse....................................................................................................9

      E.    Kemper's Attempts to Collect the Non-Existent Debt Reveals its
            Spurious Nature .....................................................................................11

IV.   ARGUMENT ....................................................................................................13

      A.    The Liberal Notice Pleading Standard of the Federal Rules of Civil
            Procedure Applies to a Motion to Dismiss For Failure to State a
            Cause of Action......................................................................................13

      B.    DuPont Properly Alleges a Cause of Action for Unjust Enrichment
            in Count III.............................................................................................14

      C.    DuPont Adequately Alleges a Cause of Action for Equitable Fraud
            in Count IV ............................................................................................16

            1.    DuPont's Allegations are Sufficient to Withstand a Motion
                 to Dismiss Pursuant to Rule 12(b)(6)...........................................16

            2.    DuPont's Allegations Meet the Particularity Requirements of
                 Rule 9(b) .....................................................................................19

      D.    DuPont Adequately Alleges a Cause of Action for Equitable
            Estoppel in Count V...............................................................................23

**TABLE OF CONTENTS (cont'd)**

E.  DuPont Adequately Alleges a Cause of Action for Breach of Contract in Count VI.................................................................................26

F.  DuPont Adequately Pleads a Claim for Reformation in Count VII...........30

V.  CONCLUSION.......................................................................................................33

# TABLE OF AUTHORITIES

## Federal Cases

*Bechtel v. Robinson,*
886 F.2d 644 (3rd Cir. 1989) ...................................................................................... 23, 24

*C.H. v. Oliva,*
226 F.3d 198 (3rd Cir. 2000) ............................................................................................ 24

*Cleveland v. Policy Mgmt. Sys. Corp.,*
526 U.S. 795 (1999)........................................................................................................... 15

*Conley v. Gibson,*
355 U.S. 41 (1957)............................................................................................................. 14

*In re Craftmatic Sec. Litig.,*
890 F.2d 628 (3rd Cir. 1989) ........................................................................................... 22

*Federal Sav. & Loan Ins. Corp. v. Shearson-American Express, Inc.,*
658 F. Supp. 1331 (D.P.R. 1987)..................................................................................... 22

*Fox v. Rodel, Inc.,*
C.A. No. 98-531-SLR, 1999 WL 803885 (D. Del. Sept. 13, 1999) ..................... 15, 16, 25

*In re Fruehauf Trailer Corp,*
 250 B.R. 168 (D. Del. 2000)............................................................................................ 21

*Hanna v. Plumer,*
380 U.S. 460 (1965)........................................................................................................... 20

*Hayduk v. Lanna,*
775 F.2d 441 (1st Cir. 1985)............................................................................................. 19

*Household Int'l, Inc. v. Westchester Fire Ins. Co.,*
286 F. Supp. 2d 369 (D. Del. 2003)................................................................................ 21

*IKO Monroe, Inc. v. Royal & Sun Alliance Insurance Co. of Canada.,*
C.A. No. 00-834 GMS, 2001 WL 1568674 (D. Del. Dec. 7, 2001) ................................. 30

*Independent Enter. Inc. v. Pittsburgh Water & Sewer Auth.,*
103 F.3d 1165 (3rd Cir. 1997) ......................................................................................... 15

*Johnsrud v. Carter,*
620 F.2d 29 (3rd Cir. 1980) ............................................................................................. 13

*Jordan v. Fox, Rothschild, O'Brien & Frankel,*
20 F.3d 1250 (3rd Cir. 1994) ................................................................ 14

*Langford v. City of Atlantic City,*
235 F.3d 845 (3rd Cir. 2000) ................................................................ 14

*Marino v. Cross Country Bank,*
C.A. No. 02-65-GMS, 2003 WL 503257 (D. Del. Feb. 14, 2003) ................... 18

*Nakell v. Liner Yankelevitz Sunshine & Regenstreif, LLP,*
394 F. Supp. 2d 762 (M.D.N.C. 2005) .................................................... 20

*Nami v. Fauver,*
82 F.3d 63 (3rd Cir. 1996) .................................................................... 13

*New Castle County v. Nat'l Union Fire Ins. Co. of Pittsburgh,*
174 F.3d 338 (3rd Cir. 1999) ........................................................... 26, 27

*Pell v. E.I. DuPont de Nemours & Co.,*
348 F. Supp. 2d 306 (D. Del. 2004) ........................................................ 24

*Rocks v. City of Philadelphia,*
868 F.2d 644 (3rd Cir. 1989) .......................................................... 13, 14

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,*
742 F.2d 786 (3rd Cir. 1984) ........................................................... 20, 21

## State Cases

*Bell Atlantic Meridian Systems v. Octel Communications Corp.,*
C. A. No. 14348, 1995 WL 707916 (Del. Ch. Nov. 28, 1995) ......................... 27

*Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.,*
794 A.2d 1141 (Del. 2002) ............................................................. 30, 33

*Consolidated Fisheries Co. v. Consol. Solubles Co.,*
112 A.2d 30 (Del. 1955) ...................................................................... 18

*Eastern States Petroleum Co. v. Universal Oil Prods. Co.,*
3 A.2d 768 (Del. Ch. 1939) .................................................................. 18

*Genencor International, Inc. v. Novo Nordisk A/S,*
766 A.2d 8 (Del. 2000) ....................................................................... 25

*Hob Tea Room, Inc. v. Miller,*
89 A.2d 851 (Del. 1952) ...................................................................... 33

*Shock v. Nash*,
732 A.2d 217 (Del. 1999) ................................................................................. 14

*Stephenson v. Capano Dev., Inc.*
462 A.2d 1069 (Del. 1983) ........................................................................... 17, 21

*VLIW Tech., LLC v. Hewlett-Packard Co.*,
840 A.2d 606 (Del. 2003) ................................................................................. 26

*Williamson v. New Castle County*,
C. A. No. 19019-NC, 2002 WL 453926 (Del. Ch. Mar. 13, 2002) ................................. 23

*Wilson v. American Ins. Co.*,
209 A.2d 902 (Del. 1965) ................................................................................. 23

*Zirn v. VLI Corp.*,
681 A.2d 1050 (Del. 1996) ............................................................................... 17

## Federal Rules

Fed. R. Civ. P. 8(a)(2) ........................................................................................ 26

Federal Rule of Civil Procedure 8(e)(2) ............................................................... 15

Federal Rule of Civil Procedure 9(b) ............................................................... 19, 20

## Other Authorities

5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §
1204 ................................................................................................................. 19

## I.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

Plaintiff E.I. du Pont de Nemours and Company ("DuPont") initially filed this action in the Delaware Court of Chancery to enjoin Defendant Lumbermens Mutual Casualty Company ("Kemper")[1] from attempting to collect a disputed debt in excess of $4.5 million until the validity of Kemper's claim could be determined.  In particular, DuPont requested that Kemper be enjoined from drawing down or presenting any claims for payment under a letter of credit and surety bond that DuPont provided to secure its valid obligations under an insurance program with Kemper.  The Delaware Court of Chancery entered the requested temporary restraining order on September 2, 2005. Following removal to this Court, Kemper consented to the entry of a preliminary injunction until the merits of this dispute are resolved.  Kemper has now filed a motion to dismiss almost all of the counts in DuPont's Complaint (the "Motion to Dismiss").  When Kemper's Motion to Dismiss is reviewed against the facts of this case and the allegations in the Complaint, the Motion's defects become readily apparent and require that the Motion be denied.

Kemper has managed an insurance program for DuPont for nearly thirty years.  Under the pre-2000 insurance program, DuPont annually paid Kemper monies for "incurred losses" (i.e., reserves for projected losses), claims handling fees, miscellaneous expenses, and an insurance premium for a limited risk transfer.  Under the program, DuPont was largely self-insured.

