# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 803885 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Maura FOX, a citizen of the Commonwealth of Virginia, Plaintiff,
v.
RODEL, INC, a Delaware corporation, and William D. Budinger, a citizen of the State of Delaware, Defendants.
RODEL, INC, a Delaware corporation, and William D. Budinger, a citizen of the State of Delaware, Counterclaim-Plaintiffs,
v.
Maura FOX, a citizen of the Commonwealth of Virginia, Counterclaim-Defendant.
No. C.A. 98-531-SLR.

Sept. 13, 1999.

Thomas P. Preston, and Michael W. Teichman, of Duane, Morris & Heckscher LLP, Wilmington, Delaware, for plaintiff.
David S. Eagle, of Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, Delaware, Steven R. Wall, and Jill E. Jachera, of Morgan, Lewis & Bockius LLP, Philadelphia, Pennsylvania, for defendants, of counsel.

MEMORANDUM OPINION

ROBINSON, J.

I. INTRODUCTION

*1 On September 8, 1998, plaintiff Maura Fox filed this action against defendants Rodel, Inc. ("Rodel"), a Delaware corporation, and William D. Budinger, the President of Rodel, asserting claims for breach of contract, breach of the obligation of good faith and fair dealing, promissory estoppel, and specific performance arising out of plaintiff's employment at Rodel. (D.I.1) Specifically, plaintiff alleges that defendants breached the terms of her compensation package by failing to make available to her options to acquire common stock of Rodel. (D.I.1) On October 12, 1998, defendants filed their answer as well as their counterclaims against plaintiff for breach of contract, specific performance, and unjust enrichment.[FN1] (D.I.5) The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

FN1. On June 17, 1999, defendants filed an amended answer. (D.I.55)

Presently before the court is plaintiff's motion for partial summary judgment with respect to certain of the relief requested in Count VIII. (D.I.62) Also before the court is defendants' motion for summary judgment.[FN2] (D.I.64) In their motion, defendants seek to (1) dismiss counts VI and VII; (2) limit counts III and VIII "to a claim seeking to enforce plaintiff's rights, if any, to ten options to purchase ten shares of Rodel stock; (3) dismiss plaintiff's request for punitive damages; (4) release Budinger as a defendant in this action; and (5) "preserv[e] for trial solely the issue of what, if any, contractual obligations Rodel had to [p]laintiff as to the (10) ten vested options upon her separation of employment from Rodel." (D.I.64) For the reasons that follow, the court will deny plaintiff's motion and grant in part and deny in part defendants' motion.

FN2. This is defendants' second motion for summary judgment. In ruling on defendants' motion for partial summary judgment on their counterclaims (D.I.19), the court on July 14, 1999, dismissed counts I, II, IV, and V of the complaint. (D.I.58)

II. BACKGROUND

A. Plaintiff's Employment History with Rodel

The following facts regarding plaintiff's employment history are undisputed. On November 15, 1996, Rodel offered plaintiff employment as its Senior Vice President for Corporate Development. (D.I.1, ¶ 9) The initial terms of the offer were set forth in a letter to plaintiff dated November 15, 1996 and signed by Rodel's President. (D.I.1, ¶¶ 10-12) With regard to stock options, the offer provided as follows:

So that you can participate in the financial growth that you enable, Rodel will issue you an option to purchase 80 shares of stock at $4,000 per share. The purchase rights will vest over a seven year period. The option will entitle you to purchase 10 shares immediately following your acceptance of this

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 1999 WL 803885 (D.Del.)  
**(Cite as: Not Reported in F.Supp.2d)**

employment offer and, during the next seven years of your employment, 10 shares on each anniversary of your employment. The option itself will be prepared by [Rodel's] attorneys and ratified by the Board. [Rodel] will attempt to have it qualified for tax purposes. Entitlement to purchase will last until end of employment.

(D.I.63, Ex. A) (last sentence inserted in handwriting). Also on November 15, Rodel's President sent plaintiff a facsimile transmission on his personal letterhead that stated *2 [a]n important part of your compensation will be an opportunity to participate via equity in the value you create for Rodel. The company offer includes an option to buy shares over a seven year period.

In addition to that option, and in anticipation of the burden you will take from me, I will invite you to buy (at a very nominal price) a call on 400 shares of my personal Rodel stock exercisable at the rate of 40 shares per year for every year you are with [Rodel]. I intend that the strike price will be the lowest justifiable fair market value so there are no tax implications when you buy the call. The call and option combined represent almost 5% of the company's outstanding shares. I would like the call to remain confidential between us and our attorneys.

... Although this letter expresses my intention, it is possible that the final terms may not exactly follow the form outlined here.

(D.I.65, Ex. C)

On November 30, 1996, plaintiff wrote to Rodel's President accepting the offer of employment. (D.I.63, Ex. B) In the letter, plaintiff delineated those terms of employment to which she felt the parties had agreed: salary base, bonus plan, relocation expenses, equipment, vacation, termination compensation,[FN3] and covenant not to compete. (D.I.68, Ex. B) She also indicated a number of terms which remained to be clarified and to which mutual agreement had not been reached:

> FN3. In this regard, plaintiff indicated that the parties had agreed that if she were "terminated or discharged at any time during [her] employment, [she would be] entitled to 6 months compensation from the date of discharge." (D.I. 68, Ex. B at D00067)

Stock and Equity Options: As we discussed, to evaluate the option price and terms I will need to have the opportunity for my advisors to review audited financial statements, and to know the holders of all issued and outstanding stock. I would request company loans that would be available at appropriate terms and would be able to be repaid from the anticipated bonuses and financial incentives of the company. I understand the option is intended to be offered at preferential price and terms, and that the attempt will be made to have this offer qualified for tax purposes.

Five aspects still require important discussion:

Process for valuing the stock

Mechanics for annual vesting and exercise of the options, or portions thereof, to include any expiration of option rights, or portions thereof, if not exercised.

Method by which I would receive distributions for the increase in value of the Rodel stock for the period between December 31, 1996, and year-end 1999, in the event you or the company determine that Rodel, Inc. is to remain a closely held company

Process by which stock and accrued distribution are converted in the case of a sale or public offering, including the acceleration of share vesting

Process for liquidation and payment of my stock entitlement or distributions for increased value in the event of termination, whether discharged or a voluntary separation on my part

(D.I. 68, Ex. B at D00067-00068)

On December 11, 1996, Rodel transmitted to plaintiff a letter signed by its President which modified the terms of the November 15 offer. (D.I.63, Ex. C) With respect to the options, the letter provided that

*3 [t]he stock option is currently being prepared by counsel. It will be an option to purchase 80 shares of stock at $4,000 per share. The purchase rights will vest over a seven year period. The option will entitle you to purchase 10 shares immediately following your acceptance of this employment offer and, during the next seven years of your employment, 10 shares on each anniversary of your employment. The option itself will be prepared by our attorneys and ratified by the Board. We will attempt to have it qualified for tax purposes. There is no requirement to purchase, and except for shares made part of a future bonus arrangement, your eligibility to purchase will remain as long as you are employed by the company (Instead of the usual expiration of purchase eligibility, part of a future bonus plan may be paid in stock from this option.).

In the event the company remains private and there is no market or buyer for the stock at the time you leave

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 1999 WL 803885 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the company, the company will redeem shares purchased or eligible under the option ...

