# EXHIBIT C



Not Reported in A.2d, 2002 WL 453926 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**H**
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
George H. WILLIAMSON, et al. Plaintiffs,
v.
NEW CASTLE COUNTY, a political subdivision
of the State of Delaware; County Council of New
Castle County; Thomas P. Gordon, County
Executive of New Castle County; Christopher A.
Coons, County Council President, County Council
of New Castle County; and Richard L. Abbott, J.
Robert Woods, Robert S. Weiner, Penrose Hollins,
Karen Venesky and J. Christopher Roberts, Council
Members, County Council of New Castle County
Defendants.
**No. Civ.A. 19019-NC.**

Submitted Dec. 20, 2001.
Decided March 13, 2002.

Current and former employees of county brought
action against county and its representatives,
challenging validity of ordinance which established
contributory funded pension program that excluded
prior employment time for county employees who
were military veterans and former federal
employees. County and representatives filed motion
to dismiss. The Court of Chancery, New Castle
County, Jacobs, Vice Chancellor, held that: (1) state
pension statutes did not prohibit county's creation of
pension plan that disqualified former federal
employees from crediting their previous
employment time, but (2) employees' allegations
were sufficient to support claim that county was
equitably estopped from raising statute of
limitations or laches defense to employees' § 1983
claim.

Motion granted in part and denied in part.

West Headnotes

**[1] Counties 104 €══69.2**

104 Counties
   104III Officers and Agents
      104k68 Compensation
         104k69.2 k. Pensions. Most Cited Cases
Pension statute providing that, upon county's
establishment of contributory funded pension, all
employees who elected to participate in the program
were entitled to "the benefits for which they
qualif[ied]" did not prohibit county from
establishing contributory funded pension program
that excluded prior employment time for county
employees who were military veterans or former
federal government employees; statute did not
entitle county employees to all pension benefits, but
only to those benefits for which they qualified. 9
Del.C. § 3101.

**[2] Counties 104 €══69.2**

104 Counties
   104III Officers and Agents
      104k68 Compensation
         104k69.2 k. Pensions. Most Cited Cases
Conclusory and unsupported allegation of current
and former county employees that county failed to
adopt an alternate pension program, for those
county employees who elected not to participate in
contributory funded pension program authorized by
statute, was insufficient to state claim that county
violated statute requiring establishment of alternate
program; employees did not address fact that
county had created an alternate pension plan that
appeared on its face to satisfy statute, and they did
not state how alleged failure to adopt alternate plan
related to or supported their request for relief. 9
Del.C. § 3102.

**[3] Counties 104 €══69.2**

104 Counties
   104III Officers and Agents
      104k68 Compensation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2002 WL 453926 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

104k69.2 k. Pensions. Most Cited Cases
County could legally adopt an alternate pension plan that disqualified former federal employees from crediting their previous employment time. 9 Del.C. § 3102.

**[4] Pretrial Procedure 307A ☞681**

307A Pretrial Procedure
   307AIII Dismissal
     307AIII(B) Involuntary Dismissal
       307AIII(B)6 Proceedings and Effect
         307Ak681 k. Matters Considered in General. Most Cited Cases
In deciding defendants' motion to dismiss complaint for failure to state a claim, Court of Chancery would not consider claim which plaintiffs failed to plead in their complaint, but instead raised for the first time in their brief opposing defendants' motion to dismiss. Chancery Court Rule 12(b)(6).

**[5] Estoppel 156 ☞62.3**

156 Estoppel
   156III Equitable Estoppel
     156III(A) Nature and Essentials in General
       156k62 Estoppel Against Public, Government, or Public Officers
         156k62.3 k. Counties and Subdivisions Thereof. Most Cited Cases
Allegations of current and former county employees that, after county enacted ordinance establishing contributory funded pension program, county told employees that the program's exclusion of prior employment time for county employees who were military veterans or former federal employees was a mistake that would be addressed and corrected, and that county waited until after two-year limitations period had expired to inform employees that it would not change the exclusion, supported claim that county was equitably estopped from raising statute of limitations or laches defense to employees' § 1983 claim challenging validity of ordinance which established the pension program. 42 U.S.C.A. § 1983; 10 Del.C. § 8119.

John Bialecki, of Bialecki & Bragg, P.C., Wilmington, Delaware; for Plaintiffs.

Scott G. Wilcox, of New Castle County Department of Law, New Castle, Delaware; for Defendants.

*MEMORANDUM OPINION*

JACOBS, Vice Chancellor.
*1 Under challenge in this action is the validity of New Castle County Ordinance 97-114 Substitute No. 1, adopted on October 21, 1997 (the "Ordinance "). The Ordinance established a contributory funded pension program for current and former employees of New Castle County. The plaintiffs, who are current and former New Castle County employees, brought this action against the County and its representatives (collectively, the "County") [FN1] for a declaration that the Ordinance is invalid, and also for an injunction that would require the County to permit the plaintiffs to participate in the pension program retroactively.

> FN1. In addition to New Castle County, the named defendants are the County Council of New Castle County; Thomas P. Gordon, County Executive of New Castle County; Christopher A. Coons, County Council President; and Richard L. Abbott, J. Robert Woods, Robert S. Weiner, Penrose Hollins, Karen Venezky and J. Christopher Roberts, Members of the County Council of New Castle County.

The County has moved to dismiss the complaint in its entirety. As discussed below, the motion will be granted with respect to the plaintiffs' Delaware statutory claims, and will be denied with respect to their Federal Civil Rights Act claim brought under 42 U.S.C.A. § 1983.

## I. FACTUAL BACKGROUND

The facts recited below are derived from the well-pled allegations of the complaint. [FN2] On October 21, 1997 the County adopted the Ordinance that established the pension program. The Ordinance gave New Castle County employees until October 21, 1998 to elect to purchase pension time they had earned from their former employment

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                    Page 3

Not Reported in A.2d, 2002 WL 453926 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

with a governmental entity other than the federal government (the "buy-in provision"). The purchased pension time could then be credited to the employee's New Castle County pension eligibility.

> FN2. *Weinberger v. UOP, Inc.*, 409 A.2d 1262, 1263-64 (Del.Ch.1979).

Immediately after the Ordinance was adopted, several New Castle County employees who were United States military veterans protested the exclusion from the pension program of their time they had previously served in the military. In response, the County's representatives told the plaintiffs that the exclusion of the veterans' military time from the pension program was a mistake that would be corrected. The plaintiffs allege they relied on those representations and that as a result, they did not bring this action to enforce their rights until after the two-year statute of limitations period had expired.

On March 6, 2000, the County formally notified the plaintiffs that it would not initiate legislation to amend the pension program to include prior employment time for County employees who were military veterans and former federal governmental employees.

This lawsuit followed.

## II. THE CLAIMS AND ISSUES

The complaint alleges three grounds for relief. First, the plaintiffs claim (in Counts I and IV) that the pension program violated the statutory guidelines prescribed by 9 *Del. C.* §§ 3101 and 3102 for creating a County pension plan. [FN3] The plaintiffs allege that Section 3101 required that any pension plan created thereunder must permit any and all County employees to participate in the plan. Because former federal employees are not allowed to credit their prior federal government employment time towards the pension plan (but former state employees are allowed to credit their prior state employment time), the plan violates the statutory

requirement that all employees be allowed to participate. The plaintiffs further claim that the County violated Section 3102 by failing to create an alternate pension plan as that statute required. For the reasons next discussed herein, I conclude that Counts I and IV do not state cognizable claims and must therefore be dismissed.

> FN3. Those provisions were subsequently repealed on July 13, 1998 by 71 Del. Laws, ch. 401, § 90, but were in force at the time of the events complained of here.

*2 Second, the plaintiffs claim (in Count II) that the pension program violates 29 *Del. C.* §§ 5551-5595, which enacted a pension plan that Delaware counties and municipalities may use for their employees (the "State pension plan"). The County contends that it is not subject to Sections 5551-5595 because it elected not to participate in the State pension plan. Because the plaintiffs have made no serious effort to support this claim or to respond to the County's pro-dismissal arguments in their brief, that claim will be dismissed as well.

Third, and finally, the plaintiffs argue (in Count III) that the pension program violates the Federal Civil Rights Statute, 42 U.S.C.A. § 1983. With respect to that claim, the only issue presented on this motion is whether the claim is barred by the statute of limitations or the doctrine of laches. The County argues that the claim is time-barred because the applicable period of limitations is two years, and the defendants waited four years to bring this action. In response, the plaintiffs contend that the County is equitably estopped from raising this defense because during the period in which the suit could be timely brought, the County misled the plaintiffs into believing that their exclusion from the pension program was a mistake that would be rectified in future legislation. I find for the purposes of this motion, that the complaint states a cognizable claim that the County is equitably estopped from raising a statute of limitations or laches defense.

The bases for these rulings are next addressed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2002 WL 453926 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

III. ANALYSIS

A. Does the Pension Program Violate 9 *Del. C.* §§
3101 and 3102?

[1] The plaintiffs first claim that the adoption of the
Ordinance violated 9 *Del. C.* §§ 3101 and 3102
because it "established a contributory funded
pension program which by its own terms did not
permit any existing employee of New Castle County
to participate, but instead discriminated against
certain classes of employees (veterans and military
employees)." [FN4] Count IV further alleges that
because the Ordinance violated those statutes, the
County's enactment of the Ordinance was arbitrary
and capricious.

FN4. Complaint ¶ 25 (emphasis omitted
from original).

These claims rest upon the proposition that all State
employees must, by law, be deemed eligible for
every available benefit under any pension plan that
is created under Section 3101. A plain reading of
Section 3101, however, shows otherwise. Section
3101 provides that:
Upon the establishment of a contributory funded
pension program, and existing employee of New
Castle County who elects to participate in said
program and all employees hired after the effective
date of said program who are covered by said
program *shall be entitled to the benefits for which
they qualify under this chapter.* [FN5]

FN5. 9 *Del. C.* § 3101 (emphasis added).

The quoted language makes it plain that County
employees will be entitled *not to all* pension
benefits, but only to the benefits *for which they
qualify* under the County pension program. In this
case, the County determined that for a New Castle
County employee to be eligible to credit
employment service with a former employer (under
the buy-in provision), that previous employer must
have been a state or any political subdivision

thereof. Thus, contrary to the plaintiffs' position,
former employees of the federal government,
including the armed forces, do not "qualify" for that
particular benefit within the meaning of Section
3101, [FN6] and nothing in that statute prohibits that
exclusion.

