EXHIBIT "A"

Westlaw.

Slip Copy
Slip Copy, 2006 WL 214206 (D.Del.)
**(Cite as: 2006 WL 214206 (D.Del.))**

Page 1

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
SEA STAR LINE, LLC, a limited liability company,
Plaintiff,
v.
EMERALD EQUIPMENT LEASING, INC., a
corporation, Defendant.
No. Civ.A.05-245-JJF.

Jan. 26, 2006.

Kathleen M. Miller, of Smith, Katzenstein &
Furlow, LLP, Wilmington, Delaware, Charles C.
Robinson, of Garvey Schubert Barer, Seattle,
Washington, Timothy J. Armstrong, of Armstrong &
Mejer, P.A ., Coral Gables, Florida, for Plaintiff, of
counsel.

Bradford J. Sandler, and Jonathan M. Stemerman, of
Adelman Lavine Gold and Levin, A Professional
Corporation, Wilmington, Delaware, Gary M.
Schildhorn, and Alan I. Moldoff, of Adelman Lavine
Gold and Levin, A Professional Corporation,
Philadelphia, Pennsylvania, for Defendant, of
counsel.

*MEMORANDUM OPINION*

FARNAN, J.

*1 Pending before the Court is a Motion To Dismiss
Emerald Equipment Leasing, Inc.'s Counterclaim
(D.I.56) filed by Plaintiff, Sea Star Line, LLC ("Sea
Star"). For the reasons discussed, Sea Star's Motion
To Dismiss will be granted with respect to Count I of
the Counterclaim to the extent it alleges a breach of
the E-Mail Agreement, Count II pertaining to
quantum meruit, Count III alleging turnover to the
extent that rent is sought, and Counts V through VIII
alleging tort claims for failure to plead in accordance
with the requirements of Federal Rule of Civil
Procedure 9(b). The Motion To Dismiss will be
denied in all other respects. Emerald Equipment
Leasing, Inc. will be granted leave to file an
Amended Counterclaim.

BACKGROUND
On March 1, 2004, Sea Star filed a Complaint
against Defendant, Emerald Equipment Leasing, Inc.
("Emerald"), in the United States District Court for

the Middle District of Florida seeking declaratory
judgment as to the parties' rights and liabilities under
an Equipment Rental Agreement dated September 28,
2002 (the "Equipment Rental Agreement"). Sea Star
also asserted claims for breach of other maritime
contracts and for money owed as a result of goods
delivered and services provided to Emerald.

Emerald is a debtor-in-possession in a pending
Chapter 11 case in the United States Bankruptcy
Court for the District of Delaware. Unaware of the
action Sea Star filed in the Middle District of Florida,
Emerald filed an adversary proceeding against Sea
Star in the United States Bankruptcy Court for the
District of Delaware on March 17, 2004. In the
adversary proceeding, Emerald asserted claims
against Sea Star based on the Equipment Rental
Agreement for (1) post-petition account
receivable/breach of lease, (2) post-petition quantum
meruit, (3) turnover/conversion, and (4) accounting.
Sea Star moved to dismiss, stay or abate the
adversary proceeding.

The Bankruptcy Court held a hearing on May 27,
2004, and concluded that Emerald's adversary
proceeding was a non-core proceeding and that the
Bankruptcy Court had "related to" jurisdiction over
the action. D.I. 59 at All. However, the Bankruptcy
Court acknowledged that under 28 U.S.C. § 959,
concomitant jurisdiction existed with the federal
district court, because a party doing business with a
debtor-in-possession has the right to file suit
regarding that dispute in any jurisdiction. *Id.* For
purposes of its decision, the Bankruptcy Court
assumed that the Florida District Court had
jurisdiction, and the Bankruptcy Court applied the
"first filed rule" to conclude that the adversary
proceeding should be dismissed. *Id.* at A12.
However, the Bankruptcy Court's dismissal was
without prejudice so that "if the Florida Court
determines that it doesn't have jurisdiction or its
action should be dismissed, the debtor is free to file
here." *Id.* at A13.

In the meantime, in the Florida action, Emerald had
moved to dismiss the Complaint, to transfer venue or
to abstain. Emerald disputed the Florida District
Court's jurisdiction on the grounds that a declaratory
judgment was inappropriately sought by Sea Star
because the Equipment Rental Agreement had been
terminated. The Florida District Court concluded that
this case should be transferred to Delaware, primarily

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 214206 (D.Del.)
(Cite as: 2006 WL 214206 (D.Del.))

because Sea Star's Complaint references proceedings that took place in the Delaware Bankruptcy Court, the Delaware Bankruptcy Court was familiar with the parties, and Emerald is a debtor undergoing reorganization in the Delaware Bankruptcy Court. D.I. 59 at A18-19.

**\*2** On April 25, 2005, Emerald filed an Answer, Affirmative Defenses and Counterclaim in this action. D.I. 53. Emerald admits jurisdiction under 28 U.S.C. § 1333 (admiralty jurisdiction), but denies federal jurisdiction under 28 U.S.C. § § 1337 (commerce and antitrust regulations) and 1367 (supplemental jurisdiction). Emerald asserts a Counterclaim against Sea Star alleging eight causes of action: (1) post-petition account receivable/breach of lease, (2) post-petition quantum meruit, (3) turnover, (4) accounting, (5) fraud, (6) constructive fraud, (7) fraudulent concealment, and (8) negligent misrepresentation/breach of fiduciary duty. Emerald contends that the Court has jurisdiction over its counterclaims pursuant to 28 U.S.C. § § 1334 (original jurisdiction of bankruptcy cases in the district court) and 157 (referral to bankruptcy court of cases arising under or related to a case under Title 11) and 11 U.S.C. § 542 (turnover of property to the estate). Emerald also contends that this action is a "core" proceeding that should be heard and determined by the Bankruptcy Court under 28 U.S.C. § 157(b)(2)(A),(C),(E) and (O). [FN1] D.I. 53, Counterclaim at ¶ 1.

> FN1. Core proceedings include, but are not limited to:
> (A) matters concerning the administration of the estate;
> (C) counterclaims by the estate against persons filing claims against the estate;
> (E) orders to turn over property of the estate;
> (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims....
> 28 U.S.C. § 157(b)(2)(A), (C), (E) and (O).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) governs Sea Star's Motion To Dismiss Emerald's Counterclaim. The purpose of a motion to dismiss is to test the sufficiency of a complaint, or in this case, a counterclaim, and not to resolve disputed facts or decide the merits of the case. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir.1993). When considering a

motion to dismiss, a court must accept as true all allegations in the counterclaim and must draw all reasonable factual inferences in the light most favorable to the non-moving party. Neitzke v. Williams, 490 U.S. 319, 326 (1989); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255 (3d Cir.1994). The Court is "not required to accept legal conclusions either alleged or inferred from the pleaded facts." Kost, 1 F.3d at 183. Dismissal is only appropriate when it appears beyond doubt that the movant can prove no set of facts in support of its claims entitling it to relief. Conley v. Gibson, 355 U.S. 41, 45 (1957). The burden of demonstrating that the counterclaim fails to state a claim upon which relief may be granted rests on the movant. Young v. West Coast Industrial Relations Assoc., Inc., 763 F.Supp. 64, 67 (D.Del.1991) (citations omitted).

As a general matter, a court may not consider matters outside the pleadings when adjudicating a motion to dismiss. However, a court may consider "document [s] integral to or explicitly relied upon" in the pleadings without converting a motion to dismiss to a motion for summary judgment. In re Rockefeller Center Properties, Inc. Securities Litigation, 184 F.3d 280, 287 (3d Cir.1999).

## DISCUSSION

As a threshold matter, Emerald appears to raise a jurisdictional issue. Specifically, Emerald contends that this case implicates the "core" jurisdiction of the Bankruptcy Court and that this case should be referred to the Bankruptcy Court under the Bankruptcy Court's "related to" jurisdiction under 28 U.S.C. § 1334. D.I. 66 at X (discussing core jurisdiction) & n. 6 (requesting referral to the Bankruptcy Court). Emerald contends that its counterclaim is a "core" matter, because it is a "counterclaim by the estate against persons filing claims against the estate" under 28 U.S.C. § 157(b)(2)(C).

**\*3** In response, Sea Star contends that the Court should not refer this case to the Bankruptcy Court under its "related to" jurisdiction because Sea Star did not consent to that jurisdiction. In addition, Sea Star contends that the Bankruptcy Court already concluded that this matter was "non-core" when it dismissed Emerald's adversary proceeding, and in any event, Sea Star has not filed a proof of claim against Emerald, and therefore, core jurisdiction under 28 U.S.C. § 157(b)(2)(C) is not implicated.

A proceeding is a core proceeding, if it invokes a substantive right provided by Title 11 or is a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 214206 (D.Del.)
(Cite as: 2006 WL 214206 (D.Del.))

Page 3

proceeding, which by its nature, could only arise in the context of a bankruptcy case. *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir.1999). The Bankruptcy Court has already concluded that similar claims alleged by Emerald in the context of its adversary proceeding were "non-core." However, Emerald contends that the Bankruptcy Court's decision should not be considered the law of the case, because that decision was made in a different procedural context. Specifically, Emerald contends that the Bankruptcy Court was only dealing with claims made by Emerald against Sea Star based on post-petition activities when it addressed Emerald's adversary proceeding. In contrast, Emerald contends that this case now involves claims asserted by Sea Star against the Emerald estate, and therefore, the proceeding is core under Section 157(b)(2)(C). However, Emerald has not advanced any case law supporting its assertion that its Counterclaim is core.

