EXHIBIT "C"

**Westlaw.**

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
LIAFAIL, INC., Plaintiff and Counterclaim Defendant
v.
LEARNING 2000, INC., James Richard Story, III, individually, Antonio Santini, individually, ILC, Inc., SFD, Inc,. and S & S Enterprises, Defendants and Counterclaim Plaintiffs and Third-Party Plaintiffs,
v.
Frank STUCKI, Third-Party Defendant.
Nos. C.A.01-599 GMS, C.A.01-678 GMS.

Nov. 25, 2002.

*MEMORANDUM AND ORDER*

SLEET, J.

## I. INTRODUCTION

*1 On June 5, 2001, the plaintiff and counter-claim defendant, Liafail, Inc. ("Liafail") filed a complaint in the United States District Court for the Western District of Kentucky, setting forth various contractual theories of liability. The United States District Court for the Western District of Kentucky transferred this case to the United States District Court for the District of Delaware on August 29, 2001. This case became Civil Action Number 01-599-GMS.

On October 9, 2001, Learning 2000, Inc ("L2K") commenced Civil Action Number 01-678-GMS in the United States District Court for the District of Delaware. In that complaint, L2K alleges that Liafail violated, *inter alia*, Section 43 of the Lanham Act, 15 U.S.C. § 1125(a); Section 2532 of the Delaware Uniform Deceptive Trade Practices Act, and the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d).

By stipulation of the parties, the court consolidated Civil Actions 01-599-GMS and 01-678-GMS on November 2, 2001.

Presently before the court is L2K's motion for summary judgment on all counts of Liafail's amended complaint. For the following reasons, the court will grant this motion in part and deny it in part.

## II. STANDARD OF REVIEW

The court may grant summary judgment only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue is "genuine" if, given the evidence, a reasonable jury could return a verdict in favor of the non-moving party. *See, e.g., Abraham v. Raso,* 183 F.3d 279, 287 (3d Cir.1999) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-51 (1986)); *Lloyd v. Jefferson,* 53 F.Supp.2d 643, 654 (D.Del.1999) (citing same). A fact is "material" if it bears on an essential element of the plaintiff's claim. *See, e.g., Abraham,* 183 F.3d at 287; *Lloyd,* 53 F.Supp.2d at 654. On summary judgment, the court cannot weigh the evidence or make credibility determinations. *See Anderson,* 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict ."); *International Union, United Auto., Aerospace & Ag. Implement Workers of America, U.A.W. v. Skinner Engine Co.,* 188 F.3d 130, 137 (3d Cir.1999) ("At the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact finder."). Instead, the court can only determine whether there is a genuine issue for trial. *See Abraham,* 183 F.3d at 287. In doing so, the court must look at the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences, and resolving all reasonable doubts in favor of that party. *See, e.g., Pacitti v. Macy's,* 193 F.3d 766, 772 (3d Cir.1999). With this standard in mind, the court will now describe the facts leading to the motion presently before the court.

## III. BACKGROUND

*2 Liafail is the owner of the "Lifetime Library," a series of multimedia programs that allow students to master skills in reading, writing, math, and other subjects at their own pace. In January 1997, Liafail and SFD, Inc. ("SFD") entered into an Exclusive Distribution Agreement and Agreement of Sale of Software (the "Original Agreement"). Under the Original Agreement, Liafail granted SFD the exclusive right to distribute "Lifetime Library"

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

software in exchange for royalty payments. The Original Agreement also contemplated the eventual sale of title to the "Lifetime Library" software to SFD once SFD paid a threshold amount of royalties to Liafail.

Because disputes arose between the parties regarding their rights and obligations under the Original Agreement, Liafail and L2K entered into an agreement on May 12, 2000 ("the May 12 Agreement"). This agreement was to serve as a basis for a formal agreement to be drafted jointly by each of the parties' attorneys. Pursuant to the agreement, at a May 24, 2000 meeting of the L2K Board, Frank Stucki, Liafail's President and Keith Hanson, Liafail's Vice President, were elected to the L2K Board and began serving immediately.

The more "formal" agreement contemplated by the parties became embodied in the Agreement and Release of August 15, 2000 (the "Second Agreement"). The Second Agreement terminated the Original Agreement, restructured the relationship between the parties, and released and discharged L2K from claims Liafail might have had under the Original Agreement, or any other agreements or understanding predating the Second Agreement.

The parties again restructured their relationship on September 27, 200 when Liafail and L2K, among others, entered into the Asset Purchase Agreement ("APA"). The APA provided, among other things:
[t]hat the Original Agreement and the Second Agreement, to the extent not previously terminated or superseded, are hereby terminated and superceded. All rights and obligations of the parties with respect to the subject matter thereof shall be governed by this Agreement along with the License Agreement and the License Amendment.

APA § 6(1)(i).

Under the APA, Liafail agreed to transfer its interest in the "Lifetime Library" software to L2K upon payment of a sum of money. The APA contemplated, but was not conditioned upon, an Initial Public Offering ("IPO") of L2K stock. L2K was obligated to purchase the software only if the closing of the L2K stock IPO took place on or prior to June 30, 2001. Finally, the APA reflected Liafail's agreement to release and discharge L2K from any and all claims arising from any agreement or understanding which predated the APA.

Simultaneously with the APA's execution, Liafail and L2K entered into a License and Royalty Agreement (the "License Agreement"). In the License Agreement, Liafail agreed to license the Lifetime Library software to L2K pending the closing of the APA. In addition, the parties executed an Amendment to the License and Royalty Agreement (the "Amendment"). This Amendment was to become effective on July 1, 2001, if the APA did not close. L2K maintains that both parties anticipated that L2K would continue to sell the Lifetime Library as evidenced by their agreement to negotiate a new license agreement in good faith. Pending the execution of such an agreement, the Amendment stated that L2K could continue to sell the Lifetime Library software on a non-exclusive basis until it successfully fulfilled the contracts that existed as of June 30, 2001.

IV. DISCUSSION

A. Count One-Recission

*3 In Count I of the complaint, Liafail seeks to rescind the Second Agreement and the APA based upon: (1) L2K's alleged material breaches of the Agreements; (2) L2K's alleged material misrepresentations inducing Liafail to enter into those Agreements; and (3) an alleged failure of consideration. The court will consider each argument in turn.

1. Material Breach

It is well-settled that a material breach of a contract gives the non-breaching party the right to rescind that contract. See e.g. Saienni v. G & C Capital Grow, Inc., 1997 WL 363919, at *2 (Del.Super. May 1, 1997); Sheehan v. Hepburn, 138 A.2d 810, 812 (Del. Ch.1958). To establish a breach of contract claim, the plaintiff must identify facts in the record to prove (a) that it suffered a legally cognizable injury; and (b) that this injury was proximately caused by the defendant's alleged conduct. See Great Lakes Chem. Corp. v. Pharmacia Corp., 788 A.2d 544, 549 (Del. Ch.2001).

In the present case, it is undisputed that both the Second Agreement and the APA expressly required L2K to exercise its best efforts in consummating its Public Offering. Liafail now argues that L2K did not use its best efforts, and therefore, breached the contract. The court recognizes that whether a party

Not Reported in F.Supp.2d                                                                                                     Page 3
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

has exercised its best efforts is a fact intensive inquiry. *See Brown v. The Buschman Co.,* 2002 WL 389139, *5 (D.Del. March 12, 2002). Notwithstanding this fact, however, Liafail has not demonstrated that it can meet the other necessary elements to establish a breach of contract. Specifically, it has failed to identify any competent evidence to demonstrate that is has suffered a legally cognizable injury and that this injury was proximately caused by L2K's alleged conduct. Instead, Liafail purports to rely on its damages expert's report for the proposition that, "the materiality of L2K's failure to use its best efforts is evidence in that, as a result of the delays occasioned by its lack of organization and existing resources, L2K missed the opportunity to pursue the transaction which served as the basis for the contract." Liafail's Answer Brief at 18 (citing Finch Report at 8-11.).

