EXHIBIT "G"

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 1

C

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
BELL ATLANTIC MERIDIAN SYSTEMS,
Plaintiff,
v.
OCTEL COMMUNICATIONS CORPORATION,
Defendant.
No. Civ. A. 14348.

Submitted: Nov. 6, 1995.
Decided: Nov. 28, 1995.

M. Duncan Grant, and Daniel V. Folt of Pepper, Hamilton & Scheetz, Wilmington, George A. Lehner and John Will Ongman of Pepper, Hamilton & Scheetz, Washington, DC, for plaintiff.
Richard H. Morse, Melanie K. Sharp and Matthew P. Denn of Young, Conaway, Stargatt & Taylor, Wilmington, for defendant.

MEMORANDUM OPINION

ALLEN, Chancellor.

*1 This contract action turns on an interpretation of the phrase "new systems" in a contract between Octel Communications Corp. ("Octel"), a designer and manufacturer of computer systems that provide voice mail services and one of its distributors, plaintiff, Bell Atlantic Meridian Systems ("BA Meridian"). The Distribution Agreement between the parties has been terminated and the suit concerns the extent of negotiated post-termination rights and duties. BA Meridian contends that Octel has a post-termination obligation to provide it with Octel's latest voice mail product system, the Overture 250 for a period of seven years following the termination of the Distribution Agreement. This contention is based upon the language of a December 17, 1992 amendment to the Distribution Agreement (the "Letter Amendment").

The Letter Amendment provided upon termination and expiration of the Distribution Agreement, for certain obligations on the part of Octel including the obligation to provide BA Meridian with "new systems where [BA Meridian] has a binding obligation to provide such systems or where the provision of such systems is reasonably necessary to maintain [BA Meridian's] business relationship with particular existing customers." BA Meridian asserts that Octel's new voice mail device, the Overture 250, is such a "new system" because it can substitute or replace some of the products that BA Meridian was specifically entitled to distribute pursuant to the Distribution Agreement. Octel, on the other hand, argues that the phrase "new systems" only entitles BA Meridian to buy additional units of products covered by the Distribution Agreement and does not expand, after termination, the products which BA Meridian has a right to distribute.

BA Meridian seeks specific performance compelling Octel to provide the post-termination support that it contends is required by the Letter Amendment. [FN1]

> FN1. BA Meridian also sought a declaration that Octel and BA Meridian orally agreed to extend the Distribution Agreement until September 30, 1995, but voluntarily dismissed this request before trial.

For the reasons that follow I conclude that the Letter Amendment did not create the legal obligation for Octel to supply to BA Meridian during the seven year post-termination period newly designed voice mail products, such as the Overture 250, but does create an obligation to sell additional units of products covered by the Distribution Agreement, as set forth in the Letter Amendment.

I. Facts

The parties stipulated to an extensive statement of undisputed facts. Absent from the stipulation, are the communications that took place during the actual negotiation and drafting of the Letter Amendment. The following facts represent both facts as agreed upon by the parties and this Court's determination, based upon a preponderance of the evidence, of the facts necessary to resolve this dispute.

1. The parties.

Octel, a Delaware corporation with its principal offices in Milpitas, California, is engaged in the design, manufacture, marketing, and servicing of voice mail systems. Octel sells its voice mail

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 2

systems through both authorized distributors and direct sales offices. BA Meridian is a general partnership formed in 1992 and consisting of two general partners, Bell Atlanticom Systems, Inc. ("Bell Atlanticom") and Northern Telecom, both of which are Delaware corporations. BA Meridian markets, installs, and maintains private telecommunication systems (including voice mail systems) primarily in the mid-Atlantic region. It is a distributor of Northern Telecom voice mail and private branch exchange (PBX) switching systems and until recently was also a distributor of Octel voice mail products. Bell Atlanticom agreed to the Distribution Agreement with Octel in January of 1992. In December of 1992, after the BA Meridian partnership was forged between Bell Atlanticom and Northern Telecom, Bell Atlanticom assigned its rights under the Distribution Agreement to BA Meridian. BA Meridian however negotiated some adjustments to the Distribution Agreement with Octel. The December 1992 Letter Amendment resulting from these negotiations provided additional post-termination support obligations on the part of Octel.

2. The Distribution Agreement.

*2 Under the January 1, 1992 Distribution Agreement Octel appointed Bell Atlanticom as its primary distributor within a stated territory, (Delaware, Maryland, New Jersey, Pennsylvania, Virginia, Washington, D.C., and West Virginia). As a primary distributor, Bell Atlanticom made a volume purchase commitment commensurate with the expected volume to be generated within the territory; Bell Atlanticom agreed to sell a minimum of $8 million of Octel voice mail systems in 1992 and a minimum of $12 million in 1993. Octel, in turn, agreed, while the agreement was in effect, not to engage in direct sales, installation, or maintenance activity in the territory, or to appoint additional distributors in the territory. The Distribution Agreement had an expiration date of December 31, 1993, and was renewable for one year upon written agreement.

The Distribution Agreement also established the terms for the post-termination relationship between Octel and Bell Atlanticom. In the event of termination, Section 12.2 of the Distribution Agreement required Octel to provide Bell Atlanticom "for a period of seven (7) years (or less if [Bell Atlanticom] so specifies) from the date of termination, hardware, Software and information ... generally available to distributors ... which will enable [Bell Atlanticom] *to maintain and support its installed base systems at the location existing as of the date of termination.*" [FN2] Section 11.4, however, provided that Octel "shall have no obligation to fill any orders *for new systems* placed by [Bell Atlanticom] after the termination of this Agreement; however, *Octel will honor any order for new systems accepted by Octel prior to the date of termination if delivery under such order is called for within sixty (60) days* of termination." In addition, pursuant to Section 9.2, Octel agreed to provide software updates and software enhancements in the post-termination period.

FN2. Emphasis supplied throughout unless otherwise noted.

In late 1992, Bell Atlanticom and Northern Telecom agreed to establish BA Meridian as a joint venture partnership to sell and service voice mail systems and other telecommunication products. BA Meridian was formed as of January 1, 1993, with Northern Telecom acquiring 80% ownership and Bell Atlanticom acquiring 20% ownership. Substantially all of Bell Atlanticom's telecommunication products sales and service business, including employees, customer contracts, vendor agreements, inventory, and other assets, was transferred to BA Meridian. Northern Telecom is a manufacturer of voice mail systems that compete with those of Octel.

3. The Letter Amendment.

In anticipation of the formation of BA Meridian, Northern Telecom, Octel, and Bell Atlanticom negotiated and executed the Letter Amendment dated December 17, 1992. BA Meridian then signed it on January 1, 1993. Through the Letter Amendment, Octel consented in writing to the assignment and transfer of the Distribution Agreement from Bell Atlanticom to BA Meridian.

*3 In the Letter Amendment, Octel and BA Meridian agreed that, upon assignment of the Distribution Agreement by Bell Atlanticom to BA Meridian, BA Meridian would assume all of Bell Atlanticom's obligations, including the $12 million annual volume purchase commitment for 1993. The Letter Amendment modified the post-termination support obligations that Octel had undertaken in the Distribution Agreement. Under paragraph 4 of the Letter Amendment, Octel's post-termination

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

obligations were modified to be as follows:

Upon the termination and expiration of the Agreement on December 31, 1993, or at the end of any extension of the term of the Agreement, Octel will provide to [BA Meridian] (or any successor to [BA Meridian] ) support (as outlined in the Agreement) with respect to [BA Meridian's] installed customer base of Octel CPE product for at least the time periods specified in the Agreement. Such support shall include, without limitation, spare parts, repair parts, Software upgrades and new Software features and applications (including both Software Updates and Software Enhancements), hardware upgrades and extensions, new systems where [BA Meridian] has a binding obligation to provide such systems or where the provision of such systems is reasonably necessary to maintain [BA Meridian's] business relationship with particular existing customers for Octel CPE Product, training for technicians of [BA Meridian] or its subcontractors, customer training, support services, application development and support, and technical assistance (both by telephone and on-site) (collectively, "Post Termination Support").

