# EXHIBIT 2

## EXHIBIT 2

### Second Notice Topic No. 5

The reason(s) DuPont elected to go with a Large Risk Contributory Dividend Plan with Kemper instead of other types of workers compensation programs, including a straight retro program.

(This topic is included within Topic Nos. 3, 6, 7, 8, 13, and 16 from Kemper's First 30(b)(6) Deposition Notice, which is attached as Exhibit C to Kemper's March 21, 2007, letter to the Court.)

#### Questions Already Asked On This Topic

Q. Did DuPont ever look to getting a straight retrospective program with Kemper that didn't have any dividend language? (p114)

Q. Why was it that DuPont elected to obtain coverage, insurance coverage from Kemper under the insurance program agreement that we have looked at rather than electing to be entirely self-insured? (p196)

Q. Why did DuPont decide to get Kemper involved to provide coverage for those 30 or so states as opposed to DuPont just being self-insured in all of those states? (p197)

Q. Right. Why is it in those states where DuPont is not directly self-insured with the states that they brought in Kemper? (p198)

Q. But for the reason that you just identified, DuPont made a decision that they wanted to go with a program of insurance in those 20 or so states as opposed to being directly self-insured, correct? (p198)

Q. Isn't it true that the reason DuPont continued with Kemper for the 2003 program year was because Kemper was cheaper than the alternative carriers that you guys were considering? (p224)

Q. You elected or DuPont elected to continue with Kemper for insurance for the 2003 program year, correct? (p231)

### Third Notice Topic No. 1

Whether DuPont ever considered or evaluated alternatives to a Large Risk Contributory Dividend Plan during the time period in which Kemper provided workers compensation insurance to DuPont from October 1, 1971 to March 1, 2003.

(This topic is included within Topic Nos. 3, 6, 7, 8, 13, 16, and 17 from Kemper's First 30(b)(6) Deposition Notice, which is attached as Exhibit C to Kemper's March 21, 2007, letter to the Court.)

#### Questions Already Asked On This Topic

Q. And if you were going to look at alternative carriers to provide potential coverage, Marsh would assist in that task as well? (p45)

Q. During the renewal process would DuPont typically ask for Marsh to get you competitive information from other carriers what they were charging? (p46)

Q. Do you know, did you receive proposals from other insurance carriers at that time? (p46)

Q. Do you recall who provided insurance proposals? (p46)

Q. And you elected based on that competitive information to stay with Kemper and its program. Is that correct? (p46)

Q. You said there was a request for competitive information in the nineties. When was that approximately? (p47)

Q. What triggered that? (p47)

Q. Did you also in addition to the claims handling look at the overall cost of providing insurance coverage or the insurance needs of DuPont? (p47)

Q. What companies did you obtain competitive information from, quotes from? (p48)

Q. Do you know if the AIG program was a dividend program? (p48)

Q. Do you recollect about Liberty Mutual if that was a dividend program? (p48)

Q. Did Marsh assist in that process of obtaining competitive information both in the midnineties and in 1987? (p48)

Q. Did anybody else assist in the '95 competitive information? (p49)

Q. What about during the '87 competitive information, who from Marsh assisted? (p49)

Q. Do you know if DuPont attempted to get competitive information relating to its insurance, worker's comp insurance needs in 2002? (p49)

Q. Did you obtain this benchmark information or have Marsh provide to you this benchmark information in connection with your consideration of whether or not to renew with Kemper for the 2003 policy year? (p51)

Q. And you were looking for this information to essentially compare to what the Kemper program was with the programs of other carriers, correct? (p51)

Q. And in order to see if you're getting the best program with Kemper, you want to make yourself advised so you can make a rational decision, correct? (p52)

Q. You wanted to make sure that the Kemper program was competitive with these other programs, correct? (p52)

Q. Now, there are obviously differences between the Kemper program and these other programs identified, correct? (p52)

Q. On the next page there is an analysis of the contract structures, the different contract structures between Kemper, Travelers and ACE, correct? (p53)

Q. And Travelers and ACE are two insurance carriers that you were trying to obtain competitive information from. Is that correct? (p53)

Q. So they gave you from their internal files without going directly to Travelers or ACE what the different types of contract structures that they had for Travelers and ACE compared to Kemper, correct? (p54)

Q. You will see there's a whole category under contract structure, a bunch of different categories of contract structures that are identified by Marsh, correct, that Marsh is comparing with Kemper, Travelers and ACE? Do you see that? (p54)

Q. So is it your understanding that Marsh was trying to explain what the dividend plan feature was with the Kemper program versus Travelers and ACE, correct? (p55)

**Third Notice Topic No. 2**

Whether DuPont ever requested from Marsh, or Marsh ever presented Dupont with, alternatives to Kemper's Large Risk Contributory Dividend Plain [*sic*] for DuPont's workers compensation insurance needs from October 1, 1971 to March 1, 2003.

