# EXHIBIT 3

# PART 1



**WILCOX & FETZER LTD.**

# CONFIDENTIAL

## In the Matter Of:

# E.I. duPont de Nemours & Company
# v.
# Lumbermens Mutual Casualty Company

## C.A. # 05-699 (KAJ)

------------------------------------------------------------

## Transcript of:
# Eugene Slesicki

## September 27, 2006

------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

CONFIDENTIAL


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CONFIDENTIAL

E. I. Du PONT de NEMOURS and          )
COMPANY,                              )
                                      )
            Plaintiff,                )
                                      ) Civil Action
v.                                    ) No. 05-699(KAJ)
                                      )
LUMBERMENS MUTUAL CASUALTY            )
COMPANY,                              )
                                      )
            Defendant.                )

        Deposition of E. I. du Pont de Nemours
and Company taken pursuant to F.R.C.P. 30(b)(6)
through its desginee EUGENE J. SLESICKI at the law
offices of Pepper Hamilton LLP, Hercules Plaza, Suite
5100, 1313 Market Street, Wilmington, Delaware,
beginning at 9:05 a.m., on Wednesday, September 27,
2006, before Kurt A. Fetzer, Registered Diplomate
Reporter and Notary Public.

APPEARANCES:

        CHRISTOPHER C. FRENCH, ESQ.
        KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
          Henry W. Oliver Building
          535 Smithfield Street
          Pittsburgh, Pennsylvania  15222-2312
          For the Plaintiff
        RANDALL M. LENDING, ESQ.
        VEDDER PRICE
          222 North Lasalle Street
          Chicago, Illinois  60601
          For the Defendant
                  WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                  (302) 655-0477
                  www.wilfet.com

Page 2

```
 1            EUGENE J. SLESICKI,
 2      the deponent herein, having first been
 3      duly sworn on oath, was examined and
 4      testified as follows:
 5            EXAMINATION
 6  BY MR. LENDING:
 7   Q.  Mr. Slesicki, my name is Randy Lending, as I
 8  introduced myself earlier to you.
 9         Let the record reflect that this is the
10  30(b)(6) deposition of DuPont taken pursuant to notice
11  under the Federal Rules of Civil Procedure.  For the
12  record, we also plan to take Mr. Slesicki in his
13  individual capacity after the production of documents
14  by DuPont is complete.
15         Mr. Slesicki, I'm going to be asking you a
16  number of questions today concerning the insurance
17  relationship between DuPont and Kemper.  If you don't
18  understand any of my questions, please tell me and I
19  will be happy to rephrase the question.
20         Also try to be clear with your answers and
21  don't nod your head or say uh-huh because the court
22  reporter can only take down affirmative statements.
23         Do you have any questions before we begin?
24   A.  No.
```

Page 3

```
 1         MR. FRENCH:  I just want to point out for
 2  the record we are offering Mr. Slesicki here today as
 3  an individual witness as well.  I understand that I
 4  guess you're reserving your right to call him as a
 5  fact witness, though this is the first I have heard
 6  that you definitely plan to try to do him a second
 7  time.
 8         MR. LENDING:  I believe I sent you --
 9         MR. FRENCH:  I prefer to try to do both of
10  them today.
11         MR. LENDING:  I know I sent you an e-mail
12  or letter saying that we reserve the right to take his
13  individual deposition after the production of
14  documents is complete.
15         MR. FRENCH:  Yes.  I guess from what you
16  just said it sounded like you were actually telling us
17  you expect to take him a second time.
18         MR. LENDING:  We very well may depending
19  upon the documents.  Again, this is the 30(b)(6)
20  deposition.
21         MR. FRENCH:  If we need to fight about it
22  down the road, we can, but for now we will proceed.
23         MR. LENDING:  We will proceed on the
24  30(b)(6).
```

Page 4

```
 1  BY MR. LENDING:
 2   Q.  Mr. Slesicki, can you please state your name
 3  for the record?
 4   A.  Eugene J. Slesicki.
 5   Q.  Where do you reside, sir?
 6   A.  317 Lynley Lane, Newark, Delaware.
 7   Q.  Where are you employed?
 8   A.  DuPont.
 9   Q.  How long have you been employed by DuPont?
10   A.  34 years.
11   Q.  What is your educational background?
12   A.  I have a college education, a degree in
13  accounting.
14   Q.  So an accounting degree from where?
15   A.  Widener.
16   Q.  Where is that?
17   A.  In Chester, Pennsylvania.
18   Q.  When did you receive that degree?
19   A.  1972.
20   Q.  And that's a B.S. in accounting?
21   A.  Yes.
22   Q.  Do you have any formal education after your
23  B.S. in accounting?
24   A.  No.
```

Page 5

```
 1   Q.  Do you have a CPA?
 2   A.  No.
 3   Q.  What is your current position?
 4   A.  Consultant - global risk management.
 5   Q.  How long have you held that position?
 6   A.  Over ten years.
 7   Q.  Who do you currently report to?
 8   A.  Ken Porter.
 9   Q.  How long have you reported to Ken Porter?
10   A.  September 1, 2001.
11   Q.  Prior to Mr. Porter who did you report to?
12   A.  Webber Lee.
13   Q.  Is Mr. Lee still with the company?
14   A.  Yes.
15   Q.  What's his current position?
16   A.  Assistant treasurer.
17   Q.  How long did you report to Mr. Lee?
18   A.  Approximately two years.
19   Q.  Prior to Mr. Lee?
20   A.  Bruce Evancho.
21   Q.  Can you spell that last name?
22   A.  E-v-a-n-c-h-o.
23   Q.  How long did you report to Mr. Evancho?
24   A.  About four years.
```

Page 6

1    Q.  Is he still with the company?
2    A.  No.
3    Q.  What does he do?
4    A.  He's retired.
5    Q.  When did he retire?
6    A.  Approximately two to three years ago.
7    Q.  Prior to Mr. Evancho, who did you report to?
8    A.  Dianna Smith.
9    Q.  What was her position at the time?
10   A.  Corporate insurance manager.
11   Q.  How long did you report to her?
12   A.  Two to three years.
13   Q.  And is she still with the company?
14   A.  Yes.
15   Q.  What's her position currently?
16   A.  She's a manager.
17   Q.  What was Mr. Evancho's position when you
18   reported to him?  Was he also --
19   A.  Corporate insurance manager.
20   Q.  Is that the same position that Mr. Lee and
21   Mr. Porter currently hold or Mr. Porter currently
22   holds that position?
23   A.  He has additional responsibilities in addition
24   to corporate insurance matters.

Page 7

1    Q.  What other additional?
2    A.  Benefits.
3    Q.  Prior to Ms. Smith who did you report to, if
4    you recall?
5    A.  James Mitchell.
6    Q.  How long?
7    A.  Directly, about a year and a half.
8    Q.  Is he still with the company?
9    A.  No.  He retired and died recently.
10   Q.  Can you recall any prior supervisors before
11   Mr. Mitchell?
12   A.  Gerald Franklin.
13   Q.  How long did you report to him?
14   A.  About six years.
15   Q.  He's still with the company?
16   A.  No.
17   Q.  Retired?
18   A.  Retired.
19   Q.  Any other supervisors that you can recall?
20   A.  Mike DiLeo.
21   Q.  How long did you report to him?
22   A.  A little over a year.
23   Q.  Is he with the company?
24   A.  Yes, he is.

Page 8

1    Q.  I assume Mr. DiLeo, Mr. Franklin and
2    Mr. Mitchell all were holding the position of
3    corporate insurance manager or --
4    A.  A title of manager.
5    Q.  Similar?
6    A.  Yeah.
7    Q.  Is it similar to what became the corporate
8    insurance manager?
9    A.  Mitchell was the corporate insurance manager.
10   There was a manager between myself and Mitchell for
11   those periods of time and that would have been either
12   Mike DiLeo or Gerald Franklin.
13   Q.  Did you have any other supervisors that you can
14   recall in the past or is this pretty much the list?
15   A.  There is one other one when I joined insurance
16   and it was William Lawter.
17   Q.  Last name?
18   A.  Lawter, L-a-w-t-e-r.
19   Q.  Is he still with the company?
20   A.  No.
21   Q.  Retired?
22   A.  He was with Conoco.  He went with Conoco.  I
23   believe he's retired at this point in time.
24   Q.  How long did you report to Mr. Lawter?

Page 9

1    A.  Three years.
2    Q.  You said your current position is a consultant
3    for global risk management.  Can you walk me through
4    the different positions you have had since you started
5    with the company 34 years ago?
6        What year was it that you started with the
7    company?
8    A.  1972.
9    Q.  When you started with the company in 1972,
10   before we get into this, was Kemper providing
11   insurance to DuPont?
12   A.  I don't know.
13   Q.  When you joined was there somebody else?
14   A.  I was in auditing in 1972.  I joined the
15   company as an internal auditor.
16   Q.  How long were you an internal auditor?
17   A.  I was in the field, what is called the field
18   outside of Wilmington for 18 years at various
19   locations in the United States.
20   Q.  That's when you reported to Mr. Lawter,
21   correct?
22   A.  No.  That's when I was in auditing.  What I
23   gave you was the supervision --
24   Q.  In insurance?

3  (Pages 6 to 9)

Page 10

1  A. – in insurance only.
2  Q. And what did you do just generally as an
3  internal auditor?
4  A. Audited the books and records of DuPont.
5  Q. Did that include an audit of anything to do
6  with the insurance business?
7  A. No.
8  Q. Then what did you do?
9  A. After eight years in the field I came into
10  Wilmington for two years as audit supervisor.
11  Q. Your duties and functions, were they similar to
12  when you were in the field but now you were
13  supervising field people?
14  A. Yes.
15  Q. Did you have any duties and responsibilities as
16  it related to the insurance program of DuPont?
17  A. No.
18  Q. Then what did you do?
19  A. Excuse me?
20  Q. Then after audit supervisor for two years, what
21  did you do?
22  A. I transferred into the insurance section in
23  December of 1982.
24  Q. And at that time was Kemper providing insurance

Page 11

1  for DuPont?
2  A. They were providing a self-insurance program
3  whereby we used their facilities. There was also some
4  element of insurance above high loss limitations
5  deductibles.
6  Q. When you transferred into the insurance
7  section, what was your position at that time in '82?
8  A. Senior insurance analyst.
9  Q. How long were you a senior insurance analyst?
10  A. Approximately five years.
11  Q. And that's when you reported to William Lawter?
12  A. Yes, and then subsequent.
13  Q. What were your duties and responsibilities
14  generally as the senior insurance analyst?
15  A. I was responsible for various insurance-related
16  programs, including the Kemper arrangements.
17  Q. What did your responsibilities include?
18  A. To have the various insurance carriers provide
19  the services to DuPont that it needed to perform its
20  business, such as self-insurance, fronting programs,
21  claims services and also act as the accounting person
22  related to distributing those costs.
23  Q. So your roles, duties and responsibilities
24  included accounting for the insurance. Is that

Page 12

1  correct?
2  A. Accounting for the services under the programs.
3  Q. What did you do, what was your next position
4  after senior insurance analyst?
5  A. I assumed a leadership role as a supervisor.
6  Q. Approximately what time? 1987?
7  A. Approximately.
8  Q. For how long?
9  A. It gets fuzzy because my role didn't change;
10  just my title changed. I still had supervisory
11  responsibilities. I received a promotion to
12  consultant, from insurance supervisor to consultant.
13  Q. When was that promotion?
14  A. It was when Bruce Evancho came into our group
15  or became the manager, and I think it was
16  approximately '95, '96.
17  Q. So approximately from 1987 to 1995 you were a
18  supervisor and then from 1995 to the present you have
19  been a consultant. Is that correct?
20  A. Correct.
21  Q. What did your duties and responsibilities
22  include when you were a supervisor in the insurance
23  group at DuPont?
24  A. Supervising staff to perform the administrative

Page 13

1  work required to perform the proof of insurance,
2  certificate of service that was provided by the
3  insurance carrier, performing accounting functions.
4  As DuPont was consolidating, we consolidated Conoco
5  within our self-insurance programs in 1987.
6  Q. How many people reported to you?
7  A. Initially, it was four, then through
8  consolidation it went down to three later in the late
9  eighties, early nineties.
10  Q. Who reported to you at that time?
11  A. Do you want the names?
12  Q. Yes.
13  A. Various people. The ones that I do remember,
14  Faye Fritzsche.
15  Q. That's F-r-i-t-c-h-e?
16  A. There's a z in there, but I can't remember
17  where it is.
18  Q. How long did she report to you?
19  A. Until she retired in '92, I think.
20  Q. Who else?
21  A. Gloria Williams.
22  Q. How long did she report to you?
23  A. Approximately the same time before she retired.
24  Q. How many years?

Page 14

1 **A. That's four, five.**
2 Q. The same with Faye?
3 **A. Yes.**
4 Q. Did they have anything, did either of them have
5 anything to do with the Kemper involvement?
6 **A. They performed the administrative services**
7 **related to the Kemper self-insurance arrangement.**
8 Q. You just said Kemper self-insurance
9 relationship. Now, you're aware of what
10 self-insurance is? What is self-insurance, sir?
11 **A. It's DuPont paying for all its claims with**
12 **respect to arrangements that it's either made directly**
13 **with states or insurance carriers and paying**
14 **administrative costs related to that.**
15 Q. Are you aware of a requirement in various
16 states for self-insurance, if you're going to be
17 self-insured you have to do certain things?
18 **A. Yes.**
19 Q. And DuPont is self-insured with respect to
20 worker's comp in certain states, correct?
21 **A. Correct.**
22 Q. In how many states?
23 **A. Could you be more specific as to what year?**
24 **Currently?**

Page 15

1 Q. Currently. Let's say during the 2002, since
2 2002 to 2003.
3 **A. We're self-insured in approximately 30.**
4 Q. 30 states?
5 **A. Yes.**
6 Q. And then in the 20 states that you're not
7 self-insured, that's where you have Kemper coming in,
8 correct?
9 **A. Yes, providing the service.**
10 Q. Back to the supervisors.
11     You had Faye and Gloria. Who else that
12 reported to you?
13 **A. There were various accountants during that**
14 **period and I don't recollect the names offhand.**
15 Q. That's fine.
16     Then you said you were promoted to
17 consultant, correct?
18 **A. Yes.**
19 Q. In approximately 1995. What did your duties
20 and responsibilities include as consultant?
21 **A. It was the same as it was before, except it was**
22 **a progression.**
23 Q. And as the consultant were you the head of the
24 insurance program at DuPont?

Page 16

1 **A. No.**
2 Q. Who was the head? That was Mr. Porter?
3 **A. Currently.**
4 Q. That's currently?
5 **A. Currently.**
6 Q. The other individuals that you identified were
7 the heads?
8 **A. Yes.**
9 Q. But you were the number two man?
10 **A. I either reported directly or through another**
11 **manager during all of those periods of time.**
12 Q. As a consultant did you have more people that
13 you supervised?
14 **A. No.**
15 Q. So it was just --
16 **A. It was less actually, from four to three during**
17 **that time.**
18 Q. So it was just merely the duties and
19 responsibilities were the same, you had one less
20 person to report to but it was more of a title, a
21 promotion in title?
22 **A. Promotion, yes.**
23 Q. Who are the people that you supervised from the
24 period of 1995 to the present that you can recall?

Page 17

1 **A. Lisa Patterson, Doris Knotts, Rose O'Neill.**
2     **Did you say to present?**
3 Q. Yes. Let's say until 2003.
4 **A. Kathy Gebhart.**
5 Q. I guess the time would be until the time that
6 you no longer used Kemper as the insurance, for
7 insurance purposes. It was March 1 of '03.
8 **A. Yes. Those are the names.**
9 Q. These are the people?
10 **A. Those are the ones that I recollect.**
11 Q. How long did Lisa Patterson report to you?
12 **A. Six years.**
13 Q. What were her duties and responsibilities?
14 **A. Initially she performed the self-insurance**
15 **filings directly with the states to self-insure. Then**
16 **she was promoted into the accounting position**
17 **approximately a year and a half to two years after**
18 **doing self-insurance filings.**
19 Q. Again, the self-insurance filings are for the
20 30 states where DuPont is self-insured and does not
21 have an insurance relationship with Kemper, correct?
22     MR. FRENCH: Objection. It misstates his
23 testimony as to what the relationship is with the
24 program with Kemper.

5 (Pages 14 to 17)

Page 18

1   Q.  Do you understand my question?
2        She did the insurance filings with respect
3   to the 30 states that Kemper has self-insurance,
4   correct?
5        MR. FRENCH:  Objection to form.  I think
6   you misspoke, Counsel.  You said Kemper has
7   self-insurance.
8   Q.  No.  That DuPont has self-insurance.
9   A.  **DuPont has self-insurance filings directly with**
10  **the states and she was responsible to perform the**
11  **administrative aspects of that.**
12  Q.  That was the approximate 30 states that you
13  testified about previously, correct?
14  A.  **Correct.**
15  Q.  Okay.  Doris Knotts, how long did she report to
16  you?
17  A.  **She continues to report to me.  She was at the**
18  **same time as Lisa Patterson.**
19  Q.  Does Lisa Patterson still report to you?
20  A.  **No.**
21  Q.  Is she still with the company?
22  A.  **Yes.**
23  Q.  What is her position now?
24  A.  **She is in tax.  I do not know her exact title.**

Page 19

1   Q.  What did Doris Knotts do?
2   A.  **Doris Knotts handled the surety bond program.**
3   Q.  With who?
4   A.  **With various surety bond companies for DuPont**
5   **and its subsidiaries, et cetera.**
6   Q.  And that's what she continues to do now?
7   A.  **Yes.**
8   Q.  Rose O'Neill, how long did she report to you?
9   A.  **She assumed the responsibility of Lisa**
10  **Patterson on the self-insurance filings approximately,**
11  **well, at the same time when Lisa came over to**
12  **accounting.**
13  Q.  When you say Lisa went to accounting --
14  A.  **Accounting for the insurance costs.**
15  Q.  How long did she assume that responsibility,
16  Rose O'Neill?
17  A.  **Until February of this year.**
18  Q.  For approximately how many years?
19  A.  **About eight years.**
20  Q.  What did she do in February of this year?  Did
21  she leave the company?
22  A.  **No.  She transferred to security, information**
23  **security.**
24  Q.  How long did Kathy Gebhart report to you?

Page 20

1   A.  **Three, a little over three years.**
2   Q.  During what time period?
3   A.  **Excuse me.  Let me change that to four years.**
4   **From 2001 to 2005.**
5   Q.  What did she do?
6   A.  **She performed the accounting function after**
7   **Lisa Patterson transferred to another position within**
8   **treasury.**
9   Q.  Was that the tax?
10  A.  **No.  She just did a lateral into another**
11  **function within our treasury division.**
12  Q.  Is Kathy Gebhart still at the company?
13  A.  **Yes.**
14  Q.  That's pretty much the group of folks that you
15  can remember that has reported to you since the time
16  you became consultant?
17  A.  **Yes, up through 2003.**
18  Q.  Then after 2003 you have had others?
19  A.  **I have a new accountant since Kathy Gebhart**
20  **left --**
21  Q.  And she has done --
22  A.  **-- and Rose left.**
23  Q.  Neither of these folks have done nothing with
24  respect to Kemper, correct?

Page 21

1   A.  **If there's any aspects of administrative work**
2   **that still deals with the self-insurance aspects of**
3   **the program, they would be involved because the**
4   **accountant takes care of the costs related to all of**
5   **the claims no matter what the year loss is, as well as**
6   **the new person who does the self-insurance filings.**
7        **Once in a while data, et cetera, that**
8   **comes out of the system in --**
9   Q.  Who are these people?
10  A.  **Sharon Mills is the current accountant.**
11  Q.  And she's been the accountant since when?
12  A.  **January 1, '06.**
13  Q.  And who else was there?
14  A.  **Carol Karr replaced Rose O'Neill February 1st.**
15  Q.  Is that K-a-r-r?
16  A.  **Two r's, right.**
17  Q.  She replaced Rose O'Neill?
18  A.  **Rose O'Neill, yes.**
19  Q.  Anybody else?
20  A.  **I also have an administrative person who**
21  **handles all our payments to Kemper or our TPA,**
22  **Broadspire, who manages that, pays the bills, does**
23  **various spreadsheets to deal with our accounting.**
24  Q.  Who is that?

