

**A**

Westlaw.

Not Reported in A.2d                                                          Page 1

Not Reported in A.2d, 2004 WL 2158051 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

▷
Baxter Intern., Inc. v. Rhone-Poulenc Rorer, Inc.Del.Ch.,2004.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
BAXTER INTERNATIONAL, INC., et al.
v.
RHÔNE-POULENC RORER, INC., et al.
**No. Civ.A. 19328.**

Submitted Sept. 2, 2004.
Decided Sept. 17, 2004.
LAMB, Vice Chancellor.

Dear Counsel:

*1 Baxter International Inc. and Baxter Healthcare Corporation ("Baxter") have moved for summary judgment. In addition, Baxter has moved to compel the production of certain purportedly privileged documents, and to strike an affidavit submitted in opposition to their summary judgment motion.[FN1] Rhône-Poulenc Rorer Inc. ("RPR") and Aventis Behring L.L.C. (collectively "Aventis") have cross-moved for summary judgment.[FN2] For the reasons set forth herein, the court denies both motions for summary judgment, grants the motion to strike, and directs Aventis to submit certain documents for an *in camera* inspection in connection with the motion to compel.

> FN1. Baxter filed its complaint on December 27, 2001. On May 12, 2003, Baxter moved for partial summary judgment. That motion was denied. On May 7, 2004, Baxter filed its motion to compel. On June 18, 2004, Baxter filed a renewed motion for summary judgment. On August 27, 2004, Baxter filed its motion to strike.

> FN2. Aventis filed its motion for summary judgment on June 18, 2004.

*The Contractual Dispute*

This action arises from a dispute over royalty obligations under a 1993 Settlement Agreement ending patent litigation between Baxter and RPR. The Settlement Agreement provides that Baxter was required to make royalty payments to RPR and later to Aventis (RPR's assignee) based on Baxter's sale of two products developed for patients suffering from hemophilia.

Under Sections 9.1 [FN3] and 9.2 [FN4] of the Settlement Agreement, Baxter was to make royalty payments to Aventis based on foreign and United States sales of product until Baxter paid the then net present value of $67 million in royalties. After Baxter paid the $67 million in royalties, it was no longer required to pay royalties on product sold in the United States. Furthermore, after reaching the $67 million threshold, Baxter was only required to pay royalties on sales outside the United States (" foreign sales"), if the product was sold or " manufactured" in a country with a granted and unexpired patent.

> FN3. Section 9.1 of the Settlement Agreement states:
> When cumulative royalties and processing fees (including minimum royalties) paid under this agreement reach a net present value of 67 million dollars (measured at a discount rate of 10% per annum from the Effective Date of this Agreement), no further royalty or processing fee shall be owed or payable by BHC [Baxter] for Factor VIII Product that is sold in the United States or in any country where there is no granted unexpired Z-F patent.

> FN4. Section 9.2 of the Settlement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2004 WL 2158051 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Agreement states:
BHC [Baxter] will continue to pay a royalty or processing fee pursuant to 7.1 beyond the amount set forth in 9.1 for Factor VIII Products that are sold for use in a country other than the United States, provided that
(a) there is a granted unexpired Z-F Patent in the country where the Factor VIII Product is sold, or, *if the Factor VIII Product is manufactured outside the United States, there is a granted unexpired Z-F Patent in the country where Factor VIII Product is manufactured or sold,* and
(b) the applicable Z-F Patent has a product claim of the same or broader scope as the European Product Claims or otherwise covers said Factor VIII Product.
(emphasis added).

In 1997, Baxter reached the $67 million threshold and discontinued paying royalties on product sold in the United States. However, from late 1997 until 2000, Baxter continued to pay royalties based on sales in certain foreign countries that did not have granted and unexpired patents. The product sold in those foreign countries was produced in the United States, and then shipped to foreign countries (such as Belgium) where it was packaged and labeled, and where there existed a granted, unexpired patent for the product.

In 2001, Baxter, believing that it had mistakenly overpaid, requested the return of the royalties paid from late 1997 to 2000 on sales of such products in countries that did not have granted, unexpired patents. Discussions between Aventis and Baxter ensued, and, in early October 2001, the parties agreed to an audit to confirm the precise amounts of the disputed payments during this period. PricewaterhouseCoopers L.L.C. ("PwC") was retained to conduct the audit. Following the audit, Aventis informed Baxter that Aventis was entitled to the royalty payments because it contended the phrase "manufactured outside the United States" in Section 9.2(a) of the Settlement Agreement covered packaging and labeling in foreign countries. After the parties failed to come to an accord, Baxter filed this suit in December 2001.[FN5]

FN5. Baxter has "reimbursed" itself the alleged overpayments by offsetting continuing royalty obligations indisputably owed to Aventis, plus interest, and now seeks a declaratory judgment that, by doing so, Baxter is not in breach of the Settlement Agreement.

