# EXHIBIT 2

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1979 WL 175245 (Del.Ch.)
**(Cite as: 1979 WL 175245 (Del.Ch.))**

Page 1

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
Claire M. CASCELLA, Plaintiff,
v.
GDV, INC. and CITY INVESTING COMPANY, Defendants.
**No. CIV.A. 5899.**

Submitted: Aug. 8, 1979.
Decided: Sept. 13, 1979.

Irving Morris, Esquire, of Morris and Rosenthal, Wilmington, for the Plaintiff.

James L. Holzman, Esquire, of Prickett, Sanders, Jones, Elliott & Kristol, Wilmington, and John T. Schriver, Esquire, of McDermott, Will & Emery, Chicago, for J. Douglas Streit and Adolph C. Ketzler.

R. Franklin Balotti, Esquire, of Richards, Layton & Finger, Wilmington, and S. Samuel Arsht, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, for the Defendants.

(MEMORANDUM OPINION)

BROWN, Vice Chancellor.

*1 Plaintiff has filed a Rule 37 motion to compel two deposition witnesses to answer certain questions. Upon the advice of their own counsel, the two witnesses have asserted the attorney-client privilege and have refused to answer any question which seeks to probe conversations occurring between them and their counsel at which no third party was present.

The two deposition witnesses, J. Douglas Streit and Adolph C. Ketzler, are directors of the defendant GDV, Inc. ("GDV"). Plaintiff is the owner of 4,800 shares of GDV stock. She has brought suit against GDV and its controlling shareholder, City Investing Company ("City"), in which she seeks to set aside the sale of a motel chain by City, as majority shareholder, to GDV, its subsidiary. Ketzler and Streit are the two members of GDV's board of directors who are not affiliated with City. In other words, they are GDV's outside directors.

As a part of the plan to seek stockholder approval of GDV's acquisition of the motel chain from City, GDV's board, as controlled by City, proposed to designate Streit and Ketzler as an independent committee to investigate the fairness of the acquisition insofar as GDV was concerned, and to make a report and recommendation on behalf of GDV's public shareholders.

Because two previous acquisitions by GDV of assets formerly held by City had resulted in litigation brought by minority shareholders--both of which suits are still unresolved--Streit and Ketzler agreed to accept the assignment only on the condition that they could retain their own attorneys "to advise us on our legal responsibilities in carrying out the assignment." (Streit affidavit). They also requested and were granted leave to retain the Chicago investment banking firm of Donaldson, Lufkin & Jenrette "to assist us in evaluating the proposed acquisition." (Streit affidavit.) The law firm selected by them was the Chicago firm of McDermott, Will & Emery. As I understand it, it was agreed that these legal and investment banking services to be provided Streit and Ketzler as the independent committee would be paid for by GDV.

Streit and Ketzler met with their investment banking firm and their counsel, sometimes together, sometimes separately. (No claim of privilege is asserted as to discussions wherein a member of the investment banking firm participated along with their attorneys.) Along the way, the acquisition price was increased by $10,000,000 and an issuance of preferred stock was substituted for a subordinated promissory note, thus working adjustments in the terms of the acquisition proposal after McDermott, Will & Emery had been retained to advise Streit and Ketzler on their responsibilities in evaluating the proposal on behalf of GDV and its minority shareholders. It also appears that the law firm was responsible for Donaldson, Lufkin & Jenrette being hired as the investment banker for the independent committee.

Subsequently, Streit and Ketzler reported to GDV's board that the terms of the proposed acquisition were fair and reasonable to GDV and its public

Not Reported in A.2d													Page 2
Not Reported in A.2d, 1979 WL 175245 (Del.Ch.)
**(Cite as: 1979 WL 175245 (Del.Ch.))**

shareholders. Thereafter, in materials forwarded to GDV's public shareholders it was stated, among other things, that Streit and Ketzler, as persons having no affiliation with City, had been appointed to evaluate the transaction, and that these gentlemen had recommended to GDV's board that the proposal was fair and reasonable insofar as GDV was concerned. The materials also stated that Streit and Ketzler had engaged the investment banking firm of Donaldson, Lufkin & Jenrette and the law firm of McDermott, Will & Emery "to aid them in their evaluation of the proposed transaction."

*2 Despite this latter assertion contained in the materials disseminated to the public shareholders, Streit and Ketzler now take the position that McDermott, Will & Emery were retained solely for their own personal protection in the event that they should be made defendants in any shareholder lawsuit arising out of the acquisition of the motel chain by GDV. It is their position that they were "concerned about our potential involvement in another lawsuit and we sought legal advice from our independent counsel concerning our duties and obligations in accepting the board's request that we evaluate the proposed transaction," that they neither sought nor obtained from their counsel "any advice regarding the business aspects" of the acquisition, and that the legal advice that they received "was solely for our own information" and was not communicated to anyone else. (Streit affidavit.)

