

Potter
Anderson
&Corroon LLP

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com

**John E. James**
**Partner**
Attorney at Law
302 984-6018 Direct Phone
302 658-1192 Fax
jjames@potteranderson.com

December 7, 2007

**By CM/ECF and by Hand**

Magistrate Judge Mary Pat Thynge
U. S. District Court for the District of Delaware
844 North King Street
Wilmington, DE 19801

RE:    *E. I. du Pont de Nemours and Company v.*
       *Lumbermens Mutual Casualty Company*
       **D. Del., C.A. No. 05-699-\*\*\***

Dear Judge Thynge:

In accordance with Your Honor's request in the teleconference yesterday in the above-styled matter, I have enclosed the Decision and Order referenced by Mr. French during the discussion of the Delrin claim. Specifically, I have enclosed the Decision by President Judge Vaughn dated July 31, 2006, styled as *E. I. du Pont de Nemours & Company v. Allstate Insurance Company*, C.A. No. 99C-12-253 (JTV) (Del. Super. July 31, 2006). Also, I have enclosed the one-page Order issued by the Delaware Supreme Court dated September 6, 2007, affirming Judge Vaughn's Decision.

If Your Honor has any questions concerning these Decisions, or if Your Honor needs further background material concerning the Superior Court action, I will be happy to address those issues.

Finally, this letter will also confirm that Your Honor will endeavor to schedule a teleconference with counsel and principals for the parties next week on either December 11, 12 or 13, to the extent that such a call can be arranged in view of Your Honor's patent trial next week. We appreciate your courtesy and assistance in that regard.

Respectfully submitted,

John E. James

JEJ/cml
Enclosures
836148/20120-345
cc:    Peter T. Dalleo, Clerk of Court (w/ encs.) (by CM/ECF)
       Randall M. Lending, Esquire (w/ encs.) (by e-mail)
       M. Duncan Grant, Esquire (w/ encs.) (by CM/ECF)
       Christopher C. French, Esquire (w/ encs.) (by e-mail)

EFiled: Jul 31 2006 4:04P
Transaction ID 11936549

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

E. I. du PONT de NEMOURS            )
& COMPANY,                          ) C.A. No.  99C-12-253 JTV
                                    )
              Plaintiff,            )
                                    )
        v.                          )
                                    )
ALLSTATE INSURANCE COMPANY,         )
et al.                              )
                                    )
              Defendants.           )

*Submitted: April 17, 2006*
*Decided: July 31, 2006*

Richard L. Horwitz, Esq. and William R. Denny, Esq., Potter, Anderson & Corroon, Wilmington, Delaware for E.I. du Pont de Nemours & Company.

Brian L. Kasprzak, Esq. and Dawn Courtney Doherty, Esq., Marks, O'Neill, O'Brien & Courtney, P. C., Wilmington, Delaware for Defendants Stonewall Insurance Company.

Louis J. Rizzo, Esq., Reger & Rizzo, Wilmington, Delaware for Defendant Travelers Casualty and Surety Company.

*Upon Consideration of Dupont's  Supplemental Motion For*
*Summary Judgment on Phase One Issues*
**GRANTED**

*Upon Consideration of Defendants Travelers' and Stonewall's*
*Motion for Summary Judgment on Deferred Phase One Issues*
**DENIED**

**VAUGHN, President Judge**

## OPINION

In this civil action, the plaintiff, E.I. du Pont de Nemours & Company ("Dupont") initially sought declaratory relief and money damages against numerous insurance companies from which it purchased excess umbrella liability insurance policies prior to March 1, 1986.[1] It alleged that the defendants were jointly and severally obligated, pursuant to the terms of their respective policies, to indemnify it for liabilities arising from the sale of a product known as Delrin. Delrin was produced by Dupont and used by other companies to make acetal fittings for polybutylene pipe plumbing systems ("PB systems"). As a result of alleged defects in Delrin, Dupont has been subjected to many thousands of claims for damages from owners of residential housing units which were equipped with PB systems.

In a decision dated August 31, 2004, the Court addressed a number of motions for summary judgment.[2] The rulings contained in that decision are summarized hereinafter. The Court now has before it the following motions:

1. Dupont's supplemental Motion for Summary Judgment on Phase One Issues.

2. Defendants Travelers' and Stonewall's Motion for Summary Judgment on Deferred Phase One Issues.

The facts are set forth in the August 31, 2004 decision. They are repeated here and expanded where pertinent to the motions now before the Court.