---

[1]    Lumbermens Mutual Casualty Company is one of several insurance companies and related affiliates that does business under the umbrella name of Kemper Insurance Companies.

In 2000, the insurance program changed to a pay-as-you-go program under which DuPont still is largely self-insured. Under the 2000-03 insurance program, DuPont annually paid Kemper an upfront amount of approximately $1 million in insurance premium for the limited risk transfer provided by Kemper, profit and administrative fees, surcharges, and taxes. DuPont also pays, on average, tens of thousands of dollars weekly into an escrow account to fund its own losses (from which Kemper pays claims against DuPont). DuPont also provided a letter of credit to Kemper in the amount of $9,604,354 and a surety bond in the amount of $5,995,646 as security to ensure those weekly payments.

Kemper does not contend that DuPont has failed to make any of its weekly payments, and the dispute in this case does not relate to those payments by DuPont. Rather, Kemper has stated that it believes it has the right and ability to demand the payment of premiums that are not owed by DuPont and were never contemplated by the parties as part of the insurance coverage at issue and to draw on the letter of credit provided by DuPont whenever it decides it needs money from DuPont. To that end, because Kemper is on the verge of insolvency and is desperate for cash, Kemper has attempted to manufacture a DuPont debt related to the 2002-03 policy year by refusing to credit DuPont approximately $4.5 million in "dividends" that Kemper itself has determined should be credited to DuPont for the 2002-03 year. (By DuPont's calculation, when DuPont is credited with the $4.5 million in accordance with the applicable accounting formula, Kemper actually owes DuPont approximately $100,000.)

By refusing to credit DuPont the "dividend" that Kemper admittedly owes DuPont, Kemper unilaterally is attempting to change the insurance program it sold to

DuPont in order to create a "debt" to support Kemper's need for cash and to draw down on DuPont's letter of credit. Critical to understanding the insurance program at issue is that the so-called "dividend" is not a share of the profits of Kemper or a return to DuPont of unused premiums. Rather, it is nothing more than a line item in a complex cash reconciliation accounting formula by which DuPont receives credit in the "audited premium" calculation for the fact that it largely is self-insured and pays its own losses. Indeed, the "audited premium" calculation itself is largely done for tax purposes, not because the "audited premium" is the amount actually owed or paid. Under the accounting formula, the "dividend" equals "Audited Subject premium minus (Basic Premium plus Converted Limited Losses) x Tax Multiplier." The "dividend" essentially equals the "Audited Subject Premium," so the amount owed by either Kemper or DuPont to the other party during the annual account reconciliation process is usually nominal. Because the "dividend" is merely a line item in a formula, not an actual cash payment, until Kemper's current financial crisis arose, this "dividend" consistently had been credited to DuPont throughout the parties' thirty-year relationship.

In essence, Kemper is seeking to charge DuPont with a $5.5 million premium (the $1 million previously paid by DuPont plus the "dividend" amount of $4.5 million) in exchange for providing little or no real insurance coverage. That was never the intent or the operation of the insurance program, which was designed to permit DuPont to largely be self-insured. Consequently, DuPont has asserted various equitable and legal claims in its Complaint against Kemper that are all premised on the fact that Kemper would obtain a $4.5 million windfall if it were permitted to draw down on DuPont's collateral or otherwise collect this fictitious $4.5 million debt.

In its Motion to Dismiss, Kemper challenges DuPont's claims in this case principally on two bases. First, Kemper argues pursuant to Rule 12(b)(6) that certain of the counts in the Complaint allegedly fail to state a claim upon which relief may be granted. This argument fails because DuPont has sufficiently pled each of the causes of action in the Complaint and because Kemper has ignored the low "notice" threshold required for pleadings in federal court. Second, Kemper argues that certain of the counts are not pled with the "particularity" required by Rule 9(b). This argument also fails because Kemper's argument is premised upon state courts' particularity standard (not the more lenient federal court standard), ignores the actual allegations in the Complaint, and ignores the overall gist of DuPont's claims.

Indeed, to support its arguments, rather than apply the "lenient" standard adopted by the Third Circuit for use in federal courts, Kemper relies upon state court cases construing state procedural rules. As will be discussed below, in every instance where pleading with particularity is required, DuPont has satisfied the Third Circuit's standard by alleging "circumstances" sufficient to put Kemper on notice of the alleged misconduct at issue. Moreover, Kemper's Motion to Dismiss overlooks the basic thrust of DuPont's complaint in this case -- namely, Kemper should not be allowed to convert the self-insurance program it sold to DuPont from a program with a relatively low-cost ($1 million) that essentially pays Kemper an amount sufficient to cover the taxes on the program and an administrative fee, to a high-cost program ($5.5 million) that provides a windfall to Kemper while DuPont still pays millions of dollars into an escrow account to pay the claims asserted against DuPont. Consequently, for these reasons and the reasons discussed more fully below, Kemper's Motion to Dismiss should be denied.

## II.    SUMMARY OF ARGUMENT

1.    Kemper's Motion to Dismiss should be denied because the liberal pleading standard embodied in the Federal Rules of Civil Procedure require only that DuPont properly plead causes of action in its Complaint, which DuPont has done.

2.    Kemper's attempt to dismiss DuPont's claim for unjust enrichment, Count III, on the basis that DuPont cannot plead both contractual and quasi-contractual theories should be denied because it has no basis in the Federal Rules of Civil Procedure and is directly contrary to Rule 8(e)(2) which permits DuPont to plead alternative claims for relief.

3.    Kemper's Motion to Dismiss DuPont's claim for equitable fraud, Count IV, should be denied because DuPont properly has alleged the elements of the cause of action and because Kemper relies upon the incorrect standard regarding pleading fraud claims with particularity.

4.    Kemper's Motion to Dismiss DuPont's claim for equitable estoppel, Count V, should be denied because DuPont properly has alleged the elements of the cause of action.  Kemper's Motion is based on the false premise that fraud is among the required elements of equitable estoppel under Delaware law and is directly contrary to Rule 8(e)(2) which permits DuPont to plead alternative claims for relief.

5.    Kemper's Motion to Dismiss DuPont's claim for breach of contract, Count VI, should be denied because DuPont properly has alleged the elements of a breach of contract claim and because the insurance program is incapable of being interpreted and construed in the absence of extrinsic evidence.

6.    Kemper's Motion to Dismiss DuPont's claim for reformation, Count VII, should be denied because DuPont has adequately alleged the elements of a

reformation claim based upon mutual mistake and because Kemper relies upon the wrong

standard for determining the degree of particularity required under the Federal Rules for a

mutual mistake claim.

## III.    STATEMENT OF FACTS

### A.    Kemper Sold Insurance Products to DuPont that Were Specifically Designed to Allow DuPont to be Largely Self-Insured for Most of its Losses

Kemper sold insurance products to DuPont from 1971 through 2003,

including workers' compensation, automobile liability, and general liability insurance

policies. (Compl. ¶ 10.) Kemper sold these insurance products to DuPont through a

comprehensive insurance program ("Insurance Program") designed and warranted to

meet DuPont's needs. (Compl. ¶ 11.) Specifically, the Insurance Program was intended

to satisfy certain regulatory requirements, to transfer to Kemper certain specifically

identified risks of loss, and to retain within DuPont the financial responsibility for most

risks of loss (e.g., workers' compensation claims). (Compl. ¶ 11.) The Insurance

Program was renewed annually by means of an insurance proposal in which Kemper

explained the Insurance Program. (Compl. ¶ 15.)