In our effort to have the option be qualified, its final form may differ slightly from what I have outlined here, but we'll stay as close as possible. Obviously, the most advantageous opportunity for redeeming your shares will occur if there is a ready market. That is the direction in which I want to take the company

(D.I.63, Ex. C)

The offer was further modified by facsimile transmission dated December 12, 1996:
2. On page two, at the end of the first paragraph (line four of page two), add this sentence: "Rodel will provide, through internal financing or other suitable sponsored borrowing, the funds you may need to purchase this and other Rodel stock, at interest rates no higher than market."

You and I were and are in complete agreement on these points. These changes were necessary as a result of oversight and the speed with which I pulled this all together, rather than any effort to 'modify' our previously agreed terms.

(D.I.63, Ex. D) At the bottom of the letter, plaintiff's handwritten notes referenced three letters: (1) the Rodel letter dated December 11, 1996; (2) her letter to Rodel's President dated November 30, 1996; and (3) the President's letter dated November 15, 1996. (D.I.68, Ex. D) According to plaintiff, these letters constitute "a comprehensive look at [Rodel's] offer [of employment] ." (D.I. 68, Ex. E at 86)

Plaintiff ultimately accepted employment with Rodel. She moved to Wilmington, Delaware; contracted to sell her residence in the Washington, D.C. area; and committed to purchasing a new residence in Delaware. She began her employment with Rodel on or about January 3, 1997.

### B. The Stock Options and Financing Agreements

At the time of plaintiff's hire by Rodel, Rodel common stock was divided into four classes. (D.I.63, Ex. H) Class A constituted a very small amount of common stock with super voting rights. (D.I.63, Ex. H) This stock was held by Rodel's President. (D.I.63, Ex. H) The distinction between the remaining classes of common stock was based primarily on ownership: Class B stock was held by Budinger family members, Class C stock was held by other shareholders, and Class D stock was held by Rohm & Haas. (D.I.63, Ex. H)

*4 Beginning in December 1996, prior to the start of her employment, plaintiff began to communicate to Rodel's President her desire to exercise those stock options that had vested. (D.I. 70, Ex. A at 105) According to plaintiff, she continually asked that formal documentation be drawn up regarding Rodel's financing of the equity purchase and change of ownership of the equity so that she could exercise the then available options. [FN4] (D.I. 70, Ex. A at 104, 244-45) However, she was told that formalization of the paperwork was delayed due to drafting errors by the attorneys retained to prepare the documents as well as administrative holdups. (D.I. 68, Ex. H at 80, Ex. E at 160, 166, 168)

> FN4. Although plaintiff's recollection was that the majority of her communications with Rodel's President were oral, she "th[ought] that there are e-mails that exist from [her] to [Rodel's President] asking for the paperwork." (D.I. 70, Ex. A at 246) Hard copies of those electronic transmissions, if any, were not offered into evidence.

In early May 1997, in light of Rodel's negotiations with Rohm & Haas Corporation ("Rohm & Haas"), [FN5] according to plaintiff, she confronted Rodel's President concerning execution of the option agreements and the financing arrangement. (D.I. 70, Ex. A at 333) She was told again that there were administrative delays but that the paperwork would be forthcoming. (D.I. 70, Ex. A at 334) Approximately two weeks later, Rodel's President provided plaintiff with the requested paperwork, indicating that it needed to be executed prior to the closure of Rodel's deal with Rohm and Haas. (D.I. 70, Ex. A at 334-35)

> FN5. Rohm & Haas and Rodel were negotiating Rohm & Haas' acquisition of a percentage interest in Rodel.

On June 3, 1997, Rodel's President sent an e-mail to Don Budinger and Susan Loncki requesting advice regarding a document [FN6] he had drafted concerning his dealings with plaintiff:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00699-SLR-MPT   Document 46-2   Filed 02/13/2006   Page 5 of 18

Not Reported in F.Supp.2d                                                                                   Page 4
Not Reported in F.Supp.2d, 1999 WL 803885 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

> FN6. A copy of the draft document was not provided to the court.

I'm trying to cover some legal bases here-to prevent a bre[a]ch of contract claim (because I didn't deliver the originally promised stock), and a future claim that there was an expectation of entitlement in regards to the 70 shares
(D.I.68, Ex. G)

On June 5, 1997, plaintiff met with Rodel's President. She informed him that she would not sign the "buy/sell" agreement he had proffered, since in her opinion it did not accurately reflect the terms to which the parties had agreed. (D.I. 70, Ex. A at 335-37, 342) She further indicated that she expected him to produce financing and change of ownership documents that reflected their agreement prior to the close of the deal with Rohm and Haas, which was scheduled to take place the next morning. (D.I. 70, Ex. A at 342) According to plaintiff, Rodel's President stated that he had no intention of honoring the 400 share call on his personal stock. (D.I.70, Ex. C) Plaintiff expressed her shock that he would attempt to alter their agreement, to which Rodel's President responded " 'Any man in my position would do the same.' " (D.I. 70, Ex. A at 343)

On June 6, 1997, in conjunction with Rohm & Haas' initial purchase of Rodel stock, Rodel implemented a 1:100 stock split. (D.I.63, Ex. H) At this time, Rohm & Haas purchased 23,000 shares of Class B stock and 5,600 shares of Class C stock for $190 per share. [FN7]
(D.I.63, Ex. H)

> FN7. On November 14, 1997, Rodel implemented a 1:1 stock dividend to be paid to all Class B, C, and D stockholders. (D.I.63, Ex. H) On March 31, 1998, Rohm & Haas purchased 99,700 shares of Class B stock and 6,350 shares of Class C stock for $180.95 per share. (D.I.63, Ex. H) Rohm & Haas made a similar purchase on January 15, 1999, purchasing 325,802 share of Class B and 23,778 shares of Class C stock at $150.79 per share. (D.I.63, Ex. H)

Plaintiff met with Rodel's President again on or about June 11, 1997. At that meeting, plaintiff declared that she was unwillingly to rework her equity offer and that she expected Rodel and its President to honor their commitments. (D.I.70, Ex. C) Rodel's President responded that this was not an option, at which point they agreed that he was constructively terminating plaintiff. (D.I.70, Ex. C) According to plaintiff's notes of the meeting, with regard to equity valuation, Rodel's President

*5 stated that the Rodel offer was "golden," that his private offer was not germane and that he would allow [plaintiff] 1 week to purchase 10 shares of Rodel stock. [Plaintiff] informed [him] this was not [her] interpretation and [they] needed to have a business discussion on this point.

(D.I.70, Ex. C)

A draft letter dated June 12, 1997 directed to plaintiff [FN8] and prepared for Susan Loncki's signature stated Rodel's acceptance of plaintiff's resignation and set forth "enhanced separation benefits." (D.I.70, Ex. D) These benefits included:

> FN8. There is no indication in the record that this letter was ever sent to plaintiff.