FN6. Pl. Ans. Br. at Ex. B.

*3 [2] [3] The plaintiffs also claim (apparently in
the alternative) that the County failed to enact "an
alternate pension plan for employees who did not
elect or could not participate in the plan adopted by
the Ordinance" as required by 9 *Del. C.* § 3102. [FN7]
In response, the County argues that it satisfied the
requirements of that Section when it created an
alternate pension plan in 1971. [FN8] The County's
argument that the alternate pension plan complies
with Section 3102 appears on its face to be a
reasonable interpretation of the statute and the
alternate pension plan. In their answering brief,
however, the plaintiffs make no reasoned effort to
show otherwise. They simply reassert their
conclusory allegation that "[t]he county also failed
to adopt an alternate contributory funded pension
program pursuant to § 3102." [FN9] The plaintiffs
do not (i) address the existence of the alternate
pension plan that was specifically created to satisfy
Section 3102 and that (at least facially) complies
with the statute or (ii) state, in their complaint or
brief, how the alleged failure to adopt an alternate
pension plan relates to or supports their request for
declaratory and injunctive relief. That omission is
also fatal because the plaintiffs' conclusory
allegation fails to confront the fact that the County
could legally adopt a Section 3102 pension plan
that also disqualifies former federal employees from
crediting their previous employment time. [FN10] In
short, the Section 3102 claim fails for lack of
specificity and legal support.

FN7. Complaint ¶ 26. Section 3102 states
that "New Castle County shall, by
ordinance enacted prior to September 23,
1971, provide a pension plan for existing
employees of New Castle County who do
not elect to participate in the pension

Not Reported in A.2d, 2002 WL 453926 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

program authorized by § 3101 of this title."

FN8. Def. Op. Br. at 7; *see New Castle County C.* §§ 26.04.200-209, formerly §§ 26-636-646 (New Castle County Alternate Pension Plan, adopted pursuant to 9 *Del. C.* § 3102).

FN9. Pl. Ans. Br. at 8.

FN10. 9 *Del. C.* § 3102 only requires a pension plan created under that Section to " provide the benefits heretofore provided under former Chapter 17 of Title 9." Chapter 17 does not allow former federal employees to credit their previous employment towards their New Castle County Pension Plan.

Accordingly, the plaintiffs' first claim, based on 9 *Del. C.* §§ 3101 and 3102, is not legally cognizable and will be dismissed. Because Count IV derives its force from Count I, that Count must be dismissed as well. FN11

FN11. Count IV alleges that the County's actions were arbitrary and capricious because the Ordinance was not adopted in compliance with Sections 3101 and 3102. Thus, the validity of Count IV depends on the legal validity of Count I.

B. Does the Pension Program Violate 29 *Del. C.* §§ 5551-5595?

Count II of the complaint alleges, in its entirety, that "[t]he ordinance adopted by the Council was in conflict with the provisions of 29 *Del. C.* §§ 5551 *et seq* [.] regarding County and Municipal Pension Plans." FN12 The County argues that Count II must be dismissed because (i) the State pension plan only applies to counties and municipalities that elect to participate in the specific plan created by that statute, FN13 and (ii) New Castle County elected to create its own pension plan under 9 *Del. C.* §§ 3101 and 3102, and therefore Sections 5551-5595 do not apply to the County's current pension scheme.

FN12. Complaint ¶ 27.

FN13. *See* 29 *Del. C.* § 5555 (providing that "[a]ny county or municipality ... may elect to participate in the State Employees' Pension Fund.").

[4] The plaintiffs do not seriously contest the County's position. They simply argue that they need to take discovery to determine "if and why the County Council Attorney failed to approve the Ordinance, and what effect this gives to the validity of the Ordinance." FN14 That argument-that the Ordinance may have been invalidly enacted because it was not approved by the County attorney-is a new claim, not pled in the complaint, that appears for the first time in the plaintiffs' brief. For that reason, that claim will not be considered for purposes of this motion. FN15 Because the plaintiffs have not responded in any meaningful way to the County's pro-dismissal arguments, Count II must be dismissed for failure to state a claim upon which relief can be granted. FN16

FN14. Pl. Ans. Br. at 8.

FN15. *Haber v. Bell,* 465 A.2d 353, 357 (Del.Ch.1983).

FN16. Del. Ch. R. 12(b)(6); *Friedman v. Alcatel Alsthom,* 752 A.2d 544, 549 (Del.Ch.1999).

C. Is the Claim Brought Under 42 U.S.C.A. § 1983 Barred by Laches?

**\*4** Lastly, the plaintiffs allege in Count III of their complaint that the Ordinance violates 42 U.S.C.A. § 1983. FN17 The only issue presented on this motion is whether that claim is time-barred by reason of the applicable statute of limitations or the equitable defense of laches. FN18

FN17. 42 U.S.C.A. § 1983 provides that any person who under the color of state law "subjects, or causes to be subjected, any citizen of the United States ... to the

Not Reported in A.2d, 2002 WL 453926 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law [or] suit in equity."

FN18. Because the plaintiffs are seeking equitable relief (an injunction and a declaratory judgment), the statute of limitations period will not (technically speaking) automatically bar the action, because most actions in equity are time-barred by application of the equitable doctrine of laches. *Atlantis Plastics Corp v. Sammons,* 558 A.2d 1062, 1064 (Del.Ch.1989). The essential elements of laches are: "(i) plaintiff must have knowledge of the claim and (ii) there must be prejudice to the defendant arising from an unreasonable delay by the plaintiff in bringing the claim." *Fike v. Ruger,* 752 A.2d 112, 113 (Del.2000). Although a statute of limitations is often not binding on a court of equity, absent circumstances that would clearly make the application of that rule inequitable and unjust, the analogous statute of limitations is given great weight in deciding whether a claim is barred by laches. *Adams v. Jankouskas,* 452 A.2d 148, 157 (Del.1982); *The Scott Fetzer Co. v. Douglas Components Corp.,* 1994 WL 148282 at *3 (Del.Ch.).

[5] The facts pertinent to that issue are as follows: (i) the Ordinance was approved by the County Executive on October 21, 1997 and (ii) the plaintiffs filed their complaint on November 13, 2001, over four years thereafter, and over two years after the applicable statute of limitations had expired. [FN19] As a result, the County argues, the plaintiffs' claim is time-barred. In response, the plaintiffs contend that the County is equitably estopped from raising the statute of limitations and laches defenses.

FN19. The United States Supreme Court has held that a court in a § 1983 action must apply the applicable statute of limitations for a personal injury claim

under the forum state's law. *Wilson v. Garcia,* 471 U.S. 261, 276, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); *see also Marker v. Talley,* 502 A.2d 972, 975 (Del.Super.Ct.1985) (applying a two-year statute of limitations set forth in 10 *Del. C.* § 8119 to a claim brought under 42 U.S.C.A. § 1983). In Delaware, the statute of limitations for a personal injury claim is two years. 10 *Del. C.* § 8119. Although that two-year period is not technically binding on this Court of Equity, in this particular case the statutory period of time will be used, by analogy, to decide (for purposes of the laches defense) whether the plaintiffs' action was timely brought.

In appropriate circumstances the doctrine of equitable estoppel will operate to toll the running of the statute of limitations. Specifically, a claim will not be time-barred if the defendant " 'took active steps to prevent the plaintiff from suing, as by promising — not to plead the statute of limitations pending settlement talks or by concealing evidence from the plaintiff that he needed in order to determine that he had a claim." ' [FN20] Thus, the County could be estopped from asserting the limitations (or laches) defense in this case if the County engaged in misleading conduct upon which the plaintiffs detrimentally relied by not filing their suit within the limitations period. [FN21] But, a party asserting an estoppel defense "must allege facts with sufficient specificity to indicate a defendant affirmatively acted to mislead and induce that party from bringing suit in order to allege the existence of an estoppel." [FN22]

FN20. *Van de Walle v. Salomon Bros., Inc.,* 733 A.2d 312, 316 n. 11 (Del.Ch.1998), *aff'd,* 734 A.2d 160 (Del.1999) (quoting *Singletary v. Continental Ill. Nat'l Bank,* 9 F.3d 1236, 1241 (7th Cir.1993)).

FN21. *First Fed. Sav. & Loan Ass'n v. Nationwide Mut. Fire Ins. Co. .,* 460 A.2d 543, 545 (Del.1983). Although *First Federal* involved tolling of a contractual

12-month suit limitation provision in an insurance policy, I see no reason why the same estoppel concepts would not apply in these circumstances. *See, e.g.,* 51 Am.Jur.2d *Limitation of Actions* § 383 (2000) ("[E]stoppel tolls the statute of limitations if the party asserting the statute of limitations engages in misconduct that fraudulently or inequitably causes the plaintiff to miss the filing deadline, the plaintiff relies on the defendant's misrepresentation, the conduct occurs before the statute of limitations expires, and the plaintiff exercises due diligence in bringing the action.") (footnotes omitted). "Although 'equitable estoppel' is sometimes used interchangeably with ' fraudulent concealment,' the latter is, strictly, a subset of the former, since neither fraud nor concealment is required for equitable estoppel, only conduct or representations by the defendant that prevent the plaintiff from suing before the statute of limitations has run." *Van de Walle,* 733 A.2d at 314 n. 4 (quotations and citations omitted).

FN22. *Ensminger v. Merrit Marine Constr., Inc.,* 597 A.2d 854, 855 (Del.Super.Ct.1988).

According to the complaint, immediately after the enactment of the Ordinance the plaintiffs began discussing with the County's representative the denial of pension benefits to veterans. The plaintiffs were told by the County that the exclusion of the veterans from the plan was not intentional, but rather was a "mistake [that] would be addressed and corrected" by amending the Ordinance to allow veterans and former federal government employees to avail themselves of the benefit being afforded to other County employees. [FN23] Not until after the two-year statute of limitations period had expired did the County inform the plaintiffs that it would not rectify what it had earlier told them was a mistake that would be corrected. The plaintiffs also allege that in pursuing their grievance with the County, they were diligent throughout the statutory period.

FN23. Complaint ¶ 14.