In considering the question of core jurisdiction under Section 157(b)(2)(C), it appears to the Court that the case law involves situations in which the debtor has filed a counterclaim in response to a proof of claim filed by a creditor. Sea Star has not filed a proof of claim against Emerald in the Bankruptcy Court, and therefore, the Court is not persuaded that Section 157(b)(2)(C) is applicable here. In addition, the Court notes that the exercise of "related to" jurisdiction is not mandated in this case, particularly where, as here, Sea Star has not consented to such jurisdiction. 28 U.S.C. § 157(c)(2), (d). [FN2] However, the Court does have subject matter jurisdiction over this action, because it arises in connection with a maritime contract over which this Court has admiralty jurisdiction. Indeed, the parties agree that the exercise of the Court's jurisdiction is appropriate under 28 U.S.C. § 1333. D.I. 53, Counterclaim at ¶ 1; D.I. 57 at 1, 6. Accordingly, the Court declines to refer this case to the Bankruptcy Court as requested by Emerald in Footnote 6 of its Answering Brief.

> FN2. In pertinent part, 28 U.S.C. § 157(c)(2) and (d) provides:
> (c)(1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party

has timely and specifically objected.
> (2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.
> (d) The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

I. Whether Emerald's Counterclaims Based On Contract Law State A Claim Upon Which Relief May Be Granted

A. *Emerald's Counterclaim for Breach of Contract*

In Count I of its Counterclaim, Emerald alleges that Sea Star breached its obligations under two agreements: (1) the E-Mail Agreement, and (2) the Equipment Rental Agreement. Emerald contends that Sea Start failed to pay Emerald rent due for the use of the equipment and for the loss incurred as a result of damage, theft, destruction or other loss of the equipment. Emerald contends that its Counterclaim appropriately refers to breach of the E-Mail Agreement, because the parties operated under the E-Mail Agreement for more than five months while the formal Equipment Rental Agreement was being finalized. To the extent Sea Star seeks dismissal of its Counterclaim based on the E-Mail Agreement, Emerald contends that such a claim is premature, because there has been no factual development regarding whether the parties intended the Equipment Rental Agreement to supersede and cancel the E-Mail Agreement.

*4 Sea Star contends that dismissal of Emerald's Counterclaim as it applies to the E-Mail Agreement is appropriate in light of the Integration Clause contained in the Equipment Rental Agreement. Although executed on July 31, 2002, the Equipment Rental Agreement indicates that it "cover[s] equipment in use at various times commencing April

Slip Copy
Slip Copy, 2006 WL 214206 (D.Del.)
**(Cite as: 2006 WL 214206 (D.Del.))**

29, 2002." A40. The E-Mail Agreement did not commence until May 2, 2002, and thus, Sea Star contends that the Equipment Rental Agreement supersedes the E-Mail Agreement. Sea Star also contends that extrinsic evidence is not required to determine the parties' intent, because the Equipment Rental Agreement is clear, and therefore, parol evidence is inadmissible.

The parties appear to agree that Maryland law governs the contracts at issue. D.I. 57 at 8; D.I. 66 at n. 7. In determining whether a contract is ambiguous, Maryland law uses an "objective interpretation of contracts." *Calomiris v. Woods,* 727 A.2d 358, 363 (Md.1999). Under this view, a written contract is ambiguous if it is susceptible to more than one meaning when it is read by a reasonably prudent person. *Id.* The determination of whether language is susceptible to more than one meaning includes a consideration of " 'the character of the contract, its purpose and the fact and circumstances of the parties at the time of execution." ' *Id.* (citations omitted). The test for whether the contract is plain and unambiguous is "not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Id.* (citations omitted). Prior evidence of the parties' intentions and negotiations is not admissible; however, the court may consider the context of the transaction or the custom of the trade in determining whether an ambiguity exists. *Id.*

In its Counterclaim, Emerald makes the following allegations regarding the E-Mail Agreement:
9.... [O]n or about May 1, 2002, Sea Star and Emerald entered into an agreement (the "E-Mail Agreement" attached hereto as Exhibit "A"), whereby Sea Star agreed to lease Emerald equipment previously leased by Emerald to NPR.
10. The E-Mail Agreement was effective as of May 1, 2002 and was applicable to any cargo worthy Emerald equipment, which Sea Star dispatched out of any port terminal or inland depot for customer use at agreed upon per diems (the "Emerald Equipment").
11. Sea Star used the Emerald Equipment pursuant to the E-Mail Agreement for a number of months, *before the leasing arrangement was more formally documented in a written agreement executed by Sea Star and Emerald in the later part of September, 2002* (the "Equipment Rental Agreement" attached hereto as Exhibit "B").
D.I. 53, Counterclaim at ¶ 9-11 (emphasis added).

Reviewing Emerald's allegations in light of the terms

of the Equipment Rental Agreement which is attached to the pleadings, the Court concludes that Emerald has failed to state a claim for breach of the E-Mail Agreement. The Equipment Rental Agreement "cover[s] equipment in use at various times commencing April 29, 2002." D.I. 53, Exh. B at introductory paragraph. It also contains an Integration Clause which states that "[t]his Agreement contains the entire agreement between the parties and subject to the provisions of section 1, may not be amended, altered, or modified, except by a writing signed by the party to be bound." *Id.,* Exh. B at ¶ 15(a). Based on this language, the Court concludes that a reasonable person reading the Equipment Rental Agreement would not find any ambiguity in its terms. The Equipment Rental Agreement covers the period for which the E-Mail Agreement had applied, and as Emerald acknowledges, the Equipment Rental Agreement constituted the parties more formal documentation of the earlier E-Mail Agreement. *Id.* at ¶ 11.

*\*5* Emerald contends that extrinsic evidence is required to determine the parties' intent as to whether the Equipment Rental Agreement was meant to supersede the E-Mail Agreement, because the Equipment Rental Agreement does not expressly reference the E-Mail Agreement. Relying on *Bradney v. Sakelson,* 473 A.2d 189, 199 (Pa.Super.1984) and *Franz Tractor Co. v. J.I. Case Co.,* 566 So.2d 524 (Fla.App. 2 Dist.1990), Emerald contends that factual discovery is needed because the doctrine of integration turns on the parties' intentions. In the Court's view, however, both *Bradney* and *Franz* are distinguishable from the circumstances in this case. As the court in *Bradney* noted, the termination agreement at issue did not contain an integration clause, did not encompass the same obligations and did not involve the same parties that were bound by the oral agreement. 473 A.2d at 192. In light of these circumstances, the *Bradney* court concluded that they could not discern any intention by the parties that the oral contract be merged into the termination agreement. *Id.*

Similarly, in *Franz Tractor Co.,* the court concluded that a modification contract was not merged into the dealer contract, because references in the modification to the dealer contract demonstrated that the parties intended the two agreements to remain separate. In addition, the modification expressly provided that it was to "supplement" the dealer contract. 566 So.2d at 526.

In this case, the Court concludes that extrinsic

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 214206 (D.Del.)
(Cite as: 2006 WL 214206 (D.Del.))

Page 5

evidence is not required to illuminate the meaning of the Equipment Rental Agreement because it is not ambiguous when viewed from the standpoint of a reasonable person. Unlike the circumstances in *Bradney* and *Franz*, the Equipment Rental Agreement here covers the same subject matter as the E-Mail Agreement for the same time period that the E-Mail Agreement had been in effect. As Emerald acknowledges in its Counterclaim, the Equipment Rental Agreement was the parties' formal documentation of the leasing arrangement that had existed previously under the E-Mail Agreement. Further, the Equipment Rental Agreement has an Integration Clause expressing the parties' intent that the Equipment Rental Agreement be "the entire agreement between the parties." *See e.g.*, *ARB (American Research Bureau), Inc. v. E-Systems, Inc., 663 F.2d 189 (D.C.Cir.1980)* (applying Maryland law and concluding that written contract was intended to be exclusive statement of the parties' agreement based primarily on presence of an integration clause). In these circumstances, the Court concludes that extrinsic evidence is not required to determine the meaning of the Equipment Rental Agreement, and Emerald cannot maintain its Counterclaim to the extent that it alleges a breach of the E-Mail Agreement because the E-Mail Agreement was subsumed by the Equipment Rental Agreement entered into by the parties. *Calomiris, 727 A.2d at 361-362* (recognizing that "[u]nder the parol evidence rule, a written agreement 'discharges prior agreements' thereby rendering legally inoperative communications and negotiations leading up to the written contract.") (quoting *Restatement (Second) of Contracts § 213 (1979)*). Accordingly, the Court will grant Sea Star's motion to the extent that it seeks dismissal of Emerald's claim alleging breach of the E-Mail Agreement. [FN3]

FN3. Emerald also directs the Court to two Delaware cases for the proposition that "a new contract relating to the subject matter of a former agreement does not destroy the obligations of the former agreement, except as it is inconsistent therewith, unless it is shown that the parties intend that the new contract supersede the old contract entirely." D.I. 66 at 2 (citing *Lee Builders, Inc. v. Wells, 92 A.2d 710, 715 (Del. Ch.1952); Jefferson Island Salt Min. Co. v. Empire Box Corp., 23 A.2d 106 (Del.Super.1941)*). However, Delaware law does not govern the contract at issue here.

B. *Emerald's Counterclaim For Quantum Meruit*

*6 In Count II of its Counterclaim, Emerald alleges a claim for post-petition quantum meruit. Emerald alleges that Sea Star has used Emerald's property and has failed to compensate Emerald for that use resulting in harm to Emerald and actual material gain to the benefit of Sea Star. Emerald seeks damages under the theory of quantum meruit, to the extent that Sea Star's use of Emerald's equipment occurred during any period not covered by the written lease agreement. Thus, Emerald contends that its quantum meruit claim is properly pled in the alternative to its contract claim.