Upon review of the cited portion of the report, however, it is apparent that the expert merely opined that, "L2K was deficient in certain fundamental areas that would have made them more attractive to external investors and made their IPO more viable." Finch Report at 8. This opinion alone, however, fails to raise a factual issue with regard to injury and causation. [FN1] Indeed, L2K has provided deposition testimony from Liafail's own 30(b)(6) witness Michelle Moreno that the unfavorable market conditions could have prompted the underwriter to call off the IPO. *See* Deposition of Michelle Moreno at 159-161. Thus, because Liafail has not established the existence of each of the essential elements of this count, the court must grant L2K summary judgment.

> FN1. Because the court has determined that the aforementioned sentence in the expert report is insufficient to raise a factual issue, it will deny L2K's motion to strike this sentence as moot.

### 2. Fraud in the Inducement

*4 Liafail's alternative ground for recission of the Second Agreement and the APA rests upon its claim for fraud or material representation in the inducement of those contracts. Fraud and/or material representation in the inducement of a contract is a well-established basis for recission in Delaware. [FN2] *See e.g., Norton v. Poplos,* 443 A.2d 1, 4 (Del.1982). To prevail on this claim under Delaware law, Liafail bears the burden of proving each of the following elements: (1) there was a misrepresentation; (2) L2K knew or believed the representation was false or made with reckless indifference to the truth; (3) the misrepresentation induced Liafail to enter into the APA; (4) Liafail's reliance on the misrepresentation was reasonable; and (5) Liafail was damaged as a result of its reliance on the misrepresentation. *See e.g., Associated/Acc Int'l, Ltd. v. DuPont Flooring Sys. Franchise Co.,* 2002 U.S. Dist. LEXIS 6464, at * 14-15 (D.Del. Mar. 28, 2002). For the following reasons, the court concludes that Liafail's claim on this ground must fail.

> FN2. Pursuant to Section 13(c) of the APA, "[t]his Agreement shall be construed and enforced in accordance with the laws of the State of Delaware, without regard to its principles of conflicts of laws."

When pleading fraud, "the circumstances constituting fraud ... shall be stated with particularity." Fed. R. Civ. P. 9(b). "This means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). Liafail's fraudulent inducement claim falls far short of meeting this standard because it fails to identify, with the required specificity, when, by whom, to whom, and under what circumstances, the alleged false statements were made which induced Liafail to enter into the APA. Indeed, it is only in Liafail's answer brief to the present motion that it suggests, without citations to any supporting source, what it believes the fraudulent misrepresentations were. [FN3] Such conclusory allegations, which appear for the first time in an answer brief on summary judgment, are not sufficient to satisfy Rule 9(b)'s mandate. [FN4] *See Schaller Tel. Co. v. Golden Sky Sys.,* 298 F.3d 736, 746 (8th Cir. July 31, 2002). Finally, even were the court to accept these statements, Liafail has failed to provide evidence as to who, when, and how the alleged statements were made. In light of this conclusion, the court need not address the remainder of Liafail's arguments as to why summary judgment would be inappropriate since each of those arguments assumes a properly pled fraud claim. Accordingly, the court will grant summary judgment on this claim.

> FN3. Specifically, Liafail now contends that it is suing on the following representations: (1) that L2K had not disclosed ownership of the Library to the underwriters when it solicited the opinions it passed on to Liafail; (2) that L2K had never defined or disclosed its capital structure and misled Liafail as to

the ownership of its stock; (3) that L2K did not have the wherewithal to provide complete financial information; (4) that L2K had secured the participation of various directors; and (5) that L2K had no reasonable belief that it could successfully pursue an IPO. See Answer Brief at 28. Liafail has not provided any further detail regarding these alleged misrepresentations.

FN4. Furthermore, Liafail's conclusory allegations that unspecified communications induced it to enter into the APA are inherently suspect because Nicholas Quinn, Liafail's CEO and director, could not identify a single false or misleading statement that L2K made in order to induce Liafail to enter into the APA. See e.g., Deposition of Nicholas Quinn at 107-108, 119, 140.

3. Failure of Consideration

The express terms of the APA state that:
in consideration of the mutual promises and covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree ...

APA at 1. As a final alternative ground for its recission claim, however, Liafail nevertheless alleges that there was a failure of consideration. Specifically, Liafail argues that, if the APA enabled L2K to avoid all of its liability under the Original Agreement, and to also avoid its obligation under the Second Agreement to pay a minimum $4 million regardless of the outcome of the IPO, then Liafail received, and L2K gave, nothing of value in the APA beyond that to which Liafail was already entitled in the Second Agreement. Liafail maintains that, in such a circumstance, the recital of consideration contained in the APA could not preclude Liafail from canceling it based on a failure of consideration. See 32A C.J.S. Evidence § 953 (noting that "a recital in a written instrument as to the payment or receipt of the consideration is not conclusive ... and may be contradicted, modified, or explained."). The court must disagree that there was insufficient consideration.

*5 Valid consideration confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance, or return promise bargained for and given in exchange for the original promise. See e.g. First Mortg. Co. of Pa. v. Federal Leasing Corp., 456 A.2d 794, 795 (Del.1982). According to the terms of the APA, L2K's legal detriment consisted of, among other things, its release of all claims arising out of the Original Agreement and the Second Agreement. See APA Section 6(1)(iii), (iv), (v), and (vii). Furthermore, it has long been established that the release of a dispute is legal consideration. See Restatement (Second) of Contracts § 74 (1981). Accordingly, L2K is entitled to summary judgment on this claim.

B. Count Two-Breach of the 1997 Agreement

Liafail next alleges that L2K breached the parties' 1997 Original Agreement. However, if the language of a contract "clearly establishes a release from liability, 'the presumption is that the parties executing such a formal agreement intended what they said.' " Conley v. Dan-Webforming Int'l. A/S (Ltd.), 1992 WL 401628, at *10 (D.Del. Dec. 29, 1992). In the present case, the APA provides, in relevant part:

Section 6(1) Prior Agreements. Upon execution of this Agreement, the parties hereby agree:
(i) That the Original Agreement and the Second Agreement, to the extent not previously terminated or superseded, are hereby terminated and superseded. All rights and obligations of the parties with respect to the subject matter thereof shall be governed by this Agreement with the License Agreement and the License Amendment.
(ii) Liafail hereby releases, discharges and acquits L2K, its successors and assigns, and its management, agents, servants and employees, from any and all payments, monies, claims, demands, actions, liabilities, damages, costs, expenses, Royalties, and division of Net Profits arising out of the Original Agreement, the Second Agreement or any subsequent agreements or undertakings between the parties prior to this Agreement, except for the License Agreements.

Frank Stucki confirmed at his deposition that all parts of the 1997 Agreement were encompassed and intended to be terminated by the APA. See Deposition of Frank Stucki at 141-142. Liafail's understanding as to the effect of this release is further confirmed by discussions between Liafail's president, Frank Stucki, and vice president, Keith Hansen ("Hansen"), about the prospects of success on a breach of contract claim under the 1997 Agreement. Specifically, at his deposition, Hansen testified that they discussed

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

the fact that, gee, we provided releases when Learning 2000 had really violated the first contract right and left, owed us money every place. We released them from that responsibility on the basis of promises that they made that we would have an IPO and everything would be fixed. They didn't hold up their end. Now we're sitting without an IPO and we have released them. So we don't have a basis to go back for damages under the first contract.

*6 Deposition of Keith Hansen at 185. Frank Stucki confirmed that he and Hansen discussed his concern that Liafail might not be able to sue L2K for damages under the Original Agreement because Liafail had given L2K releases in the APA. *See* Deposition of Frank Stucki at 132-133. He further testified that this reflected his understanding about how the release worked. *See id.*

Notwithstanding this clear intent to release any claims pre-dating the APA, Liafail now wishes to be relieved from the bargain that it has struck "in light of L2K's fraudulent inducement ." As the court discussed above, however, Liafail has failed to state a fraud claim. Accordingly, the court will grant L2K's motion for summary judgment on this claim.

C. Count Three-Fraud

As discussed in Section IV.A, *supra,* Liafail has failed to identify any alleged fraudulent statements with the required specificity in its pleadings. Thus, the court is constrained to grant L2K's motion for summary judgment on this claim.