4. The negotiation of the Letter Amendment.

Because Octel products accounted for a substantial portion of Bell Atlanticom's revenues, Northern Telecom felt it was important, in order to make the joint venture between Bell Atlanticom and Northern Telecom work, for the joint venture to maintain a distributor relationship with Octel. Thus, in late 1992, before proceeding with the formation of BA Meridian, John Losier, the contemplated President of the future joint venture, was assigned the responsibility of reaching an agreement with Octel.

In considering the viability and profitability of the anticipated joint venture, John Losier's primary concern in dealing with Octel was the joint venture's ability to maintain the revenue streams from customers using Octel systems. Given this objective, he felt that assumption of the Distribution Agreement without change was inadequate; the Distribution Agreement was due to expire at the end of 1993 and did not provide, in Losier's mind, sufficient post-termination support rights in order for him to maintain the joint venture's relationship with its installed base of Octel customers.

Octel was also convinced of the propriety of maintaining a relationship with the new joint venture and appointed James Jennings to head up the negotiations with Bell Atlanticom and Northern Telecom. Although Octel would be taking on a competitor as a distributor, it would also be continuing one of its most successful distributorships and sales forces-a distributorship committed to at least $12 million in purchases for the following year. The negotiations between Losier and Jennings resulted in the Letter Amendment to the Distribution Agreement.

*4 At the first meeting between Losier and Jennings, Losier communicated his business concerns about being able to maintain relationships with his existing Octel customers during the seven year post-termination period contemplated in the Distribution Agreement. Jennings, in turn, indicated a willingness to address Losier's business concerns and on November 16, 1992, faxed a letter to Losier proposing certain post-termination support obligations. Upon receiving this fax, Losier made a notation on it that he "also need[ed] [the] ability to sell new systems to the base." Losier then instructed John Woods, senior counsel at Northern Telecom and anticipated counsel to BA Meridian, to draft an amendment to the Distribution Agreement that would enable BA Meridian to fully support its existing Octel customers in the post-termination period; including the ability to sell "new systems."

Woods' draft of the Letter Amendment containing a provision addressing "new systems" was sent to Jennings and Susan Thornton, general counsel of Octel, for review. Woods' proposed language modifying Octel's post-termination support obligations apparently was not controversial and the Letter Amendment to the Distribution Agreement was agreed upon by Losier and Jennings after only a couple of telephone conversations and without any significant debate over the meaning of the revised post-termination support obligations.

5. The renegotiation period.

Following execution of the Letter Amendment, BA Meridian acted as a distributor for Octel in the Mid-Atlantic territory. Despite the fact that BA Meridian was 80% owned by a competitor of Octel's, the relationship progressed smoothly for the first year and in November 1993, BA Meridian and Octel began negotiations to extend the Distribution Agreement (which was to expire at the end of 1993) for an additional two-year period. For more than a year, the parties discussed various draft versions of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

an amendment for a two-year extension. During this time, the Distribution Agreement was repeatedly extended on a month-to-month basis, beginning in January of 1994.

As these on-going negotiations were taking place, changes in the business context of their relationship began to make that relationship more problematic. In February 1994, Octel announced that it had agreed to merge with VMX, a competing voice mail manufacturer. BA Meridian became concerned not only about the way in which the Octel and VMX product lines would be integrated, but also because Octel had begun using the former VMX direct sales office in BA Meridian's territory to sell VMX voice mail systems. In fact, in November 1994, Octel began considering cross-training its direct sales personnel in BA Meridian's territory (acquired from VMX) to sell the same type of voice mail systems that BA Meridian was selling under the terms of the Distribution Agreement. Then, in January 1995, in the parties' monthly agreement to extend the Distribution Agreement, Octel stated that it would no longer agree to refrain from engaging in direct sales of voice mail systems sold by BA Meridian in BA Meridian's territory. In February 1995, Octel initiated a "competitive replacement program" designed to assist its sales force in displacing competitive voice mail systems.

*5 On the BA Meridian side of the relationship, as early as August 1994, BA Meridian began encouraging the sale of Meridian Mail (a voice mail system manufactured by Northern Telecom) over Octel to new customers. Sales personnel had to obtain management approval to make proposals to new customers for the sale of Octel voice mail but not Meridian Mail. By March 1995, a subsidiary of Northern Telecom was offering to provide Meridian Mail at its cost to BA Meridian for displacement of Octel voice mail systems.

6. Termination of the Distribution Agreement and introduction of the Overture 250.

On April 25, 1995, Octel informed BA Meridian in writing that Octel would not extend the Distribution Agreement further and thus it would terminate. In May, Octel notified several distributors and customers that it would be introducing a new product (the Overture 250) at a July 11, 1995 customer or user group meeting in San Francisco. Octel also notified BA Meridian that according to the terms of the Distribution Agreement as amended by the Letter Amendment, BA Meridian would not be entitled to sell new voice mail products that become available to the market for the first time after June 14, 1995, including, but not limited to, the Overture 250. BA Meridian initiated this suit on June 7, 1995.

On July 11, 1995, Octel announced the introduction of the Octel Overture 250 message server. Octel described the Overture 250 as a "new mid-level system designed for medium-sized businesses or large branch offices." The Overture 250 is a newly designed product incorporating new technology and an entirely new logic design. It has been designed to have an identical user interface as have other Octel products. Thus while it will seem the same in many respects to users, it will offer new utilities to buyers of voice mail systems.

The trade press reported that the "Octel Overture 250 is designed to replace the former Branch XP, Aspen, Maxum, and Maxum SE" voice mail systems (*Business Wire*). *Infoworld* similarly reported that the "Overture 250 replaces the Aspen line of servers and will use the Aria software. Users must purchase the new system to upgrade Aspen servers." In fact, Octel's own internal marketing reports project that many Maxum-Aspen voice mail units (which have been distributed by BA Meridian under the Distribution Agreement) will convert to the Overture 250 in the next two years. Octel is also developing new features for the Overture 250 (including visual mailboxes, hot-plug cards and drives, system back-up, and global message redundancy) that it will not make available for the Aspen-Maxum line of voice mail systems.

II. Rules of Contract Construction [FN3]

> FN3. A choice of law provision in the Distribution Agreement provides that New York law will apply to its construction. The parties, however, have not suggested that New York law should be applied. Although I decide the issue as a matter of Delaware law, I note that New York law with respect to the interpretation of contracts is consistent with the general principles and applicable law of Delaware and have cited, where possible, New York authority for these propositions.