(This topic is included within Topic Nos. 3, 6, 7, 8, 13, 16, and 17 from Kemper's First 30(b)(6) Deposition Notice, which is attached as Exhibit C to Kemper's March 21, 2007, letter to the Court.)

### Questions Already Asked On This Topic

Q. And if you were going to look at alternative carriers to provide potential coverage, Marsh would assist in that task as well? (p45)

Q. During the renewal process would DuPont typically ask for Marsh to get you competitive information from other carriers what they were charging? (p46)

Q. Do you know, did you receive proposals from other insurance carriers at that time? (p46)

Q. Do you recall who provided insurance proposals? (p46)

Q. And you elected based on that competitive information to stay with Kemper and its program. Is that correct? (p46)

Q. You said there was a request for competitive information in the nineties. When was that approximately? (p47)

Q. What triggered that? (p47)

Q. Did you also in addition to the claims handling look at the overall cost of providing insurance coverage or the insurance needs of DuPont? (p47)

Q. What companies did you obtain competitive information from, quotes from? (p48)

Q. Do you know if the AIG program was a dividend program? (p48)

Q. Do you recollect about Liberty Mutual if that was a dividend program? (p48)

Q. Did Marsh assist in that process of obtaining competitive information both in the midnineties and in 1987? (p48)

Q. Did anybody else assist in the '95 competitive information? (p49)

Q.  What about during the '87 competitive information, who from Marsh assisted? (p49)

Q.  Do you know if DuPont attempted to get competitive information relating to its insurance, worker's comp insurance needs in 2002? (p49)

Q.  Did you obtain this benchmark information or have Marsh provide to you this benchmark information in connection with your consideration of whether or not to renew with Kemper for the 2003 policy year? (p51)

Q.  And you were looking for this information to essentially compare to what the Kemper program was with the programs of other carriers, correct? (p51)

Q.  And in order to see if you're getting the best program with Kemper, you want to make yourself advised so you can make a rational decision, correct? (p52)

Q.  You wanted to make sure that the Kemper program was competitive with these other programs, correct? (p52)

Q.  Now, there are obviously differences between the Kemper program and these other programs identified, correct? (p52)

Q.  On the next page there is an analysis of the contract structures, the different contract structures between Kemper, Travelers and ACE, correct? (p53)

Q.  And Travelers and ACE are two insurance carriers that you were trying to obtain competitive information from. Is that correct? (p53)

Q.  So they gave you from their internal files without going directly to Travelers or ACE what the different types of contract structures that they had for Travelers and ACE compared to Kemper, correct? (p54)

Q.  You will see there's a whole category under contract structure, a bunch of different categories of contract structures that are identified by Marsh, correct, that Marsh is comparing with Kemper, Travelers and ACE? Do you see that? (p54)

Q.  So is it your understanding that Marsh was trying to explain what the dividend plan feature was with the Kemper program versus Travelers and ACE, correct? (p55)

### Third Notice Topic No. 3

Whether Dupont ever sought to compare, or Marsh ever provided comparisons to DuPont of, the Kemper Insurance Program with programs offered by other insurance carriers from October 1, 1971 to March 1, 2003.

(This topic is included within Topic Nos. 3, 6, 7, 8, 13, 16, and 17 from Kemper's First 30(b)(6) Deposition Notice, which is attached as Exhibit C to Kemper's March 21, 2007, letter to the Court.)

#### Questions Already Asked On This Topic

Q. And if you were going to look at alternative carriers to provide potential coverage, Marsh would assist in that task as well? (p45)

Q. During the renewal process would DuPont typically ask for Marsh to get you competitive information from other carriers what they were charging? (p46)

Q. Do you know, did you receive proposals from other insurance carriers at that time? (p46)

Q. Do you recall who provided insurance proposals? (p46)

Q. And you elected based on that competitive information to stay with Kemper and its program. Is that correct? (p46)

Q. You said there was a request for competitive information in the nineties. When was that approximately? (p47)

Q. What triggered that? (p47)

Q. Did you also in addition to the claims handling look at the overall cost of providing insurance coverage or the insurance needs of DuPont? (p47)