Page 22

1   A.  Alshannon Showell.
2   Q.  Al?
3   A.  Alshannon, A-l Shannon, one word, Showell,
4   S-h-o-w-e-l-l.
5   Q.  How long has Alshannon been in this position?
6   A.  Three-and-a-half years to four, in that range.
7   She goes by Shannon, but that's her formal name,
8   Alshannon.
9        (Slesicki Deposition Exhibit No. 1 was
10  marked for identification.)
11  BY MR. LENDING:
12  Q.  I'm going to hand to you what I have marked as
13  Slesicki Deposition Exhibit No. 1 which is for the
14  record marked DuPont 21455 through 21457.
15       Can you identify this document as produced
16  by DuPont?
17  A.  Yes.
18  Q.  What is it?
19  A.  It's a listing of my major responsibilities
20  that I prepared.
21  Q.  Does this accurately summarize your major
22  responsibilities as consultant of the insurance
23  program at DuPont?
24       MR. FRENCH:  Counsel, did you say

Page 23

1   currently?
2   Q.  Well, when did you prepare this?
3   A.  It was done when Webber Lee was the manager.
4   Approximate time I don't remember if it's not dated.
5   Q.  Approximate year?  Can you give me a period?
6   A.  It's in the 2000 period.
7   Q.  Would this pretty much fairly summarize your
8   duties and responsibilities from 2000 to 2004, the
9   gist of these?
10  A.  They have changed, so that's why I am needing
11  to read it.
12  Q.  When did they change?
13  A.  When I delegated or transferred some of the
14  responsibilities under some of these tasks to other
15  people.
16  Q.  Was that after 3-1-03?
17  A.  It was around that time.
18  Q.  During the time from 2000, during the period
19  that Kemper provided or had an insurance relationship
20  with DuPont, these would be your major
21  responsibilities, correct?
22  A.  Yes.
23       (Slesicki Deposition Exhibit No. 2 was
24  marked for identification.)

Page 24

1   BY MR. LENDING:
2   Q.  I'm going to hand to you what I will mark as
3   Slesicki Deposition Exhibit No. 2.  For the record,
4   this is DuPont 21458 through 21459.
5        Can you identify this document?
6   A.  Yes.
7   Q.  What is it?
8   A.  It is a list of goals or objectives that I had
9   prepared for internal insurance used by management as
10  well as staff.
11  Q.  One of the items was there's a little arrow
12  "Negotiate More Favorable Cash Terms With Kemper For
13  The Year 2001 And Prior Years."
14       Do you see that?
15  A.  Yes.
16  Q.  As part of your duties and responsibilities you
17  directly negotiated with Kemper from time to time,
18  correct?
19  A.  Yes.
20  Q.  You along with your insurance agent Marsh,
21  correct?
22       MR. FRENCH:  Objection to form.
23  A.  The insurance brokers were involved with the
24  aspects of our recommendations and sought agreement

Page 25

1   with Kemper, as well as any other insurance company.
2   Q.  Who did the negotiations with Kemper when there
3   would be a renewal?  Would that be you personally or
4   you and Marsh or Marsh alone and not you or some other
5   combination?
6   A.  It would be with myself and Kemper, as well as
7   Kemper and Marsh, so it would be those combinations.
8   Q.  What types of things did you negotiate with,
9   what types of things did you do in terms of your
10  negotiations with Kemper?
11  A.  We reviewed the costs of the program which was
12  the administrative costs to provide the program
13  specifications, the assessment costs that Kemper would
14  need to pay the states, the insurance costs related to
15  the contractors' program whereby we bought a small
16  element of insurance above a million dollar deductible
17  and it excluded chemical explosions.
18  Q.  And that now is the aspect that you were
19  involved in the negotiations with Kemper?
20  A.  Yes.
21  Q.  Who did you deal with at Kemper in terms of
22  those negotiations?
23  A.  Mike Brundage.
24  Q.  This would be on a yearly basis right at the

Page 26

1  time where there would be a renewal?  Is that correct?
2  **A.  This was with respect to the year 2002 and**
3  **prior years.  There were others prior to Mike**
4  **Brundage.**
5  Q.  Do you know about how many years you dealt with
6  Mike Brundage at the renewal time negotiating these
7  items that you just identified?
8  **A.  I recollect around the nineties, 1990's.**
9  Q.  Approximately ten plus years?
10  **A.  Yes.**
11  Q.  You would deal with or you would negotiate with
12  Mike the specific terms for the insurance program with
13  Kemper.  Is that correct?
14  **A.  Yes.**
15  Q.  Did Marsh work with you in those negotiations
16  or were you pretty much handling those directly with
17  Mike Brundage?
18  **A.  I would direct Marsh to handle the aspects of**
19  **the negotiation and also had discussions with Mike**
20  **directly with or without Marsh being on the phone.**
21  Q.  Let me just go back.
22      You said you would have discussions with
23  Mike Brundage with or without Marsh, correct?
24  **A.  Correct.**

Page 27

1  Q.  If you wanted Marsh's assistance you would
2  include them; if you didn't think you needed their
3  assistance, you would just deal directly with Mike.
4  Is that fair?
5  **A.  Yes.**
6  Q.  Were you the person at DuPont most directly
7  responsible for the negotiations with Kemper?
8  **A.  Yes.**
9  Q.  Who else from DuPont was involved in the
10  negotiation process?
11  **A.  With respect to what year?  Any year?**
12  Q.  Let's talk from 1990 to 2003.  Who else was
13  involved?
14  **A.  From DuPont?**
15  Q.  Correct.
16  **A.  Directly with Kemper?  I advised management of**
17  **the status of our negotiations, on the price of the**
18  **services.**
19  Q.  You would advise, when you said you would
20  advise management, you would advise the persons you
21  identified previously as being your --
22      MR. FRENCH: Counsel, I think you
23  interrupted him before he finished his answer.
24  Q.  I'm sorry.  Go ahead.  Finish your answer.  I

Page 28

1  didn't want to cut you off.  I'm sorry.
2  **A.  I don't think I was.**
3      Go ahead.
4  Q.  So I didn't interrupt you?
5  **A.  No, you did not.  I don't think.**
6  Q.  When you said you advised management of the
7  status, you were talking about the managers that you
8  previously identified, Ken Porter, Webber Lee, Bruce
9  Evancho, correct?
10  **A.  Yes.**
11  Q.  Who else from management other than those
12  individuals would you report to in terms of your
13  status of your negotiations with Kemper?
14  **A.  No one else in management.**
15  Q.  Were these folks in management also directly
16  involved in the negotiations with Kemper or was it
17  just you?
18  **A.  They may have attended a closing meeting of the**
19  **negotiations on occasion, but I would not say they**
20  **were directly involved with the details of the costs**
21  **of the program other than through my advisement as to**
22  **what the agreement was.**
23  Q.  Was there anybody else from DuPont involved in
24  the negotiation process directly with Kemper other

Page 29

1  than yourself from the period let's say 1990 to 2003?
2  **A.  Say your question again.  Anyone else?**
3  Q.  Was there anybody else from DuPont, other than
4  yourself, involved with the negotiations with Kemper
5  during that time period?
6  **A.  Periodically a staff member would attend the**
7  **telephone conference calls or obtain e-mails as to**
8  **status of the negotiations or even attend the closing**
9  **meetings.**
10  Q.  But, again, that would be at your direction?
11  **A.  At my direction.**
12  Q.  Are you the person from DuPont most responsible
13  for the decision to obtain the insurance program with
14  Kemper during the years let's say 1990 to 2003?
15  **A.  It was my responsibility to obtain the**
16  **self-insurance program that we maintained with Kemper.**
17  Q.  When you say, "the self-insurance program,"
18  let's just go back.
19      DuPont had a self-insurance aspect where
20  they would go and directly obtain self-insurance with
21  or go to various states and be self-insured, correct?
22      MR. FRENCH: Objection to the form of the
23  question.  You're misstating his prior testimony.
24  Q.  You can answer my question.

Page 30

1    A.  State the question again.
2    Q.  DuPont would obtain or go to various states, I
3  think you said 30 states, where DuPont was
4  self-insured, correct?
5    A.  Yes.
6    Q.  The program with Kemper did not relate to those
7  30 states, correct?
8    A.  That's incorrect.
9    Q.  How did the program with Kemper relate to those
10  30 states?
11    A.  A Kemper subsidiary also handled the claims
12  under those self-insured states, also provided when
13  required by law a fronting self-insurance worker's
14  comp excess policy.  They were involved with aspects
15  of those programs.
16    Q.  With respect to these 30 states where DuPont
17  was self-insured, Kemper you said assisted in claims
18  handling?
19    A.  They performed the claims handling for the
20  actual claims that were reported for self-insured
21  worker's comp.
22    Q.  What else did Kemper do in addition to the
23  claims handling function for these 30 states where
24  DuPont was self-insured and filed the self-insurance

Page 31

1  papers with those states?
2    A.  They provided an excess worker's comp policy if
3  the state required an excess worker's comp policy that
4  was fronted and we indemnified Kemper for any claim
5  that may occur under those policies.
6    Q.  What else did Kemper do with respect to those
7  30 states other than those two functions?
8    A.  They would provide loss statistics that was
9  provided to the states through the insurance
10  self-insurance administrators I mentioned before.
11    Q.  Who would provide those loss statistics to the
12  states?  Would that be DuPont that would do it or
13  would Kemper directly do it?
14    A.  We would provide it to the state as part of the
15  filing.  However, Kemper as a third-party
16  administrator may have had duties directly with the
17  state as well.
18    Q.  Other than those functions, what else did
19  Kemper do with respect to the 30 states where DuPont
20  was self-insured?
21    A.  Self-insured for worker's comp directly with
22  the state?
23    Q.  Correct.
24    A.  They would also have to sometimes, depending

Page 32

1  upon the state, provide a signature that they have
2  claims administration responsibilities with respect to
3  those states that required it.
4    Q.  What else?  Anything else or does that pretty
5  much encapsulate the role of Kemper with respect to
6  the 30 states where DuPont was self-insured for
7  worker's compensation directly with the states?
8    A.  That's what I can recollect, yeah.
9    Q.  With respect to the other states, the other 20
10  states where DuPont was not self-insured for worker's
11  comp directly with the states, what services did
12  Kemper provide, what did Kemper provide, not just
13  services, what did they provide?
14        MR. FRENCH:  Objection to form.  It
15  misstates his testimony.
16    Q.  Do you understand my question?
17    A.  State it again.
18    Q.  Okay.  We just went through the 30 states where
19  DuPont was self-insured for worker's comp directly
20  with the states, correct?
21    A.  Yes.
22    Q.  And you just provided the items that Kemper
23  provided to DuPont, correct?
24    A.  Yes.

Page 33

1    Q.  Let's talk about the other 20 states.  What did
2  Kemper do?
3    A.  At the request of DuPont, we asked them to
4  provide services in the form of a policy where we
5  would pay a fee for their services so we can have with
6  those states an insurance policy for worker's
7  compensation.
8        In addition to that, we would pay all the
9  claims related to those states and effectively be
10  self-insured for all losses.
11    Q.  But you were not self-insured directly with the
12  states, correct, with these 20 states?
13    A.  We were self-insured for deductibles that were
14  on the policy if it was stated on the policy.  So
15  that's what we were responsible for, as well as any
16  amount above the deductibles through the warranty
17  agreements that are in the 2002 agreements.
18    Q.  You said that DuPont would pay a fee to Kemper.
19  So DuPont could, in essence, have a policy for
20  worker's comp insurance with those states?  Is that
21  correct?
22    A.  Yes.
23    Q.  So that's unlike being directly self-insured in
24  the 30 states.  Here in these 20 states you would

Page 34

1  report to the states that you had an insurance policy,
2  correct?
3         MR. FRENCH: Objection to form.
4  Q. You can answer.
5  **A. We would provide evidence of an insurance**
6  **policy.**
7  Q. What else did Kemper do in these 20 states
8  where DuPont would show to the various states that
9  they had an insurance policy for worker's comp other
10  than what you just identified?
11        Is there anything else that Kemper would
12  do?
13  **A. Other than worker's comp?**
14  Q. No. Within the worker's comp.
15  **A. Within the worker's comp. They would handle**
16  **the claims as well in those states just like the**
17  **states that are directly self-insured with the state.**
18  Q. What else would Kemper do?
19  **A. With respect to?**
20  Q. With respect to these 20 states, in these 20
21  states, other than handling the claims and whatever
22  else you just testified to?
23  **A. We also had a contractors' program whereby**
24  **through the same negotiated fee they would provide**

Page 35

1  **policies to the contractors to comply with the**
2  **statutory law. And DuPont, we would pay the claims**
3  **underneath those policies and reimburse Kemper for**
4  **those costs as well in the same format as the company,**
5  **DuPont Company direct claims.**
6  Q. Is there anything else that Kemper provided
7  with respect to those 20 states other than what you
8  have testified to?
9  **A. No.**
10  Q. Kemper provided, as you testified previously, a
11  limited degree of insurance directly for certain
12  catastrophic claims, is that correct, in these 20
13  states?
14  **A. It was related to the contractors' program only**
15  **which was approximately 20 states. It may not have**
16  **been the same 20 states that you're referring to**
17  **because these were contractors where you were to**
18  **provide individual worker's comp policies wherever**
19  **they worked and that insurance was above a million**
20  **dollar stop-loss for specific losses not related to a**
21  **chemical explosion or toxic release.**
22        **So there was no insurance for those types**
23  **of incidents if they ever occurred.**
24  Q. Again, you're referring now to the 2002

Page 36

1  proposal?
2  **A. Correct.**
3  Q. Was it different in prior years that you can
4  recall?
5  **A. With respect to coverage on the contractors'**
6  **program?**
7  Q. Correct.
8  **A. No. From '87 on it was the same coverage**
9  **backed by a warranty agreement for any losses that**
10  **were not to be paid -- excuse me. To be paid to**
11  **Kemper. We indemnified them for all losses that was**
12  **not insured which is the contractors' program.**
13  Q. And the insured losses what you said was above
14  a million dollars with the exclusion for chemical
15  explosions, correct?
16  **A. Correct. To date there haven't been any**
17  **payments by Kemper for any of those.**
18  Q. But if there was, that would be something that
19  Kemper would provide coverage for, correct?
20  **A. Yes.**
21  Q. Other than you, who else from DuPont was
22  responsible or involved in the decision to obtain
23  coverage from Kemper during the period 1995, let's
24  say, to 2003?

Page 37

1  **A. With respect to the contractors?**
2  Q. With respect to worker's comp, worker's comp
3  program with Kemper, who else was involved in that
4  decision other than you?
5  **A. With respect to the self-insurance**
6  **administration costs, fee costs that was related to**
7  **the worker's comp portion of the program, I would**
8  **report it to management.**
9  Q. And you would get approval from Ken Porter?
10  **A. Yes.**
11  Q. Who is Steve Putnam?
12  **A. He is -- his title is consultant as well.**
13  Q. Did he --
14  **A. He's a staff member who reports directly to Ken**
15  **Porter.**
16  Q. So both of you are consultants reporting to Ken
17  Porter?
18  **A. Yes.**
19  Q. For how long has he had that position?
20  **A. I believe he was promoted to that position**
21  **about three, four years ago. Prior to that he was a**
22  **senior insurance analyst or advisor.**
23  Q. What role or involvement has he had with
24  respect to the Kemper program?

Page 38

1   A. He would request certificates of insurance for
2   customers through the insurance broker or directly to
3   Kemper, depending upon what our customers would need.
4   He handled at one point auto liability claims which
5   were handled by Kemper.
6   Q. Was he involved in any of the negotiations with
7   Kemper?
8   A. He may have attended one of those meetings
9   early in his time within insurance.
10  Q. Anything else that he's had to do with the
11  Kemper insurance program other than the auto liability
12  claims, potentially certificates of insurance?
13  A. No.
14  Q. Who is Jean Western?
15  A. She is currently titled advisor, senior
16  advisor, insurance advisor who reports directly to Ken
17  Porter.
18  Q. What role or involvement has she had in the
19  Kemper program?
20  A. She may have been involved with requesting a
21  certificate of insurance from Marsh or directly
22  through Kemper during those years or the 2002 year.
23  Q. How long has she been the senior insurance
24  advisor?

Page 39

1   A. She was promoted from insurance advisor to
2   senior insurance advisor about five years ago.
3   Q. What role or involvement did she have in the
4   negotiations with Kemper?
5   A. None.
6   Q. Who is John Broomfield?
7   A. He's our European insurance manager based in
8   the U.K.
9   Q. What role or how long has he held that
10  position?
11  A. He was based at various locations, but his
12  principal responsibilities haven't changed since I've
13  known him, which is in the eighties.
14  Q. So he's pretty much always been the European
15  insurance manager?
16  A. Yes, the non-U.S. related.
17  Q. What role or involvement did he have with
18  Kemper or any Kemper program?
19  A. None.
20  Q. Who is Doris Knotts? I believe you have
21  mentioned her before, right?
22  A. Yes.
23  Q. She was one of your direct reports?
24  A. Yes.

Page 40

1   Q. We have talked about these others.
2       MR. FRENCH: Is this a good time for a
3   break?
4       MR. LENDING: Yes. Just give me one
5   minute.
6       (Slesicki Deposition Exhibit No. 3 was
7   marked for identification.)
8       (Discussion off the record.)
9       MR. LENDING: Just for the record, I'm
10  going to hand to you the 30(b)(6) deposition notice.
11  We can take up on that when we get back.
12      MR. FRENCH: While we're on that...
13      MR. LENDING: There you go, Chris.
14      MR. FRENCH: Thanks.
15      Just for the record, in response to that
16  deposition notice we did serve objections on September
17  22nd, 2006 in the form of a letter from Scott Bowan to
18  Jeffery Heftman at Vedder Price.
19      Good time for a break now?
20      MR. LENDING: Good time.
21      (A brief recess was taken.)
22  BY MR. LENDING:
23  Q. Mr. Slesicki, prior to the break we marked
24  Slesicki Deposition Exhibit No. 3, which is a 30(b)(6)

Page 41

1   deposition notice. You have had a chance to review
2   this document.
3       You have seen this before, correct?
4   A. I don't remember.
5       MR. LENDING: For the record, is
6   Mr. Slesicki being tendered as the 30(b)(6)
7   representative for these items?
8       MR. FRENCH: Yes, he is, subject to the
9   objections set forth in that September 22nd, 2006
10  letter.
11      MR. LENDING: All right.
12      MR. FRENCH: From Mr. Bowman to
13  Mr. Heftman.
14  BY MR. LENDING:
15  Q. Mr. Slesicki, what is the relationship between
16  Marsh and DuPont?
17  A. Marsh is our insurance broker for our various
18  programs that are with insurance carriers and
19  third-party administrators throughout the world.
20  Q. How long has Marsh been the insurance broker
21  for DuPont?
22  A. They were there when I was there in 1980, so --
23  excuse me. '82. '82. So I don't recollect when they
24  started.

11  (Pages 38 to 41)

Page 42

1   Q.  Is it your understanding that Marsh is acting
2   as DuPont's agent as it relates to insurance matters?
3          MR. FRENCH:  Objection to form.  Calls for
4   a legal conclusion.
5   Q.  You can answer that.
6          MR. FRENCH:  No foundation.
7   A.  They're not an agent.  They're a broker which
8   they take direction from DuPont on their requests for
9   obtaining various services related to our
10  self-insurance program or our insurance programs over
11  high deductibles.  So they're at our direction and
12  authority.
13  Q.  You would expect Marsh to be representing
14  DuPont's interest --
15         MR. FRENCH:  Objection to form.
16  Q.  -- correct?
17         MR. FRENCH:  I'm sorry.  I didn't mean to
18  interrupt you, Counsel.
19         Objection to form.  It calls for a legal
20  conclusion.  No foundation.
21  Q.  You can go ahead and answer.
22  A.  They're representing DuPont's interests in the
23  insurance market.
24  Q.  They're not working for Kemper, correct?

Page 43

1          MR. FRENCH:  Objection to form.  No
2   foundation.
3   A.  They did provide services for Kemper as part of
4   the primary program, issuing certificates, things like
5   that, so it was done with our direction as well as
6   Kemper's.
7   Q.  But when they're out assisting in the
8   negotiation process by and between DuPont and Kemper,
9   you would expect that Marsh is acting in the best
10  interest of DuPont in trying to find the best deal for
11  DuPont as opposed to Kemper, correct?
12  A.  They're out there to perform in the best
13  interest of DuPont.
14  Q.  What does Marsh do to assist DuPont with
15  respect to its worker's comp program with Kemper?
16  A.  With respect to the worker's comp as part of
17  the overall insurance program --
18  Q.  Correct.
19  A.  -- that we have with Kemper and the
20  self-insurance contained in that?
21  Q.  Correct.
22  A.  They would assist at my direction to obtain --
23  like with respect to 2002 I would provide them the
24  payroll information.  They would obtain back from

Page 44

1   Kemper the cost to administer the self-insurance
2   program which is either directly or indirectly with
3   states and provide those cost elements back to DuPont
4   after they got them from Kemper.
5          There would be an assessment whether or
6   not Kemper's costs to provide the elements for the
7   fees and assessments, the small portion of the
8   contractors' insurance above a million dollar loss,
9   excluding the chemical release, those cost factors as
10  well as any matters dealing with the cash
11  reimbursement of our losses, that's what they were
12  involved in.
13  Q.  You said there would be an assessment made
14  after Marsh provided that information to DuPont?
15  A.  Yes.
16  Q.  You would internally look at it, correct?
17  A.  Yes.
18  Q.  And then would you then get back to Kemper to
19  discuss that with Kemper and Mr. Brundage?
20  A.  Yes, with Marsh on the phone.
21  Q.  Again, if you wanted them?
22  A.  Yes.
23  Q.  And that's essentially how the renewal process
24  occurred year after year?