**\*2** The cross motions for summary judgment focus on the construction of Section 9.2 of the Settlement Agreement and, in particular, on the question whether the packaging and labeling of product in foreign countries with granted, unexpired patents constitutes "manufacturing" in that country under the Settlement Agreement.

The court's review of the factual record submitted in connection with the cross motions for summary judgment reveals the existence of material issues of fact relating to the history of the negotiation and performance of the Settlement Agreement. The court offered to resolve these questions of fact on a paper record, but the parties have not agreed to proceed in this manner, as is their right. Thus, the court concludes that it is necessary to deny both motions for summary judgment and proceed to trial on the existing schedule.

*The Discovery Dispute*

Baxter has moved to compel the production of 13 emails that are listed in the privilege log supplied by Aventis. Baxter contends that Aventis has wrongfully withheld these emails based on the attorney-client and work-product privileges.

The disputed emails are listed in Aventis's privilege log as entries 60-72. They reflect communications among members of Aventis's management and its in-house counsel. Ten of these emails were purely internal emails, circulated only among the management at Aventis and its in-house lawyers (the "internal emails"); while three of the emails (60, 63 and 68) were also sent to PwC auditors Blaise Coleman and Jeffery Williams (the "PwC emails").

According to Baxter, these emails should be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 3

Not Reported in A.2d, 2004 WL 2158051 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

produced because they relate to whether Aventis " always believed" that the term "manufacturing" included packaging and labeling or, instead, developed this interpretation as a litigation strategy. Furthermore, Baxter claims that the emails may give insight into who first developed the interpretation supported by Aventis, and whether this interpretation was developed by PwC after conducting their audit.

### Are The Emails Privileged?

Under the attorney-client privilege, a party may refuse to disclose confidential communications made for the purpose of facilitating the rendition of legal services to the party.[FN6] Under the work product rule, documents and tangible things prepared in anticipation of litigation need not be produced unless the party requesting production shows a substantial need for the materials and the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.[FN7]

> FN6. Del. R. Evid. 502(b); *see also Texaco, Inc. v. Phoenix Steel Corp.,* 264 A.2d 523 (Del.Ch.1970) (noting that the attorney-client privilege has long existed in Delaware as part of the common law).

> FN7. Ch. Ct. R. 26(b)(3), *see also Riggs Nat'l Bank v. Zimmer,* 355 A.2d 709, 715 (Del.Ch.1976) (recognizing and applying the work-product rule).

The emails in dispute were circulated on October 16 and October 17, 2001, slightly more than two months before Baxter brought this suit. The emails contained communications among members of Aventis's management and in-house counsel relating to the royalty dispute. Furthermore, they came on the heels of the disputed PwC audit and were sent in the context of the recent royalty reimbursement imbroglio. It is clear that they were prepared in anticipation of litigation and were meant to advise the management of Aventis about the dispute. As such, these materials are privileged.

### Do The Communications Fall Within The "Facts" Exception?

*3 In *Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati Inc.,*[FN8] then Vice-Chancellor Chandler held that the attorney-client privilege can be relied upon "to prevent discovery of any communications with [ ] legal counsel," but that it cannot be relied upon to block inquiry into facts.[FN9] The rationale behind the facts exception is to preclude a party from hiding discoverable information behind the wall of the attorney-client privilege by communicating it to an attorney.[FN10]

> FN8. 1995 WL 347799 at *2 (Del.Ch. May 17, 1995).

> FN9. *See also Upjohn Co. v. United States,* 449 U.S. 383, 395, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) ("The protection of the [attorney-client] privilege extends only to communications and not to facts").

> FN10. *Id.*

Baxter argues that it seeks only the "facts" contained in the emails, and not the " communications" contained therein. Specifically, Baxter wants to know *"who* within Aventis (or PwC) first articulated the definition of ' manufactured' as including packaging and labeling and *when* that first occurred." [FN11]

> FN11. Pl. Op. Br. at 12 (emphasis in original).

Baxter had ample opportunity to discover these facts through other, non-privileged means such as depositions and interrogatories. Of the ten individuals who were party to the emails, Baxter chose to depose only two: Jennifer Evans Stacey, Aventis's then general counsel, and Leonard Puzzuoli, Aventis's Manager of Finance for the Hemophilia API Business Unit. It is therefore inaccurate for Baxter to argue, as it does, that the " only" source of these facts is the emails. Since the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2004 WL 2158051 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

facts could have been discovered in another fashion, the underlying rationale of the facts exception would not be served by compelling production of the communications.