Messrs. Streit and Ketzler have no quarrel with the proposition that business advice rendered by an attorney is not a communication falling within the protection of the attorney-client privilege. **_United States v. Vehicular Parking_, 52 F.Supp. 751 (D.Del.1943)**. Nor do they contest the principle relied upon by the plaintiff that where a corporation seeks advice from legal counsel, and the information relates to the subject of a later suit by a minority shareholder in the corporation, the corporation is not entitled to claim the privilege as against its own shareholder, absent special cause. _Garner v. Wolfinbarger_, 430 F.2d 1093 (5th Cir.1970); _Valente v. Pepsico, Inc._, 68 F.R.D. 361 (D.Del.1975). However, since they aver that they received no business advice, and since they view the _Garner_ exception to the attorney-client privilege to apply only where it is the corporation itself which has sought the advice and where the communication sought to be discovered relates to the subject matter of the subsequently-filed suit, neither of which elements they view to be present here, they view these authorities to be inapplicable.

Accepting their position at face value, I nonetheless have difficulty in accepting the end result that would naturally follow therefrom. In the first place, in the context of the factual setting, it would permit Streit and Ketzler, and their attorneys, to be the sole judge as to whether they were, during private meetings, given business or legal advice concerning the proposed acquisition. The terms of the acquisition changed after counsel was retained. Counsel apparently did sit in with the investment bankers when Streit and Ketzler were presumably receiving business advice from the latter. Moreover, GDV's board advised the public shareholders that the law firm had been engaged to assist them in their evaluation of the fairness of the transaction, and not that the firm had been retained to advise them concerning potential shareholder suits.

Secondly, assuming that their private meetings with counsel dealt only with their personal rights and obligations with a view toward the possibility of ultimately being sued, to uphold the attorney-client privilege as a bar to shareholder inquiry would be to set up a device whereby a majority board could designate persons already owing a fiduciary duty to all shareholders to act for the interests of the minority shareholders in a special capacity under which the latter would be estopped from ascertaining the specific legal standards upon which the action was taken in their behalf. I think this is especially true here when it is remembered that Streit and Ketzler were not compelled to act as the independent committee, but rather that they voluntarily accepted the assignment.

*3 Their position seems to be that because they voluntarily undertook to act as a special, independent committee with a heavy responsibility to the corporation, they are entitled to stand to one side of the transaction much like an independent advisor and thereby have the privity of their discussion with counsel as to potential liability preserved from inquiry by others. I tend to take an opposite view. As directors of GDV they already stood in a fiduciary capacity to the shareholders. _Petty v. Penntech Papers, Inc._, Del.Ch., 347 A.2d 140 (1975); _Lofland v. Cahall_, Del.Ch., 118 A.1 (1922). By voluntarily accepting the assignment to do something more on behalf of the corporation and its minority shareholders, I can hardly see that this fiduciary obligation was lessened or that they were freed from it.

Their admitted purpose in insisting on having counsel of their own while acting in their capacity of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

increased responsibility to the public shareholders was to be advised of their "duties and obligations" in carrying out that responsibility in order that they might be in good stead in the event they were later sued by a public shareholder for anything they might have done in carrying out their assignment. Their counsel were paid by the corporation and their recommendation was made to the entire board of the corporation so that the corporation, in turn, could advise its shareholders that the proposed acquisition of the asset from the majority shareholder was fair and in the best interests of the corporation.

As stated by Chancellor Quillen in *Riggs Nat. Bank of Washington, D.C. v. Zimmer*, Del.Ch., 355 A.2d 709, 713 (1976):
> "Thus the purpose of the attorney-client privilege is to foster the confidence of the client and enable him to communicate without fear in order to seek legal advice. Valente v. Pepsico, Inc., 68 F.R.D. 361, 367 (D.Del.1975). This is indeed important. But courts have noted that the privilege is an exception to the usual rules requiring full disclosure and its scope can be limited where circumstances so justify. United States v. Goldfarb, 328 F.2d 280 (6th Cir.1964); Valente v. Pepsico, Inc., supra, 68 F.R.D. at 367; McCormick on Evidence, 2d Ed., § 89."

This same authority approves the principle that in order for the attorney-client privilege to apply, the *injury* to inure to the attorney-client relationship by the disclosure of the communications must be *greater than the benefit* thereby gained for the correct disposal of the litigation.

Applying this balancing test to the particular facts of this situation, I am of the opinion that the policy behind the attorney-client privilege would not be fostered by upholding its applicability here. In view of the special fiduciary relationship to the corporation and its minority shareholders which Streit and Ketzler agreed to accept, and in view of their acknowledged reason for insisting upon their own counsel to guide them in this endeavor, it is my opinion that they cannot assert the attorney-client privilege against discovery questions which seek to inquire into the actual legal advice they were given, their understanding based thereon as to the legal standards governing their "duties and obligations" in carrying out their assignment on behalf of the corporation, and the nature of their communications with their specially-retained counsel concerning these duties and obligations.

*4 An appropriate form of order may be submitted.

Not Reported in A.2d, 1979 WL 175245 (Del.Ch.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.