## FACTS

In 1983 Dupont began manufacturing and selling an acetal resin plastic material known as "Delrin," which was purchased and used by other companies to mold

---

[1] Since the filing of suit, Dupont has entered into settlements with many of the original defendants.

[2] *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 879 A.2d 929 (Del. Super. 2004).

*E.I. du Pont de Nemours and Company v. Allstate Insurance Company, et al.*
C.A. No. 99C-12-253 JTV
July 31, 2006

fittings for polybutylene pipe plumbing systems, which were installed in residential housing units. PB systems were developed by Shell Chemical Company ("Shell"), which made the polybutylene material and sold it to various manufacturing companies that made the plumbing pipes. The original manufacturer of acetal plastic material was Hoechst-Celanese Corporation ("Celanese"), which called its product "Celcon." Between 1978 and 1983, Celanese supplied all of the acetal plastic material for the manufacture of fittings for PB plumbing systems. In 1983, Dupont entered the market with its product, Delrin. Beginning in that year, both Dupont and Celanese sold acetal plastic material to the fitting manufacturers, and both Dupont's Delrin and Celanese's Celcon were used to make fittings that were incorporated into PB systems installed across the country. Dupont manufactured and sold Delrin until 1989. In all, it is estimated that beginning in 1978 and continuing until 1989, PB systems with acetal fittings were installed in millions of homes across the United States and Canada.

In 1987, Dupont received service of its first lawsuit filed on behalf of homeowners seeking damages on account of property damage allegedly caused by defective PB systems. This lawsuit alleged that Dupont, along with Shell, Celanese, and other entities, was liable for damages because PB systems, including their acetal fittings, were inherently defective and caused property damage and loss of use of property. As a result of this lawsuit and several others, Dupont stopped selling Delrin to manufacturers of PB system fittings.

In the ensuing years, Dupont, Shell and Celanese were faced with many lawsuits filed on behalf of homeowners with PB systems. The suits sought compensation for the cost of repair and replacement of the PB plumbing systems, the

3

*E.I. du Pont de Nemours and Company v. Allstate Insurance Company, et al.*
C.A. No. 99C-12-253 JTV
July 31, 2006

cost of repairing water damage to homes caused by leaks in PB plumbing systems, and damages for other problems which the homeowners allegedly experienced as a result of the failure of PB systems.

When used in PB plumbing applications, the acetal material from which the fittings were made experienced degradation. Both Delrin and Celcon acetal fittings are susceptible to chemical attack by elements found in typical household water supplies, such as chlorine, unfavorable pH, and soluble metals.

Thus, when acetal fittings are placed into service in household PB systems and come into contact with water, they begin to degrade. Ultimately, the fittings lose their strength and can no longer contain the water flowing through them – thereby resulting in pipe bursts and leaks.

Delrin and Celcon acetal fittings were used interchangeably by plumbers and other persons installing or repairing PB systems. Once a PB system with acetal fittings was placed into service in a home, it would be very difficult for a person inspecting, repairing or replacing the system to discern whether the acetal fittings in the system were made from Delrin as opposed to Celcon. Acetal fittings incorporated the same design regardless of whether they were made from Delrin or Celcon. Generally, acetal fittings made from Delrin and Celcon had the same physical appearance, including the same color – gray. Only on close inspection under bright lighting could an experienced technician discern the difference between a Delrin fitting and a Delcon fitting by noticing the slightly more translucent appearance of a Delrin fitting, or, in some cases, by reviewing the small trademark of the fitting manufacturer. Morever, when incorporated into a PB system installed in a home, it

4

*E.I. du Pont de Nemours and Company v. Allstate Insurance Company, et al.*
C.A. No. 99C-12-253 JTV
July 31, 2006

is very difficult to distinguish a Delrin fitting from a Celcon fitting because, when installed, these fittings are mostly covered by the PB pipe into which they have been inserted. Moreover, these PB systems are often installed into dark or inaccessible parts of houses, such as behind the wall or above the ceiling, and thus they are difficult to see clearly. In many cases, a plumber that is replacing a home's PB system in response to a homeowner claim will leave part of the PB system remaining in the home and simply bypass it by installing a new copper plumbing system because the PB system is relatively inaccessible and it would be very costly to remove.

Since 1989, Dupont has entered into settlements of approximately 200 lawsuits filed by individual plaintiffs or groups of plaintiffs. These settlements include settlements of lawsuits brought by property owners, as well as settlements of actions brought by fitting manufacturers which were themselves the subject of homeowner claims. Some PB system lawsuits against Dupont are still pending.