Prior to 2000, the Insurance Program was an "incurred loss" program,

which meant that DuPont paid Kemper upfront for "incurred losses." (Compl. ¶ 20.) In

other words, at the beginning of the policy period, DuPont deposited money with Kemper

based upon reserves established for projected losses. In addition, DuPont paid certain

claims handling fees, miscellaneous expenses, and an insurance premium for a limited

risk transfer.[2] (Compl. ¶ 20.) As losses were actually incurred, Kemper paid them from

---

[2]    Because of DuPont's strong commitment to safety, DuPont had found that it could provide workers' compensation insurance to its contractors more cost-effectively

the deposit DuPont had made with Kemper. Each year an accounting subsequently was done to determine whether DuPont had deposited too much or too little with Kemper. (Compl. ¶ 20.) If DuPont had deposited too little, then DuPont paid the additional amount necessary to cover the losses (and related fees and expenses). (Compl. ¶ 20.) If DuPont had deposited too much, then Kemper credited the excess amount paid to DuPont. (Compl. ¶ 20.)

Beginning with the 2000 policy year, the Insurance Program changed to a "pay-as-you-go" program. (Compl. ¶ 21.) Under this program, DuPont did not pre-pay claims through advance premiums (deposits) that were based upon projected losses. Instead, DuPont agreed to reimburse Kemper on a "pay-as-you-go" basis for amounts that Kemper paid on DuPont's behalf. Under this program, DuPont (1) made fixed payments to Kemper, which included charges for Kemper's overhead and profit, taxes, front fees, various surcharges and assessments, and the limited risk transfer purchased by DuPont for specified risks; (2) initially funded and constantly replenishes an escrow account that Kemper uses to pay claims on DuPont's behalf; and (3) gave Kemper security in the form of a letter of credit and surety bond (in equal amounts) to ensure that DuPont would reimburse Kemper for the claims it paid on DuPont's behalf. (Compl. ¶ 21.) Despite the change from an "incurred loss" to a "pay-as-you-go" program in 2002, the premium calculation formula remained the same.

---

than if the contractors had to purchase that insurance in the market. (Compl. ¶ 13.) Although DuPont retained most of that risk, DuPont did bargain with Kemper to transfer the risk of workers' compensation claims in excess of $1 million asserted against DuPont's contractors. (Compl. ¶ 13.) To date, no such claim has arisen for the 2002 policy year, and, consequently, Kemper has not used any Kemper monies to pay claims against DuPont under this part of the Insurance Program.

**B.      DuPont Provided Millions of Dollars in Collateral to Kemper to Secure DuPont's Obligations to Pay its Own Losses Under the Insurance Program**

The Insurance Program for 2002-03 also contained a method for determining the security required by the Insurance Program. See Insurance Program, p. 11 (Exhibit 1 to Verified Complaint). DuPont has provided a Safeco bond in the amount of $5,995,646 and a letter of credit with J.P. Morgan (now BankOne) for $9,604,354 as security. (Compl. ¶ 40.)

**C.      The "Dividend" Plan was Supposed to Ensure that DuPont was Required to Pay Only the Actual Losses and Related Claims-Handling Fees and Expenses Under the Insurance Program**

The "dividend" portion of the Insurance Program has been manipulated by Kemper to justify Kemper's assertion that DuPont has an unsatisfied debt to Kemper. According to Kemper's most recent Cash/Security Reconciliation for the 2002-03 policy year, DuPont is entitled to a credit of $4,532,579. (Compl. ¶ 37.) When the credit is included in the calculation as intended, Kemper actually owes DuPont a refund of $96,867. Kemper, however, refuses to credit this "dividend" to DuPont and instead improperly is attempting to collect from DuPont that same amount in the form of an additional premium payment. (Compl. ¶ 37.)

The "dividends" at issue are not dividends in the traditional sense, in which the profits of a company are distributed among its owners. (Compl. ¶ 36.) Rather, the "dividends" are simply a line item in the accounting calculation through which DuPont is credited with being largely self-insured. (Compl. ¶ 36.) In essence, each year DuPont's account is audited largely for tax purposes to determine whether the initial projection regarding DuPont's payroll, which is part of the premium calculation and needed to calculate the taxes owed for the Insurance Program, was accurate. If the

-8-

account balancing reveals the projection was high, then the amount paid by DuPont based upon the excessive payroll projection is refunded or credited to DuPont. If the account balancing reveals the projection was low, then DuPont pays an additional amount to Kemper. Thus, because DuPont effectively is self-insured for most claims, the so-called "dividend" is nothing more than DuPont's side of the accounting calculation that determines whether DuPont has paid Kemper the appropriate premium and related administrative costs and taxes based upon the projected payroll. (Compl. ¶ 36.) Indeed, under the accounting formula, the "dividend" equals the "Audited Subject premium minus (Basic Premium plus Converted Limited Losses) x Tax Multiplier" (i.e., the dividend is nearly the same amount as the audited premium).

Contrary to the purpose and intent of the insurance program, and solely because Kemper is on the brink of insolvency, Kemper has refused to count DuPont's "dividend" side of the equation during the account balancing and claims that DuPont owes it an additional premium in excess of $4.5 million even though DuPont essentially is self-insured. (Compl. ¶ 5.) Kemper has acknowledged that DuPont's "dividend" under the applicable accounting formula is in excess of $4.5 million. (Compl. ¶ 5.) In fact, a correct account balancing under the applicable formula reveals that instead of DuPont owing Kemper millions of dollars, Kemper actually owes DuPont approximately $100,000.

### D.    Kemper is Teetering on the Verge of Insolvency and Financial Collapse

By late 2002, Kemper was experiencing significant financial difficulty resulting in serious erosion of its statutory surplus (assets in excess of liabilities) and downgrading of its credit worthiness. (Compl. ¶ 63.) Significantly, on December 24,

2002, A.M. Best Company ("A.M. Best") lowered the financial strength rating of Kemper from A- to B+. (Compl. ¶ 64.) When downgrading Kemper's creditworthiness, A.M. Best cited Kemper's recently announced business decision to repurchase $125 million of Berkshire Hathaway's minority equity investment in a Kemper subsidiary company as a basis for the downgrading because the loss of capital damaged Kemper's overall capitalization and liquidity. (Compl. ¶ 65.) Between December 20 and 24, 2002, Moody's Investors Service and Standard & Poor's also downgraded Kemper's financial strength and other financial ratings. (Compl. ¶ 69.) Because most commercial policyholders and insurance brokers will not do business with an insurance company that has less than an A- rating, the downgrade effectively prevented Kemper from writing new policies or retaining existing policyholders. (Compl. ¶ 64.)

These developments occurred during the final stages of negotiations for the 2003 policy period and less than two months after DuPont signed the insurance proposal for the 2002 policy year. Kemper must have been fully aware of the continuing drain on its statutory surplus and the impending downgrading of its credit rating while it was negotiating with DuPont for the renewal of the insurance program in December of 2002 for the 2003 policy year. (Compl. ¶ 74.) Throughout this period, however, Kemper continued to represent to DuPont and other policyholders that it was a stable and solvent company. (Compl. ¶ 76.) For example, in an advertisement that Kemper placed in *Business Insurance* on December 16, 2002, mere days before A.M. Best downgraded Kemper, Kemper stated that, "as with anything at Kemper, you'll always have the integrity of our reputation for financial stability and strength." (Compl. ¶ 76; Compl. Ex. 4.)

As a result of its financial problems, Kemper has entered into "run off" mode whereby it is attempting to achieve an orderly winding down of its business operations without entering rehabilitation or liquidation proceedings. (Compl. ¶ 77.) Kemper has taken extraordinary steps to temporarily avoid insolvency, including reportedly reducing its workforce from 7,000 to 370 employees (a reduction of nearly 95%) and selling its headquarters in Long Grove, Illinois. (Compl. ¶ 77.) Even with these drastic measures, Kemper's statutory surplus continues to decline rapidly. (Compl. ¶ 78.) Kemper has reported that its surplus is expected to decline by approximately $12 million per month, excluding the impact of claims and reinsurance commutations and loss development. (Compl. ¶ 80.)