1.4 Relating to the 80 share option terms as explained in Rodel's letter of December 11, 199[6], Rodel will pay you in cash $10,000 which is calculated to be at least the difference between a (10 share): i. (January 6, 1996) strike price; and ii. Rodel's PV ("present value["] ) on the date of your resignation.
(D.I.70, Ex. D) In return for these benefits, plaintiff, *inter alia,* would release Rodel and its President from all possible claims she might have against them. (D.I.70, Ex. D)

C. The Separation Agreement

Following the termination of her employment, plaintiff and Rodel entered into negotiations regarding the terms of a partial settlement. On November 6, 1997, plaintiff executed a Separation Agreement and General Release (the "Release"). (D.I.65, Ex. L) In return for her execution of the Release, plaintiff was to receive bi-weekly payments for the period of June 11, 1997 through December 12, 1997 at her annual salary of $175,000 as well as reimbursement for medical, future medical, relocation, and business expenses. (D.I.65, Ex. L)

III. STANDARD OF REVIEW

A court shall grant summary judgment only "when the admissible evidence fails to demonstrate a

Case 1:05-cv-00699-SLR-MPT    Document 46-2    Filed 02/13/2006    Page 6 of 18

Not Reported in F.Supp.2d                                                                                  Page 5
Not Reported in F.Supp.2d, 1999 WL 803885 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." *Wetzel v. Tucker,* 139 F.3d 380, 383 n. 2 (3d Cir.1998) (citing Fed.R.Civ.P. 56(c)). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

### IV. DISCUSSION

#### A. Plaintiff's Motion for Partial Summary Judgment

*6 Pursuant to the terms of the November 15 and December 11, 1996 letters to plaintiff, Rodel granted plaintiff options to purchase Rodel common stock as compensation for her acceptance of employment with Rodel. Specifically, the letters provided that

[t]he option will entitle you [ (plaintiff) ] to purchase 10 shares immediately following your acceptance of this employment offer and, during the next seven year of your employment, 10 shares on each anniversary of your employment.

(D.I.63, Ex. A) The parties do not dispute that options to purchase ten shares of Rodel stock vested upon plaintiff's acceptance of employment. They do disagree, however, as to whether those options were timely exercised and/or whether defendants effectively prevented plaintiff from exercising the options by not only failing to make the options available but also by failing to provide the promised financing.[FN9]

> FN9. In count VIII of the complaint, plaintiff alleges that:
> 63. Rodel had a contractual obligation to make the option to acquire 80 shares of common stock available to [p]laintiff.
> 64. Budinger had a contractual obligation to make the option to acquire 400 shares of common stock available to plaintiff.
> 65. Rodel and Budinger both promised to finance the exercise of [p]laintiff's options through the financial resources of Rodel.
> 66. Rodel and Budinger have each, separately and in concert, reneged on their respective promises and obligations to [p]laintiff.
> 67. Plaintiff has been injured by the illegal conduct of Rodel and Budinger, and demands that [d]efendants be directed to perform their contractual obligations to [p]laintiff.
> (D.I.1, ¶¶ 63-67)

Plaintiff contends that the record is devoid of any evidence indicating that Rodel offered plaintiff an opportunity to exercise her rights to purchase these ten shares, and that such a failure constitutes "an undisputed breach of contract." First, plaintiff identifies defendants' failure to prepare formal contract documents concerning the stock options and financing arrangement despite her repeated requests that they do so. (D.I. 70, Ex. A at 104-06, 244-45, 333-35, 342) Plaintiff looks to the November 15 letter as requiring defendants to prepare such documentation. Second, plaintiff identifies the June 3, 1997 e-mail as an admission by Rodel's President that "the originally promised stock" was not delivered. Finally, she points to Rodel's apparent failure to provide the financing necessary for her to acquire the ten shares despite its obligation to do so.

In reply, defendants contend that plaintiff never exercised the vested options, and that such was a prerequisite to her ability to purchase the shares. Defendants first point to the affidavit of William Budinger in which he states that plaintiff "never communicated to me, or to any person at Rodel that I

Case 1:05-cv-00699-SLR-MPT    Document 46-2    Filed 02/13/2006    Page 7 of 18

Not Reported in F.Supp.2d                                                                                      Page 6
Not Reported in F.Supp.2d, 1999 WL 803885 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

am aware of, her intention to exercise the ten options." (D.I. 68, Ex. F at 2) Second, they look to plaintiff's notes from her June 11, 1997, meeting with Rodel's President, in which she indicates that he offered her one week to purchase ten shares of Rodel stock. According to Budinger's affidavit, during the meeting, plaintiff "specifically declined any commitment to exercise the options and said something to the effect that 'she would think about it.' " [FN10] (D.I. 70, Ex. F at 2) Finally, defendants contend that plaintiff's own deposition testimony demonstrates that, although the preparation of formal documents concerning the stock options was delayed due to drafting errors and administrative holdups, plaintiff was presented with drafts of the option documents prior to her separation from Rodel. (D.I. 70, Ex. C, Ex. E at 166, 168)

> FN10. Plaintiff argues that Budinger's affidavit is directly contradictory to his prior sworn testimony, in which he stated that he could not recall a specific instance where a Rodel employee had been offered the opportunity to exercise stock options after the termination of his/her employment, and thus cannot be used to create a genuine issue of fact. (D.I. 70 at 6) Plaintiff's own notes, however, indicate that Budinger made the offer in question.

Given the dearth of objective, contemporaneous evidence, the court concludes that a factfinder reasonably could infer from the record at bar that defendants offered plaintiff the opportunity to exercise the vested options but that she failed to do so in a timely fashion. Moreover, genuine issues of material fact exist concerning, *inter alia*, (1) whether the ten vested options terminated upon plaintiff's separation from Rodel; (2) whether defendants were obligated to prepare formal documentation regarding the stock options and their financing; and (3) whether defendants breached their obligation to provide plaintiff the financing necessary to allow her to exercise the options. Accordingly, plaintiff's motion for partial summary judgment shall be denied.

**B. Defendants' Motion for Summary Judgment**

**1. Counts III [FN11] and VIII**

> FN11. In count III, plaintiff alleges the following:
> 33. Rodel's promise to finance the purchase of equity in the company by [plaintiff] constituted a contract between [plaintiff] and Rodel which is supported by consideration.
> 34. [Plaintiff] fulfilled all conditions precedent to the contract.
> 35. Rodel breached the contract by failing to provide financing for [plaintiff] to purchase equity interests in Rodel.
> 36. Plaintiff has been damaged as a result of Rodel's breach.
> (D.I. 1, ¶¶ 33-36)

*7 Construction of contract language is a question of law. *See Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del.1991). The primary consideration in interpreting a contract is to give effect to the intent of the parties at the time they contracted, and the court will attempt to determine intent from the overall language of the contract. *See Myers v. Myers*, 408 A.2d 279, 280-81 (Del.1979). In ascertaining intent, Delaware courts adhere to the "objective" theory of contracts. *See Cantera v. Marriott Senior Living Servs., Inc.*, No. 16498, 1999 WL 118823, at *4 (Del.Ch. Feb. 18, 1999). Under this approach, a contract's "construction should be that which would be understood by an objective reasonable third party." *R.E. Haight & Assocs. v. W.B. Venables & Sons, Inc.*, C.A. No. 94C-11-023, 1996 WL 658969, at *3 (Del.Super.Ct. Oct. 30, 1996) (quoting *Demetree v. Commonwealth Trust Co.*, No. 14354, 1996 WL 494910, at *4 (Del. Ch. Aug. 27, 1996)) Thus,

[w]here the parties have entered into an unambiguous integrated written contract, the contract[']s construction should be that which would be understood by an objective reasonable third party. An inquiry into the subjective unexpressed intent or understanding of the individual parties [to the contract] is neither necessary nor appropriate where the words of the contract are sufficiently clear to prevent reasonable persons from disagreeing as to their meaning.