I conclude that the § 1983 claim (Count III) survives the County's dismissal motion, because the plaintiffs have pled facts that support a claim of estoppel. [FN24]

FN24. That conclusion, however, only advances this claim to the next stage. In any determination on the merits, to avoid dismissal of their § 1983 claim on time-bar grounds the plaintiffs will need to present evidence that the County specifically represented to the plaintiffs that the omission of their prior military service was a mistake that would be corrected, that that representation was made continuously during the two-year statute of limitations period and that it was reasonable for the plaintiffs to rely on those representations. The case law holds that a mere offer by the defendant to remedy a plaintiff's injury (thus, causing the plaintiff to forego filing suit until the injury is cured) will not toll the statute of limitations unless that offer persisted throughout the statutory period. In short, a plaintiff must show that he or she reasonably believed, because of representations by a defendant, that there was no reason to bring suit, and the plaintiff became aware of the need to bring suit only after it was too late. *Ontario Hydro v. Zallea Sys Inc.,* 569 F.Supp. 1261, 1272 (D.Del.1983) (citing *DiBiase v. A & D, Inc.,* 351 A.2d 865 (Del.Super.Ct.1976) (no estoppel claim); *State Farm Mut. Auto. Ins Co v. Budd,* 185 Neb. 343, 175 N.W.2d 621 (Neb.1970) (estoppel claim)).

IV. CONCLUSION

For the reasons discussed, the County's motion to dismiss Counts I, II and IV of the complaint is granted, and its motion to dismiss Count III is denied. Counts V (requesting declaratory judgment) and VI (requesting injunctive relief) are dismissed to the extent that the relief requested therein is

Not Reported in A.2d                                                    Page 8

Not Reported in A.2d, 2002 WL 453926 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**


based on Counts I, II and IV. Counsel shall submit
an appropriate form of implementing order.

Del.Ch.,2002.
Williamson v. New Castle County
Not Reported in A.2d, 2002 WL 453926 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D



Not Reported in A.2d

Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 1

**C**
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
BELL ATLANTIC MERIDIAN SYSTEMS,
Plaintiff,
v.
OCTEL COMMUNICATIONS CORPORATION,
Defendant.
**No. Civ. A. 14348.**

Submitted: Nov. 6, 1995.
Decided: Nov. 28, 1995.

M. Duncan Grant, and Daniel V. Folt of Pepper,
Hamilton & Scheetz, Wilmington, George A. Lehner
and John Will Ongman of Pepper, Hamilton &
Scheetz, Washington, DC, for plaintiff.
Richard H. Morse, Melanie K. Sharp and Matthew
P. Denn of Young, Conaway, Stargatt & Taylor,
Wilmington, for defendant.

MEMORANDUM OPINION

ALLEN, Chancellor.
**\*1** This contract action turns on an interpretation of
the phrase "new systems" in a contract between
Octel Communications Corp. ("Octel"), a designer
and manufacturer of computer systems that provide
voice mail services and one of its distributors,
plaintiff, Bell Atlantic Meridian Systems ("BA
Meridian"). The Distribution Agreement between
the parties has been terminated and the suit
concerns the extent of negotiated post-termination
rights and duties. BA Meridian contends that Octel
has a post-termination obligation to provide it with
Octel's latest voice mail product system, the
Overture 250 for a period of seven years following
the termination of the Distribution Agreement.
This contention is based upon the language of a
December 17, 1992 amendment to the Distribution
Agreement (the "Letter Amendment").

The Letter Amendment provided upon termination
and expiration of the Distribution Agreement, for
certain obligations on the part of Octel including the
obligation to provide BA Meridian with "new
systems where [BA Meridian] has a binding
obligation to provide such systems or where the
provision of such systems is reasonably necessary to
maintain [BA Meridian's] business relationship with
particular existing customers." BA Meridian
asserts that Octel's new voice mail device, the
Overture 250, is such a "new system" because it can
substitute or replace some of the products that BA
Meridian was specifically entitled to distribute
pursuant to the Distribution Agreement. Octel, on
the other hand, argues that the phrase "new systems"
only entitles BA Meridian to buy additional units
of products covered by the Distribution Agreement
and does not expand, after termination, the products
which BA Meridian has a right to distribute.

BA Meridian seeks specific performance
compelling Octel to provide the post-termination
support that it contends is required by the Letter
Amendment. [FN1]

> FN1. BA Meridian also sought a
> declaration that Octel and BA Meridian
> orally agreed to extend the Distribution
> Agreement until September 30, 1995, but
> voluntarily dismissed this request before
> trial.

For the reasons that follow I conclude that the
Letter Amendment did not create the legal
obligation for Octel to supply to BA Meridian
during the seven year post-termination period newly
designed voice mail products, such as the Overture
250, but does create an obligation to sell additional
units of products covered by the Distribution
Agreement, as set forth in the Letter Amendment.

I. Facts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 2

The parties stipulated to an extensive statement of undisputed facts. Absent from the stipulation, are the communications that took place during the actual negotiation and drafting of the Letter Amendment. The following facts represent both facts as agreed upon by the parties and this Court's determination, based upon a preponderance of the evidence, of the facts necessary to resolve this dispute.

### 1. The parties.

Octel, a Delaware corporation with its principal offices in Milpitas, California, is engaged in the design, manufacture, marketing, and servicing of voice mail systems. Octel sells its voice mail systems through both authorized distributors and direct sales offices. BA Meridian is a general partnership formed in 1992 and consisting of two general partners, Bell Atlanticom Systems, Inc. (" Bell Atlanticom") and Northern Telecom, both of which are Delaware corporations. BA Meridian markets, installs, and maintains private telecommunication systems (including voice mail systems) primarily in the mid-Atlantic region. It is a distributor of Northern Telecom voice mail and private branch exchange (PBX) switching systems and until recently was also a distributor of Octel voice mail products. Bell Atlanticom agreed to the Distribution Agreement with Octel in January of 1992. In December of 1992, after the BA Meridian partnership was forged between Bell Atlanticom and Northern Telecom, Bell Atlanticom assigned its rights under the Distribution Agreement to BA Meridian. BA Meridian however negotiated some adjustments to the Distribution Agreement with Octel. The December 1992 Letter Amendment resulting from these negotiations provided additional post-termination support obligations on the part of Octel.

### 2. The Distribution Agreement.

**\*2** Under the January 1, 1992 Distribution Agreement Octel appointed Bell Atlanticom as its primary distributor within a stated territory, (Delaware, Maryland, New Jersey, Pennsylvania,

Virginia, Washington, D.C., and West Virginia). As a primary distributor, Bell Atlanticom made a volume purchase commitment commensurate with the expected volume to be generated within the territory; Bell Atlanticom agreed to sell a minimum of $8 million of Octel voice mail systems in 1992 and a minimum of $12 million in 1993. Octel, in turn, agreed, while the agreement was in effect, not to engage in direct sales, installation, or maintenance activity in the territory, or to appoint additional distributors in the territory. The Distribution Agreement had an expiration date of December 31, 1993, and was renewable for one year upon written agreement.

The Distribution Agreement also established the terms for the post-termination relationship between Octel and Bell Atlanticom. In the event of termination, Section 12.2 of the Distribution Agreement required Octel to provide Bell Atlanticom "for a period of seven (7) years (or less if [Bell Atlanticom] so specifies) from the date of termination, hardware, Software and information ... generally available to distributors ... which will enable [Bell Atlanticom] *to maintain and support its installed base systems at the location existing as of the date of termination.*" [FN2] Section 11.4, however, provided that Octel "shall have no obligation to fill any orders *for new systems* placed by [Bell Atlanticom] after the termination of this Agreement; however, *Octel will honor any order for new systems accepted by Octel prior to the date of termination if delivery under such order is called for within sixty (60) days* of termination." In addition, pursuant to Section 9.2, Octel agreed to provide software updates and software enhancements in the post-termination period.

> FN2. Emphasis supplied throughout unless otherwise noted.

In late 1992, Bell Atlanticom and Northern Telecom agreed to establish BA Meridian as a joint venture partnership to sell and service voice mail systems and other telecommunication products. BA Meridian was formed as of January 1, 1993, with Northern Telecom acquiring 80% ownership and Bell Atlanticom acquiring 20% ownership.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Substantially all of Bell Atlanticom's telecommunication products sales and service business, including employees, customer contracts, vendor agreements, inventory, and other assets, was transferred to BA Meridian. Northern Telecom is a manufacturer of voice mail systems that compete with those of Octel.

### 3. The Letter Amendment.

In anticipation of the formation of BA Meridian, Northern Telecom, Octel, and Bell Atlanticom negotiated and executed the Letter Amendment dated December 17, 1992. BA Meridian then signed it on January 1, 1993. Through the Letter Amendment, Octel consented in writing to the assignment and transfer of the Distribution Agreement from Bell Atlanticom to BA Meridian.

*3 In the Letter Amendment, Octel and BA Meridian agreed that, upon assignment of the Distribution Agreement by Bell Atlanticom to BA Meridian, BA Meridian would assume all of Bell Atlanticom's obligations, including the $12 million annual volume purchase commitment for 1993. The Letter Amendment modified the post-termination support obligations that Octel had undertaken in the Distribution Agreement. Under paragraph 4 of the Letter Amendment, Octel's post-termination obligations were modified to be as follows:
Upon the termination and expiration of the Agreement on December 31, 1993, or at the end of any extension of the term of the Agreement, Octel will provide to [BA Meridian] (or any successor to [BA Meridian] ) support (as outlined in the Agreement) with respect to [BA Meridian's] installed customer base of Octel CPE product for at least the time periods specified in the Agreement. Such support shall include, without limitation, spare parts, repair parts, Software upgrades and new Software features and applications (including both Software Updates and Software Enhancements), hardware upgrades and extensions, new systems where [BA Meridian] has a binding obligation to provide such systems or where the provision of such systems is reasonably necessary to maintain [BA Meridian's] business relationship with particular

existing customers for Octel CPE Product, training for technicians of [BA Meridian] or its subcontractors, customer training, support services, application development and support, and technical assistance (both by telephone and on-site) (collectively, "Post Termination Support").

### 4. The negotiation of the Letter Amendment.

Because Octel products accounted for a substantial portion of Bell Atlanticom's revenues, Northern Telecom felt it was important, in order to make the joint venture between Bell Atlanticom and Northern Telecom work, for the joint venture to maintain a distributor relationship with Octel. Thus, in late 1992, before proceeding with the formation of BA Meridian, John Losier, the contemplated President of the future joint venture, was assigned the responsibility of reaching an agreement with Octel.