Sea Star contends that dismissal of Emerald's quantum meruit claim is warranted. Sea Star contends that Count II is not properly pled in the alternative to Count I, because it expressly "incorporates" the paragraphs of Count I, "as fully as if set forth herein in their entirety." D.I. 53, Counterclaim at ¶ 22. Sea Star further contends that quantum meruit does not apply for matters covered by a written contract, and Emerald has failed to allege any time period for which the Equipment Rental Agreement would not have applied.

Under Maryland law, quantum meruit is not available "when there is an express contract dealing specifically with the services rendered." *See e.g., First Nat'l Bank v. Burton, Parsons & Co., 470 A.2d 822, 829 (Md.Ct.Spec.App.1984).* Emerald contends that an action for quantum meruit may appropriately lie if Sea Star contends that it is not liable to Emerald for compensation under the written agreement. However, Maryland courts have rejected the use of quantum meruit in such circumstances. As the Court in *Mass Transit Admin. v. Granite Constr. Co., 471 A.2d 1121, 1126 (Md.Ct.Spec.App.1984)* stated:

The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests. The reason for this rule is not difficult to discern. When parties enter into a contract they assume certain risks with an expectation of a return. *Sometimes, their expectations are not realized, but they discover that under the contract they have assumed the risk of having those expectations defeated. As a result, they have no remedy under the contract for restoring their expectations. In desperation, they turn to quasi-contract for recovery. This the law will not allow.*
(emphasis added).

In this case, Emerald has pled the existence of a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 214206 (D.Del.)
(Cite as: 2006 WL 214206 (D.Del.))

written contract governing its claims, and the contract contains an integration clause. _County Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc._, 747 A.2d 600, 607-608 (Md.2000); _see also Wal-Mart Stores, Inc. v. AIG Life Ins. Co._, 872 A.2d 611, 620 (Del. Ch.2005) (recognizing that dismissal of quantum meruit claim is appropriate where it is clear from face of complaint that written contract exists and controls). Accordingly, the Court will dismiss Count II of the Complaint alleging recovery under the theory of quantum meruit.

### C. Emerald's Counterclaim For Turnover

*7 In Count III of its Counterclaim, Emerald alleges a claim for turnover pursuant to 11 U.S.C. § 342. In its briefing, Emerald alleges that its reference to Section 342 is a typographical error, and that the appropriate reference should be to 11 U.S.C. § 542. Emerald contends that Section 542 permits it to seek the return of the equipment or the value of the equipment, and therefore, it has appropriately alleged a claim for turnover.

Sea Star contends that dismissal of Count III is warranted, because Count III alleging turnover is essentially a rephrasing of Count I's breach of contract allegations. Specifically, Sea Star contends that Emerald does not demand turnover of the equipment, but only "damages equaling unpaid rent, and the value of the equipment together with interest and costs of suit."

In its Counterclaim, Emerald does not specify under which paragraph of Section 542 it is seeking relief. However, in its briefing it asserts Section 542(a). It appears to the Court, that two paragraphs of Section 542 may be applicable, paragraph (a) and paragraph (b). In full, 11 U.S.C. § 542(a) and (b) provides:
(a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property _or the value of such property,_ unless such property is of inconsequential value or benefit to the estate.
(b) Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debts to, or on the order of the trustee, except to the extent that such debt may be offset under section

553 of this title against a claim against the debtor. (emphasis added).

To the extent Emerald seeks rent in its claim for turnover, the Court concludes that Emerald fails to state a claim for turnover. Under Section 542(b), turnover is required for amounts that are "matured, payable on demand, or payable on order." Active disputes over the amount owed take an action outside the realm of a turnover action. See _J.T. Moran Fin. Corp. v. American Consol. Fin. Corp._, 124 B.R. 931, 938 (S.D.N.Y.1991) ("Where as here, the court must resolve whether or not the debt claimed is due, the action to collect the disputed funds cannot be regarded as a turnover proceeding under the core jurisdiction of the bankruptcy court."); _In re Teligent, Inc._, 325 B.R. 134, 137-138 (Bankr.S .D.N.Y.2005) (recognizing that turnover provisions cannot be used to liquidate contract disputes or demand assets whose title is in dispute and collecting cases). Rather, the action is simply a claim for breach of contract. _In re National Audit Defense Network_, 332 B.R. 896 (Bankr.D.Nev.2005) ("Settled and controlling law holds that the presence of an active dispute over the amount owed takes the action out of the turnover area; one cannot shortcut a breach of contract action with a turnover demand."). In this case, it appears to the Court that the rental amount is in dispute, and therefore, the Court concludes that a turnover action is not properly sustained as to the rental amounts.

*8 However, Emerald also alleges that Sea Star has failed to return numerous chassis, gen sets and containers under the Equipment Rental Agreement. The Equipment Rental Agreement does not give Sea Star any title, ownership or property rights in this equipment, and pursuant to paragraph 10 of the Equipment Rental Agreement, Sea Star is required to redeliver the equipment to certain locations identified in the contract or agreed to by the parties. The Court understands Sea Star to base its motion to dismiss this claim on the sole fact that Emerald seeks the value of the Equipment rather than the return of the Equipment itself. However, the Equipment Rental Agreement provides that if the equipment is not returned within 60 days, Emerald may elect to treat the Equipment at a loss and seek the value of the equipment, together with all accrued rental charges. Further, it appears that Section 542(a) permits Sea Star to seek the value of the equipment, and not just the return of the equipment, in a turnover action. In light of the express language of both the applicable contract and Section 542(a), Sea Star has not explained why dismissal of this Count is warranted. Accordingly, the Court concludes at this juncture,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 214206 (D.Del.)
**(Cite as: 2006 WL 214206 (D.Del.))**

that Emerald has pled a claim for turnover to the extent that it seeks the value of certain property belonging to Emerald which Sea Star is alleged to have failed to return.

### D. Emerald's Counterclaim For An Accounting

In Count IV of its Counterclaim, Emerald seeks an accounting of all Sea Star's usage of Emerald's equipment. Emerald contends that an accounting is a proper remedy regardless of whether this action is an action at law or equity, because the accounts are complex and Sea Star had a fiduciary relationship with Emerald as a result of Sea Star's obligation to produce self-billing reports.

Sea Star seeks dismissal of this claim contending that the equitable relief of an accounting is not appropriate because there is an adequate remedy at law for Emerald, namely the recovery of money damages. Because Emerald's counterclaim seeks damages for breach of contract, and such damages are an adequate remedy at law, Sea Star contends that the Court lacks equity jurisdiction to award an accounting.

"The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is ... the absence of an adequate remedy at law." _Dairy Queen, Inc. v. Wood_, 369 U.S. 469, 478 (1962). Whether equitable jurisdiction should be exercised is a decision committed to the sound discretion of the Court. 1 Am.Jur.2d, Accounts and Accounting § 54 (1994 & Supp.2002).

Actions for an accounting are not available when the amount in question is readily ascertainable; however, such an action may be maintained when the facts create a reasonable doubt as to whether an adequate remedy at law may be obtained. _Id._ Equitable jurisdiction for an accounting is typically invoked in three circumstances: "(1) there is a fiduciary relationship between the parties, accompanied by a duty on the part of the defendant to render an account; (2) there are mutual accounts, or, if the account is all on one side, the account is complicated; and (3) there is a need for discovery." _Id._ An action for an accounting may also be appropriate when there are allegations of fraud. _Id._

**\*9** At this juncture, Emerald has alleged that Sea Star had an obligation to produce self-billing reports which created an independent fiduciary relationship. Emerald has also alleged that Sea Star has used over 5,000 pieces of Emerald equipment and that the

information regarding Sea Star's use of this equipment is only within the knowledge of Sea Star. Given the complexities alleged by Emerald as a result of Sea Star's self-billing, the apparent need for discovery, and the allegations of fraud and a fiduciary relationship, all of which must be taken as true at this juncture, the Court declines to dismiss Emerald's claim for an accounting.

### II. Whether Emerald's Counterclaims Based On Tort Law State A Claim Upon Which Relief May Be Granted

In Counts V through VIII of its Counterclaim, Emerald alleges fraud (Count V), [FN4] constructive fraud (Count VI), fraudulent concealment (Count VII), and negligent misrepresentation/breach of fiduciary duty (Count VIII). Sea Star contends that these claims should be dismissed, because Emerald's tort claims do not exist independently, but instead are woven into the contract. Sea Star contends that the economic loss doctrine prohibits Emerald from recovering in tort, because its economic losses flow only from Sea Star's alleged breaches of a contract. Sea Star also contends that, even if Emerald's tort claims withstand dismissal under the economic loss doctrine, the allegations of fraud are not pled with particularity as required by _Federal Rule of Civil Procedure 9(b)_, and therefore, dismissal of Emerald's tort claims is warranted.

> FN4. The Counterclaim refers to the fraud count as Count IV, but this appears to be an error. Given the sequence of the other counts asserted, the fraud count should be labeled Count V.

In response, Emerald contends that the Equipment Rental Agreement is silent as to Sea Star's obligations to create self-billing reports. Emerald further contends that it was not notified when Sea Star began using a piece of Emerald Equipment and no receipt or document was required to be executed in order for Sea Star to begin using that equipment. Because Emerald was relying on Sea Star's honesty to report its usage of equipment, Emerald contends that the circumstances were rife with the opportunity for fraud. Emerald contends that Sea Star took advantage of this self-billing to under-report its usage of Emerald's equipment. Emerald also contends that this self-billing arrangement resulted in a fiduciary relationship between the parties created based on the "relationship of inequality" between the parties. Specifically, Emerald contends that it placed particular reliance and confidence in Sea Star to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

report its usage accurately.