D. Count Four-Negligent Misrepresentation

In any negligence cause of action, the plaintiff must establish that: (1) the defendant owed a duty; (2) the duty was breached; and (3) the breach was the proximate cause of damages. *See generally* W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 30, at 164-165 (5th ed.1984). In the present case, Liafail alleges that L2K "supplied Liafail with false information regarding the financial condition of the company, the feasibility of a public offering and/or their intentions with regard to the offering." Amended Complaint at ¶ 133.

Liafail has not, however, proffered any evidence with regard to whether the alleged misrepresentations proximately caused damages to Liafail. If Liafail does not demonstrate "a pecuniary loss caused by" the alleged negligent misrepresentation, its claim "must fail." *Darnell v. Myers,* 1998 WL 294012, at *5 (Del. Ch. May 27, 1998). As Liafail has not raised a genuine issue of material fact that it has suffered damages and that those damages were causally related to actionable misrepresentations, the court must grant summary judgment in L2K's favor.

E. Count Five-Breach of the APA

L2K's motion for summary judgment on this claim depends on the alleged failure of various conditions. In response, Liafail has alleged that all the items L2K identifies as conditions precedent were in fact fulfilled, waived, or prevented from occurring by L2K's own actions.

One of the conditions precedent that would have to have been fulfilled before L2K's obligations matured was that Liafail would enter into certain agreements within seven days of the APA's effective date. At his deposition, Frank Stucki admitted that, while Liafail had not entered into those agreements within the seven days, it was because L2K had granted Liafail an extension. *See* Deposition of Frank Stucki at 199-201. His counsel, who would have handled the agreement negotiations, also had this understanding. *See* Deposition of Russel Holloway at 154, Deposition of Susan Neumeyer at 266. In fact, Susan Neumeyer testified at her deposition that this belief was reinforced by the participation of the attorneys handling the IPO in the negotiations. *See* Deposition of Susan Neumeyer at 204. These negotiations took place without any indication that L2K considered the delay a material breach of the agreement, or that the attorneys themselves considered it in any way material to the success of the IPO. *See id.* Thus, there remains a genuine issue of material fact with regard to whether the agreements were material requirements of the APA.

*7 L2K next claims that its obligation to go forward with the transaction was contingent on the correctness and truth of Liafail's representations. To the extent that any of Liafail's representations or warranties failed, L2K would no longer have an obligation to go forward with the transaction. L2K now argues that Liafail's actions in the current lawsuit breached the representations it made in the APA that, *inter alia,* Liafail had received sufficient consideration and that the parties desired for their relationship and respective rights and obligations to be governed by the APA. Liafail in turn contends that it was only L2K's revelation that it never intended to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 6

honor its commitments and its alleged misrepresentations of various facts which led Liafail to "disavow" its obligation to abide by these statements. Were the court to credit L2K's argument on this point, it would have to find against Liafail, as the court has already granted L2K's motion for summary judgment on the fraud and negligent misrepresentation claims. However, the court need not reach this decision as it finds L2K's contentions on this point to be frivolous. L2K's obligations to perform would have matured, if at all, well before this lawsuit commenced. Thus, it cannot use Liafail's current representations as an excuse for its alleged failure to perform.

L2K next argues that it was not obligated to consummate the transaction until it was, in its sole discretion, satisfied with the results of its due diligence review of the assets. L2K now contends that the record is devoid of any competent evidence demonstrating that it was afforded an opportunity to complete a due diligence review of the assets, and satisfy itself as to the sufficiency and accuracy of the review. In response, Liafail maintains that, in the two years L2K served as its distributor, it had ample time and opportunity to perform its due diligence. Moreover, it argues that L2K has not pointed to one instance in which Liafail refused to provide L2K with requested information. Indeed, Liafail asserts that it gave L2K full access to the Lifetime Library, even to the extent of turning over the source code for the new product. *See* Deposition of Frank Stucki at 59-60. On these contested facts, the court cannot determine the effect of this alleged condition precedent. Thus, to grant summary judgment on this ground would be improper.

L2K further contends that it was not obligated to proceed with the IPO unless certain market conditions existed. However, no particular market conditions had to exist before L2K was obligated to make a good faith attempt to ready the company for moving forward in accordance with the parties' joint plans. The court thus finds L2K's argument on this point unavailing.

L2K next offers that, before the IPO could proceed, the lead underwriter had to retain co-managers for the IPO. In turn, Liafail offers deposition testimony that three co-managers remained "in the mix" at the time the IPO preparations were halted. *See* Deposition of Michelle Moreno at 160, 172. Moreover, Liafail argues that, while a co-manager would have been desirable, nothing in the APA conditioned any obligation on the hiring of a co-manager. Thus, the court will not grant L2K's motion for summary judgment on this ground.

*8 With regard to L2K's remaining two arguments, namely that Liafail's audit was not completed and the Lifetime Library's relationship with certain companies had not been clarified, the court finds these arguments unpersuasive as well. Liafail submits that its audit was conducted by Ernst & Young, the accountants engaged to do so by L2K. According to the record, Ernst & Young indicated that it did not require any further information from Liafail. *See* Deposition of Susan Neumeyer at 179, Deposition of Frank Stucki at 666. Frank Stucki further testified that L2K had "called off" Ernst and Young. *See* Deposition of Frank Stucki at 213. Liafail was not informed that Ernst & Young needed any further information, and in fact, Ernst & Young testified that it too had set aside this question pending resolution of issues for which L2K had yet to provide information. *See* Deposition of Clint Adams at 322. Similarly, with regard to the Library's relationship with two companies, Liafail argues that it obtained signed extensions in the form suggested by L2K's attorneys after working with the attorneys for a long period of time. *See* Deposition of Susan Neumeyer at 203, 264-265. In light of these contested issues, the court concludes that summary judgment on this claim would be inappropriate.

F. Counts Six, Seven and Eight-Lanham Act, Common Law Trademark Infringement and Unfair Trade Practices/Unfair Competition

To prevail on these claims, Liafail must demonstrate that: (1) L2K used a false designation; (2) that such use of a false designation occurred in interstate commerce in connection with goods and services; (3) that such false designation is likely to cause confusion, mistake or deception as to the origin, sponsorship, or approval of L2K's goods or services by another person; and (4) that Liafail has been or is likely to be damaged. *See AT & T Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1428 (Fed.Cir.1994); *see also Major League Baseball Promotion Corp. v. Colour-Tex, Inc.,* 729 F.Supp. 1035, 1039 (D.N.J.1990) (noting that the same elements apply to federal and common law trademark infringement claims, as well as unfair competition claims).

In its motion, L2K argues that summary judgment is appropriate because: (1) Liafail has failed to demonstrate any evidence of damages; (2) L2K has

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

an exclusive license to use the term "Lifetime Library;" and (3) L2K is not selling the product unless the sale is pursuant to contracts existing as of June 30, 2001. For the following reasons, the court concludes that genuine issues of material fact exist.

Liafail has adduced evidence that L2K itself recognizes the "Lifetime Library" as Liafail's trademark. *See* Deposition of Richard at 217; Deposition of Russel Holloway at 76. Furthermore, and as the court recognized in its October 23, 2002 Memorandum and Order, Liafail has pointed to evidence demonstrating that its educational software product was developed and marketed as the "Lifetime Library" long before L2K had any involvement with the product. *See* October 23, 2002 Memorandum and Order at 8. Moreover, Liafail argues that L2K's right to use the Lifetime Library name as a licensee only applied if it used the name in accordance with a valid agreement between the parties. Liafail contends that, although there is no valid agreement in effect between the parties, L2K nevertheless continues to sell the library. In turn, L2K maintains that, as the exclusive licensee, it was the entity that brought Lifetime Library "its claim to fame" and that it continues to act in accordance with the parties' Amendment to License and Royalty Agreement. *See* Amendment to License and Royalty Agreement § 3 (stating that, [n]otwithstanding anything to the contrary in the License Agreement, L2K may continue to sell the Licensed Product on a nonexclusive basis but only to fulfill L2K's contracts existing on June 30, 2001, or if earlier, on the date of the termination of the [APA]."). Liafail, however, points to Russell Holloway's deposition testimony that L2K is currently selling to customers based on word of mouth and referrals from existing customers. *See* Deposition of Russell Holloway at 52. In light of these contested factual issues, the court concludes that a grant of summary judgment on this count would be improvident.