The primary consideration in the construction of contract language is to fulfill, to the extent possible,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 5

the reasonable expectations of the parties at the time they contracted. See *Corbin on Contracts* § 1 (1960); *Brown Bros. Electrical Contractors, Inc. v. Beam Construction Corp.*, 361 N.E.2d 999, 1001 (N.Y.1977); cf. *Steigler v. Ins. Co. of North America*, Del.Supr., 384 A.2d 398, 401 (1978) (stating that insurance contracts should be read to fulfill the reasonable expectations of the purchaser). This is often stated as giving effect to the intent or shared understanding of the parties. See *Restatement (Second) of Contracts* § 201 cmt. c (1981) ("The objective of interpretation in the general law of contracts is to carry out the understanding of the parties...."); *Klair v. Reese*, Del.Supr., 531 A.2d 219, 223 (1987); *Burge v. Fidelity Bond & Mortgage Co.*, Del.Supr., 648 A.2d 414, 420 (1994); *Deering Milliken, Inc. v. Georgette Juniors, Inc.*, 235 N.Y.S.2d 72 (N.Y.App.Div.1962). In this process, Delaware courts adhere to an "objective" theory of contracts. [FN4] See *"Industrial America", Inc. v. Fulton Indus., Inc.*, Del.Supr., 285 A.2d 412, 415 (1971); *Leeds v. First Allied Connecticut Corp.*, Del.Ch., 521 A.2d 1095, 1097 (1986). See also *Mencher v. Weiss*, 114 N.E.2d 177, 181 (N.Y.1953); *Brown Bros. Electrical Contractors, Inc. v. Beam Construction Corp.*, 361 N.E.2d 999, 1001 (N.Y.1977) (both stating that it is the objective manifestations of a party's intentions that ordinarily is controlling).

FN4. Although one might be inclined to think otherwise, giving primacy to the parties' intent is not inconsistent with objective theory. Objective theory simply recognizes that only objective indicia of the parties' intent or expectations should be considered. In other words, it is generally not the parties' unexpressed intent or understanding that is relevant. See *Leeds v. First Allied Connecticut Corp.*, Del.Ch., 521 A.2d 1095, 1097 (1986); *Brown Bros. Electrical Contractors, Inc. v. Beam Construction Corp.*, 361 N.E.2d 999, 1001 (N.Y.1977) (both stating that subjective intention of party is irrelevant in determining whether party intended to bind himself contractually). This is reflected in the requirement that the parties' expectations be reasonable. That is, only expectations reasonably induced by the other parties' overt words and acts under the circumstances and business context will be recognized.

*6 Under the objective approach, the court must first determine whether the contractual language in dispute is ambiguous. When the contract language, read in the context of the entire contract, is not reasonably susceptible to more than one meaning, this "objective" meaning will govern. *Rainbow Navigation, Inc. v. Yonge*, Del.Ch., C.A. No. 9432, Allen, C. (April 24, 1989); *Levco Construction Corp. v. New York*, 350 N.Y.S.2d 219, 221 (N.Y.App.Div.1973). Moreover, parol evidence (that is evidence pertaining to antecedent agreements, communications of the parties, commercial usage in the industry, etc ...) that contradicts or varies this meaning will not be considered. [FN5] *City Investing Co. v. Continental Cas. Co.*, Del.Supr., 624 A.2d 1191, 1198 (1993); *Pellaton v. Bank of New York*, Del.Supr., 592 A.2d 473, 478 (1991); *W.W.W. Assoc., Inc. v. Giancontieri*, 566 N.E.2d 639, 641 (N.Y.1990).

FN5. In some cases, the meaning of the words to a contract can only be known through an understanding of the context and business circumstances under which they were negotiated, and extrinsic evidence must necessarily be evaluated. See *Klair v. Reese*, Del.Supr., 531 A.2d 219, 223 (1987). While it is unlikely that the contractual language under these circumstances evokes a plain and clear meaning on its face, there is a small minority of cases where seemingly unequivocal language becomes reasonably susceptible to more than one meaning when considered in conjunction with the context in which the negotiation and contracting occurred. This kind of hidden ambiguity is often referred to as a latent ambiguity, and in these cases, extrinsic evidence to discern the real meaning and intention of the parties is not excluded. See, e.g., *Corbin on Contracts* § 537 fn. 30 (Cunningham & Jacobson Supp.1994); *Northeastern Life Ins. Co. of N.Y. v. Leach*, 213 N.Y.S.2d 357 (N.Y.Sup.Ct.1961). Thus, a preliminary consideration of extrinsic evidence may be necessary to determine whether language is ambiguous. This is not to say, however, that contract language is rendered ambiguous simply because the parties disagree over its meaning in litigation; the objective theory of contract demands that any understanding of the meaning of the language be reasonable given the objective evidence as known by the party arguing for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  
Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)  
**(Cite as: Not Reported in A.2d)**

Page 6

that meaning. See *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, Del.Supr., 616 A.2d 1192, 1196 (1992).

When contractual language is reasonably susceptible to more than one meaning, all objective extrinsic evidence is considered: the overt statements and acts of the parties, the business context, prior dealings between the parties, and the business customs and usage in the industry. *Klair v. Reese*, 531 A.2d 219, 223 (1987). Given all this evidence, the court construes the language in the way that best carries out the reasonable expectations of the parties that contracted in those circumstances. *Id.* To do so, Professor Corbin advocates the following analysis: "The court will give legal effect to the words of a contract in accordance with the meaning actually given to them by one of the parties, if the other knew or had reason to know that he did so." *Corbin on Contracts* § 543 (1960). See also *Restatement (Second) of Contracts* § 201 (1981) (setting forth the same test); *Klair v. Reese*, Del.Supr., 531 A.2d 219, 223 (1987) (citing § 201 of the Restatement as a proper rule of analysis).[FN6]

> FN6. Aside: Imagine a case in which contractual language is susceptible to two different meanings, each reasonable and imagine that each party expressed in terms sufficiently clear, his or her subjective understanding of the meaning of the term. What result? Two possibilities appear: the court might accept one or the other as the more reasonable or it may conclude that despite the "objective" manifestation of contract, when viewed in context the parties have failed to contract on that point.

Under this analysis, then, it becomes incumbent upon the party seeking judicial enforcement of their interpretation of the ambiguous language to show by a preponderance of the evidence that the other party knew or had reason to know of the meaning they attached to the language. As necessitated under an objective theory of contract, a party will be legally responsible for a contractual obligation if a reasonable person in the same circumstances would have understood that they were taking on such an obligation; a subjective belief to the contrary is not relevant. *Cf. Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, Del.Supr., 616 A.2d 1192, 1196 (1992) (stating that the "true test is ... what a reasonable person in the position of the part[y] would have thought it meant.").

For BA Meridian to obtain judicial enforcement of its interpretation of "new systems", the preponderance of the evidence must indicate that the language of the Letter Amendment was ambiguous and that Octel knew or had reason to know that BA Meridian understood "new systems" to entitle it to successor systems in the post-termination period. As discussed below, the language of the contract was ambiguous and although I assume that BA Meridian in good faith understood "new systems" to entitle it to successor products, I conclude that Octel did not know and did not have reason to know of this understanding. As a result, BA Meridian is not entitled to enforce upon Octel its interpretation of the Letter Amendment.

### III. The Letter Agreement is Ambiguous

*7 Examining the language of the Letter Amendment in conjunction with the Distribution Agreement, it cannot be said that there is one plain meaning that must govern. Consequently, all relevant extrinsic evidence will be examined in attempting to give legal effect to the language of the Letter Amendment.

Certainly in a literal sense, "new systems", as used in the Letter Amendment, could refer either to (1) additional units of the commercial products covered by the Distribution Agreement (new voice mail units); or, alternatively, it might refer to new future products (new voice mail products). Either meaning is possible viewing the language used in isolation.