Q. What companies did you obtain competitive information from, quotes from? (p48)

Q. Do you know if the AIG program was a dividend program? (p48)

Q. Do you recollect about Liberty Mutual if that was a dividend program? (p48)

Q. Did Marsh assist in that process of obtaining competitive information both in the midnineties and in 1987? (p48)

Q. Did anybody else assist in the '95 competitive information? (p49)

Q.   What about during the '87 competitive information, who from Marsh assisted? (p49)

Q.   Do you know if DuPont attempted to get competitive information relating to its insurance, worker's comp insurance needs in 2002? (p49)

Q.   Did you obtain this benchmark information or have Marsh provide to you this benchmark information in connection with your consideration of whether or not to renew with Kemper for the 2003 policy year? (p51)

Q.   And you were looking for this information to essentially compare to what the Kemper program was with the programs of other carriers, correct? (p51)

Q.   And in order to see if you're getting the best program with Kemper, you want to make yourself advised so you can make a rational decision, correct? (p52)

Q.   You wanted to make sure that the Kemper program was competitive with these other programs, correct? (p52)

Q.   Now, there are obviously differences between the Kemper program and these other programs identified, correct? (p52)

Q.   On the next page there is an analysis of the contract structures, the different contract structures between Kemper, Travelers and ACE, correct? (p53)

Q.   And Travelers and ACE are two insurance carriers that you were trying to obtain competitive information from. Is that correct? (p53)

Q.   So they gave you from their internal files without going directly to Travelers or ACE what the different types of contract structures that they had for Travelers and ACE compared to Kemper, correct? (p54)

Q.   You will see there's a whole category under contract structure, a bunch of different categories of contract structures that are identified by Marsh, correct, that Marsh is comparing with Kemper, Travelers and ACE? Do you see that? (p54)

Q.   So is it your understanding that Marsh was trying to explain what the dividend plan feature was with the Kemper program versus Travelers and ACE, correct? (p55)

**Third Notice Topic No. 4**

Whether Marsh ever advised DuPont, prior to January 1, 2003, that the declaration and/or issuance of the dividend under the Large Risk Contributory Dividend Plan set forth in the Insurance Program and Proposals was discretionary?

(This topic is included within Topic Nos. 1, 3, 4, 9, and 13 from Kemper's First 30(b)(6) Deposition Notice, which is attached as Exhibit C to Kemper's March 21, 2007, letter to the Court.)

**Questions Already Asked On This Topic**

Q. So is it your understanding that Marsh was trying to explain what the dividend plan feature was with the Kemper program versus Travelers and ACE, correct? (p55)

Q. The description that Marsh provided with respect to the dividend plan which states the large risk contributory dividend plan declared by Kemper's board in its sole discretion, is that your understanding of how the program worked with Kemper? (p56)

Q. Did you call Ms. Rivera and tell her that you believe that Marsh incorrectly stated the dividend feature of the Kemper program in this document? (p59)

Q. Did you ever have any discussions with anyone at Marsh as to what that language [that dividends cannot be promised or guaranteed] meant? (p122)

Q. You said you have had discussions along the lines of what the provision [that dividends cannot be promised or guaranteed] means, correct, with Marsh? (p122)

Q. And when were these discussions? (p122)

Q. Do you have any specific recollection of any specific discussion with anybody from Marsh relating to what the provision means that dividends cannot be promised or guaranteed? (p123)

Q. Did you have further discussions, I'm trying to focus on further discussions with anybody from Marsh about the dividend language that we just looked at that they cannot be promised or guaranteed? (p127)

Q. Sir, did you ever have any conversations with anybody at Marsh as to what that phrase ["dividends are declared at the sole discretion of the Company's Board of Directors"] means? (p134)

- 8 -

- 9 -

### Third Notice Topic No. 5

Whether Kemper and DuPont ever had discussions, prior to January 1, 2003, regarding the discretionary nature of the dividend under the Large Risk Contributory Dividend Plan set forth in the Insurance Program and Proposals.

(This topic is included within Topic Nos. 1, 3, 4, 9, 10 and 13 from Kemper's First 30(b)(6) Deposition Notice, which is attached as Exhibit C to Kemper's March 21, 2007, letter to the Court.)

#### Questions Already Asked On This Topic

Q. Did you ever have any discussions with anybody from Kemper as to what that phrase ["dividends are declared at the sole discretion of the Company's Board of Directors"] means? (p134)