Page 45

1   A.  Yes.  Marsh provided the administrative service
2   to me to obtain the information, validate that it's
3   correct.
4   Q.  And if you were going to look at alternative
5   carriers to provide potential coverage, Marsh would
6   assist in that task as well?
7   A.  If requested by myself to indicate what other
8   similar insurance carriers would charge for the
9   self-insurance costs, the assessments costs, the small
10  portion, they may have in their office some indication
11  of those costs.
12  Q.  But the day-to-day negotiations back and forth
13  between DuPont and Kemper was essentially done by you
14  and Mr. Brundage, correct, with Marsh's assistance as
15  you would request?
16  A.  We would, I would write, have Marsh write a
17  letter as to what I requested and then Marsh would
18  provide it to Brundage or Kemper and then it went back
19  to Marsh, who validated the information as correct and
20  then came to me.
21         So the dialogue was to me direct with
22  Brundage with Marsh in the middle to obtain all the
23  administrative aspects of this program, the details to
24  ensure that the aspects of the costs were about the

Page 46

1  same as in past years.
2   Q.  During the renewal process would DuPont
3  typically ask for Marsh to get you competitive
4  information from other carriers what they were
5  charging?
6   A.  We requested it one time in the nineties and
7  then prior to that one time when we brought in Conoco,
8  which was for the '87 year.  So it wasn't done
9  annually as to going out to the insurance market or
10  the self-insurance market to obtain the cost of all of
11  these services.
12   Q.  You said it was done one time in the eighties
13  when you brought in Conoco?
14   A.  For the 1987 year.
15   Q.  Do you know, did you receive proposals from
16  other insurance carriers at that time?
17   A.  Yes.
18   Q.  Do you recall who provided insurance proposals?
19   A.  It was Hartford and I don't remember if it was
20  called INA at that time or CIGNA.  I can't remember
21  exactly, but it was that family of carriers.
22   Q.  And you elected based on that competitive
23  information to stay with Kemper and its program.  Is
24  that correct?

Page 47

1   A.  Kemper provided the services that we required
2  at a reduced cost when you brought Conoco into the
3  mix.
4   Q.  You said there was a request for competitive
5  information in the nineties.  When was that
6  approximately?
7   A.  In the midnineties.
8   Q.  What triggered that?
9   A.  It was to look at the market with respect to
10  claims handling primarily, to ensure that our service
11  received from Kemper for claims handling was adequate
12  and I'll say in the top tier of companies offering
13  that to a company like DuPont.
14   Q.  Did you also in addition to the claims handling
15  look at the overall cost of providing insurance
16  coverage or the insurance needs of DuPont?
17   A.  What we did was after determining that there
18  were companies out there dealing with claims service
19  that were also adequate, we asked those other
20  companies to provide the cost of their self-insurance
21  administration services, fees, the insurance of the
22  contractors' program above a million dollar
23  deductible, things like that, stop-loss, excuse me,
24  stop-loss.

Page 48

1   Q.  What companies did you obtain competitive
2  information from, quotes from?
3   A.  AIG and Liberty Mutual.
4   Q.  Do you know if the AIG program was a dividend
5  program?
6   A.  I don't recollect.
7   Q.  Do you recollect about Liberty Mutual if that
8  was a dividend program?
9   A.  I don't recollect.  Our main focus was on
10  claims service and after looking at that, we decided
11  that Kemper was competitive.
12   Q.  Did Marsh assist in that process of obtaining
13  competitive information both in the midnineties and in
14  1987?
15   A.  Yes.
16   Q.  Who from Marsh?
17   A.  Which year?
18   Q.  Give me both.
19   A.  From the claims side, it was John Faughnan.
20   Q.  Was this in '87 or '95?
21   A.  '95.  Excuse me.
22   Q.  F-a --
23   A.  F-a-u-g-h-n-a-n.
24   Q.  Is he still with Marsh, to your knowledge?

Page 49

1   A.  Yes.
2   Q.  Did anybody else assist in the '95 competitive
3  information?
4   A.  It was under the direction of John Ball.  There
5  were other personnel that was involved.  I don't
6  recollect the names right at this point.
7   Q.  What about during the '87 competitive
8  information, who from Marsh assisted?
9   A.  Ed Kloos was involved as well as John
10  Ball.
11   Q.  Is Ed still with Marsh, to your knowledge?
12   A.  I don't recollect.
13   Q.  Then I believe there was also, I have seen
14  documentation and also information that it was done
15  late in 2002, competitive information, is that
16  correct, between -- --
17   A.  I don't recollect.
18   Q.  Do you know if DuPont attempted to get
19  competitive information relating to its insurance,
20  worker's comp insurance needs in 2002?
21   A.  I would have to review the documents.  I don't
22  recollect that.
23      (Slesicki Deposition Exhibit No. 4 was
24  marked for identification.)

Page 50

BY MR. LENDING:

1   Q. I will hand to you what I have marked as
2   Slesicki Exhibit No. 4. I ask you if you can identify
3   this.
4   A. (Reviewing document)
5   Q. Can you identify this document?
6       For the record, it's an e-mail with
7   attachments dated 12-3-02 from Quetzy Rivera of Marsh
8   to Gene Slesicki of DuPont and they have been stamped
9   with the Bates stamps DuPont 1003 to 1015.
10      MR. FRENCH: I'm sorry, counsel. What
11  pages do you have? 1 through 15?
12      MR. LENDING: Correct.
13      MR. FRENCH: Thank you.
14  BY MR. LENDING:
15  Q. Mr. Slesicki, can you identify this document?
16  A. It's a document that I requested Marsh to
17  prepare to benchmark what other insurance fronting
18  companies similar to Kemper or claims handling
19  services that could, that would be applicable under
20  our DuPont situation of self-insurance.
21  Q. Was this done in connection with DuPont's
22  decision whether or not to renew with Kemper for the
23  '03 policy year?

Page 51

1   A. State that question again.
2   Q. Sure.
3       Did you obtain this benchmark information
4   or have Marsh provide to you this benchmark
5   information in connection with your consideration of
6   whether or not to renew with Kemper for the 2003
7   policy year?
8   A. It was used as a benchmark. We would be
9   renewing our self-insurance program with Kemper. It
10  would take longer to really get these insurance
11  companies or TPA's involved. There was no
12  communication between DuPont and these insurance
13  carriers or TPA's at this point.
14      This was just a benchmarking to see what
15  facilities that were available by other insurance
16  carriers or TPA's.
17  Q. And you were looking for this information to
18  essentially compare to what the Kemper program was
19  with the programs of other carriers, correct?
20  A. That Marsh, our broker, had with other clients
21  or have received information from these insurance
22  carriers. There was no real trading of information by
23  DuPont with these insurance carriers, so it's just an
24  indication.

Page 52

1   Q. And in order to see if you're getting the best
2   program with Kemper, you want to make yourself advised
3   so you can make a rational decision, correct?
4       MR. FRENCH: Objection to form.
5   A. We wanted to see what other insurance carriers
6   or TPA's in Marsh's profiles or their information that
7   was comparable to Kemper's or not comparable to see if
8   it dealt with service or price or whatever the case is
9   because what we were expecting from our TPA's or
10  insurance carriers is the service to provide the
11  insurance policies, certificate of insurance under the
12  program and to pay them for that service and then the
13  other side of it is the quality of the service.
14  Q. You wanted to make sure that the Kemper program
15  was competitive with these other programs, correct?
16  A. We wanted to see that they were in the
17  ballpark.
18  Q. Now, there are obviously differences between
19  the Kemper program and these other programs
20  identified, correct?
21  A. Yes.
22  Q. And the first page, DuPont 1004, talks about
23  rates, the current Kemper rates versus Old Republic
24  current rates and Sedgwick current rates. Do you see

Page 53

1   that?
2   A. When you say -- you're saying this document
3   number?
4   Q. Yes, 1004. It's the second page.
5   A. Okay. State your question again because I
6   didn't see that number.
7   Q. On this page this shows differences in the
8   comparison between the Kemper current rates versus the
9   Old Republic and Sedgwick rates, correct?
10  A. This dealt with claims handling, yes, there are
11  differences.
12  Q. Then turn the page.
13      On the next page there is an analysis of
14  the contract structures, the different contract
15  structures between Kemper, Travelers and ACE, correct?
16  A. Yes.
17  Q. And Travelers and ACE are two insurance
18  carriers that you were trying to obtain competitive
19  information from. Is that correct?
20  A. I asked Marsh to provide me whatever they had.
21  They came up with these as two that they had recently.
22  I didn't direct them to any specific carriers or TPA's
23  at that point.
24  Q. So they gave you from their internal files

Page 54

1  without going directly to Travelers or ACE what the
2  different types of contract structures that they had
3  for Travelers and ACE compared to Kemper, correct?
4   A.  Yes.
5   Q.  You will see that there's a whole category
6  under contract structure, a bunch of different
7  categories of contract structures that are identified
8  by Marsh, correct, that Marsh is comparing with
9  Kemper, Travelers and ACE?
10      Do you see that?
11  A.  Yes. It's my contacts. I have to blink. I'm
12  sorry.
13  Q.  That's okay. Do you need some glasses?
14  A.  No. No. It's just very small and so,
15  therefore, it requires a blink once in a while
16  Q.  Do you see under the fourth box down there's a
17  category called dividend plan?
18      Do you see that?
19  A.  Yes.
20  Q.  And there's some wording under the Kemper
21  dividend plan, but there's no wording under Travelers
22  or ACE.
23      Do you see that?
24  A.  Yes.

Page 55

1   Q.  The wording under the Kemper dividend plan, it
2  states "The Large Risk Contributory Dividend Plan
3  declared by Kemper's board of directors in its sole
4  discretion."
5       Do you see that?
6   A.  Yes.
7   Q.  So is it your understanding that Marsh was
8  trying to explain what the dividend plan feature was
9  with the Kemper program versus Travelers and ACE,
10  correct?
11      MR. FRENCH: Objection to form. No
12  foundation.
13  Q.  You can answer.
14  A.  They were taking from the Kemper self-insurance
15  arrangement a paragraph or a sentence from that
16  paragraph and placing it into their spreadsheet.
17  Q.  Did you have any discussion with anybody from
18  Marsh about what they put in under the dividend plan
19  portion of the contract structure?
20  A.  No.
21  Q.  Did you discuss this document at all with
22  Quetzy Rivera or anybody else from Marsh?
23  A.  We discussed the form and setting up the
24  content as to what the comparisons are.

Page 56

1   Q.  What do you recall of those discussions with
2  Ms. Rivera or anybody else from Marsh about this
3  document?
4   A.  Nothing specific with respect to this document.
5  We wanted to have a self-insurance program and what
6  was the best vehicle to have that and we were just
7  copying basically what they had in the file, what they
8  going into the insurance market and seeing what they
9  would do for DuPont.
10  Q.  The description that Marsh provided with
11  respect to the dividend plan which states the large
12  risk contributory dividend plan declared by Kemper's
13  board in its sole discretion, is that your
14  understanding of how the program worked with Kemper?
15  A.  No. Because what we had was a self-insurance
16  program where there wasn't really a dividend from the
17  normal course of what a dividend is on profits and
18  losses.
19      Our program was structured where there
20  would be an adjustment based on the fees that were
21  estimated up front and adjusted based on actual
22  payroll with respect to the assessments and fees, as
23  well as the contractors' payroll.
24  Q.  So do you believe what Marsh put in here under

Page 57

1  the Kemper program is incorrect?
2   A.  Their spreadsheet doesn't describe the
3  self-insurance program that we had. It was a
4  statement from Kemper's proposal.
5   Q.  This statement in the description of the
6  dividend plan contract structure that's set forth in
7  Exhibit 4, do you believe this misstates the dividend
8  plan feature of the Kemper program?
9   A.  Yes. It misstates it from DuPont's perspective
10  of the way the program has worked over the last 30
11  years where we received adjustments for all the
12  amounts that either were underpaid or overpaid
13  throughout the years. So it's based on what we had
14  was an estimate of fees and then on actual we adjusted
15  those fees. So the adjustment was being made annually
16  based on that.
17  Q.  So your testimony is that you think this
18  misstates the Kemper program as it relates to the
19  dividend feature? Is that correct?
20  A.  Well, we don't have a dividend. We have an
21  adjustment to reflect our actual assessments and fees
22  and we paid the claims. We pay all the claims and we
23  also had a warranty agreement that backed up any
24  payments that were within the plan. So we paid for

Page 58

1  all losses on a weekly basis.
2        So there was no, per se, dividend. There
3  was an adjustment of what we paid in the beginning of
4  the year and then adjusted six to nine months after
5  the policy period based on actual payroll.
6   Q.  Sir, is it your testimony that the DuPont
7  program with Kemper does not have a dividend feature?
8   A.  Yes.
9   Q.  There's no dividend feature in the DuPont
10  program with Kemper.  Is that correct?
11   A.  Yeah.  It is my testimony that it's an
12  adjustment based on estimated amounts and actual
13  amounts because we paid for all claims and paid all
14  the costs related to their assessments and fees and
15  insurance premium.
16   Q.  We will get into the specific language of the
17  proposals, but I'm just looking at this document right
18  now.
19        So you're saying that when Marsh put this
20  together they misstated and did not properly
21  characterize the dividend plan feature of the Kemper
22  proposal.  Is that correct?
23        MR. FRENCH:  Counsel, you have asked the
24  same question I think four, five different times now.

Page 59

1   Q.  Go ahead.
2        MR. FRENCH:  It's asked and answered.
3   A.  I answered that already.
4   Q.  And the answer is yes, they did misstate,
5  correct?
6        MR. FRENCH:  Objection.
7   A.  They did not state it correctly.
8   Q.  And you will see with Marsh when they described
9  whether Travelers or ACE has a dividend feature, they
10  don't indicate anything, correct?
11   A.  I don't know if that's correct either.
12   Q.  But they don't specify anything in this
13  document, correct?
14   A.  Right.
15   Q.  Did you have any discussion -- I assume when
16  you received this from Ms. Rivera you reviewed it,
17  correct?
18   A.  Yes, I reviewed it.
19   Q.  Did you call Ms. Rivera and tell her that you
20  believe that Marsh incorrectly stated the dividend
21  feature of the Kemper program in this document?
22        MR. FRENCH:  Counsel, I don't mean to
23  interrupt your questioning, but you have already asked
24  him what, if any, discussions he had about that

Page 60

1  section and the whole document with Kemper, I mean
2  with Marsh, so this is either argument or redundant.
3  I'm not sure which.
4   Q.  You can answer.
5   A.  I don't recollect.
6   Q.  If Marsh typically said something or sent
7  something to you that you disagreed with or was not
8  consistent with your understanding, would you raise
9  that with Marsh?
10   A.  Yes.
11   Q.  But you don't recall any discussion with Marsh
12  about this document, correct?
13   A.  No specific discussion.
14   Q.  Sir, when you said that you don't believe that
15  the Kemper insurance program with DuPont contains a
16  dividend feature -- I believe that was your testimony,
17  correct?
18   A.  Yes.
19   Q.  Do you recall seeing in the proposals year
20  after year provisions relating to dividends?
21   A.  There were provisions.  But our program was to
22  provide, pay them a fee to provide the aspects of a
23  self-insurance program whereby we reimbursed them for
24  all fees and assessments and it really wasn't a

Page 61

1  dividend in the sense that we expected any profits
2  from that dividend.  It was really a calculation, an
3  accounting calculation to get to the actual cost of
4  the fees, assessments, the insurance premium for the
5  contractors' program and to pay for the losses on a
6  pay-as-you-go basis.
7   Q.  Sir, when you would get these proposals from
8  Kemper year after year -- for decades they existed,
9  correct?  You have seen proposals for decades with
10  DuPont and Kemper, correct?
11   A.  Yes.
12   Q.  You were involved for decades reviewing these
13  proposals before they were signed, correct?
14   A.  I was involved since 1982.
15   Q.  And I've got all of the proposals.  We can go
16  through them one by one.
17        But they all contain provisions relating
18  to dividends, correct?
19   A.  Yes.
20   Q.  And they all contain provisions to the effect
21  that dividends are not promised or guaranteed,
22  correct?
23        MR. FRENCH:  Objection to form.  Counsel,
24  you're asking him about twenty different years.

Page 62

1   Q.  As you recall?
2   A.  Well, I will have to look at them, but what it
3   also said is that Kemper throughout the years did
4   provide a dividend for the last 30 years or so
5   throughout their documents and that the program was
6   set up with Kemper with the intent that we would be
7   self-insuring this, all the risk, and we would expect
8   an adjustment to our actual expenses every year.
9   Q.  And the adjustment that you were expecting was
10  in the form of a dividend pursuant to the proposal
11  language, correct?
12  A.  It was in the form of an accounting adjustment
13  based on estimated deposits to actual information as
14  the year changed throughout the year or so.  So I did
15  not look at it as a dividend for purposes of Kemper
16  providing a profit over their overall business.  It
17  was just an adjustment just based on DuPont
18  information.
19  Q.  What did the parties call this adjustment
20  mechanism?  Didn't all the parties call it a dividend?
21  A.  They called it an adjustment with an adjective
22  sometimes called a dividend adjustment, their
23  definition, their definition.
24  Q.  But it was called in the agreements that you

Page 63

1   signed a dividend, correct?
2   A.  Their words were that it was called a dividend.
3   Q.  And you agreed to that by signing, correct?
4   A.  That was not my agreement as it stands now.  My
5   agreement was that we would self-insure, pay them for
6   the assessments and continue to pay the actual cost
7   like the last decades under the program, reimbursing
8   them for only their costs.
9         There was no insurance premium mechanism
10  in this, other than for the contractors' program.
11  Q.  But in the agreement that you signed, for
12  example -- and we will look at the specific language,
13  but just without looking at it I want to get your
14  recollection.  There was a provision in there, which I
15  believe you just referenced, that talked about a
16  dividend.
17        You would agree it says that the dividend
18  is not promised or guaranteed, correct?
19        MR. FRENCH:  Objection to form.
20  Q.  You can go ahead and answer.
21        MR. FRENCH:  Counsel, why don't you put
22  the document in front of him rather than ask him what
23  he thinks the language says?
24  Q.  You can go ahead.

Page 64

1         MR. FRENCH:  I think it would be fair to
2   the witness to put the language in front of him.
3   Q.  Sir, you have reviewed this insurance proposal,
4   haven't you?
5   A.  Yes.
6   Q.  Within the last 24 hours you have looked at it?
7   A.  Yes.
8   Q.  You have looked at the dividend portion of the
9   insurance proposal in the last 24 hours, correct?
10  A.  Yes.
11  Q.  So you know what provision I'm talking about,
12  correct?
13  A.  For the year 2002?
14  Q.  2002.
15  A.  Yes.
16  Q.  And that language in there talks about the fact
17  that dividends are not promised or guaranteed,
18  correct?
19  A.  It states that.
20  Q.  It also states that dividends are even subject
21  to recall by the Kemper board, correct?
22  A.  Yes.
23  Q.  And it also states that the dividends are at
24  the sole discretion of the Kemper board, correct?