### Do The Emails Fall Within The "At Issue" Exception?

The "at issue" exception to the attorney-client privilege applies when the party holding the privilege waives the privilege in one of two basic ways: (1) the party injects the communications into the litigation, or (2) the party injects an issue into the litigation, the truthful resolution of which requires an examination of the confidential communications.[FN12] The "at issue" exception is based on the principles of waiver and of fairness, so that the party holding the privilege cannot use it as both a sword and a shield. [FN13] That exception has also been described as a "waiver ... where the issue was lack of good faith." [FN14]

> FN12. *Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co.,* 623 A.2d 1118, 1122 (Del.Super.1992).
>
> FN13. *Id.*
>
> FN14. *Ramada Inns v. Drinkhall,* 490 A.2d 593, 597 (Del.Super.1985).

Aventis has not injected the communications into the litigation. The existence of the emails was raised by Baxter, not Aventis. Aventis is not inequitably using the attorney-client privilege as a sword. Additionally, while the subject matter of the emails may be at issue (as is often the case with privileged material), the communications themselves are not. Finally, there is no alleged bad faith on the part of Aventis. Therefore, the balance of equities does not require Aventis to disclose the communications under the at issue exception.

### Has Aventis Waived Its Privilege Protection?

Baxter claims that Aventis waived its privilege

protection with respect to the PwC emails by sending them to Messrs. Coleman and Williams, thereby destroying the confidentiality of the communications.

**\*4** In order for a communication to be privileged, it must be confidential. [FN15] A communication made in furtherance of the rendition of professional legal services to the client is a confidential communication unless the client *intends* the information to be disclosed to non-confidential persons.[FN16] When the client makes a communication with the intention or expectation that it will be revealed to another person who is not necessary for the rendition of the legal services or communication, this element of confidentiality is lacking.[FN17]

> FN15. *Hoechst,* 623 A.2d at 1122.
>
> FN16. *Ramada Inns v. Dow Jones & Co.,* 523 A.2d 968, 972 (Del.Super.1986).
>
> FN17. *Hoechst,* 623 A.2d at 1122.

As discussed, *supra,* the emails were made in furtherance of the rendition of professional legal services. Therefore, unless Aventis *intended* the information to be disclosed to non-confidential persons, the emails were confidential.

Furthermore, as a general matter, when information is communicated to an attorney in the presence of a third party, the communication is not privileged. [FN18] However, when disclosure to a third party is necessary for the client to obtain informed legal advice, courts have recognized exceptions to the rule that disclosure waives the attorney-client privilege. [FN19]

> FN18. *Constar Int'l, Inc. v. Cont'l Pet Techs., Inc.,* 2003 WL 21132, at \*1 (D.Del. Nov. 19, 2003); *see also Westinghouse Elec. Corp. v. Republic of Phil.,* 951 F.2d 1414, 1424 (3d Cir., 1991) ("[V]oluntary disclosure to a third party of purportedly privileged communications

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                           Page 5

Not Reported in A.2d, 2004 WL 2158051 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

has long been considered inconsistent with an assertion of the privilege").

FN19. *Id.*

There is a two-part inquiry as to whether Aventis has waived the attorney-client privilege with respect to the PwC emails. First, did Aventis intend that the emails remain confidential? If so, were the communications to PwC "necessary" to provide legal service to Aventis? Aventis has waived its privilege and must produce the PwC emails if either of these questions is answered in the negative.

In order for the court to answer either of these questions, it is necessary to actually see the PwC emails. Therefore, Aventis should immediately submit the PwC emails to court for *in camera* review.

*Aventis's Honaker Defense*

Trial is scheduled to begin on October 12, 2004 and, pursuant to the Fourth Amended Scheduling Order, discovery closed on May 7, 2004. On June 18, 2004, more than a month after the close of discovery, in its opening brief in support of its motion for summary judgment, Aventis first raised an equitable estoppel defense based on the decision of the Delaware Supreme Court in *Home Ins. Co. v. Honaker.*[FN20] The decision recognized in that case is based on the equitable principle of detrimental reliance. In order to prove this defense, a defendant must show, at the very least, that it changed position in reliance on the plaintiff's actions.[FN21] In support of that defense, Aventis submitted the affidavit of James E. Fickenscher, a former Aventis employee, that lays out the extensive factual basis for Aventis's claim of detrimental reliance. Baxter moves to strike the Fickenscher Affidavit and to bar the assertion of the defense on grounds that it was not given fair notice of this purported defense or an opportunity to take discovery relating to it.

FN20. 480 A.2d 652 (Del.1984).

FN21. *Honaker,* 480 A.2d at 654.

Aventis's Fourth Affirmative Defense contains the rote and entirely uninformative assertion that: " [Baxter's] claims are barred in whole or in part by the doctrines of estoppel, waiver, and laches." During discovery, Baxter made discovery requests for the factual basis for Aventis's Fourth Affirmative Defense. In response, Aventis stated: " [t]he basis for the defense is that the plaintiffs have always had full and complete access to the information that they needed in order to determine the proper amount of each quarterly royalty payment that Baxter Healthcare has made under the Settlement Agreement." [FN22] This was the full extent of Aventis's response to Baxter's request for discovery pursuant to this defense, before the close of discovery. As a consequence, the discovery record is a total void in relation to the issue raised in the Fickenscher Affidavit. Indeed, that affidavit, which contains numerous references to detailed financial information, is itself devoid of reference to a single interrogatory answer, response to request for admission or deposition transcript.