In the mid-1990's Dupont, Shell and Celanese entered into negotiations with various claimants' counsel for a national class action settlement of all PB claims. Dupont reached such a class action settlement in an Alabama class action lawsuit captioned *Garria Spencer v. Shell Oil Co.*[3] ("*Spencer*"). This settlement, which was approved in November 1995, provided that Dupont would pay a flat 10% share of the costs borne by homeowners with PB systems with acetal fittings who had replaced their systems.

Shortly after the *Spencer* settlement, Shell and Celanese entered into another

---

[3]  Case No. CV-94-074 (Cir. Ct. Greene County, AL).

5

*E.I. du Pont de Nemours and Company v. Allstate Insurance Company, et al.*
C.A. No. 99C-12-253 JTV
July 31, 2006

national class action settlement in a Tennessee case captioned *Cox v. Shell Oil Co.*[4]
("*Cox*"). Under the *Cox* settlement, which was approved by the court in 1995, Shell
and Celanese agreed to pay for the replacement of PB systems of homeowners who
qualified for relief. Shell and Celanese committed a total of $950 million to fund this
settlement.

Following the *Spencer* and *Cox* national class action settlements, Dupont, Shell
and Celanese entered into an agreement, dated November 17, 1995 (the "1995 Three-
Party Agreement"), under which they agreed to settle the claims asserted against each
other relating to their past costs, and they agreed on funding and payment mechanisms
for the national class action settlements on a going-forward basis.

Under the Agreement, Dupont agreed to pay the 10% share to which it
committed itself in *Spencer* on claims involving PB systems with acetal fittings which
Shell and Celanese were settling in *Cox,* through the *Cox* class action claims facility,
which was known as the Consumer Plumbing Recovery Center ("CPRC").

Under the *Spencer* class action agreement and the 1995 Three-Party Agreement,
Dupont pays 10% of the costs associated with resolving all PB claims involving
acetal fittings made with either Celron or Delrin, rather than only those PB claims that
were proven to involve Delrin acetal fittings. It is the position of Dupont that this
arrangement was practical and reasonable because, *inter alia,* Delrin acetal fittings and
Celcon acetal fittings were used interchangeably in PB systems after 1983, and were
visually indistinguishable. Dupont states, for the reasons given above, that it would

---

[4]   Civ. A. No. 18844 (Ch. Ct. Obion County, TN).

*E.I. du Pont de Nemours and Company v. Allstate Insurance Company, et al.*
C.A. No. 99C-12-253 JTV
July 31, 2006

have been difficult, and very costly, for the CPRC to inspect each fitting in the PB systems of hundreds of thousands of claimants' homes to determine whether the fitting was made of Delrin rather than Celcon. Dupont further states that, in order to save substantial costs of administering the class action settlements, the parties agreed not to attempt to determine whether the fittings in a particular claimant's PB plumbing system were made of Celcon or Delrin or both. As a result, the settling defendants, including DuPont, structured a settlement method that was not based on a claim-by-claim analysis of each defendant's relative responsibility for each claim. Rather, the class action settlement was based on a view of all claims as a whole and on each defendant's relative participation in the PB system market. Both Dupont and Celanese agreed to pay a percentage of the total cost of all claims arising from PB plumbing systems with acetal fittings. Dupont further states that its agreement to pay 10% of the costs of all claims involving acetal fittings avoided the very real litigation risk of a higher percentage of liability being imposed on Dupont at trial or in other resolutions of the claims.

This settlement structure was made known to Dupont's insurers both before and after the date that Dupont entered into these settlements. In addition, the insurers were kept informed by regular status reports and other written notices of Dupont's settlements of claims.

Since the entry into the *Spencer* and *Cox* national class action settlements, Dupont has been regularly providing funds to support the claims facilities established by these settlements. It has also been providing written status reports to the insurers informing them of the amounts expended by Dupont in connection with these

7

*E.I. du Pont de Nemours and Company v. Allstate Insurance Company, et al.*
C.A. No. 99C-12-253 JTV
July 31, 2006

settlements, and informing them of all of its PB-related litigation and settlement activity.