On June 10, 2004, the Illinois Department of Insurance reportedly approved Kemper's second proposed run-off plan, the first such plan having been rejected by the state regulators. (Compl. ¶ 81.) Kemper's run-off plan remains secret, as neither Kemper nor the Illinois Department of Insurance has disclosed its terms. (Compl. ¶ 82.) However, in a press release announcing the approval of the plan, Kemper disclosed that it has "little premium revenue (about $90 million estimated for 2004 and virtually none thereafter)" and that all investment income being generated is "offset by expenses." (Compl. ¶ 82.) Most tellingly, Kemper stated that achieving the plan's objective of positive surplus and liquidity through 2006 "will be very challenging." (Compl. ¶ 82; Compl. Ex. 5.)

### E.    Kemper's Attempts to Collect the Non-Existent Debt Reveals its Spurious Nature

On September 14, 2004, Kemper sent an invoice to DuPont claiming that DuPont owed Kemper $12,459,116. (Compl. ¶ 45.) DuPont registered numerous

-11-

objections to the calculations through its insurance broker, Marsh USA, Inc. ("Marsh").

(Compl. ¶ 46.) Kemper ultimately issued a revised calculation on May 12, 2005, which

reduced the amount Kemper claimed that DuPont owed Kemper to $6,292,733 ("Revised

Calculation"). (Compl. ¶ 47.)

      The Revised Calculation still was incorrect. (Compl. ¶ 48.) In both the

original calculation and the Revised Calculation, Kemper failed to properly credit DuPont

with the "dividend" line item credit due DuPont as determined in accordance with the

Insurance Program and had made other errors in its calculation. (Compl. ¶ 51.) In the

Revised Calculation, Kemper calculated and acknowledged that DuPont should be

credited with a "dividend" of $4,532,579, yet Kemper improperly refuses to credit

DuPont with that amount. (Compl. ¶ 52.) Consequently, on June 23, 2005, Marsh sent

detailed calculations to Kemper's representative showing that DuPont was still being

overbilled. (Compl. ¶ 48.) Marsh followed up by e-mail on August 4, 2005, in an effort

to resolve the outstanding billing issues relating to the Revised Calculation. (Compl.

¶ 49.) Kemper did not respond to Marsh's identification of those additional billing

inaccuracies. (Compl. ¶ 50.)

      On July 27, 2005, Kemper also attempted to bill DuPont for interest in the

amount of $902,475.71 ("Interest Billing"), which purportedly is based on the amounts

claimed to be owed by DuPont to Kemper even though Kemper acknowledges that the

interest charges are based on amounts (1) which Kemper concedes were not due because

they were based upon Kemper's original admittedly erroneous calculation; (2) which

previously have been paid by DuPont after Kemper made corrections to its billings; and

(3) which were untraceable to any prior billings. (Compl. ¶ 55.) For example, in its

Interest Billing, Kemper charges interest of $328,158.72 on a line item of $2,563,740 that allegedly was invoiced on September 14, 2004, which was the date of the original $12,459,116 billing that Kemper has admitted was incorrect. (Compl. ¶ 56.) But when Kemper removed that line item on its Revised Calculation of May 12, 2005 because that amount was not owed, Kemper removed interest charges of only $62,811.63. (Compl. ¶ 56.) Thus, in this example, Kemper is charging interest of $265,347.09 ($328,158.72 minus $62,811.63) on a "debt" that Kemper admits was never owed. (Compl. ¶ 56.)

Kemper knows or should know that its claim for interest is patently false and is made in bad faith, which may be why Kemper has not included its interest claim as part of its counterclaim. (Compl. ¶ 57; Kemper's Answer and Affirmative Defenses to Complaint and Counterclaims against Plaintiff.) Indeed, the Insurance Program sold to DuPont does not even include any provision allowing Kemper to charge DuPont interest on amounts claimed to be due. (Compl. ¶ 57.)

## IV. ARGUMENT

### A. The Liberal Notice Pleading Standard of the Federal Rules of Civil Procedure Applies to a Motion to Dismiss For Failure to State a Cause of Action

Dismissals pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted are disfavored because of the liberal pleading requirements of the Federal Rules of Civil Procedure. See Johnsrud v. Carter, 620 F.2d 29, 33 (3rd Cir. 1980). All that a plaintiff must do in its complaint is put the defendant on notice of the essential elements of a cause of action. See Nami v. Fauver, 82 F.3d 63, 66 (3rd Cir. 1996). In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." Rocks v.

-13-

City of Philadelphia, 868 F.2d 644, 645 (3rd Cir. 1989). Consequently, dismissal of a complaint is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Langford v. City of Atlantic City, 235 F.3rd 845, 847 (3rd Cir. 2000). When considering a motion to dismiss, the Court is not asked to determine whether the plaintiff will ultimately prevail, but rather only whether the plaintiff can prove any set of facts under which it would be entitled to relief. See Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3rd Cir. 1994).

**B.     DuPont Properly Alleges a Cause of Action for Unjust Enrichment in Count III**

To obtain restitution under a theory of unjust enrichment, a plaintiff must show (1) that the defendant was unjustly enriched; (2) that the defendant secured a benefit; and (3) that it would be unconscionable to allow the defendant to retain that benefit. Shock v. Nash, 732 A.2d 217, 232 (Del. 1999).[3] DuPont satisfies the requirements of notice pleading by alleging each of these elements in Paragraphs 95 through 97 of its Complaint. Specifically, DuPont alleges that Kemper's failure to credit DuPont with a $4.5 million "dividend," its claim for nearly $1 million in interest, and its retention of excess collateral unjustly enrich Kemper because Kemper is not entitled to these claimed benefits or assets. (Compl. ¶¶ 95-97.) DuPont further alleges that "[i]t would be unjust, inequitable, and unconscionable" for Kemper to collect and/or retain these benefits. (Compl. ¶ 97.)

---

[3]     DuPont contends that Delaware law applies to this dispute, and Kemper has not argued to the contrary. DuPont is prepared, however, to brief the issue of choice of law at the Court's request.

Notably, Kemper does not claim in its Motion to Dismiss that DuPont has failed to state a cause of action pursuant to Rule 12(b)(6). Instead, Kemper invents an argument that has no basis in the Federal Rules. Kemper argues that "[h]aving pled the existence of a contract, DuPont's quasi-contractual theory of unjust enrichment must fail as a matter of law." (Def. Br. at 6.) Kemper does not, and cannot, cite to any Federal Rule of Civil Procedure to support this specious argument for the simple reason that Kemper's argument is *directly contrary to* the Federal Rules.

Kemper's contention cannot stand in the face of the well-established rule that pleading in the alternative is permitted in federal court. Indeed, Federal Rule of Civil Procedure 8(e)(2) *expressly permits* a party to plead alternative or inconsistent claims. That Rule states, in pertinent part:

> A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. . . . A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds.

Fed. R. Civ. P. 8(e)(2). Pleading in the alternative is allowed because a party "may not be sure in advance upon which legal theory [it] will succeed." Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 805 (1999). In fact, "[t]his Rule permits inconsistency in both legal and factual allegations . . . and has been interpreted to mean that a court 'may not construe [a plaintiff's] claim as an admission against another alternative or inconsistent claim.'" Independent Enter. Inc. v. Pittsburgh Water & Sewer Auth., 103 F.3d 1165, 1175 (3rd Cir. 1997) (citing cases).