*Demetree*, 1996 WL 494910, at *4; *accord Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del.1997) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."). The court must first determine whether the contractual language in dispute, when read in the context of the entire contract, is ambiguous.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Case 1:05-cv-00699-SLR-MPT   Document 46-2   Filed 02/13/2006   Page 8 of 18

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 1999 WL 803885 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Ambiguity exists only when a contractual provision is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.,* 616 A.2d 1192, 1196 (Del.1992); *accord SI Mgmt. L.P. v. Wininger,* 707 A.2d 37, 42 (Del.1998) (same).

Ambiguity does not exist where the court can determine the meaning of a contract "without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends."

*Rhone-Poulenc,* 616 A.2d at 1196 (quoting *Holland v. Hannan,* 456 A.2d 807, 815 (D.C.1983)). Contractual language "is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Id.* Nor is it ambiguous "simply because the parties in litigation differ concerning its meaning." *City Investing Co. Liquidating Trust v. Continental Cas. Co.,* 624 A.2d 1191, 1198 (Del.1993). "The mere assertion that ambiguity or divergent intent exists will not prevent summary judgment from being entered." Charles Alan Wright et al., *Federal Practice and Procedure,* § 2730.1, at 65 (1998).

*8 In the instant action, the disagreement centers on the language of the stock options found in the correspondence between Rodel and its President and plaintiff, specifically the terms of vesting. Defendants contend that the language of both the "Rodel Option" [FN12] and the "Budinger Call" [FN13] is clear on its face, providing, with the exception of the ten shares that vested upon plaintiff's acceptance of employment, for each installment of the options to vest, if it does at all, at the end of each year of plaintiff's employment with Rodel, i.e., on her anniversary date. (D.I. 65 at 13-16) Consequently, they argue that upon plaintiff's separation from employment with Rodel, only ten options had vested under the Rodel Option and none under the Budinger Call. (D.I. 65 at 13)

> FN12. By "Rodel Option," defendants are referring to the offer to issue plaintiff an option to purchase 80 shares of Rodel stock set forth in Rodel's November 15 and December 11, 1996 letters to plaintiff.
>
> FN13. By "Budinger Call" defendants are referring to Rodel's President's offer to plaintiff to buy a call on 400 shares of his personal Rodel stock which is set forth in the President's November 15, 1996 letter to plaintiff.

According to plaintiff, the terms of vesting set forth in the Rodel Option and the Budinger Call are ambiguous, thus giving rise to genuine issues of material fact which preclude the possibility of summary judgment. Specifically, plaintiff contends that both the Rodel Option and the Budinger Call could be interpreted as allowing for the vesting of the options on a pro rata basis during each year of plaintiff's employment, such that the designated installment of options would become vested in toto on each of her anniversary dates. (D.I. 67 at 9, 15) Moreover, plaintiff maintains that the vesting schedule of the Budinger Option should be construed to operate in the same manner as that of the Rodel Option, i.e., the first installment of forty shares vesting immediately upon her acceptance of employment with the remaining options vesting over a period of years-an entitlement to forty shares accruing on each of her anniversary dates. (D.I. 67 at 11)

The court concludes that with respect to the Rodel Option the provision in question is not "reasonably or fairly susceptible" of differing interpretations or meanings and thus is unambiguous. [FN14] The Rodel Option manifests the parties' clear intent that, aside from the initial right to purchase ten shares which would vest upon her acceptance of employment, the options would vest at a rate of ten per year and that vesting would take place en masse on plaintiff's anniversary date. Any construction of the contract that would allow for the vesting of options on an accrual basis during each year of employment would abrogate the clear intentions of the contracting parties. Accordingly, since plaintiff's employment with Rodel began on January 6, 1997, the second ten-share option installment would not have vested until January 6, 1998. Plaintiff was no longer in Rodel's employ as of that date; therefore, the second option block never vested. Per the terms of the Rodel Option, which provides that "[e]ntitlement to purchase will last until [the] end of your employment," plaintiff has no right to exercise any options not vested as of the date of her separation of employment with Rodel.

> FN14. In the absence of ambiguity in the contract, "the writing itself is the sole source for gaining an understanding of intent." *E.I. duPont de Nemours & Company v. Admiral Ins. Co.,* 711 A.2d 45, 56 (Del.1995); *accord Northwestern Nat'l Ins. Co. v.*

Not Reported in F.Supp.2d                                                Page 8
Not Reported in F.Supp.2d, 1999 WL 803885 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

*Esmark, Inc.*, 672 A.2d 41, 43 (Del.1996) ("Courts consider extrinsic evidence to interpret the agreement only if there is an ambiguity in the contract."); *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 822 (Del.1992) ("It is an elementary canon of contract construction that the intent of the parties must be ascertained from the language of the contract. Only when there are ambiguities may a court look to collateral circumstances.") (citations omitted). Because the court finds no ambiguity in the construction or interpretation of the language of the Rodel Option, it has no occasion to consider the offers of extrinsic evidence on which plaintiff relies in support of her rejected interpretation. *See Eagle Indus.*, 702 A.2d at 1232 ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create ambiguity.").

Likewise, the vesting schedule set forth in the Budinger Call is not reasonably susceptible of more than one interpretation. The November 15 facsimile from Rodel's President offered plaintiff an opportunity to buy a call on 400 shares of stock "exercisable at the rate of 40 shares per year for every year you are with us." Plaintiff's strained interpretation, which would allow for the first forty shares to vest upon plaintiff's acceptance of employment while having the remaining installments vest on a pro rata basis during her tenure of service, is not a reasonable reading of the provision's text. "The [c]ourt will not twist, distort or torture contractual terms to create an ambiguity when the language is clear and unambiguous." *Admiral Ins. Co.*, 711 A.2d at 57. The provision unambiguously conveys the parties' expectation that, in return for [FN15] each year of service, plaintiff would be entitled to options on forty shares of stock. Accordingly, the completion of one year of employment was a condition precedent to plaintiff's entitlement to options in any of Rodel's President's personal shares of stock. Consistent with the parties' manifest intent, the first installment of the Budinger Call would not have vested until the first anniversary of plaintiff's employment with Rodel. The remaining installments would have vested, had they vested, at the end of each subsequent year of plaintiff's employment. Since plaintiff's employment with Rodel terminated prior to the completion of her first year of service, she never vested in the options to purchase the first forty shares under the Budinger Call.

> FN15. As plaintiff notes, the word "for" has many meanings, including, as plaintiff notes, "before," "as a preparation toward," "a prerequisite to," "so as to secure as a result," and "in connection with." (D.I. 67 at 9) However, within the context of the Budinger Call, the word is used to denote "in exchange as the equivalent of ... or in the requital of." *Webster's Third New Int'l Dictionary* 886 (1971).