In considering the viability and profitability of the anticipated joint venture, John Losier's primary concern in dealing with Octel was the joint venture's ability to maintain the revenue streams from customers using Octel systems. Given this objective, he felt that assumption of the Distribution Agreement without change was inadequate; the Distribution Agreement was due to expire at the end of 1993 and did not provide, in Losier's mind, sufficient post-termination support rights in order for him to maintain the joint venture's relationship with its installed base of Octel customers.

Octel was also convinced of the propriety of maintaining a relationship with the new joint venture and appointed James Jennings to head up the negotiations with Bell Atlanticom and Northern Telecom. Although Octel would be taking on a competitor as a distributor, it would also be continuing one of its most successful distributorships and sales forces-a distributorship committed to at least $12 million in purchases for the following year. The negotiations between Losier and Jennings resulted in the Letter Amendment to the Distribution Agreement.

*4 At the first meeting between Losier and

Not Reported in A.2d

Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Jennings, Losier communicated his business concerns about being able to maintain relationships with his existing Octel customers during the seven year post-termination period contemplated in the Distribution Agreement. Jennings, in turn, indicated a willingness to address Losier's business concerns and on November 16, 1992, faxed a letter to Losier proposing certain post-termination support obligations. Upon receiving this fax, Losier made a notation on it that he "also need[ed] [the] ability to sell new systems to the base." Losier then instructed John Woods, senior counsel at Northern Telecom and anticipated counsel to BA Meridian, to draft an amendment to the Distribution Agreement that would enable BA Meridian to fully support its existing Octel customers in the post-termination period; including the ability to sell "new systems."

Woods' draft of the Letter Amendment containing a provision addressing "new systems" was sent to Jennings and Susan Thornton, general counsel of Octel, for review. Woods' proposed language modifying Octel's post-termination support obligations apparently was not controversial and the Letter Amendment to the Distribution Agreement was agreed upon by Losier and Jennings after only a couple of telephone conversations and without any significant debate over the meaning of the revised post-termination support obligations.

5. The renegotiation period.

Following execution of the Letter Amendment, BA Meridian acted as a distributor for Octel in the Mid-Atlantic territory. Despite the fact that BA Meridian was 80% owned by a competitor of Octel's, the relationship progressed smoothly for the first year and in November 1993, BA Meridian and Octel began negotiations to extend the Distribution Agreement (which was to expire at the end of 1993) for an additional two-year period. For more than a year, the parties discussed various draft versions of an amendment for a two-year extension. During this time, the Distribution Agreement was repeatedly extended on a month-to-month basis, beginning in January of 1994.

As these on-going negotiations were taking place, changes in the business context of their relationship began to make that relationship more problematic. In February 1994, Octel announced that it had agreed to merge with VMX, a competing voice mail manufacturer. BA Meridian became concerned not only about the way in which the Octel and VMX product lines would be integrated, but also because Octel had begun using the former VMX direct sales office in BA Meridian's territory to sell VMX voice mail systems. In fact, in November 1994, Octel began considering cross-training its direct sales personnel in BA Meridian's territory (acquired from VMX) to sell the same type of voice mail systems that BA Meridian was selling under the terms of the Distribution Agreement. Then, in January 1995, in the parties' monthly agreement to extend the Distribution Agreement, Octel stated that it would no longer agree to refrain from engaging in direct sales of voice mail systems sold by BA Meridian in BA Meridian's territory. In February 1995, Octel initiated a "competitive replacement program" designed to assist its sales force in displacing competitive voice mail systems.

**\*5** On the BA Meridian side of the relationship, as early as August 1994, BA Meridian began encouraging the sale of Meridian Mail (a voice mail system manufactured by Northern Telecom) over Octel to new customers. Sales personnel had to obtain management approval to make proposals to new customers for the sale of Octel voice mail but not Meridian Mail. By March 1995, a subsidiary of Northern Telecom was offering to provide Meridian Mail at its cost to BA Meridian for displacement of Octel voice mail systems.

6. Termination of the Distribution Agreement and introduction of the Overture 250.

On April 25, 1995, Octel informed BA Meridian in writing that Octel would not extend the Distribution Agreement further and thus it would terminate. In May, Octel notified several distributors and customers that it would be introducing a new product (the Overture 250) at a July 11, 1995 customer or user group meeting in San Francisco. Octel also notified BA Meridian that according to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 5

the terms of the Distribution Agreement as amended by the Letter Amendment, BA Meridian would not be entitled to sell new voice mail products that become available to the market for the first time after June 14, 1995, including, but not limited to, the Overture 250. BA Meridian initiated this suit on June 7, 1995.

On July 11, 1995, Octel announced the introduction of the Octel Overture 250 message server. Octel described the Overture 250 as a "new mid-level system designed for medium-sized businesses or large branch offices." The Overture 250 is a newly designed product incorporating new technology and an entirely new logic design. It has been designed to have an identical user interface as have other Octel products. Thus while it will seem the same in many respects to users, it will offer new utilities to buyers of voice mail systems.

The trade press reported that the "Octel Overture 250 is designed to replace the former Branch XP, Aspen, Maxum, and Maxum SE" voice mail systems (*Business Wire* ). *Infoworld* similarly reported that the "Overture 250 replaces the Aspen line of servers and will use the Aria software. Users must purchase the new system to upgrade Aspen servers." In fact, Octel's own internal marketing reports project that many Maxum-Aspen voice mail units (which have been distributed by BA Meridian under the Distribution Agreement) will convert to the Overture 250 in the next two years. Octel is also developing new features for the Overture 250 (including visual mailboxes, hot-plug cards and drives, system back-up, and global message redundancy) that it will not make available for the Aspen-Maxum line of voice mail systems.

II. Rules of Contract Construction [FN3]

FN3. A choice of law provision in the Distribution Agreement provides that New York law will apply to its construction. The parties, however, have not suggested that New York law should be applied. Although I decide the issue as a matter of Delaware law, I note that New York law

with respect to the interpretation of contracts is consistent with the general principles and applicable law of Delaware and have cited, where possible, New York authority for these propositions.

The primary consideration in the construction of contract language is to fulfill, to the extent possible, the reasonable expectations of the parties at the time they contracted. *See Corbin on Contracts* § 1 (1960); *Brown Bros. Electrical Contractors, Inc. v. Beam Construction Corp.,* 361 N.E.2d 999, 1001 (N.Y.1977); *cf. Steigler v. Ins. Co. of North America,* Del.Supr., 384 A.2d 398, 401 (1978) (stating that insurance contracts should be read to fulfill the reasonable expectations of the purchaser). This is often stated as giving effect to the intent or shared understanding of the parties. *See Restatement (Second) of Contracts* § 201 cmt. c (1981) ("The objective of interpretation in the general law of contracts is to carry out the understanding of the parties...."); *Klair v. Reese,* Del.Supr., 531 A.2d 219, 223 (1987); *Burge v. Fidelity Bond & Mortgage Co.,* Del.Supr., 648 A.2d 414, 420 (1994); *Deering Milliken, Inc. v. Georgette Juniors, Inc.,* 235 N.Y.S.2d 72 (N.Y.App.Div.1962). In this process, Delaware courts adhere to an "objective" theory of contracts. [FN4] *See "Industrial America", Inc. v. Fulton Indus., Inc.,* Del.Supr., 285 A.2d 412, 415 (1971); *Leeds v. First Allied Connecticut Corp.,* Del.Ch., 521 A.2d 1095, 1097 (1986). *See also Mencher v. Weiss,* 114 N.E.2d 177, 181 (N.Y.1953); *Brown Bros. Electrical Contractors, Inc. v. Beam Construction Corp.,* 361 N.E.2d 999, 1001 (N.Y.1977) (both stating that it is the objective manifestations of a party's intentions that ordinarily is controlling).

FN4. Although one might be inclined to think otherwise, giving primacy to the parties' intent is not inconsistent with objective theory. Objective theory simply recognizes that only objective indicia of the parties' intent or expectations should be considered. In other words, it is generally not the parties' unexpressed intent or understanding that is relevant. *See Leeds*

Not Reported in A.2d                                                                                    Page 6

Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

*v. First Allied Connecticut Corp.,* Del.Ch., 521 A.2d 1095, 1097 (1986); *Brown Bros. Electrical Contractors, Inc. v. Beam Construction Corp.,* 361 N.E.2d 999, 1001 (N.Y.1977) (both stating that subjective intention of party is irrelevant in determining whether party intended to bind himself contractually). This is reflected in the requirement that the parties' expectations be reasonable. That is, only expectations reasonably induced by the other parties' overt words and acts under the circumstances and business context will be recognized.

**\*6** Under the objective approach, the court must first determine whether the contractual language in dispute is ambiguous. When the contract language, read in the context of the entire contract, is not reasonably susceptible to more than one meaning, this "objective" meaning will govern. *Rainbow Navigation, Inc. v. Yonge,* Del.Ch., C.A. No. 9432, Allen, C. (April 24, 1989); *Levco Construction Corp. v. New York,* 350 N.Y.S.2d 219, 221 (N.Y.App.Div.1973). Moreover, parol evidence (that is evidence pertaining to antecedent agreements, communications of the parties, commercial usage in the industry, etc. ...) that contradicts or varies this meaning will not be considered. [FN5] *City Investing Co. v. Continental Cas. Co.,* Del.Supr., 624 A.2d 1191, 1198 (1993); *Pellaton v. Bank of New York,* Del.Supr., 592 A.2d 473, 478 (1991); *W.W.W. Assoc., Inc. v. Giancontieri,* 566 N.E.2d 639, 641 (N.Y.1990).

FN5. In some cases, the meaning of the words to a contract can only be known through an understanding of the context and business circumstances under which they were negotiated, and extrinsic evidence must necessarily be evaluated. *See Klair v. Reese,* Del.Supr., 531 A.2d 219, 223 (1987). While it is unlikely that the contractual language under these circumstances evokes a plain and clear meaning on its face, there is a small minority of cases where seemingly unequivocal language becomes reasonably

susceptible to more than one meaning when considered in conjunction with the context in which the negotiation and contracting occurred. This kind of hidden ambiguity is often referred to as a latent ambiguity, and in these cases, extrinsic evidence to discern the real meaning and intention of the parties is not excluded. *See, e.g., Corbin on Contracts* § 537 fn. 30 (Cunningham & Jacobson Supp.1994); *Northeastern Life Ins. Co. of N.Y. v. Leach,* 213 N.Y.S.2d 357 (N.Y.Sup.Ct.1961). Thus, a preliminary consideration of extrinsic evidence may be necessary to determine whether language is ambiguous. This is not to say, however, that contract language is rendered ambiguous simply because the parties disagree over its meaning in litigation; the objective theory of contract demands that any understanding of the meaning of the language be reasonable given the objective evidence as known by the party arguing for that meaning. *See Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.,* Del.Supr., 616 A.2d 1192, 1196 (1992).