As for Sea Star's arguments under Rule 9(b), Emerald contends that its counterclaim is properly pled. However, Emerald contends that, to the extent the Court concludes that further particularity is required, Emerald should have the opportunity to amend its Counterclaim. [FN5]

> FN5. As a threshold matter, the parties have not specifically alleged which state's substantive law applies to Emerald's tort claims. Sea Star alleges that the claims are non-maritime, and therefore, Delaware's conflict of law rules apply to determine which state's substantive law applies. Although Sea Star identifies the "most significant relationship test" as the appropriate test, it is unclear which state Sea Star alleges has the most significant relationship to the occurrences and the parties. In a footnote, Emerald alleges that federal common law should apply, because courts sitting in admiralty strive for uniformity. In the alternative, Emerald identifies Delaware choice of law rules and contends that the law of the place of injury would apply, because this is a diversity action. However, it is also unclear which state Emerald alleges as the specific place of injury.

In the Court's view, the choice of law issue is not sufficiently briefed for the Court to make a final decision as to which law applies to the tort claims in this case. The parties cite case law from Florida, Virginia, Iowa, Georgia, Delaware and New Jersey. Accordingly, at this juncture, the Court will work within the confines of the law that has been presented in the briefing to make a determination as to whether Emerald's claims can withstand a motion to dismiss.

A. *Whether Emerald Has Pled Torts Existing Independently From The Contract*

Stated generally, the economic loss doctrine prohibits a party from recovering in tort economic losses, the entitlement of which, flows only from a contract. *Werwinski v. Ford Motor Company,* 286 F.3d 661, 671 (3d Cir.2002) (predicting how the Pennsylvania Supreme Court would rule on the viability of the economic loss doctrine). It appears to the Court that the formulation of the economic loss doctrine varies depending on which state law applies.

For example, under Delaware law, the economic loss doctrine " 'prohibits recovery in tort where a product has damaged only itself (i.e., has not caused personal injury or damage to other property) and, the only losses suffered are economic in nature." ' *Pinkert v. Olivieri,* 2001 WL 641737, *5 n. 6 (D.Del. May 24, 2001) (quoting *Danforth v. Acorn Structures, Inc.,* 608 A.2d 1194, 1195 (Del.1992)). However, Delaware courts have also recognized that "where an action is based entirely on a breach of the terms of a contract between the parties and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort." *Id.* at *5 (dismissing fraud claims where plaintiff alleged that defendants knowingly misrepresented the nature of their work each time they submitted an application and certification for payment where duty to submit these periodic payment applications existed solely by reason of construction contract and defendant had not violated any common law duty independent of the construction contract).

*10 Exceptions to the economic loss doctrine have also been recognized where the claim arises independently from the contract. *See e.g., HTP, Ltd. v. Lineas Aereas Constarricenses, S.A.,* 685 So.2d 1238, 1239 (Fla.1996). Further, in the case of allegations of fraud resulting from circumstances involving self-billing type reports, courts in other jurisdictions have permitted such claims to proceed in tort. *See e.g., Insteel Indus., Inc. v. Costanza Contracting Co., Inc.,* 276 F.Supp.2d 479, 484-486 (E.D.Va.2003) (allowing claim based on false invoices to proceed in tort as a fraud claim where duty to submit invoice stemmed from contract, but contract did not require sworn and truthful statements in the invoices); *F/V Robins Nest, Inc. v. Atlantic Marine Diesel, Inc.,* 1994 WL 594592, *10 (D.N.J. Oct. 24, 1994) (allowing fraud claim to proceed where vessel owner had to rely on integrity of shipyard to honestly report parts and labor used and work actually performed, contract had no specific price term, and shipyard had wide latitude in carrying out repairs).

Reviewing the circumstances alleged in this case in light of the case law cited by the parties, the Court concludes that dismissal of Emerald's fraud claims is not appropriate at this juncture. As Emerald points out, the Equipment Rental Agreement makes no provisions for self-billing. Rather, under the Equipment Rental Agreement, the lease term begins on the date when the equipment is delivered to the Lessee and ends when the equipment is returned pursuant to section 10. Emerald has alleged,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                   Page 9
Slip Copy, 2006 WL 214206 (D.Del.)
**(Cite as: 2006 WL 214206 (D.Del.))**

however, that the equipment was already in place at
the time Sea Star purchased the assets of NPR, Inc.
Emerald has further alleged that Sea Star's usage was
determined by self-billing and that Emerald relied on
Sea Star to accurately report its usage. Emerald has
also alleged that Sea Star intentionally under-reported
its usage of Emerald's equipment. At this juncture,
the Court concludes that Emerald has pled sufficient
facts to establish distinct torts arising independently
of the contractual obligations such that the claims are
not definitively barred by the economic loss doctrine.
Accordingly, the Court will deny Sea Star's Motion
To Dismiss Emerald's tort claims on this ground.

  B. *Whether Emerald Has Satisfied The Pleading
Requirements Under* Rule 9(b)

  Sea Star contends that Emerald has failed to **plead**
its fraud charges with **particularity** as required by
**Rule 9(b)**. With respect to the self-billing allegations
which form the basis of its fraud claim, Emerald has
**pled** that (1) in order to ascertain rental payments due
for equipment, Sea Star provided Emerald with
monthly self-billing reports; and (2) "upon later
investigation, Emerald discovered that the 'self-
billing reports' prepared by Sea Star were grossly
understated, failing, *inter alia,* to account for
numerous pieces of Emerald Equipment which Sea
Star has been using without paying rental charges to
Emerald and failing to pay the appropriate amounts
for usage of equipment contained in the 'self-billing
reports.' ' D.I. 53, Counterclaim at ¶ 14, 15. Emerald
has not pled any specific dates of the alleged fraud
and to the extent Emerald is aware from the further
investigation it alleges it conducted in its
Counterclaim, Emerald has not disclosed which
invoices were defective or which pieces of equipment
were implicated. In these circumstances, the Court
concludes that additional facts are required to
establish the pleading requirements of **Rule 9(b)**, if
those facts are within Emerald's knowledge. To the
extent that some or all of this information is within
Sea Star's exclusive control, Emerald should reflect
that allegation in any amended pleadings it submits.
Accordingly, the Court will **dismiss** Emerald's **fraud**
claims, Counts V through VIII, with leave to amend
to more particularly state the allegations relevant to
Emerald's **fraud** claims.

CONCLUSION
  *11 For the reasons discussed, Emerald's Motion To
Dismiss will be granted as it pertains to (1) Count I,
to the extent Count I alleges a breach of the E-Mail
Agreement, (2) Count II alleging quantum meruit, (3)
Count III alleging turnover to the extent that rent is

sought, and (4) Counts V through VIII alleging tort
claims for failure to satisfy the pleading requirements
under Rule 9(b). In all other respects, the Motion To
Dismiss will be denied. Emerald will be granted
leave to file an Amended Counterclaim.

  An appropriate Order will be entered.

* * *
* * *
* * *

  Slip Copy, 2006 WL 214206 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT "B"

1 of 2 DOCUMENTS

**MAURA FOX, a citizen of the Commonwealth of Virginia, Plaintiff, v. RODEL, INC, a Delaware corporation, and WILLIAM D. BUDINGER, a citizen of the State of Delaware, Defendants. RODEL, INC, a Delaware corporation, and WILLIAM D. BUDINGER, a citizen of the State of Delaware, Counterclaim-Plaintiffs, v. MAURA FOX, a citizen of the Commonwealth of Virginia, Counterclaim-Defendant.**

**C.A. No. 98-531-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1999 U.S. Dist. LEXIS 15502*

**September 13, 1999, Decided**

**NOTICE:** [*1]   FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Plaintiff's motion for summary judgment denied and defendants' motion for partial summary judgment granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff and defendants moved for partial summary judgment in plaintiff's suit alleging breach of contract, breach of obligation of good faith and fair dealing, promissory estoppel, and specific performance, arising out of plaintiff's employment by defendant corporation.

**OVERVIEW:** Plaintiff filed suit following termination of her employment, alleging breach of contract, breach of obligations of good faith and fair dealing, and promissory estoppel, and sought specific performance. The parties moved for summary judgment on various issues. Granting defendants' motion in part, the court concluded that the employment contract was unambiguous, and clearly established when plaintiff would receive stock option installments. Because plaintiff was no longer in defendant's employ when the second installment vested, she was not entitled to recovery, and was limited to seeking enforcement of her contractual rights. Plaintiff's promissory estoppel claim was stricken, as this form of equitable relief was only available where no written contract existed. Additionally, plaintiff's claims for punitive damages were dismissed, as the parties' release agreement precluded the presentation of tortious conduct evidence; in the absence of tortious conduct, punitive damages were unavailable. Plaintiffs' motion was denied, as questions of fact remained.

**OUTCOME:** Defendant's motion for summary judgment was granted in part to strike claims of promissory estoppel where a written agreement existed, and to preclude a claim for punitive damages where plaintiff had expressly agreed that she would present no evidence of defendants' tortious conduct.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] A court shall grant summary judgment only when the admissible evidence fails to demonstrate a genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of proving that no genuine issue of material fact exists. Facts that could alter the outcome are material, and disputes are genuine if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct. If the moving party has demonstrated an absence of material fact, the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN2] On a motion for summary judgment, the court will view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion. The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary

1999 U.S. Dist. LEXIS 15502, *

judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.

***Contracts Law > Contract Interpretation > Interpretation Generally***
[HN3] Construction of contract language is a question of law. The primary consideration in interpreting a contract is to give effect to the intent of the parties at the time they contracted, and the court will attempt to determine intent from the overall language of the contract. In ascertaining intent, Delaware courts adhere to the "objective" theory of contracts. Under this approach, a contract's construction should be that which would be understood by an objective reasonable third party.