### G. Counts Nine and Ten-Interference and Tortious Interference

*9 To state a claim for tortious interference, the plaintiff must prove that: (1) a valid contract existed, (2) the defendants knew of the contract, (3) the defendants undertook an intentional act that was a significant factor in causing a breach of the contract; (4) a lack of justification for the defendant's action; and (5) injury as a result of the intentional acts. *See Cantor Fitzgerald, L.P. v. Cantor*, 2000 WL 307370, at *24 (Del. Ch. March 13, 2000).

L2K argues that summary judgment is appropriate on this claim because Liafail cannot identify "a specific contract or potential business opportunity" that was compromised by L2K's representations. *Kirkwood Kin Corp. v. Dunkin Donuts*, 1997 Del.Super. LEXIS 30, *43 (Del.Super.1997). Specifically, L2K contends that neither Liafail, nor its 30(b)(6) witness, has identified the specific representations at issue, nor has either of them proffered evidence to show that these representations in fact thwarted a specific contract or business opportunity. For the following reasons, the court must agree.

The business relationships that Liafail has identified with respect to these counts are Kentucky Educational Television ("KET"), the United States Army, and Northwest Technical College. Liafail designated Frank Stucki as its Rule 30(b)(6) witness with respect to Liafail's tortious interference claim. Frank Stucki had no knowledge of Liafail's claim regarding Northwest Technical College. Nor did Liafail provide a basis for that claim in its Answer Brief. Thus, the court will grant summary judgment on any claim of interference or tortious interference with regard to Northwest Technical College.

When asked to identify the alleged interfering statements on which Liafail's claim with respect to the United States Army is based, Frank Stucki testified that L2K "made no statements to the Army." *See* Deposition of Frank Stucki at 1335-1336. He further states that the allegation with regard to the Army is based solely on the fact that a meeting took place between the Army and L2K. *See id.* at 1335-1336. Liafail has "no information whatsoever what was said by [L2K] to the Army at that meeting." *Id.* at 1335-1338. Finally, Frank Stucki could not identify a single false verbal or written statement that L2K made to the Army. *See id.* at 1354-1355. Although Liafail points to William Haynes' ("Haynes") testimony that he admitted to forwarding information to an Army representative and arranging for a demonstration of the product, this purported evidence fails to even arguably demonstrate that L2K compromised Liafail's relationship with the Army.

Finally, with respect to its KET claims, Frank Stucki testified that L2K "implied" to KET that Liafail and L2K "were best of friends" and that L2K "had sold 20-some million dollars worth of software to Gateway and that they were expanding their business operations." Deposition of Frank Stucki at 1339-1340. He had no further information to provide on the KET allegations. Liafail now argues, however

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 8

that Haynes testified that he and Holloway had met with KET about a new video series that KET had developed. *See* Deposition of William Haynes at 162-163. This alleged meeting, however, without more, does not begin to satisfy Liafail's burden of establishing a genuine issue of material fact with regard to each of the elements of this claim. Accordingly, the court concludes that summary judgment is appropriate.

H. Count Eleven-Business Defamation

*10 Liafail's business defamation count asserts that the "[d]efendants have made false statements to others about Liafail." Amended Complaint at ¶ 207. However, the court finds that there exists no genuine factual dispute regarding the falsity of those statements because Liafail has failed to identify the statements. Nor has it identified to whom, by whom, or when those statements were made. Nevertheless, it contends that these unidentified statements to unidentified persons have "harmed Liafail's standing in the marketplace and created confusion." *Id.* at ¶ 208. Liafail further asserts that these statements have "maligned [its] business reputation and inflicted injury on Liafail." *Id.* at 211. As Liafail has failed to adduce any evidence whatsoever of even one such false statement, the court must grant summary judgment on this count.

I. Count Twelve-Injurious Falsehood

Liafail next asserts that, as a result of L2K's alleged false statements, it has been deprived of business relationships with Microsoft, Compaq, and the Army. *See* Deposition of Frank Stucki at 1353-1354, 1357. However, Frank Stucki also admitted at his deposition that Liafail is not aware of "a single" false verbal or written statement made by L2K to Microsoft, Compaq, or the Army. *Id.* at 1354-58. Nor does Liafail point to any such evidence in its responsive papers to the present motion. The court will, therefore, grant summary judgment on this ground.

J. Count Thirteen-Conspiracy

The only argument raised by L2K with regard to Liafail's conspiracy claim is the alleged absence of any other substantive claim. However, as the court has found genuine issues of material fact on several of Liafail's counts, it must allow the conspiracy claim to also proceed.

K. Count Fourteen-Conversion

Conversion is the "wrongful exercise of dominion over the property of another, in denial of his right, or inconsistent with it ." *Acierno v. Preit-Rubin, Inc., 199 F.R.D. 157, 165 (D.Del.2001)* (citation omitted). In order to establish a successful conversion claim, Liafail must establish that, at the time of the alleged conversion: (1) it held an interest in the property; (2) it had a right to possession of the property; and (3) L2K converted the property. *See Arnold v. Society for Sav. Bancorp, Inc., 678 A.2d 533, 536 (Del.1996).*

In the present case, Liafail contends that the property that has allegedly been taken away from it, and over which L2K has allegedly exercised dominion, are sales of the Lifetime Library. In support of this proposition, Liafail argues that "[e]ach such unauthorized sale deprives Liafail of that sales opportunity, thereby causing damages." *See* Liafail's Answer Brief at 37. It then concedes that, "Liafail certainly retains some control over its asset, the Lifetime Library tradename, source code, and related intellectual property...." *Id.* Nevertheless, it concludes its four sentence response on this count by summarily stating that, "L2K's actions [are] inconsistent with Liafail's right to determine the use of this property [and] satisfy the elements of conversion in a manner sufficient to preclude summary judgment." *Id.*

*11 Given that Liafail has admitted that it still retains at least some control over its asset, the court is unpersuaded that there remains a genuine issue of material fact with regard to whether L2K has converted the property. Nor does Liafail's summary response cite to any evidence, competent or otherwise, which would raise such an issue. Specifically, Liafail has not identified any sale made by L2K over which L2K exercised improper dominion. As such, the court concludes that Liafail has failed to meet its burden of establishing the elements required for a claim of conversion.

L. Count Fifteen-Duty of Good Faith

Liafail next contends that, as the exclusive distributor of Liafail's product, "L2K owed [it] a duty to act in good faith to maximize the value of the Lifetime Library and the profits to Liafail." Amended Complaint at ¶ 231. In support of this argument, Liafail recites the unimpressive proposition that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Delaware recognizes the duty of good faith and then states, "[t]his principle appears so obvious as to require little discussion...." Liafail's Answer Brief at 38. It then immediately ends its discussion of this issue by stating that, "Liafail has raised ample evidence of bad faith and must, therefore, be afforded the opportunity to present this claim to a jury." *Id.* Notwithstanding Liafail's confident language, it has failed to point to any evidence to support its claim. Thus, in light of Liafail's boilerplate arguments on this point, the court will grant summary judgment in L2K's favor.

M. Count Sixteen-Alter Ego

To prevail on an alter ego claim under Delaware law, L2K must first show that the parent and subsidiary "operated as a single economic entity." *Harper v. Delware Valley Broadcasters, Inc.,* 743 F.Supp. 1076, 1085 (D.Del.1990), *aff'd* 932 F.2d 959 (3d Cir.1991). L2K must also demonstrate that an "overall element of injustice or unfairness ... [is] present." *Id.* Effectively, "the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *In re Sunstates Corp. Shareholder's Litig.,* Del. Ch. 788 A.2d 530, 534 (Del. Ch.2001).

The United States Court of Appeals for the Third Circuit has set forth several considerations for a court to consider in determining whether a "single economic unit" existed. *See United States v. Pisani,* 646 F.2d 83, 88 (3d Cir.1981). These consideration are as follows: (1) undercapitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) the insolvency of the debtor corporation at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders. *See id.* Moreover, the situation must present an element of injustice or fundamental unfairness. *See id.* However, the *Pisani* list of factors is not conjunctive, nor is it an exclusive list. *See Galgay v. Gangloff,* 677 F.Supp. 295, 299-300 (M.D.Pa.1987).