When considered in light of the language of the entire Distribution Agreement, however, the more limited interpretation asserted by Octel appears very reasonable. First, the Letter Amendment did not purport to change provisions in the Distribution Agreement that specifically enumerated the voice mail systems BA Meridian was entitled to purchase; suggesting that the Letter Amendment was not intended to expand the menu of voice mail systems that BA Meridian was entitled to purchase. Second, the phrase "new systems" is used in other places in the Distribution Agreement where the context clearly suggests it is referring to additional units of the systems BA Meridian already had a right to purchase.

The Distribution Agreement appears to enumerate the products BA Meridian was to distribute. The Agreement defines "Products" to be the voice mail systems listed in Exhibits A and B. The Agreement goes on to state that such "Products ... are hereby

offered for sale by Octel." The Distribution Agreement also provides that "specifications for Products are listed in Exhibit D." The first page of Exhibit D, entitled "Products Identified," states that "[t]he following are identified as customer premise equipment voice information processing products ("CPE Products") and no others" and then lists the voice mail systems identified in Exhibit A.

One would expect the provisions of the Distribution Agreement to be altered if the Letter Amendment was to give BA Meridian the right to subsequently develop voice mail systems that serve as a substitute or replacement for the systems listed in these Exhibits. Either the Letter Amendment would have made reference to these Exhibits as not limiting BA Meridian's right to successor systems or the Distribution Agreement would have been amended to specifically include successor systems. Because no changes were made to these provisions at the time the Letter Amendment was executed, the more limited interpretation of "new systems" is consistent (arguably more consistent) with the entire contract, as amended.

Furthermore, the phrase "new systems" appears in several places in the Distribution Agreement. Although it is not a defined term, the context in which it is used in these other instances is consistent with the concept of additional units of existing systems. Section 11.4 of the Distribution Agreement stated that Octel was not obligated to fill orders "for new systems placed by [BA Meridian] after the termination of [the] Agreement." See p. 6 above. In addition, Exhibit A of the Distribution Agreement, which lists and prices the products Octel was offering to sell to BA Meridian, repeatedly refers to "new systems" in the context of new orders for the systems listed in the Exhibit. "New systems" in both of these instances appears to be consistent with the concept of additional units.

*8 Reading the contract as a whole, I find that the language of the Letter Amendment referring to "new systems" could reasonably be given either asserted interpretation and is therefore ambiguous.

IV. Octel Did Not Know or Have Reason to Know of
BA Meridian's Understanding of the Letter
Amendment

After examining the commercial context in which the Letter Amendment was negotiated, the prior dealings between the parties, the practices within the voice mail industry, and the statements made by the parties before and during their negotiations, I conclude that the preponderance of the evidence requires the conclusion that Octel did not know or have reason to know that BA Meridian understood the Letter Amendment to entitle it to new products, whether limited to "successor systems" or not. [FN7]

> FN7. There is no meaningful evidence in the record of any statements made by Octel or conduct on the part of Octel to indicate that Octel knew that BA Meridian understood "new systems" in the broader sense. The analysis therefore focuses exclusively on whether Octel had reason to know.

1. BA Meridian did not convey their understanding of
the scope of the phrase "new systems" to Octel.

In deciding whether a reasonable person in Octel's position would have reason to know that BA Meridian understood "new systems" to include successor systems, the court must consider all extrinsic evidence known by Octel prior to and during the negotiations. The most critical extrinsic evidence in making this determination are the statements made by BA Meridian representatives to Octel representatives prior to or at the time the language was being negotiated. If one in the position of Octel should have understood that BA Meridian understood the meaning of the term "new systems" to create an obligation to provide newly created "successor" products, then, where the phrase is itself ambiguous, BA Meridian's understanding would be given legal effect. Although there is conflicting testimony on this point, I conclude that Losier did not convey to Jennings a view that "new systems" would encompass any newly developed voice mail systems that in effect replaced the systems BA Meridian currently was able to sell and that Jennings' understanding that "new systems" meant new units of covered products was reasonable.

*a. The conflicting testimony.*

Resolution of this case is not aided by the utter lack of communication over the phrase "new systems" in the negotiation of the Letter Amendment. From the testimony, it appears that there was no negotiation or debate over the language of the Letter Amendment as drafted by Woods and submitted by Losier to Octel. This means that if, based on communications between the parties, Octel had reason to know that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 8

BA Meridian understood "new systems" in the broader sense, such reason would have to stem from the statements Losier made in communicating his reasons for wanting to expand BA Meridian's post-termination support rights. On this crucial point, Jennings' and Losier's testimonies are conflicting.

Losier testified at trial that he told Jennings during their discussions that "new systems" included the concept of successor systems. (Tr. T. 44). He also testified that he conveyed to Jennings, that he needed access to the latest products offered by Octel in order to maintain his relationship with the installed customer base during the post-termination period. (Tr. T. 45). Jennings, on the other hand, testified in his deposition that Losier never specifically asked for the right to purchase successor systems and that there was no discussion about the possibility that after termination Octel would introduce a new product or system and BA Meridian would want to purchase it. (Dep. T. 14). Although Jennings admitted that Losier conveyed to him his concern that the original agreement did not provide Bell Atlanticom any rights in terms of selling them additional new systems in the sense of additional units of voice mail systems, he testified that the specific example Losier used in conveying his desire for additional post-termination rights was a scenario in which an account opened a new office and BA Meridian would not be able to sell them additional equipment. (Dep. T. 11-12). He further testified that Losier used the specific example of Johnson & Johnson opening a new office. (Tr. T. 12). To the contrary, Losier testified that they only talked about "new systems" in terms of successor products. (Tr. T. 47).

*b. The better interpretation of the evidence is that Mr. Losier did not explicitly tell Mr. Jennings that "new systems" included successor systems.*

*9 I do not find that either party in this case is more or less trustworthy than the other. Rather, in light of all the evidence in the record, I find that while Losier may have understood his language to entail successor systems and even may have thought without good grounds that Mr. Jennings understood the same, Losier who was proposing the creation of a contract right, did not in fact successfully convey that understanding to Jennings. That is, although he testified otherwise, I find that Losier did not explicitly refer to "new systems" as encompassing successor systems. This conclusion is based on the evidence as set forth below.

*i. No one could remember what specifically Losier said about "new systems" and Losier thought the phrase "new systems" conveyed only one meaning.*

With regard to his own testimony on this issue, Losier could not recall his or Jennings' statements with any specificity. When asked if he told Jennings that he wanted the right to purchase any voice mail systems developed by Octel within the seven-year time frame, he stated that he did not use those exact words. (Tr. T. 45). Moreover, he could not recall the exact words he used. (Tr. T. 63). He also did not recall what Jennings response was when he informed Jennings of his view that "new systems" included successor products. (Tr. T. 63). Similarly, John Woods, who was purportedly present during most of the conversations between Losier and Jennings, could not remember what was said by Losier or Jennings in regards to "new systems." (Tr. T. 255).

In addition, the evidence is clear that Losier felt that the phrase "new systems" unequivocally included newly developed or successor systems. He specifically testified that he thought the phrase "successor systems," "future systems," and "new systems" meant the same thing. (Tr. T. 45-46). Thus, Losier could have thought that by telling Jennings he wanted access to "new systems" in the post-termination period, Jennings would understand this meant newly developed systems.

This is understandable when one considers that Losier was not familiar with the language of the Distribution Agreement, and in fact did not even recall reading it or the Exhibits to it. (Tr. T. 64-66). This is not to condemn him for not doing so, because he did ask his counsel (John Woods) what BA Meridian would be entitled to in the way of post-termination support. (Tr. T. 64-66). However, without being familiar with the Distribution Agreement, Losier had no reason to know that his use of the phrase "new systems" might not convey his understanding that it covered successor systems.[FN8]

   FN8. As explained previously, in the context of the Distribution Agreement and its Exhibits, "new systems" could easily, and probably would be, understood in a more narrow sense.