Page 65

1   A.  Yes.
2   Q.  And that's something you signed, correct?
3   A.  I signed it on the aspect that this is --
4   there's not really a dividend.  It's an accounting
5   adjustment based on our aspects of the fees and
6   assessments that we were paying under the program and
7   there was not a dividend aspect of it with respect to
8   it being for profit or loss in the true sense of a
9   dividend.
10        MR. FRENCH:  Counsel, I don't mean to
11  interupt you, but under the completeness doctrine
12  since you're declining to actually put the language --
13        MR. LENDING:  I will put the language in
14  front of him.
15        MR. FRENCH:  I feel like from the
16  completeness doctrine we need to put the language into
17  the record right now.  And it states in the dividend
18  plan, it also states in addition to some of these
19  provisions that counsel has been paraphrasing it
20  states "For the record, the Board of Directors has
21  never failed to declare the full dividend under the
22  terms and conditions of the Large Risk Contributory
23  Dividend Plan," end quote.
24        Sorry for the interruption, Counsel.  Go

Page 66

1  ahead.
2       MR. LENDING: If you want to resume or
3  continue with the deposition right now?
4       MR. FRENCH: If you're going to ask him
5  the language in the proposal without putting it in
6  front of him --
7       MR. LENDING: I told you I'm putting it in
8  front of him. I'm just asking for his recollection
9  right now.
10      MR. FRENCH: That's why under the
11 completeness doctrine I felt like I needed to put some
12 of the other language into the record.
13 BY MR. LENDING:
14   Q. Sir, you said DuPont expected an adjustment,
15 correct? That was your testimony, expected an
16 adjustment, correct?
17   **A. Adjustment based on estimated versus actual**
18 **payroll.**
19   Q. But the adjustment that it would get or the
20 credit that DuPont would be getting under this
21 insurance proposal was in the form of a dividend
22 pursuant to the proposal, correct?
23   **A. It would be in the form of an adjustment of the**
24 **basic costs, the fees and assessments versus the**

Page 67

1  **actual. Kemper defined it as a dividend.**
2       **There was an adjustment based on our**
3  **self-insurance aspects of this where we're paying for**
4  **all of the losses, so there's no insurance and so**
5  **there was an adjustment to those costs based on**
6  **estimated versus actual.**
7    Q. The words that were used for decades, it was
8  called a dividend for decades? That was the
9  adjustment, correct?
10   **A. That's what Kemper called it.**
11   Q. And that's what people at DuPont came to
12 expect, is that your testimony, that you would expect
13 that there would be an adjustment called a dividend
14 every year?
15   **A. There would be an accounting adjustment of the**
16 **costs of the program every year.**
17   Q. Did you -- go ahead.
18   **A. And they did perform that for every year. So,**
19 **yes, it was expected for the year 2002 as well.**
20   Q. You expected in the year 2002 that there
21 would be this adjustment called a dividend,
22 correct?
23   **A. We would expect after the close of the year**
24 **there to be an adjustment in the following year.**

Page 68

1    Q. Called a dividend?
2    **A. Called an adjustment which Kemper called a**
3  **dividend. We called it an adjustment of the estimated**
4  **versus the actual.**
5    Q. But the proposal calls it a dividend
6  adjustment, correct, that you signed?
7    **A. I'll have to see the words to see if it exactly**
8  **says dividend adjustment.**
9    Q. Well, the provision that your counsel just read
10 into the record, that was under the dividend portion
11 of the policy or proposal, correct?
12   **A. (Pause.)**
13      **(Slesicki Deposition Exhibit No. 5 was**
14 **marked for identification.)**
15      MR. LENDING: We will mark Slesicki
16 Exhibit No. 5, 1613 through 1686.
17      MR. FRENCH: Are you done with Exhibit 4
18 for the moment, Counsel?
19      MR. LENDING: For the moment.
20      MR. FRENCH: Is this the copy that you
21 wanted to provide to me?
22      MR. LENDING: Oh, no. I'm sorry.
23      That's fine. Actually, I'll provide this
24 one to the witness.

Page 69

1  BY MR. LENDING:
2    Q. Why don't you identify Exhibit 5 for the
3  record?
4    **A. (Pause.)**
5    Q. Can you identify Exhibit 5? Is this your file
6  relating to the 2002 program agreement with Kemper?
7    **A. Yes.**
8    Q. You will see on page 12 of the program
9  agreement with the Bates stamp 1631, that's the
10 dividend portion of the program agreement, correct?
11   **A. Yes. Your question was was there anything that**
12 **said dividend adjustment in there? It doesn't say**
13 **anything about dividend adjustment.**
14   Q. Well, but the parties were calling this
15 adjustment that you're referring to as a dividend,
16 correct?
17      MR. FRENCH: Objection. It misstates his
18 testimony.
19   Q. Go ahead.
20   **A. Kemper called it a dividend adjustment in their**
21 **calculations.**
22   Q. There was also on page 9 a formula for coming
23 up with the amount of the potential dividend, correct?
24   **A. Are you referring to the line that says**

Page 70

1 **Dividend Formula?**
2  Q.  Correct.
3  **A.  That's the calculation of the adjustment.**
4  Q.  The parties called it in this document that was
5 signed by you a dividend formula, correct?
6  **A.  Yes.**
7  Q.  Let me take that back and I will go back to
8 this.
9  **A.  Sorry.**
10  Q.  That's okay.
11      Why don't you put Exhibits 4 and 5 aside
12 just for a moment?  I will go back to Marsh.
13      You have identified some of the services
14 that Marsh has performed for DuPont, correct?
15  **A.  Yes.**
16  Q.  And every year there would be a brokerage
17 service engagement letter type agreement by and
18 between Marsh and DuPont, correct?
19  **A.  There may have been every year.  I don't**
20  **recollect every year.**
21  Q.  But some years you recall specific program
22 engagement letters?
23  **A.  There were letters issued by Marsh**
24  **management.**

Page 71

1  Q.  Saying this is essentially what we will do,
2 this is what you're paying us to do, correct?
3  **A.  Yes.**
4      **(Slesicki Deposition Exhibit No. 6 was**
5  **marked for identification.)**
6  **BY MR. LENDING:**
7  Q.  I want to hand to you Slesicki Exhibit No. 6.
8 This is a document that was produced by Marsh as
9 indicated by the Bates stamp at the bottom and for the
10 record it contains the Bates stamp Marsh 5905 through
11 5914.
12      Do you recognize this document as being
13 one of those types of engagement agreements by and
14 between Marsh and DuPont?
15  **A.  Yes.**
16  Q.  And this document sets forth a number of the
17 services that Marsh is to perform for DuPont for the
18 2003 program year, correct?
19  **A.  It's titled, yeah, 2003 Brokerage Services**
20  **Engagement Letter.**
21  Q.  If you would, just go through --
22      MR. FRENCH:  I'm sorry to interrupt.  For
23 the record let me just note that it's addressed to
24 Mr. Porter.

Page 72

1      MR. LENDING:  I know.
2      MR. FRENCH:  And it's unsigned as well.
3      MR. LENDING:  Okay.  We will talk to
4 Mr. Porter a little bit further about this.
5 BY MR. LENDING:
6  Q.  Does this Exhibit 6 accurately set forth the
7 types of services Marsh performed for DuPont during
8 the 2002 and 2003 program years?
9  **A.  I would have to read it.**
10  Q.  Go ahead.  Read through it.
11  **A.  Okay.  (Reviewing document).**
12  Q.  You can stop at the top of page 3, the last
13 bullet point up at the top because all we're talking
14 about are the services.
15  **A.  Oh, okay.**
16      **Okay.**
17  Q.  Does this document, the bullet points that you
18 just read, accurately summarize the services that
19 Marsh has performed for DuPont with respect to
20 insurance matters for the years let's say 2000 to
21 2003?
22  **A.  This is a real general first three pages, so it**
23  **carries items that I don't specifically handle or it**
24  **would be done by others in our group, specifically**

Page 73

1 **Jean Western and Steve Putnam.**
2      **So is your question related to overall?**
3  Q.  Overall, yes.  Your understanding of what Marsh
4 does for DuPont?
5  **A.  Or could do for DuPont.**
6  Q.  Or could do, whether they do it or not?
7  **A.  Whether they do it or not.**
8  Q.  That's correct.
9      MR. FRENCH:  Objection based on your
10 foundation.
11  Q.  Based on your years of experience at DuPont in
12 the insurance group?
13  **A.  These are services that Marsh could or have**
14  **done for DuPont in 2002-2003.**
15  Q.  Is that also true to the best of your knowledge
16 for prior years as well, to the best of your
17 knowledge?
18      MR. FRENCH:  Counsel, just so we're clear,
19 you're asking him as a fact witness here as opposed to
20 a corporate representative, I gather?
21      MR. LENDING:  Well --
22      MR. FRENCH:  I have been allowing a lot of
23 these questions to go without objecting on the basis
24 that they're not within the scope of the 30(b)(6)

Page 74

1  notice on the assumption that you're asking him as a
2  fact witness.
3        MR. LENDING:  Well, the 30(b)(6) does deal
4  with the areas of negotiation and acceptance of the
5  insurance program for 2002-2003.
6  BY MR. LENDING:
7    Q.  You have already testified this is what would
8  be done, these are the type of services that Marsh
9  would perform or could perform for DuPont during the
10 '02-03 program years, correct?
11       MR. FRENCH:  As a fact witness he's given
12 you that testimony.  This isn't a topic of the
13 corporate notice.  I'm pointing that out because I'm
14 assuming you want him to answer these questions.
15       If you want him to answer as a corporate
16 representative, then he's not here to do that.
17       MR. LENDING:  Okay.  Our corporate
18 30(b)(6) talks about DuPont's negotiation and
19 acceptance of the insurance program for the policy
20 years 2002-2003.  Marsh was involved in that
21 negotiation process.
22 BY MR. LENDING:
23    Q.  So it may very well overlap that, but let's
24 just ask for your own understanding, Mr. Slesicki.

Page 75

1        These are the type of services that Marsh
2  could provide and did provide for DuPont during the
3  '02-03 program years, correct?
4    A.  You're narrowing your question to just the
5  program that we established with Kemper, not our
6  worldwide program?
7    Q.  Correct.
8    A.  Because this deals with the world, not just the
9  Kemper matter.
10   Q.  Within the subset of what's identified on
11 Exhibit 6 includes what they did with respect to
12 Kemper, correct?
13   A.  They may have, yes.  There are some items in
14 here that are specific.
15   Q.  Like what?
16   A.  Not in any particular order, act as a liaison
17 between you and insurers, consult with you regarding
18 specific claims, establish or assist you in
19 establishing claim reporting procedures.
20   Q.  Even going back -- go ahead.  Sorry.  Go ahead.
21   A.  Review audits, adjustments, give dividend
22 calculation and loss data, process or facilitate the
23 processing of certificates of insurance, bonds, auto
24 identification cards as requested by you, following

Page 76

1  placements deliver binders prior to execution --
2  excuse me -- expiration of your current policies.
3    Q.  There could be others as well?
4    A.  And there's others.  I'm just going up the
5  list.
6    Q.  Who are the persons from Marsh that assisted
7  DuPont during the 2000, let's say 2000 to 2004 years
8  as it related to Kemper?
9    A.  John Ball.
10   Q.  What did he do?
11   A.  He was the person in charge of obtaining
12 Kemper's estimated costs of those program years.  He
13 was also responsible to execute on our request to
14 obtain the program on a pay-as-you-go basis versus
15 paying a deposit on losses.  He followed our direction
16 as to what we wanted to do opposite the programs.
17       He had assistants who made -- that he
18 might have delegated certain of those responsibilities
19 to and that would have been Eileen Gorke or Brad
20 Griffin.
21   Q.  Was John Ball the primary person from Marsh who
22 worked on the Kemper program?
23   A.  In the years 2000 through 2001 as well as for
24 the 2002 year we also had Quetzy Rivera, who took the

Page 77

1  primary lead from John.  Where John may have led the
2  2000-2001, Quetzy would lead the 2002, but John would
3  be supervising and also involved in any aspect of the
4  program.  I'd define him as a supervisor-type
5  underwriter at that point.
6    Q.  So Quetzy, that's Q-u-e-t-z-y, reported to John
7  Ball?
8    A.  With respect to the DuPont account, yes.
9    Q.  Did John Ball have responsibilities prior to
10 2000 as well?
11   A.  Yes.  He was involved with the program at least
12 in 1987, if not prior to that.
13   Q.  All the way through the end?
14   A.  When you say, "the end"?
15   Q.  The end of the program with Kemper.
16   A.  Yes.
17   Q.  You identified Eileen Gorke.  She assisted John
18 Ball.  Is that correct?
19   A.  Yes.
20   Q.  Do you know where she works now?
21   A.  No, not specifically, although I know she lives
22 on the west coast or did at the time I know.
23   Q.  She's no longer with Marsh?
24   A.  No.

Page 78

1    Q. What years was she involved in the Kemper-
2    DuPont program?
3    A. She started in the mid to late nineties and I
4    believe was involved in 2000-2001.
5    Q. Have you had any discussions or has anybody
6    else from DuPont had any discussions with Ms. Gorke
7    involving DuPont's current dispute with Kemper?
8    A. I did not.
9    Q. Do you know anybody who has?
10   A. No.
11   Q. Do you know where she lives on the west coast?
12   A. (Pause).
13   Q. Or who she works for?
14   A. No. I don't remember that being a -- she
15   transferred from Marsh New York out to Marsh San Diego
16   and then from there she left Marsh at some point. I
17   don't know. But the last I heard she is on the west
18   coast.
19   Q. Is that G-o-r-k-e?
20   A. Yes. E-i-l-e-e-n is ther first name.
21   Q. Who is Brad Griffin?
22   A. He was also there in the late nineties and he
23   may have been there for 2000-2001. I don't recollect.
24   Q. What did he do?

Page 79

1    A. He assisted John Ball with aspects of the
2    program that we had with Kemper.
3    Q. Who is Paul Martelloni?
4    A. Paul Martelloni works for Marsh.
5    Q. In what capacity?
6    A. He handles today the arrangement that we have
7    with Old Republic to self-insure, do the assessments,
8    provide the insurance above a million dollar
9    deductible on the contractors' program with Old
10   Republic.
11   Q. Is there a dividend component to the Old
12   Republic program?
13   A. No.
14   Q. In the contractual documents by and between
15   DuPont and Old Republic is there any reference to
16   dividends?
17   A. Yes. The document has -- I'm still reviewing
18   that document to ensure that it's accurate before it's
19   signed by management.
20   Q. So it has not been signed?
21   A. It has not been signed.
22   Q. Is it your responsibility to read and review
23   insurance-related agreements before they're signed?
24   A. Yes.

Page 80

1    Q. To make sure you understand the terms prior to
2    binding DuPont?
3    A. Yes.
4    Q. And that's, in fact, what you do and that's
5    what you have done for years, correct?
6    A. I've done that for the Kemper program, also
7    with respect to AIG and now Old Republic.
8    Q. So --
9    A. As well as other insurance programs.
10   Q. So after Kemper, DuPont went with AIG, correct?
11   A. Yes.
12   Q. And was that a dividend-type program?
13   A. No.
14   Q. And the insurance agreement between DuPont and
15   AIG did not contain a provision similar to the ones we
16   have looked at in Exhibit 5 --
17       MR. FRENCH: Objection.
18   Q. -- relating to dividends?
19       MR. FRENCH: Objection.
20       Let's go off the record for a second.
21       (Discussion off the record.)
22       MR. FRENCH: I'm going to allow some very
23   limited questions on this topic just so you can get a
24   general understanding who these policies have been

Page 81

1    placed with or the programs have been placed with.
2        We're not going to delve into the details
3    of these programs since they're not at issue in this
4    case.
5        I would also note for the record that I
6    would like this subject to the confidentiality
7    agreement in the case.
8        MR. LENDING: I have no problem with the
9    confidentiality.
10       I think there is certainly potential
11   relevance to this line of inquiry or I wouldn't be
12   asking it, but be that as it may we will mark this
13   confidential and we will move on.
14   BY MR. LENDING:
15   Q. Mr. Slesicki, does the AIG agreement have a
16   dividend component similar to what we saw in the
17   Exhibit 5 with Kemper?
18   A. It has the self-insurance aspects with respect
19   to costs and fees and assessments and deposits is as
20   we had under the Kemper. It does not have the word
21   dividend in its document.
22   Q. Is it your understanding that the program with
23   AIG is commonly referred to as a retro-type program?
24   A. No. It was a -- it is the, it is the same

Page 82

1  program that we had with Kemper, except that they have
2  a billion dollar deductible, which for all intents and
3  purposes is self-insurance.
4     Q.  But, in addition, you said it's the same
5  program with Kemper, but it doesn't contain the
6  dividend language that we looked at in Exhibit 5,
7  correct?
8     A.  It does not.
9     Q.  Other than Mr. Martelloni dealing with the Old
10 Republic issues, what other involvement did
11 Mr. Martelloni have, if any, with the Kemper-DuPont
12 program?
13    A.  In 2004 he was involved with respect to the
14 adjustments that were to be made on the 2002 and prior
15 years.  He assumed the responsibility of Quetzy Rivera
16 when he joined Marsh in I believe 2004.
17    Q.  And then after 2004 when he joined, Quetzy no
18 longer had involvement.  Is that correct?
19    A.  She still was in the unit.  She may have been
20 called by me on occasion about the arrangements
21 directly, so she's still a Marsh employee.
22    Q.  So Martelloni, he just joined Marsh in 2004 and
23 then from the time he joined that's when he picked up
24 Kemper-related responsibilities and Old Republic

Page 83

1  related.  Is that correct?
2     A.  AIG and Old Republic.
3     Q.  Who is Claudette Monsier, M-o-n-s-i-e-r?
4     A.  I believe she's a Kemper person, as I
5  recollect.  There may have been an e-mail from her via
6  Paul Martelloni.  I don't recollect because I believe
7  she's a Marsh employee now, I think.  I think this is
8  the person.
9     Q.  What involvement did she have with the Kemper-
10 DuPont program, if any?
11    A.  I don't recollect.
12    Q.  Are you aware of any discussions or
13 conversations by and between DuPont and Ms. Monsier?
14    A.  No.
15    Q.  As it relates to this dispute?
16    A.  No.
17    Q.  Who is Will Eustace?  What role or involvement
18 has he had in the Kemper-DuPont program?
19    A.  Will was involved when we were approached to
20 determine whether or not a novation for Kemper's years
21 would be an alternative for DuPont versus going
22 through a liquidation process.
23    Q.  But other than that, he's had no involvement in
24 the Kemper-DuPont program other than relating, as it

Page 84

1  may relate to a novation?
2     A.  Correct.
3     Q.  Paul Carleton?
4     A.  The name sounds familiar.  He's with Marsh.  I
5  believe he provided some information or correspondence
6  around the Marsh opinion on the Kemper runoff
7  situation.
8     Q.  And also are you aware that he was involved in
9  some discussions by and between DuPont and Marsh
10 relating to whether Kemper had the right to refuse to
11 declare a dividend for the 2002-2003 program years?
12    A.  I don't recollect that.  I would have to look
13 at correspondence.
14    Q.  Jon Limmer?
15    A.  That name doesn't sound familiar to me.
16    Q.  David Cobleigh?
17    A.  He's Paul Martelloni's manager.  That's what I
18 know.
19    Q.  To your knowledge, he has not been involved in
20 the Kemper-DuPont program?
21    A.  To my knowledge, no.
22    Q.  Carmella Inneo?
23    A.  She's the DuPont account executive who works
24 for Marsh, who works for Marsh.

Page 85

1     Q.  And the DuPont account executive for Marsh for
2  how long?
3     A.  It was after 2003, so I think it was 2004 or
4  during 2003.  I don't recollect exactly.
5     Q.  What role or involvement has she had with
6  respect to the Kemper program?
7     A.  I haven't talked to her about it.  It would be
8  Paul Martelloni talking to her about it.
9     Q.  She reports to Paul?
10    A.  No.
11    Q.  Who does she report to?
12    A.  She's the account executive for all of
13 DuPont-related insurance matters.
14    Q.  What does that mean?  She's the client
15 representative?
16    A.  Yes.
17    Q.  If there's a problem you go to her?
18    A.  Yeah, if there was a problem with service from
19 Marsh worldwide.
20    Q.  Tim Brady?  Does he ring a bell?
21    A.  The name sounds familiar, but I don't recollect
22 it as having any involvement with the DuPont account.
23    Q.  George Lucas?  That's a different George Lucas.
24 Maybe not.

Page 86

1      MR. FRENCH: One of those many hats.
2    A.  I'm sorry. No, I don't recollect that name.
3    Q.  Robert Beyer?
4    A.  Robert Beyer was responsible with me with
5    respect to claims handling services and auditing claim
6    files and discussing strategy on claims.
7    Q.  Was he involved ever in the negotiations by and
8    between DuPont and Kemper?
9    A.  With respect to any claims services around the
10   cost aspect of those claims services, management fees,
11   the claims handling fees, things like that, he would
12   be involved with that or was involved with that.
13   Q.  Is he still with Marsh?
14   A.  No.
15   Q.  Where is he?
16   A.  I don't know, but I know he's not with Marsh.
17   Q.  When did he leave?
18   A.  I guess it's a little over a year and a half
19   ago. Maybe longer.
20   Q.  Terrence Dugan?
21   A.  I don't recollect that name.
22   Q.  John Faughnan, F-a-u-g-h-n-a-n?
23   A.  Yes. Bob Beyer reported to John Faughnan.
24   Q.  What involvement did John have as it relates to

Page 87

1    the Kemper-DuPont program?
2    A.  Bob Beyer reported to him, so that's the
3    relationship.
4    Q.  Did you have direct dealings with John?
5    A.  During one specific period?
6    Q.  I'm just trying to find out who these people
7    are.
8    A.  Okay.
9    Q.  What they know.
10   A.  He was involved with the program back in the
11   eighties and early nineties and maybe even to the
12   midnineties, and Bob Beyer took his place with respect
13   to direct contact.
14   Q.  When was that that Beyer took Faughnan's place?
15   A.  I don't recollect the years, but I'm saying mid
16   to late nineties.
17   Q.  So Beyer then was from mid to late nineties to
18   the 2003-2004 time frame?
19   A.  He took a transfer off the account, off the
20   DuPont account sometime in 2002, 2003. I don't
21   recollect exactly when.
22   Q.  Other than these folks that I have identified
23   from Marsh, is there anybody else from Marsh who had
24   any role or involvement in the Kemper-DuPont

Page 88

1    relationship that you can think of?
2    A.  No.
3    Q.  How was Marsh compensated?
4    A.  For?
5    Q.  The services that it would perform for DuPont.
6    A.  With respect to the overall?
7    Q.  Yes, overall. How were they compensated?
8    A.  I think this was -- how they were compensated
9    was on a fixed fee basis.
10   Q.  So DuPont would agree to pay Marsh a fixed fee
11   each year for the services that it would perform. Is
12   that correct?
13   A.  Yes. And then we had performance incentives in
14   there to provide service to DuPont or even an
15   incentive to understand their fee structure.
16   Q.  Take a look --
17   A.  For the year 2003, as an example.
18   Q.  I see there's a fixed fee program on page 5911,
19   page 7 of this letter. Is that what you're referring
20   to as a type of fee structure that existed year after
21   year? The amounts may change but this is generally
22   what occurred?
23   A.  I don't recollect if this is the final document
24   because it's not signed.