FN22. Resp. to Baxter's Interrog. No. 13, served on Aug. 16, 2002.

**\*5** At argument, Aventis counsel admitted that he first considered raising a defense based on *Honaker* in October of 2003, and that he worked with his client to determine if there was a factual basis for raising this affirmative defense.[FN23] Apparently, those efforts were delayed by the press of other business and, although counsel stated that the factual inquiry was complete in April 2004, Aventis never supplemented its discovery responses to reflect the information learned.

FN23. Tr. Sept. 2, 2004, at 47-48.

In view of this history, the court concludes that Baxter's objection to the Fickenscher Affidavit and the assertion of the *Honaker* defense are well taken. It is simply not reasonable or appropriate to expect Baxter to undertake an extensive additional discovery program to explore the matters set forth in the Fickenscher Affidavit at this stage of this 2 1/2 year old case. Aventis had more than ample

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2004 WL 2158051 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

opportunity to develop its theories during discovery. It failed to do so, instead interjecting a new, intensely factual theory of defense after the close of discovery, in connection with the summary judgment proceedings, and only shortly before the scheduled trial.

For these reasons, the court will grant the motion to strike and will preclude Aventis from relying on *Honaker* or any of the factual matters raised in the Fickenscher Affidavit.[FN24]

> FN24. The decision to preclude this defense is unlikely to work any hardship or inequity on Aventis since the *Honaker* case is very likely inapposite. In *Honaker,* an insurance company for another party paid a victim of a car accident (Honaker) $24,907, even though the coverage limit of the policy was $10,000. Honaker spent the money on his living and medical expense, and on the living and medical expenses of his child. 480 A.2d at 653. The insurance company sued for restitution and the Delaware Supreme Court held that the unusual equities of the situation, including Honaker's innocent belief that he was entitled to the money and his substantial change of position, supported a defense to the claim. *Id.* at 654-55.
> This court must, and will, consider all relevant equities in resolving a claim for restitution. Nevertheless, it is hard to imagine a finding that considerations of equity prevent the repayment of $5-10 million dollars by one multi-billion dollar company to another. This is particularly true when, as is true in this case, there is no suggestion that the party seeking restitution has acted inequitably in making the overpayment at issue.

### *Conclusion*

For all the reasons set forth in this letter opinion, the court denies both motions for summary judgment. The motion to strike is granted and Aventis is precluded from relying on *Honaker* or

any of the factual matters raised in the Fickenscher Affidavit. In connection with the motion to compel, the court directs Aventis to submit the PwC emails for *in camera* review. IT IS SO ORDERED.

Del.Ch.,2004.
Baxter Intern., Inc. v. Rhone-Poulenc Rorer, Inc.
Not Reported in A.2d, 2004 WL 2158051 (Del.Ch.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# B

Casualty Practice
*Articles & Announcements*

MARSH

## Kemper - Dividend Rejection and Conversation with Michael Coutu (04/04)
### Kemper

Michael Coutu, Acting President and CEO of Kemper, has issued the attached letter that briefly summarizes Kemper's current status, actions, and the statement that the Kemper Board of Directors have rejected all dividends. This letter also states Kemper's expectation that dividends will not be declared in the foreseeable future. Tim Brady (US Casualty Practice), Joe Peiser (MP North America), Jon Limmer (Market Information Group), and Will Eustace (Marsh Risk Consulting) conducted a conference call with Michael Coutu, Marla Donovan and their colleagues earlier today to discuss the situation in greater detail. A summary of that conversation and planned activities follows:

1. Kemper has filed their Runoff Plan with Illinois and seven other key states. They expect approval within 3-4 weeks. The contents of this document are not expected to be made public. The objective is to conduct an orderly runoff, rather than liquidation.
2. Kemper began 2003 with 7,000 employees. They currently have about 650 employees and expect to shrink further. This dramatic reduction in staff is obviously having a severe impact on the servicing of accounts. They have also suspended all severance packages and stay in place bonuses. Kemper is planning a new compensation plan to retain and attract staff with the appropriate skills to service customers in this runoff situation.
3. The rejection of dividends affects Kemper's ability to offset some or all of, additional premiums now due under loss sensitive programs. Deferred balances, historically offset by the initial dividend will become due and payable. Policyholders should expect to receive bills in the very near future for any additional premiums due as a result of this decision.
4. Kemper is continuing to review and adjust collateral. Unfortunately, this is moving at a very slow pace due to lack of personnel and open items on accounts.
5. Kemper has developed several initiatives to increase their liquidity. These include a "Policy Buyback" program, as well as a willingness to Novate policies. Will and Jon are working with Kemper to develop criteria for the most likely candidates for the Novation and Policy Buyback initiatives. In parallel, Kemper is in the process of identifying likely candidates and we expect to receive this information in the near future. Offices will be contacted on an individual basis as we are made aware of candidates.
6. Kemper is closing their remaining satellite offices and will be running everything out of the Long Grove, IL office.
7. Jon Limmer is preparing an updated review of Kemper's financial situation which we expect to distribute on Thursday.
8. Will Eustace (Norwalk) is Marsh's designated liaison with Kemper to help facilitate the resolution of individual account issues.
9. ACE has shown interest in Novating policies. The Casualty Practice has also contacted other carriers to try and develop additional alternatives. Additional details will be shared as they become available.