As a result of the hundreds of thousands of PB claims asserted against Dupont, and the related litigation and other costs, Dupont has incurred liabilities currently totaling more than $235,600,000 from its manufacture and sale of Delrin acetal resin for use in making fittings for PB systems as of June 30, 2005. According to Dupont, approximately $74 million of these costs, or 31% of the total, are not associated with any particular claim. They include the following:

| | |
|---|---:|
| Litigation expenses (attorneys' fees, experts, etc.) | $42,234,083 |
| Spencer Class Action Plaintiffs' Counsel Fees | 8,900,000 |
| Spencer Notice Costs - 1995 | 7,788,170 |
| Spencer Notice Costs - 1999 | 2,959,276 |
| Spencer Notice Costs - 2003 | 2,527,425 |
| Spencer Administrative Costs | 4,370,590 |
| Canadian Class action Plaintiffs' Counsel fees | 3,425,961 |
| Canadian Class action Notice Costs | 671,825 |
| Funding for Open MASCO Claims | 378,909 |
| Funding for Open *Cox* Claims | 396,680 |
| Funding for Open *Spencer* Claims | 81,201 |
| Total | $73,733,820 |

A substantial portion of these costs are litigation expenses that include the attorneys' fees of national coordinating defense counsel (a single law firm) and defense counsel in various jurisdictions as well as expert fees, consultant fees and various other litigation expenses. Some of these costs are associated with cases in which the cases were resolved successfully without the payment of any claims.

8

*E.I. du Pont de Nemours and Company v. Allstate Insurance Company, et al.*
C.A. No. 99C-12-253 JTV
July 31, 2006

Another category of these costs are costs of conducting widespread notice campaigns in the *Spencer* national class action and the Canadian national class action. A third category of these costs is payments of plaintiffs' counsel fees in the settlement of the *Spencer* and Canadian national class actions. A fourth category of these costs is administrative costs incurred by Dupont for the operation of the *Spencer* national class action claims facility.

An analysis of the claims in a PB claims database developed and maintained by Dupont shows by year that the percentage of total claims arising from installations of PB systems during each year is as follows:

| | |
|---|---|
| 1983-84 | 8.2% |
| 1984-85 | 17.8% |
| 1985-86 | 18.4% |
| Post-1986 | 56.6% |

From March 1, 1967 forward until today, Dupont has maintained a comprehensive general liability insurance program. For each policy year, there is a "per-occurrence" self-insured retention ("SIR") amount of $50 million and then multiple layers of excess liability insurance providing coverage above the SIR amount. In many cases, each layer of excess coverage in a given policy year is subscribed to by multiple insurance companies. For example, in the March 1, 1983 to March 1, 1984 policy year ("1983 year"), there is a $50 million per occurrence SIR, followed by four layers of excess insurance totaling $145 million of coverage. Each layer of excess coverage is subscribed to by multiple insurers.

Travelers and Stonewall are insurers who issued policies in the 1985 policy

9

*E.I. du Pont de Nemours and Company v. Allstate Insurance Company, et al.*
C.A. No. 99C-12-253 JTV
July 31, 2006

year.

The relevant policy language of all policies for purposes of this litigation is as follows:

The insuring agreement states that:

> Underwriters hereby agree, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay . . . by reason of the liability:-
>
> for damages on account of:-
>
> > (ii)    Property Damage caused by or arising out of each occurrence happening anywhere in the world.

The term, "Property Damage," is defined as follows:

> The term "Property Damage" wherever used herein, means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

The term, "Occurrence," is defined as follows:

> The term "Occurrence" wherever used herein shall mean an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period.  All such

10

*E.I. du Pont de Nemours and Company v. Allstate Insurance Company, et al.*
C.A. No. 99C-12-253 JTV
July 31, 2006

> exposure to substantially the same general conditions
> existing at or emanating from one premises location shall
> be deemed one occurrence. All Personal Injury or Property
> Damage arising out of a common condition in goods or
> products manufactured, sold, handled or distributed by the
> Named Insured shall be deemed one occurrence.

In the course of this litigation, the parties stipulated that:

> With respect to each Claim at issue, physical injury or
> direct damage to, or destruction of, tangible property takes
> place continuously during each policy period from the time
> that each Claimant's System is placed into service in the
> Claimant's Property Unit until the End Date.

The parties reserved for determination in a future litigation phase the question of what constitutes the "End Date." It is also undisputed that the damage, although continuous and progressive, was not uniform from the date of installation to the End Date.