Consistent with Rule 8(e)(2), this Court has recognized that a plaintiff may plead both contractual and quasi-contractual claims. In Fox v. Rodel, Inc., C.A.No. 98-

531-SLR, 1999 WL 803885 (D. Del. Sept. 13, 1999)(Ex. A hereto), this Court held that a plaintiff can allege the existence of an express contract, plead a breach of contract claim, and also plead promissory estoppel in the alternative. The defendants in that case argued, as Kemper does here, that the plaintiff's promissory estoppel claim must fail as a matter of law because the plaintiff pled the existence of a valid and enforceable contract. This Court noted that while it is axiomatic that a claim for promissory estoppel can succeed only in the absence of an enforceable contract, "[i]t is equally undisputable that the Federal Rules of Civil Procedure allow for alternative and inconsistent claims to be made in a complaint." Id. at *11. Because this Court had not ruled in Fox that a valid and enforceable contract existed, the plaintiff was free to pursue her promissory estoppel claims. Likewise, DuPont should be free to pursue both its breach of contract and its unjust enrichment claims at this early stage in the litigation.

Even though DuPont may not be able to *recover* under both contractual and quasi-contractual theories, that does not mean that DuPont may not *plead* both contractual and quasi-contractual theories. Kemper's Motion to Dismiss Count III of the Complaint should, therefore, be denied.

### C.    DuPont Adequately Alleges a Cause of Action for Equitable Fraud in Count IV

#### 1.    DuPont's Allegations are Sufficient to Withstand a Motion to Dismiss Pursuant to Rule 12(b)(6)

DuPont pled in its Complaint all of the necessary elements of an equitable fraud claim. Under Delaware law, the elements of a claim for equitable fraud are (1) a false representation, usually one of fact, made by the defendant; (2) an intent to induce the plaintiff to act or to refrain from acting; (3) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (4) damage to the plaintiff as a result of

-16-

such reliance. <u>Zirn v. VLI Corp.</u>, 681 A.2d 1050, 1060-61 (Del. 1996). These are the same elements as for common law fraud, except that "the defendant did not have to know or believe that his statement was false or to have proceeded in reckless disregard of the truth." <u>Stephenson v. Capano Dev., Inc.</u>, 462 A.2d 1069, 1073 (Del. 1983). In other words, equity provides a remedy for negligent or innocent misrepresentations. <u>Id.</u>

DuPont only needs to plead a cause of action in Count IV to survive a Rule 12(b)(6) motion to dismiss, and it has done so: (1) DuPont gives examples of Kemper's misrepresentations in Paragraph 99, as well as in other Paragraphs throughout its Complaint that are incorporated by reference in Paragraph 98; (2) DuPont alleges in Paragraph 100 that Kemper's statements were intended to induce, and did induce, reliance by DuPont, including by inducing DuPont to act in purchasing the insurance as offered and to refrain from action by changing or clarifying the Insurance Program terms or by moving the Insurance Program to another insurance company; (3) DuPont alleges in Paragraph 101 that DuPont justifiably relied on Kemper's statements to DuPont and/or its representatives regarding the operation of the Insurance Program and Kemper's financial condition; and (4) DuPont alleges in Paragraph 102 that it has been damaged by its reliance on Kemper's representations. Because DuPont alleges each element of an equitable fraud claim, Kemper's Motion to Dismiss Count IV pursuant to Rule 12(b)(6) should fail.

Kemper further contends that some of the misrepresentations identified by DuPont are not actionable as a matter of law because they are opinions regarding the future. Not only does such an argument ignore the numerous allegations in the Complaint that irrefutably set forth facts (e.g., ¶¶ 62-63, 65-68, 71, 75-76), but Kemper's

argument does not provide a basis for dismissing DuPont's equitable fraud claim because discovery is required to determine whether those misrepresentations were opinions or whether they expressly or impliedly contained statements of fact. Although "[i]t is the general rule that mere expressions of opinion as to probable future events, when clearly made as such, cannot be deemed fraud or misrepresentations," Consolidated. Fisheries Co. v. Consolidated Solubles Co., 112 A.2d 30, 37 (Del. 1955), opinions as to future events are not actionable *only* "when clearly made as such." Id. Thus, just because a statement can be characterized as an opinion of future events does not automatically render that statement an insufficient basis for an equitable fraud claim as a matter of law.

Indeed, Delaware courts recognize that "[w]hat are expressions of opinion and what are statements of fact are often difficult to determine; but the mere fact that a material statement is in the form of an opinion, or of an estimate, is not necessarily conclusive as to whether it must be treated as such, or whether it can be regarded as a representation of fact." Eastern States Petroleum Co. v. Universal Oil Prods. Co., 3 A.2d 768, 775 (Del. Ch. 1939). Furthermore, "if the facts are not equally known to both sides, then a statement of opinion by the one who knows the facts best involves very often a statement of a material fact for he impliedly states that he knows facts which justify his opinion." Id. at 776. Thus, discovery is required to determine whether any alleged "opinions" are actually facts, and Kemper's Motion to Dismiss Count IV should be denied.[4]

---

[4]      Precisely because there is often no clear facial distinction between facts and opinions, this Court in Marino v. Cross Country Bank, C.A. No.02-65-GMS, 2003 WL 503257 (D. Del. Feb. 14, 2003) (Ex. B hereto) , denied a motion to dismiss a fraud count because it was unknown "whether the alleged representations of the defendants were clearly made and understood as mere expressions of opinion as to probable future results,

2.    **DuPont's Allegations Meet the Particularity Requirements of Rule 9(b)**

Kemper also argues that DuPont's claim for equitable fraud should be dismissed because it does not meet the "particularity" requirement for allegations of fraud. This argument fails because Kemper relies upon the wrong standard. Rather than relying on cases interpreting Federal Rule of Civil Procedure 9(b), Kemper relies upon standards developed in Delaware and Illinois *state* courts regarding those *states'* procedural rules. According to Kemper, Illinois' and Delaware's state pleading requirements obligate the plaintiff to "specify the time, place, and contents of the alleged misrepresentations, the facts misrepresented, the identity of the person making the misrepresentation, and what he obtained thereby." (Def. Br. at 8.) Regardless of the accuracy of that assertion, what Illinois and Delaware require to be pled in their state courts is irrelevant to what is required in this federal court.

The appropriate inquiry is whether DuPont satisfies the particularity requirements of the *Federal* Rules. As recognized by the leading treatise on federal practice, "it no longer can be doubted that the rules regarding the specificity to be applied to . . . the special requirements for pleading certain matters . . . are governed by the federal rules and not by the practice of the courts in the state in which the federal court happens to be sitting." 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1204. A federal district court with diversity jurisdiction over an action removed from state court is to apply *federal* standards to the particularity requirements of Rule 9(b). See Hayduk v. Lanna, 775 F.2d 441, 443 (1st Cir. 1985) (noting that

---

or whether they were false representations intended to fraudulently induce the plaintiff into entering the employment contract." Id. at *3.

-19-

"[a]lthough state law governs the burden of proving fraud at trial, the procedure for pleading fraud in federal courts in all diversity suits is governed by the special pleading requirements of Federal Rule of Civil Procedure 9(b)); Nakell v. Liner Yankelevitz Sunshine & Regenstreif, LLP, 394 F. Supp. 2d 762, 772 (M.D.N.C. 2005) (stating that "[b]ecause Rule 9(b) concerns federal procedure, it governs in civil actions where subject matter jurisdiction is based on diversity") (citing Hanna v. Plumer, 380 U.S. 460 (1965)). Thus, the degree of particularity required by Illinois and Delaware state courts, which is different from the federal standard applied by this Court and the U.S. Court of Appeals for the Third Circuit, has no bearing on this case.