*9 Consistent with the above constructions, with respect to counts III and VIII of the complaint, plaintiff is limited to seeking enforcement of her contractual rights, if any, to the options to purchase the ten shares of Rodel stock which vested upon her acceptance of employment pursuant to the Rodel Option and Rodel's subsequent promise to finance the purchase of said equity. Further, the court shall grant summary judgment in defendants' favor to the extent that plaintiff seeks to enforce any contractual rights against Budinger pursuant to the Budinger Call. [FN16]

> FN16. Defendants have requested Budinger's release as a defendant in this action. The court finds, at this juncture, that release is not warranted.

2. Counts VI [FN17] and VII [FN18]

> FN17. Count VI provides in relevant part:
> 53. Rodel promised [plaintiff] that she could purchase 80 shares of Rodel stock with financing provided by Rodel.
> 54. In reliance on Rodel's promises, [plaintiff] changed her position when she resigned from her previous employment, moved to Delaware, and commenced employment with Rodel.
> 55. Rodel failed to keep its promise either to finance [plaintiff's] purchase of its stock or otherwise allow her to purchase any Rodel stock.
> 56. Plaintiff has been damaged by changing position in reliance on Rodel's promise.
> (D.I.1, ¶¶ 53-56)

> FN18. Count VII provides in relevant part:
> 58. Budinger promised [plaintiff] that he would sell her a call to purchase 400 shares

Case 1:05-cv-00699-SLR-MPT   Document 46-2   Filed 02/13/2006   Page 10 of 18

Not Reported in F.Supp.2d                                                                                                    Page 9
Not Reported in F.Supp.2d, 1999 WL 803885 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

of Rodel stock owned by Budinger.
59. In reasonable reliance on Budinger's promise [plaintiff] changed her position when she resigned from her previous employment, moved to Delaware, and commenced employment with Rodel.
60. Budinger failed to keep his promise to sell [plaintiff] a call to purchase 400 shares of Rodel stock owned by Budinger.
61. Plaintiff has been damaged by changing position in reliance on Budinger's promise.
(D.I.1, ¶¶ 58-61)

Counts VI and VII of the complaint are premised upon the theory of promissory estoppel. Specifically, plaintiff alleges in these causes of action that in reliance on Rodel's and its President's offer of stock options she changed her position when she resigned from her previous employment and moved to Delaware to commence work with Rodel. (D.I.1, ¶¶ 52-61) Defendants argue that these claims must fail as a matter of law because plaintiff has pled the existence of valid and enforceable contracts. [FN19] The court finds defendants' request premature.

> FN19. In fact, plaintiff has argued that the record is devoid of any evidence challenging the existence of a contract between Rodel and herself. (D.I. 63 at 7-10) Defendants do not appear to challenge the existence of such a contract.

It is axiomatic that a claim for promissory estoppel is applicable only in the absence of an enforceable contract. *See Carlson v. Arnot-Ogden Memorial Hosp.*, 918 F.2d 411, 416 (3rd Cir.1990) (suggesting that an employee may make a promissory estoppel claim where the normal contract requirements are not met: "In light of our finding that the parties formed an enforceable contract, relief under a promissory estoppel claim is unwarranted"); *Kysor Indus. Corp. v. Margaux*, 674 A.2d 889, 896 (Del.Super.Ct.1996) (finding it unnecessary to address the issue of promissory estoppel where there is a contract). It is equally undisputable that the Federal Rules of Civil Procedure allow for alternative and inconsistent claims to be made in a complaint. *See* Fed.R.Civ.P. 8(e)(2) ("A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds."). In the case at bar, the court has yet to make a finding that the correspondence at issue comprises valid and enforceable contracts. [FN20] Until the time that such a finding is made, plaintiff is free to pursue her promissory estoppel claims.

> FN20. Although the court has construed the language of the putative agreements it has never made any finding regarding their enforceability or validity.

### 3. Punitive Damages

Defendants assert that they are entitled to summary judgment with respect to plaintiff's claim for punitive damages, arguing that the facts at bar do not warrant such an award under Delaware law. The Delaware Supreme Court addressed the issue of punitive damages in a breach of employment contract action in *E.I. duPont de Nemours & Co. v. Pressman*, 679 A.2d 436 (Del.1996). In *Pressman*, the plaintiff, an employee of defendant, sued for punitive damages based on breach of his employment contract, alleging that one of defendant's agents had manufactured materially false grounds to cause plaintiff's dismissal. The Delaware Supreme Court, sitting en banc, held that "punitive damages are not available for any breach of the employment contract which may be found by the jury upon retrial of [plaintiff's] claim." *Id.* at 448. In so holding, the Delaware Supreme Court recognized that the traditional rule, which allows recovery of punitive damages for breach of contract only where the conduct amounts to an independent tort, has been subjected by other courts to a number of exceptions including,
*10 breach of contract to marry; failure of a public monopoly to discharge its obligations to the public; breach of a fiduciary duty; breach accompanied by fraudulent conduct; and bad faith refusal by an insurer to settle a claim[,]

but was itself "reluctant to depart markedly from the well-established body of law." *Id.* at 445-46. The Delaware Supreme Court acknowledged that previously it had permitted punitive damages in the insurance "bad faith" context but went on to distinguish the employment relationship from that of insurer-insured:Market forces will not allow an employer consistently to treat valued employees in such a shabby manner as that presented here. An employer has an incentive to retain and motivate employees to achieve its mission.... Corporations cannot allow their agents systematically to engage in ill treatment of employees, particularly in light of "the numerous protections against improper terminations already afforded employees."
Insurance is different. Once an insured files a claim, the insurer has a strong incentive to conserve its

Not Reported in F.Supp.2d                                                                                   Page 10
Not Reported in F.Supp.2d, 1999 WL 803885 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

financial resources balanced against the effect on its reputation of a "hard-ball" approach. Insurance contracts are also unique in another respect. Unlike other contracts, the insured has no ability to "cover" if the insurer refuses without justification to pay a claim.... In a typical contract, the non-breaching party can replace the performance of the breaching party by paying the then-prevailing market price for the counter-performance. With insurance this is simply not possible. This feature of insurance contracts distinguishes them from other contracts and justifies the availability of punitive damages for breach in limited circumstances.

*Id.* at 447 (internal footnotes and citations omitted); *see also Colonial Ins. Co. of Calif. v. Sudler,* C.A. No. 97A-02-016-CHT, 1997 WL 1048174, at *4 (Del.Super.Ct. Sept. 25, 1997) (stating that in light of *Pressman* "[p]unitive damages are generally not available for breach of contract absent a showing of bad faith that amounts to an independent tort which alone would support such an award")

In the case at bar, plaintiff states that *"Pressman* should be not [sic] invoked outside of actions seeking punitive damages for breach of employment-at-will contracts," noting that "[a]s the [c]ourt is well aware, the present action is not an action for breach of [p]laintiff's employment contract, thus *Pressman* serves as no bar to punitive damages." (D.I. 67 at 17-18) Even if the court were to accept plaintiff's description of the case FN21 and her reading of *Pressman,* plaintiff has failed to allege fraudulent or deceitful conduct on the part of defendants that alone would support an independent tort. Moreover, plaintiff is barred from asserting such allegations by virtue of her execution of the Separation Agreement and General Release ("the Release"). The court previously has interpreted the Release as manifesting "the parties' clear intent to limit the scope of future litigation to "a putative breach of contract claim" involving only "the terms" of the option agreements." (D.I. 58 at 16) (emphasis in original). Accordingly, the court limited plaintiff "to those causes of action involving the terms of the option agreements that can be established without proof of the facts surrounding her employment and/or separation." (D.I. 58 at 16) Since plaintiff is barred by reason of the Release from presenting evidence of any tortious conduct on the part of defendants, the court finds that punitive damages are not an available remedy in the case at bar.