When contractual language is reasonably susceptible to more than one meaning, all objective extrinsic evidence is considered: the overt statements and acts of the parties, the business context, prior dealings between the parties, and the business customs and usage in the industry. *Klair v. Reese,* 531 A.2d 219, 223 (1987). Given all this evidence, the court construes the language in the way that best carries out the reasonable expectations of the parties that contracted in those circumstances. *Id.* To do so, Professor Corbin advocates the following analysis: "The court will give legal effect to the words of a contract in accordance with the meaning actually given to them by one of the parties, if the other knew or had reason to know that he did so." *Corbin on Contracts* § 543 (1960). *See also Restatement (Second) of Contracts* § 201 (1981) (setting forth the same test); *Klair v. Reese,* Del.Supr., 531 A.2d 219, 223 (1987) (citing § 201 of the Restatement as a proper rule of analysis). [FN6]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 7

Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN6. Aside: Imagine a case in which contractual language is susceptible to two different meanings, each reasonable and imagine that each party expressed in terms sufficiently clear, his or her subjective understanding of the meaning of the term. What result? Two possibilities appear: the court might accept one or the other as the more reasonable or it may conclude that despite the "objective" manifestation of contract, when viewed in context the parties have failed to contract on that point.

Under this analysis, then, it becomes incumbent upon the party seeking judicial enforcement of their interpretation of the ambiguous language to show by a preponderance of the evidence that the other party knew or had reason to know of the meaning they attached to the language. As necessitated under an objective theory of contract, a party will be legally responsible for a contractual obligation if a reasonable person in the same circumstances would have understood that they were taking on such an obligation; a subjective belief to the contrary is not relevant. *Cf. Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.,* Del.Supr., 616 A.2d 1192, 1196 (1992) (stating that the "true test is ... what a reasonable person in the position of the part[y] would have thought it meant." ).

For BA Meridian to obtain judicial enforcement of its interpretation of "new systems", the preponderance of the evidence must indicate that the language of the Letter Amendment was ambiguous and that Octel knew or had reason to know that BA Meridian understood "new systems" to entitle it to successor systems in the post-termination period. As discussed below, the language of the contract was ambiguous and although I assume that BA Meridian in good faith understood "new systems" to entitle it to successor products, I conclude that Octel did not know and did not have reason to know of this understanding As a result, BA Meridian is not entitled to enforce upon Octel its interpretation of the Letter Amendment.

### III. The Letter Agreement is Ambiguous

**\*7** Examining the language of the Letter Amendment in conjunction with the Distribution Agreement, it cannot be said that there is one plain meaning that must govern. Consequently, all relevant extrinsic evidence will be examined in attempting to give legal effect to the language of the Letter Amendment.

Certainly in a literal sense, "new systems", as used in the Letter Amendment, could refer either to (1) additional units of the commercial products covered by the Distribution Agreement (new voice mail units); or, alternatively, it might refer to new future products (new voice mail products). Either meaning is possible viewing the language used in isolation.

When considered in light of the language of the entire Distribution Agreement, however, the more limited interpretation asserted by Octel appears very reasonable. First, the Letter Amendment did not purport to change provisions in the Distribution Agreement that specifically enumerated the voice mail systems BA Meridian was entitled to purchase; suggesting that the Letter Amendment was not intended to expand the menu of voice mail systems that BA Meridian was entitled to purchase. Second, the phrase "new systems" is used in other places in the Distribution Agreement where the context clearly suggests it is referring to additional units of the systems BA Meridian already had a right to purchase.

The Distribution Agreement appears to enumerate the products BA Meridian was to distribute. The Agreement defines "Products" to be the voice mail systems listed in Exhibits A and B. The Agreement goes on to state that such "Products ... are hereby offered for sale by Octel." The Distribution Agreement also provides that "specifications for Products are listed in Exhibit D." The first page of Exhibit D, entitled "Products Identified," states that "[t]he following are identified as customer premise equipment voice information processing products (" CPE Products") and no others" and then lists the voice mail systems identified in Exhibit A.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 8

Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

One would expect the provisions of the Distribution Agreement to be altered if the Letter Amendment was to give BA Meridian the right to subsequently develop voice mail systems that serve as a substitute or replacement for the systems listed in these Exhibits. Either the Letter Amendment would have made reference to these Exhibits as not limiting BA Meridian's right to successor systems or the Distribution Agreement would have been amended to specifically include successor systems. Because no changes were made to these provisions at the time the Letter Amendment was executed, the more limited interpretation of "new systems" is consistent (arguably more consistent) with the entire contract, as amended.

Furthermore, the phrase "new systems" appears in several places in the Distribution Agreement. Although it is not a defined term, the context in which it is used in these other instances is consistent with the concept of additional units of existing systems. Section 11.4 of the Distribution Agreement stated that Octel was not obligated to fill orders "for new systems placed by [BA Meridian] after the termination of [the] Agreement." *See* p. 6 above. In addition, Exhibit A of the Distribution Agreement, which lists and prices the products Octel was offering to sell to BA Meridian, repeatedly refers to "new systems" in the context of new orders for the systems listed in the Exhibit. " New systems" in both of these instances appears to be consistent with the concept of additional units.

**\*8** Reading the contract as a whole, I find that the language of the Letter Amendment referring to " new systems" could reasonably be given either asserted interpretation and is therefore ambiguous.

### IV. Octel Did Not Know or Have Reason to Know of BA Meridian's Understanding of the Letter Amendment

After examining the commercial context in which the Letter Amendment was negotiated, the prior dealings between the parties, the practices within the voice mail industry, and the statements made by the parties before and during their negotiations, I conclude that the preponderance of the evidence

requires the conclusion that Octel did not know or have reason to know that BA Meridian understood the Letter Amendment to entitle it to new products, whether limited to "successor systems" or not. [FN7]

> FN7. There is no meaningful evidence in the record of any statements made by Octel or conduct on the part of Octel to indicate that Octel knew that BA Meridian understood "new systems" in the broader sense. The analysis therefore focuses exclusively on whether Octel had reason to know.

1. BA Meridian did not convey their understanding of the scope of the phrase "new systems" to Octel.

In deciding whether a reasonable person in Octel's position would have reason to know that BA Meridian understood "new systems" to include successor systems, the court must consider all extrinsic evidence known by Octel prior to and during the negotiations. The most critical extrinsic evidence in making this determination are the statements made by BA Meridian representatives to Octel representatives prior to or at the time the language was being negotiated. If one in the position of Octel should have understood that BA Meridian understood the meaning of the term "new systems" to create an obligation to provide newly created "successor" products, then, where the phrase is itself ambiguous, BA Meridian's understanding would be given legal effect. Although there is conflicting testimony on this point, I conclude that Losier did not convey to Jennings a view that "new systems" would encompass any newly developed voice mail systems that in effect replaced the systems BA Meridian currently was able to sell and that Jennings' understanding that "new systems" meant new units of covered products was reasonable.

#### a. The conflicting testimony.

Resolution of this case is not aided by the utter lack of communication over the phrase "new systems" in the negotiation of the Letter Amendment. From the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

testimony, it appears that there was no negotiation or debate over the language of the Letter Amendment as drafted by Woods and submitted by Losier to Octel. This means that if, based on communications between the parties, Octel had reason to know that BA Meridian understood "new systems" in the broader sense, such reason would have to stem from the statements Losier made in communicating his reasons for wanting to expand BA Meridian's post-termination support rights. On this crucial point, Jennings' and Losier's testimonies are conflicting.

Losier testified at trial that he told Jennings during their discussions that "new systems" included the concept of successor systems. (Tr. T. 44). He also testified that he conveyed to Jennings, that he needed access to the latest products offered by Octel in order to maintain his relationship with the installed customer base during the post-termination period. (Tr. T. 45). Jennings, on the other hand, testified in his deposition that Losier never specifically asked for the right to purchase successor systems and that there was no discussion about the possibility that after termination Octel would introduce a new product or system and BA Meridian would want to purchase it. (Dep. T. 14). Although Jennings admitted that Losier conveyed to him his concern that the original agreement did not provide Bell Atlanticom any rights in terms of selling them additional new systems in the sense of additional units of voice mail systems, he testified that the specific example Losier used in conveying his desire for additional post-termination rights was a scenario in which an account opened a new office and BA Meridian would not be able to sell them additional equipment. (Dep. T. 11-12). He further testified that Losier used the specific example of Johnson & Johnson opening a new office. (Tr. T. 12). To the contrary, Losier testified that they only talked about "new systems" in terms of successor products. (Tr. T. 47).

> *b. The better interpretation of the evidence is that Mr. Losier did not explicitly tell Mr. Jennings that " new systems" included successor systems*

**\*9** I do not find that either party in this case is more

or less trustworthy than the other. Rather, in light of all the evidence in the record, I find that while Losier may have understood his language to entail successor systems and even may have thought without good grounds that Mr. Jennings understood the same, Losier who was proposing the creation of a contract right, did not in fact successfully convey that understanding to Jennings. That is, although he testified otherwise, I find that Losier did not explicitly refer to "new systems" as encompassing successor systems. This conclusion is based on the evidence as set forth below.

> *i. No one could remember what specifically Losier said about "new systems" and Losier thought the phrase "new systems" conveyed only one meaning.*

With regard to his own testimony on this issue, Losier could not recall his or Jennings' statements with any specificity. When asked if he told Jennings that he wanted the right to purchase any voice mail systems developed by Octel within the seven-year time frame, he stated that he did not use those exact words. (Tr. T. 45). Moreover, he could not recall the exact words he used. (Tr. T. 63). He also did not recall what Jennings response was when he informed Jennings of his view that " new systems" included successor products. (Tr. T. 63). Similarly, John Woods, who was purportedly present during most of the conversations between Losier and Jennings, could not remember what was said by Losier or Jennings in regards to "new systems." (Tr. T. 255).