***Contracts Law > Contract Interpretation > Interpretation Generally***
[HN4] Where the parties have entered into an unambiguous integrated written contract, the contract's construction should be that which would be understood by an objective reasonable third party. An inquiry into the subjective unexpressed intent or understanding of the individual parties to the contract is neither necessary nor appropriate where the words of the contract are sufficiently clear to prevent reasonable persons from disagreeing as to their meaning.

***Contracts Law > Defenses > Ambiguity & Mistake***
[HN5] Ambiguity exists only when a contractual provision is reasonably or fairly susceptible of different interpretations or may have two or more different meanings. Ambiguity does not exist where the court can determine the meaning of a contract without any other guide than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends.

***Contracts Law > Defenses > Ambiguity & Mistake***
[HN6] Contractual language is not rendered ambiguous simply because the parties do not agree upon its proper construction, nor is it ambiguous simply because the parties in litigation differ concerning its meaning. The mere assertion that ambiguity or divergent intent exists will not prevent summary judgment from being entered.

***Contracts Law > Contract Interpretation > Interpretation Generally***

***Contracts Law > Contract Interpretation > Parol Evidence Rule***
[HN7] In the absence of ambiguity in the contract, the writing itself is the sole source for gaining an understanding of intent.

***Contracts Law > Contract Interpretation > Interpretation Generally***
[HN8] The court will not twist, distort, or torture contractual terms to create an ambiguity when the language is clear and unambiguous.

***Contracts Law > Formation > Detrimental Reliance***
[HN9] It is axiomatic that a claim for promissory estoppel is applicable only in the absence of an enforceable contract.

***Civil Procedure > Pleading & Practice > Pleadings > Interpretation***
[HN10] *Fed. R. Civ. P. 8(e)(2)* allows for alternative and inconsistent claims to be made in a complaint.

***Contracts Law > Remedies > Compensatory Damages***
[HN11] The Delaware Supreme Court has held that punitive damages are not available for breach of an employment contract.

**COUNSEL:** For plaintiff: Thomas P. Preston, Esquire, Michael W. Teichman, Esquire, Duane, Morris & Heckscher LLP, Wilmington, Delaware.

For defendants: David S. Eagle, Esquire, Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, Delaware.

For defendants: Steven R. Wall, Esquire, Jill E. Jachera, Esquire, Of Counsel, Morgan, Lewis & Bockius LLP, Philadelphia, Pennsylvania.

**JUDGES:** Sue L. Robinson, District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

### MEMORANDUM OPINION

Dated: September 13, 1999
Wilmington, Delaware

**ROBINSON, District Judge**

1999 U.S. Dist. LEXIS 15502, *

## I. INTRODUCTION

On September 8, 1998, plaintiff Maura Fox filed this action against defendants Rodel, Inc. ("Rodel"), a Delaware corporation, and William D. Budinger, the President of Rodel, asserting claims for breach of contract, breach of the obligation of good faith and fair dealing, promissory estoppel, and specific performance arising out of plaintiff's employment at Rodel. (D.I. 1) Specifically, plaintiff alleges that defendants breached the terms [*2] of her compensation package by failing to make available to her options to acquire common stock of Rodel. (D.I. 1) On October 12, 1998, defendants filed their answer as well as their counterclaims against plaintiff for breach of contract, specific performance, and unjust enrichment. n1 (D.I. 5) The court has jurisdiction over this matter pursuant to *28 U.S.C. § 1332.*

n1 On June 17, 1999, defendants filed an amended answer. (D.I. 55)

Presently before the court is plaintiff's motion for partial summary judgment with respect to certain of the relief requested in Count VIII. (D.I. 62) Also before the court is defendants' motion for summary judgment. n2 (D.I. 64) In their motion, defendants seek to (1) dismiss counts VI and VII; (2) limit counts III and VIII "to a claim seeking to enforce plaintiff's rights, if any, to ten options to purchase ten shares of Rodel stock; (3) dismiss plaintiff's request for punitive damages; (4) release Budinger as a defendant in this action; and (5) "preserve [*3] for trial solely the issue of what, if any, contractual obligations Rodel had to plaintiff as to the (10) ten vested options upon her separation of employment from Rodel." (D.I. 64) For the reasons that follow, the court will deny plaintiff's motion and grant in part and deny in part defendants' motion.

n2 This is defendants' second motion for summary judgment. In ruling on defendants' motion for partial summary judgment on their counterclaims (D.I. 19), the court on July 14, 1999, dismissed counts I, II, IV, and V of the complaint. (D.I. 58)

## II. BACKGROUND

### A. Plaintiff's Employment History with Rodel

The following facts regarding plaintiff's employment history are undisputed. On November 15, 1996, Rodel offered plaintiff employment as its Senior Vice President for Corporate Development. (D.I. 1, P 9) The initial terms of the offer were set forth in a letter to plaintiff dated November 15, 1996 and signed by Rodel's President. (D.I. 1, PP 10-12) With regard to stock options, the offer provided [*4] as follows:

> So that you can participate in the financial growth that you enable, Rodel will issue you an option to purchase 80 shares of stock at $ 4,000 per share. The purchase rights will vest over a seven year period. The option will entitle you to purchase 10 shares immediately following your acceptance of this employment offer and, during the next seven years of your employment, 10 shares on each anniversary of your employment. The option itself will be prepared by [Rodel's] attorneys and ratified by the Board. [Rodel] will attempt to have it qualified for tax purposes. Entitlement to purchase will last until end of employment.

(D.I. 63, Ex. A) (last sentence inserted in handwriting). Also on November 15, Rodel's President sent plaintiff a facsimile transmission on his personal letterhead that stated

> an important part of your compensation will be an opportunity to participate via equity in the value you create for Rodel. The company offer includes an option to buy shares over a seven year period.
>
> In addition to that option, and in anticipation of the burden you will take from me, I will invite you to buy (at a very nominal price) a call on 400 [*5] shares of my personal Rodel stock exercisable at the rate of 40 shares per year for every year you are with [Rodel]. I intend that the strike price will be the lowest justifiable fair market value so there are no tax implications when you buy the call. The call and option combined represent almost 5% of the company's outstanding shares. I would like the call to remain confidential between us and our attorneys.
>
> * * * *
>
> . . . Although this letter expresses my intention, it is possible that the final terms

may not exactly follow the form outlined here.

(D.I. 65, Ex. C)

On November 30, 1996, plaintiff wrote to Rodel's President accepting the offer of employment. (D.I. 63, Ex. B) In the letter, plaintiff delineated those terms of employment to which she felt the parties had agreed: salary base, bonus plan, relocation expenses, equipment, vacation, termination compensation, n3 and covenant not to compete. (D.I. 68, Ex. B) She also indicated a number of terms which remained to be clarified and to which mutual agreement had not been reached:

> Stock and Equity Options: As we discussed, to evaluate the option price and terms I will need to have the opportunity for my advisors [*6] to review audited financial statements, and to know the holders of all issued and outstanding stock. I would request company loans that would be available at appropriate terms and would be able to be repaid from the anticipated bonuses and financial incentives of the company. I understand the option is intended to be offered at preferential price and terms, and that the attempt will be made to have this offer qualified for tax purposes.

Five aspects still require important discussion:

. Process for valuing the stock
. Mechanics for annual vesting and exercise of the options, or portions thereof, to include any expiration of option rights, or portions thereof, if not exercised.
. Method by which I would receive distributions for the increase in value of the Rodel stock for the period between December 31, 1996, and year-end 1999, in the event you or the company determine that Rodel, Inc. is to remain a closely held company
. Process by which stock and accrued distribution are converted in the case of a sale or public offering, including the acceleration of share vesting
. Process for liquidation and payment of my stock entitlement or distributions for increased value in [*7] the event of termination, whether discharged or a voluntary separation on my part

(D.I. 68, Ex. B at D00067-00068)

> n3 In this regard, plaintiff indicated that the parties had agreed that if she were "terminated or discharged at any time during [her] employment, [she would be] entitled to 6 months compensation from the date of discharge." (D.I. 68, Ex. B at D00067)

On December 11, 1996, Rodel transmitted to plaintiff a letter signed by its President which modified the terms of the November 15 offer. (D.I. 63, Ex. C) With respect to the options, the letter provided that

> the stock option is currently being prepared by counsel. It will be an option to purchase 80 shares of stock at $ 4,000 per share. The purchase rights will vest over a seven year period. The option will entitle you to purchase 10 shares immediately following your acceptance of this employment offer and, during the next seven years of your employment, 10 shares on each anniversary of your employment. The option itself will be [*8] prepared by our attorneys and ratified by the Board. We will attempt to have it qualified for tax purposes. There is no requirement to purchase, and except for shares made part of a future bonus arrangement, your eligibility to purchase will remain as long as you are employed by the company (Instead of the usual expiration of purchase eligibility, part of a future bonus plan may be paid in stock from this option.).

> In the event the company remains private and there is no market or buyer for the stock at the time you leave the company, the company will redeem shares purchased or eligible under the option . . .

> * * * *

> In our effort to have the option be qualified, its final form may differ slightly from what I have outlined here, but we'll stay as close as possible. Obviously, the most advantageous opportunity for redeeming your shares will occur if there is a ready market. That is the direction in which I want to take the company.

(D.I. 63, Ex. C)

The offer was further modified by facsimile transmission dated December 12, 1996:

2. On page two, at the end of the first paragraph (line four of page two), add this sentence: "Rodel will provide, through internal [*9] financing or other suitable sponsored borrowing, the funds you may need to purchase this and other Rodel stock, at interest rates no higher than market."