*12 Liafail first points to Story's deposition testimony wherein he conceded that "ILC" is a "shell corporation" owned by Santini and himself. As the Fourth Circuit has recognized, however, this testimony is insufficient to demonstrate a disregard of corporate formalities such that would justify piercing the corporate veil. *See Huennekens v. Reczek,* 43 F.ed Appx. 562, 567 (4th Cir.2002)) (finding the fact that an individual capitalized a shell corporation to be insufficient).

Liafail next purports to offer Anthony Santini's deposition testimony for the proposition that he left virtually all of the decision-making to Richard Story. *See* Liafail's Answer Brief at 38 (citing Santini at 38-41). After reviewing the cited excerpts of Santini's deposition testimony, the court finds no support for Liafail's assertion that he testified in such a manner. Accordingly, it will afford this "fact" no weight.

Liafail next cites Richard Story's deposition testimony for the proposition that he and Santini were accused of mismanaging L2K. *See id* (citing Story at 257). The court again disagrees that Story so testified. Indeed, Story merely testified that he and Santini expanded the board of directors to avoid micromanaging the company. *See* Deposition of Richard Story at 257. This can hardly be construed as "mismanagement." Thus, the court again declines to credit Liafail's statements in this regard.

Again, citing Santini's deposition testimony, Liafail asserts that Story had free reign to run the company. *See* Liafail's Answer Brief at 38. Santini actually testified, however, that he told Story "to go ahead, do whatever he [Story] needed to do" and that Santini was not involved in "negotiating the deal between Learning 2000 and Liafail." *See* Deposition of Anthony Santini at 11, 14-16. The court is again not persuaded that this testimony raises any factual issues as it is within a board's prerogative to delegate negotiations to the chairman of the board in a valid exercise of its business judgment. *See e.g. State of Wisconsin Inv. Bd. v. Bartlett,* 2000 WL 238026, at *4 (Del. Ch. Feb. 24, 2000).

Furthermore, contrary to Liafail's suggestion, the record does not establish that Story, or anybody else at L2K, attempted to "create the impression of solvency" or that there was any threat of insolvency during the relevant period of time. Although the record does reflect that some employees' salaries were deferred at some point in time, Liafail's theory that this was related to insolvency is mere speculation unsupported by any facts. As such, this speculation will not preclude the entry of summary judgment.

With regard to Liafail's statement that Story "was repaid his initial $100,000" loan to L2K, the court is unclear as to how this fact entitles Liafail to pierce L2K's corporate veil. Were Liafail's theory to be correct, no corporation could pay its debts without running into the risk of alter ego liability.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 10

*13 Liafail next points out that L2K improperly "routinely" made payments on Story's American Express card and transferred large sums of cash to other entities owned by Story and Santini. However, the mere making of payments and transfers alone does not create alter ego liability. Cf Canario v. Lidelco, Inc., 782 F.Supp. 749, 760 (E.D.N.Y.1992) (finding that purchasing a private airplane with corporate funds, taking personal income tax deductions for the airplane's depreciation while the corporation paid for its upkeep, and keeping all profits upon the airplane's sale "does not ... rise to the level necessary to pierce the corporate veil.). Nor does Liafail identify any facts from which the court, or a jury, could reasonably determine that either of these actions were improper.

Finally, Liafail contends that L2K was unable to produce a set of corporate documents or resolutions which did not suffer from "glaring inconsistencies" and that it could not explain its capital structure. See Liafail's Answer Brief at 38 (citing Thompson at 122-134, Adams at 26, 53-54, 59, 87, 110-111). Conversely, L2K argues that Julie Thompson testified that: (1) she produced the documents requested of her; (2) there were no pieces of information that were requested of her that she was unable to provide; and (3) everything Ernst & Young asked for, she was able to give them. See Deposition of Julie Thompson at 122, 124. With respect to Clint Adam's testimony, the only outstanding documents as of the time the underwriter called off the IPO were up-to-date board minutes and board minutes showing that a number of stock options and warrants had been issues. See Deposition Testimony of Clint Adams at 53-54, 87, 110-111.

Moreover, when the IPO was aborted, Ernst & Young stopped working on its audit. Thus, it is hardly surprising that its due diligence of L2K's records was left somewhat incomplete. Accordingly, even crediting Liafail's evidence that the corporate records may have been in imperfect form, the court concludes that, in light of the dearth of evidence on this count, it is constrained to grant summary judgment in L2K's favor.

N. Count Seventeen-Unjust Enrichment

Liafail next asserts that L2K has engaged in "extra-contractual actions" from which it has profited to Liafail's detriment. Liafail does not dispute the long-recognized principle that a plaintiff cannot recover on an unjust enrichment theory where the parties' relationship is governed by an express contract. See e.g. Chrysler Corp. v. Airtemp Corp., 426 A.2d 845, 854 (Del.Super.Ct.1980). Its argument that the present case falls outside this principle because the alleged actions are "extra-contractual" is unavailing. Rather, it is clear that, in this litigation, Liafail merely disputes which contract governs the relationship between the parties and whether that contract was breached. It does not dispute the existence of a contractual relationship. Therefore, recovery under an unjust enrichment claim is precluded as a matter of law.

O. Count Eighteen-Injunctive Relief

*14 L2K contends that this count must fail because Liafail cannot establish a right to relief under any of the substantive causes of action. However, because the court has determined that genuine issues of material fact exist with regard to a number of Liafail's claims, L2K's argument on this point must fail.

V. CONCLUSION

Following a careful review of the record before it, the court has concluded that factual issues remain with regard to Counts Five, Six, Seven, Eight, Thirteen, and Eighteen. The court will grant summary judgment in L2K's favor on the remaining counts.

On a final note, as the court found it unnecessary to reach the portion of Shawn Kiehn's Affidavit which L2K now asserts is inadmissible hearsay, the court will deny L2K's motion to strike it as moot.

For the foregoing reasons, IT IS HEREBY ORDERED that:
1. L2K's Motion for Summary Judgment (D.I.253) is GRANTED in part and DENIED in part.
2. L2K's Motion to Strike Finch's Report (D.I.297) is declared MOOT.
3. L2K's Motion to Strike the Affidavit of Shawn Kiehn (D.I.300) is declared MOOT.

D.Del.,2002.
Laifail, Inc. v. Learning 2000, Inc.
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)

Briefs and Other Related Documents (Back to top)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2002 WL 31667861 (D.Del.)  
**(Cite as: Not Reported in F.Supp.2d)**

Page 11

- 1:01CV00678 (Docket) (Oct. 09, 2001)
- 1:01CV00599 (Docket) (Sep. 04, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT "D"

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 704779 (D.Del.), 7 NDLR P 258
(Cite as: 1995 WL 704779 (D.Del.))

Page 1

H

**Motions, Pleadings and Filings**

United States District Court, D. Delaware.
Peggy ADKINS, et al., Plaintiffs,
v.
E.I. DU PONT DE NEMOURS & CO., INC.,
Individually and in its Capacity as
Administrator of the Plan, Wilmington Trust
Company, John Doe, Jane Doe,
Richard Roe and Rhonda Roe, Defendants.
Civ. A. No. 95-315-SLR.

Nov. 21, 1995.

Robert Jacobs, and Douglas B. Canfield, of Jacobs & Crumpler, Wilmington, Delaware; J. David Flowers, and James H. Rion, Jr., of Ness, Motley, Loadholt, Richardson & Poole, Greensville, South Carolina; Gary W. Kendall, Denise Y. Lunsford, of Michie, Hamlett, Lowry, Rasmussen & Tweel, Charlottesville, Virginia; and Kenneth Henley, of Michie, Hamlett, Lowry, Rasmussen & Tweel, Bala Cynwyd, Pennsylvania, attorneys for plaintiffs.

Richard Allen Paul, and Catherine Hagerty Thompson, of E.I. duPont de Nemours and Company, Wilmington, Delaware; and Hill B. Wellford, Jr., Patricia K. Epps, and Wood W. Lay, of Hunton & Williams, Richmond, Virginia, attorneys for defendants.

MEMORANDUM OPINION

SUE L. ROBINSON, District Judge.