From this evidence, I am inclined to think that Losier, thinking to himself that he wanted access to Octel's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

latest products, included the phrase "new systems" in the first draft of the Letter Amendment and then explained to Jennings that he wanted to be able to purchase "new systems." He then used as an example, a customer opening a new account (again possibly thinking in his mind that the new account would want the latest technology). Jennings could easily have understood this to be limited to additional out-of-the-box systems. This establishes some consistency between Losier's and Jennings' testimonies. Other evidence suggests this may have been the case.

ii. *The absence of controversy over the phrase "new systems" suggests Losier did not explicitly explain to Jennings that he thought it meant successor systems.*

\*10 Losier testified at trial that Woods was on the telephone during the initial discussions with Jennings about the language of the Letter Amendment. (Tr. T. 59). Woods, however, did not recall any specific discussions about "new systems." (Tr. T. 255-56). He only recalled that the language was not controversial. (Tr. T. 255-56). Yet, had Losier specifically asked for access to entirely new technology during a lengthy post-termination period, one would predict it to be controversial under the circumstances.

The Distribution Agreement had specifically limited the products that Octel was obligated to provide. Although the reason for that specificity may or may not have been a concern over access to future technology, that concern was certainly present after formation of the joint venture-when Octel would be faced with a distributor that was 80% owned by a competitor. Giving that competitor access to newly developed proprietary systems for seven years after the parties' on-going relationship had terminated would surely be controversial. The lack of controversy tends to prove that Losier did not convey to Jennings that he sought access to such technology.

The preponderance of the evidence indicates that although Losier may have told Jennings that he needed access to new systems in order maintain his relationships with his installed customer base, he did not provide to Octel reasonable grounds to understand he intended by "new systems" to include access to future "successor" technologies.

2. Extrinsic evidence indicates that Octel did not have reason to know that "new systems" was intended to include successor systems.

Even though BA Meridian did not convey its understanding of the scope of the phrase "new systems" to Octel, BA Meridian's broader interpretation could nevertheless be given legal effect if other extrinsic evidence showed that a reasonable person would have understood that "new systems" was intended to include successor systems. However, taking into account the business setting and the commercial practices and usage in the industry, I find that a reasonable person in Octel's position would not have such reason to know.

a. *"New systems" does not convey an unequivocal meaning based on usage in the industry.*

It is clear from the evidence in the record, that "new systems" has been used in the industry to refer to newly developed products. BA Meridian introduced into evidence several articles from trade journals that refer to Octel's most recently developed voice mail system, the Overture 250, as a new system. Indeed, Octel has used the phrase in its own internal communications to refer to the Overture 250. There is no evidence in the record, however, that indicates the phrase is generally understood in the industry to only mean newly developed systems. No experts on trade usage testified and the testimony based on first-hand experiences in the business simply established that "new products" and "new systems" are sometimes used interchangeably.

b. *BA Meridian's business concerns were not, in and of themselves, enough to give notice to Octel that the term "new systems" was intended to include successor systems.*

\*11 The evidence shows that Losier communicated to Jennings his primary business concern; maintaining business relationships with BA Meridian's installed customer base during the entire post-termination period. There is also evidence in the record that the voice mail industry is subject to ever-quickening technological change. Based on this, one might argue that Octel had reason to know that BA Meridian understood "new systems" to include successor systems.

i. *Access to successor systems was not necessary in order for BA Meridian to satisfy its business concern expressed to Mr. Jennings.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 10

In light of the other significant post-termination rights to which BA Meridian was entitled under the Letter Amendment, access to successor systems was not so crucial that a reasonable person in Octel's position should be charged with the knowledge that BA Meridian must have been asking for this right.

Under the Letter Amendment, BA Meridian was entitled to software and hardware upgrades and new features. This would presumably go a long way towards meeting the installed customer base's on-going needs; it enabled BA Meridian to keep them technologically up to date, *with respect to covered products.* Although being able to provide these customers with the successor system not covered by the Distribution Agreement would be valuable, such future non-covered products were not the subject of the Distribution Agreement or any discussions in connection with the Letter Amendment.

When a negotiating party proposes ambiguous language to address a business concern, a reasonable person is not automatically charged with the broadest interpretation possible simply because the broadest interpretation would best enable the opposing party to satisfy their business concern. Other interpretations may be and here are possible.

*ii. The relationship between the parties gave Octel no reason to think that BA Meridian sought to substantially extend its rights to covered products by reason of a termination of the Distribution Agreement.*

It is a termination period right the parties were negotiating about. Surely BA Meridian interests would be best protected by giving it a continuing ability to access *any* new products that Octel might innovate over the period, but absent some explicit indication, a reasonable negotiator would not assume that an ambiguous term was intended to go so far. It is important to keep in mind that BA Meridian was 80% owned by a direct competitor of Octel's. These are relevant factors in considering what a reasonable person would have understood.

I assume that BA Meridian in good faith understood the Letter Amendment to entitle it to successor systems. Read in the context of the entire contract, however, the language purportedly entitling BA Meridian to this right is susceptible to two reasonable interpretations. The preponderance of the evidence indicates that Octel neither knew nor had reason to know that BA Meridian understood the ambiguous language to allow it to expand the Distribution Agreement list of covered products after termination to include new products or "successor systems." Plaintiffs requested relief is therefore denied.

Del.Ch.,1995.
Bell Atlantic Meridian Systems v. Octel Communications Corp.
Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT "H"

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
IKO MONROE, INC. Plaintiff,
v.
ROYAL & SUN ALLIANCE INSURANCE COMPANY OF CANADA, INC., Hartford Insurance Company of Canada, Inc., HIH Cotesworth Canada Limited, Defendants.
No. CIV.A. 00-834 GMS.

Dec. 7, 2001.

MEMORANDUM AND ORDER

SLEET, District J.

I. INTRODUCTION

*1 In September 2000, IKO Monroe ("IKO") filed a declaratory judgment action against Royal & Sun Alliance Insurance Company of Canada, Inc. ("Royal Sun"), Hartford Insurance Company of Canada, Inc. ("Hartford"), and HIH Cotesworth Canada Limited ("HIH"). IKO seeks a declaratory judgment stating that the defendants had a duty to defend IKO Monroe against certain lawsuits pending in Michigan. After IKO amended its complaint, each of the defendants submitted a revised answer. In its amended answer, Hartford added a counterclaim for reformation of its insurance contract with IKO.

Presently before the court are two motions-IKO's motion for a more definite statement from Hartford on its counterclaim and Royal Sun's motion for summary judgment against IKO. [FN1] After reviewing the briefs and hearing oral argument, the court will deny IKO's motion for a more definite statement and grant Royal Sun's motion for summary judgment.

> FN1. By order of the court, HIH's motion for summary judgment was stricken and HIH was instructed to join in Royal Sun's motion. (D.I.59.) The parties agree that the Royal Sun-IKO and HIH-IKO contracts contain very similar language. For simplicity, the court will refer only to Royal Sun. However, the same reasoning that applies to Royal Sun applies to HIH. By contrast, the language in the Hartford-IKO contract differs from the others, and therefore Hartford is not a party to this summary judgment motion.

II. BACKGROUND

A. Factual Background

IKO Monroe, a subsidiary of IKO Industries Ltd., is a Delaware corporation with its principal place of business in Monroe, Michigan. IKO manufactures paper for use in roofing products. Asphalt is used in the manufacturing process. Both the asphalt and the paper production process cause IKO's plants emit disagreeable odors.