Page 89

1    Q.  That's fine.
2    A.  And you're referring to page 7?
3    Q.  Correct.
4    A.  This was their allocation of a fee, their
5    estimates.
6    Q.  Is it fair to say that for the 2003 program
7    year they were paid somewhere in the neighborhood of
8    about 1.6, $1.7 million, give or take?
9        MR. FRENCH: Objection. No foundation.
10   A.  This is a global program.
11   Q.  Global, right. For the global program?
12       MR. FRENCH: Objection. No foundation.
13   Q.  If you understand, if you know. I'm just
14   looking for a ballpark. I'm not looking to hold you
15   to the specific number.
16   A.  It was about that.
17   Q.  It was about that the prior year as well?
18   A.  I don't recollect.
19   Q.  And in this fee category, what relates to the
20   worker's comp portion of what they're to do?
21   A.  It's contained by their definition in the
22   primary casualty program.
23   Q.  Would it also include the excess liability
24   program as well, their work in connection with the

23  (Pages 86 to 89)

Page 90

1 Kemper-DuPont relationship?
2   A. This is an allocation. How they determined the
3 amounts was basically for accounting allocation of
4 costs. It really -- it's contained in the primary
5 casualty program piece.
6       The excess liability dealt with excess
7 insurers and things like that.
8   Q. In the 2002 program year, can you give me an
9 estimate or ballpark of what the fee or compensation
10 was for Marsh globally? Would it be in -- was it over
11 a million bucks? Would you assume?
12       MR. FRENCH: Again, objection. This is I
13 assume as a fact witness?
14       MR. LENDING: Fact witness, yes.
15   A. It was above a million.
16   Q. Above a million?
17   A. (The witness nodded).
18   Q. We have talked briefly about the renewal
19 process that would go on each year where DuPont would
20 essentially renew its coverages with Kemper.
21   A. Are you done with this?
22   Q. Yes, I'm done with that.
23       And you have testified previously that you
24 personally were extensively involved in that

Page 91

1 negotiation process, correct?
2   A. For that 2002 year?
3   Q. Correct.
4   A. Yes.
5   Q. And you were also extensively involved in prior
6 years as well?
7   A. Yes.
8   Q. And Marsh would assist you as you would request
9 and direct, correct?
10   A. Yes.
11   Q. During the 2002 program year who assisted from
12 DuPont for that 2002 proposal, if you recall?
13   A. Who in DuPont?
14   Q. Yes.
15   A. Assisted me?
16   Q. Yes.
17   A. With the information that's required for the
18 estimated cost?
19   Q. Correct. Whatever else would be part of the
20 proposal which we saw in Exhibit 5, who else from
21 Marsh was involved in the negotiations?
22   A. Marsh or DuPont? I thought you said DuPont.
23 That's why I am asking you.
24   Q. Let's start with Marsh.

Page 92

1       Who else from Marsh would have assisted
2 you?
3   A. For the 2002 year?
4   Q. Correct.
5   A. I believe it's John Ball and Quetzy Rivera.
6   Q. And can you tell me what Ball did in terms of
7 assisting you with the 2002 proposal that was
8 ultimately executed by and between DuPont and Kemper?
9   A. In the prior year, like October of 2001, John
10 with Quetzy and myself would discuss whether or not
11 any changes needed to be made to the pricing or
12 services provided by Kemper, Kemper as the fronting
13 company for the insurance policies, as well as the
14 claims handling aspects of the program.
15   Q. So if there was any change that you wanted to
16 the proposal from the prior year, you guys would sit
17 down and discuss it sometime in the fall?
18   A. As a beginning discussion.
19   Q. In the fall of 2001. Is that correct?
20   A. Yes. We would provide at a minimum our
21 estimates of the payroll information that goes into
22 the calculations for the fees, assessments, the cost
23 of the insurance program under the contractors'
24 program whereby we pay the first million and they pay

Page 93

1 in excess of a million, excluding any chemical
2 explosions.
3   Q. During these discussions that you would have
4 with Mr. Ball, Ms. Rivera, would you pull out the
5 proposal that was entered during the previous year as
6 your starting point for reviewing what changes to be
7 proposed for the upcoming year?
8   A. Would I --
9   Q. Would you pull out the prior year's proposal to
10 see what changes you wanted to propose for the
11 upcoming year?
12   A. We would look at it opposite an Excel
13 spreadsheet if it was prepared or this specific
14 proposal.
15   Q. And then what would happen after that?
16   A. We would ask, we would get together and have, I
17 would have John Ball or Quetzy Rivera write a letter
18 saying what DuPont expected under this program, which
19 is I think contained in a letter that's in the file.
20 I can't quote it at this point. I would have to
21 review it.
22       But it would set out that we would expect
23 from claims service, fees either to be the same or
24 less. It also assumed possibly that we're adding new

Page 94

1  facilities that might have to come underneath this
2  program as DuPont had subsidiaries or joint ventures
3  and is possibly adding or the other side, selling
4  throughout these years. It really set out in motion
5  what we wanted to get back as our fees and assessments
6  and contractors' program to be in line with prior
7  years.
8    Q.  There would be some back and forth by and
9  between Kemper and DuPont regarding that process,
10  correct?
11    A.  Yes. We may have had a verbal discussion with
12  Kemper -- not Kemper. Bill -- not Bill.
13    Q.  Brundage?
14    A.  Mike Brundage with respect to that and set out
15  in a letter and by the way, here's the payrolls to
16  provide that information.
17    Q.  Then ultimately when --
18    A.  The cost.
19    Q.  When ultimately there was agreement reached on
20  the language of the proposal, it would be marked
21  final, correct, and then it would ultimately be signed
22  by both Kemper and DuPont, correct?
23    A.  It would be marked by Kemper as final.
24    Q.  Then it would ultimately be signed both by

Page 95

1  Kemper and DuPont, correct?
2    A.  Yes.
3    Q.  After all of the negotiations, correct?
4    A.  Yes.
5    Q.  And before I think we saw that you had signed
6  the 2002 insurance proposal which has been marked
7  Exhibit 5.
8        That's your signature on page 14, correct?
9    A.  Yes.
10    Q.  And before you signed it obviously you read
11  this entire proposal, correct?
12    A.  Yes.
13    Q.  You understood it, correct?
14        MR. FRENCH: Objection to form. No
15  foundation.
16    A.  I understood it as a self-insurance program
17  whereby we would reimburse them for their costs of
18  providing the policies, plus payment of the losses and
19  we would warrant payment of all losses under this
20  program.
21    Q.  Sir, you understood the terms that you were
22  agreeing to by signing this document, correct?
23        MR. FRENCH: Objection to form. No
24  foundation. I think that's the same question you just

Page 96

1  asked.
2        THE WITNESS: Yeah. I was going to say
3  that, I just answered that.
4  BY MR. LENDING:
5    Q.  You understood the terms that you were signing?
6        MR. FRENCH: Objection. Now it's
7  argumentative. No foundation. Asked and answered.
8    Q.  Go ahead. You can answer.
9    A.  As I previously stated, it's the cost of the
10  claims, plus the fees and the assessments and we had a
11  warranty agreement that paid for all losses underneath
12  this program, except for the contractors' program
13  where there was an element of insurance above a one
14  million dollar stop-loss except for chemical
15  explosions.
16    Q.  Sir, before you signed this document you
17  understood it was your responsibility before you bind
18  DuPont to read and understand what you were signing,
19  correct?
20    A.  Yes.
21    Q.  And you did read and understand it, correct?
22    A.  Read and understand it with respect to what I
23  stated prior.
24    Q.  You read and understood the 14 pages of this

Page 97

1  insurance proposal before you signed it, correct?
2        MR. FRENCH: Objection. Asked and
3  answered.
4    Q.  Either you did or you didn't. Did you read and
5  understand it?
6    A.  I understood it with respect to what I already
7  answered with respect to us paying the fees and
8  assessments and insurance.
9    Q.  Sir, when you signed your name you understood
10  you were binding DuPont to the terms as set forth in
11  the insurance proposal, correct?
12    A.  What I was binding DuPont for was the payment
13  of all fees and assessments adjusted based on actual
14  information after the close of the policy year, as
15  well as the insurance premium, the claims handling and
16  the payment of all losses.
17    Q.  Sir, are there provisions in the first 14 pages
18  of this document that you do not believe you were
19  binding DuPont to?
20        MR. FRENCH: Could we have the exhibit?
21        Thanks.
22    Q.  You signed it on page 14, correct? Take a look
23  on page 14. That's your signature. We already looked
24  at that, right?

25  (Pages 94 to 97)

Page 98

1    A. Yeah.
2    Q. You were agreeing to bind DuPont to the terms
3   as set forth on the preceding pages, correct?
4         MR. FRENCH: Objection. Argumentative.
5   It's been asked and answered.
6         MR. LENDING: I haven't gotten an answer
7   to my question.
8         MR. FRENCH: You may not have liked the
9   counsel, Counsel, but he's answered it four different
10  times.
11        MR. LENDING: I'm not getting a responsive
12  answer.
13        MR. FRENCH: He's answered it four or five
14  different times. I think asking the question for the
15  sixth and seventh time isn't going to change what we
16  are doing here.
17        So is that what you want to do, is just
18  keep asking the question?
19        MR. LENDING: I want an answer to my
20  question.
21        MR. FRENCH: Well, you got the answer
22  already.
23  BY MR. LENDING:
24    Q. Go ahead, Mr. Slesicki.

Page 99

1         MR. FRENCH: Do you have anything to add
2   to your prior answer?
3         THE WITNESS: No.
4   BY MR. LENDING:
5    Q. When you signed this document on behalf of
6   DuPont, were there any pages of this proposal that you
7   believe that you weren't agreeing to on behalf of
8   DuPont?
9    A. State your question again.
10        MR. LENDING: Can you read it back?
11        THE WITNESS: Yes. Read it back for me.
12        (The reporter read back the last
13  question.)
14        THE WITNESS: I was agreeing to the pages
15  that were written into the proposal for DuPont.
16  BY MR. LENDING:
17   Q. Prior to signing Exhibit 5, you had an
18  opportunity to review the terms and provisions of this
19  document with Marsh, correct?
20   A. Yes.
21   Q. And you did review the terms and conditions and
22  provisions of this document with Marsh prior to
23  signing it, correct?
24   A. Yes. And the terms were to reimburse --

Page 100

1    Q. We know. The terms are what the terms are.
2         MR. FRENCH: Are you interrupting his
3   answer, Counsel?
4    Q. You agreed to the terms and provisions?
5         MR. FRENCH: Did you have anything to add
6   to your answer before counsel interrupted you?
7    A. What I was saying is I agreed to the terms that
8   this was a self-insurance program where we paid all
9   the assessments, fees and it was adjusted based on
10  payroll. We paid an insurance premium for the
11  contractors' program which was above a million dollars
12  stop-loss except for chemical explosion and that was
13  based on payroll and that we warranted the payment of
14  all losses, except for that contractors' program as
15  part of the warranty agreement.
16   Q. Are there any terms and provisions on the 14
17  pages of this proposal that you were not agreeing to?
18        MR. FRENCH: Objection. Asked and
19  answered.
20   A. I already replied to it.
21   Q. So what was the answer?
22   A. I already replied to that previously.
23   Q. So you agreed to all of the terms and
24  provisions as set forth on the 14 pages of this

Page 101

1   proposal, correct?
2         MR. FRENCH: Objection. Misstates his
3   testimony. It's argumentative.
4    A. What I stated was I agreed to reimburse Kemper
5   for all of its fees and assessments and insurance
6   premium, as well as warrant the payment of all losses
7   under the program so we could self-insure financially
8   DuPont's risk.
9    Q. Sir, are there any provisions or terms on the
10  14 pages of this insurance proposal that you did not
11  agree to with Kemper?
12   A. As of October?
13   Q. As of the date that you signed it.
14   A. I agreed with it as of October 20th, yes. Is
15  that the date? The 20th?
16        Excuse me. The 31st.
17   Q. You agreed to bind DuPont, correct?
18   A. Agreed to bind DuPont to self-insure its
19  program through Kemper.
20   Q. You agreed to bind DuPont with respect to all
21  of the provisions on the first 14 pages of this
22  document, correct?
23        MR. FRENCH: Objection. Counsel --
24   A. I already stated it.

Page 102

1    MR. FRENCH: Yes. You're just asking the
2  same question over and over again. I'm kind of at a
3  loss of what you expect us to do. I understand you
4  don't like the answer you're getting.
5    Does that mean you're just going to keep
6  asking until you get the answer you want? If that's
7  the case, let's stop the deposition now.
8    MR. LENDING: No.
9  BY MR. LENDING:
10   Q.  Mr. Slesicki, you just testified that there
11 were no provisions in the first 14 pages that you did
12 not agree to, correct?
13   **A.  Yes. That's correct. As of October 31 what I**
14 **agreed to was that we would reimburse Kemper for all**
15 **of its fees and assessments and cost of the insurance**
16 **and we would get an adjustment reflecting those**
17 **balances.**
18   Q.  What I'm trying to do is everything in the
19 first 14 pages you agreed to, correct? It's simple.
20 I'm not trying to trick either of you guys. I just
21 want to get an answer to my question. I do not have a
22 clear answer to my question.
23   MR. FRENCH: We don't think you're trying
24 to trick us, Counsel. I think the problem is you just

Page 103

1  don't seem to think the answer he's providing you is
2  the one that you're entitled to and he's given you his
3  answer.
4    Q.  Mr. Slesicki, you already testified that
5  there's nothing in the first 14 pages that you did not
6  agree to, correct?
7    **A.  I agreed to the 14 pages that DuPont would**
8  **self-insure its fees and assessments and reimburse**
9  **Kemper for all of those costs related to the program.**
10   Q.  You're qualifying it, sir. I don't want a
11 qualification.
12   **A.  That's what the program is about.**
13   MR. FRENCH: Counsel, I think I can cut
14 through this. Why don't we go off the record for a
15 minute and I will talk to the witness and we will come
16 back in and see if we can deal with this?
17   MR. LENDING: No.
18 BY MR. LENDING:
19   Q.  Let me just deal with this. You keep
20 qualifying it, sir.
21    There's 14 pages to this proposal,
22 correct?
23   **A.  Yes.**
24   Q.  You agreed to each of these 14 pages, correct?

Page 104

1    MR. FRENCH: Well, now, Counsel, I think
2  you're trying to trick him. You say 14 pages. You
3  put in front of him a 70- or 80-page document that has
4  lots of other sections to it than just the first 14
5  pages.
6    Q.  Fine. The 14 pages that has your signature,
7  correct? The provisions, the 14 pages that precede
8  your signature, correct?
9    **A.  Yes, there's 14 pages that precede my**
10 **signature.**
11   Q.  And you agreed to the terms of those 14 pages,
12 correct?
13   **A.  I agreed to the terms that stated that there**
14 **would be an adjustment to the fees and expenses.**
15   Q.  I'm not getting an answer to my question.
16   MR. FRENCH: I'm trying to help you, but
17 you don't want me to help. You're complaining that
18 you're not getting an answer that you want, but I told
19 you we wanted to break and speak to the witness and
20 come back in and see if we can cut through this, but
21 you have declined that invitation.
22    So we're now left in the position where
23 you're just going to repeat the same question I guess
24 and get the same answer and be dissatisfied with it.

Page 105

1  If that's what you want to do, then we can sit here
2  and do that.
3    MR. LENDING: Go ahead. Break.
4    MR. FRENCH: Thank you.
5    THE WITNESS: I have to go to the rest
6  room anyway.
7    (A brief recess was taken.)
8  BY MR. LENDING:
9    Q.  Mr. Slesicki --
10   MR. FRENCH: Actually, before you ask your
11 question, let me just say that we have conferred in an
12 attempt to try to provide an answer that's going to be
13 acceptable to you or get you more information that's
14 going to be acceptable to you.
15    If you want to try it one more time,
16 Mr. Slesicki is going to do his best to see if he can
17 augment his prior answers.
18 BY MR. LENDING:
19   Q.  Mr. Slesicki, if you can answer this with a yes
20 or no, I would appreciate it.
21    By signing the insurance proposal, page 14
22 you agreed to bind DuPont to the terms and provisions
23 set forth in the insurance proposal, correct?
24   **A.  This program is very complicated and you can't**

Page 106

1  just answer it with a yes or no because there's terms
2  in there that are not fully explained and that's what
3  I was attempting to do with respect to the
4  understanding that DuPont has with this program. And
5  its a self-insurance program over many years with
6  Kemper. We valued them at those points in time, at
7  those points in time over the 30 years as a valued
8  vendor.
9        And so this one year is, yes, I agreed to
10  the terms with the understanding that you need to
11  understand all of this complication because it doesn't
12  clearly out there state that we're self-insuring and
13  there's some terms in there and so what I have been
14  stating to you is the way the program has existed over
15  the many years.
16  Q.  But you were agreeing to the terms and
17  conditions set forth in the insurance proposal by
18  signing it, correct?
19  A.  For 2002, with the understanding that this is a
20  very complicated program.
21  Q.  So the answer is yes, you were agreeing to
22  those terms and provisions, correct?
23  A.  With respect to this year, yes.
24  Q.  Thank you.

Page 107

1        Sir, we talked briefly about the renewal
2  process. I want to have you identify Exhibit 7 for
3  the record.
4        (Slesicki Deposition Exhibit No. 7 was
5  marked for identification.)
6  BY MR. LENDING:
7  Q.  For the record, it's a document with the Bates
8  6657.
9        Can you identify this document?
10  A.  It's a flow chart.
11  Q.  Is this something you prepared or Marsh
12  prepared?
13  A.  It was a document that was initially prepared
14  by someone in my group and I'm thinking it was Lisa
15  Patterson with input from Kemper and Marsh as to what
16  is the process. The reason for this was to obtain the
17  cost allocations in a user friendly format easily from
18  Kemper/Marsh so we can input it into our accounting
19  system.
20  Q.  Lisa Patterson would have prepared this
21  document at your direction, correct?
22  A.  Yes. I was her supervisor.
23  Q.  Does this fairly and accurately describe a
24  portion of the renewal program process?