Michael Coutu's letter follows:

kemper.pdf

Colleagues are strongly encouraged to contact their clients to make them aware of this news and the ongoing changes at Kemper. As we have previously learned from the collapse of Kemper and other carriers, it is critically important to keep our clients fully informed. We expect to be able to provide additional information over the next several days. There will undoubtedly be an advantage to quick action once we better understand Kemper's ability and true interest in Novation and Policy Buyback and we should be prepared to act accordingly.

DPT03025



Entered 04/14/2004 09:17 AM by Peggy J Sherertz/NYC-NY/US/Marsh/MMC.
Last modified 06/30/2004 12:50 AM by Paul Carleton/NYC-NY/US/Marsh/MMC.
*Copyright © 2004 Marsh USA Inc. All rights reserved.*

DPT03026

LMC Bd. of Dirs. Mtg.
February 26, 2004
Page 8

REDACTED

## DIVIDENDS

Mr. Coutu then discussed the status of the Company's practices and obligations relating to policyholder dividends, noting that the Company ceased paying dividends during 2003 after the Company went into run-off and after the Securitas middle-market deal was terminated. He further noted ongoing efforts to review the precise nature and scope of all dividend payments during 2003.

The board discussed the issue and concluded that the declaration of dividends would be neither advisable nor appropriate given the Company's financial condition and the presence of certain legal and regulatory restrictions relating to both the declaration and payment of dividends. Therefore, on motion made and seconded, it was

VOTED, That all initial dividends recommended by the Company for the board's consideration since the inception of the run-off, and not previously

KEMPER37871
CONFIDENTIAL

LMC Bd. of Dirs. Mtg.
February 26, 2004
Page 9

declared, are hereby specifically disapproved, and that all initial dividends to be
recommended in the future for consideration shall likewise be deemed
disapproved absent a change in circumstances warranting the board's further
action.

REDACTED

KEMPER37872
CONFIDENTIAL



Michael A. Coutu
Acting President
and Chief Executive Officer

Dear Policyholder:

Though we know you are aware of the significant challenges facing the Kemper Insurance Companies, we write today to inform you of a specific action that affects your account.

Our financial statements reflect a combined statutory surplus of $212 million at December 31, 2003 after giving effect to approximately $1 billion of surplus-enhancing accounting relief approved by the Illinois Department of Insurance.

In recognition of our financial condition and applicable law, our Board of Directors has rejected all dividends on expired policies and has stated its expectation that it will not declare any dividends in the foreseeable future. In reaching these decisions, the Board exercised the discretion generally afforded corporate boards and specifically referred to in your policy and proposal documents.

These actions have a direct impact on your account. Specifically, you will note that the enclosed invoice references a dividend of "0," which means that a payment due Kemper may be larger than anticipated or that a return or credit may be less than expected, despite underlying losses. Moreover, to the extent Kemper had been carrying a deferred premium balance that might otherwise have been offset in whole or in part by an initial dividend, that balance is now due and payable along with your other obligations.

We appreciate that this is not welcome news, but we suspect it does not come as a surprise, and we trust you understand the reasons for these decisions. By way of our Board's rejection of dividends, Kemper preserves assets necessary to avoid delays in paying valid claims and to satisfy other obligations generally.

Notwithstanding the above, we do have positive news to report.

Kemper has fashioned a commercial run-off plan that, if approved by the Illinois Department of Insurance, will allow Kemper to continue to discharge its legal and contractual obligations to policyholders and claimants, in a timely manner, during the pendency of the commercial run-off. We believe quite strongly, as do many industry professionals, that a solvent commercial run-off presents far better options for Kemper's constituencies than a judicial proceeding, especially for large accounts that may be ineligible for state guaranty fund protection. We are optimistic about approval of the run-off plan, and we will keep you posted as to developments in that respect.

Very truly yours,



Michael A. Coutu
Acting President and Chief Executive Officer

One Kemper Drive
Long Grove, Illinois 60049
www.kemperinsurance.com

DPT03354



April 15, 2005

To our producers and policyholders:

Early in 2003, Kemper's board of directors ceased declaring initial dividends on expired policies. This decision, which for many policyholders may have caused an increase in their expected net cost of insurance, was driven by Illinois law and was guided by the board's obligation to marshal and preserve Kemper's limited assets for the payment of policyholder claims.