Beginning March 1, 1986 and for the relevant period thereafter, Dupont obtained most of its liability insurance from its Bermuda-based captive insurers, Danube Insurance Ltd. and Wabash Insurance Ltd. (collectively, "Danube"), which in turn were 100% reinsured by Bermuda-based insurers, including X.L. Insurance Company ("XL") and A.C.E. Insurance Company ("ACE"). Like the pre-1986 insurers, Danube, XL and ACE provided liability coverage with a $50 million per-occurrence SIR. The Danube/XL policy provided coverage limits of $75 million in excess of the $50 million SIR. The Danube/ACE policy provided coverage limits of $120 million in excess of the Danube/XL $75 million and the $50 SIR.

In 1996 Dupont and Danube/XL entered into a settlement agreement in which

11

*E.I. du Pont de Nemours and Company v. Allstate Insurance Company, et al.*
C.A. No. 99C-12-253 JTV
July 31, 2006

Danube agreed to pay XL and XL in turn agreed to pay Dupont $67.5 million on account of Delrin coverage claims in exchange for a release of any further coverage responsibility.

In 1998, as Dupont's Delrin liabilities continued to rise significantly, Dupont, Danube and ACE entered into an initial settlement agreement which called for ACE to begin reimbursing Danube (and later its successor, Christiana) once Dupont's PB liabilities reached a threshold amount of $166,666,667. At that point, ACE would begin reimbursing Danube (and later Christiana) 75% of its PB-related liabilities and costs, subject however to a chargeback by ACE of a portion of those amounts under the terms of a concurrently executed Loss Stabilization Agreement.

In 2005, because of certain disagreements that arose between Dupont and Christiana and ACE regarding the operation of the 1998 ACE settlement agreement, the parties negotiated a second settlement agreement. The second settlement agreement resolved various reimbursement issues, terminated the Loss Stablization Agreement and provided, generally, that ACE would reimburse Danube (and, in turn Danube would reimburse Dupont) for 60% of Dupont's ongoing PB liabilities that have been incurred, beginning with the period commencing January 1, 2005. Thus, on a going forward basis, Dupont will receive reimbursement from ACE for 60% of its PB-related costs and liabilities. Pursuant to the two agreements, ACE has reimbursed Dupont the total sum of $41,949,387 on account of Dupont's PB liabilities incurred through the second quarter of 2005.

## PHASE ONE ISSUES

The parties agreed upon phasing of this litigation. The parties' agreement on

12

*E.I. du Pont de Nemours and Company v. Allstate Insurance Company, et al.*
C.A. No. 99C-12-253 JTV
July 31, 2006

phasing the action was approved by the Court in the form of a Case Management Order. As described in the now-operative Second Amended Case Management Order, the Phase One issues were as follows:

      (a)    the appropriate allocation theory (*e.g.*, joint-and-several, pro rata, modified pro rata, etc.) to be utilized in determining any coverage obligation that may be imposed on the insurers who issued policies effective for any year between March 1, 1983 and March 1, 1986 for the underlying polybutylene claims for which Dupont seeks coverage ("the Claims");

      (b)    the manner in which the self-insured retention(s) ("SIR(s)") of any relevant policies will be applied to the Claims;

      (c)    the number of occurrences;

      (d)    the coverage obligations, if any, of each of the policies placed at issue in Dupont's Amended Complaint that were in force from March 1, 1983 to March 1, 1986, with respect to Claims related to installations of polybutylene plumbing systems taking place either prior to March 1, 1983, or after a policy's expiration, subject to the coverage defenses to be litigated in a subsequent phase; and

      (e) the effect of Dupont's submission of claims to, settlements with, and receipt of payments from post-1986 insurers (collectively, "Phase One Issues").

The pertinent rulings on Phase One issues set forth in the August 31, 2004 decision are hereby incorporated by reference. In summary, they were as follows:

<u>Nature of the "occurrence(s)"</u>. The relevant occurrence (or occurrences) is the damage caused by Dupont's product, Delrin. Damage caused by Celcon is not a relevant occurrence under Dupont's policies. Thus, the occurrence arising out of

*E.I. du Pont de Nemours and Company v. Allstate Insurance Company, et al.*
C.A. No. 99C-12-253 JTV
July 31, 2006

Delrin, if it is one occurrence, first occurred, at the earliest, in 1983, when Delrin entered the market, and continued in each year thereafter during which Delrin damage occurred.

Coverage for claims relating to pre-1983 installations. The policies in effect between March 1, 1983 and March 1, 1986 cannot have any liability for damage to PB systems installed before 1983, because Delrin was not in existence on the market before 1983.