The degree of particularity required for DuPont's equitable fraud claim is governed by Federal Rule 9(b), which states:

> **Fraud, Mistake, Condition of Mind.** In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Courts within this Circuit interpret Rule 9(b)'s requirement that the "circumstances" of the alleged fraud be pled with particularity in the context of the purpose of the Rule, which is "to place the defendants on notice of the precise misconduct with which they are charged." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984).

The Third Circuit recognizes that "focusing exclusively on [Rule 9(b)'s] 'particularity' language 'is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.'" Seville, 742 F.2d at 791 (citation omitted). Indeed, this Court has recognized that "[t]he Third Circuit courts take

-20-

a 'lenient approach' to the application of Rule 9(b)." In re Fruehauf Trailer Corp, 250 B.R. 168, 198 (D. Del. 2000). While "date, place or time" allegations akin to those arguably required by Illinois and Delaware state courts can fulfill the purpose of Rule 9(b), "nothing in the rule requires them." Seville, 742 F.2d at 791. Rather, "[p]laintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." Id. See also Household Int'l, Inc. v. Westchester Fire Ins. Co., 286 F. Supp. 2d 369, 373 (D. Del. 2003) (refusing to dismiss policyholder's fraud claim based on insurance company's misrepresentation of what the policy would cover).

DuPont's Complaint is replete with allegations regarding the "circumstances" of the misrepresentations and/or omissions upon which it relied and thus satisfies the Third Circuit's "lenient standard." For example, DuPont alleges that the Insurance Program was intended to permit DuPont to remain largely self-insured. See, e.g., Compl. ¶¶ 2, 11-14, 21, 23, 36. In this context, DuPont alleges that Kemper made numerous misrepresentations, either by stating false facts or by concealing the truth,[5] regarding Kemper's financial condition;[6] the manner in which the Insurance Program would operate;[7] and the circumstances under which "dividends" would be credited.[8]

---

[5]    Failure to disclose material facts can constitute an actionable misrepresentation. Stephenson, 462 A.2d at 1074 ("[F]raud does not consist merely of overt misrepresentations. It may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak. Thus, one is equally culpable of fraud who by omission fails to reveal that which is it is his duty to disclose in order to prevent statements actually made from being misleading.").

[6]    See, e.g., Compl. ¶¶ 99(a) and (b).

[7]    See, e.g., Compl. ¶¶ 99(c) and (d).

[8]    See, e.g., Comp. ¶¶ 99(e) and (f).

These allegations satisfy the Third Circuit's "lenient" standard for pleading the "circumstances" of fraudulent statements by putting Kemper on notice of the misconduct at issue. It is not as if DuPont's Complaint simply alleges, "Kemper made misrepresentations," and ends there. Rather, DuPont's Complaint puts Kemper on notice of the types of misrepresentations at issue.[9]

　　　　　Furthermore, and perhaps most significantly, Kemper purported to sell an Insurance Program to DuPont that, through the use of complicated formulas and so-called "dividends," would allow DuPont to remain largely self-insured. Yet, Kemper concealed from DuPont that, under Kemper's interpretation of the Insurance Program, if Kemper ever ran into financial trouble, as it now has, it would refuse to credit DuPont with the fictional "dividends" that are crucial to the accounting calculations that ensure that DuPont remains self-insured and is not required to pay millions of dollars in premiums for a self-insured program. Kemper also failed to disclose to DuPont that if Kemper's finances became poor, Kemper would demand that DuPont pay millions of dollars in insurance premiums in exchange for nothing. Kemper's failure to disclose to DuPont this dramatic change in the operation of the Insurance Program alone constitutes a material misrepresentation that is sufficient to support DuPont's claim for equitable fraud.

---

[9]　　　Moreover, the specific details (e.g., who said what to whom) of the communications regarding the Insurance Program occurred between Marsh, a third-party insurance broker, and Kemper. Given that these communications are currently within the control of Marsh and Kemper, DuPont should be given additional leeway in pleading prior to discovery. Cf. In re Craftmatic Sec. Litig., 890 F.2d 628, 645 (3rd Cir. 1989) (noting that "courts have relaxed [Rule 9(b)] when factual information is peculiarly within the defendant's knowledge or control). See also Federal Sav. & Loan Ins. Corp. v. Shearson-American Express, Inc., 658 F. Supp. 1331, 1337 (D.P.R. 1987) (noting that Rule 9(b) should not demand more detail where the complaint may have lacked details and relied to some extent upon pleadings based on information and belief but where "discovery would obtain a greater degree of specificity").

**D.     DuPont Adequately Alleges a Cause of Action for Equitable Estoppel in Count V**

DuPont has properly pled a claim for equitable estoppel in its Complaint. Under Delaware law, equitable estoppel "may arise when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment." Bechtel v. Robinson, 886 F.2d 644, 650 (3rd Cir. 1989) (quoting Wilson v. American Ins. Co., 209 A.2d 902, 903-904 (Del. 1965)). Here, in paragraphs 104 and 108 of the Complaint, DuPont makes such allegations. Thus, Kemper's Motion to Dismiss Count V should be denied.

Kemper's critiques of DuPont's equitable estoppel count are based on a flawed understanding of federal pleading standards. First, Kemper attempts to hold DuPont to the higher pleading standards of Rule 9(b) by erroneously asserting that fraud is an element of an equitable estoppel claim under Delaware law. Yet, no cases interpreting Delaware law have held that fraud or fraudulent statements are an element of equitable estoppel. To the contrary, at least one Delaware case affirmatively has stated that fraud is not required for equitable estoppel.[10] See Williamson v. New Castle County, C. A. No. 19019-NC, 2002 WL 453926 at *4 n.21 (Del. Ch. Mar. 13, 2002) (Ex. C hereto) (noting that "[a]lthough 'equitable estoppel' is sometimes used interchangeably with 'fraudulent concealment,' the latter is, strictly, a subset of the former, *since neither fraud nor concealment is required for equitable estoppel. . . .*" (citations omitted)

---

[10]     Kemper relies on a case interpreting Michigan law for its proposition that fraud is an element of equitable estoppel. (Def. Br. at 14.) Neither party has suggested that Michigan law is controlling in this case so the case cited by Kemper is of no consequence to this action.

(emphasis added)). Accordingly, Kemper is incorrect that DuPont must plead its equitable estoppel count with the particularity required by Rule 9(b).

Rather, under the liberal notice pleading requirements of Rule 8(a)(2), DuPont needs only to set forth a short and plain statement of its claim. See C.H. v. Oliva, 226 F.3d 198, 206 (3rd Cir. 2000) (Alito, J., dissenting). This, DuPont unquestionably has done. As stated above, equitable estoppel "may arise when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment." Bechtel, 886 F.2d at 650. DuPont alleges that it lacked knowledge about Kemper's financial condition and the manner in which Kemper would treat the Insurance Program if its financial condition were to deteriorate (Compl. ¶ 104); that Kemper knew its financial condition was deteriorating and knew DuPont's insurance needs and intent in purchasing the Insurance Program (Compl. ¶ 105); that Kemper's conduct and representations led DuPont to believe it would have limited financial commitments to Kemper and would fund its own losses (Compl. ¶ 106); and that Kemper's conduct and representations were intended to, and did induce, DuPont to rely upon them and change its position to its detriment by purchasing the Insurance Program (Compl. ¶¶ 107-08). These allegations more that satisfy the Federal Rules' notice pleading standard and state a cause of action sufficient to overcome Kemper's Rule 12(b)(6) Motion to Dismiss.

Furthermore, Kemper's assertion that "[t]he party seeking estoppel must adduce evidence to demonstrate that its reliance on the alleged misrepresentations was reasonable" is irrelevant at this stage. The case Kemper cites, Pell v. E.I. DuPont de Nemours & Co., 348 F. Supp. 2d 306, 313 (D. Del. 2004), decided a motion for summary

judgment, not a motion to dismiss. (It also interpreted federal common law rather than Delaware law.) Because DuPont's Complaint need only put Kemper on notice of its claim, DuPont is not required to "adduce evidence" for any element of its claim in order to state a cause of action sufficient to withstand a motion to dismiss.