plaintiff, in her brief in support of her motion for partial summary judgment (D.I.63), referred to the letters of November 15, December 11, and December 12, 1996 as "compris [ing] the offer of employment made by Budinger and Rodel to the [p]laintiff." (D.I. 63 at 7) She then went on to state that "[o]ne of the terms of this employment contract was itself a contract for the issuance of options to [p]laintiff, allowing her to purchase a total of 80 shares of Rodel common stock from Rodel." (D.I. 63 at 7)

V. CONCLUSION

*11 For the reasons stated above, the court concludes that there are genuine issues of material fact relating to count VIII of the complaint that preclude the grant of summary judgment. The court finds that with respect to counts III and VIII that plaintiff is limited to seeking enforcement of her contractual rights, if any, to the options to purchase the ten shares of Rodel common stock that vested upon her acceptance of employment pursuant to the Rodel Option and Rodel's promise to finance the purchase of said equity. Consistent with this finding, count VIII is dismissed to the extent that plaintiff seeks to enforce any contractual rights against defendant Budinger pursuant to the Budinger Call. With respect to counts VI and VII, the court finds that summary judgment in defendants' favor is not warranted at this time. The court further finds that punitive damages are not warranted in the case at bar. Accordingly, the court will deny plaintiff's motion for summary judgment and grant in part and deny in part defendants' motion for partial summary judgment. An appropriate order shall issue.

D.Del.,1999.
Fox v. Rodel, Inc.
Not Reported in F.Supp.2d, 1999 WL 803885 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:98cv00531 (Docket) (Sep. 08, 1998)

END OF DOCUMENT

FN21. The court notes in this regard that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

**Westlaw.**

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 503257 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

C
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Kenneth J. MARINO, Plaintiff
v.
CROSS COUNTRY BANK, Applied Card Systems, Inc., and Rocco A. Abessinio, Defendants.
No. C.A.02-65-GMS.

Feb. 14, 2003.

*MEMORANDUM AND ORDER*

SLEET, J.

I. INTRODUCTION

*1 The plaintiff, Kenneth J. Marino, filed the instant action on January 25, 2002, alleging various tort and contract claims arising from an employment agreement with the defendants, Cross Country Bank ("CCB"), Applied Card Systems, Inc. ("ACS"), and Rocco A. Abessinio (collectively "the defendants"). Abessinio is Chairman of both corporate defendants. The defendants move to dismiss several counts of the Amended Complaint (D.I.34) on various grounds. For the following reasons, the court will grant in part and deny in part the defendants' motion.

II. BACKGROUND

The plaintiff is a lawyer. In September of 2000, he entered into a written employment agreement with CCB to serve as General Counsel for that corporation. After serving approximately eighteen weeks in that position, Marino was terminated. On July 11, 2001, following tensions between the parties, CCB filed a Demand for Arbitration pursuant to the employment agreement's arbitration provision. The plaintiff filed the present suit on January 25, 2002, alleging fraud, breach of the implied covenant of good faith and fair dealing, defamation, violation of the Delaware Wage Payment and Collection Law, interference with prospective business relations, injurious falsehood, and conspiracy. The defendants moved to dismiss the majority of the plaintiff's claims on April 18, 2002. Shortly thereafter, in June 2002, the parties abandoned arbitration and agreed to consolidate all of the claims, defenses, and counterclaims raised in the arbitration case into this action. The defendants' motion to dismiss was therefore dismissed as moot, and the plaintiff amended his pleading. The defendants now move to dismiss several counts of the amended complaint.

II. STANDARD OF REVIEW

The defendants move to dismiss Counts I, II, V, VII, and VIII as to the corporate defendants, and all counts as to Abessinio personally, pursuant to Federal Rule of Civil Procedure 12(b)(6). The role of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). Thus, in deciding a motion to dismiss, the court must "accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them." *Markowitz v. Northeast Land Co.,* 906 F .2d 100, 103 (3d Cir.1990). In particular, the court looks to 'whether sufficient facts are plead to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer.' *Colburn v. Upper Darby Township,* 838 F.2d 663, 666 (3d Cir.1988) (quoting *Frazier v. Southeastern Pa. Transp. Auth.,* 785 F.2d 65, 68 (3d Cir.1986)). In this analysis, however, the court should disregard a complaint's 'bald assertions' and 'legal conclusions.' *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1429-30 (3d Cir.1997) (quoting *Glassman v. Computervision Corp.,* 90 F.3d 617, 628 (1st Cir.1996). The court will dismiss a complaint only if the plaintiff can prove no set of facts, consistent with the allegations, upon which relief could be granted. *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249-50 (1989); *see also Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

III. DISCUSSION

A. Claims against CCB and ACS

*2 The defendants contend that Marino has failed to state a cause of action against the corporate defendants, CCB and ACS, for fraud (Count I), breach of the implied covenant of good faith and fair dealing (Count II), interference with prospective

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 503257 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

business relations (Count V), and conspiracy (Count VII). Additionally, the defendants contend that Marino's breach of contract claim (Count VIII) is time-barred under prior arbitration proceedings. The court will discuss each of the defendants' contentions in turn.

1. Fraud

In Count I of his amended complaint, Marino alleges that the defendants intentionally made false and misleading representations to him in connection with his employment contract and termination from CCB. Additionally, the plaintiff alleges that the defendants made misrepresentations of fact to Wilmington Trust, a third party, regarding Marino's lease of a vehicle pursuant to his employment contract. For the reasons discussed below, the court finds that Marino has sufficiently pled a cause of action for fraud.

Under Delaware law, a plaintiff claiming fraud must demonstrate:
(1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's actions or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.

Brooks v. Fiore, 2001 WL 1218448, at *7 (D.Del.2001) (citing Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1074 (Del.1983)). In addition, Federal Rule of Civil Procedure 9(b) requires that a pleading of fraud or mistake "be stated with particularity." Fed. R. Civ. P. 9(b). Thus, in order to sufficiently plead a claim of fraud, Marino must "provide sufficient factual detail regarding the circumstances of the alleged fraud to place the defendants on notice of the precise misconduct charged." Brug v. Enstar Group, Inc., 755 F.Supp. 1247, 1253 (D.Del.1991) (citing Seville Indus. Machine Corp. v. Southmost Machinery Corp., 742 F.2d 786, 791 (3d Cir.1984)). Count I of the amended complaint meets this standard.

In his amended complaint, the plaintiff alleges that the "defendants committed fraud by intentionally misleading Marino with false material statements regarding the scope of the Contract which reasonably induced Marino to enter the Contract." Pl.'s An. Br. at 14. The plaintiff alleges that the defendants falsely told him he would: (1) be given full authority over their legal departments; (2) be encouraged to provide legal advice; (3) be considered senior management; (4) participate in management of the company; and (5) be allowed to make reforms. See Amended Compl. ¶ 33(a)-(e). Marino contends that these false and misleading statements fraudulently induced him to leave his position with Blank Rome and to enter into an employment contract with the corporate defendants. Clearly, the amended complaint states a claim for fraud.