In addition, the evidence is clear that Losier felt that the phrase "new systems" unequivocally included newly developed or successor systems. He specifically testified that he thought the phrase " successor systems," "future systems," and "new systems" meant the same thing. (Tr. T. 45-46). Thus, Losier could have thought that by telling Jennings he wanted access to "new systems" in the post-termination period, Jennings would understand this meant newly developed systems.

This is understandable when one considers that Losier was not familiar with the language of the Distribution Agreement, and in fact did not even

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 10

Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

recall reading it or the Exhibits to it. (Tr. T. 64-66). This is not to condemn him for not doing so, because he did ask his counsel (John Woods) what BA Meridian would be entitled to in the way of post-termination support. (Tr. T. 64-66). However, without being familiar with the Distribution Agreement, Losier had no reason to know that his use of the phrase "new systems" might not convey his understanding that it covered successor systems. [FN8]

> FN8. As explained previously, in the context of the Distribution Agreement and its Exhibits, "new systems" could easily, and probably would be, understood in a more narrow sense.

From this evidence, I am inclined to think that Losier, thinking to himself that he wanted access to Octel's latest products, included the phrase "new systems" in the first draft of the Letter Amendment and then explained to Jennings that he wanted to be able to purchase "new systems." He then used as an example, a customer opening a new account (again possibly thinking in his mind that the new account would want the latest technology). Jennings could easily have understood this to be limited to additional out-of-the-box systems. This establishes some consistency between Losier's and Jennings' testimonies. Other evidence suggests this may have been the case.

ii. *The absence of controversy over the phrase "new systems" suggests Losier did not explicitly explain to Jennings that he thought it meant successor systems.*

**\*10** Losier testified at trial that Woods was on the telephone during the initial discussions with Jennings about the language of the Letter Amendment. (Tr. T. 59). Woods, however, did not recall any specific discussions about "new systems." (Tr. T. 255-56). He only recalled that the language was not controversial. (Tr. T. 255-56). Yet, had Losier specifically asked for access to entirely new technology during a lengthy post-termination period, one would predict it to be

controversial under the circumstances.

The Distribution Agreement had specifically limited the products that Octel was obligated to provide. Although the reason for that specificity may or may not have been a concern over access to future technology, that concern was certainly present after formation of the joint venture-when Octel would be faced with a distributor that was 80% owned by a competitor. Giving that competitor access to newly developed proprietary systems for seven years after the parties' on-going relationship had terminated would surely be controversial. The lack of controversy tends to prove that Losier did not convey to Jennings that he sought access to such technology.

The preponderance of the evidence indicates that although Losier may have told Jennings that he needed access to new systems in order maintain his relationships with his installed customer base, he did not provide to Octel reasonable grounds to understand he intended by "new systems" to include access to future "successor" technologies.

> 2. Extrinsic evidence indicates that Octel did not have reason to know that "new systems" was intended to include successor systems.

Even though BA Meridian did not convey its understanding of the scope of the phrase "new systems" to Octel, BA Meridian's broader interpretation could nevertheless be given legal effect if other extrinsic evidence showed that a reasonable person would have understood that "new systems" was intended to include successor systems. However, taking into account the business setting and the commercial practices and usage in the industry, I find that a reasonable person in Octel's position would not have such reason to know.

> a. *"New systems" does not convey an unequivocal meaning based on usage in the industry.*

It is clear from the evidence in the record, that "new systems" has been used in the industry to refer to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

newly developed products. BA Meridian introduced into evidence several articles from trade journals that refer to Octel's most recently developed voice mail system, the Overture 250, as a new system. Indeed, Octel has used the phrase in its own internal communications to refer to the Overture 250. There is no evidence in the record, however, that indicates the phrase is generally understood in the industry to only mean newly developed systems. No experts on trade usage testified and the testimony based on first-hand experiences in the business simply established that " new products" and "new systems" are sometimes used interchangeably.

*b. BA Meridian's business concerns were not, in and of themselves, enough to give notice to Octel that the term "new systems" was intended to include successor systems.*

**\*11** The evidence shows that Losier communicated to Jennings his primary business concern; maintaining business relationships with BA Meridian's installed customer base during the entire post-termination period. There is also evidence in the record that the voice mail industry is subject to ever-quickening technological change. Based on this, one might argue that Octel had reason to know that BA Meridian understood "new systems" to include successor systems.

*i. Access to successor systems was not necessary in order for BA Meridian to satisfy its business concern expressed to Mr. Jennings.*

In light of the other significant post-termination rights to which BA Meridian was entitled under the Letter Amendment, access to successor systems was not so crucial that a reasonable person in Octel's position should be charged with the knowledge that BA Meridian must have been asking for this right.

Under the Letter Amendment, BA Meridian was entitled to software and hardware upgrades and new features. This would presumably go a long way towards meeting the installed customer base's on-going needs; it enabled BA Meridian to keep

them technologically up to date, *with respect to covered products.* Although being able to provide these customers with the successor system not covered by the Distribution Agreement would be valuable, such future non-covered products were not the subject of the Distribution Agreement or any discussions in connection with the Letter Amendment.

When a negotiating party proposes ambiguous language to address a business concern, a reasonable person is not automatically charged with the broadest interpretation possible simply because the broadest interpretation would best enable the opposing party to satisfy their business concern. Other interpretations may be and here are possible.

*ii. The relationship between the parties gave Octel no reason to think that BA Meridian sought to substantially extend its rights to covered products by reason of a termination of the Distribution Agreement.*

It is a termination period right the parties were negotiating about. Surely BA Meridian interests would be best protected by giving it a continuing ability to access *any* new products that Octel might innovate over the period, but absent some explicit indication, a reasonable negotiator would not assume that an ambiguous term was intended to go so far. It is important to keep in mind that BA Meridian was 80% owned by a direct competitor of Octel's. These are relevant factors in considering what a reasonable person would have understood.

I assume that BA Meridian in good faith understood the Letter Amendment to entitle it to successor systems. Read in the context of the entire contract, however, the language purportedly entitling BA Meridian to this right is susceptible to two reasonable interpretations. The preponderance of the evidence indicates that Octel neither knew nor had reason to know that BA Meridian understood the ambiguous language to allow it to expand the Distribution Agreement list of covered products after termination to include new products or " successor systems." Plaintiffs requested relief is therefore denied.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 12

Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**


Del.Ch.,1995.
Bell   Atlantic   Meridian   Systems   v   Octel
Communications Corp.
Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E



Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
IKO MONROE, INC. Plaintiff,
v.
ROYAL & SUN ALLIANCE INSURANCE
COMPANY OF CANADA, INC., Hartford
Insurance Company of Canada, Inc., HIH
Cotesworth Canada Limited, Defendants.
**No. CIV.A. 00-834 GMS.**

Dec. 7, 2001.

MEMORANDUM AND ORDER

SLEET, District J.

I. INTRODUCTION

**\*1** In September 2000, IKO Monroe ("IKO") filed a declaratory judgment action against Royal & Sun Alliance Insurance Company of Canada, Inc. ("Royal Sun"), Hartford Insurance Company of Canada, Inc. ("Hartford"), and HIH Cotesworth Canada Limited ("HIH"). IKO seeks a declaratory judgment stating that the defendants had a duty to defend IKO Monroe against certain lawsuits pending in Michigan. After IKO amended its complaint, each of the defendants submitted a revised answer. In its amended answer, Hartford added a counterclaim for reformation of its insurance contract with IKO.

Presently before the court are two motions-IKO's motion for a more definite statement from Hartford on its counterclaim and Royal Sun's motion for summary judgment against IKO. [FN1] After reviewing the briefs and hearing oral argument, the court will deny IKO's motion for a more definite statement and grant Royal Sun's motion for summary judgment.

FN1. By order of the court, HIH's motion for summary judgment was stricken and HIH was instructed to join in Royal Sun's motion. (D.I.59.) The parties agree that the Royal Sun-IKO and HIH-IKO contracts contain very similar language. For simplicity, the court will refer only to Royal Sun. However, the same reasoning that applies to Royal Sun applies to HIH. By contrast, the language in the Hartford-IKO contract differs from the others, and therefore Hartford is not a party to this summary judgment motion.

II. BACKGROUND

A. Factual Background

IKO Monroe, a subsidiary of IKO Industries Ltd., is a Delaware corporation with its principal place of business in Monroe, Michigan. IKO manufactures paper for use in roofing products. Asphalt is used in the manufacturing process. Both the asphalt and the paper production process cause IKO's plants emit disagreeable odors.

IKO entered into insurance contracts with Canadian based insurance providers Royal Sun, HIH, and Hartford. In the IKO-Royal Sun insurance contract, Royal Sun agreed to defend IKO against claims for "bodily injury, personal injury, [or] property damage." (D.I. 46 at 5.) The policy also limited the duty to defend in significant ways. Most important for the present discussion, the policy contained an "absolute pollution exclusion" clause. The absolute pollution exclusion clause stated that the policy's coverage did not extend to "claims arising out of the actual, alleged, potential or threatened spill, discharge, emission, dispersal, seepage, leakage, migration, release or escape of pollutants." (D.I. 46 at 5.) The contract defines the term pollutant as "any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, *odour,* vapour, soot,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

fumes, acids, chemicals, and waste." (D.I. 46 at 5) (emphasis added).

In July 2000, the *Compora v. IKO Monroe* case was filed in Michigan state court. The *Compora* plaintiffs alleged that IKO's plant had caused " noxious odors ... accumulated and controlled by Defendant [IKO], to physically invade Plaintiff's person and property, [thereby] substantially and unreasonably interfer[ing] with Plaintiffs use and enjoyment of their property." (D.I. 46 at 7 .) In October 2000, the city of Monroe, Michigan also filed suit against IKO in Michigan state court. In the *City of Monroe v. IKO Monroe* complaint, the City of Monroe charged that IKO "had been for some months prior to the date of this Complaint emitting or causing foul, offensive, noxious, and/or disagreeable odors or stenches which are extremely repulsive to the physical senses of persons in the general vicinity of the Defendant's premises." (D.I. 46 at 8.)

*2 Following the filing of these lawsuits, IKO asked Royal Sun to defend it against the claims. After reviewing the *Compora* and *City of Monroe* complaints, Royal Sun determined that both plaintiffs sought damages based on IKO's emission of "noxious odors ." Royal Sun then notified IKO that under the terms of the absolute pollution exclusion, it had no duty to defend either lawsuit.