* * * *

You and I were and are in complete agreement on these points. These changes were necessary as a result of oversight and the speed with which I pulled this all together, rather than any effort to 'modify' our previously agreed terms.

(D.I. 63, Ex. D) At the bottom of the letter, plaintiff's handwritten notes referenced three letters: (1) the Rodel letter dated December 11, 1996; (2) her letter to Rodel's President dated November 30, 1996; and (3) the President's letter dated November 15, 1996. (D.I. 68, Ex. D) According to plaintiff, these letters constitute "a comprehensive look at [Rodel's] offer [of employment]." (D.I. 68, Ex. E at 86)

Plaintiff ultimately accepted employment with Rodel. She moved to Wilmington, Delaware; contracted to sell her residence in the Washington, D.C. area; and committed to purchasing a new residence in Delaware. She began her employment with Rodel on or about January 3, 1997.

**B. The Stock Options and Financing Agreements**

At the time of plaintiff's hire by Rodel, Rodel [*10] common stock was divided into four classes. (D.I. 63, Ex. H) Class A constituted a very small amount of common stock with super voting rights. (D.I. 63, Ex. H) This stock was held by Rodel's President. (D.I. 63, Ex. H) The distinction between the remaining classes of common stock was based primarily on ownership: Class B stock was held by Budinger family members, Class C stock was held by other shareholders, and Class D stock was held by Rohm & Haas. (D.I. 63, Ex. H)

Beginning in December 1996, prior to the start of her employment, plaintiff began to communicate to Rodel's President her desire to exercise those stock options that had vested. (D.I. 70, Ex. A at 105) According to plaintiff, she continually asked that formal documentation be drawn up regarding Rodel's financing of the equity purchase and change of ownership of the equity so that she could exercise the then available options. n4 (D.I. 70, Ex. A at 104, 244-45) However, she was told that formalization of the paperwork was delayed due to drafting errors by the attorneys retained to prepare the documents as well as administrative holdups. (D.I. 68, Ex. H at 80, Ex. E at 160, 166, 168)

n4 Although plaintiff's recollection was that the majority of her communications with Rodel's President were oral, she "thought that there are e-mails that exist from [her] to [Rodel's President] asking for the paperwork." (D.I. 70, Ex. A at 246) Hard copies of those electronic transmissions, if any, were not offered into evidence.

[*11]

In early May 1997, in light of Rodel's negotiations with Rohm & Haas Corporation ("Rohm & Haas"), n5 according to plaintiff, she confronted Rodel's President concerning execution of the option agreements and the financing arrangement. (D.I. 70, Ex. A at 333) She was told again that there were administrative delays but that the paperwork would be forthcoming. (D.I. 70, Ex. A at 334) Approximately two weeks later, Rodel's President provided plaintiff with the requested paperwork, indicating that it needed to be executed prior to the closure of Rodel's deal with Rohm and Haas. (D.I. 70, Ex. A at 334-35)

n5 Rohm & Haas and Rodel were negotiating Rohm & Haas' acquisition of a percentage interest in Rodel.

On June 3, 1997, Rodel's President sent an e-mail to Don Budinger and Susan Loncki requesting advice regarding a document n6 he had drafted concerning his dealings with plaintiff:

I'm trying to cover some legal bases here--to prevent a breach of contract claim (because I didn't deliver the originally promised [*12] stock), and a future claim that there was an expectation of entitlement in regards to the 70 shares.

(D.I. 68, Ex. G)

n6 A copy of the draft document was not provided to the court.

On June 5, 1997, plaintiff met with Rodel's President. She informed him that she would not sign the "buy/sell" agreement he had proffered, since in her opinion it did not accurately reflect the terms to which the parties had agreed. (D.I. 70, Ex. A at 335-37, 342) She further indicated that she expected him to produce financing and change of ownership documents that reflected their agreement prior to the close of the deal with Rohm and Haas, which was scheduled to take place the next morning. (D.I. 70, Ex. A at 342) According to plaintiff, Rodel's President stated that he had no intention of honoring the 400 share call on his personal stock. (D.I. 70, Ex. C) Plaintiff expressed her shock that he would attempt to alter their agreement, to which Rodel's President responded "'Any man in my position would do the same.'" (D.I. 70, [*13] Ex. A at 343)

On June 6, 1997, in conjunction with Rohm & Haas' initial purchase of Rodel stock, Rodel implemented a 1:100 stock split. (D.I. 63, Ex. H) At this time, Rohm & Haas purchased 23,000 shares of Class B stock and 5,600 shares of Class C stock for $ 190 per share. n7 (D.I. 63, Ex. H)

n7 On November 14, 1997, Rodel implemented a 1:1 stock dividend to be paid to all Class B, C, and D stockholders. (D.I. 63, Ex. H) On March 31, 1998, Rohm & Haas purchased 99,700 shares of Class B stock and 6,350 shares of Class C stock for $ 180.95 per share. (D.I. 63, Ex. H) Rohm & Haas made a similar purchase on January 15, 1999, purchasing 325,802 share of Class B and 23,778 shares of Class C stock at $ 150.79 per share. (D.I. 63, Ex. H)

Plaintiff met with Rodel's President again on or about June 11, 1997. At that meeting, plaintiff declared that she was unwillingly to rework her equity offer and that she expected Rodel and its President to honor their commitments. (D.I. 70, Ex. C) Rodel's President responded that [*14] this was not an option, at which point they agreed that he was constructively terminating plaintiff. (D.I. 70, Ex. C) According to plaintiff's notes of the meeting, with regard to equity valuation, Rodel's President

stated that the Rodel offer was "golden," that his private offer was not germane and that he would allow [plaintiff] 1 week to purchase 10 shares of Rodel stock. [Plain-tiff] informed [him] this was not [her] interpretation and [they] needed to have a business discussion on this point.

(D.I. 70, Ex. C)

A draft letter dated June 12, 1997 directed to plaintiff n8 and prepared for Susan Loncki's signature stated Rodel's acceptance of plaintiff's resignation and set forth "enhanced separation benefits." (D.I. 70, Ex. D) These benefits included:

1.4 Relating to the 80 share option terms as explained in Rodel's letter of December 11, 1996, Rodel will pay you in cash $ 10,000 which is calculated to be at least the difference between a (10 share): i. (January 6, 1996) strike price; and ii. Rodel's PV ("present value["]) on the date of your resignation.

(D.I. 70, Ex. D) In return for these benefits, plaintiff, inter alia, would release [*15] Rodel and its President from all possible claims she might have against them. (D.I. 70, Ex. D)

n8 There is no indication in the record that this letter was ever sent to plaintiff.

## C. The Separation Agreement

Following the termination of her employment, plaintiff and Rodel entered into negotiations regarding the terms of a partial settlement. On November 6, 1997, plaintiff executed a Separation Agreement and General Release (the "Release"). (D.I. 65, Ex. L) In return for her execution of the Release, plaintiff was to receive bi-weekly payments for the period of June 11, 1997 through December 12, 1997 at her annual salary of $ 175,000 as well as reimbursement for medical, future medical, relocation, and business expenses. (D.I. 65, Ex. L)

## III. STANDARD OF REVIEW

[HN1] A court shall grant summary judgment only "when the admissible evidence fails to demonstrate a genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." *Wetzel v. Tucker, 139 F.3d 380, 383 n.2 (3d Cir. 1998)* [*16] (citing *Fed.R.Civ.P. 56(c)*). The moving party bears the burden of proving that no genuine issue of material fact exists. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S.*

*Ct. 1348 (1986).* "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita, 475 U.S. at 587* (quoting *Fed.R.Civ.P. 56(e)*). [HN2] The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).* The mere existence of some evidence in support of the nonmoving party, however, will not [*17] be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the non-moving party on that issue. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).*

## IV. DISCUSSION

### A. Plaintiff's Motion for Partial Summary Judgment

Pursuant to the terms of the November 15 and December 11, 1996 letters to plaintiff, Rodel granted plaintiff options to purchase Rodel common stock as compensation for her acceptance of employment with Rodel. Specifically, the letters provided that

> the option will entitle you [(plaintiff)] to purchase 10 shares immediately following your acceptance of this employment offer and, during the next seven year of your employment, 10 shares on each anniversary of your employment.

(D.I. 63, Ex. A) The parties [*18] do not dispute that options to purchase ten shares of Rodel stock vested upon plaintiff's acceptance of employment. They do disagree, however, as to whether those options were timely exercised and/or whether defendants effectively prevented plaintiff from exercising the options by not only failing to make the options available but also by failing to provide the promised financing. n9

n9 In count VIII of the complaint, plaintiff alleges that:

> 63. Rodel had a contractual obligation to make the option to acquire 80 shares of common stock available to plaintiff.
>
> 64. Budinger had a contractual obligation to make the option to acquire 400 shares of common stock available to plaintiff.
>
> 65. Rodel and Budinger both promised to finance the exercise of plaintiff's options through the financial resources of Rodel.
>
> 66. Rodel and Budinger have each, separately and in concert, reneged on their respective promises and obligations to plaintiff.
>
> 67. Plaintiff has been injured by the illegal conduct of Rodel and Budinger, and demands that defendants be directed to perform their contractual obligations to plaintiff.

(D.I. 1, PP 63-67)

[*19]

Plaintiff contends that the record is devoid of any evidence indicating that Rodel offered plaintiff an opportunity to exercise her rights to purchase these ten shares, and that such a failure constitutes "an undisputed breach of contract." First, plaintiff identifies defendants' failure to prepare formal contract documents concerning the stock options and financing arrangement despite her repeated requests that they do so. (D.I. 70, Ex. A at 104-06, 244-45, 333-35, 342) Plaintiff looks to the November 15 letter as requiring defendants to prepare such documentation. Second, plaintiff identifies the June 3, 1997 e-mail as an admission by Rodel's President that "the originally promised stock" was not delivered. Finally, she points to Rodel's apparent failure to provide the financing necessary for her to acquire the ten shares despite its obligation to do so.