*1 On May 26, 1995, 180 individual plaintiffs seeking certification as a class of approximately 600 brought this action in the United States District Court for the District of Delaware under the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Employee Retirement Income Security Act ("ERISA") and the common law of Virginia.

Presently before the court is defendants' motion to dismiss a number of plaintiffs' claims pursuant to Fed.R.Civ.P. 12(b). (D.I. 17) For the reasons discussed below, the motion will be granted in part and denied in part.

BACKGROUND

Plaintiffs are former employees at defendant E.I. Du Pont de Nemours & Co.'s ("Du Pont") Martinsville, Virginia plant. Plaintiffs allege that in or about September 1993, the management at the Martinsville plant proposed to the employees' union that a High Performance Work Systems ("HPWS") be implemented, which would allegedly require every employee to qualify for every job in the plant. (D.I. 1 at 6) According to plaintiffs, this prospect was intimidating to many employees, in part because one job--First Floor Spinning--"required a great deal of manual labor and was a very difficult assignment for older employees, and for any employee with a physical, mental and/or emotional disability." (Id. at 8) Concurrently, the management allegedly announced an enhanced severance benefits program for those employees choosing not to participate in the HPWS. (Id. at 7) Employees were required to elect severance by November 15, 1993. According to plaintiffs, the approximately 600 who so elected were constructively or actually terminated on that date. (Id. at 11-12) Thereafter, plaintiffs allege, Du Pont did not implement the HPWS "as it repeatedly indicated it would." (Id. at 10)

Plaintiffs' complaint seeks relief under 12 causes of action, including five (or six) counts arising under federal law and seven (or six) counts arising under Virginia law. [FN1] Defendants' motion to dismiss is addressed to plaintiffs' ERISA claim(s) and pendent state claims. At oral argument on September 25, 1995, plaintiffs represented that they did not oppose defendants' motion to dismiss three of their state claims, specifically counts 5 (negligent misrepresentation), 10 (promissory estoppel), and 11 (breach of covenant of good faith and fair dealing). (D.I. 30 at 3-4) Accordingly, the court will grant defendants' motion to dismiss those counts. The remainder of the opinion will address defendants' motion to dismiss plaintiffs' counts 4 (violation of 29 U.S.C. § 1140), 6 (breach of fiduciary duty), 7 (cofiduciary liability), 8 (civil conspiracy), 9 (fraud), and 12 (constructive fraud).

DISCUSSION

A. Preemption

1. Counts 9 and 12

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 704779 (D.Del.), 7 NDLR P 258
(Cite as: 1995 WL 704779 (D.Del.))

Page 2

Defendants move to dismiss plaintiffs' counts 9 (fraud) and 12 (constructive fraud) on the ground that these counts are preempted by ERISA, 29 U.S.C. §§ 1001 et seq.

29 U.S.C. § 1144(a) provides in relevant part that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." ERISA defines "State laws" as "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1). Plaintiffs' fraud and constructive fraud claims clearly arise under state law. Preemption therefore depends on whether the claims "relate to" a plan.

*2 The Supreme Court of the United States has stated that a law " 'relates to' a covered employee benefit plan for purposes of the [preemption clause] 'if it has connection with or reference to such a plan.' " *District of Columbia v. Greater Washington Bd. of Trade*, 113 S.Ct. 580, 583 (1992) (citations omitted). In the present action, the latter alternative can be ruled out, because the relevant law--that governing common law fraud and constructive fraud claims-- does not "refer" to an ERISA plan. As to the former alternative, the Supreme Court has recently decided that attempting to define "connection with" is "unhelpful" and "frustrating," [FN2] and that, accordingly, courts must "go beyond" the text and "look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *New York State Conference of Blue Cross & Blue Shield Plans v. Travellers Ins. Co.*, 1995 WL 238409, *5 (1995). The Court noted that it had found the purpose of § 514(a) to be

"to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government ..., [and to prevent] the potential for conflict in substantive law ... requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction." *Ingersoll-Rand, 498 U.S., at 142, 111 S.Ct., at 484*.
*Id.* The Court found that
[t]his objective was described in the House of Representatives by a sponsor of the Act, Representative Dent, as being to "eliminat[e] the threat of conflicting and inconsistent State and local regulation." 120 Cong.Rec. 29197 (1974). Senator Williams made the same point, that "with the narrow exceptions specified in the bill, the substantive and enforcement provisions ... are intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans." *Id.*, at 29933. The basic thrust of the pre-emption clause, then was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans.
*Id.* at *5-6.

ERISA preemption, accordingly, is not unlimited. "Some state actions may affect employee benefits in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983). Further, "the absence of a direct nexus to [an] ERISA plan[ ]" will put a cause of action "beyond the scope of § 514 preemption." *United Wire, Metal and Mach. Health and Welfare Fund v. Morristown Memorial Hosp.*, 995 F.2d 1179, 1195 (3d Cir.), cert. denied, 114 S.Ct. 382 and 114 S.Ct. 383 (1993). In determining whether Congress intended that ERISA preempt a particular cause of action, courts have considered "the statute's express objectives, its structure, and its interpretation by the courts." *Robinson v. Fikes of Alabama, Inc.*, 804 F.Supp. 277, 280 (M.D.Ala.1992), citing *FMC Corp. v. Holliday*, 111 S.Ct. 403, 407 (1990). "[A]n overarching consideration in the determination is that the preemption provision must be given a 'common-sense' effect." *Id.*, citing *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 174 (1985).

*3 In count 9, plaintiffs allege that
Dupont, through its management personnel at the Martinsville plant, including but not limited to Larry McDorman, Harold Slate and a number of first line supervisors, made a number of false statements to Plaintiffs regarding the HPWS and the severance program introduced in the fall of 1993; these statements were made in the knowledge of their falsity; they were made with the intent that Plaintiff would rely on them; the Plaintiffs did in fact reasonably rely on the statements; and, the Plaintiffs were harmed by the false statements.
(D.I. 1 at 18-19) (emphasis added).

Defendants, relying on the emphasized language, note that the severance program as to which Du Pont allegedly made false statements "is described throughout the Complaint as a pension benefit and subject to ERISA's jurisdiction." (D.I. 18 at 8) (citations omitted). Citing *Berger v. Edgewater*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 704779 (D.Del.), 7 NDLR P 258
(Cite as: 1995 WL 704779 (D.Del.))

Page 3

Steel Co., 911 F.2d 911 (3d Cir.1990), cert. denied, 499 U.S. 920 (1991), defendants argue that as a claim based on the misrepresentation of plan terms, this claim is preempted by ERISA. In *Berger,* plaintiffs alleged that the defendant company's president had misrepresented, in a letter to all employees, the benefits available under an early retirement plan. *Id.* at 914-15, 923. The Third Circuit concluded that the district court was "clearly correct in holding that § 514(a) preempts the Employees' misrepresentation claims, since they relate to an employee benefit plan." *Id.* at 923.

Plaintiffs admit that "[i]f the allegations" in count 9 "related solely to the misrepresentation of Plan terms ..., the Defendants might be correct in their preemption argument." (D.I. 20 at 4) According to plaintiffs, however, count 9 "allege[s] much more, ... and only indirectly allege[s] misrepresentation concerning the Plan." (D.I. 20 at 4) Indeed, according to plaintiffs, the count "center[s] on" Du Pont's misrepresentations "concerning the HPWS, its implementation and the result of failure or inability to comply." The claim "neither require[s] proof of the existence of an ERISA plan nor conflict[s] directly with an ERISA cause of action." (*Id.* at 5) "Further the impact on ERISA is indirect and too tenuous or remote to warrant preemption." (*Id.*) (citation omitted).

In count 12, plaintiffs allege that
[t]he representations made by Defendant Dupont through its management and department supervisors on or about September, 1993, that a High Performance Work System ("HPWS") would be implemented and all employees would have to attain a level of competency in all skill levels and areas or operations at the plant or be terminated were representations of material facts and made in the course of and in the scope of the representatives' employment....
[These representations] were false....
The Plaintiffs relied on the representations and acted on the representations by electing to participate in the severance program and accept reduced pension benefits because they believed they would be unable to meet the requirements of the HPWS....
*4 The Plaintiffs suffered damage as a direct and proximate result of the Defendant's fraud. The Plaintiffs, in accepting the early retirement package, stopped working much earlier than they had planned and were denied the advantage of receiving their full benefits which would have been available to them had they remained and not relied upon the Defendant's representations.
(D.I. 20 at 20-21) Count 12 also incorporates all prior allegations, including those in count 9.