IKO entered into insurance contracts with Canadian based insurance providers Royal Sun, HIH, and Hartford. In the IKO-Royal Sun insurance contract, Royal Sun agreed to defend IKO against claims for "bodily injury, personal injury, [or] property damage." (D.I. 46 at 5.) The policy also limited the duty to defend in significant ways. Most important for the present discussion, the policy contained an "absolute pollution exclusion" clause. The absolute pollution exclusion clause stated that the policy's coverage did not extend to "claims arising out of the actual, alleged, potential or threatened spill, discharge, emission, dispersal, seepage, leakage, migration, release or escape of pollutants." (D.I. 46 at 5.) The contract defines the term pollutant as "any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, *odour,* vapour, soot, fumes, acids, chemicals, and waste." (D.I. 46 at 5) (emphasis added).

In July 2000, the *Compora v. IKO Monroe* case was filed in Michigan state court. The *Compora* plaintiffs alleged that IKO's plant had caused "noxious odors ... accumulated and controlled by Defendant [IKO], to physically invade Plaintiff's person and property, [thereby] substantially and unreasonably interfer[ing] with Plaintiffs use and enjoyment of their property." (D.I. 46 at 7 .) In October 2000, the city of Monroe, Michigan also filed suit against IKO in Michigan state court. In the *City of Monroe v. IKO Monroe* complaint, the City of Monroe charged that IKO "had been for some months prior to the date of this Complaint emitting or causing foul, offensive, noxious, and/or disagreeable odors or stenches which

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

are extremely repulsive to the physical senses of persons in the general vicinity of the Defendant's premises." (D.I. 46 at 8.)

*2 Following the filing of these lawsuits, IKO asked Royal Sun to defend it against the claims. After reviewing the *Compora* and *City of Monroe* complaints, Royal Sun determined that both plaintiffs sought damages based on IKO's emission of "noxious odors ." Royal Sun then notified IKO that under the terms of the absolute pollution exclusion, it had no duty to defend either lawsuit.

B. IKO's Motion for a More Definite Statement

After Royal Sun refused to defend IKO, IKO filed suit in this court asking the court to declare that the defendants had a duty to defend the Michigan lawsuits. After each of the defendants answered, IKO requested and was given permission to amend its complaint. Subsequently, each of the defendants submitted a revised answer. In its second answer, Hartford included a counterclaim against IKO for reformation of contract. In particular, paragraph 13 of the answer and counterclaim asserts that:

To the extent the definition of personal injury in the Hartford Canada policy is interpreted to encompass claims arising out of or related to pollution, the definitional language permitting such interpretation was excluded solely because of mutual mistake on the part of both IKO and Hartford Canada ...

(D.I. 44, Exh. 1 at 16.)

In response to the counterclaim, IKO filed a motion for more definite statement pursuant to Rule 12(e). In the motion, IKO asserts that Hartford failed to plead its allegations of mutual mistake with sufficient particularity as required by Rule 9(b). Hartford responds by asserting that it should be permitted to clarify its pleadings through discovery. Furthermore, Hartford argues that it cannot plead with more particularity because the relevant facts are solely in IKO's possession. Hartford states:

The facts within the possession of Hartford-Canada are that the parties to this insurance policy agreed to a contract that excluded coverage for pollution related claims and that, despite that intent and understanding, the written instrument as drafted by IKO or its insurance broker included language that IKO Monroe now alleges provides such coverage.

(D.I. 50 at 7.) In its reply, IKO cites several cases for the proposition that Hartford must plead with more specificity. Although IKO acknowledges that it is possible to clarify pleadings through subsequent pleadings or discovery, it denies that Hartford's pleadings sufficiently elucidate its claim.

C. Royal Sun's Motion for Summary Judgment

On the same day that IKO filed its motion for a more definite statement, Royal Sun filed a motion for summary judgment asserting that it had no duty to defend the *Compora* or *City of Monroe* actions. Royal Sun argues that since the definition of "pollution" in the policy includes "odours," there is no duty to defend against lawsuits based on noxious odors. Based on this interpretation of the clause and the fact that both of the underlying Michigan lawsuits seek damages for IKO's emission of noxious odors, Royal Sun maintains that it has no duty to defend either lawsuit.

*3 IKO makes four basic arguments in its response brief. First, IKO asserts that the term "odours" was intended to mean only toxic odors. Second, IKO claims that the term "pollution" was intended to mean only "true pollution." Third, IKO alleges that it had a "reasonable expectation" of coverage because both IKO and Royal Sun knew or should have known that IKO's plants would produce some disagreeable odors in the normal course of business. Finally, IKO claims that it needs discovery from Royal Sun before it can demonstrate that the term "odour" is ambiguous.

In rebuttal, Royal Sun states that the absolute pollution exclusion does not limit the definition of odors to "toxic" odors. Royal Sun further contends that the clause is not limited to "true pollution." Royal Sun also states that IKO is not entitled to the benefit of the reasonable expectations doctrine because, under Michigan law, the reasonable expectations doctrine does not apply where the contract language is unambiguous. Finally, at oral argument, Royal Sun insisted that further discovery was unnecessary in this case because the contract language is unambiguous, and therefore extrinsic evidence is impermissible.

III. DISCUSSION

Since the summary judgment motion and the motion for a more definite statement require separate standards of review, the court will address each motion in turn. First, however, the court will address

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

the choice of law issues involved in this case.

A. Choice of Law

The court accepts the view of both parties that Michigan law applies to this dispute. A federal district court sitting in diversity must apply the choice of law rules of the state in which it sits to determine which state's law governs the controversy before it. *Hionis Int'l Enterprises, Inc. v. Tandy Corp.,* 867 F.Supp. 268, 271 (D.Del.1994) (citing *Day & Zimmermann, Inc. v. Challoner,* 423 U.S. 3, 4 (1975); *Klaxon Co. v. Stentor Mfg. Co.,* 313 U.S. 487, 496 (1941)). Therefore, the court will apply Delaware's choice of law rules.

In Delaware, "the subject matter of the contract is a factor to be considered as 'the state where the thing or risk is located will have a natural interest in the transactions affecting it.' " *See Liggett Group, Inc. v. Affiliated FM Ins. Co.,* No.CIV.A.00C-01-207, 2001 WL 589041, at *6 (Del.Super.Ct. May 15, 2001) (citations omitted). Delaware courts have held that in environmental insurance coverage cases, "the location of the subject matter is the location of the sites where the environmental damage or injury occurred." *See id.* In this case, Michigan is the site of the alleged environmental injury. Therefore, the court concludes that Michigan law will govern its analysis of the contract language at issue.

B. Royal Sun's Motion for Summary Judgment

1. The Summary Judgment Standard

Summary judgment is appropriate only if the record shows that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See also 2-J Corp. v. Tice,* 126 F.3d 539, 540 (3d Cir.1997). The moving party bears the burden of proving that there are no genuine issues of material fact in dispute. *See Carter v. Exxon Co.,* 177 F.3d 197, 202 (3d Cir.1999); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 743 (3d Cir.1996). In deciding a motion for summary judgment, all inferences should be drawn in the light most favorable to the non-moving party. *See Carter v. Exxon Co.,* 177 F.3d at 202. In determining if summary judgment is appropriate, the court's "function is not to weigh the evidence and determine the truth of the matter," but to determine whether there are genuine issues of material fact in dispute.