Page 108

1  A.  With respect to the year 2000.
2  Q.  Would it be different for let's say the 2002
3  policy year?
4  A.  I'm reading each component to make sure of that
5  statement.
6  Q.  Sure.
7  A.  (Reviewing document) All but the time lines.
8  Q.  Okay.
9  A.  That was the objective, is to have all of these
10  agreements, everything in place and finalized before
11  the year that came into play.
12  Q.  You would agree that as this shows it was a
13  fairly detailed process, the renewal process. Is that
14  correct?
15  A.  What's the detail is each step in the process
16  as to complexity. I think that was your question.
17  Q.  There was a lot of back and forth between
18  Kemper and DuPont before the proposal was ultimately
19  signed, correct?
20  A.  Yeah, to get the cost structure from the
21  self-insurance program and the assessments, et cetera
22  and get all of the payroll correct as there could have
23  been errors.
24  Q.  This was the process that was generally

Page 109

1  followed except for the timing year after year as
2  between Kemper and DuPont?
3  A.  This was the process for 2000 going forward
4  because our plan changed from a pay-as-you-go basis --
5  excuse me. To a pay-as-you-go basis on all of the
6  claims matters and there was no deposit for losses
7  that was also maintained by Kemper in prior years.
8  Q.  When you talk about the old program from 2000
9  and before, it was an incurred loss program with
10  respect to claims?
11  A.  We would pay for an estimated amount of a claim
12  based on the incurred amount and it would be adjusted
13  once a year. The difference between those years and
14  this year is that there would be no claims adjustment.
15  It would just be an adjustment based on the
16  assessments, the fees that were estimated, as well as
17  the insurance premium which was all estimated and then
18  trued up at the end of the policy year nine months
19  after that policy or with actual payroll information
20  to true it up on an assessment, fees, et cetera basis.
21  Q.  The pay as you go, as you call it, or the paid
22  loss -- you're familiar with that term, paid loss?
23  A.  Yes.
24  Q.  We're talking about when it is that DuPont must

Page 110

1  pay for the claims, correct?
2    A.  It's when Kemper or the TPA, NATLSCO, that's
3  their subsidiary, would pay the claimants, providers,
4  legal, et cetera, we would reimburse them weekly for
5  those and they would have an escrow to fund those
6  payments that were made until we reimbursed that
7  amount that was paid to them the following week.
8    Q.  And that's how it went as the paid loss after
9  2000, correct, what you just described?
10    A.  With respect to the worker's comp aspect to
11  this.  But we also had auto liability and general
12  liability that was not that way, as well as our
13  self-insured worker's comp claims we were reimbursing
14  them weekly.  This aspect dealt with what was in the
15  incurred loss as you defined it, the incurred loss
16  program versus paid loss basis.
17    Q.  And that's with respect to worker's comp, not
18  the auto, general liability and self-insured, correct?
19    A.  Yes.
20    Q.  And so there was no change as it relates to
21  auto, GL and self-insured in 2000?  It was always the
22  same way?
23    A.  It was that way prior.
24    Q.  When you say, "that way prior" meaning paid

Page 111

1  loss type?
2    A.  It was pay as you go or weekly reimbursement
3  prior to 2000 for those coverages.
4    Q.  Then with respect to the worker's comp claims,
5  the change in 2000 was from incurred loss to a paid
6  loss or pay as you go, correct?
7    A.  Yes.
8    Q.  And that relates, it's really an issue of
9  timing of when it is that DuPont is going to pay the
10  claims, correct?
11        MR. FRENCH:  Objection.  Misstates the
12  testimony.
13    A.  It dealt with whether or not we wanted to pay a
14  deposit to Kemper or pay the claim as we went on.  And
15  in prior years Kemper wanted an additional fee to go
16  to a pay as you go and actually in 2001, for the 2001
17  year they agreed that we will go pay as you go or paid
18  loss without any increase in fees or assessments
19  related to the claims aspect of it.  And they agreed
20  or volunteered that we can go back to 2000, since we
21  were in the 2000 year, to go back and adjust that.
22        What happened was all the moneys that we
23  had on deposit were returned and what we gave as
24  security instead of those incurred loss, incurred loss

Page 112

1  deposits, we gave a letter of credit or surety bond
2  that was split 50/50.
3    Q.  So with respect to the pay as you go, as you
4  said, Kemper historically wanted an additional fee
5  because they would be paying the money out without
6  having any money of DuPont's beforehand?
7    A.  Actually, they were making a cash flow interest
8  expense -- not expense.  Income based on the money we
9  gave them and so, therefore, they felt previously that
10  they wanted additional fee reimbursement for that.
11    Q.  But after 2001 they said no, they're not going
12  to charge you this additional fee and that they will
13  pay, they will pay the claims and then subject to your
14  weekly reimbursement to them, correct?
15        MR. FRENCH:  Objection.  No foundation.
16    Q.  Go ahead.
17    A.  It was for the year 2000 and 2001, so it goes
18  back to 2000 there.  When you say 2001 forward, it
19  started in October 2000 and once Kemper agreed with
20  that, it became a change.  It was a matter of that's
21  the way we always wanted it, but from a cash
22  standpoint paying more fees and assessments, et cetera
23  on the program did not make sense.
24    Q.  So then Kemper agreed to it and what they

Page 113

1  essentially agreed to was that they would pay the
2  claims subject to this weekly reimbursement by DuPont,
3  correct?
4    A.  Yes.
5    Q.  Sir, are you aware generally how a dividend
6  program differs from a retrospective program?
7    A.  No.
8    Q.  No.  Did DuPont ever try to get rid of the
9  dividend language in the insurance proposal that we
10  already looked at at any time that you're aware of?
11    A.  No.
12    Q.  What is your understanding of how this large
13  risk contributory dividend plan worked by and between
14  Kemper and DuPont?
15    A.  That we would be paying all the assessments,
16  the cost or Kemper's fee, including their profit and
17  administrative fee, to produce this plan, as well as
18  the losses, except for the contractors' program
19  whereby we self-insured the first million dollars and
20  except for chemical leaks, if ever occurred, we would
21  insure that amount above a million for the
22  contractors' program.  And then we would warrant all
23  payment of all claims with respect to the plan.
24        So any adjustment would really be an

Page 114

1  adjustment to a self-insurance financing mechanism.
2    Q.  And the adjustment as you understood it was in
3  the form of a dividend?  That was what Kemper called
4  it?
5    A.  That was what Kemper called it.  It was an
6  accounting adjustment based on DuPont's experience and
7  the losses and the payroll, et cetera.
8    Q.  Did DuPont ever look to getting a straight
9  retrospective program with Kemper that didn't have any
10  dividend language?
11    A.  I don't recollect that being a subject matter.
12  This is what Kemper offered as their way of
13  self-insuring our risks and based on the 30 years of
14  the relationship, that's the way it worked.  We were
15  always given the adjustments because there was no
16  insurance other than the contractors' program in it.
17        And the understanding we had with Kemper
18  is that's how DuPont wanted to self-insure and they
19  were willing to offer this program in order to provide
20  that type of program that DuPont wanted.
21    Q.  When you agreed to the 2002 insurance proposal,
22  you were aware that it contained the language that we
23  have looked at on page 12, correct?
24        Do you want to take a look on page 12 of

Page 115

1  Exhibit 5?
2    A.  (Reviewing document)  State your question again
3  now that I have read it again.
4    Q.  When you signed this document and agreed to the
5  terms, you were aware that this proposal contained the
6  language we see on page 12, correct?
7    A.  Yes.
8    Q.  You will see the first sentence says
9  that "Recognizing that dividends cannot be promised or
10  guaranteed," do you see that?
11    A.  Yes.
12    Q.  Did you have any belief that the dividend or
13  the adjustment which Kemper called a dividend was
14  going to be guaranteed and promised?
15    A.  I went to the last sentence in that paragraph
16  that's paragraph 1, Dividend, that says, "For the
17  record, the Board of Directors have never failed to
18  declare the full dividend under the terms and
19  conditions of the Large Risk Contributory Dividend
20  Plan" as DuPont was already self-insuring all the
21  losses, was indemnifying, warranting all payments of
22  all losses except for the contractors' program.
23    Q.  So you expected --
24        MR. FRENCH:  I'm sorry.  Were you

Page 116

1  finished?
2    Q.  Are you finished?
3    A.  I was just going to add --
4    Q.  Go ahead.  I'm sorry.
5    A.  -- add that except for losses above a million
6  on the contractors' program except for chemical
7  explosions and leaks.  Where there was any claims
8  resulting from that, we would pay for those as well.
9    Q.  You said you looked to the last sentence of the
10  dividend paragraph on page 12 of the proposal.
11    A.  Yes.
12    Q.  Did you understand that to be a description of
13  Kemper's past practices?
14    A.  That was a description of their past practice
15  and also for the year 2002.
16    Q.  And you read that to say that when they say,
17  "For the record, the Board of Directors has never
18  failed to declare the full dividend," you understood
19  that to be in the past, correct?
20    A.  Yes, as well as the present because what we're
21  doing is adjusting the prior years as I'm signing this
22  report and they're making the adjustment for prior
23  years, but I'm doing it as we speak, so it's
24  continuous.

Page 117

1        It's a long-term relationship where you're
2  agreeing that this is a self-insurance program and
3  you're agreeing that it continues year after year
4  after year and the adjustments were being made.
5    Q.  Did you interpret and understand the sentence
6  that you're pointing out to be a promise that in the
7  future Kemper would promise to continue to declare
8  dividends?
9    A.  Yes.
10    Q.  That doesn't say that though, does it?
11    A.  No.
12    Q.  In fact, the first sentence of this
13  specifically says that dividends cannot be promised or
14  guaranteed, correct?
15    A.  Yes.  And that's why it's confusing because
16  that also says that they always have.  So based on
17  past experience, based on a 30-year relationship and
18  continuing on to do the prior years just like this
19  year, it to me implied that there's a promise.
20    Q.  Was it your understanding that Kemper was
21  promising or guaranteeing to DuPont that it would
22  continue to make dividends and declare dividends when
23  you signed this document?
24    A.  Say the question again.

Page 118

1  Q.  Was it your understanding that Kemper was
2  promising to you and to DuPont that it would continue
3  to declare dividends in the future?
4  **A.  It would continue to adjust the program as it**
5  **has been in the past and if you want to use Kemper**
6  **words, yes, it would be expected that the adjustments**
7  **would continue to go every year.**
8  Q.  And that there would be a dividend declared
9  each year, correct?
10  **A.  There would be an adjustment to the estimates**
11  **of payroll because losses were being paid continuous**
12  **and we had a warranty agreement that backed up all the**
13  **losses.  There was no insurance program.  So this**
14  **adjustment really was just an adjustment of**
15  **self-insurance that DuPont had all the risk on this**
16  **program.**
17  Q.  And the adjustment that we're referring to is
18  what we see in the proposal called dividend, correct?
19  **A.  Like I said, it's a confusing-type document**
20  **because it doesn't really refer to dividend**
21  **adjustment.  It refers to dividend as to me something**
22  **that really says that we have real insurance, and we**
23  **didn't have real insurance here.  We had a program**
24  **where we paid their costs and reimbursed them for**

Page 119

1  **their costs and paid all the claims.**
2  Q.  Sir, the proposal that we looked at before,
3  page 9, the adjustment that you're referring to is the
4  dividend formula.  That's what you're understanding is
5  the adjustment, dividend equals the audited subject
6  premium minus basic premium plus converted limited
7  losses times the tax multiplier?
8      MR. FRENCH:  Objection.  No foundation.
9  It misstates his testimony.
10  **A.  I didn't hear that.**
11      THE WITNESS:  What did you just say?
12      MR. FRENCH:  I said objection.  No
13  foundation.  Misstates his testimony.
14  BY MR. LENDING:
15  Q.  You can answer.
16  **A.  Your question again was is dividend formula**
17  **really called dividend adjustment?**
18  Q.  No.  The adjustment that you keep talking
19  about, you're referring to the dividend formula which
20  is defined on page 9?
21  **A.  No.  I'm talking about in the adjustment that's**
22  **taking the estimated cost, we put in a million dollars**
23  **in cash and adjusting, which is based on those payroll**
24  **estimates and what insurance premium, assessments, et**

Page 120

1  **cetera and related to all of that cost and the**
2  **insurance premium and adjusting that to actual based**
3  **on actual payroll.  That's the adjustment that I'm**
4  **referring to.  It's in one of these other pages, in**
5  **the cash security reconciliation.**
6  Q.  In terms of the page 12 where it says, "For the
7  record, the Board of Directors has never failed to
8  declare the full dividend under the terms and
9  conditions of the Large Risk Contributory Dividend
10  Plan," what was the dividend that you were believing
11  that the board had always declared?
12  **A.  My interpretation of the dividend is this**
13  **adjustment that was made between what we paid in as a**
14  **deposit and what was the actual after the policy year.**
15  **It wasn't a dividend that we're getting real insurance**
16  **or having any aspect based on loss experience or some**
17  **adjustment.  It was all calculated in order to provide**
18  **the self-insurance program.**
19  Q.  It was your understanding that the dividend
20  would be used to offset the amount of premium that was
21  ultimately due Kemper, correct?
22      MR. FRENCH:  Objection.  No foundation.
23  Q.  Is that your understanding?
24  **A.  There's only a characteristic of the premium**

Page 121

1  **dealing with the contractors' program.  I looked at**
2  **all of the other costs as self-insurance fees and**
3  **assessments that's contained in the document under**
4  **what is called basic premium and that's what we're**
5  **adjusting, is really just the basic premium.**
6  Q.  Sir, did anybody from Kemper ever tell you that
7  dividends would be promised or guaranteed?
8  **A.  Not to my recollection.**
9      MR. FRENCH:  Counsel, is this a good time
10  to break for lunch?  It's 12:37.
11      MR. LENDING:  Sure.  That's fine.  We can
12  take a break now.
13      (Recessed for lunch at 12:37 p.m.)
14          - - - - -
15          AFTERNOON SESSION
16          1:20 p.m.
17  BY MR. LENDING:
18  Q.  Prior to the break I showed you language in the
19  insurance proposal to the effect that dividends cannot
20  be promised or guaranteed.
21      Do you recall that, that language that we
22  looked at in Exhibit 5?
23  **A.  Yes.**
24  Q.  Do you recall seeing language similar to this

Page 122

1  in the proposals from prior years?
2  **A. Yes.**
3  Q.  In fact, there were proposals for decades,
4  correct?
5  **A. Yes.**
6  Q.  Did you ever have any discussion with anyone at
7  Marsh as to what that language meant?
8  **A. In what year?  Are you talking today?**
9  Q.  At any time.
10 **A. The discussions I've had relate to that Kemper**
11 **always provided these adjustments and these**
12 **adjustments were really just taking it down to where**
13 **our claims experience was, so it's really an**
14 **adjustment based on our self-insurance aspects.  So we**
15 **never said that, we never discussed that this was an**
16 **adjustment that wasn't going to be made.  It was**
17 **always going to be, it was going to be made, an**
18 **adjustment like this.**
19 Q.  You said you have had discussions along the
20 lines of what the provision means, correct, with
21 Marsh?
22 **A. What it meant to DuPont.**
23 Q.  And when were these discussions?
24 **A. Throughout the thirty years, I mean with Marsh.**

Page 123

1  I don't have any real specific time as to who I
2  discussed it with, but it would have been the Marsh
3  folks that I mentioned, that you mentioned their names
4  as well as I have in the past.
5  Q.  Do you have any specific recollection of any
6  specific discussion with anybody from Marsh relating
7  to what the provision means that dividends cannot be
8  promised or guaranteed?
9  **A. No.**
10 Q.  Do you have any recollection of any discussions
11 with Marsh or anybody from Marsh as to what this
12 language means after the dispute with Kemper arose?
13 **A. Yes.**
14 Q.  And who have you discussed what this provision
15 means with Marsh after the dispute with Kemper arose?
16 **A. With Paul Martelloni.**
17 Q.  Anybody else?
18 **A. Will Eustace.**
19 Q.  Anyone else?
20 **A. Those are the two names that I recollect.**
21 Q.  Were these separate discussions with Martelloni
22 or Eustace or were they together?
23 **A. They were separate and there could have been**
24 **one combined discussion when we were doing a novation.**

Page 124

1  Q.  Let's talk about the first discussion.
2      Was that with Mr. Martelloni or
3  Mr. Eustace?
4  **A. Martelloni.**
5  Q.  When was that?
6  **A. In 2005 sometime.  Excuse me.  2004, when the**
7  **adjustment we received did not allow for the**
8  **self-insurance adjustment to reduce the premiums that**
9  **Kemper established down to our cost of the self-**
10 **insurance program.**
11 Q.  So at about the time you received notice from
12 Kemper that they would not be making, as you call it,
13 the adjustment, as Kemper calls it a dividend, that's
14 when you had this discussion with Mr. Martelloni?
15 **A. Yes.  Because the calculations were incorrect**
16 **for various reasons, payroll.  They performed other**
17 **calculation errors in their adjustments, as well as**
18 **when we got to what Kemper felt was the adjustment**
19 **that was not going to be allowed.**
20 Q.  Was this meeting with Mr. Martelloni in person
21 or by phone?
22 **A. By phone.**
23 Q.  What did Mr. Martelloni say to you and what did
24 you say to him at that time?

Page 125

1  **A. What I said to him, what I said to him is that**
2  **this adjustment is part of the program where we would**
3  **adjust to our actual expenses and the actual expenses**
4  **being the estimated deposit which contained the**
5  **administrative fee reimbursement, the cost of**
6  **insurance for the contractors' program above a million**
7  **dollars, excluding a chemical release, the assessment**
8  **cost, as well as any other related assessment cost in**
9  **the program.  That should be compared as part of the**
10 **program and then it's backed in by Kemper through this**
11 **formula to come up with the adjustment to reflect the**
12 **actual amount intended to be paid under the program.**
13 Q.  What did Mr. Martelloni explain to you during
14 that conversation?
15 **A. He wasn't familiar with the program because he**
16 **had inherited it.**
17 Q.  So he had not read the program agreement?
18 **A. Not at that point as far as I could recollect.**
19 **And so I gave him what the intent of the**
20 **program that was negotiated with Kemper by his**
21 **predecessor, Quetzy Rivera, and John Ball.**
22 Q.  So Mr. Martelloni said he would get back to you
23 on that because he wasn't familiar?  How did it end?
24 **A. Yeah.  I would say that would be the way, yeah,**

32  (Pages 122 to 125)

Page 126

1 he didn't have it in front of him.
2   Q.  So he didn't give you any specific, his views
3 on what that language meant or what Marsh's view was
4 on what that language meant at that time, did he?
5   A.  Not that I recollect.  I don't...
6   Q.  Did you ever have a conversation with
7 Mr. Martelloni where he expressed the views of Marsh
8 as to what that language meant?
9   A.  We had a dialogue later that talked about the
10 agreement and went through all of the pieces.
11   Q.  When was this dialogue?
12   A.  It was before payment was made partially to
13 Kemper for the losses for the 1999 and prior years, as
14 we still haven't received any correction or
15 explanation with respect to the 2000 and forward years
16 because that went from a pay as you go in an
17 adjustment for the losses for '99 on an incurred loss
18 basis for 1999 and prior years.
19       So all of that was discussed at that time
20 and that's how we then presented to Kemper that we
21 will reimburse you for the '99 and prior years
22 adjustments because it dealt with loss adjustments.
23 However, with respect to 2000 and forward, the
24 adjustments that were being proposed by Kemper we did

Page 127

1 not agree with.
2   Q.  Did you have further discussions, I'm trying to
3 focus on further discussions with anybody from Marsh
4 about the dividend language that we just looked at
5 that they cannot be promised or guaranteed?
6   A.  No.
7   Q.  Do you recall any discussions -- you said
8 previously you had some discussion with Mr. Eustace.
9 But your discussion with Eustace, did that involve
10 this paragraph or these paragraphs that we see on page
11 12 of the proposal?
12   A.  No.  It was just stating why we're not paying
13 the adjustment.
14   Q.  Sir, if you look at the language on page 12 of
15 the program agreement, do you find anything unclear
16 about the first phrase that says, "Recognizing that
17 dividends cannot be promised or guaranteed"?  Is that
18 clear to you?
19   A.  Yes.
20   Q.  The next sentence says, "and noting that
21 dividends are declared at the sole discretion of the
22 Company's Board of Directors."
23       Do you see that?
24   A.  Yes.

Page 128

1   Q.  Do you find that phrase to be in any way
2 unclear and ambiguous?
3   A.  With respect to the 30-year relationship that
4 DuPont had with Kemper, it just becomes something that
5 was not being taken into consideration for our
6 arrangements for the last 30 years because they
7 continued to provide those adjustments based on
8 DuPont's experience and it was really a credit to our
9 ability and also willingness to self-insure all our
10 claims and to adjust it to fit what DuPont wanted and
11 Kemper was providing that.
12   Q.  Do you find the language that dividends are
13 declared at the sole discretion of the company's board
14 of directors to be unclear or ambiguous?
15       MR. FRENCH:  Objection.  Asked and
16 answered.
17   A.  I just replied to that.
18   Q.  So that is unclear and ambiguous to you?
19   A.  Yes, based on the 30 years relationship we had
20 with Kemper because they always did it and this was
21 always in there, but it really never applied to our
22 program.
23   Q.  Because your view is that because Kemper had
24 declared a dividend for 30 years you came to expect

Page 129

1 that they would continue to do so?
2       MR. FRENCH:  Objection.  Misstates his
3 testimony.  No foundation.
4   Q.  You can answer.
5   A.  What we were doing is adjusting our claims
6 experience, and it wasn't a dividend.  It was really
7 an adjustment based on our loss experience and,
8 therefore, as our losses went up or down, it would be
9 a negative or a positive.  So every year it kept on
10 adjusting.
11       So the clause becomes unclear because of
12 that because it's not a one-year arrangement.  We're
13 talking a relationship over time that's built on
14 DuPont's experience, not Kemper's experience.
15   Q.  Did you understand that there would be a
16 process by which Kemper would submit to its board of
17 directors a proposed recommendation to its board that
18 a dividend in favor of DuPont be declared?
19   A.  What was clear to me was what I will call the
20 back room would do all of the adjusting and prepare a
21 number that would be given to the board to sign off
22 on.
23   Q.  It was your expectation that the board would
24 continue to do so because it had done so for 30 years

Page 130

1  in the past?
2  A. Yes. And that we warranted all the losses and
3  we paid for all of the costs of the program and this
4  was their method to provide DuPont a credit because
5  DuPont was self-insuring this cost anyway. It wasn't
6  an insurance premium. It was self-insurance. We were
7  reimbursing them for all of the costs.
8  Q. Sir, the next phrase says, "this quotation
9  constitutes no more than an agreement to recommend the
10  proposed formula, after the expiration of the term to
11  which the dividend declaration shall be applicable to
12  the Board of Directors for consideration and action."
13      Do you see that sentence?
14  A. Yes.
15  Q. What do you understand that to mean?
16  A. Well, to me it means that DuPont, that this
17  adjustment could be made based on whatever formulas
18  that the board or the back room would decide.
19  However, it was all within the self-insurance
20  adjustment credit that we would be receiving opposite
21  their premium estimates.
22  Q. Sir, where it talks about the proposed formula,
23  is it your understanding that the proposed formula is
24  the dividend formula that we looked at on page 9?