Those same principles have caused us to take a renewed look at our process of re-determining dividends on older policies for which a substantial initial dividend was, in fact, declared and paid prior to 2003. In most cases, these re-determinations provide for a "recall" or "recapture" by Kemper of some portion of the previously-declared initial dividend, but in certain limited instances, the re-determinations may generate additional dividend credits to policyholders.

In the case of insurers in Kemper's financial circumstances, the Illinois Insurance Code prohibits not only the board's declaration, but also the company's *payment*, of dividends. Because these additional dividend credits – which typically function as a partial set-off against a larger amount of policyholder obligations due Kemper – are the economic equivalents of cash dividend payments, we can no longer permit them.

As such, in those unusual cases in which a dividend credit would ordinarily have been allowed for a certain policy year at an annual re-determination, our reconciliation invoices will now display a "0" for that policy year instead of a credit balance. In those instances, the net balance currently due Kemper will be higher than may have been expected. However, as losses develop at future re-determinations, the net financial impact of these higher initial billings will be reduced or eliminated.

Please note that this change in procedure is dictated solely by our financial situation and by applicable law.

DPT03355

C

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF DELAWARE

3

4      E.I. du PONT de NEMOURS

5      and COMPANY,

6                   Plaintiff,

7

8         -vs-                      No. C.A. No. 05-699(KAJ)

9

10     LUMBERMENS MUTUAL

11     CASUALTY COMPANY,

12                   Defendant.

13     _____

14

15              The deposition of JOHN McGREGOR, called

16     by the Plaintiff for examination, pursuant to

17     notice and pursuant to the Federal Rules of Civil

18     Procedure for the United States District Courts

19     pertaining to the taking of depositions, taken

20     before Cynthia J. Conforti, Certified Shorthand

21     Reporter, at One Kemper Place, Long Grove,

22     Illinois, commencing at the hour of 9:30 a.m. on

23     the 29th day of September, A.D., 2006.

24

25

John McGregor

September 29, 2006

Long Grove, IL

Page 42

1    A.  It depends on the type and nature and the
2  amount in dispute.
3    Q.  What about for the dispute with DuPont?
4    A.  Again, I don't think we would need express
5  approval by the Illinois Department of Insurance,
6  but, again, we have to be mindful of the fact that
7  in trying to resolve any issue we're not declaring
8  or paying an illegal dividend because there's a
9  statutory prohibition to that effect.
10      THE WITNESS:  Take a couple minutes.
11      (Whereupon a discussion was had
12        off the record.)
13      (Whereupon Exhibit 4 was
14        marked for identification.)
15  BY MR. FRENCH:
16    Q.  Sir, you've just been handed Exhibit 4 to
17  your deposition.  Is this the statute that you're
18  referring to when you say the dividend is not
19  allowed?
20    A.  Yes, it is.
21    Q.  I'll come over here since I seem to have
22  lost my copy.
23      MR. LENDING:  Here.
24      MR. FRENCH:  It's all right?  You don't
25  need it?

Page 43

1      MR. LENDING:  I'll look over John's
2  shoulder.
3  BY MR. FRENCH:
4    Q.  Sir, what particular language in the
5  statute are you referring to as the basis for your
6  testimony?
7    A.  Subparagraph A of paragraph three of
8  section 5/54 reading:
9      No dividend shall be declared or paid at
10  any time, except out of earned, as distinguished
11  from contributed, surplus.  And it goes on from
12  there.
13    Q.  Okay.  What specifically about that in your
14  view prohibits the declaration of a dividend?
15    A.  I just read it.  The statement that no
16  dividend shall be declared or paid except out of
17  earned surplus.
18    Q.  So you're saying there's no earned surplus
19  at Kemper right now?
20    A.  That's correct.
21    Q.  And what does "earned surplus" mean then?
22    A.  "Earned surplus" is the surplus of the
23  company excluding things like contributed surplus,
24  surplus notes outside investment.  It's the
25  company's own.  It's a concept equivalent to

Page 44

1  retained earnings, and Kemper has had negative
2  earned surplus, Lumbermens has, since December
3  31st, '02 at the latest.
4    Q.  Is "earned surplus" defined anywhere in the
5  statute to your knowledge?
6    A.  I don't know that it is.
7    Q.  Now, Kemper hasn't fallen below the
8  statutory minimums for surplus in Illinois,
9  correct?
10    A.  Well, it depends on what you mean by that.
11      Are you talking about the minimum statutory
12  surplus provisions for purposes of subparagraph
13  3(a) here or for other purposes?
14    Q.  Right.  For 3(a).
15    A.  I don't believe we have, no.
16    Q.  So if "earned surplus" isn't defined
17  anywhere, and you're still above the statutory
18  minimums, I'm a little confused as to why you
19  don't believe you can declare any dividends.
20    A.  Because we don't have earned surplus, and
21  we have a statutory prohibition saying we can't
22  declare or pay dividends except out of earned
23  surplus.
24      There are other reasons in here why a
25  company can't pay dividends, and whether those are