Coverage for claims relating to installations after a policy expired. Since the 1983, 1984 and 1985-year policies provide insurance for all sums which Dupont becomes obligated to pay by reason of liability for damages on account of property damage caused by or arising out of an occurrence, and "property damage" is expressly defined as "physical injury to or destruction of tangible property which occurs during the policy period," coverage under a particular year's policy cannot exist for damage to a PB system which undisputed facts show was not installed, and therefore did not exist and could not be damaged, until after the policy year expired.

Allocation where damage to a PB system occurs during two or more policy years. Where damage to a single PB system, which under the parties' stipulation begins with installation and ends with the "End Date," occurs over two or more policy years, the coverage of those years' policies for the damage to that system is joint and several for all the damage to that system.

Application of Self-Insured Retentions. The $50 million SIR of each annual policy must be separately exhausted with claims falling within the scope of that year's coverage. Where insurers for two or more policy years are jointly and severally liable

14

*E.I. du Pont de Nemours and Company v. Allstate Insurance Company, et al.*
C.A. No. 99C-12-253 JTV
July 31, 2006

for the same claims, each year's SIR must be exhausted with separate claims.

Rulings deferred in the August 31, 2004 decision have now been brought forward by the current motions.

## STANDARD OF REVIEW

Summary judgment should be rendered if the record shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[5] The facts must be viewed in the light most favorable to the non-moving party.[6] Summary judgment may not be granted if the record indicates that a material fact is in dispute, or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of the law to the circumstances.[7] However, when the facts permit a reasonable person to draw but one inference, the question becomes one for decision as a matter of law.[8]

## DUPONT'S MOTION

The issues presented by the current motions are as follows:

In its motion, Dupont asks the Court to issue the following rulings:

1. The 1985-year policies are jointly and severally liable, up to their respective limits of liability, for the amount of PB-related liabilities incurred by Dupont that are

---

[5] Superior Court Civil Rule 56(c).

[6] *Guy v. Judicial Nominating Comm'n*, 659 A.2d 777, 780 (Del. Super. 1995) *Figgs v. Bellevue Holding Co.*, 652 A.2d 1084, 1087 (Del. Super. 1994).

[7] *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962).

[8] *Wooten v. Kiger*, 226 A.2d 238 (Del. 1967).

*E.I. du Pont de Nemours and Company v. Allstate Insurance Company, et al.*
C.A. No. 99C-12-253 JTV
July 31, 2006

attributable to claims involving installations taking place during or before the 1985 policy year ("The 1985-year policies' coverage").

    2. The 1985-year policies are jointly and severally liable for the full amount of all Dupont's PB-related liabilities that are not attributable to any particular claims ("Liabilities allegedly not attributable to any particular claims").

    3. Given that Dupont has selected only one policy year for coverage of its PB-related liabilities, i.e., the 1985 year, that it is obligated to bear only one per-occurrence SIR, for $50 million, which is underlying the 1985-year policies ("The $50 million SIR")

    4. All of its PB-related costs and liabilities are deemed to be on account of the sale of its Delrin product and not on account of any other entity's product, and thus coverage for all such costs and liabilities are covered under insurance policies issued to Dupont beginning with the 1983 policy year, when Dupont began selling Delrin in connection with PB plumbing systems ("Delrin v. Celcon").

    5. Its settlements with post-1986 insurers do not negate the coverage obligations of the 1985-year insurers ("the effect of the post-1986 insurance").

## TRAVELERS' AND STONEWALL'S MOTION

    Defendants Travelers and Stonewall oppose Dupont's motion, and in their cross-motion for summary judgment ask the Court to rule on two issues:

    1. The effect of Dupont's submissions of claims to, settlements with and receipt of payments from its post-1986 insurers.

    2. The allocation of certain expenses that Dupont contends cannot be allocated pursuant to this Court's August 31, 2004 decision.

*E.I. du Pont de Nemours and Company v. Allstate Insurance Company, et al.*
C.A. No. 99C-12-253 JTV
July 31, 2006

These two issues correspond with issues five and two, respectively, of Dupont's above-mentioned issues.

### FINDINGS AND CONCLUSIONS

The 1985 year policies' coverage. For the reasons set forth in the August 31, 2004 decision, which I do not believe need to be restated here, I conclude that the 1985-year policies are jointly and severally liable, up to their respective limits of liability, for that amount of PB-related liabilities incurred by Dupont which are attributable to claims involving installations taking place during the 1983, 1984 and 1985 policy years which have an End Date during or after the 1985 policy year.