In addition, because DuPont is permitted under Rule 8(e)(2) to plead in the alternative, Kemper is also incorrect in arguing that DuPont may not assert a claim for equitable estoppel while alternatively seeking a declaration of rights under a contract. See Fox v. Rodel, Inc., C.A. No. 98-531-SLR, 1999 WL 803885 (D. Del. Sept. 13, 1999) (allowing plaintiff to plead both breach of contract and promissory estoppel under Rule 8(e)(2)). Indeed, the case Kemper cites, Genencor International, Inc. v. Novo Nordisk A/S, 766 A.2d 8 (Del. 2000), does not support the rule Kemper would have this Court apply. In Genencor, the Supreme Court of Delaware reviewed the remedy granted by the Court of Chancery for a breach of contract. It was clear in that case that a contract governed the issue and that Novo Nordisk had breached the contract. The issue on appeal was whether the remedy Genencor sought was an appropriate remedy for the breach. Novo Nordisk argued that the remedy Genencor was seeking was based upon an equitable estoppel claim because Novo Nordisk sought to force Genencor to prove reasonable reliance. The court disagreed, stating that, "because this is a dispute about enforcement of a bargained-for contract right, we conclude that the remedy Genencor seeks is not equitable estoppel." Id. at 13. From this, Kemper argues that DuPont cannot assert a claim for equitable estoppel and seek a declaration of rights under the Insurance Program. Such an interpretation by Kemper is a patent misreading of the case because it

-25-

addresses the appropriate remedies for a breach of contract, not whether a party can plead

both breach of contract and equitable estoppel claims in its complaint.

### E.    DuPont Adequately Alleges a Cause of Action for Breach of Contract in Count VI

As discussed above, Rule 8(a)(2) requires only that DuPont make a short

and plain statement of its claims. Fed. R. Civ. P. 8(a)(2). To state a claim for breach of

contract under Delaware law, DuPont must allege: (1) the existence of a contract; (2) the

breach of an obligation imposed by that contract; and (3) resulting damage to DuPont.

VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003). Count VI

easily satisfies these requirements. DuPont alleges the existence of a contract between

DuPont and Kemper. (Compl. ¶¶ 16, 110.) DuPont alleges that Kemper breached

obligations imposed by that contract. (Compl. ¶¶ 110-113). DuPont also alleges

damages resulting from Kemper's breaches. (Compl. ¶¶ 111-113). DuPont has,

therefore, put Kemper on notice of its breach of contract claim and met the liberal

pleading requirements under the Federal Rules. Accordingly, Kemper's Motion to

Dismiss DuPont's breach of contract claim should be denied.

Notwithstanding the fact that DuPont has clearly met the pleading

requirements of the Federal Rules, Kemper argues that this Court should dismiss

DuPont's breach of contract claim based on its interpretation of a single provision in the

Insurance Program relating to the payment of "dividends." In doing so, Kemper ignores

every other provision of the complicated arrangement created by the Insurance Program

hoping that this Court will do the same. Kemper's attempt to isolate a single provision

violates a fundamental tenet of Delaware law, namely, that the Court must examine the

disputed language of an insurance policy "in the context of the entire policy." New

Castle County v. Nat'l Union Fire Ins. Co. of Pittsburgh, 174 F.3d 338, 343 (3d Cir. 1999) (applying Delaware law).

When viewing the Insurance Program as a whole and in the context in which it exists (i.e., as part of a historical relationship between DuPont and Kemper in which DuPont is largely self-insured), the "dividend" provision is anything but clear and unambiguous and, therefore, cannot be interpreted on a motion to dismiss. Rather, internal inconsistencies in the documents comprising the Insurance Program reveal numerous ambiguities, including what precisely the term "dividend" means because a "dividend" under the program is obviously not a dividend in the traditional use of the term. To resolve these ambiguities, this Court will have to consider "all objective extrinsic evidence" including "the overt statements and acts of the parties, the business context, prior dealings between the parties, and the business customs and usage in the industry." Bell Atlantic Meridian Sys. v. Octel Commc'ns Corp., C. A. No. 14348, 1995 WL 707916 at *6 (Del. Ch. Nov. 28, 1995) (Ex. D hereto) . In cases such as this, "the meaning of the words to a contract can only be known through an understanding of the context and business circumstances under which they were negotiated, and extrinsic evidence must necessarily be evaluated." Id. at *6 n.5.

Among the ambiguities inherent in the Insurance Program are the following: First, as described above, the Insurance Program was intended to leave DuPont almost entirely self-insured. This intent is reflected in the Insurance Proposal on page 11:

> Reimbursement for paid losses will be due and payable in cash on a weekly basis. A escrow fund in the amount of $167,000 will be required on 1-1-02. This amount will be reviewed periodically for adequacy. This amount applies

-27-

> to all years and lines of insurance, ***including self-insured
> W.C.***.

(Compl. Ex. 1 at 11. (emphasis added).)  To date, DuPont has paid over $4 million into

this escrow account to fund claims under the 2002 Insurance Program.  Yet, Kemper does

not discuss this, or any other, provision of the Insurance Program and how it squares with

the "dividend" provision.

When evidence is adduced, it will show that the "dividend" provision is

merely a line item in an accounting formula for determining how much DuPont owes

Kemper under the Insurance Program for claims administration fees, taxes, and the

premium for the limited risk transfer.  This formula ensures that DuPont will remain

largely self-insured, while still calculating what the premium would be if DuPont were

not self-insured because that calculation is necessary to determine what taxes must be

paid in states that tax sales of insurance.

Even with that knowledge in hand (which will require discovery so that it

can be presented to the Court), the accounting formula is anything but a model of clarity.

For example, the "Cash/Security Reconciliation" formula provides that "[t]he sum of

audited premium and assessments plus or minus any dividend declared, plus worker's

compensation paid losses, less all cash received, equals the balance due DUPONT or

Kemper." (Compl. Ex. 1 at 11.)  Extrinsic evidence will be needed to show that this

formula only computes a premium amount reflective of DuPont's self-insured status if

the "dividends" are taken into account.  Nonetheless, Kemper contends that the crediting

of "dividends" is purely discretionary without even discussing what a "dividend" is in the

Insurance Program.  While traditional dividends (i.e., distributions of profits to

shareholders) may be payable at Kemper's discretion, just as they are with most

-28-

corporations, if the term "dividend" in the "Cash/Security Reconciliation" formula refers to something entirely discretionary, then that formula is completely devoid of any meaning or purpose in a program like this where the policyholder remains largely self-insured. To resolve this ambiguity (if it can indeed be resolved at all without reforming the contract), discovery into the meaning of the term "dividend" must be taken, and it would be inappropriate for the Court to try to interpret that term on a motion to dismiss and in the absence of all of the relevant facts.

As yet another example of an ambiguity inherent in the Insurance Program, the program incorporates a "Warranty Agreement" under which "DUPONT warrants to [Kemper] that under said policies total incurred losses shall not exceed 81.61% of total subject premiums." This Warranty Agreement, which was insisted upon by Kemper under the pre-2000 "incurred-loss" program and which refers to "incurred losses," is still a part of the post-2000 "pay-as-you-go" program even though it makes no sense because of its reference to "incurred losses" which are not part of the 2002-03 program. Any attempt to explain this plain contradiction will require the use of extrinsic evidence and further mitigates against attempting to construe the Insurance Program on a motion to dismiss.