*3 The defendants note that under Delaware law, however, allegations of fraud cannot be based upon statements of future results. See Craft v. Bariglio, 1984 WL 8207, at *8 (Del. Ch.1984) ("Mere expressions of opinion as to probabl[e] future results, when clearly made and understood as such, do not constitute false representation even though they may relate to material matters."). It is unknown at this point, however, whether the alleged representations of the defendants were clearly made and understood as mere expressions of opinion as to probable future results, or whether they were false representations intended to fraudulently induce the plaintiff into entering the employment contract. For purposes of this motion, the plaintiff's averments are sufficient to state a claim of fraud.

2. Breach of Implied Covenant of Good Faith and Fair Dealing

Under Delaware law, "every employment contract made under the laws of this State, consonant with general principles of contract law, includes an implied covenant of good faith and fair dealing." Merrill v. Crothall-American, Inc., 606 A.2d 96, 101 (Del.1992). A cognizable action for breach of the implied covenant of good faith and fair dealing exists where the termination violates public policy. See DuPont v. Pressman, 679 A.2d 436, 441 (Del.1996) (noting recognized exceptions to employment at will). In such a case, the employee "must assert a public interest recognized by some legislative, administrative or judicial authority, and the employee must occupy a position with responsibility for that particular interest." Shearin v. E.F. Hutton Group, Inc., 652 A.2d 578, 587-88 (Del. Ch.1994). Additionally, "Delaware will not invoke the public policy exception absent some illegal act by the employer." Paolella v. Browning-Ferris, Inc., 158 F.3d 183, 191 (3d Cir.1998).

In Count II of his amended complaint, Marino alleges that the defendants' conduct constituted a breach of

Case 1:05-cv-00699-SLR-MPT    Document 46-2    Filed 02/13/2006    Page 15 of 18

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2003 WL 503257 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

the implied covenant of good faith and fair dealing. Specifically, the plaintiff asserts:

Marino discovered that the mismanagement, misconduct and illegal activities conducted by ... [defendants] was far more extreme and pervasive than Marino had previously been led to believe. As Marino proceeded in his efforts to address and resolve those problems cost-effectively and expeditiously, Marino met with unanticipated and immovable resistance from ... [the defendants].

Amended Compl. ¶ 20. Further, the plaintiff alleges that "[a]s a result ... [the defendants] took measures to ensure that Marino would (1) not continue in his investigations; (2) not report the findings of those investigations; (3) lose his credibility and reputation with the appropriate governmental and law enforcement agencies..." Id. ¶ 22. Marino alleges that he "was wrongfully terminated for investigating and threatening to uncover unethical and illegal banking activities by the defendants." Pl.'s An. Br. at 16. Finally, Marino asserts that he was terminated, "though no termination notice compliant with the terms of the Contract was ever provided to Marino by either CCB or ACS." Id. ¶ 24.

*4 Accepting the plaintiff's allegations as true for purposes of this motion, Count II survives a motion to dismiss because Marino has sufficiently stated a cause of action for breach of the implied covenant of good faith and fair dealing. Retaliatory terminations violate public policy. Indeed, "the paradigmatic dismissal giving rise to a public policy cause of action is the termination of an employee in retaliation for the employee's refusal to act contrary to public policy." _Lawrence v. National Westminster Bank_, 98 F.3d 61, 73 (3d Cir.1996). Furthermore, to the extent the plaintiff's termination resulted from his attempt to uphold the code of ethics governing the legal profession, the termination may have been wrongful. See, e.g., _Shearin_, 652 A.2d at 587 ("[T]he law would protect to some extent an employee who upheld a legally significant professional standard against attempted invasion."). In short, the amended complaint suffices, for purposes of this motion, to state a claim of breach of the implied covenant of good faith and fair dealing.

3. Interference with Prospective Business Relations

In Count V of the amended complaint, Marino alleges that the defendants interfered with prospective business relations. Under Delaware law, to establish a claim for tortious interference with prospective business relations, the claimant must show: "(1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted." _Lucent Information Mgmt., Inc. v. Lucent Techs., Inc._, 5 F.Supp.2d 238, 243 (D.Del.1998) (citing _Dionisi v. DeCampli_, 1995 WL 398536 (Del. Ch. June 28, 1995)). Additionally, "the plaintiff must be able to cite 'actual or potential contracts.' " _Id._ (citing _Kirkwood Kin Corp. v. Dunkin' Donuts, Inc._, 1995 WL 411319 (Del.Super. Ct. June 30, 1995)).

Count V does not sufficiently plead a claim of interference with prospective business relations. Marino fails to allege an actual or potential contract with any identifiable entity. Naturally, because he names no valid contract or expectancy, the plaintiff also fails to allege a breach or termination of such a contract or expectancy. Marino alleges only that the defendants' conduct caused him to "lose the ability to earn a living as a banking lawyer to support his wife and children" and that the defendants "took actions which were designed to destroy Marino's reputation and ability to find employment in his profession." Amended Compl. ¶¶ 22, 27. This broad grievance which, at best, implies a loss of potential future employment contracts, is purely speculative and does not sufficiently state a claim for interference with prospective business relations. See _Lucent Information Mgmt._, 5 F.Supp.2d at 243 (granting summary judgment to the defendant because plaintiff "only makes [a] broad claim [regarding] 'potential' customers, but does not cite any actual contract, or even contract discussions, with any of these parties."). Count V, therefore, is dismissed.

4. Conspiracy

*5 In Count VII of his amended complaint, Marino alleges that the "defendants conspired to cause harm to Marino and took action in furtherance of that conspiracy." Amended Compl. ¶ 53. Rule 8(a) of the Federal Rules of Civil Procedure governs allegations of civil conspiracy. Under the liberal pleading requirements of Rule 8(a), Delaware courts have required that the "allegations must be sufficient to 'describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in the conspiracy.' " _China Resource Prods. (U.S.A.), Ltd. v. Fayda Int'l, Inc._,

Not Reported in F.Supp.2d                                                                                                                    Page 4
Not Reported in F.Supp.2d, 2003 WL 503257 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

788 F.Supp. 815, 819 (D.Del.1992) (citing _Rose v. Bartle,_ 871 F.2d 331, 366 (3d Cir.1989)). Additionally, in order to plead a civil conspiracy under Delaware law, a plaintiff must allege: "(1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage." _Id_ at 820 (citing _Nicolet, Inc. v. Nutt,_ 525 A.2d 146, 149-50 (Del.1987)). Moreover, Delaware courts have recognized that civil conspiracy is not a separate cause of action and "must arise from an underlying cause of action." See _Ramunno v. Cawley,_ 705 A.2d 1029, 1039 (Del.1998) (discussing pleading standards for civil conspiracy). Finally, where the underlying cause of action is defamation, "[t]he complaint must set forth specific facts such as 'meetings, conferences, telephone calls or joint signatures on written recommendations to indicate a conspiracy." ' _Id._ (quoting _Petula v. Mellody,_ 588 A.2d 103, 107 (Pa.Commw.Ct.1991)).