### B. IKO's Motion for a More Definite Statement

After Royal Sun refused to defend IKO, IKO filed suit in this court asking the court to declare that the defendants had a duty to defend the Michigan lawsuits. After each of the defendants answered, IKO requested and was given permission to amend its complaint. Subsequently, each of the defendants submitted a revised answer. In its second answer, Hartford included a counterclaim against IKO for reformation of contract. In particular, paragraph 13 of the answer and counterclaim asserts that:
To the extent the definition of personal injury in the Hartford Canada policy is interpreted to encompass claims arising out of or related to pollution, the definitional language permitting such interpretation was excluded solely because of mutual mistake on

the part of both IKO and Hartford Canada ...

(D.I. 44, Exh. 1 at 16.)

In response to the counterclaim, IKO filed a motion for more definite statement pursuant to Rule 12(e). In the motion, IKO asserts that Hartford failed to plead its allegations of mutual mistake with sufficient particularity as required by Rule 9(b). Hartford responds by asserting that it should be permitted to clarify its pleadings through discovery. Furthermore, Hartford argues that it cannot plead with more particularity because the relevant facts are solely in IKO's possession. Hartford states:
The facts within the possession of Hartford-Canada are that the parties to this insurance policy agreed to a contract that excluded coverage for pollution related claims and that, despite that intent and understanding, the written instrument as drafted by IKO or its insurance broker included language that IKO now alleges provides such coverage.

(D.I. 50 at 7.) In its reply, IKO cites several cases for the proposition that Hartford must plead with more specificity. Although IKO acknowledges that it is possible to clarify pleadings through subsequent pleadings or discovery, it denies that Hartford's pleadings sufficiently elucidate its claim.

### C. Royal Sun's Motion for Summary Judgment

On the same day that IKO filed its motion for a more definite statement, Royal Sun filed a motion for summary judgment asserting that it had no duty to defend the *Compora* or *City of Monroe* actions. Royal Sun argues that since the definition of " pollution" in the policy includes "odours," there is no duty to defend against lawsuits based on noxious odors. Based on this interpretation of the clause and the fact that both of the underlying Michigan lawsuits seek damages for IKO's emission of noxious odors, Royal Sun maintains that it has no duty to defend either lawsuit.

*3 IKO makes four basic arguments in its response brief. First, IKO asserts that the term "odours" was intended to mean only toxic odors. Second, IKO claims that the term "pollution" was intended to

Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

mean only "true pollution." Third, IKO alleges that it had a "reasonable expectation" of coverage because both IKO and Royal Sun knew or should have known that IKO's plants would produce some disagreeable odors in the normal course of business. Finally, IKO claims that it needs discovery from Royal Sun before it can demonstrate that the term " odour" is ambiguous.

In rebuttal, Royal Sun states that the absolute pollution exclusion does not limit the definition of odors to "toxic" odors. Royal Sun further contends that the clause is not limited to "true pollution." Royal Sun also states that IKO is not entitled to the benefit of the reasonable expectations doctrine because, under Michigan law, the reasonable expectations doctrine does not apply where the contract language is unambiguous. Finally, at oral argument, Royal Sun insisted that further discovery was unnecessary in this case because the contract language is unambiguous, and therefore extrinsic evidence is impermissible.

### III. DISCUSSION

Since the summary judgment motion and the motion for a more definite statement require separate standards of review, the court will address each motion in turn. First, however, the court will address the choice of law issues involved in this case.

### A. Choice of Law

The court accepts the view of both parties that Michigan law applies to this dispute. A federal district court sitting in diversity must apply the choice of law rules of the state in which it sits to determine which state's law governs the controversy before it. *Hionis Int'l Enterprises, Inc. v. Tandy Corp.*, 867 F.Supp. 268, 271 (D.Del.1994) (citing *Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4 (1975); *Klaxon Co. v. Stentor Mfg. Co.*, 313 U.S. 487, 496 (1941)). Therefore, the court will apply Delaware's choice of law rules.

In Delaware, "the subject matter of the contract is a

factor to be considered as 'the state where the thing or risk is located will have a natural interest in the transactions affecting it.' " *See Liggett Group, Inc. v. Affiliated FM Ins. Co.*, No.CIV A.00C-01-207, 2001 WL 589041, at *6 (Del.Super.Ct. May 15, 2001) (citations omitted). Delaware courts have held that in environmental insurance coverage cases, "the location of the subject matter is the location of the sites where the environmental damage or injury occurred." *See id.* In this case, Michigan is the site of the alleged environmental injury. Therefore, the court concludes that Michigan law will govern its analysis of the contract language at issue.

### B. Royal Sun's Motion for Summary Judgment

#### 1. The Summary Judgment Standard

Summary judgment is appropriate only if the record shows that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See also 2-J Corp. v. Tice*, 126 F.3d 539, 540 (3d Cir.1997). The moving party bears the burden of proving that there are no genuine issues of material fact in dispute. *See Carter v. Exxon Co.*, 177 F.3d 197, 202 (3d Cir.1999); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir.1996). In deciding a motion for summary judgment, all inferences should be drawn in the light most favorable to the non-moving party. *See Carter v. Exxon Co.*, 177 F.3d at 202. In determining if summary judgment is appropriate, the court's "function is not to weigh the evidence and determine the truth of the matter," but to determine whether there are genuine issues of material fact in dispute. *Id.* (citation omitted). " Facts that could alter the outcome are 'material', and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms,* 90 F.3d at 743 (citation omitted).

*4 In particular, in a breach of contract action, the court can grant summary judgment only when "the contract is unambiguous and the moving party is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 4

Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

entitled to judgment as a matter of law." *Newport Assocs. Indem. Co. v. Traveler's Indemnity Co.,* 162 F.3d 789, 791 (3d Cir.1999) (citing *Tamarind Resort Assocs. v Government of Virgin Islands,* 138 F.3d 107, 111 (3d Cir.1998)).

    2. The Contract Language Is Unambiguous

The court finds that the contract is unambiguous and that Royal Sun is entitled to judgment as a matter of law based on the four corners of the contract. The court will now explain why IKO's arguments to the contrary are unavailing.

    a. The term "odour"

IKO maintains that the term "odour" was intended to apply to "toxic odours" only. Under Michigan law, contract terms are given their plain meaning. *See Datron, Inc. v. CRA Holdings, Inc.,* 42 F.Supp.2d 736, 742 (W.D.Mich.1999) ( "The court should accord the words and phrases of the contract their plain meaning..."); *McKusick v. Travelers Indemn. Co.,* No.CIV.A.221171, 2001 WL 637676, at *4 (Mich.App. June 8, 2001) ("This court must enforce the insurance policy in accordance with its terms that are interpreted in light of their commonly used, ordinary, and plain meanings."). A contract term is ambiguous where it is susceptible to more than one valid interpretation. *See Society of St. Vincent DePaul in Archdiocese of Detroit v. Mt. Hawley Ins. Co.,* 49 F.Supp.2d 1011, 1016 (E.D.Mich.1999); *Cole v. Ladbroke Racing Michigan, Inc.,* 614 N.W.2d 169, 176 (Mich.App.2000). If the court finds that the term is ambiguous, extrinsic evidence may be admitted to explain the ambiguity. *See New Amsterdam Cas. Co. v. Sokolowski,* 132 N.W.2d 66, 68 (Mich.1965) ("[If a contract] is ambiguous, testimony may be taken to explain the ambiguity."). If, however, the court finds that the term is unambiguous, no extrinsic evidence will be allowed to interpret the term. *See City of Kalamazoo v. Michigan Disposal Service Corp.,* 125 F.Supp.2d 219, 243 (W.D.Mich.2000) ("When words of written contract are clear and unambiguous ... the court has no right to look to extrinsic evidence to determine

their intent."); *Commercial Union Ins. Co. v. Cannelton Industries,* 938 F.Supp. 458, 461 (W.D.Mich.1996) ("Under Michigan law, when insurance policy is clear and unambiguous, there is no need for the court to resort to extrinsic evidence.").

The term "odour" as used in the contract at issue is not ambiguous. Its meaning is plain. Webster's Third New International Dictionary defines an "odour" as "a quality of something that affects the sense of smell ... a scent, fragrance, or aroma." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1565 (1993). In other words, colloquially speaking, an odor is a smell. Although an odor can be disagreeable, *see id.,* the court has found no evidence-and IKO has presented none-that an odor must be toxic or that the term as normally understood encompasses toxic materials at all. The plain meaning of the word "odour," therefore, does not lend itself to the interpretation suggested by IKO.

**\*5** IKO further suggests that plain meaning notwithstanding, the parties to the contract understood "odours" to mean only "toxic odours." However the record does not support this contention. It is clear that the insurance clause does not include any reference to "toxic odours" or "noxious odours" or "polluting odours"only "odours." The term is left unmodified. The parties here appear to be very sophisticated, of equal bargaining strength, and to have negotiated this contract at arm's length. Since "odours" as normally understood does not by definition include "toxic odors," if IKO intended only toxic odors to be exempted from coverage, it could have and should have negotiated to have this included in the contract. The court will not re-write the contract now to produce the result that IKO seeks.

    b. The term "pollution"

IKO also contends that the entire pollution exclusion clause, not just the language dealing with odors, is directed only at "true environmental pollution" that is, the release of hazardous substances into the environment. In support of this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5

Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

contention, IKO cites numerous cases from various jurisdictions wherein courts held that insurance clauses such as the one here are only applicable to cases involving major environmental harm. This court, however, is applying Michigan law. In *McKusick v. Travelers Indemn. Co.*, the Michigan Court of Appeals expressly rejected IKO's argument, stating that where the pollution exclusion clause at issue does not specifically require that the insured cause traditional environmental pollution before triggering the exclusion, the court will not judicially engraft such a limitation. *See McKusick*, 2001 WL 637676, at *4. The plain language of the pollution exclusion clause at issue does not specifically state that the insured must cause "traditional" or "true" environmental pollution. Therefore, under Michigan law, this court cannot interpret the clause as requiring traditional environmental pollution, and will not do so.

c. Reasonable expectation of coverage

IKO's third argument is that it had a reasonable expectation of coverage based on the parties' understanding of how IKO's plants would normally generate disagreeable smells. IKO cites various cases from other jurisdictions in support of this position. However, as Royal Sun has pointed out, no *Michigan* court has held that the "reasonable expectations" doctrine applies where the contract language is unambiguous. Michigan courts have consistently stated, and recently reaffirmed, that the "reasonable expectations" doctrine applies only where the contract language at issue is ambiguous. FN2 As explained earlier, the contract provisions at issue here are unambiguous regarding the scope of coverage. Therefore, under Michigan law, IKO is not entitled to the benefit of the reasonable expectations doctrine, and the court will not apply that doctrine in this case.