In reply, defendants contend that plaintiff never exercised the vested options, and that such was a prerequisite to her ability to purchase the shares. Defendants first point to the affidavit of William Budinger in which he states that plaintiff "never communicated to me, or to any

person at Rodel that I am aware of, her intention [*20] to exercise the ten options." (D.I. 68, Ex. F at 2) Second, they look to plaintiff's notes from her June 11, 1997, meeting with Rodel's President, in which she indicates that he offered her one week to purchase ten shares of Rodel stock. According to Budinger's affidavit, during the meeting, plaintiff "specifically declined any commitment to exercise the options and said something to the effect that 'she would think about it.'" n10 (D.I. 70, Ex. F at 2) Finally, defendants contend that plaintiff's own deposition testimony demonstrates that, although the preparation of formal documents concerning the stock options was delayed due to drafting errors and administrative holdups, plaintiff was presented with drafts of the option documents prior to her separation from Rodel. (D.I. 70, Ex. C, Ex. E at 166, 168)

n10 Plaintiff argues that Budinger's affidavit is directly contradictory to his prior sworn testimony, in which he stated that he could not recall a specific instance where a Rodel employee had been offered the opportunity to exercise stock options after the termination of his/her employment, and thus cannot be used to create a genuine issue of fact. (D.I. 70 at 6) Plaintiff's own notes, however, indicate that Budinger made the offer in question.

[*21]

Given the dearth of objective, contemporaneous evidence, the court concludes that a factfinder reasonably could infer from the record at bar that defendants offered plaintiff the opportunity to exercise the vested options but that she failed to do so in a timely fashion. Moreover, genuine issues of material fact exist concerning, inter alia, (1) whether the ten vested options terminated upon plaintiff's separation from Rodel; (2) whether defendants were obligated to prepare formal documentation regarding the stock options and their financing; and (3) whether defendants breached their obligation to provide plaintiff the financing necessary to allow her to exercise the options. Accordingly, plaintiff's motion for partial summary judgment shall be denied.

**B. Defendants' Motion for Summary Judgment**

**1. Counts III n11 and VIII**

n11 In count III, plaintiff alleges the following:

33. Rodel's promise to finance the purchase of equity in the company by [plaintiff] constituted a

contract between [plaintiff] and Rodel which is supported by consideration.

34. [Plaintiff] fulfilled all conditions precedent to the contract.

35. Rodel breached the contract by failing to provide financing for [plaintiff] to purchase equity interests in Rodel.

36. Plaintiff has been damaged as a result of Rodel's breach.

(D.I. 1, PP 33-36)

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - -[HN3]

[*22]

Construction of contract language is a question of law. See *Pellaton v. Bank of New York, 592 A.2d 473, 478 (Del. 1991)*. The primary consideration in interpreting a contract is to give effect to the intent of the parties at the time they contracted, and the court will attempt to determine intent from the overall language of the contract. See *Myers v. Myers, 408 A.2d 279, 280-81 (Del. 1979)*. In ascertaining intent, Delaware courts adhere to the "objective" theory of contracts. See *Cantera v. Marriott Senior Living Servs., Inc., 1999 Del. Ch. LEXIS 26, No. 16498, 1999 WL 118823*, at *4 (Del. Ch. Feb. 18, 1999). Under this approach, a contract's "construction should be that which would be understood by an objective reasonable third party." *R.E. Haight & Assocs. v. W.B. Venables & Sons, Inc., 1996 Del. Super. LEXIS 445, C.A. No. 94 C-11-023, 1996 WL 658969*, at *3 (Del. Super. Ct. Oct. 30, 1996) (quoting *Demetree v. Commonwealth Trust Co., 1996 Del. Ch. LEXIS 112, No. 14354, 1996 WL 494910*, at *4 (Del. Ch. Aug. 27, 1996)). Thus,

[HN4] where the parties have entered into an unambiguous integrated written contract, the contract[']s construction should be that which would be understood [*23] by an objective reasonable third party. An inquiry into the subjective unexpressed intent or understanding of the individual parties [to the contract] is neither necessary nor appropriate where the words of the contract are sufficiently clear to prevent reasonable persons from disagreeing as to their meaning.

*Demetree*, 1996 WL 494910, at *4; accord *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."). The court must first determine whether the contractual language in dispute, when read in the context of the entire contract, is ambiguous.

[HN5] Ambiguity exists only when a contractual provision is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992); accord *SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 42 (Del. 1998) (same). [*24]

> Ambiguity does not exist where the court can determine the meaning of a contract "without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends."

*Rhone-Poulenc*, 616 A.2d at 1196 (quoting *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. 1983)). [HN6] Contractual language "is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Id.* Nor is it ambiguous "simply because the parties in litigation differ concerning its meaning." *City Investing Co. Liquidating Trust v. Continental Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993). "The mere assertion that ambiguity or divergent intent exists will not prevent summary judgment from being entered." Charles Alan Wright et al., Federal Practice and Procedure, § 2730.1, at 65 (1998).

In the instant action, the disagreement centers on the language of the stock options found in the correspondence between Rodel and its President and plaintiff, specifically the terms of vesting. Defendants contend that the language of both the "Rodel Option" n12 and the "Budinger Call " n13 is clear on [*25] its face, providing, with the exception of the ten shares that vested upon plaintiff's acceptance of employment, for each installment of the options to vest, if it does at all, at the time at end of each year of plaintiff's employment with Rodel, i.e., on her anniversary date. (D.I. 65 at 13-16) Consequently, they argue that upon plaintiff's separation from employment with Rodel, only ten options had vested under the

Rodel Option and none under the Budinger Call. (D.I. 65 at 13)

> n12 By "Rodel Option," defendants are referring to the offer to issue plaintiff an option to purchase 80 shares of Rodel stock set forth in Rodel's November 15 and December 11, 1996 letters to plaintiff.

> n13 By "Budinger Call" defendants are referring to Rodel's President's offer to plaintiff to buy a call on 400 shares of his personal Rodel stock which is set forth in the President's November 15, 1996 letter to plaintiff.

According to plaintiff, the terms of vesting set forth in the Rodel Option and the Budinger Call are ambiguous, thus [*26] giving rise to genuine issues of material fact which preclude the possibility of summary judgment. Specifically, plaintiff contends that both the Rodel Option and the Budinger Call could be interpreted as allowing for the vesting of the options on a pro rata basis during each year of plaintiff's employment, such that the designated installment of options would become vested in toto on each of her anniversary dates. (D.I. 67 at 9, 15) Moreover, plaintiff maintains that the vesting schedule of the Budinger Option should be construed to operate in the same manner as that of the Rodel Option, i.e., the first installment of forty shares vesting immediately upon her acceptance of employment with the remaining options vesting over a period of years--an entitlement to forty shares accruing on each of her anniversary dates. (D.I. 67 at 11)

The court concludes that with respect to the Rodel Option the provision in question is not "reasonably or fairly susceptible" of differing interpretations or meanings and thus is unambiguous. n14 The Rodel Option manifests the parties' clear intent that, aside from the initial right to purchase ten shares which would vest upon her acceptance of employment, [*27] the options would vest at a rate of ten per year and that vesting would take place en masse on plaintiff's anniversary date. Any construction of the contract that would allow for the vesting of options on an accrual basis during each year of employment would abrogate the clear intentions of the contracting parties. Accordingly, since plaintiff's employment with Rodel began on January 6, 1997, the second ten-share option installment would not have vested until January 6, 1998. Plaintiff was no longer in Rodel's employ as of that date; therefore, the second option block never vested. Per the terms of the Rodel Option, which provides that "entitlement to purchase will last until [the] end of your employment," plaintiff has no right to exer-

cise any options not vested as of the date of her separation of employment with Rodel.

n14 [HN7] In the absence of ambiguity in the contract, "the writing itself is the sole source for gaining an understanding of intent." *E.I. duPont de Nemours & Company v. Admiral Ins. Co., 711 A.2d 45, 56 (Del. 1995)*; accord *Northwestern Nat'l Ins. Co. v. Esmark, Inc., 672 A.2d 41, 43 (Del. 1996)* ("Courts consider extrinsic evidence to interpret the agreement only if there is an ambiguity in the contract."); *Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del. 1992)* ("It is an elementary canon of contract construction that the intent of the parties must be ascertained from the language of the contract. Only when there are ambiguities may a court look to collateral circumstances.") (citations omitted). Because the court finds no ambiguity in the construction or interpretation of the language of the Rodel Option, it has no occasion to consider the offers of extrinsic evidence on which plaintiff relies in support of her rejected interpretation. See *Eagle Indus., 702 A.2d at 1232* ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create ambiguity.").

[*28]

Likewise, the vesting schedule set forth in the Budinger Call is not reasonably susceptible of more than one interpretation. The November 15 facsimile from Rodel's President offered plaintiff an opportunity to buy a call on 400 shares of stock "exercisable at the rate of 40 shares per year for every year you are with us." Plaintiff's strained interpretation, which would allow for the first forty shares to vest upon plaintiff's acceptance of employment while having the remaining installments vest on a pro rata basis during her tenure of service, is not a reasonable reading of the provision's text. [HN8] "The court will not twist, distort or torture contractual terms to create an ambiguity when the language is clear and unambiguous." *Admiral Ins. Co., 711 A.2d at 57.* The provision unambiguously conveys the parties' expectation that, in return for n15 each year of service, plaintiff would be entitled to options on forty shares of stock. Accordingly, the completion of one year of employment was a condition precedent to plaintiff's entitlement to options in any of Rodel's President's personal shares of stock. Consistent with the parties' manifest intent, the first installment [*29] of the Budinger Call would not have vested until the first anniversary of plaintiff's employment with Rodel. The remaining installments would have vested, had they vested, at the end of each subse-

quent year of plaintiff's employment. Since plaintiff's employment with Rodel terminated prior to the completion of her first year of service, she never vested in the options to purchase the first forty shares under the Budinger Call.

n15 As plaintiff notes, the word "for" has many meanings, including, as plaintiff notes, "before," "as a preparation toward," "a prerequisite to," "so as to secure as a result," and "in connection with." (D.I. 67 at 9) However, within the context of the Budinger Call, the word is used to denote "in exchange as the equivalent of . . . or in the requital of." Webster's Third New Int'l Dictionary 886 (1971).