Defendants contend that in count 12 plaintiffs "allege that DuPont's misrepresentations were intended to induce them to participate in a severance program with reduced pension benefits or, stated another way, to elect early retirement." (D.I. 18 at 9) "Thus," according to defendants, "in addition to the allegations of misrepresentations directly involving an employee benefit plan, Plaintiffs are alleging that these misrepresentations were intended to deprive them of future benefits under DuPont's pension plan." (*Id.*) Defendants contend that "[i]t is difficult to imagine a clearer nexus between a cause of action and ERISA." (*Id.*) In support of their argument, defendants cite to *Elmore v. Cone Mills,* 23 F.3d 855 (4th Cir.1994), *Pane v. RCA Corp.,* 868 F.2d 631 (3d Cir.1989), and *Salomon v. Transamerica Occidental Life Ins. Co.,* 801 F.2d 659 (4th Cir.1986).

Plaintiffs answer that their allegations that Du Pont's alleged misrepresentations were intended to deprive them of plan benefits "are not necessary to proof of the Plaintiffs' state claims." (D.I. 20 at 5) Plaintiffs reiterate that their "main contention is Dupont's representations concerning implementation of the HPWS and the impact of those misrepresentations on the Plaintiffs' acceptance of early retirement." (*Id.* at 6) According to plaintiffs, defendants' cited cases are factually distinguishable, in that *Pane* arose from "the defendant's decision to offer a plan and the impact on the plaintiff" and *Cone Mills* and *Salomon* involved claims "directly related to and dependent on the employee benefit plan." (*Id.*)

The court concludes that those portions of plaintiffs' claims in counts 9 and 12 charging Du Pont with having made false statements and misrepresentations regarding the severance plan relate to an ERISA plan and are preempted under 29 U.S.C. § 1144(a). Therefore, the court will grant defendants' motion to dismiss so much of plaintiffs' counts 9 and 12 as allege fraud and constructive fraud arising from such statements and representations. The court will deny defendants' motion to dismiss the remainder of counts 9 and 12.

2. Count 6
In count 6, plaintiffs allege that "[a]s Plan administrator, Defendant Dupont was a fiduciary required to discharge its duties solely in the interests of the participants and beneficiaries," and it breached this fiduciary obligation, for which plaintiffs claim

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 704779 (D.Del.), 7 NDLR P 258
(Cite as: 1995 WL 704779 (D.Del.))

Page 4

compensatory and punitive damages. (D.I. 1 at 17) Defendants argue that this claim "simply mirrors the statutory language of ERISA" and represents an attempt to convert an ERISA claim into a state cause of action in order to obtain compensatory and punitive relief, which are not available under ERISA. Defendants urge that count 6 is therefore preempted. (D.I. 18 at 9-10)

*5 Plaintiffs, as noted, answer that the count was brought pursuant to ERISA, not state law, and that defendants' preemption argument is therefore moot. (D.I. 20 at 1 n. 1) Plaintiffs do not answer defendants' contention that compensatory and punitive damages are unavailable under ERISA.

The court accepts plaintiffs' characterization of this count as brought under ERISA. As this court held in *Loatman v. Metropolitan Life Ins. Co.*, 1995 WL 418502, at *6, however:
> [A]lthough plaintiff may have an individual cause of action [for breach of fiduciary duty] under [29 U.S.C.] § 1132(a)(3), said cause of action is limited to one seeking equitable relief.

Where, as here, plaintiffs seek solely monetary relief for an alleged breach of duty under ERISA, the court will find such claim precluded. Therefore, the court will grant defendants' motion to dismiss plaintiffs' count 6. [FN3]

B. Failure to State a Claim: Count 8

In count 8, plaintiffs allege that
> Defendant Dupont, and/or Amfibe, Inc., and/or others secretly negotiated and agreed to adversely affect the rights of the Plaintiffs....
> This conspiracy, participated in by the Defendant has, in fact, harmed the rights of Plaintiffs who are therefore entitled to receive compensatory and punitive damages in an amount to be determined by the jury.
> (D.I. 1 at 18)

Quoting *Glass v. Glass*, 321 S.E.2d 69, 74 (Va.1984), defendants contend that under Virginia law, a civil conspiracy " 'is a combination of two or more persons to accomplish an unlawful purpose by unlawful means, resulting in damage to the plaintiff.' " Defendants argue that plaintiffs "allege no unlawful purpose or unlawful means" and that, consequently, the count should be dismissed. (D.I. 18 at 13)

Plaintiffs answer that the following allegations, incorporated into count 8, sufficiently allege both unlawful purpose and unlawful means:
> [T]hat Dupont announced the HPWS and that employees who could not perform accordingly would be terminated; ... that Dupont also announced a reduction in work force at the Facility; ... that a member of the Dupont senior management stated the need to get rid of older employees; ... that the Plaintiffs retired as a result of the HPWS and the stated result of termination; ... that Amfibe was established to operate within the Facility, has recruited and is attempting to recruit individuals who retired under threat of HPWS and is paying its employees less wages and benefits tha[n] they previously received from Dupont; ... [and] that the above actions adversely impacted the rights of older and disabled employees and were calculated to have such impact.

(D.I. 20 at 9) Plaintiffs urge that if the court finds the count insufficient, plaintiffs should be allowed the opportunity to amend. (*Id.* at 10)

The court finds that count 8 falls short of pleading the essential elements of a civil conspiracy cause of action. Therefore, defendants' motion will be granted as to count 8.

C. Failure to Plead with Sufficient Particularity: Counts 9 and 12

*6 Plaintiff argues that plaintiffs' claims of **fraud** (count 9) and constructive **fraud** (count 12) should be **dismissed** for failure to **plead** with **particularity** as required by Fed.R.Civ.P. 9(b), which provides that "[i]n all averments of **fraud** or mistake, the circumstances constituting **fraud** or mistake shall be stated with **particularity**. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Citing this court's opinion in *Toner v. Allstate Ins. Co.*, 821 F.Supp. 276, 283 (D.Del.1993), defendants argue that **Rule 9(b)** applies to common law claims of fraud and constructive fraud, as well as to "causes of action where the gravamen of the claim is fraud although the theory supporting it is not technically termed fraud." (D.I. 18 at 13-14)

According to defendants, Rule 9(b) requires plaintiffs " 'to place defendants on notice of the precise misconduct with which they are charged.' " (*Id.*) (citation omitted) In the Third Circuit, defendants charge, the seminal case is *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786 (3d Cir.1984), *cert. denied*, 469 U.S. 1211 (1985), in which the appeals court held that plaintiffs may

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 704779 (D.Del.), 7 NDLR P 258
(Cite as: 1995 WL 704779 (D.Del.))

Page 5

provide notice of the "precise misconduct" by alleging the "date, place, or time" of the misconduct or by using an "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." _Seville_, 742 F.2d at 791. Defendants argue that plaintiffs fail to meet this standard. "At a minimum," defendants suggest, "Plaintiffs should be required to identify who among them is alleged to have received false information, from whom, and when the information was provided." (D.I. 18 at 17) [FN4]

Plaintiffs answer that the fraud and constructive fraud counts are pleaded with sufficient particularity, in that plaintiffs have alleged that (1) Du Pont "introduced the HPWS at the Facility and defined its parameters;" (2) "implementation was with the knowledge that certain older and disabled employees could not perform the work required by the HPWS;" (3) Du Pont "announced a reduction in work force at the same time as the HPWS and, after the retirement of the Plaintiffs which was coerced by the HPWS, now requires substantial overtime and has rehired some retired employees;" and (4) "the actions complained of occurred in September through November, 1993 and January, 1994." (D.I. 20 at 10-11) In any event, plaintiffs contend, defendants "are in a much better position" to know the details of the fraudulent conduct. According to plaintiffs,

> [t]he Defendants are ... well aware of the Dupont Corporate officers and members of the Board of Benefits and Pensions and Executive Committee directly involved in the decisions alleged.... There is only one Dupont plant in Martinsville, Virginia. Specific employees worked in Management positions at the Facility in the Fall of 1993. The HPWS was introduced there only one time.