*Id.* (citation omitted). "Facts that could alter the outcome are 'material', and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms,* 90 F.3d at 743 (citation omitted).

*4 In particular, in a breach of contract action, the court can grant summary judgment only when "the contract is unambiguous and the moving party is entitled to judgment as a matter of law." *Newport Assocs. Indem. Co. v. Traveler's Indemnity Co.,* 162 F.3d 789, 791 (3d Cir.1999) (citing *Tamarind Resort Assocs. v. Government of Virgin Islands,* 138 F.3d 107, 111 (3d Cir.1998)).

2. The Contract Language Is Unambiguous

The court finds that the contract is unambiguous and that Royal Sun is entitled to judgment as a matter of law based on the four corners of the contract. The court will now explain why IKO's arguments to the contrary are unavailing.

a. The term "odour"

IKO maintains that the term "odour" was intended to apply to "toxic odours" only. Under Michigan law, contract terms are given their plain meaning. *See Datron, Inc. v. CRA Holdings, Inc.,* 42 F.Supp.2d 736, 742 (W.D.Mich.1999) ( "The court should accord the words and phrases of the contract their plain meaning..."); *McKusick v. Travelers Indemn. Co.,* No.CIV.A.221171, 2001 WL 637676, at *4 (Mich.App. June 8, 2001) ("This court must enforce the insurance policy in accordance with its terms that are interpreted in light of their commonly used, ordinary, and plain meanings."). A contract term is ambiguous where it is susceptible to more than one valid interpretation. *See Society of St. Vincent DePaul in Archdiocese of Detroit v. Mt. Hawley Ins. Co.,* 49 F.Supp.2d 1011, 1016 (E.D.Mich.1999); *Cole v. Ladbroke Racing Michigan, Inc.,* 614 N.W.2d 169, 176 (Mich.App.2000). If the court finds that the term is ambiguous, extrinsic evidence may be admitted to explain the ambiguity. *See New Amsterdam Cas. Co. v. Sokolowski,* 132 N.W.2d 66, 68 (Mich.1965) ("[If a contract] is ambiguous, testimony may be taken to explain the ambiguity."). If, however, the court finds that the term is unambiguous, no extrinsic evidence will be allowed to interpret the term. *See City of Kalamazoo v. Michigan Disposal Service Corp.,* 125 F.Supp.2d 219, 243 (W.D.Mich.2000) ("When words

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

of written contract are clear and unambiguous ... the court has no right to look to extrinsic evidence to determine their intent."); *Commercial Union Ins. Co. v. Cannelton Industries,* 938 F.Supp. 458, 461 (W.D.Mich.1996) ("Under Michigan law, when insurance policy is clear and unambiguous, there is no need for the court to resort to extrinsic evidence.").

The term "odour" as used in the contract at issue is not ambiguous. Its meaning is plain. Webster's Third New International Dictionary defines an "odour" as "a quality of something that affects the sense of smell ... a scent, fragrance, or aroma." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1565 (1993). In other words, colloquially speaking, an odor is a smell. Although an odor can be disagreeable, *see id.,* the court has found no evidence-and IKO has presented none-that an odor must be toxic or that the term as normally understood encompasses toxic materials at all. The plain meaning of the word "odour," therefore, does not lend itself to the interpretation suggested by IKO.

*5 IKO further suggests that plain meaning notwithstanding, the parties to the contract understood "odours" to mean only "toxic odours." However the record does not support this contention. It is clear that the insurance clause does not include any reference to "toxic odours" or "noxious odours" or "polluting odours"only "odours." The term is left unmodified. The parties here appear to be very sophisticated, of equal bargaining strength, and to have negotiated this contract at arm's length. Since "odours" as normally understood does not by definition include "toxic odors," if IKO intended only toxic odors to be exempted from coverage, it could have and should have negotiated to have this included in the contract. The court will not re-write the contract now to produce the result that IKO seeks.

b. The term "pollution"

IKO also contends that the entire pollution exclusion clause, not just the language dealing with odors, is directed only at "true environmental pollution" that is, the release of hazardous substances into the environment. In support of this contention, IKO cites numerous cases from various jurisdictions wherein courts held that insurance clauses such as the one here are only applicable to cases involving major environmental harm. This court, however, is applying Michigan law. In *McKusick v. Travelers Indemn. Co.,* the Michigan Court of Appeals expressly rejected IKO's argument, stating that where the pollution exclusion clause at issue does not specifically require that the insured cause traditional environmental pollution before triggering the exclusion, the court will not judicially engraft such a limitation. *See McKusick,* 2001 WL 637676, at *4. The plain language of the pollution exclusion clause at issue does not specifically state that the insured must cause "traditional" or "true" environmental pollution. Therefore, under Michigan law, this court cannot interpret the clause as requiring traditional environmental pollution, and will not do so.

c. Reasonable expectation of coverage

IKO's third argument is that it had a reasonable expectation of coverage based on the parties' understanding that IKO's plants would normally generate disagreeable smells. IKO cites various cases from other jurisdictions in support of this position. However, as Royal Sun has pointed out, no *Michigan* court has held that the "reasonable expectations" doctrine applies where the contract language is unambiguous. Michigan courts have consistently stated, and recently reaffirmed, that the "reasonable expectations" doctrine applies only where the contract language at issue is ambiguous. [FN2] As explained earlier, the contract provisions at issue here are unambiguous regarding the scope of coverage. Therefore, under Michigan law, IKO is not entitled to the benefit of the reasonable expectations doctrine, and the court will not apply that doctrine in this case.

FN2. *See Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel,* 596 N.W.2d 915, 921 (Mich.1999) ("[T]he rule of reasonable expectations has no applicability here because no ambiguity exists in the [insurance] clause and the insured could have discovered the clause on examination of the contract.") citing *Vanguard Ins. Co. v. Clarke,* 475 N.W.2d 48, 52 n. 7 (Mich.1991) ("Factors to consider in determining the legitimate existence of reasonable consumer expectation include 'whether an insurance policy includes a provision that unambiguously limits or excludes coverage and whether a policyholder could have ... discover[ed] a relevant clause that limits coverage.' "); *McKusick,* 2001 WL 637676, at *4 (holding reasonable expectations doctrine did not apply because "the pollution exclusion clause was "clear[ ] and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

unambiguous[ ]").

d. Discovery

Finally, since the court finds that the contract is unambiguous, it will reject IKO's final argument that it should be allowed discovery on this issue. Under Michigan law, extrinsic evidence is admissible to interpret a contract only where the terms are ambiguous. See *New Amsterdam*, 132 N.W.2d at 68, *Commercial Union*, 938 F.Supp. at 461. (W.D.Mich.1996). Since the court finds that the terms are unambiguous, however, there is no need for discovery.

*6 IKO further argues that discovery should be permitted because the ambiguity is latent. Although Michigan courts permit extrinsic evidence to resolve latent ambiguities, see *McCarty v. Mercury Metalcraft Co.*, 127 N.W.2d 340, 344 (Mich.1964), IKO has not sufficiently demonstrated the presence of a latent ambiguity. A latent ambiguity arises "where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation..." See *id.* As indicated at oral argument, the typical latent ambiguity situation involves two items, only one of which is named in the contract. See e.g., *Raffles v. Wichelhaus*, 159 Eng. Rep. 375 (Ex. 1864) (two ships named 'Peerless').