Page 131

1  A. It doesn't define proposed formula and dividend
2  formula being the same so, here again, it's not clear.
3  The agreement doesn't make it clear that the dividend
4  formula equals the proposed formula. So it's unclear,
5  another aspect of the program that I have been saying
6  that it's self-insurance, we're paying for all of the
7  claims, we have a warranty agreement that backs this
8  up that will continue to pay claims.
9  Q. Was it your understanding that there was a
10  formula by and between, a formula that the parties had
11  discussed and agreed would be proposed for this
12  adjustment, as you call it, or the dividend, which
13  Kemper calls it?
14  A. Well, the formula was that we would be paying
15  the costs of the program, their fees, the insurance
16  premium under the contractors' program and paying all
17  the assessments and how Kemper did their internal
18  adjustments to make that equal in the end to the
19  actual versus the deposit was up to them. And really
20  it was an adjustment based on deposit premium or
21  deposit basic to the actual amount of the adjustment.
22  Q. Is it your understanding that the deposit
23  premium and basic premium are the same?
24  A. Page 8, it talks about what the basic premium

Page 132

1  is. Those calculations all add up to what is in page
2  10 of the fixed payment and they call it the deposit
3  premium, which is fixed payments and they also call it
4  the reimbursement for paid losses and the letter of
5  credit and surety bond. So their definition of a
6  deposit premium is those three items.
7      What I am concentrating on is the amount
8  of the basic premium which is number one of what they
9  characterize as the deposit premium.
10  Q. Sir, what was your understanding of what the
11  purpose for putting in a dividend formula on page 9
12  was?
13  A. It was to provide us the credit for our
14  self-insurance program because that dividend was
15  really just a calculation of what we have paid in
16  basic on the deposit basis from what it actually came
17  out at the end of the policy period based on actual
18  payroll. So the difference became that number which
19  is really our credit for self-insurance and paying all
20  the claims, et cetera.
21  Q. That was the amount of credit that you expected
22  to be given to you, correct, in the form of the
23  adjustment that we have been talking about?
24  A. The adjustment between the basic estimate and

Page 133

1  the basic actual?
2  Q. Correct.
3  A. That is the adjustment.
4  Q. Sir, back on page 12, what is your
5  understanding as to what the phrase "dividends are
6  declared at the sole discretion of the Company's Board
7  of Directors"? What does that mean?
8  A. State your question again.
9  Q. What is your understanding of what the phrase
10  "dividends are declared at the sole discretion of the
11  Company's Board of Directors"?
12  A. That they approve those dividends for their
13  company overall and it didn't have anything really to
14  do with the DuPont program. Here again, it's because
15  we're paying for all the losses under this program and
16  except, here again, if we ever had a loss under the
17  contractors' program above a million dollar stop-loss.
18  Q. So your understanding is that this phrase
19  "dividends are declared at the sole discretion of the
20  Company's Board of Directors" had nothing to do with
21  the Kemper-DuPont insurance program?
22  A. Except from an accounting calculation
23  standpoint. They call it a dividend. I call it an
24  adjustment. And that's the way it really proceeded

Page 134

1  for the last 30 years over the period of time.  There
2  was never a question about any of this as to any
3  adjustment that was made by the board of directors.
4       We, of course, have had errors in Kemper
5  calculating those adjustments which were always made
6  as part of our verification process with Marsh as well
7  as myself.
8  Q.  Sir, did you ever have any conversations with
9  anybody at Marsh as to what that phrase means?
10 A.  Not to my recollection.
11 Q.  Did you ever have any discussions with anybody
12 from Kemper as to what that phrase means?
13 A.  There may have been over the 30 years, but I
14 can't really answer that specifically.
15 Q.  Then the next phrase says, "Accordingly, at any
16 given dividend determination, the Board of Directors
17 may or may not adopt the proposed formula or may
18 subject such formula to change as their authority
19 allows."
20      Do you see that?
21 A.  Yes.
22 Q.  What is your understanding as to what that
23 means?
24 A.  What that means is they could change the aspect

Page 135

1  of the program with respect to this dividend
2  determination.
3  Q.  The next sentence says, "All dividends are
4  recallable."
5       Do you see that?
6  A.  Yes.
7  Q.  What is your understanding of what that means?
8  A.  Since we really didn't have any, here again,
9  all these dividends, we didn't really have dividends
10 from the DuPont standpoint because we paid all the
11 claims, there was really nothing that would be
12 recallable or the formula being adjusted because our
13 intent, and that's the way the program operated, is
14 that we would pay for the cost of all of our claims
15 and just adjust the fixed cost, et cetera.
16 Q.  So what is your understanding of what that
17 phrase means, "All dividends are recallable"?
18 A.  It has no applicability to the DuPont program.
19 It only says what it says.
20 Q.  Well, I agree it says what it says.
21 A.  Yes.
22 Q.  It does say what it says.  But what is your
23 understanding of what that means?  Do you have an
24 understanding?

Page 136

1  A.  Since DuPont didn't have this type of program
2  and that the adjustments were not in DuPont's opinion
3  to be dividends, they were actually an adjustment of
4  losses and adjustments for the self-insurance aspect
5  backed by the warranty agreement, it didn't have any
6  applicability.
7  Q.  So what's your understanding of what a large
8  risk contributory dividend program is?
9  A.  I would have to refer to the documents to get
10 more specific as to that.  It doesn't -- unless it's
11 attached here.  I would have to read it again.
12 Q.  Look on page 1 of the agreement, the second
13 paragraph.  It says, "This program utilizes a one year
14 Worker's Compensation Large Risk Contributory Dividend
15 Plan Effective 1/1/02 To 1/1/03."
16      Do you see that?  Does that help you in
17 telling you what a large risk contributory dividend
18 plan is?
19 A.  It's a plan that Kemper filed with the state
20 regulators.
21 Q.  Do you know what Kemper filed with the state
22 regulators?
23 A.  This dividend plan.
24 Q.  What we're seeing in Exhibit 5, correct?

Page 137

1  A.  I don't know.  I haven't seen it.  That's why I
2  was looking for that specific because it becomes part
3  of the insurance policy and it's not here.
4  Q.  We will get to other documents and we will see
5  if we can find it.
6  A.  And it further goes on to say this is backed up
7  by a fronting indemnity agreement and it also is
8  backed up by a warranty agreement that says that we
9  would pay for the losses.
10 Q.  Sir, I want you to turn to page 6 of Exhibit 5.
11      Page 6 sets forth estimated annual
12 premiums for 2002, correct?
13 A.  Yes.
14 Q.  And the total estimated subject premium for
15 2002 was 5,601,988, correct?
16 A.  That's what it states, yes.
17 Q.  What is your understanding of what an estimated
18 annual premium is?
19 A.  For aspects of this program, it had no bearing
20 other than to distribute the assessments that was used
21 to allocate the assessment rates from various states'
22 agencies as Kemper would be taxed on these amounts at
23 some percentage and so we would use those percentages
24 to distribute all our costs back to the businesses.

Page 138

1      So that was the only reason that we used
2  this page.
3    Q.  So what was being estimated here?  It says
4  Estimated Annual Premiums.
5      Do you see that?
6    A.  Yes.
7    Q.  What is being estimated here?  Annual premiums
8  for what?
9    A.  For these coverages where they define as Line.
10   Q.  So the estimated annual premium for 2002 for
11  all the different coverages identified in the line is
12  $5.6 million, correct?
13        MR. FRENCH:  Objection.  No foundation.
14  Misstates his prior testimony.
15   A.  Your question again?
16   Q.  My question is:  The estimated annual premium
17  for 2002 for the various lines is $5.6 million,
18  correct?
19   A.  Yes.  These are amounts that they put on the
20  face of the policy.
21   Q.  What is a premium based on your 30 years of
22  working in the insurance area?  Maybe not even 30
23  years.  How many years have you been involved in
24  insurance?

Page 139

1    A.  Your question is how many years have I been
2  involved in insurance?
3    Q.  Correct.
4    A.  Since 1982, so that's 24 years.
5    Q.  In your 24 years what's a premium?
6    A.  It's a general term.  It could mean for
7  corporations like DuPont it could be a fee.
8    Q.  A fee for what?
9    A.  It could be a fee for services applied or a
10  portion of that amount could be a fee for services
11  applied and in our agreement it was that,, plus we
12  indemnified Kemper for all of the claims that would
13  come under these policies and, therefore, there was no
14  real insurance for that.
15      So it was basically a calculation to
16  perform that was required by worker's comp regulators
17  to be placed on the policies.  It was not intended to
18  be anything that we would pay to Kemper.  It never
19  has, never will be.
20   Q.  Is a premium generally referred to as an amount
21  paid to an insurance company for certain coverages?
22   A.  Not with respect to our fronting program, no.
23   Q.  Not with respect to Kemper.  Just generally?
24        MR. FRENCH:  Objection.  No foundation.

Page 140

1    Q.  What is your understanding of what a premium
2  is?
3        MR. FRENCH:  Asked and answered.
4    Q.  Go ahead.
5    A.  With respect to our program, it wasn't a
6  premium.  It could be, here again, an amount that is
7  shown to the regulators and it could be adjusted to
8  actual amounts that are intended by the agreements.
9      So that's my general understanding, even
10  with every type of program.
11   Q.  So forgetting this program with DuPont and
12  Kemper, is a premium an amount based on your
13  experience that is typically paid to an insurance
14  company for coverage?
15   A.  When there's real insurance coverage it would
16  be a premium, but this is not the case with respect to
17  this program.  This is not an insurance program.  It's
18  a self-insurance program where we're warranting all
19  the claims, all the fees, where we're paying Kemper a
20  service to provide us the avenue so that we can
21  self-insure in those states where we choose to.
22   Q.  Sir, what type of -- Kemper did provide
23  coverage to DuPont for certain risks, correct?
24   A.  With respect to what year?

Page 141

1    Q.  2002 to 2003.  What risk did Kemper insure
2  DuPont against?
3    A.  It's contained in what is called the loss limit
4  charge on page 8, $1.125 per thousand dollars of
5  contractors' payroll.  It's above.
6      Then it states later in the agreement
7  where it says, "Loss Limitation, None including," on
8  page 9, "None Including allocated claim expense,
9  except Contractors worker's comp, (excluding all
10  accidents)."  That's the insurance that we provided
11  and it states here as to what that charge is for that
12  insurance on page 8.
13   Q.  So Kemper was providing certain insurance for
14  certain claims in excess of a million dollars, not
15  excluding chemical explosion or leak, correct?
16   A.  Correct.  It's for contractors' claims only.
17   Q.  For contractors' claims.
18      Kemper also was responsible to pay the
19  claims from dollar one subject to being repaid by
20  DuPont, correct?
21   A.  Which we reimbursed them weekly.
22   Q.  But Kemper was responsible from dollar one
23  subject to being reimbursed, correct?
24   A.  Their TPA, NATLSCO, which is a third-party

Page 142

1  administrator, so we reimburse them.
2  Q. But you understood that Kemper was the one that
3  was providing the payments?
4  A. For that week for the -- based on the escrow
5  that we already provided them. So we provided them
6  that escrow. They then paid the claims. We
7  reimbursed that amount on a weekly basis.
8  Q. So back to page 6 when we're talking about
9  estimated annual premiums for 2002, is it your
10 testimony that the estimated annual premiums was not
11 an estimate of what DuPont was potentially responsible
12 for to Kemper for 2002?
13 A. Yes, it wasn't responsible for premiums. It
14 was responsible for the fees, the losses that are
15 covered under the program, as well as anything above
16 these premiums that are contained as part of the
17 warranty agreement.
18 Q. What was the purpose of putting an estimated
19 annual premium together for DuPont for this program?
20 A. This was, here again, we distributed -- because
21 certain states assess an assessment based on premiums,
22 we took these details down to the lowest level and
23 allocated those costs to our business units. It was
24 only used for our cost allocation purpose.

Page 143

1  Q. Well, there was an estimated subject premium,
2  correct, based upon an estimated payroll, correct?
3  A. Right. We provided the estimated payroll every
4  October.
5  Q. And that's how they came up with this estimated
6  subject premium, correct?
7  A. They used our estimated payroll.
8  Q. Then at the end of the year there would be a
9  subsequent audit, correct? And then an audited
10 payroll would come up, would be used to determine an
11 audited subject premium, correct?
12 A. They came up with an audited subject premium.
13 Q. And the audited subject premium, if everything
14 was the same as the estimate, the audited subject
15 premium should be the same as the estimated subject
16 premium, correct, if the payroll was exactly what was
17 estimated?
18 A. Well, there's other components of the estimated
19 payroll that comes up. If you're saying that the
20 estimated payroll plus all the statutory worker's comp
21 rates, experience mods., discounts, et cetera were the
22 same to come up with the --
23 Q. Audited subject.
24 A. -- audited subject premium? Is that what

Page 144

1  you're saying?
2  Q. Yes. If the audited subject premium, if
3  everything was the same as what was being estimated,
4  the audited subject premium would be the same as the
5  estimated subject premium, correct?
6  A. Yes.
7  Q. And from the audited subject premium if you
8  look at the dividend formula on page 9 where it says
9  dividend equals the audited subject premium, which we
10 have just talked about, minus basic premium, which we
11 have also talked about -- correct? Basic premium
12 includes those items listed on page 8 that we just
13 looked at, correct?
14 A. Yes.
15 Q. So the formula for dividend, it equals the
16 audited subject premium minus the basic premium, plus
17 converted limited losses.
18     Do you see that?
19 A. Yes.
20 Q. What is converted limited losses?
21 A. I don't know if it's defined in here.
22 Q. What's your understanding of what converted
23 limited losses are?
24 A. It's losses that are limited if there was any

Page 145

1  insurance as explained up in the contractors' worker's
2  comp section of the loss limitation, as well as any
3  other losses in the program.
4  Q. Would that include losses from the states of
5  Arizona and Wisconsin, to your knowledge?
6  A. For?
7  Q. Claims.
8  A. For DuPont's worker's comp claims?
9  Q. Correct.
10 A. If, if they were to be above the deductible.
11 Q. Are you aware that in Wisconsin and Arizona
12 state laws do not provide for a deductible or permit a
13 deductible?
14 A. Not firsthand knowledge because we typically
15 don't have claims in those states. If we did, we were
16 reimbursing Broadspire or, excuse me, NATLSCO for
17 those claims on a pay-as-you-go basis. So the cash
18 operation of this was that there was also no -- there
19 was a repayment to Kemper for all of these losses on a
20 weekly basis.
21 Q. Sir, is it your understanding that after the
22 dividend would be applied or the adjustment, as you
23 call it, would be applied, DuPont would essentially be
24 responsible for paying its basic premium, plus

37 (Pages 142 to 145)

Page 146

1  converted limited losses?
2  **A. They would be responsible for payment -- you're**
3  **talking about after the year, that when there is an**
4  **adjustment?**
5  Q. No. Just the ultimate liability. In addition,
6  separate and apart from the claims which Kemper --
7  **A. Which converted limited losses is claims.**
8  Q. So that's all claims, is your understanding
9  that's all claims being paid by DuPont to Kemper?
10  **A. No. It really didn't have losses here because**
11  **we were also reimbursing them for all losses on a**
12  **pay-as-you-go basis as contained in the other pages of**
13  **this agreement. The whole calculation is very**
14  **confusing. It really didn't have applicability to our**
15  **program so, therefore, the answer is zero with respect**
16  **to any converted limited losses if we were reimbursing**
17  **Kemper as Kemper was billing us, which we were.**
18  Q. Above and beyond the claims which DuPont has
19  paid back to Kemper, what is your understanding as to
20  what DuPont is ultimately responsible to pay to
21  Kemper? Is it essentially the basic premium?
22  **A. In the beginning you said something that led me**
23  **to believe that you're talking about losses and then**
24  **you changed your question. I'm confused.**

Page 147

1  Q. Apart from losses --
2  **A. Oh, apart from losses.**
3  Q. -- which DuPont has paid back to Kemper or is
4  required to pay back to Kemper, what is your
5  understanding as to what DuPont would owe Kemper?
6  **A. The basic premium, plus the tax multiplier.**
7  Q. That's essentially what this dividend formula
8  was intended based on your understanding to do, was to
9  make it clear that DuPont only pay basic premium, plus
10  this multiplier?
11  **A. Yes, in addition to any outside assessments**
12  **outside this formula that could occur.**
13  Q. Sir, I see your signature on this proposal on
14  page 14 is in October of '02, which is 10-31-02, which
15  is approximately ten months into this program year,
16  correct?
17  **A. Yes.**
18  Q. Was that typical, to sign the program agreement
19  ten months, more than ten months, yes, almost eleven
20  months into the program year?
21  **A. It varied. It wasn't as previously explained**
22  **in the program renewal that the agreement is signed in**
23  **December and not in October, but there was always some**
24  **items of discussions or clarity dealing with the**

Page 148

1  **overall agreement, whether it was claims handling or**
2  **exhibits or stating the correct amounts in the**
3  **contract. Also when Kemper would finally get it to me**
4  **correctly, then that's when it was finally signed.**
5  **There would be drafts back and forth, whatever the**
6  **case is, on these documents.**
7  Q. So negotiations could continue into the policy
8  year back and forth between Kemper and DuPont?
9  **A. It was generally corrections of the dollar**
10  **values on the fees and assessments as well as the**
11  **claims handling aspects of the contract.**
12  Q. Sir, attached to the proposal are a number of
13  endorsements.
14        Do you see that?
15  **A. Yes.**
16  Q. Let me just ask you just before we get into any
17  of the endorsements. What was your understanding of
18  what the purpose of the insurance proposal was that
19  was signed by and between Kemper and DuPont?
20  **A. What was the?**
21  Q. The purpose for this document.
22  **A. It's to agree to the financial matters under**
23  **the program so that we can get the service that we**
24  **required for the insurance policies, as well as the**

Page 149

1  **claims services.**
2  Q. Now, this insurance program agreement -- I
3  think you call it the primary program agreement,
4  correct? That is your term?
5  **A. Yes, that is our internal term to separate it**
6  **from the excess program.**
7  Q. So the purpose for this primary program
8  agreement which is identified in Exhibit 5 which is
9  called insurance proposal, this is not the actual
10  policy itself, correct? This is just an agreement by
11  and between Kemper and DuPont as to what the insurance
12  relationship would be, correct?
13  **A. What the relationship would be.**
14  Q. In addition to these documents, there would be
15  a specific policy, correct?
16  **A. Yes. There would be insurance policies.**
17  Q. And then let's take a look, if you would, at
18  page 1648, which is the large risk contributory
19  dividend plan endorsement. Take a look at that.
20        What's your understanding of what the
21  large risk contributory dividend plan endorsement is?
22  **A. My understanding is this is the document that**
23  **Kemper provided as part of the insurance policy in**
24  **order for the insurance regulators to accept our, to**

Page 150

1  accept Kemper's way of self-insuring our risk. And
2  then what happened with this is also there was a
3  warranty agreement that came and it provided DuPont
4  the ability to self-insure all claims that were
5  considered to be self-insured other than the
6  contractors' program claims above a million dollar
7  deductible.
8    Q.  So as part of the proposal process or the
9  program agreement process, the parties would agree to
10  a number of endorsements that would be part of the
11  actual insurance policy.  Is that correct?
12    A.  Yes.
13    Q.  And take a look, if you would, on the large
14  risk contributory dividend plan endorsement.  I assume
15  you reviewed all of these endorsements prior to
16  signing the insurance program agreement, correct?
17    A.  Yes, I would have.
18    Q.  Certainly if you had any questions about them,
19  you would have talked to Marsh or Kemper about them,
20  correct?
21    A.  Yes.
22    Q.  And from time to time you did talk to Marsh
23  about these endorsements and you also talked to Kemper
24  about these endorsements, correct?

Page 151

1    A.  Yes.
2    Q.  Take a look at page 1 of 4 on DuPont 1648.  The
3  first full paragraph says, "The Named Insured under
4  the policy shall be entitled to receive refunds of
5  unabsorbed premium (herein called dividends) as shall
6  be determined in the absolute discretion of the Board
7  of Directors under the contributory dividend plan
8  applicable to this policy."
9        Do you see that?
10    A.  Yes.
11    Q.  What was your understanding as to what that
12  sentence means?
13    A.  That as the prior 30 years of the relationship
14  with Kemper in performing the aspects of this program
15  that they would continue to provide those adjustments
16  which they title refunds, but it's not something that
17  we ever paid so, therefore, it was never a payment.
18  It was just an accounting adjustment to reflect our
19  fees, our assessments, what we put into the program as
20  cash.
21        So that's my interpretation of that.
22    Q.  What is your understanding of what it means at
23  the absolute discretion of the board of directors?
24  What is your understanding of what that means?