Page 45

1  applicable or not does not change the fact that we
2  have no earned surplus.  Therefore, we don't get
3  past the first sentence of paragraph 3(a).
4    Q.  How is the surplus earned in Kemper's
5  business?
6    A.  Oh, I'm not really an accounting guy, so I
7  don't know if I could give you a detailed answer,
8  but, again --
9      MR. LENDING:  Let me just interject.
10  This I believe is beyond the scope of the 30(B)(6)
11  to the extent that you're asking this witness
12  for --
13      MR. FRENCH:  This is a corporate
14  question.  This relates to the declaration of the
15  dividend.
16  BY MR. FRENCH:
17    Q.  Go ahead.
18    A.  I don't know all the circumstances or
19  mechanisms by which a company earns its surplus,
20  but, again, generally speaking, earned surplus is
21  a similar concept to earnings, and I believe to
22  the extent a company is profitable and it's
23  generating earnings, it's going to contribute to
24  the bottom line or to retained earnings or, in our
25  case, to earned surplus.

12 (Pages 42 to 45)

John McGregor                                                      September 29, 2006
Long Grove, IL

**Page 70**

1  dividend. That was certainly related to Kemper's
2  financial situation.
3  BY MR. FRENCH:
4     Q. We earlier talked about the reason they did
5  not declare a dividend. As I understood it, it
6  was based upon the fact they did not have any
7  earned surplus.
8     Is there an additional part to that story
9  that I haven't heard?
10    A. Well, the fact that there's no earned
11 surplus, that there was no earned surplus at the
12 time, gives rise to the statutory prohibition
13 which I believe weighed into the board's decision,
14 but I think the board's discretion went beyond
15 that, and such that the board concluded I believe
16 that a company in our financial situation just
17 simply should not be declaring or paying
18 dividends.
19    That issue also came up with our regulators
20 who echoed that sentiment, so I believe it goes
21 beyond simply the statutory prohibition.
22    Q. I thought I understood your testimony, and
23 I still think I do, but let's make sure we're on
24 the same page.
25    A. Okay.

**Page 71**

1     Q. Is there any reason Kemper did not declare
2  a dividend in 2002 for DuPont other than its
3  financial problems?
4     A. I think the financial situation of Kemper
5  at the time was the primary driver to the board's
6  decision not to declare or pay dividends.
7     Q. Is there anything else?
8     A. Not that I'm aware of.
9        --    (Whereupon Exhibits 7 and 8 were
10       marked for identification.)
11 BY MR. FRENCH:
12    Q. Sir, can you tell us what Exhibit 7 is?
13    A. It is a letter to producers and
14 policyholders from Kemper dated April 15th, 2005.
15    Q. And is this the letter in which Kemper
16 advised its policyholders that it was not
17 declaring dividends for 2002 and onward?
18    A. No, I don't think so.
19    I think there may have been another letter
20 to that effect with respect to initial dividends
21 because this letter appears to be saying that
22 early in 2003, which is two years earlier,
23 Kemper's board had ceased declaring initial
24 dividends. I recall that there may have been an
25 earlier communication with respect to that

**Page 72**

1  decision back in 2003.
2     Q. What's the purpose of this letter then?
3     A. Well, this letter was meant to address
4  situations in which a dividend redetermination in
5  any given year would result in additional
6  dividends payable to a policyholder, and we were
7  advising policyholders we were looking at
8  that situation as essentially the payment of a
9  dividend, which, again, we couldn't do.
10    I don't believe that when the board first
11 ceased declaring initial dividends on expired
12 policies that it took into account the issue of
13 redeterminations of that dividend many years
14 later, perhaps yielding additional dividend to a
15 policyholder.
16    Q. For like the prior years in other words.
17    A. Yes. So this was a way of communicating to
18 policyholders upfront that that situation may come
19 to light in a particular policy, in a particular
20 adjustment, and we wanted to let policyholders
21 know that we wouldn't be able to pay those
22 dividends either.
23    Q. For the same reasons?
24    A. Same reasons.
25    Q. The financial difficulties of Kemper?