Delrin v. Celcon. Under its agreement to pay 10% of all PB claims involving acetal fittings made with either Celcon or Delrin, Dupont paid approximately $28.5 million, it appears from the parties' briefs, for claims which arose prior to 1983, when only Celcon was on the market. In my August 31, 2004 decision, I ruled that Dupont could not be liable for any liability arising from Celcon, but I expressed no opinion concerning the issue as to whether Dupont's agreement to pay 10% of all Celcon/Delrin damage exceeded its liability for Delrin damage.

Dupont has explained clearly and convincingly that its agreement to pay 10% of liabilities arising from either product was based upon (1) the fact that the two are, for all intents and purposes, indistinguishable; and (2) an assessment of Delrin's share of the total Celcon/Delrin market. I am therefore persuaded that all of Dupont's PB-related costs and liabilities derive from its product, Delrin, notwithstanding the fact that some payments were made for claims arising from a period during which only Celcon was on the market.

17

*E.I. du Pont de Nemours and Company v. Allstate Insurance Company, et al.*
C.A. No. 99C-12-253 JTV
July 31, 2006

I conclude that there is no genuine issue as to any material fact on this issue, that all of Dupont's PB-related costs and liabilities are on account of the sale of its Delrin product and not on account of any other entity's product, and that coverage for all such costs and liabilities are covered under insurance policies issued to Dupont beginning with the 1983 policy year, when Dupont began selling Delrin in connection with PB plumbing systems.

The effect of the post-1986 insurance. Dupont contends that its settlements with post-1986 insurers have no legal effect upon the pre-1986 insurers, except that Dupont cannot recover more than the total amount of its claims.

Travelers and Stonewall contend that when one accounts for the effect of Dupont's settlements with its post-1986 insurers, it has insufficient claims remaining to reach their insurance coverage for the year 1985. They contend that Dupont has allocated claims to the post-1986 period which, when deducted from the total claims, leave insufficient claims remaining to reach the coverage of the 1985 year. They contend that in order to reach the Danube/ACE coverage, Dupont first had to allocate $50 million of claims to its post-1986 SIR, then $75 million to the Danube/XL coverage, making a subtotal of $125 million of allocated claims. They contend that one must then add to this subtotal the sum of $51 million which Dupont has received or is entitled to receive from Danube/ACE, making a subtotal of $176 million. They contend that this must then be increased by $50 million retention for the 1985 year, making a subtotal of $226 million. They contend that this must be increased by $28,429,448 for amounts paid by Dupont for claims arising before 1983, when Celcon was on the market but Delrin was not. They contend that Dupont can have no claim

18

*E.I. du Pont de Nemours and Company v. Allstate Insurance Company, et al.*
C.A. No. 99C-12-253 JTV
July 31, 2006

against them for this amount because Dupont cannot be liable for claims arising prior to 1983. Adding this figure makes a total of $254,429,448, which exceeds Dupont's total loss. Therefore, they contend, there are no claims left for which they can have any coverage liability.

The last point, the pre-1983 claims, is resolved above in the discussion of Delrin v. Celcon.

The contention that the $50 million SIR of the post-1986 period is relevant to the coverage obligations of the 1985 policies must be rejected. The record shows that 56.6% of the total Delrin claims arise from installations which occurred post-1986. Travelers and Stonewall and the post-1986 insurers are not jointly and severally liable for these 56.6% of claims because they were for damage occurring after Travelers' and Stonewall's policies expired. Travelers and Stonewall have no liability for these claims. The amount of claims payments for which the post-1986 insurers only are liable significantly exceeds the $50 million SIR of the post-1986 policies. Dupont is entitled to have the $50 million SIR for the post-1986 period deemed satisfied from claims that apply only to that period.

I also reject the contention that Travelers and Stonewall should receive a credit or set off in excess of amounts which Dupont has actually received in its settlements with the post-1986 insurers. The settlement agreements which Dupont has made with the post-1986 insurers do not constitute or contain waivers of any claims it has against its 1985 insurers. The fact that Dupont has presented claims to one insurer or even entered into a settlement agreement with respect to claims does not prevent it from pursuing those same claims against another liable insurer until it receives payment.

19

*E.I. du Pont de Nemours and Company v. Allstate Insurance Company, et al.*
C.A. No. 99C-12-253 JTV
July 31, 2006

I agree with Dupont that the settlements have no legal effect upon the obligations of pre-1986 insurers except that Dupont may not recover more than its total claims. Accordingly, at this point their effect is to reduce the total claims which Dupont may assert against the 1985 insurers by approximately $109.5 million, from approximately $235.6 million to approximately $126.1 million.