In short, while the intent of the Insurance Program was to permit DuPont to remain largely self-insured, the documents that are supposed to put that intent into practice became a jumbled mess when DuPont and Kemper switched from an "incurred loss" program to a "pay-as-you-go" program. Only through extrinsic evidence will the Court be able to unscramble the documents, and contrary to Kemper's desire, the issues in this case cannot be resolved by interpreting an isolated provision of the Insurance

-29-

Program in the abstract. Rather, it will be necessary for the parties to develop, through discovery, the evidence that this Court will need in order to properly determine the intent and operation of the Insurance Program.

**F.    DuPont Adequately Pleads a Claim for Reformation in Count VII**

Kemper argues that DuPont has failed to state a claim for reformation because it did not plead its allegations with sufficient particularity. (Def. Br. at 17.) To state a cause of action for reformation, DuPont only needs to allege that the contract as written does not reflect the intent of the parties due to either mutual mistake of both parties or to a unilateral mistake of one party and knowledge of the mistake by that party regarding which it remained silent. See Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P., 794 A.2d 1141, 1151 (Del. 2002).

Because DuPont alleges such a mistake -- in this case discovered when Kemper belatedly proffered its interpretation of the Insurance Program and attempted to collect a fictional debt -- DuPont acknowledges that it must plead the mistake with particularity pursuant to Rule 9(b). Kemper, however, again relies upon the Delaware particularity standard, rather than the Third Circuit's "lenient" standard, for pleading allegations of mistake. When analyzed under the correct standard, there should be no question that DuPont's reformation count satisfies the particularity requirements for pleading a claim for mistake in federal court.

This Court's decision in IKO Monroe, Inc. v. Royal & Sun Alliance Insurance Co. of Canada., C.A. No. 00-834 GMS, 2001 WL 1568674 (D. Del. Dec. 7, 2001) (Ex. E hereto) , is directly on point. There, a policyholder (IKO) sought a declaratory judgment against its insurers. One of those insurers, Hartford, counterclaimed for reformation of the insurance policy to the extent that the definition of

-30-

personal injury was found to encompass claims arising out of pollution.  IKO moved for a more definite statement of the reformation claim arguing that it did not meet the particularity requirements of Rule 9(b).  This Court denied the motion.

Noting that the *circumstances*, rather than the specific facts of the claim, are essential, this Court held that "[b]y notifying IKO that mutual mistake is the issue, Hartford has provided IKO with the general circumstances involving its claim."  Id. at *7.  This Court added that when pleading mistake, "[t]he same considerations that make it necessary to plead fraud with specificity -- namely damage to reputation -- do not arise in the mistake context."  Id. at *9 n.3.  Thus, the "lenient" 9(b) particularity standard is relaxed even more when pleading mistake.

DuPont's Complaint more than satisfies the applicable "lenient" standard.  Specifically, DuPont pled the following particulars about the mistake at issue:

- The parties mutually intended that the Insurance Program starting in 2000 would be a "pay-as-you-go" program. (Compl. ¶ 115.)

- Pursuant to the Insurance Program, DuPont would be required to provide Fixed Payments at the beginning of the policy period, as adjusted at a subsequent payroll audit. (Compl. ¶ 115.)

- Pursuant to the Insurance Program, DuPont would be required to replenish an escrow account on a weekly basis to pay losses. (Compl. ¶ 115.)

- Pursuant to the Insurance Program, DuPont would be required to provide security in the form of a letter of credit and surety bond, in equal amounts. (Compl. ¶ 115.)

- By providing these payments, DuPont paid for Kemper's overhead, profit, surcharges, assessments, taxes, and for all real transfer of underwriting risk, while DuPont paid its own losses under the Insurance Program through the escrow account. (Compl. ¶ 116.)

- It was never the intent of the parties that Kemper would be required to pay losses under the Insurance Program as constituted after 2000, other than those risks of losses specifically identified (such as contractors' losses in excess of $1 million per occurrence), without repayment by DuPont. (Compl. ¶ 117.)

- It was never the intent of the parties that DuPont would be required to pay the full "audited premium" without credit for the "dividend," which is essentially the full amount of the "audited premium" less taxes owed by DuPont. (Compl. ¶ 117.)

- Requiring DuPont to pay the full audited subject premium would constitute payment of a premium for coverage that is not provided under the Insurance Program. (Compl. ¶ 117.)

- The Insurance Proposals, dividend endorsements, and other Insurance Program agreements may not fully express the parties' mutual intent, as is clear by Kemper's attempt to require DuPont to pay the full audited subject premium without credit for the "dividend" properly determined in accordance with the formula provided in the Insurance Program. (Compl. ¶ 118.)

This host of particulars more than satisfies the Third Circuit's requirements for pleading mistake with particularity.

Furthermore, discovery likely will show that both parties intended that the Insurance Program starting in 2000 would not require DuPont to pay the full audited subject premium. Discovery will also show that Kemper understood the Insurance Program in the same manner as DuPont until Kemper's deteriorating financial condition caused it to unilaterally adopt a position more advantageous to its bottom line.

Finally, in its argument in support of its Motion to Dismiss DuPont's reformation claim, Kemper repeatedly states that DuPont must allege that an "oral agreement" was reached that differs from the written agreement. (Def. Br. at 19.) This

-32-

argument reveals a flawed understanding of what is required to state a reformation claim. All that DuPont has to allege is that there was "an understanding" between the parties that differs from the written agreement. Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P., 794 A.2d 1141 (Del. 2002); Hob Tea Room, Inc. v. Miller, 89 A.2d 851, 857 (Del. 1952). The allegations in DuPont's Complaint suffice to explain the details of that understanding and, consequently, DuPont's reformation count should not be dismissed.

## V.   CONCLUSION

For all of the foregoing reasons, DuPont respectfully requests that the Court deny Kemper's Motion to Dismiss. Alternatively, DuPont respectfully requests that, if the Court is inclined to dismiss any of DuPont's causes of action, then DuPont be granted leave to amend its Complaint.

*Of Counsel*:                                              POTTER ANDERSON & CORROON LLP

John M. Sylvester
Christopher C. French                                   By:  /s/ John E. James
Scott A. Bowan                                                  John E. James (No. 996)
KIRKPATRICK & LOCKHART                          Richard L. Horwitz (No. 2246)
   NICHOLSON GRAHAM LLP                          Hercules Plaza – Sixth Floor
Henry W. Oliver Building                                  1313 North Market Street
535 Smithfield Street                                        Wilmington, DE  19801
Pittsburgh, PA  15222                                      Telephone: (302) 984-6000
Telephone:  (412) 355-6500                            E-Mail:   jjames@potteranderson.com
                                                                           rhorwitz@potteranderson.com

                                                                  *Attorneys for Plaintiff*
                                                                  *E. I. du Pont de Nemours and Company*

Dated:  February 13, 2006
719621/20120-345

-33-

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, John E. James, hereby certify that, on February 13, 2006, the foregoing

**PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S**

**MOTION TO DISMISS COUNTS III, IV, V, VI, AND VII OF PLAINTIFF'S**

**COMPLAINT** was filed electronically with the Clerk of Court using CM/ECF which

will send notification of such filing to the following attorney of record stating that the

document is available for viewing and downloading from CM/ECF:

>David B. Stratton
>PEPPER HAMILTON LLP
>Hercules Plaza, Suite 5100
>1313 N. Market Street
>P.O. Box 1709
>Wilmington, DE 19899-1709
>
>*Attorney for Defendant,*
>*Lumbermens Mutual Casualty Company*

>/s/ John E. James
>John E. James (Del. No. 996)
>POTTER ANDERSON & CORROON LLP
>Hercules Plaza, 6th Floor
>1313 North Market Street
>Wilmington, DE 19801
>Telephone: (302) 984-6000
>E-Mail: jjames@potteranderson.com