Count VII does not sufficiently allege a claim of conspiracy. Marino describes the general composition of the conspiracy as including CCB, ACS, Abessinio, Dougherty, "and others." The complaint states that these parties conspired "to fabricate false and/or wildly exaggerated grounds for the termination of Marino's employment at CCB and ACS." Although this may be viewed as stating the broad objective of the conspiracy, it does not allege an unlawful act done in furtherance thereof. Marino also alleges that the defendants "communicated false, defamatory and misleading statements to officials of Wilmington Trust Company that Marino was not authorized to enter into an automobile lease as part of his compensation from CCB and ACS and that Marino had in fact stolen the leased automobile" and that the defendants "took actions which were designed to destroy Marino's reputation and ability to find employment in his profession." Amended Compl. ¶ ¶ 25, 27. Although this language is sufficient to allege defamation as the unlawful act underlying the conspiracy, it does not provide specific facts to support a claim of conspiracy to defame. For example, the amended complaint fails to allege any meetings, phone calls, or other specific conduct that points to the existence of a conspiracy. In addition, the plaintiff fails to allege any actual damage arising from the conspiracy. See _Atlantis Plastics Corp. v. Sammons,_ 558 A.2d 1062, 1066 (Del. Ch.1989) ( "Facts, not legal conclusions, must be pled, including facts showing damages.").

*6 In sum, Marino's allegations, even when viewed in a light most favorable to him, do not sufficiently plead a claim of conspiracy because they fail to meet the pleadings criteria for such a claim. Thus, the court will dismiss Count VII.

5. Breach of Contract

The plaintiff alleges a breach of contract claim in Count VIII; the defendants contend that the claim is time-barred. In support of their argument, the defendants cite Marino's failure to meet deadlines during the parties' prior arbitration proceedings. The defendants' basic contention is that the plaintiff's breach of contract claim is time-barred because Marino "flouted the deadlines imposed by the arbitrator" to such an extent that his claim in the arbitration proceeding became barred. Defs.' Opening Br. at 24. Therefore, the defendants argue, the plaintiff "should not ... be allowed to amend his pleadings here to asset a time-barred claim." _Id_

The court finds this argument most unpersuasive. First, it is unclear whether the plaintiff's counterclaim would have been barred in the arbitration proceedings. This is so because counterclaims in the arbitration context are permissive and not mandatory. _See_ Am. Arb. Ass'n. Comm. Arb. R. 4(b)(iii)(1) (providing for permissive counterclaims). Moreover, the arbitrators did not rule on the timeliness of Marino's counterclaims before the parties agreed to forego arbitration in June 2002. Pl.'s An. Br. at 19.

Second, and more importantly, the defendants have offered no caselaw, and the court can fathom none, for their position that relevant statutes of limitations and the rules of federal procedure and practice do not apply in federal court once parties have voluntarily abandoned the arbitration process and brought their dispute to federal court. Thus, the plaintiff's breach of contract claim is subject only to the three-year statute of limitations governing such claims. See 10 Del. C. § 8106 (setting three-year statute of limitations for suits "based upon alleged wrongful termination of [a] contract and seeks damages therefor"); _see also Goldman v. Braunstein's, Inc.,_ 240 A.2d 577, 578 (Del.1968) (discussing statute of limitations governing actions for breach of contract based on wrongful termination). According to the amended complaint, Marino's breach of contract claim accrued on February 12, 2001, when the plaintiff was suspended from his employment with CCB and ACS. _See_ Amended Com pl. ¶ 23-24. The present action was instituted on January 25, 2002. Clearly, Marino's claim is not time-barred. Therefore, the defendants' motion to dismiss the breach of contract claim is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 5
Not Reported in F.Supp.2d, 2003 WL 503257 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

denied.

### B. Claims against Abessinio Individually

The defendants urge that Abessinio cannot be sued in his individual capacity for the present claims. They maintain that Abessinio, as Chairman of the Board of both CCB and ACS, is shielded from liability for actions performed in his corporate capacity and on behalf of the corporations. Because all of the claims at issue arise only from the defendants' employment relationship with the plaintiff, the defendants assert, and because all of Abessinio's dealings with Marino were performed in his capacity as an agent for the corporate defendants, Abessinio is protected from personal liability arising from these actions. In addition, the defendants note that Abessinio was not a signatory in his personal capacity to the employment agreement with the plaintiff. Nor can the conspiracy claim survive against Abessinio, they argue, because an officer or director acting in his or her corporate capacity can not conspire with the corporation. Because the court has dismissed the claims of tortious interference with prospective business relations and conspiracy, it need not address Abessinio's liability as to these claims. The remaining claims against Abessinio are: fraud; breach of the implied covenant of good faith and fair dealing; breach of contract; defamation; and injurious falsehood. [FN1]

> FN1. Count IV, alleging violations of the Delaware Wage Payment and Collection Act, implicates the corporate defendants only. Therefore, it is not addressed in the analysis of Abessinio's personal liability.

#### 1. Breach of Contract and of Implied Covenant of Good Faith and Fair Dealing

*7 Abessinio cannot be held personally liable for these claims. It is well-established that directors and officers are not personally liable on contracts signed by them on behalf of the corporation unless they purport to bind themselves individually. *Wallace v. Wood,* 752 A.2d 1175, 1180 (Del. Ch.1999) ("Delaware law clearly holds that officers of a corporation are not liable on corporate contracts as long as they do not purport to bind themselves individually."); *see also International Ass'n of Heat & Frost Insulators & Asbestos Workers Local Union 42,* 814 F.Supp. 392, 400 ("[A]n officer or director may be held personally liable for tortious interference with a contract of the corporation if, and only if, said officer or director exceeds the scope of his agency in so doing."). The plaintiff has not alleged that Abessinio purported to bind himself individually on the employment contract, or that he exceeded the scope of his agency with regard to the employment contract. Counts II and VIII are dismissed as to Abessinio personally.

#### 2. Fraud, Defamation, and Injurious Falsehood

Abessinio may be held personally liable for fraud, defamation, and injurious falsehood. "Corporate officers are liable for their tortious conduct even if they were acting officially for the corporation in committing the tort. A corporate officer can be held personally liable for the torts he commits and cannot shield himself behind a corporation when he is a participant." *Stonington Partners, Inc. v. Lernout & Hauspie Speech Products, N.V.,* 2002 WL 31439767, at *8, n. 27 (citing cases). As stated above, the amended complaint suffices to state a claim for fraud. It also appears to allege all of the elements of the torts of defamation and injurious falsehood. [FN2] The plaintiff has sufficiently pled these claims. Thus, the defendant Abessinio is not entitled to immunity regarding these torts. Counts I, III, and VI survive the defendants' motion.

> FN2. The defendants did not challenge the sufficiency of the pleadings regarding these claims, nor have they moved to dismiss these claims regarding the corporate defendants.

### IV. CONCLUSION

For the aforementioned reasons, IT IS HEREBY ORDERED that:
1. The defendants' Motion to Dismiss the Amended Complaint (D.I.34) is GRANTED in part and DENIED in part.
2. Counts V (Interference with Prospective Business Relations) and VII (Conspiracy) are DISMISSED as to each defendant.
3. Counts II (Breach of the Implied Covenant of Good Faith and Fair Dealing) and VIII (Breach of Contract) are DISMISSED as to the defendant Rocco A. Abessinio.

D.Del.,2003.
Marino v. Cross Country Bank

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                             Page 6
Not Reported in F.Supp.2d, 2003 WL 503257 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Not Reported in F.Supp.2d, 2003 WL 503257 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.