> FN2. *See Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel*, 596 N.W.2d 915, 921 (Mich.1999) ("[T]he rule of reasonable expectations has no applicability here because no ambiguity exists in the [insurance] clause and the insured could

have discovered the clause on examination of the contract.") citing *Vanguard Ins. Co. v. Clarke*, 475 N.W.2d 48, 52 n. 7 (Mich.1991) ("Factors to consider in determining the legitimate existence of reasonable consumer expectation include ' whether an insurance policy includes a provision that unambiguously limits or excludes coverage and whether a policyholder could have ... discover[ed] a relevant clause that limits coverage.' "); *McKusick*, 2001 WL 637676, at *4 (holding reasonable expectations doctrine did not apply because "the pollution exclusion clause was "clear[ ] and unambiguous[ ]").

d. Discovery

Finally, since the court finds that the contract is unambiguous, it will reject IKO's final argument that it should be allowed discovery on this issue. Under Michigan law, extrinsic evidence is admissible to interpret a contract only where the terms are ambiguous. *See New Amsterdam*, 132 N.W.2d at 68, *Commercial Union*, 938 F.Supp. at 461. (W.D.Mich.1996). Since the court finds that the terms are unambiguous, however, there is no need for discovery.

*6 IKO further argues that discovery should be permitted because the ambiguity is latent. Although Michigan courts permit extrinsic evidence to resolve latent ambiguities, *see McCarty v. Mercury Metalcraft Co.*, 127 N.W.2d 340, 344 (Mich.1964), IKO has not sufficiently demonstrated the presence of a latent ambiguity. A latent ambiguity arises " where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation..." *See id.* As indicated at oral argument, the typical latent ambiguity situation involves two items, only one of which is named in the contract. *See e.g., Raffles v. Wichelhaus*, 159 Eng. Rep. 375 (Ex. 1864) (two ships named 'Peerless').

IKO's discovery request is not directed at the facts surrounding contract formation, but rather at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 6

Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

information regarding Royal Sun's interpretation of
the contract terms. However, a party's interpretation
of contract terms is not actually a fact because one
party's understanding of the contract terms is not
binding on the other party. *See Turner Holdings,
Inc. v. Howard Miller Clock Co.,* 657 F.Supp. 1370,
1380 (W.D.Mich.1987). Thus, even if IKO could
prove that Royal Sun had another understanding of
the contract terms, this different understanding or
interpretation is not sufficient to create a latent
ambiguity. *See id.* (refusing to find latent ambiguity
based on defendant's "uncommunicated belief"
about the meaning of contract terms). Therefore, the
court is not compelled to find a latent ambiguity
here.

### e. Judgment as a matter of law

Having found that the pollution exclusion clause is
unambiguous, the court further finds that Royal Sun
is entitled to judgment as a matter of law based on
the unambiguous wording of the contract. Absent
fraud, duress, unconscionability, or other such
factors, a court is bound to give full effect to a valid
contract between two parties. *See Mellon Bank,
N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001,
1009 (3d Cir.1980). First, the court finds that there
was a valid contract here-the parties do not dispute
this fact. Second, the court does not find any
impediment to the enforceability of this contract.
There are no indicia of fraud, duress, or the like.
Since there was a valid and unambiguous contract
with no impediments to enforceability, the court must
give full effect to the words of that contract. Under
that contract, Royal Sun is not required to defend
actions arising from the "discharge, emission,
dispersal, seepage, leakage, migration, release, or
escape" of pollutants. Pollutants includes "odours."
"Odour" is not limited to toxic odors. Since the
underlying lawsuits both involve claims against
IKO for the discharge of odors, and the discharge of
odor is explicitly exempted from coverage by the
policy in question, Royal Sun has no contractual
duty to defend either lawsuit. Given the court's
ruling, it will not reach the arguments regarding the
timing of the Michigan lawsuits or the distinction
between damages and injunctive relief.

### C. *IKO's Motion for More Definite Statement*

*7 A motion for a more definite statement should be
granted only where the pleading is so "vague or
ambiguous" that the opponent cannot draft a
responsive pleading. *See* FED. R. CIV. P. 12(e).
*See also Schaedler v. Reading Eagle Publication,*
370 F.2d 795, 798 (3d Cir.1967) (same). Courts
have interpreted this language to mean that the
motion should only be granted where the pleading is
unintelligible, *see CFMT, Inc. v. Yieldup
International Corp.,* No.CIV.A.95-549, 1996 WL
33140642, at *1 (D.Del.Apr.5, 1996); *United States
v. Board of Harbor Commissioners,* 73 F.R.D. 460,
462 (D.Del.1977), or the issues cannot be
determined. *See Fischer & Porter Co. v. Sheffield
Corp.,* 31 F.R.D. 534, 536 (D.Del.1962); *Container
Co. v. Carpenter Container Corp.,* 8 F.R.D. 208,
210 (D.Del.1948).

IKO's motion for a more definite statement under
Rule 12(e) must be denied. First, after reviewing the
pleadings, the court finds that Hartford's pleading is
far from unintelligible. It is clear on the face of the
complaint that Hartford is alleging "mutual mistake .
" Furthermore, nothing in the briefs or at argument
indicates that IKO was or is unable to determine
that mutual mistake is the issue. Since IKO is able
to discern the issues, it is also able to respond to
them.

Second, to the extent that IKO's motion rests on the
contention that Hartford has not pleaded mistake
with sufficient particularity under Rule 9(b), this
argument must also fail. While Rule 9(b) requires
that fraud and mistake be pleaded with particularity,
*see* FED. R. CIV. P. 9(b), this rule must be read in
conjunction with Rule 8 which outlines the liberal
standard of pleading favored by the Federal Rules
of Civil Procedure. *See* 5 CHARLES ALAN
WRIGHT & ARTHUR R. MILLER, FEDERAL
PRACTICE AND PROCEDURE § 1298 ("Rule
9(b) ... does not render the general principles set
forth in Rule 8 entirely inapplicable to pleadings
alleging fraud; rather the two rules must be read in
conjunction with each other.") The federal rules
contemplate notice rather than fact pleading. This
standard applies to Rule 9(b) as well. *See id.* ("
[N]either Rule 8 nor Rule 9(b) requires fact

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 7

Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

pleading."). Thus, even under Rule 9(b), the circumstances, rather than the specific facts of the claim, are essential. *See id.* ("Although circumstances may consist of facts, the obligation to plead circumstances need not be treated as requiring allegations of facts in the pleading."). By notifying IKO that mutual mistake is the issue, Hartford has provided IKO with the general circumstances involving its claim.

Further, where an issue is not pleaded with particularity, a party can clarify its claims through its subsequent pleadings and briefs. *See Union Carbide v. Shell Oil Co.,* No.99-CV-274, 2000 WL 1481015, at *2 (D.Del. Sept. 29, 2000) ("Here the defendant's pleadings appear to be 'bare-boned' on their face. However, its brief submitted in opposition to the present motion sufficiently clarified its pleadings to overcome Rule 9(b)'s requirements."); *Scripps Clinic and Research Foundation v. Baxter Travenol Laboratories,* Civ.A.No. 87-140, 1988 WL 22602, at *3 (D.Del. Mar. 9, 1988) (noting that defendant clarified its pleading in response to plaintiff's interrogatories). In its Opposition to IKO Monroe's Motion for a More Definite Statement, Hartford stated:

*8 The facts within the possession of Hartford-Canada are that the parties to this insurance policy agreed to a contract that excluded coverage for pollution related claims and that, despite that intent and understanding, the written instrument as drafted by IKO or its insurance broker included language that IKO Monroe now alleges provides such coverage.

Through this paragraph, Hartford has managed to add more detail to what it meant by "mutual mistake." These details appear to focus on the intent and understanding of the parties at the time of drafting. Hartford can either admit that the inclusion of the clause was the intent of the parties, deny that it was the intent of the parties, or state that it lacks sufficient information at this time to admit or deny that it was the intent of the parties. Therefore, the court finds that there is sufficient particularity. [FN3] Consequently, a more definite statement of the claim is unnecessary. [FN4]

FN3. Although IKO offers several cases supporting its argument that Rule 9(b) requires Hartford to be more specific, *see Christidis v. First Pennsylvania Mortgage Trust,* 717 F.2d 96 (3d Cir.1983); *SEC v. Saltzman,* 127 F.Supp.2d 660 (E.D. Pa 2001); *United States v. Kensington Hospital,* 760 F.Supp.1120 (E.D.Pa.1991), all of the cited cases involve fraud. The same considerations that make it necessary to plead fraud with specificity-namely damage to reputation-do not arise in the mistake context. *See Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 683 (7th Cir.1992) ("Accusations of fraud do serious damage to the goodwill of a business firm or professional person .... Why, if this is the true rationale of Rule 9(b), allegations of mere mistake should have to be particularized is a mystery.").

FN4. The court finds that the "motion to strike" issue is rendered moot by the court's ruling on IKO's motion for a more definite statement.

IV. CONCLUSION

For the foregoing reasons, the court concludes that Royal Sun has no duty to defend the Michigan lawsuits. Therefore, the court grants Royal Sun's motion for summary judgment. The court further concludes that IKO is able to form a responsive pleading. Therefore, IKO's motion for a more definite statement is denied.

For these reasons, IT IS HEREBY ORDERED that:
1. Royal & Sun Alliance Insurance Company of Canada, Inc.'s Motion for Summary Judgment (D.I.45) is GRANTED.
2. Summary Judgment be and hereby is ENTERED in favor of Royal & Sun Alliance Insurance Company of Canada, Inc. and HIH Cotesworth Canada Limited and against IKO, Monroe on all claims in the complaint.
3. IKO Monroe's Motion for a More Definite Statement (D.I.44) is DENIED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 8

Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**


D.Del.,2001.
Iko Monroe, Inc. v. Royal & Sun Alliance Ins. Co.
of Canada, Inc.
Not Reported in F.Supp.2d, 2001 WL 1568674
(D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:00CV00834 (Docket) (Sep. 14, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.