Consistent with the above constructions, with respect to counts III and VIII of the complaint, plaintiff is limited to seeking enforcement of her contractual rights, if any, to the [*30] options to purchase the ten shares of Rodel stock which vested upon her acceptance of employment pursuant to the Rodel Option and Rodel's subsequent promise to finance the purchase of said equity. Further, the court shall grant summary judgment in defendants' favor to the extent that plaintiff seeks to enforce any contractual rights against Budinger pursuant to the Budinger Call. n16

n16 Defendants have requested Budinger's release as a defendant in this action. The court finds, at this juncture, that release is not warranted.

### 2. Counts VI n17 and VII n18

n17 Count VI provides in relevant part:

53. Rodel promised [plaintiff] that she could purchase 80 shares of Rodel stock with financing provided by Rodel.

54. In reliance on Rodel's promises, [plaintiff] changed her position when she resigned from her previous employment, moved to Delaware, and commenced employment with Rodel.

55. Rodel failed to keep its promise either to finance [plaintiff's] purchase of its stock or oth-

erwise allow her to purchase any Rodel stock.

56. Plaintiff has been damaged by changing position in reliance on Rodel's promise.

(D.I. 1, PP 53-56)
[*31]

n18 Count VII provides in relevant part:

58. Budinger promised [plaintiff] that he would sell her a call to purchase 400 shares of Rodel stock owned by Budinger.

59. In reasonable reliance on Budinger's promise [plaintiff] changed her position when she resigned from her previous employment, moved to Delaware, and commenced employment with Rodel.

60. Budinger failed to keep his promise to sell [plaintiff] a call to purchase 400 shares of Rodel stock owned by Budinger.

61. Plaintiff has been damaged by changing position in reliance on Budinger's promise.

(D.I. 1, PP 58-61)

Counts VI and VII of the complaint are premised upon the theory of promissory estoppel. Specifically, plaintiff alleges in these causes of action that in reliance on Rodel's and its President's offer of stock options she changed her position when she resigned from her previous employment and moved to Delaware to commence work with Rodel. (D.I. 1, PP 52-61) Defendants argue that these claims must fail as a matter of law because plaintiff has pled the existence of valid and enforceable contracts. n19 The court [*32] finds defendants' request premature.

n19 In fact, plaintiff has argued that the record is devoid of any evidence challenging the existence of a contract between Rodel and herself. (D.I. 63 at 7-10) Defendants do not appear to challenge the existence of such a contract.

[HN9] It is axiomatic that a claim for promissory estoppel is applicable only in the absence of an enforceable contract. See *Carlson v. Arnot-Ogden Memorial Hosp., 918 F.2d 411, 416 (3rd Cir.1990)* (suggesting that an employee may make a promissory estoppel claim where the normal contract requirements are not met: "In light of our finding that the parties formed an enforceable contract, relief under a promissory estoppel claim is unwarranted"); *Kysor Indus. Corp. v. Margaux, 674 A.2d 889, 896 (Del. Super. Ct. 1996)* (finding it unnecessary to address the issue of promissory estoppel where there is a contract). It is equally indisputable that [HN10] the Federal Rules of Civil Procedure allow for alternative and inconsistent claims [*33] to be made in a complaint. See *Fed.R.Civ.P. 8(e)(2)* ("A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds.") In the case at bar, the court has yet to make a finding that the correspondence at issue comprises valid and enforceable contracts. n20 Until the time that such a finding is made, plaintiff is free to pursue her promissory estoppel claims.

n20 Although the court has construed the language of the putative agreements it has never made any finding regarding their enforceability or validity.

### 3. Punitive Damages

Defendants assert that they are entitled to summary judgment with respect to plaintiff's claim for punitive damages, arguing that the facts at bar do not warrant such an award under Delaware law. The Delaware Supreme Court addressed the issue of punitive damages in a breach of employment contract action in *E.I. duPont de Nemours & Co. v. Pressman, 679 A.2d 436 (Del. 1996).* [*34] In Pressman, the plaintiff, an employee of defendant, sued for punitive damages based on breach of his employment contract, alleging that one of defendant's agents had manufactured materially false grounds to cause plaintiff's dismissal. [HN11] The Delaware Supreme Court, sitting en banc, held that "punitive damages are not available for any breach of the employment contract which may be found by the jury upon retrial of [plaintiff's] claim." *Id. at 448.* In so holding, the Delaware Supreme Court recognized that the traditional rule, which allows recovery of punitive damages for breach of contract only where the conduct amounts to an independent tort, has been subjected by other courts to a number of exceptions including,

breach of contract to marry; failure of a public monopoly to discharge its obligations to the public; breach of a fiduciary duty; breach accompanied by fraudulent conduct; and bad faith refusal by an insurer to settle a claim[,]

but was itself "reluctant to depart markedly from the well-established body of law." *Id. at 445-46.* The Delaware Supreme Court acknowledged that previously it had permitted punitive damages [*35] in the insurance "bad faith" context but went on to distinguish the employment relationship from that of insurer-insured:

> Market forces will not allow an employer consistently to treat valued employees in such a shabby manner as that presented here. An employer has an incentive to retain and motivate employees to achieve its mission. . . . Corporations cannot allow their agents systematically to engage in ill treatment of employees, particularly in light of "the numerous protections against improper terminations already afforded employees."

> Insurance is different. Once an insured files a claim, the insurer has a strong incentive to conserve its financial resources balanced against the effect on its reputation of a "hard-ball" approach. Insurance contracts are also unique in another respect. Unlike other contracts, the insured has no ability to "cover" if the insurer refuses without justification to pay a claim. . . . In a typical contract, the non-breaching party can replace the performance of the breaching party by paying the then-prevailing market price for the counter-performance. With insurance this is simply not possible. This feature of insurance contracts distinguishes [*36] them from other contracts and justifies the availability of punitive damages for breach in limited circumstances.

*Id. at 447* (internal footnotes and citations omitted); *see also Colonial Ins. Co. of Calif. v. Sudler, 1997 Del. Super. LEXIS 633, C.A. No. 97 A-02-016-CHT, 1997 WL 1048174,* at *4 (Del. Super. Ct. Sept. 25, 1997) (stating that in light of Pressman "punitive damages are generally not available for breach of contract absent a showing of

bad faith that amounts to an independent tort which alone would support such an award").

In the case at bar, plaintiff states that "Pressman should be not [sic] invoked outside of actions seeking punitive damages for breach of employment-at-will contracts," noting that "as the court is well aware, the present action is not an action for breach of plaintiff's employment contract, thus Pressman serves as no bar to punitive damages." (D.I. 67 at 17-18) Even if the court were to accept plaintiff's description of the case n21 and her reading of Pressman, plaintiff has failed to allege fraudulent or deceitful conduct on the part of defendants that alone would support an independent tort. Moreover, plaintiff is barred [*37] from asserting such allegations by virtue of her execution of the Separation Agreement and General Release ("the Release"). The court previously has interpreted the Release as manifesting "the parties' clear intent to limit the scope of future litigation to "a putative breach of contract claim" involving **only** "the terms" of the option agreements." (D.I. 58 at 16) (emphasis in original). Accordingly, the court limited plaintiff "to those causes of action involving the terms of the option agreements that can be established without proof of the facts surrounding her employment and/or separation." (D.I. 58 at 16) Since plaintiff is barred by reason of the Release from presenting evidence of any tortious conduct on the part of defendants, the court finds that punitive damages are not an available remedy in the case at bar.

---

n21 The court notes in this regard that plaintiff, in her brief in support of her motion for partial summary judgment (D.I. 63), referred to the letters of November 15, December 11, and December 12, 1996 as "comprising the offer of employment made by Budinger and Rodel to the plaintiff." (D.I. 63 at 7) She then went on to state that "one of the terms of this employment contract was itself a contract for the issuance of options to plaintiff, allowing her to purchase a total of 80 shares of Rodel common stock from Rodel." (D.I. 63 at 7)

---

[*38]

## V. CONCLUSION

For the reasons stated above, the court concludes that there are genuine issues of material fact relating to count VIII of the complaint that preclude the grant of summary judgment. The court finds that with respect to counts III and VIII that plaintiff is limited to seeking enforcement of her contractual rights, if any, to the options to purchase the ten shares of Rodel common stock

1999 U.S. Dist. LEXIS 15502, *

that vested upon her acceptance of employment pursuant to the Rodel Option and Rodel's promise to finance the purchase of said equity. Consistent with this finding, count VIII is dismissed to the extent that plaintiff seeks to enforce any contractual rights against defendant Budinger pursuant to the Budinger Call. With respect to counts VI and VII, the court finds that summary judgment in defendants' favor is not warranted at this time. The court further finds that punitive damages are not warranted in the case at bar. Accordingly, the court will deny plaintiff's motion for summary judgment and grant in part and deny in part defendants' motion for partial summary judgment. An appropriate order shall issue.