*7 (_Id._ at 11) "It is inconceivable," plaintiffs conclude, "that the Defendants could request, or that the Plaintiffs could provide, a more specific pleading than the Complaint." [FN5]

Defendants reply by quoting _Shapiro v. UJB Financial Corp._, 964 F.2d 272, 285 (3d Cir.), cert. denied, 113 S.Ct. 365 (1992), in which the Third Circuit noted that:

> To avoid dismissal in these circumstances, a complaint must delineate at least the nature and scope of plaintiffs' efforts to obtain, before filing a complaint, the information needed to plead with particularity. This requirement is intended to ensure that plaintiffs thoroughly investigate all possible sources of information, including but not limited to all publicly available relevant information, before filing a complaint.

(D.I. 22 at 11) For this additional reason, defendants contend, counts 9 and 12 should be dismissed.

As this court has noted:

> Four reasons exist for the heightened pleading standard required in fraud cases. First, it protects defendant from frivolous suits. Second, it puts defendant on notice as to the conduct complained of so defendant will have information adequate to form a defense. Third, it prevents fraud actions in which all the facts are learned after the complaint is filed by way of the discovery process. Finally, it serves to protect defendant from damage to its reputation and goodwill.

_Toner_, 821 F.Supp. at 284 (citation omitted). Bearing these considerations in mind, the court finds that counts 9 and 12 fall short of satisfying the requirements of Fed.R.Civ.P. 9(b). Moreover, plaintiffs have offered no suggestion of the efforts they have undertaken to satisfy the rule. The court, however, will give plaintiffs the opportunity to amend these counts on or before February 1, 1996. Should plaintiffs again fail to plead their amended counts with sufficient particularity, the court will grant any motion then filed to dismiss these counts under Rule 9(b).

D. Limitations Bar: Count 4

Lastly, defendants argue that plaintiffs' count 4 (violation of 29 U.S.C. § 1140) should be dismissed as time-barred under the applicable statute of limitations. ERISA does not establish a limitations period for Section 510 claims. Consequently, the court must apply the most analogous Delaware limitations period. This court has held that the most analogous period for Section 510 claims is the Delaware statutory limitations period for wrongful termination actions. _Dewitt v. Penn-Del Directory Corp._, 872 F.Supp. 126, 132 (D.Del.1994).

*8 In the case at bar, the cause of action arose in Virginia. Delaware law states that when an action arises outside the state, Delaware courts will apply the shorter of the Delaware limitations period or the applicable period where the claim arose. 10 Del.Code Ann. § 8121. According to defendants, plaintiffs' Section 510 claim arose when their employment at Du Pont was actually or constructively terminated on or about November 15, 1993. At that time, defendants aver, the Virginia limitations period for wrongful termination actions was one year. (D.I. 18 at 18, citing Va.Code Ann. 8.01-248 (1992) and _Guiden v. Southeastern Public Serv. Auth._, 760 F.Supp. 1171, 1179 (E.D.Va.1991)).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 704779 (D.Del.), 7 NDLR P 258
(Cite as: 1995 WL 704779 (D.Del.))

Page 6

Plaintiffs filed their complaint on May 25, 1995, 18 months after the alleged date of termination. Accordingly, defendants contend, plaintiffs' count 4 should be dismissed as time-barred. (D.I. 18 at 19)Plaintiffs respond that "the actions resulting in the Plaintiffs' Section 510 claim arose" not in Virginia, as defendants claim, but in Delaware. Specifically, plaintiffs allege that "the creation and decision to implement the HPWS ... occurred in Delaware at the corporate offices of Dupont and the location of Wilmington Trust Company, the Board of Benefits and Pensions and the Executive Committee. The actions of the management at the Facility in Virginia were the result of the decisions of the Defendants and were taken simply to carry out a directive from corporate headquarters in Delaware." (D.I. 20 at 12-13) Moreover, the "most analogous" Delaware statute is not the wrongful termination statute, but the Delaware statute of limitations "for the denial of contractual employment benefits." (*Id.* at 13) This period, plaintiffs assert (citing 10 Del. § 8106) is three years.

Even should the court find that the cause arose in Virginia, plaintiffs contend, the count is not time-barred, because the cited one-year limitations period is inapplicable. According to plaintiffs, the case most closely resembles a § 1981 or § 1983 discrimination claim, to which Virginia applies the two-year limitations period of Va.Code Ann. § 8.01-243. Plaintiffs argue that *Guiden* misinterpreted Virginia law. In any event, they argue, the present claim is not one for wrongful termination or discharge. "The crux of Plaintiffs' Section 510 claim is that the Defendants' actions discriminated against the Plaintiffs because of the Plaintiffs' status as older or disabled employees." When considered against "Section 510's clear anti-discriminatory intent," this "make[s] it obvious that the claim is most analogous to a claim of discrimination." Alternatively, plaintiffs contend, the claim is analogous to a claim of fraud, to which Virginia applies a two-year limitations period. (D.I. 20 at 13-14)

The court finds that the cause of action pleaded in count 4 accrued on or about November 15, 1993, and that the one-year limitations period of Va.Code Ann. § 8.01-248 applies to the count. Because of the alleged fraud, however, it appears to the court that the limitations period may have been equitably tolled for some period subsequent to accrual. The Fourth Circuit has held that under Virginia law a limitations period "is tolled until a person intentionally misled by a putative defendant could reasonably discover the wrongdoing and bring action to redress it." *F.D.I.C.*

*v. Cocke,* 7 F.3d 396, 402 (4th Cir.1993), cert. denied, 115 S.Ct. 53 (1994). In the present case, plaintiffs are entitled to conduct discovery to determine whether this rule applies to this count. The motion to dismiss the count, therefore, will be denied without prejudice to renew.

CONCLUSION

For the reasons stated, the court will deny defendants' motion to dismiss (D.I. 17) as to count 4, grant defendants' motion to dismiss as to counts 9 and 12 to the extent plaintiffs allege misrepresentations regarding the severance plan, and grant defendants' motion to dismiss as to counts 5, 6, 7, 8, 10 and 11. In addition, the court will order plaintiffs to file on or before February 1, 1996 an amended complaint including amended counts 9 and 12. An appropriate order shall issue.

> FN1. Count 6 alleges breach of fiduciary duty. Defendants construe this count as raising a claim under state law. Plaintiffs state, however, that count 6 "is brought pursuant to 29 U.S.C. § 1104." (D.I. 20 at 1 n. 1)
>
> FN2. In seeking to find meaning in the terms "relate to" and "connection with," the Court noted:
> If "relate to" were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for "[r]eally, universally, relations stop nowhere," H. James, *Roderick Hudson* xli (New York ed., World Classics 1980).... [In interpreting "connection with",] an uncritical literalism is no more help than in trying to construe "relates to." For the same reason that infinite relations cannot be the measure of pre-emption, neither can infinite connections.
> *Travellers Ins. Co.,* 1995 WL 238409 at *5.
>
> FN3. Count 7 (cofiduciary liability against all defendants) suffers from precisely the same infirmity, and the court will therefore dismiss count 7 as well.
>
> FN4. Defendants also urge dismissal on the ground that plaintiffs rely "on information and belief" in alleging "crucial" elements of this claims based on fraudulent conduct.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 704779 (D.Del.), 7 NDLR P 258
(Cite as: 1995 WL 704779 (D.Del.))

Page 7

> FN5. Despite this representation, plaintiffs close their argument against defendants' Rule (9(b) motion with a plea that, should the court find for defendants, plaintiffs be granted leave to amend. The court is hard pressed to see just how plaintiffs could amend, given their position that the provision of a more specific pleading is "inconceivable." The court assumes that in their word choice plaintiffs have succumbed to cinematic hyperbole. *See, The Princess Bride* (Twentieth Century Fox, 1987).

Not Reported in F.Supp., 1995 WL 704779 (D.Del.), 7 NDLR P 258

**Motions, Pleadings and Filings (Back to top)**

• 1:95CV00315 (Docket) (May. 26, 1995)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.