IKO's discovery request is not directed at the facts surrounding contract formation, but rather at information regarding Royal Sun's interpretation of the contract terms. However, a party's interpretation of contract terms is not actually a fact because one party's understanding of the contract terms is not binding on the other party. See *Turner Holdings, Inc. v. Howard Miller Clock Co.*, 657 F.Supp. 1370, 1380 (W.D.Mich.1987). Thus, even if IKO could prove that Royal Sun had another understanding of the contract terms, this different understanding or interpretation is not sufficient to create a latent ambiguity. See *id.* (refusing to find latent ambiguity based on defendant's "uncommunicated belief" about the meaning of contract terms). Therefore, the court is not compelled to find a latent ambiguity here.

e. Judgment as a matter of law

Having found that the pollution exclusion clause is unambiguous, the court further finds that Royal Sun is entitled to judgment as a matter of law based on the unambiguous wording of the contract. Absent fraud, duress, unconscionability, or other such factors, a court is bound to give full effect to a valid contract between two parties. See *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir.1980). First, the court finds that there was a valid contract here-the parties do not dispute this fact. Second, the court does not find any impediment to the enforcability of this contract. There are no indicia of fraud, duress, or the like. Since there was a valid and unambiguous contract with no impediments to enforcability, the court must give full effect to the words of that contract. Under that contract, Royal Sun is not required to defend actions arising from the "discharge, emission, dispersal, seepage, leakage, migration, release, or escape" of pollutants. Pollutants includes "odours." "Odour" is not limited to toxic odors. Since the underlying lawsuits both involve claims against IKO for the discharge of odors, and the discharge of odor is explicitly exempted from coverage by the policy in question, Royal Sun has no contractual duty to defend either lawsuit. Given the court's ruling, it will not reach the arguments regarding the timing of the Michigan lawsuits or the distinction between damages and injunctive relief.

C. *IKO's Motion for More Definite Statement*

*7 A motion for a more definite statement should be granted only where the pleading is so "vague or ambiguous" that the opponent cannot draft a responsive pleading. See FED. R. CIV. P. 12(e). See also *Schaedler v. Reading Eagle Publication*, 370 F.2d 795, 798 (3d Cir.1967) (same). Courts have interpreted this language to mean that the motion should only be granted where the pleading is unintelligible, see *CFMT, Inc. v. Yieldup International Corp.*, No.CIV.A.95-549, 1996 WL 33140642, at *1 (D.Del.Apr.5, 1996); *United States v. Board of Harbor Commissioners*, 73 F.R.D. 460, 462 (D.Del.1977), or the issues cannot be determined. See *Fischer & Porter Co. v. Sheffield Corp.*, 31 F.R.D. 534, 536 (D.Del.1962); *Container Co. v. Carpenter Container Corp.*, 8 F.R.D. 208, 210 (D.Del.1948).

IKO's motion for a more definite statement under Rule 12(e) must be denied. First, after reviewing the pleadings, the court finds that Hartford's pleading is far from unintelligible. It is clear on the face of the complaint that Hartford is alleging "mutual mistake ." Furthermore, nothing in the briefs or at argument indicates that IKO was or is unable to determine that mutual mistake is the issue. Since IKO is able to

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 6

discern the issues, it is also able to respond to them.

Second, to the extent that IKO's motion rests on the contention that Hartford has not pleaded mistake with sufficient particularity under Rule 9(b), this argument must also fail. While Rule 9(b) requires that fraud and mistake be pleaded with particularity, see FED. R. CIV. P. 9(b), this rule must be read in conjunction with Rule 8 which outlines the liberal standard of pleading favored by the Federal Rules of Civil Procedure. See 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1298 ("Rule 9(b) ... does not render the general principles set forth in Rule 8 entirely inapplicable to pleadings alleging fraud; rather the two rules must be read in conjunction with each other."). The federal rules contemplate notice rather than fact pleading. This standard applies to Rule 9(b) as well. See id. ("[N]either Rule 8 nor Rule 9(b) requires fact pleading."). Thus, even under Rule 9(b), the circumstances, rather than the specific facts of the claim, are essential. See id. ("Although circumstances may consist of facts, the obligation to plead circumstances need not be treated as requiring allegations of facts in the pleading."). By notifying IKO that mutual mistake is the issue, Hartford has provided IKO with the general circumstances involving its claim.

Further, where an issue is not pleaded with particularity, a party can clarify its claims through its subsequent pleadings and briefs. See Union Carbide v. Shell Oil Co., No.99-CV-274, 2000 WL 1481015, at *2 (D.Del. Sept. 29, 2000) ("Here the defendant's pleadings appear to be 'bare-boned' on their face. However, its brief submitted in opposition to the present motion sufficiently clarified its pleadings to overcome Rule 9(b)'s requirements."); Scripps Clinic and Research Foundation v. Baxter Travenol Laboratories, Civ.A.No. 87-140, 1988 WL 22602, at *3 (D.Del. Mar. 9, 1988) (noting that defendant clarified its pleading in response to plaintiff's interrogatories). In its Opposition to IKO Monroe's Motion for a More Definite Statement, Hartford stated:

*8 The facts within the possession of Hartford-Canada are that the parties to this insurance policy agreed to a contract that excluded coverage for pollution related claims and that, despite that intent and understanding, the written instrument as drafted by IKO or its insurance broker included language that IKO Monroe now alleges provides such coverage.

Through this paragraph, Hartford has managed to add more detail to what it meant by "mutual mistake." These details appear to focus on the intent and understanding of the parties at the time of drafting. Hartford can either admit that the inclusion of the clause was the intent of the parties, deny that it was the intent of the parties, or state that it lacks sufficient information at this time to admit or deny that it was the intent of the parties. Therefore, the court finds that there is sufficient particularity. [FN3] Consequently, a more definite statement of the claim is unnecessary. [FN4]

FN3. Although IKO offers several cases supporting its argument that Rule 9(b) requires Hartford to be more specific, see Christidis v. First Pennsylvania Mortgage Trust, 717 F.2d 96 (3d Cir.1983); SEC v. Saltzman, 127 F.Supp.2d 660 (E.D. Pa 2001); United States v. Kensington Hospital, 760 F.Supp.1120 (E.D.Pa.1991), all of the cited cases involve fraud. The same considerations that make it necessary to plead fraud with specificity-namely damage to reputation-do not arise in the mistake context. See Bankers Trust Co. v. Old Republic Ins. Co., 959 F.2d 677, 683 (7th Cir.1992) ("Accusations of fraud do serious damage to the goodwill of a business firm or professional person .... Why, if this is the true rationale of Rule 9(b), allegations of mere mistake should have to be particularized is a mystery.").

FN4. The court finds that the "motion to strike" issue is rendered moot by the court's ruling on IKO's motion for a more definite statement.

IV. CONCLUSION

For the foregoing reasons, the court concludes that Royal Sun has no duty to defend the Michigan lawsuits. Therefore, the court grants Royal Sun's motion for summary judgment. The court further concludes that IKO is able to form a responsive pleading. Therefore, IKO's motion for a more definite statement is denied.

For these reasons, IT IS HEREBY ORDERED that:
1. Royal & Sun Alliance Insurance Company of Canada, Inc.'s Motion for Summary Judgment (D.I.45) is GRANTED.
2. Summary Judgment be and hereby is ENTERED in favor of Royal & Sun Alliance Insurance

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 7

Company of Canada, Inc. and HIH Cotesworth Canada Limited and against IKO, Monroe on all claims in the complaint.
3. IKO Monroe's Motion for a More Definite Statement (D.I.44) is DENIED.

D.Del.,2001.
Iko Monroe, Inc. v. Royal & Sun Alliance Ins. Co. of Canada, Inc.
Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:00CV00834 (Docket) (Sep. 14, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.