Page 152

1    A.  They can decide to provide us refunds.  But we
2  never received any refunds so, therefore, from the
3  standpoint of any unabsorbed premium, we were really
4  adjusting fees and assessments and things like that,
5  nothing -- it was all related based on payroll.  It
6  had nothing to do with refunds of any profits or
7  losses that Kemper was not allowing to DuPont as part
8  of this program.  It was a cost plus program.
9    Q.  But what is your understanding of what it means
10  absolute discretion?  Does that mean it's up to Kemper
11  whether to do it or not?
12    A.  If we were to receive those refunds but, here
13  again, there was nothing that we paid.  We didn't pay
14  any premiums.  We paid the cost to operate this
15  program, plus the contractors' program with respect to
16  the insurance above a stop-loss of $1 million.
17    Q.  Sir, we looked before at the estimated annual
18  premium which we saw on -- keep your hand on page
19  1648.
20    A.  Sure.
21    Q.  We looked at before at the estimated annual
22  premium and we saw an estimated annual premium of 5.6
23  million for the subject premium, correct?
24    A.  Yes.

Page 153

1    Q.  We also looked at what at the end there would
2  be an audited subject premium, correct?
3    A.  We looked at it?  We didn't look at it.  We
4  talked about it.
5    Q.  We talked about it, right.  There would be an
6  audited subject premium.
7        So in order for DuPont to pay ultimately
8  the basic expenses, DuPont would be getting an offset
9  or a refund of certain amounts so that it would then
10  ultimately be responsible and all it would pay to
11  Kemper is the basic expenses, I'm sorry, the basic
12  premium, plus the tax multiplier, correct?
13    A.  I'm either confused as to how you said this,
14  but what we paid was the basic premium.  The standard
15  premiums or the subject premium and unabsorbed premium
16  never got into play.  It was really just the cost of
17  the program as defined in the basic and that's what we
18  provided as a deposit.
19        And then the adjustment is made based on
20  those two, estimated and the actual, and the
21  adjustment is made because we're paying all the losses
22  as we go.  We're not intending on having any refunds,
23  et cetera, unless Kemper paid something incorrectly
24  and they refunded me a claim or something like that,

Page 154

1 but nothing with respect to these clauses so there's
2 no real refunds.
3    Q.  Sir, are you aware that the position that
4 Kemper has taken is that DuPont is responsible for the
5 entire audited subject premium without any dividend
6 offset?
7    A.  I recognize that today what they feel their
8 intent was back in 2002, but that's not what the
9 program was established for and that's not the way it
10 was run for the last 30 years.
11    Q.  You understand that what Kemper is trying to do
12 is to say that DuPont, you're responsible for the
13 entire audited subject premium and our board of
14 directors did not declare a dividend?  Do you
15 understand that to be Kemper's position?
16    A.  And -- yeah, I understand that's their
17 position.
18        But they're not taking all the factors
19 into play that we're also warranting all of the
20 payments of losses.  There is no premium.  That's the
21 issue at this.  There is no premium for that.  And the
22 basic costs were defined here as to what we were
23 paying for and that's how we have been paying for it
24 in the past.  We weren't paying for a guaranteed cost

Page 155

1 program of any amount, other than for this
2 contractors' program aspect for that stop-loss
3 insurance premium.
4    Q.  Sir, did you understand that absent the
5 declaration of a dividend by Kemper, DuPont would be
6 responsible for the audited subject premium?
7    A.  No.  There was never an understanding of that
8 because the way the program operated for the last 30
9 years was that that was adjusted and it was based on
10 our loss experience and based on us paying the fees
11 and assessments and that's how the program operated.
12 It wasn't really based on any activity outside of
13 DuPont experience.  So this is all based on our
14 activity.
15    Q.  Sir, you never had the understanding that
16 assuming that DuPont would not get the benefit of the
17 dividend, DuPont would be subject to or responsible
18 for the entire audited subject premium?
19    A.  State that again.  I missed the first half of
20 that.
21    Q.  Sure.  I'll try it again.
22    A.  I'm sorry.
23    Q.  On page 6 we see an estimated annual premium
24 and an estimated subject premium that we looked at,

Page 156

1 $5.6 million?
2    A.  Yes.
3    Q.  Did you ever have the understanding that DuPont
4 would be responsible for an annual audited subject
5 premium but then you expected DuPont to get the credit
6 or an offset of that audited subject premium by way of
7 a dividend?
8    A.  What DuPont expected to pay was a basic amount
9 of fees and costs and how Kemper would give us a
10 credit for the self-insurance aspect of this program
11 that was backed up by the warranty agreement, DuPont
12 continued to pay for losses under this agreement, the
13 answer is no, we did not expect to pay any of that
14 amount, other than what was applicable to the basic
15 premium.
16    Q.  Sir, you're familiar with GAAP accounting,
17 correct?
18    A.  Define GAAP accounting.
19    Q.  Generally accepted accounting principles.
20    A.  Yes.
21    Q.  And as part of what you do, you have oversight
22 over accounting functions, correct?
23    A.  Yes.
24    Q.  As it relates to insurance, correct?

Page 157

1    A.  Yes.
2    Q.  And DuPont follows GAAP, correct?
3    A.  Yes.
4    Q.  When you put on your books in 2002 what your
5 premium expense relating to the Kemper-DuPont program
6 was, how did you account for that?
7    A.  We placed in the cost of the basic premium
8 which is what was our estimate, our best estimate as
9 of October the prior year as to what our cost would be
10 throughout the year for our fixed cost and we
11 distributed that cost to the businesses.
12    Q.  So you accounted for your premium liability,
13 the total amount of your premium liability for let's
14 say 2002 before there was an audit of that 2002 year,
15 you put that as your basic premium amount?
16    A.  I don't know what the question is.
17    Q.  I want to know how much you accounted for in
18 terms of your premium liability in 2002.
19        Was it the basic premium amount or was it
20 the estimated annual premium amount?
21    A.  It was the amount that's contained on another
22 page here which is defined as --
23    Q.  Is that page 10?
24    A.  Page 10 call fixed payments and it's the total

Page 158

1 of the 858,343, plus 185,000. That was our
2 anticipated cost for Kemper to provide the service in
3 order for us to self-insure all of our programs.
4   Q. And you did not put on as a premium liability
5 the 5.6 million or the $5.7 million in estimated
6 premium that we see on page 6. Is that correct?
7   A. No.
8   Q. You're sure of that?
9   A. I am positive.
10   Q. How would I determine that? What documents
11 would I look at to see?
12   A. Our ledgers, our accounting ledgers.
13   Q. What specific document? Is there an accounting
14 ledger for insurance premiums?
15   A. The defined ledger account is called 1520.
16 It's a general ledger account that accounts for all of
17 our insurance, assessment and service fee costs, as
18 well as how we distribute our losses that came in
19 every week and created a liability on our records for
20 our liability for those claims.
21   Q. Sir, you're aware that the amount, and I can
22 show you specific documents, but the amount that we're
23 talking about for the dividend for the 2002 year is
24 approximately $4.5 million, correct?

Page 159

1   A. Correct.
2   Q. And that's what you're claiming is an
3 adjustment that you should be given credit for as the
4 dividend that Kemper is saying look, we just didn't
5 declare?
6   A. That's the amount that we consider as being our
7 credit for the self-insurance program that we agreed
8 to.
9   Q. And each year for 30 years there would be a
10 similar credit or what Kemper called a dividend,
11 correct? Is that what your testimony is?
12   A. With respect to that initial year or all the
13 other years? Because there's adjustments that are
14 made for all of the policy years.
15       Which question?
16   Q. Let's just say 2001, the 2001 policy year.
17 There would be a dividend, a dividend that Kemper
18 would have declared for the 2001 policy year, that's
19 not an issue right now that's in dispute, 2001 by and
20 between Kemper and DuPont, correct?
21   A. There is no issue because the adjustment was
22 made for that year in the year 2002-2003.
23   Q. Fine. Let's assume that the amount of that
24 adjustment or dividend was $4 million, and I may be

Page 160

1 off by a little bit, but let's just assume for
2 accounting purposes that that's what it was.
3       When that adjustment would be given to
4 DuPont, how would DuPont account for that adjustment?
5   A. That adjustment would be ignored because what
6 we did was take the basic premium that was for that
7 year, 2001, on an estimated basis, let's say that
8 million dollars that was paid, then in Kemper's
9 records there's a calculation that comes up with the
10 actual amount of that adjustment and we would then
11 bookkeep the difference, debit or credit, to our
12 ledgers.
13   Q. So internally at DuPont you wouldn't
14 necessarily look at the $4 million number that Kemper
15 was crediting DuPont because you've already accounted
16 for the basic premium that was originally estimated in
17 the 2001 program agreement, correct?
18   A. We would not take that into consideration,
19 unless they calculated it wrong and it made the
20 difference between the two basics different.
21   Q. Okay. If it was, then you would account for
22 that?
23   A. Yes. But it didn't.
24   Q. Right. Your understanding is that that

Page 161

1 accounting is consistent with generally accepted
2 accounting principles?
3   A. Yes.
4   Q. Have you ever looked into that?
5   A. Yes.
6   Q. Did you ever look into whether you should have
7 to account for the entire annual estimated premium
8 that we see, for example, on page 6 as a premium
9 liability or a liability of DuPont subject to in the
10 subsequent year reducing that liability?
11   A. According to GAAP, if you can reasonably expect
12 you're supposed to bookkeep, but we did not reasonably
13 expect that as the program was what I stated in the
14 past, the basic cost, plus the assessments and,
15 therefore, that was not a liability that DuPont would
16 ever expect because of the program being this nature,
17 as well as all of the agreements that we have had in
18 the past about us warranting all payment of all
19 claims.
20       MR. FRENCH: Counsel, are you going on to
21 another topic?
22       THE WITNESS: I need a bio break. It's up
23 to you. One more question or not?
24       (Discussion off the record.)

Page 162

1    MR. FRENCH: I just want the entire
2  transcript to be designated confidential. There's a
3  number of sensitive things in here, including this
4  accounting stuff you just covered, so just make the
5  entire transcript confidential so that it can't be
6  used outside of this litigation and subject to the
7  confidentiality agreement we have in the case.
8    MR. LENDING: Okay. Let's do this. Why
9  don't we stipulate right now that the Kemper witnesses
10  as well as the Marsh witnesses will be all treated as
11  confidential subject to the confidentiality agreement?
12  If we have a dispute as to whether certain things
13  should be removed from the confidentiality
14  designation, I think we should chat about that.
15    MR. FRENCH: I can agree with that with
16  respect to Kemper and DuPont.
17    I will have to give some thought to the
18  Marsh depositions.
19    MR. LENDING: Good. Because there is some
20  sensitive issues with Kemper that may be subject to a
21  confidentiality order.
22    MR. FRENCH: Since I haven't even heard
23  any of their testimony it's not clear to me what those
24  might be, but I can agree in principle with that now

Page 163

1  and I'll let you know if I think there's a problem
2  with that as we get into those.
3    MR. LENDING: Good.
4    (A brief recess was taken.)
5    (Slesicki Deposition Exhibit No. 8 was
6  marked for identification.)
7  BY MR. LENDING:
8   Q. Mr. Slesicki, I'm going to hand to you what I
9  marked as Exhibit 8. Let's see if you can identify
10  what Exhibit 8 is for me.
11    Just for the record, as you're thumbing
12  through that, it's Kemper document 3740 through 3751.
13    Can you identify what Exhibit 8 is?
14   A. It's titled Workers Compensation And Employers
15  Liability Insurance Policy.
16   Q. Is it your understanding this is the actual
17  policy by and between Kemper and DuPont with respect
18  to worker's compensation? I have heard the term
19  called jacket. It's the jacket? Have you heard of
20  that term, the jacket?
21   A. Yes. I have heard of the term and sometimes
22  they have or used to have it as -- they don't have it
23  on this one, jacket, but I understand that term.
24    MR. FRENCH: Counsel, can you tell me

Page 164

1  since I'm looking at this document while I sit here
2  where the date on this document is?
3    THE WITNESS: They're a basic jacket. It
4  could be any --
5    MR. FRENCH: I see a copyright on the
6  bottom that says 1991 National Council.
7    MR. LENDING: Right.
8    MR. FRENCH: Is that the best that you got
9  too?
10    MR. LENDING: That's the best date I've
11  got. I'm sure Mr. Slesicki --
12  BY MR. LENDING:
13   Q. When you would get a policy or get the policy
14  from Kemper, it would contain the declarations,
15  endorsements and then there would be this (indicating)
16  separate policy which you're calling the jacket. Is
17  that correct, generally?
18   A. Yes.
19   Q. And this jacket was part of the insurance
20  agreement or part of the insurance agreement between
21  Kemper and DuPont, correct?
22   A. I don't know if -- with respect to 2002 year?
23   Q. Yes.
24   A. I don't know because I don't remember the dates

Page 165

1  that's like here that says 1991, I don't know if that
2  was on the 2002 policy year. I wouldn't remember that
3  detail.
4   Q. Let's take a look, if we could, at another
5  document.
6    This (indicating) is part of a document
7  and I want to identify this. Your understanding is
8  this is the jacket or part of the insurance program
9  agreement, correct?
10    MR. FRENCH: You mean in general?
11   Q. In general.
12   A. In general. Not specific to -- I don't know if
13  that's the one for the year 2002, if that's the year
14  that we're talking about.
15   Q. Let's just take a look, if we could, at
16  Exhibit 9.
17    (Slesicki Deposition Exhibit No. 9 was
18  marked for identification.)
19  BY MR. LENDING:
20   Q. This is for the record a document 3710 through
21  3751, correct? Can you identify this document for the
22  record?
23   A. This is Kemper document 0003710?
24   Q. Right.

42  (Pages 162 to 165)

Page 166

1   A. Okay.
2   Q. What is this document that I just handed you
3   which is marked Deposition Exhibit 9?
4   A. This is the worker's comp and employer's
5   liability policy information page, as well as behind
6   that page is the information as to what companies,
7   including DuPont, were part of this insurance policy
8   and then also endorsements, there's endorsements to
9   this policy as part of an information page extension
10  schedule.
11  Q. The Exhibit 9 is the worker's compensation
12  policy for the states of Arizona and Louisiana,
13  correct?
14  A. Yes.
15  Q. If you would, take a look at what I have tabbed
16  at 3740.
17  A. Okay.
18  Q. 3740 is the same document which I have taken
19  out of Exhibit 9. So Exhibit 8 is part of Exhibit 9.
20      Do you see that?
21  A. Yes.
22  Q. And this would be the jacket, appears to be the
23  jacket for the 2002 insurance policy, correct?
24  A. Yes, based on the information you gave me. I'm

Page 167

1   assuming that's what I have back in my office as
2   well.
3   Q. Sure. I will represent to you that I have not
4   seen in the production from DuPont the actual policy
5   for the 2002 year with the attachments and
6   endorsements. I haven't seen it. It may be in the
7   production that's coming and we should check to make
8   sure that this is from the Kemper documents, what we
9   have.
10      Mr. Slesicki, the jacket that we talked
11  about which is 3740 through 3751, this would be part
12  of, assuming this is the entire policy for Arizona,
13  Louisiana, this is part of the policy, correct?
14  A. The jacket and the information page, et cetera,
15  yes.
16  Q. If you would, part of your job as a consultant
17  for DuPont dealing with insurance-related matters you
18  would read and review the policies, as well as the
19  program agreements, correct?
20  A. I would depend on Marsh to read the policies
21  and ensure that it agrees with DuPont's servicing
22  needs which is to provide an insurance policy that is
23  on our specifications. The specification changed with
24  respect to like the contractors' program. There would

Page 168

1   be endorsements that really would just specify that it
2   dealt with DuPont locations as opposed to a policy
3   like this where it says E. I. du Pont and its
4   subsidiaries contained in this document.
5       So Marsh was responsible to review it.
6   They would then tell me if there was anything outside
7   of the specifications, in other words, an endorsement
8   wasn't issued by Kemper, to make sure that it applied
9   to the years. So I relied on Marsh to perform that
10  service.
11  Q. But you from time to time would have occasion
12  to look at or review the jacket, correct?
13  A. I reviewed it possibly once or twice in my
14  career.
15  Q. Reading insurance documents is not a lot of
16  fun, is it?
17  A. I don't know if it's fun, but it became
18  standard and, therefore, I didn't review it every year
19  to see if there was a change. I asked them when there
20  were any changes in any of the documents I would read
21  that first one or ask Marsh to point out where the
22  changes were made from one year to the next because
23  these documents tend for worker's comp purposes to not
24  change.

Page 169

1   Q. Back to Exhibit 5, if you would. You've got
2   that in front of you, which is the 2002 program
3   agreement.
4       Take a look on page 5 where it talks about
5   at the top of page 5, which is the 2002 program
6   agreement, it says Workers' Compensation and
7   Employers' Liability and it says Policy Form, Standard
8   Bureau Forms.
9       Do you see that?
10  A. Yes.
11  Q. It's your understanding that was referring to
12  the jacket?
13  A. Yes.
14  Q. And the standard bureau forms, again that's
15  NCCI, which is an organization that has form policy
16  language, correct?
17  A. Yes.
18  Q. And in the jacket we see that there's the NCCI
19  designation on a number of the pages and then on the
20  seventh page there's page 7 of 7, if you could take a
21  look at that. That's not part of the NCCI language,
22  but there's specific language on this page.
23      Do you see this? This is part of the
24  policy. Do you see that?

Page 170

1  **A.  Yes.**
2  Q.  And there's references here to various
3  provisions, correct?
4  **A.  Yes.**
5  Q.  Sir, are you aware that a number of states
6  expressly prohibit an insurance company from making a
7  promise to pay a dividend under a dividend plan type
8  program?
9          You don't need to look at this right now.
10 Just are you aware of that?
11 **A.  No.  No.**
12 Q.  You're not aware of states making or having
13 express prohibitions from making a guarantee that a
14 dividend would be paid?
15 **A.  I'm not aware.**
16 Q.  Are you aware that certain states, in fact,
17 necessitate and mandate that if you have a dividend
18 program, you need to put express language that
19 dividends are not promised or guaranteed?
20         Are you aware of that?
21 **A.  I was recently made aware of that after the**
22 **discussions with Kemper and not allowing our**
23 **adjustments which they defined as dividends with the**
24 **State of Illinois.**

Page 171

1  Q.  Well, let's take a look at what it says on page
2  7 of 7 of this jacket with respect to California.
3          You see it says, "Under California Law it
4  is unlawful for an insurer to promise the future
5  payment of dividends under an unexpired workers
6  compensation policy or to misrepresent the conditions
7  for dividend payment."
8          Then it goes on to say, "Dividends are
9  payable only pursuant to conditions determined by the
10 Board of Directors or other governing board of the
11 Company following policy expiration."
12         Do you see that?
13 **A.  Yes.**
14 Q.  Did you ever have any discussions with Marsh or
15 Kemper about that provision?
16 **A.  No.**
17 Q.  Do you understand what that provision means?
18         MR. FRENCH:  I object to the extent it
19 calls for legal interpretation.
20 Q.  I'm not asking for your legal interpretation.
21         Do you have an understanding of what that
22 means?
23 **A.  What it means is California does not allow an**
24 **insurance company to promise any dividends.**

Page 172

1  Q.  Then under Oregon law it says, "It is unlawful
2  in Oregon for an insurer to promise to pay
3  policyholder dividends for any unexpired portion of
4  the policy term or to misrepresent the conditions for
5  dividend payment.  Dividends will be due and payable
6  only for a policy period that has expired or, if a
7  policy is issued for a period in excess of one year
8  and a premium is payable at each anniversary, for an
9  anniversary period that has expired, and only if
10 declared by and under the conditions prescribed by the
11 Board of Directors of the insurer."
12         Do you see that?
13 **A.  Yes, I see that.**
14 Q.  Do you have an understanding of what that
15 provision means?
16 **A.  Oregon does not allow an insurer to promise an**
17 **insured any dividends.**
18 Q.  Was it your understanding did Kemper provide
19 any type of insurance-related services or coverages in
20 the states of California, Oregon or South Carolina?
21 **A.  They provided insurance-related services for**
22 **those states.**
23 Q.  Then let's look at South Carolina.  It says,
24 "The insured shall participate in the earnings of the

Page 173

1  company only in accordance with law and a plan and any
2  amendments thereto applicable to this policy which
3  have been filed with the Chief Insurance Commissioner
4  of South Carolina, provided the insured has complied
5  with all terms of this policy with respect to the
6  payment of premium."
7          And it goes on to say, "Neither dividends
8  nor any factor in their calculation may be guaranteed.
9  By purchasing this policy, the insured obtains no
10 contractual right to a dividend.  Dividends are
11 declared in the sole discretion of the governing body
12 of the insurer.  Any representations to the contrary
13 are false."
14         Do you see that?
15 **A.  Yes.**
16 Q.  What's your understanding of what that means?
17 **A.  The insured can participate in earnings of the**
18 **company provided the insured has complied with all of**
19 **the terms of the policy with respect to any payment of**
20 **the premium.**
21 Q.  Do you understand what it means with respect to
22 dividends?
23 **A.  That it's at the discretion of the governing**
24 **body of the insurer.**

44  (Pages 170 to 173)