**Page 73**

1     A. Correct.
2     Q. And what's Exhibit 8?
3     A. Exhibit 8 is a portion of the minutes of
4  the Lumbermens board of directors meeting in
5  February 26th, '04.
6     Q. What was redacted?
7     A. Oh, these were board meeting minutes. I
8  don't recall as I sit here, but there probably was
9  a lot of confidential stuff in there not relating
10 in any way to the dividend issue.
11    MR. FRENCH: Counsel, we haven't received
12 a privilege log yet from Kemper. Is that in the
13 works?
14    MR. LENDING: I will check and get back
15 to you.
16 BY MR. FRENCH:
17    Q. So as you sit here today, sir, you're not
18 sure what was on this portion that was redacted?
19    A. I'm not. All I can tell you is that it
20 didn't relate in any way to dividends or the
21 issues in this case.
22    Q. Does this exhibit accurately reflect the
23 board's decision and reasoning behind its decision
24 not to declare dividends for the policies going
25 forward?

19 (Pages 70 to 73)

# D

Westlaw.

**215 ILCS 5/54**

**C**

Formerly cited as IL ST CH 73 ¶ 666

**Effective: [See Text Amendments]**

West's Smith-Hurd Illinois Compiled Statutes Annotated Currentness
   Chapter 215. Insurance (Refs & Annos)
      Act 5. Illinois Insurance Code (Refs & Annos)
       Article III. Domestic Mutual Companies (Refs & Annos)

    → **5/54. Dividends**

§ 54. Dividends. (1) The board of directors or trustees of any company subject to the provisions of this article doing the kind or kinds of insurance business described in Class 1 of section 4 may declare dividends to its members.

(2) The board of directors or trustees of any company subject to the provisions of this article doing any of the kind or kinds of business described in Classes 2 and 3 of section 4 may from time to time fix and determine the amount of dividends or of unabsorbed or unused premiums or premium deposits to be returned to each policyholder, and may for such purpose establish reasonable classifications or groupings of policyholders and plans for the distribution of such refunds upon each general kind of insurance or groups or classes thereof and may establish reasonable territorial divisions upon policies expiring during a fixed period, after retaining sufficient funds for the payment by the company of all outstanding policy and other obligations.

(3) The declaration and payment of dividends by any company subject to the provisions of this article shall be subject to the following conditions:

(a) No dividend shall be declared or paid at any time except out of earned, as distinguished from contributed, surplus, nor when the surplus of the company is less than the surplus required in section 43 for the kind or kinds of insurance the company is authorized to write, nor when the payment of such dividend will reduce its surplus to less than such amount.

(b) No dividend shall be declared or paid contrary to any restriction contained in the articles of incorporation.

CREDIT(S)

Laws 1937, p. 696, § 54. Amended by Laws 1959, p. 635, § 1, eff. July 8, 1959; P.A. 86-753, § 1, eff. Jan. 1, 1990.

FORMER REVISED STATUTES CITATION

**Formerly** Ill.Rev.Stat.1991, ch. 73, ¶ 666.

REPEAL OF ARTICLE

            &lt;For repeal of Article, see note preceding 215 ILCS 5/36.&gt;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# E



STATE OF ILLINOIS
## DEPARTMENT OF INSURANCE
320 WEST WASHINGTON STREET
SPRINGFIELD, ILLINOIS 62767-0001

ROD R. BLAGOJEVICH
GOVERNOR

DEIRDRE K. MANNA
ACTING DIRECTOR

April 13, 2004

**CONFIDENTIAL**

Mr. John K. Conway
General Counsel and Corporate Secretary
Kemper Insurance Companies
One Kemper Drive
Long Grove, Illinois  60049-0001

Re:     Policyholder Dividends

Dear Mr. Conway:

It has come to our attention that there is some question as to whether policyholder dividends are allowed under the existing confidential Corrective Orders.  Please be advised that the Department construes the prior approval provisions of confidential Corrective Order 03-2003 to apply to policyholder dividends.

We understand that the Company's board of directors has rejected all proposed policyholder dividends on expired policies for which no dividends previously have been declared and that the board has expressed its intention to not declare any such dividends during the pendency of the Company's run-off.   This decision obviates the need for the Department's intervention at the present time.

Further, given the Company's financial condition, discretionary dividend payments not only would constitute an unwarranted and inappropriate expense but would, in fact, appear to be precluded by the Illinois Insurance Code.  Moreover, since the payment of policyholder dividends by either Lumbermens or any of its stock subsidiaries will result in a reduction of the surplus of Lumbermens, policyholder dividends by those stock subsidiaries, as well as by Lumbermens, trigger the prohibitions under Section 54(3)(a) of the Illinois Insurance Code

**LEGAL**

APR 1 6 2004

**DEPT.**

http://www.ins.state.il.us

DPT01131

-2-

[215 ILCS 5/54(3)(a)]. The Department, in exercising its authority over Company disbursements, would have neither approved nor sanctioned such payments under these circumstances.

If you have any questions regarding the Department's interpretation on this issue, you may contact me at your convenience.

This letter may be disclosed publicly, in the discretion of the company.

Sincerely,

Jack Messmore
Chief Deputy Director

cc:   J. Pirmann
      J. Rundblom
      T. Lurkins