Therefore, I conclude that the settlements with the post-1986 insurers have no legal effect upon the obligations of the 1983, 1984, or 1985 policy year insurers except that Dupont may not recover more than the total amount of its claims.

<u>Liabilities allegedly not attributable to any particular claims.</u>

Dupont contends that approximately $74 million of liabilities relate to the claims as a whole . They further contend that under the "all sums" language of the polices, all insurers are jointly and severally liable for all of these expenses.

Travelers and Stonewall contend that some of these expenses have been allocated to the post-1986 insurers and cannot be asserted against them. For the reasons set forth above, this contention is rejected. Travelers and Stonewall further contend that Dupont has itself broken these expenses down among claims in its negotiations with the post-1986 insurers. Travelers and Stonewall also contend that these expenses are not indivisible and can be spread proportionately among claims. For example, they contend that plaintiffs' counsel fees in class action suits can be spread proportionately among the respective class members. They perform a similar analysis for other expenses.

The fact that Dupont broke out, or allocated, litigation expenses in negotiations with its post-1986 insurers has no legal effect upon this litigation. That was done

20

*E.I. du Pont de Nemours and Company v. Allstate Insurance Company, et al.*
C.A. No. 99C-12-253 JTV
July 31, 2006

purely for negotiation purposes.

I also conclude that the defendants' contention that these expenses, or some of them, should be spread proportionately among claims, must be rejected. No basis exists on the record of this case to divide the attorneys' fees of national coordinating defense counsel among policy years. In addition, as Dupont points out, many of the class action and other suit costs were incurred in connection with claimants who never received any payment. Some suits were successfully defended. The record does not suggest that the expenses for each claim were the same or necessarily proportional. I am persuaded that attempting to break these expenses down among claims in a principled way would be an impossible task. I therefore agree with Dupont's contention that they are not divisible among policy years. For this reason, I conclude that under the "all sums" language of the polices, all insurers are jointly and severally liable for the litigation expenses.[9]

The $50 million SIR. For the reasons set forth above in connection with the effect of the post-1986 insurance, I conclude, with respect to the 1985 year, that Dupont is obligated to bear only one per-occurrence SIR, for $50 million, which is underlying the 1985-year policies.[10]

For the foregoing reasons, Dupont's supplemental motion for summary

---

[9] The defendants contend that the record is incomplete regarding the costs for funding for open MASCO, *Cox*, and *Spencer* claims and that more discovery must be conducted on these items. However, I am satisfied that sufficient time has been allowed for discovery of phase one issues in this litigation and that an inference can be drawn that they are similar to some of the other expenses making up the $74 million.

[10] I express no opinion concerning the effect of the settlements with pre-1986 insurers.

21

*E.I. du Pont de Nemours and Company v. Allstate Insurance Company, et al.*
C.A. No. 99C-12-253 JTV
July 31, 2006

judgment on phase one issues is *granted* and Travelers' and Stonewall's motion for

summary judgment on deferred phase one issues is *denied*.

      **IT IS SO ORDERED**.

                                              /s/ James T. Vaughn, Jr.
                                                  President Judge

oc:   Prothonotary (by e-File)
cc:   Order Distribution (by e-File)
       Counsel
       File

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY and STONEWALL INSURANCE COMPANY, | ) ) ) ) No. 462, 2006 |

TRAVELERS CASUALTY AND ) No. 462, 2006
SURETY COMPANY and )
STONEWALL INSURANCE )
COMPANY, ) Court Below:  Superior Court
) of the State of Delaware in
    Defendants Below, ) and for New Castle County
    Appellants, )
) C.A. No. 99C-12-253
v. )
)
E.I. DUPONT de NEMOURS & )
COMPANY, )
)
    Plaintiff Below, )
    Appellee. )

Submitted:  July 25, 2007
Decided:  September 6, 2007

Before **STEELE,** Chief Justice**, HOLLAND, BERGER, JACOBS,** Justices and **NOBLE,** Vice Chancellor\* constituting the court *en banc.*

## *O R D E R*

This 7th day of September 2007, upon consideration of the briefs of the parties, and their contentions in oral argument, it appears to the Court that the judgment of the Superior Court should be affirmed on the basis of and for the reasons set forth in its decision dated July 31, 2006.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is **AFFIRMED.**

BY THE COURT:


/s/ Myron T. Steele
Chief Justice

\*Sitting by designation pursuant to Del. Const. Art. IV § 12.